UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **William C. Toth Jr.**; **William J. Hall**; **Howard Gartland**; **James Bognet**; **Aaron Bashir**; **Alan M. Hall**,<br><br>          Plaintiffs,<br><br>v.<br><br>**Leigh M. Chapman**, in her official capacity as Acting Secretary of the Commonwealth; **Jessica Mathis**, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries; **Tom Wolf**, in his official capacity as Governor of Pennsylvania,<br><br>          Defendants | Case No. 1:22-cv-00208-JPW |

## SECOND AMENDED COMPLAINT

The state of Pennsylvania lost a congressional seat in the most recent de-
cennial census. The Pennsylvania legislature must therefore draw a new con-
gressional map for the 2022 elections. Under the U.S. Constitution, the "leg-
islature" in each state is charged with prescribing the "times, places, and man-
ner" of electing Senators and Representatives, although Congress may enact
laws to "make or alter such regulations." *See* U.S. Const. art. I, § 4, cl. 1 ("The

Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."). That means the state legislature must either enact a new congressional map or delegate its map-creation authority to another institution. *See, e.g.*, *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015).

But the Pennsylvania legislature has not yet enacted a congressional map for the 2022 elections. Earlier this year, the Republican-led General Assembly passed a reasonable, non-gerrymandered map that would have created a 9-8 majority of *Democratic*-leaning congressional districts. *See* Exhibit 9 at p. 47 (picture of map); *id.* at p. 211 (¶¶ 78–79). But Governor Wolf vetoed the map, despite its Democratic tilt, complaining that this 9-8 Democratic map was "unfair" and insufficiently "bipartisan."[1] *See Smiley v. Holm*, 285 U.S. 355 (1932) (redistricting legislation that is vetoed by the governor is not "prescribed . . . by the Legislature" within the meaning of the Elections Clause). In the meantime, a group of litigants represented by the Elias Law Group repaired to state court in an effort to induce the Supreme Court of Pennsylvania— which has a 5-2 Democratic majority—to impose a more partisan Democratic congressional map for the 2022 elections. *See* Exhibit 1 (state-court petition); Exhibit 5 (state-court brief in support).

---

1.  Governor Wolf 's veto statement can be found at: https://bit.ly/33WvHW7.

The Elias proposal—also known as the "Carter Plan"—would create a 10-7 majority of Democratic-leaning congressional districts, rather than the 9-8 Democratic majority in the map approved by the General Assembly. *See* Exhibit 5 at p. 24. It would also place two Republican incumbents in the same congressional district, ensuring that at least one incumbent Republican will be eliminated from the state's congressional delegation. *See* Exhibit 9 at p. 195 (¶ 32). The General Assembly's map, by contrast, would have placed a Democratic and a Republican incumbent in a single congressional district, an approach that does not "seek to obtain an unfair partisan advantage through incumbent pairings." Exhibit 9 at p. 210 (¶ 68).

The Supreme Court of Pennsylvania appointed a special master to consider the 13 different congressional maps that had been proposed by litigants and amici in the state-court litigation, including the "Carter Plan" and the map that the General Assembly had approved. The special master recommended that the state supreme court adopt the General Assembly's proposed map for the 2022 elections, which was "subjected to the scrutiny of the people and duly amended." *See* Exhibit 9, p. 216. The special master also commended the Republican-led General Assembly for proposing a Democratic-leaning map, which "underscores its partisan fairness." Exhibit 9, p. 216 (¶ 97). But on February 23, 2022, the state supreme court, in a 4-3 vote, overruled the special master and purported to "adopt" the Carter Plan as the state's congressional map. *See* Exhibit 11. And the state's election officials intend to implement this Carter Plan for the 2022 elections.

But any attempt by the defendants to implement the Carter Plan is flatly unconstitutional. The Elections Clause says that "the Legislature"—not the judiciary—must "prescribe" the manner of electing representatives, and the General Assembly has not adopted or approved the Carter Plan as the state's congressional map. More importantly, the General Assembly has not authorized the state judiciary to draw congressional maps or participate in the redistricting process in any way. The state judiciary must therefore wait for the General Assembly to act. And any attempt by the state judiciary to usurp the legislature's constitutionally assigned role must be disregarded by state officials, who are compelled to honor the Elections Clause over any contrary edicts that might emanate from a state court.

