# Exhibit B

Received 12/27/2021 4:22:48 PM Supreme Court Middle District

Filed 12/27/2021 4:22:00 PM Supreme Court Middle District
141 MM 2021

# IN THE SUPREME COURT OF PENNSYLVANIA

---

No. 141 MM 2021

---

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

---

No. 142 MM 2021

---

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela A. Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

---

**OPPOSITION OF PROPOSED INTERVENORS BRYAN CUTLER, SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; KERRY BENNINGHOFF, MAJORITY LEADER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JAKE CORMAN, PRESIDENT PRO TEMPORE OF THE PENNSYLVANIA SENATE; AND KIM WARD, MAJORITY LEADER OF THE PENNSYLVANIA SENATE TO PETITIONERS' APPLICATIONS FOR EXERCISE OF EXTRAORDINARY RELIEF OR KING'S BENCH POWER**

**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Proposed Intervenors Jake Corman, President Pro Tempore of the Pennsylvania Senate, and Kim Ward, Majority Leader of the Pennsylvania Senate*

**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

*\* Pro Hac Vice application forthcoming*

*Counsel for Proposed Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives*

2

Neither set of Petitioners meets the "heavy burden" of justifying the exercise of extraordinary jurisdiction here. *Wash. Cty. Comm'rs v. Pa. Lab. Rels. Bd.*, 490 Pa. 526, 532, 417 A.2d 164, 167 (1980). Most of the issues in these matters are not difficult and do not call for this Court's review, at least in this posture.

There is no dispute that the Commonwealth's existing congressional district plan cannot be used in future elections. And, although there is still time for the General Assembly and the Governor to reach an accord and enact a new congressional redistricting plan, the Commonwealth Court, in its order of December 20, 2021, has ordered judicial redistricting proceedings.  Based on that order, the Commonwealth Court has implicitly concluded that the process has advanced to a stage where judicial redistricting proceedings are appropriate even though the General Assembly has "the primary responsibility and authority for drawing federal congressional legislative districts."[1] *League of Women Voters v. Commonwealth*, 645 Pa. 1, 129, 178 A.3d 737, 821 (2018). No matter which court adjudicates this case, it will have little or no difficulty enjoining the existing plan or ordering the commencement of remedial proceedings. That issue is not of "immediate public importance." 42 Pa. Stat. and Cons. Stat. § 726.

---

[1] The Commonwealth's political actors continue to work toward a legislative solution. If these efforts succeed, the resulting legislation would set the congressional districts for future elections by operation of law, regardless of how far judicial proceedings have advanced and even if they have yielded a final judgment.

What *may* prove difficult and important is reviewing proposed plans and fashioning a remedy. Although Petitioners make these remedial proceedings the focus of their applications, they ignore institutional interests and competencies that counsel in favor of the familiar two-step process of trial-court adjudication and appellate review. And they inexplicably ask this Court to adopt a new redistricting plan without evidentiary proceedings or an opportunity for public input. A judicial redistricting process, like a legislative redistricting process, should be fact- and labor-intensive and involve opportunities for input and proposals, adversarial proceedings to establish facts germane to those proposals, and evidentiary hearings and submissions to ascertain an acceptable and lawful redistricting solution. In the prior impasse case that Petitioners cite, *Mellow v. Mitchell*, 530 Pa. 44, 607 A.2d 204 (1992), a full evidentiary record was developed and trial proceedings were conducted before this Court adopted congressional redistricting remedies. The Commonwealth Court is the best-situated institution to conduct evidentiary proceedings, and this Court is the best-situated institution to review that court's judgment.

The applications for extraordinary review fail to establish, or even address, why extraordinary review is preferable to that familiar process, appropriately expedited. They should be denied. Alternatively, even if this Court exercises extraordi-

nary jurisdiction, it should provide for evidentiary proceedings and reject Petitioners' request to select a new redistricting plan solely on the basis of legal briefs and lawyers' arguments, without the benefit of a full vetting that the process deserves.

## BACKGROUND

After each decennial census, "States must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). In Pennsylvania, "the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." *League of Women Voters*, 645 Pa. at 129, 178 A.3d at 821. However, it is not contested in this case that, "[w]hen . . . the legislature is unable or chooses not to act, it becomes the judiciary's role to determine the appropriate redistricting plan."[2] *League of Women Voters*, 645 Pa. at 130, 178 A.3d at 822.