The Carter Plan is unconstitutional for an additional reason: It violates the equal-population rule that the Supreme Court established in *Wesberry v. Sanders*, 376 U.S. 1 (1964). The congressional districts in the Carter Plan contain *two*-person deviations, which is constitutionally impermissible when it remains possible to draw a map that contains no more than one-person deviations among the proposed districts:

***Equal Population:*** Based on the 2020 Census, the ideal population of each congressional district is 764,865. The Carter Plan includes 4 districts with the ideal population and 13 districts with a deviation of plus or minus one person. District-level details are provided in Table 4.

**Table 4: District Population Deviations[5]**

| District | Population | Deviation from Ideal |
|---|---|---|
| 1 | 764866 | 1 |
| 2 | 764865 | 0 |
| 3 | 764864 | -1 |
| 4 | 764865 | 0 |
| 5 | 764866 | 1 |
| 6 | 764864 | -1 |
| 7 | 764865 | 0 |
| 8 | 764866 | 1 |
| 9 | 764864 | -1 |
| 10 | 764864 | -1 |
| 11 | 764864 | -1 |
| 12 | 764864 | -1 |
| 13 | 764864 | -1 |
| 14 | 764866 | 1 |
| 15 | 764864 | -1 |
| 16 | 764865 | 0 |
| 17 | 764864 | -1 |

Exhibit 5, p. 21 *see also* Exhibit 9 at p. 192 (¶ 18) ("[U]nlike the other plans that have a maximum population deviation of one person, the Carter Plan and the House Democratic Plan both result in districts that have a two-person deviation."); *id.* at 195 (¶ 34) (describing the Carter Plan as "contrary to . . . United States Supreme Court precedent."); *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) ("*Wesberry v. Sanders* . . . requires that the State make a good-faith effort to achieve precise mathematical equality."); *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) ("States must draw congressional districts with populations as close to perfect equality as possible."). The map passed by the General Assem-

bly, by contrast, would limit population deviation among congressional districts to no more than one person, consistent with the Supreme Court's equal-population rule:

| District | Final Population | Unchanged Population | Preliminary Distrcts that Remains Unchanged |
|---|---|---|---|
| **Difference between Preliminary Map and Updated Preliminary Map by Population** |
| 1 | 764,865 | 764,865 | 100.00% |
| 2 | 764,865 | 727,974 | 95.18% |
| 3 | 764,865 | 727,974 | 95.18% |
| 4 | 764,865 | 764,865 | 100.00% |
| 5 | 764,865 | 665,110 | 86.96% |
| 6 | 764,865 | 664,660 | 86.90% |
| 7 | 764,864 | 744,414 | 97.33% |
| 8 | 764,864 | 745,298 | 97.44% |
| 9 | 764,864 | 710,269 | 92.86% |
| 10 | 764,865 | 685,726 | 89.65% |
| 11 | 764,865 | 745,299 | 97.44% |
| 12 | 764,865 | 720,103 | 94.15% |
| 13 | 764,864 | 642,606 | 84.02% |
| 14 | 764,865 | 741,290 | 96.92% |
| 15 | 764,864 | 764,864 | 100.00% |
| 16 | 764,865 | 755,133 | 98.73% |
| 17 | 764,865 | 741,290 | 96.92% |
|  |  | Average Same | 95% |

Exhibit 6 at p. 31. So the Carter Plan is unconstitutional coming and going, and it cannot be implemented consistent with the Elections Clause or the equal-population rule from *Wesberry*. The Court should declare the Carter Plan unconstitutional and immediately enjoin its enforcement.

None of this means that Pennsylvania will be unable to conduct elections for its congressional delegation. If the General Assembly fails to enact a new congressional map in time for the 2022 elections, then the remedy is set forth

in 2 U.S.C. § 2a(c): The state's congressional delegation shall be elected at-large:

> Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner: . . . (5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large.

2 U.S.C. § 2a(c). The Elections Clause requires state officials to implement this congressional instruction if the General Assembly fails to enact a new congressional map in time for the 2022 elections. Congress, in enacting 2 U.S.C. § 2a(c)(5), has "ma[de] . . . Regulations" that govern the election of representatives pursuant to its authority under the Elections Clause, and state election officials are constitutionally obligated to follow this congressional command over any contrary instructions that might appear in a state-court ruling.