---

[2] Officers of the General Assembly have argued in prior litigation, including the *League of Women Voters* case, that the "Elections Clause" of Article I, section 4 of the U.S. Constitution forecloses state courts from enforcing *state* law against an act of the state's legislature, or at least imposes limitations when they do so. The difference here is that the current congressional plan contravenes the U.S. Constitution, and it is settled law that state courts have authority to declare and remedy violations of the U.S. Constitution, even with respect to laws governing congressional elections. *See Growe v. Emison*, 507 U.S. 25, 32–36 (1993). Proposed Intervenors do not dispute that the Pennsylvania courts have the authority to adjudicate Petitioners' claims for violations of the U.S. Constitution or other federal laws, and it appears that the state-law issues they raise implicate standards that duplicate federal standards.

The relevant facts of this case are not in dispute. Pennsylvania's existing congressional plan was fashioned by this Court in 2018 based upon the 2010 census results. *League of Women Voters*, 645 Pa. 576, 583, 181 A.3d 1083, 1087 (2018) (finding that the adopted plan achieved "equality of population"); *see also Carter* Petition ¶ 18 (alleging that the Court's adopted plan was "based on the 2010 data"); *Gressman* Petition ¶ 2 (same).

The 2020 census results have since been released, both in the form of initial apportionment results at the level of each state and later in the form of census-block level population data suitable for redistricting *within* states. *Carter* Petition ¶¶ 19, 27; *Gressman* Petition ¶¶ 26–27. The results show, among other things, that Pennsylvania's population has increased; that it has not increased sufficiently to keep pace with neighboring states; that Pennsylvania must lose one congressional seat, dropping from 18 to 17 seats; and that the existing districting plan—aside from being improperly crafted to yield 18 seats rather than 17—is malapportioned. *Carter* Petition ¶¶ 19–28; *Gressman* Petition ¶¶ 26–27. It is therefore undisputed that redistricting is essential for the Commonwealth to fulfill the Equal Protection Clause's guarantee of "one person, one vote." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964).

The two Petitions for Review commencing these suits were filed in the Commonwealth Court on December 17, 2021. In each case, Petitioners allege that they

reside in underpopulated districts, and they assert that, without a new, properly apportioned redistricting plan, their votes will be diluted in future elections. *Carter* Petition ¶¶ 9, 49–63; *Gressman* Petition ¶¶ 10–22, 34–52. Although Proposed Intervenors do not have sufficient information to verify Petitioners' factual assertions (such as their residencies), at the end of the day, Proposed Intervenors do not dispute the basic notion that the Commonwealth cannot use the existing congressional districting plan in 2022 elections for the simple reason that the Commonwealth cannot elect an 18-member delegation to the next Congress since it has only been apportioned 17 seats in that Congress. Nor do Proposed Intervenors disagree with the principle that the U.S. Constitution requires equally apportioned districts.

Proposed Intervenors are officers of the Pennsylvania Senate and House of Representatives who have authorization from members of the Republican Caucuses of those bodies, who possess sufficient votes to pass legislation, to seek intervention on their behalf in this suit. Proposed Intervenors have worked together with other legislators in good faith to develop a congressional redistricting plan that complies with the law and that the General Assembly could pass and present to the Governor. Although a plan has not yet been enacted, Proposed Intervenors will continue to take this approach to the work.  The legislative process will continue, but Proposed In-

tervenors acknowledge that the Commonwealth Court has ordered the commence-
ment of a judicial redistricting process, and Proposed Intervenors do not intend to
file preliminary objections in either action.[3]

The Commonwealth Court quickly processed the Petitions, issued a schedul-
ing order, called for petitions to intervene, and otherwise prepared to proceed expe-
ditiously to resolve this case by early February. Although both sets of Petitioners
criticize this schedule as insufficiently expedited, they did not move the Common-
wealth Court to amend it.

Instead, Petitioners filed applications for extraordinary review in this Court,
seeking to bypass the Commonwealth Court. They have proposed a scheduling order
that would call for presentation of proposed plans and briefing regarding those plans,
but no discovery or evidentiary hearings. *See Carter* Application 11; *Gressman* Ap-
plication 22. Proposed Intervenors, meanwhile, petitioned the Commonwealth Court
to intervene. Given the time-sensitive nature of this case, they are simultaneously
filing this brief in opposition to the applications for extraordinary review, to provide
the Court with adversarial briefing on those applications.