The notion that the Supreme Court of Pennsylvania can replace the fallback regime that Congress has established in 2 U.S.C. § 2a(c)(5) with a congressional map of its own creation violates the Constitution in at least two respects. First, it usurps the authority that the Elections Clause assigns to the state legislature, because the Elections Clause gives "the Legislature" and not the judiciary the power to "prescribe" the manner of electing representatives. Second, it usurps the authority that the Elections Clause confers upon Congress, because Congress has enacted a statute requiring Pennsylvania's representatives to be elected at large if the General Assembly fails to enact a map in

time for the 2022 elections. The Court should therefore enter declaratory and injunctive relief that enjoins the defendants from implementing or enforcing the Carter Plan. And it should compel the defendants to hold at-large elections for the 2022 Pennsylvania congressional delegation, notwithstanding any ruling that might issue from the Supreme Court of Pennsylvania, unless and until the General Assembly enacts a new congressional map.

## JURISDICTION AND VENUE

1.   The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.   Venue is proper in this district and division because a substantial portion of the events or omissions giving rise to the present claim occurred in this district and division. *See* 28 U.S.C. § 1391(b)(2).

3.   The plaintiffs request a three-judge panel under 28 U.S.C. § 2284(a) because this action is challenging to the constitutionality of the apportionment of congressional districts.

## PARTIES

4.   Plaintiff William C. Toth Jr. is a resident of Columbia County and a registered voter in Pennsylvania.

5.   Plaintiff William J. Hall is a resident of Lycoming County and a registered voter in Pennsylvania.

6.   Plaintiff Howard Gartland is a resident of Delaware County and a registered voter in Pennsylvania.

7.   Plaintiff Jim Bognet is a resident of Luzerne County and a Republican candidate for Congress. He is also a registered voter in Pennsylvania.

8.   Plaintiff Aaron Bashir is a resident of Philadelphia County and a Republican candidate for Congress. He is also a registered voter in Pennsylvania.

9.   Plaintiff Alan M. Hall is resident of Susquehanna County and a member of the Susquehanna Board of Elections. He is also a registered voter in Pennsylvania.

10.   Defendant Leigh M. Chapman is Acting Secretary of the Commonwealth of Pennsylvania. She may be served at 302 North Office Building, 401 North Street Harrisburg, Pennsylvania 17120. Acting Secretary Chapman is sued in her official capacity.

11.   Defendant Jessica Mathis is Director for the Pennsylvania Bureau of Election Services and Notaries. She may be served at 210 North Office Building, 401 North Street Harrisburg, Pennsylvania 17120. Director Mathis is sued in her official capacity.

12.   Defendant Tom Wolf is the governor of Pennsylvania. He may be served at the Office of the Governor, 508 Main Capitol Building, Harrisburg, Pennsylvania 17120. Governor Wolf is sued in his official capacity.

## FACTS

13.   Before the 2020 census, the state of Pennsylvania had 18 seats in the U.S. House of Representatives.

14.   The results of the 2020 census left Pennsylvania with 17 seats in the U.S. House, one fewer than before. *See* U.S. Dept. of Commerce, Table 1. Apportionment Population and Number of Representatives by State: 2020 Census.

15.   Under the Elections Clause of the U.S. Constitution, "the Legislature" of Pennsylvania must prescribe the "manner" by which its representatives are elected, while Congress "may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1; *see also id*. ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."). The powers conferred by the Elections Clause include the prerogative to draw a new congressional map in response to the decennial census.

16.   On August 20, 2021, the census-block results of the 2020 Census were delivered to Governor Wolf and the leaders of the General Assembly, which allowed the legislature to begin the process of drawing a new congressional map.

17.   On December 15, 2021, the House State Government Committee approved a new congressional map (HB 2146), in a 14-11 vote. The General Assembly eventually passed HB 2146, but it was vetoed by Governor Wolf on January 26, 2022.

18.   On December 17, 2021, a group of eighteen voters known as the "Carter petitioners" filed a lawsuit in the Commonwealth Court of Pennsylvania, asking the state judiciary to impose a map for the 2022 congressional elections. *See* Exhibit 1. Later that day, a separate group of twelve voters (the "Gressman petitioners") filed a similar lawsuit in the Commonwealth Court.

19.   The Commonwealth Court of Pennsylvania is the court of original jurisdiction for lawsuits involving the state and its officials.