---

[3] As the *Carter* Petitioners recount, they filed similar claims months *before* usable
redistricting data were even released, and the Commonwealth Court correctly sus-
tained preliminary objections to their original petition for review, concluding that
the suit was premature and unripe. The *Carter* Petitioners did not appeal that judg-
ment.

## ARGUMENT

This case does not fall within the narrow and exceptional circumstances meriting a departure from the ordinary two-stage judicial process of trial court adjudication and appellate review. Quite the opposite.  Under current conditions, it is both preferable and feasible to adhere to that traditional process, albeit on an expedited basis.

To qualify for extraordinary review, a case must raise "an issue of immediate public importance." 42 Pa. Stat. and Cons. Stat. Ann. § 726. "This court's exercise of extraordinary jurisdiction should be used sparingly." *Commonwealth v. Morris*, 565 Pa. 1, 18, 771 A.2d 721, 731 (2001); *accord Wash. Cty.*, 490 Pa. at 532, 417 A.2d at 167. To begin, Petitioners must establish both that there is a heightened public interest in the issues at hand and that the ordinary litigation process is insufficient to timely remedy alleged violations of their rights. *Bd. of Revision of Taxes, City of Phila. v. City of Philadelphia*, 607 Pa. 104, 122, 4 A.3d 610, 620 (2010); *see also Carter* Application 7; *Gressman* Application 8–9. Furthermore, "[t]he presence of an issue of immediate public importance is not alone sufficient to justify extraordinary relief. As in requests for writs of prohibition and mandamus, we will not invoke extraordinary jurisdiction unless the record clearly demonstrates a petitioner's rights." *Cty. of Berks ex rel. Baldwin v. Pennsylvania Lab. Rels. Bd.*, 544 Pa. 541,

549, 678 A.2d 355, 359 (1996) (citation omitted). "Even a clear showing that a petitioner is aggrieved does not assure that this Court will exercise its discretion to grant the requested relief." *Id.* This standard is not met here.

**A.    These Matters Present Fact-Intensive Questions That Do Not Meet The High Standards For Extraordinary Jurisdiction**

Most of the issues in these cases are not difficult or important within the meaning of the extraordinary-jurisdiction standard, and those that *may* prove to be so are fact-intensive and not amenable to clean resolution as a matter of law.

First, the liability issues are governed by clearly established law such that no serious contest is likely to arise. Issues that qualify under the "public importance" test include those as to which this Court should "provide guidance" because they are "likely to recur," *Morris*, 565 Pa. at 18, 771 A.2d at 731, and those that remain unresolved and concern a variety of state instrumentalities and citizens, *Bd. of Revision of Taxes*, 607 Pa. at 122, 4 A.3d at 620. But these cases raise no issues that are unresolved or are "likely to recur." Rather, they present a "garden variety" dispute, *id.*, in the sense that there is no basis even to contest the governing legal principles or their application. *See Carter* Application 7 ("[T]can be no dispute that continuation of the status quo is unconstitutional."); *Gressman* Application 1 ("The current map's malapportionment violates the Pennsylvania Constitution."). As the U.S. Supreme Court has explained, the one-person, one-vote rule is "easily administrable" because judges are able "to decide whether a violation has occurred (and to remedy

8

it) essentially on the basis of three readily determined factors—where the plaintiff lives, how many voters are in his district, and how many voters are in other districts." *Vieth v. Jubelirer*, 541 U.S. 267, 290 (2004) (plurality opinion). There is no dispute here that the Commonwealth's congressional districts are malapportioned, and there is unlikely to be a genuine dispute over where Petitioners reside. That portion of the case, at least, does not present "an issue of immediate public importance." 42 Pa. Stat. and Cons. Stat. § 726.

Second, the issues that *may* rise to the level of public importance fail to qualify under independent elements of the extraordinary-review test. As noted, this Court "will not invoke extraordinary jurisdiction unless the record clearly demonstrates a petitioner's rights." *Cty. of Berks*, 544 Pa. at 549, 678 A.2d at 359 (citation omitted). As to any difficult and important issue, this record does not do so. The challenge in an impasse case lies in selecting a remedial districting plan. In that regard, Petitioners cannot show that the record clearly demonstrates their rights. There are infinite ways to divide the Commonwealth into 17 equally populated congressional districts, and Petitioners cannot establish a clear right to their preferred choice among numerous options. Neither set of Petitioners has even proposed a plan at this stage. The tribunal that adjudicates the facts of this case will be obliged to entertain competing proposals, take evidence, make factual findings, and make discretionary choices in fashioning a remedy. This situation is the opposite of one where "there is no factual

dispute," and the matter of public importance raises an issue "of law, resolvable on the pleadings." *Bd. of Revision of Taxes*, 607 Pa. at 122–23, 4 A.3d at 621. It is a poor fit for this Court's extraordinary jurisdiction.