20.   The Commonwealth Court consolidated the two redistricting cases on December, 20, 2021, and the cases were assigned to Judge Patricia McCullough.

21.   On December 21, 2021, the petitioners in those cases filed an application for extraordinary relief in the Supreme Court of Pennsylvania, asking the state supreme court to exercise extraordinary jurisdiction over the case. *See* Exhibit 2.

22.   The Supreme Court of Pennsylvania has a 5-2 Democratic majority.

23.   On January 10, 2022, the state supreme court declined to invoke its extraordinary jurisdiction and denied the application for extraordinary relief without prejudice. *See* Exhibit 3.

24.   On January 14, 2022, Judge McCullough ordered all parties and intervenors to submit proposed maps and expert reports by January 24, 2022. Judge McCullough also scheduled an evidentiary hearing for January 27 and 28, 2022, and announced that if the General Assembly "has not produced a new congressional map by January 30, 2022, the Court shall proceed to issue an

opinion based on the hearing and evidence presented by the Parties." *See* Exhibit 4.

25.   On January 26, 2022, Governor Wolf vetoed HB 2146, a congressional map that had been approved by the General Assembly.

26.   On January 27 and 28, 2022, Judge McCullough presided over the evidentiary hearings that had been scheduled in her order of January 14, 2022.

27.   On January 29, 2022, the petitioners in the state redistricting lawsuit filed a new "emergency application" with the Supreme Court of Pennsylvania, asking the state supreme court to immediately exercise "extraordinary jurisdiction" and take over the redistricting litigation from Judge McCullough. *See* Exhibit 7.

28.   On February 1, 2022, Judge McCullough announced that her ruling in the redistricting cases will issue no later than February 4, 2022.

29.   On February 2, 2022, before Judge McCullough had issued her ruling, the Pennsylvania Supreme Court granted the application to exercise extraordinary jurisdiction in a 5-2 party-line vote.

30.   The state supreme court's order designated Judge McCullough to serve as its "Special Master," and instructed her to file with the Supreme Court of Pennsylvania, on or before February 7, 2022, "a report containing proposed findings of fact and conclusions of law supporting her recommendation of a redistricting plan from those submitted to the Special Master, along with a proposed revision to the 2022 election schedule/calendar." *See* Exhibit 8.

31.    Justice Mundy and Justice Brobson, both Republicans, dissented from the state supreme court's order granting extraordinary relief and exercising extraordinary jurisdiction.

32.    On February 7, 2022, Judge McCullough issued her findings and recommended that the map approved by the General Assembly (HB 2146) be used as the congressional map. *See* Exhibit 9.

33.    Judge McCullough recommended HB 2146 from among the 13 plans that had been submitted for consideration by the parties and their amici. *See* Exhibit 9 at pp. 44–57 (describing the 13 competing plans and maps).

34.    Judge McCullough rejected the Carter Plan because, among other reasons, it produces districts with a two-person deviation, which is unconstitutional when it remains possible to adopt other maps that contain no more than a one-person deviation. *See* Exhibit 9 at p. 192 (¶ 18) ("[U]nlike the other plans that have a maximum population deviation of one person, the Carter Plan and the House Democratic Plan both result in districts that have a two-person deviation."); *id.* at 195 (¶ 34) (describing the Carter Plan as "contrary to . . . United States Supreme Court precedent."); *id.* at 204 ("[T]his Court does not recommend adopting the Carter Plan for the congressional districts in the Commonwealth of Pennsylvania because . . . it has a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one person deviation"); *see also Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) ("*Wesberry v. Sanders* . . . requires that the State make a good-faith effort to achieve precise mathematical equality.");

*Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) ("States must draw congressional districts with populations as close to perfect equality as possible.").

35.   Judge McCullough also rejected the Carter Plan because it would put two incumbent Republican incumbents into one congressional district:

> [C]ontrary to every other map submitted, the Senate Democratic Caucus 1 Plan and the Carter Plan include two Republican incumbents in one congressional district, which effectively eliminates a Republican from continued representation in the United States House of Representatives. . . . [A]lthough Pennsylvania has already lost one congressional seat as a result of decreased population, the Senate Democratic Caucus 1 Plan and the Carter Plan, in effect, seek to preemptively purge a Republican Congressman from the 17 seats that . . . remain available for office.").