### B.   There Is Time for an Expedited Proceeding in the Commonwealth Court and Review in This Court

Petitioners are incorrect that proceedings in the Commonwealth Court "will be insufficient to timely remedy Petitioners' rights." *Carter* Application 8; *see also Gressman* Application 21–22 ("[T]he schedule established by the Commonwealth Court would effectively deny the parties any opportunity to appeal that Court's judgment to this Court[.]"). Although proceedings undoubtedly must be expedited to ensure time for administration of any remedial plan, recent experience indicates that there is time for both trial and appellate proceedings here. Just three years ago, in the *League of Women Voters* litigation, this Court issued a liability ruling on January 22, 2018—after a full trial in the Commonwealth Court—and a remedial ruling on February 19, 2018. *League of Women Voters of Pa. v. Commonwealth*, 644 Pa. 287, 175 A.3d 282 (2018); *League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 576, 181 A.3d 1083 (2018). In *Mellow v. Mitchell*, 530 Pa. 44, 607 A.2d 204 (1992), a final ruling came even later, on March 26 of 1992—which was an election year.

There is no indication that implementing remedies in either instance posed any administrative challenge.[4]

The Commonwealth Court is positioned to proceed on an expedited basis and issue a judgment in early February, which would permit review in this Court by the middle of February, achieve the *League of Women Voters* schedule, and outpace the *Mellow* schedule. Indeed, in *Mellow*, an order was issued providing that a court-selected plan would be imposed "if the Legislature failed to act by February 11, 1992." *Id.* at 47, 607 A.2d at 205. Here, the Commonwealth Court set a more restrictive deadline of January 31, 2022. Furthermore, it is more important to take a few extra weeks to ensure that a suitable plan is adopted to govern the Commonwealth's congressional elections for the next decade than to rush the process. But, if the Court perceives things differently, the appropriate remedy would be to direct the Commonwealth Court to expedite its proceedings beyond what it has already done. Yet Petitioners did not move the Commonwealth Court to amend its scheduling order.

---

[4] Petitioners rely on prior assertions by the Department of State that January 24 is the deadline for a new plan, but they do not cite statutory authority for that proposition, and no one has explained why the dates that were found sufficient in *League of Women Voters* and *Mellow* are unworkable here.

**C.    These Cases Cannot Be Resolved Without Evidentiary Hearings, and Petitioners Fail To Explain How Extraordinary Review Is Preferable to Appellate Review**

The applications contend that this Court may, through extraordinary review, bring this case to final judgment more expeditiously than adjudication in the Commonwealth Court followed by an appeal to this Court. But Petitioners ignore that, in all events, a two-step process is essential, because the fact-intensive issues of redistricting require a lengthy evidentiary hearing. The applications fail to explain why the familiar two-step process, appropriately expedited, is inferior to folding those two steps into one extraordinary review process. No reason is apparent and consolidating the entire process before this Court could lead to distrust of the process.

The two cases Petitioners rely on, *Mellow* and *League of Women Voters*, confirm the fact-intensive nature of the issues at hand and the necessity of evidentiary proceedings. Petitioners cite these cases for the proposition that they "are not asking this Court to do something it has not done before." *Carter* Application 9; *see also Gressman* Application 5. But they *are*, in fact, making such a request, at least insofar as they request that a new plan be imposed without evidentiary proceedings and process for public input. *See id.* at 11; *Gressman* Application 22.

Both of the cases that Petitioners cite were decided after extensive evidentiary proceedings. In *Mellow*, the Court assigned a judge of the Commonwealth Court "as Master to conduct hearings" and issue a "report," and, as a result, "three days of

12

hearings" were conducted "in the Commonwealth Court," 607 A.2d at 206, resulting in a "Factual Analysis" subject to review in this Court, *id.* at 215. In *League of Women Voters*, this Court addressed remedial issues only after a liability trial had occurred in the Commonwealth Court (the case concerned "partisan gerrymandering," not a decennial impasse), and this Court's remedial ruling made it clear that "[t]he Remedial Plan is based upon the record developed in the Commonwealth Court." *League of Women Voters*, 645 Pa. at 583, 181 A.3d at 1087. Here, however, Petitioners ask this Court to adopt a remedy (i.e., a new congressional redistricting plan that will be in place for the next decade) without evidentiary proceedings, either in the Commonwealth Court or this Court. Essentially, Petitioners request that this Court act as the map drawer and also the appellate court that reviews the legality of the adopted map. At a minimum, *this* request is untenable, unprecedented, and meritless.