Exhibit 9 at p. 195 (¶ 32–33); *see also id.* at pp. 204–05 ("[T]his Court does not recommend adopting the Carter Plan for the congressional districts in the Commonwealth of Pennsylvania because . . . without any explicit or apparent justification, it pairs two Republican incumbents in one congressional district and effectively eliminates a Republican from continued representation in the United States House of Representatives").

36.   And Judge McCullough also found that the Carter Plan "provides a partisan advantage to the Democratic party in contravention to the natural state of political voting behavior and bias towards Republicans in Pennsylvania." Exhibit 9 at p. 205.

37.   In recommending HB 2146 as the state's congressional map, Judge McCullough acknowledged that the imposition of a court-selected map would

"effectively usurp the role and function of the law-making bodies of this Commonwealth." Exhibit 9 at p. 206 (¶ 49).

38.   Judge McCollough also found that HB 2146 would result in "9 Democratic-leaning seats and 8 Republican-leaning seats," despite the fact that the Republican majority in the General Assembly had developed and proposed that plan. *See* Exhibit 9 at p. 211 (¶¶ 78–79); *id.* at 211 at ¶ 79 ("Unlike other maps that leaned Democrat, here, it is the Republican majority in the General Assembly that developed and proposed a plan, HB 2146, that favors Democrats, which ultimately underscores the partisan fairness of the plan.").

39.   The Supreme Court of Pennsylvania allowed any party or intervenor to file exceptions to Judge McCullough's findings and recommendations by February 14, 2022, and the state supreme court scheduled oral argument for February 18, 2022.

40.   On February 9, 2022, the Supreme Court of Pennsylvania issued an order sua sponte that purports to "suspend" the General Primary Election calendar codified in 25 Pa. Stat. §§ 2868 and 2873. *See* Exhibit 10. No litigant had asked the state supreme court to suspend the primary-election calendar or issue an order purporting to do so.

41.   On February 23, 2022, the Supreme Court of Pennsylvania entered an order that purports to "adopt" the Carter Plan for the 2022 elections. *See* Exhibit 11. Three justices dissented from the decision to adopt the Carter plan. *See id.*

42.   The state supreme court's order instructs state election officials to "prepare textual language that describes the Carter Plan and submit the same to the Secretary of the Commonwealth without delay," and to "publish notice of the Congressional Districts in the Pennsylvania Bulletin." Exhibit 11.

43.   The state supreme court also "modified" the statutory deadlines in General Primary Election calendar to accommodate its decision to impose the Carter Plan for the 2022 congressional elections, and it commanded that its "modified" schedule "shall be implemented by the Secretary of the Commonwealth and all election officers within the Commonwealth." *Id.* It also directed the Secretary of the Commonwealth to "notify this Court by 4:00 P.M. on February 25, 2022, should it foresee any technical issues." Exhibit 11.

44.   The defendants intend to implement the Carter Plan for the 2022 congressional elections, in defiance of the Elections Clause, 2 U.S.C. § 2a(c)(5), and the equal-population rule of *Wesberry v. Sanders*, 376 U.S. 1 (1964).

## PENNSYLVANIA'S ELECTION LAWS

45.   A candidate who wishes to appear on the primary ballot in Pennsylvania must file a nomination petition signed by members of his party who are registered voters. *See* 25 Pa. Stat. §§ 2867.

46.   Candidates for the U.S. House of Representatives in Pennsylvania must obtain 1,000 signatures from registered voters in the Commonwealth at large. *See* 25 Pa. Stat. §§ 2872.1(12).

47.   The statutes governing Pennsylvania elections provide that the first day that candidates may begin circulating nominating petitions is February 15, 2022. The final day to obtain signatures is March 8, 2022.

48.   The state supreme court's order of February 9, 2022, purported to "suspend" the General Primary Election calendar, so that candidates were unable to begin circulating nominating petitions on February 15, 2022.

49.   The state supreme court's order of February 23, 2022, purports to modify these statutory deadlines by declaring that the first day to circulate and file nomination petitions shall be February 25, 2022, rather than February 15, 2022, and that the last day to circulate and file nomination petitions shall be March 15, 2022, rather than March 8, 2022. *See* Exhibit 11 at p. 3.