To be sure, the *Mellow* decision signals that it is possible for this Court to exercise extraordinary jurisdiction in an impasse case and resolve evidentiary matters by resort to hearings before a special master (presumably, a Commonwealth Court judge) rather than through appellate review of a Commonwealth Court judgment. Although taking that approach is an *option*, the Court should decline to do so here. The difference between the options in terms of time to finality is marginal at most, since both options would entail the two steps of (1) evidentiary hearings in the

13

Commonwealth Court—whether before a "master" or a "judge"—and (2) subsequent briefing and argument in this Court.

And the Court's interest in "promot[ing] confidence in the authority and integrity of our state and local institutions," *Bd. of Revision of Taxes*, 607 Pa. at 122, 4 A.3d at 620, cuts in favor of respecting the traditional judicial process (on an expedited basis). On this point, it would be preferable for this Court to permit the Commonwealth Court to take evidence and issue findings and a judgment and, subsequently, exercise review as an appellate tribunal than to issue all findings itself after *de novo* review of a special master's report. The former path would create two layers of review over the issues in this case and therefore afford disappointed litigants, and the public, recourse to an oversight process, which would highlight the integrity and fairness of the proceedings. Those values are essential to public faith in a redistricting process. By comparison, in an extraordinary-review process, the public would see this Court issue findings of fact and adopt a remedy and simultaneously declare those findings sound and the remedy lawful, leaving no room for additional oversight and review, except in the event of a colorable violation of federal law. Because it is almost certain that *someone* is bound to complain of any redistricting plan

adopted in any jurisdiction under any circumstances, interests of public confidence weigh against this approach.[5]

Denying the applications would also "conserve judicial resources," *Morris*, 565 Pa. at 18, 771 A.2d at 731, by limiting this Court's adjudication to those issues raised by the parties on appeal, after issues are narrowed in the Commonwealth Court. This approach would facilitate the narrowing of issues through trial-level litigation and the weeding out of issues that ultimately prove not to be material or worthy of this Court's review. By contrast, folding both steps of adjudication into one process would, with or without a special master, make this Court responsible for resolving all disputes in the first instance, regardless of how material and difficult they prove to be.

Because Petitioners fail to acknowledge the need for evidentiary hearings, they are in no position to explain why evidentiary proceedings before a special master of the Commonwealth Court are preferable to evidentiary proceedings before a judge of the Commonwealth Court. And none is apparent. The *Mellow* decision did not address this question and appears not to have considered it. Therefore, contrary to what Petitioners suggest, it should not be read to establish that impasse cases must

---

[5] One need not doubt the good faith of members of this Court to see that a process of oversight through ordinary appellate review enhances the appearance of fairness, due process, and integrity—which are all values underpinning the *League of Women Voters* decisions.

automatically be resolved in this Court's extraordinary jurisdiction. This is a differently composed Court, acting 30 years after *Mellow*, and is of course free to exercise its discretion in a different way, based on current circumstances and considerations.

## CONCLUSION

The applications should be denied. Alternatively, if this Court exercises extraordinary jurisdiction, it should adopt a scheduling order that provides for public evidentiary proceedings directed through an appointed special master.

Dated: December 27, 2021

Respectfully submitted,

/s/ Anthony R. Holtzman
**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Proposed Intervenors Jake Corman, President Pro Tempore of the Pennsylvania Senate, and Kim Ward, Majority Leader of the Pennsylvania Senate*

/s/ Jeffry Duffy
**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

*\* Pro Hac Vice application forthcoming*

*Counsel for Proposed Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives*

17

## CERTIFICATION OF COMPLIANCE

I hereby certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.


/s/ Anthony R. Holtzman
Anthony R. Holtzman

# CERTIFICATE OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service by PACFile eService as follows:**

All counsel of record

Date: December 27, 2021          /s/ Anthony R. Holtzman
                                 Anthony R. Holtzman