50.   The statutes governing Pennsylvania elections require the state's primary elections to be held on May 17, 2022.

51.   The state supreme court's order of February 23, 2022, does not attempt to change the date of the state's primary election, even though it attempts to alter the deadlines for circulating and filing nominating petitions.

## FACTS RELATED TO STANDING

52.   Each of the six plaintiffs is a registered voter in Pennsylvania, and each of them is suffering injury in fact from the defendants' implementation of the unconstitutional Carter Plan and their refusal to hold at-large elections for the state's congressional delegation, as required by the Elections Clause and 2 U.S.C. § 2a(c)(5).

53.   Under 2 U.S.C. § 2a(c), the plaintiffs are entitled to cast ballots for all 17 of the state's representatives in the U.S. House if the General Assembly fails to enact a new congressional map in time for the 2022 elections. The defendants are depriving each of the plaintiffs of their entitlement to vote in all 17 congressional races by refusing to hold at-large elections as required by 2 U.S.C. § 2a(c)(5). This injury is traceable to the allegedly unlawful conduct of the named defendants, who are violating the Elections Clause and 2 U.S.C. § 2a(c)(5) by implementing the Carter Plan for the 2022 congressional elections. And it will be redressed by an injunction that halts the implementation of the Carter plan and requires the defendants to conduct at-large elections for Pennsylvania's congressional delegation unless and until the General Assembly enacts a new congressional map.

54.   Plaintiff Gartland is suffering additional injury in fact from the Carter Plan's violation of the equal-population rule. Plaintiff Gartland resides and will vote in the Carter Plan's 5th congressional district, and his vote will carry less weight because the population of his district has been overweighted in violation of the Constitution's equal-population rule. *See* Exhibit 5, p. 21; Gartland Decl. (attached as Exhibit 14). This injury is traceable to the allegedly unlawful conduct of the named defendants, who are violating *Wesberry v. Sanders* by implementing the Carter Plan for the 2022 congressional elections. And it will be redressed by an injunction that halts the implementation of the Carter Plan and requires the defendants to conduct at-large elections for Pennsylvania's

congressional delegation unless and until the General Assembly enacts a new congressional map.

55.   Plaintiff Bashir is suffering additional injury in fact because the Carter plan is forcing him to run in a congressional district with a massive Democratic voter-registration advantage, rather than in a statewide at-large election where the number of Democratic and Republican voters are more evenly split. *See* Bashir Decl. ¶ 4 (attached as Exhibit 10). This injury is traceable to the allegedly unlawful conduct of the named defendants, who are violating the Elections Clause and 2 U.S.C. § 2a(c)(5) by implementing the Carter Plan for the 2022 congressional elections. And it will be redressed by an injunction that halts the implementation of the Carter plan and requires the defendants to conduct at-large elections for Pennsylvania's congressional delegation unless and until the General Assembly enacts a new congressional map.

56.   Plaintiffs Bognet and Bashir are suffering additional injuries in fact because the defendants' implementation of the unconstitutional Carter Plan and their refusal to honor the Elections Clause and 2 U.S.C. § 2a(c)(5) is leaving plaintiffs Bognet and Bashir uncertain of how they should campaign for a seat in the U.S. House of Representatives. The primary election is only three months away, and the defendants' implementation of a patently unconstitutional congressional map creates a substantial risk that a federal court or the Supreme Court of the United States will declare the map unlawful after they have spent time and resources campaigning in the court-drawn congressional

districts. *See* Bashir Decl. ¶ 5 (attached as Exhibit 12). This cloud of legal uncertainty over the court-drawn map inflicts additional injury in fact by making it difficult for Mr. Bashir and Mr. Bognet to raise money from donors to finance their campaigns. *See* Bashir Decl. ¶ 6–8 (attached as Exhibit 10). This injury is traceable to the allegedly unlawful conduct of the named defendants, who are violating the Elections Clause and 2 U.S.C. § 2a(c)(5) by implementing the Carter Plan for the 2022 congressional elections. And it will be redressed by an injunction that halts the implementation of the Carter plan and requires the defendants to conduct at-large elections for Pennsylvania's congressional delegation unless and until the General Assembly enacts a new congressional map.

57.    Plaintiff Alan M. Hall is suffering additional injuries in fact in his capacity as a member of the Susquehanna County Board of Elections. The defendants' implementation of the Carter Plan will force Mr. Hall to conduct an election under an unconstitutional map, in contravention of Mr. Hall's oath of office. In addition, the state supreme court's unilateral "revisions" to the statutorily mandated primary election calendar will force Mr. Hall to depart from the General Primary Calendar that the legislature enacted, in violation of the U.S. Constitution and in contravention of Mr. Hall's oath to obey the Constitution. These injuries are traceable to the allegedly unlawful conduct of the named defendants, who are violating the Elections Clause and 2 U.S.C. § 2a(c)(5) by implementing the Carter Plan for the 2022 congressional elections. And it will be redressed by an injunction that halts the implementation

of the Carter plan and requires the defendants to conduct at-large elections for Pennsylvania's congressional delegation unless and until the General Assembly enacts a new congressional map.

58.   Plaintiff Hall is also suffering injury in fact from the defendants' decision to implement the "revised" General Primary Calendar decreed by the state supreme court. Because the state supreme court extended the deadline for circulating and filing nomination petitions by seven days, Mr. Hall does not expect to have a certified list of candidates until March 29, 2022—seven days later than would be expected under the calendar prescribed by the Legislature. *See* Hall Decl. ¶ 7 (attached as Exhibit 12). Yet under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Mr. Hall's office must send ballots to overseas military members at least 45 days before the primary election. *See* 52 U.S.C. § 20302(a)(8)(A). That deadline falls on April 2, 2022, a Saturday. So the defendants' departure from the legislatively enacted calendar leaves Mr. Hall and his colleagues with only one or two days to prepare and mail overseas military absentee ballots given the deadline established in UOCAVA. *See* Hall Decl. ¶ 8 (attached as Exhibit 12). This injury is traceable to the allegedly unlawful conduct of the named defendants, who are violating the Elections Clause by departing from the General Primary Calendar that the Pennsylvania legislature enacted. And it will be redressed by an injunction that enjoins the defendants from departing from the General Primary Calendar.

## CLAIM #1: THE DEFENDANTS' IMPLEMENTATION OF THE CARTER PLAN VIOLATES THE ELECTIONS CLAUSE AND 2 U.S.C. § 2a(c)(5)

59.   The Elections Clause provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. 1, § 4, cl. 1 (emphasis added).

60.   The Elections Clause forbids the defendants to implement the Carter Plan because it has not been "prescribed" by "the Legislature" of Pennsylvania. The Supreme Court of Pennsylvania is not part of "the Legislature," and the General Assembly has not delegated any of its map-drawing powers to the state judiciary or authorized the state courts to involve themselves in the re-districting process in any way.

61.   The Elections Clause also forbids the defendants to defy the requirements of 2 U.S.C. § 2a(c)(5), which requires Pennsylvania to hold at-large elections if the General Assembly fails to enact a new congressional map in time for the 2022 primary. *See* U.S. Const. art. 1, § 4, cl. 1 (allowing Congress to "make or alter" regulations for electing representatives). The Supreme Court of Pennsylvania is constitutionally forbidden to replace the fallback regime that Congress has established in 2 U.S.C. § 2a(c)(5) with a court-drawn

map—and the state's election officials are constitutionally obligated to implement 2 U.S.C. § 2a(c)(5) over any contrary command that might emanate from the state judiciary.

62.   The Court should therefore declare the Carter Plan unconstitutional and enjoin the defendants from enforcing or implementing it. The Court should also enter an injunction that requires the defendants to hold at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map.

63.   The plaintiffs bring these claims under 42 U.S.C. § 1983, the Declaratory Judgment Act, and any implied rights of action that might exist under the Constitution of the United States or any election-related statute enacted by Congress.

## CLAIM #2: THE DEFENDANTS' DEPARTURE FROM THE GENERAL PRIMARY CALENDAR VIOLATES THE ELECTIONS CLAUSE

64.  The Elections Clause provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. 1, § 4, cl. 1 (emphasis added).

65.   The Elections Clause forbids the defendants to depart from the General Primary Calendar that has been "prescribed" by "the Legislature" of Pennsylvania to govern the state's congressional and senatorial elections.

66.   The Court should declare that the defendants must adhere to the General Primary Calendar when conducting elections for the U.S. House and Senate, and it should enjoin the defendants from departing from that legislatively enacted primary calendar unless and until that calendar is modified or altered by the Pennsylvania legislature.

67.   The plaintiffs bring these claims under 42 U.S.C. § 1983, the Declaratory Judgment Act, and any implied rights of action that might exist under the Constitution of the United States or any election-related statute enacted by Congress.

## CLAIM #3: THE CARTER PLAN VIOLATES THE EQUAL-POPOULATION RULE OF WESBERRY V. SANDERS

68.   The Constitution requires states to establish congressional districts of equal population. *See Wesberry v. Sanders*, 376 U.S. 1 (1964). This equal-population rule compels states to "draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016).

69.   The Carter Plan, however, produces congressional districts with a two-person deviation, even though 11 of the 13 plans that were proposed to the state supreme court had population deviations of no more than one person. *See* Exhibit 9 at p. 192 (¶ 18) ("[U]nlike the other plans that have a maximum population deviation of one person, the Carter Plan and the House Democratic Plan both result in districts that have a two-person deviation.").

70.  A two-person population deviation is constitutionally impermissible when it is possible to draw congressional districts with exactly equal populations or with population deviations of no more than one. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969); *Karcher v. Daggett*, 462 U.S. 725, 730–31 (1983); *Evenwel*, 578 U.S. at 59 ("States must draw congressional districts with populations as close to perfect equality as possible.").

71.  The special master appointed by the Supreme Court of Pennsylvania rejected the Carter Plan for precisely this reason. *See* Exhibit 9 at 195 (¶ 34) (describing the Carter Plan as "contrary to . . . United States Supreme Court precedent."); *id.* at 204 ("[T]his Court does not recommend adopting the Carter Plan for the congressional districts in the Commonwealth of Pennsylvania because . . . it has a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one person deviation").

72.  The Supreme Court of Pennsylvania, however, overruled the special master and "adopted" the Carter Plan despite its incompatibility with the equal-population rule—and despite the fact that the other competing maps complied with the Supreme Court's equal-population edicts by ensuring a population deviation of no more than one person.

73.  The Court should declare the Carter Plan unconstitutional because it violates the equal-population rule of *Wesberry v. Sanders*, and it should enjoin the defendants from implementing or enforcing the Carter Plan.

74. The plaintiffs bring these claims under 42 U.S.C. § 1983, the Declaratory Judgment Act, and any implied rights of action that might exist under the Constitution of the United States or any election-related statute enacted by Congress.

## DEMAND FOR RELIEF

75. The plaintiffs respectfully request that the court:

    a.    declare that the Carter Plan violates the Elections Clause and 2 U.S.C. § 2a(c)(5);

    b.    declare that the Elections Clause compels the defendants to adhere to the General Primary Calendar enacted by the Pennsylvania legislature when conducting elections for the U.S. House and Senate;

    c.    declare that the Carter Plan violates the equal-population rule of *Wesberry v. Sanders*;

    d.    declare that the Elections Clause and 2 U.S.C. § 2a(c)(5) require the defendants to hold at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map;

    e.    enter a preliminary and permanent injunction that: (1) restrains the defendants from implementing or enforcing the Carter Plan; (2) restrains the defendants from departing from the General Primary Calendar enacted by the Pennsylvania legislature when conducting elections for the U.S. House and Senate; and

(3) compels the defendants to hold at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map;

f.     award the plaintiffs costs and attorneys' fees under 42 U.S.C. § 1988;

g.     grant all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL

WALTER S. ZIMOLONG III
Pennsylvania Bar No. 89151
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: February 26, 2022

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 26, 2022, I filed this document on CM/ECF, which will effectuate service upon the following counsel of record:

ROBERT A. WIYGUL
CARY L. RICE
JOHN B. HILL
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103-6933
(215) 568-6200
rwiygul@hangley.com
crice@hangley.com
jhill@hangley.com

JOSHUA A. MATZ
Kaplan, Hecker & Fink
1050 K Street NW, Suite 1040
Washington, DC 20001
(929) 294-2537
jmatz@kaplanhecker.com

*Counsel for Defendants*

ABHA KHANNA
LALITHA D. MADDURI
JYOTI JASRASARIA
TINA Y. MENG
Elias Law Group LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law
lmadduri@elias.law
jjasrasaria@elias.law
tmeng@elias.law

ELIZABETH WINGFIELD
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
(215) 665-8500 (phone)
(215) 864-8999 (fax)
wingfielde@ballardspahr.com

*Counsel for Proposed Intervenors*

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*