UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

**William C. Toth Jr.**, et al.

Plaintiffs,

v.

**Leigh M. Chapman**, et al.,

Defendants

Case No. 1:22-cv-00208-JPW-KAJ-PS

**RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

The defendants present numerous arguments that have nothing to do with jurisdiction or justiciability, even though the defendants' motion is styled as a Rule 12(b)(1) motion and insists that it is addressing "only justiciability arguments concerning Plaintiffs' Elections Clause claims." Defs.' Br., ECF No. 61, at 1 n.1. The alleged absence of a cause of action is not a jurisdictional objection,[1] laches is an affirmative defense (rather than a jurisdictional obstacle),[2] and the *Purcell* doctrine merely restricts the courts' remedial powers on the eve of an election. The plaintiffs will nevertheless address each of the arguments presented, without conceding that these non-jurisdictional arguments have any place in a Rule 12(b)(1) motion. If the Court wishes to rule on these issues, it should construe the defendant's filing as a motion to dismiss under both Rule 12(b)(1) and 12(b)(6). *See* Fed. R. Civ. P. 12(g)(1) (allowing joiner of Rule 12(b)(1) and 12(b)(6) motions).

## RESPONSE TO BACKGROUND SECTIONS

The "background" portion of the defendants' and intervenors' briefs include false statements of fact and law. The defendants, for example, claim that "[w]hen the political branches are unable to agree, 'it becomes the judiciary's role to ensure a valid districting scheme.'" Defs.' Br., ECF No. 61, at 2 (quoting *League of Women Voters of Pennsylvania v. Commonwealth*, 645 Pa. 576, 582 n.6 (2018)). That is untrue.

---

1. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998) ("'[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case.").

2. *See* Fed. R. Civ. P. 8(c)(1).

When the political branches are unable to agree, the remedy is set forth in 2 U.S.C.

§ 2a(c):

> Until a State is redistricted in the manner provided by the law thereof
> after any apportionment, the Representatives to which such State is en-
> titled under such apportionment shall be elected in the following man-
> ner: (1) If there is no change in the number of Representatives, they shall
> be elected from the districts then prescribed by the law of such State,
> and if any of them are elected from the State at large they shall continue
> to be so elected; (2) if there is an increase in the number of Representa-
> tives, such additional Representative or Representatives shall be elected
> from the State at large and the other Representatives from the districts
> then prescribed by the law of such State; (3) if there is a decrease in the
> number of Representatives but the number of districts in such State is
> equal to such decreased number of Representatives, they shall be
> elected from the districts then prescribed by the law of such State; (4)
> if there is a decrease in the number of Representatives but the number
> of districts in such State is less than such number of Representatives,
> the number of Representatives by which such number of districts is ex-
> ceeded shall be elected from the State at large and the other Represent-
> atives from the districts then prescribed by the law of such State; or (5)
> if there is a decrease in the number of Representatives and the number
> of districts in such State exceeds such decreased number of Represent-
> atives, they shall be elected from the State at large.

2 U.S.C. § 2a(c). Of course, the requirements of 2 U.S.C. § 2a(c)(1) and (2) will often

result in a malapportioned congressional map, which the judiciary must remedy if

the political branches fail to do so. *See Wesberry v. Sanders*, 376 U.S. 1 (1964); *Growe

v. Emison*, 507 U.S. 25 (1993). And the at-large elections requirement in 2 U.S.C.

§ 2a(c)(5) will present issues under the single-member district requirement of 2

U.S.C. § 2c, which courts may remedy so long as there is time to impose a court-

created map of single-member districts without disrupting the election process. *See*

*Branch v. Smith*, 538 U.S. 254, 275 (2003) (plurality opinion of Scalia, J.). But there is no freestanding authority for the Pennsylvania judiciary to draw a congressional map in response to a legislative impasse. The fallback regime is specified in 2 U.S.C. § 2a(c), and the judiciary's role is limited to correcting constitutional defects or violations of federal law that result from implementing the relevant provision of 2 U.S.C. § 2a(c). The following chart illustrates the judiciary's role:

|  | **State Gains Seat(s)** | **No change** | **State Loses Seat(s)** |
|---|---|---|---|
| Requirement of 2 U.S.C. § 2a(c) if an impasse occurs | Use old map; elect new representatives at large. *See* 2 U.S.C. § 2a(c)(1). | Use old map. *See* 2 U.S.C. § 2a(c)(2). | Elect all representatives at large. *See* 2 U.S.C. § 2a(c)(5). |
| Legality? | Unconstitutional under *Wesberry*. | Unconstitutional under *Wesberry*. | Violates 2 U.S.C. § 2c. |
| Can state judiciary remedy? | Yes. *See Growe v. Emison*, 507 U.S. 25 (1993). | Yes. *See Growe v. Emison*, 507 U.S. 25 (1993). | Yes, but only if there is time to impose a new map without disrupting the election process. *See Branch v. Smith*, 538 U.S. 254, 274–75 (2003) (plurality opinion of Scalia, J.) |
| How should state judiciary remedy? | Fix malapportionment problem, while deviating as little as possible from previous map | Fix malapportionment problem, while deviating as little as possible from previous map | Impose a new map, while following the "policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature." *Branch*, 538 U.S. at 274 (plurality opinion of Scalia, J.) |

The defendants tout statements from the leaders of the state legislature that "expressly endorsed" the state judiciary's authority to impose a map and alter the General Primary Calendar that had been imposed by statute. *See* Defs.' Br., ECF No. 61, at 4. But it is the Court's job to decide whether the defendants are acting in conformity with the Elections Clause and 2 U.S.C. § 2a(c), and there is no *Chevron* deference accorded to the leaders of a state legislative body. More importantly, the brief submitted by the state's legislative leaders is wrong to claim that the Supreme Court of Pennsylvania acted to "'remedy violations of the U.S. Constitution.'" Defs.' Br., ECF No. 61 (citation omitted). The state's old congressional map became extinct when the President transmitted the new census and apportionment data to Congress,[3] and federal law required Pennsylvania to hold at-large elections until the state had been "redistricted in the manner provided by the law thereof." 2 U.S.C. § 2a(c). The requirement to hold at-large elections under 2 U.S.C. § 2a(c)(5) presents no constitutional problems under *Wesberry*, so there was no role for the state judiciary to play in remedying "violations of the U.S. Constitution." The state judiciary was acting only to remedy the violation of 2 U.S.C. § 2c that would arise if the state failed to enact a map, thereby triggering the at-large election provision of 2 U.S.C. § 2a(c)(5).

The intervenors are likewise wrong to claim that their state-court lawsuit was brought "to declare the 2108 congressional map unconstitutional." Intervenors' Br., ECF No. 59, at 4. The 2018 map no longer existed when the intervenors sued in

---

3. *See* 2 U.S.C. § 2a(a); 2 U.S.C. § 2a(c).

December 2021. *See* 2 U.S.C. § 2a(c)(5). The *only* basis on which the state judiciary could have intervened was to prevent the violation of 2 U.S.C. § 2c that would result from at-large elections. *See Branch v. Smith*, 538 U.S. 254, 274–75 (2003) (plurality opinion of Scalia, J.). But the judiciary's role in enforcing 2 U.S.C. § 2c is limited. A court may impose a map under 2 U.S.C. § 2c only if it can do so "without disrupting the election process." *Id.* at 275 (plurality opinion of Scalia, J.). And when a court imposes a map under 2 U.S.C. § 2c, it "must follow the 'policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature,' except, of course, when 'adherence to state policy . . . detract[s] from the requirements of the Federal Constitution.'" *Id.* at 274–75 (plurality opinion of Scalia, J.) (quoting *White v. Weiser,* 412 U.S. 783, 795 (1973)). The intervenors want to pretend as though that the state judiciary was remedying a malapportionment problem with the no-longer-in-existence 2018 map, in an effort to free the state court from the constraints of *Branch* and to defend the imposition of the "Carter Plan"—which hews closely to the court-imposed map from 2018 rather than the "the reapportionment plans proposed by the state legislature." *Branch*, 538 U.S. at 274 (plurality opinion of Scalia, J.).

## I. The Defendants' And Intervenors' Standing Objections Are Meritless

The defendants and intervenors raise numerous attacks on the plaintiffs' standing to assert their Elections Clause claim, none of which have merit.

### A. Each Of The Plaintiffs Has Standing As A Voter To Challenge The Defendants' Refusal Hold At-Large Elections, As Required By The Elections Clause And 2 U.S.C. § 2a(c)(5)

The plaintiffs allege that the defendants' refusal to conduct at-large elections is depriving them of their right to vote in all 17 of the state's congressional races. *See* Second Amended Complaint, ECF No. 49, at ¶ 53. That assuredly constitutes a "concrete and particularized" injury sufficient to confer standing:

> We have long recognized that a person's right to vote is "individual and personal in nature." *Reynolds v. Sims,* 377 U.S. 533, 561 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage.

*Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Iowa Voter Alliance v. Black Hawk County*, 515 F. Supp. 3d 980, 990 (N.D. Iowa 2021) ("[T]here is no doubt that the right to vote is sacrosanct and that any burdens on that right are, in general, judicially cognizable injuries." (citing *Gill*, 138 S. Ct. at 1929)).

The defendants and intervenors claim that the plaintiffs are asserting a mere "generalized grievance" under *Lance v. Coffman*, 549 U.S. 437 (2007). But the plaintiffs in *Lance* failed to allege *any* injury caused by the alleged failure to comply with the Elections Clause:

> The *only injury plaintiffs allege* is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we

> have found standing. See, *e.g., Baker v. Carr,* 369 U.S. 186, 207–208
> (1962). *Because plaintiffs assert no particularized stake in the litigation*, we
> hold that they lack standing to bring their Elections Clause claim.

*Id.* at 442 (emphasis added). The plaintiffs in this case, by contrast, are alleging that

the defendants' violation of the Elections Clause (and 2 U.S.C. § 2a(c)(5)) is depriv-

ing them of their right to vote in 16 of the 17 state congressional races. That is far

more than a "generalized grievance" that the law has not been followed. It explains

*how* the defendants' failure to follow the law is inflicting Article III injury on the

plaintiffs—something that the plaintiffs in *Lance* (and the plaintiffs in *Bognet v. Sec-*

*retary Commonwealth of Pennsylvania*, 980 F.3d 336 (3d Cir. 2020)) failed to do.

The defendants and intervenors also claim the denial of the plaintiffs' right to

vote in all 17 congressional races is a "generalized grievance" because a similar injury

is inflicted on every voter in the Commonwealth. *See* Defs.' Br., ECF No. 61, at 8

(claiming that the plaintiffs' injuries "would be a generalized grievance, since every

voter in Pennsylvania could claim to be equally aggrieved"); Intervenors' Br., ECF

No. 59, at 12 ("Any purported deprivation of rights, if it exists, is felt by all Pennsyl-

vania voters equally, and Plaintiffs thus lack standing."). That is not the definition of

a "generalized grievance." The fact that an injury is widely shared does not make an

injury nonjusticiable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016) ("The

fact that an injury may be suffered by a large number of people does not of itself make

that injury a nonjusticiable generalized grievance. The victims' injuries from a mass

tort, for example, are widely shared, to be sure, but each individual suffers a particu-

larized harm."). A generalized grievance arises when a plaintiff alleges "*nothing more*

*than* an abstract and generalized harm to a citizen's interest in the proper application

of the law." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (emphasis added). As the Supreme Court has explained:

> [A] grievance that amounts to *nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law* does not count as an 'injury in fact.' And it consequently does not show standing. *Hollingsworth, supra,* at 706, 133 S. Ct. 2652; *see also Lance* v. *Coffman*, 549 U.S. 437, 439–441 (2007) (*per curiam*) (describing this Court's "lengthy pedigree" in refusing to serve as a forum for generalized grievances).

*Id.* at 498–99 (emphasis added). That is not the situation here. The defendants' alleged violations of the law are inflicting injury in fact on the plaintiffs by depriving them of their right to vote in all 17 congressional races. That other voters are equally or similarly burdened does not convert the plaintiffs' claim into a "generalized grievance." *See Spokeo*, 578 U.S. at 339 n.7.

## B. Plaintiffs Bashir And Bognet Have Standing As Congressional Candidates

The defendants claim that the uncertainty inflicted on Bashir's and Bognet's campaigns fails to qualify as "certainly impending" injury under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). *See* Defs.' Br., ECF No. 61, at 9–10. But the defendants are conflating the uncertainty of a future judicial decision with the immediate, present-day impact on the plaintiffs' campaigns. The particular outcome of a future judicial decision may or may not qualify as "certainly impending" under *Clapper*, but the present-day uncertainty affecting the plaintiffs' campaigns, and the uncertainty surrounding whether they should campaign in one location or another, is not a future

or "impending" injury at all. It is an immediate injury that the plaintiffs are suffering *now*.

The defendants and intervenors also complain that the alleged fundraising injuries depend on the independent actions of third parties not before the Court. *See* Defs.' Br., ECF No. 61, at 10–11; *See* Intervenors' Br., ECF No. 59, at 13–14. But the Supreme Court has made clear that the plaintiff may establish standing by relying on the "predictable effect of Government action on the decisions of third parties." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *see also id.* ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."). The plaintiffs have alleged that the defendants' actions will hinder their fundraising efforts, and that factual allegation *must* be assumed true at this stage of the litigation. *See Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true."). Whether this actually is a "predictable effect" of the defendants' actions is a factual question to be resolved on summary judgment or at trial, not at the motion-to-dismiss stage. *See Department of Commerce*, 139 S. Ct. at 2566 (deferring to the district court's factfinding on the "predictable effect" question).

The intervenors complain that the "uncertainty" inflicted on Bashir's and Bognet's campaigns is a self-inflicted harm caused by their own lawsuit,[4] but that is

---

4. *See* Intervenors' Br., ECF No. 59, at 12–13.

wrong. The remaining plaintiffs in this case would have challenged the defendants' actions regardless of whether Bashir and Bognet had sued, and the standing of those plaintiffs to sue in their capacity as voters is undeniable. *See supra* at pp. at 6–8. So these uncertainty harms would have befallen Bashir's and Bognet's campaigns regardless of whether they had sued, and the Court cannot use the self-inflicted harm doctrine to defeat their standing.

Finally, plaintiff Bashir is assuredly suffering injury in fact from being forced to run in an overwhelmingly Democratic district rather than statewide. The defendants and intervenors deny that a candidate for office has standing to challenge the makeup or boundaries of the district in which he intends to run, but that is untenable. The injury-in-fact test requires nothing more than an "identifiable trifle," *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973), and courts have long permitted candidates for office to sue over redistricting decisions that adversely affect their election prospects. *See, e.g.*, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 475 (2006) (Stevens, J., concurring) ("[T]o have standing to challenge a district as an unconstitutional partisan gerry-mander, a plaintiff would have to prove that he is either a candidate or a voter who resided in a district that was changed by a new districting plan."). The defendants and intervenors complain that a candidate or representative lacks a "legally cogniza-ble interest" in the composition of his district, but whether an interest is *legally* pro-tected goes to the merits, not standing. *See Cottrell v. Alcon Laboratories*, 874 F.3d 154, 164 (3d Cir. 2017); *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) ("[A] plaintiff can have standing . . . even though the interest would not be protected

by the law in that case"). The injury-in-fact test asks only whether a plaintiff has been affected in a concrete and particularized way by the defendants' actions, and a congressional candidate who is forced to run in a less favorable district easily satisfies that test. *Corman v. Torres*, 287 F. Supp. 3d 558, 569–70 (M.D. Pa. 2018), failed to apply the injury-in-fact test and asked instead whether a legislator has a "legally cognizable interest in the composition of the district he or she represents"—an inquiry that wrongfully conflates a merits-based question with Article III standing analysis.

### C. Plaintiff Alan M. Hall Has Standing As A Member Of The Susquehanna County Board Of Elections

Plaintiff Alan Hall has standing because the defendants' actions are forcing him to administer elections in violation of the Constitution and compressing his window of time to prepare and send overseas military ballots as required by federal law. The defendants deny that Mr. Hall can establish standing based on his claim that the defendants are compelling him to act unlawfully, but the Supreme Court endorsed this theory of standing in *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236 (1968), as the defendants acknowledge in their brief. *See id.* at 241 n.5 ("Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation."); Defs.' Br., ECF No. 61, at 13–14 (acknowledging *Allen* in a "but see" citation).

The defendants want this Court to disregard *Allen* in favor of lower-court decisions that take a more skeptical view of oath-of-office standing. *See* Defs.' Br., ECF No. 61, at 13. But even those decisions hold only that the alleged violation of one's oath—standing alone—is insufficient to confer standing. *See, e.g.*, *Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) ("[T]he violation of one's oath *alone* is an insufficient injury to support standing.") (emphasis added); *City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 236, 237 (9th Cir. 1980) ("Apart from the highly speculative potential exposure to civil liability which we discuss infra, the councilmembers will lose nothing by enforcing the CTRPA's ordinances save an abstract measure of constitutional principle. No consequences, save those of conscience self-imposed by the councilmembers' personal beliefs, flow from the violation of the oath in performance of a statutory duty."). Mr. Hall is alleging more than the mere violation of his oath. He is alleging that the defendants' actions are not only forcing him to violate the law but *also* compressing his window of time for preparing and mailing overseas military ballots. Neither the defendants nor the intervenors acknowledges or discusses this additional injury.

### D. The Defendants' Causation-And-Redressability Objections Are Meritless

The defendants argue that the plaintiffs have failed to plead causation and redressability because (according to the defendants) the plaintiffs are not entitled to at-large elections under *Branch v. Smith*, 538 U.S. 254 (2003). That goes to the merits and has nothing to do with standing. The standing inquiry is not concerned with whether the plaintiffs are *legally entitled* to the relief that they request. Instead, a

Court is to assume that the plaintiffs will prevail on the merits, and ask whether the *requested* relief will redress the plaintiffs' injuries. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) ("[T]he relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed *by a favorable decision*." (emphasis added)); *Larson v. Valente,* 456 U.S. 228, 244, n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that *a favorable decision* will relieve a discrete injury to himself."). A "favorable decision" from this Court will result in at-large elections and a restoration of the statutory General Primary Calendar that the state supreme court suspended and modified. Neither the defendants nor the intervenors deny that this requested relief will remedy the alleged injuries that the defendants are inflicting on the plaintiffs.

For what it's worth, the defendants are also wrong to claim that *Branch* rejected the plaintiffs' interpretation of 2 U.S.C. § 2a(c). The plaintiffs readily acknowledge that *Branch* allows courts to remedy violations of 2 U.S.C. § 2c by drawing single-member districts—including in situations where 2 U.S.C. § 2a(c)(5) purports to require at-large elections. *See Branch*, 538 U.S. at 266–72 ; *id.* at 273–75 (plurality opinion of Scalia, J.). But a court may *not* invoke 2 U.S.C. § 2c at the expense of 2 U.S.C. § 2a(c)(5) if doing so would "disrupt[] the election process." *Id.* at 275 (plurality opinion of Scalia, J.). And a court that imposes a map under 2 U.S.C. § 2c "must follow the 'policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature,' except, of course, when 'adherence to state policy . . . detract[s] from the requirements of the Federal Constitution.'" *Id.* at 274–75 (plurality opinion of Scalia,

J.) (quoting *White v. Weiser,* 412 U.S. 783, 795 (1973)). The Pennsylvania Supreme Court flouted each of these requirements. It "disrupt[ed] the election process" (and violated the Elections Clause) by "suspending" the General Primary Calendar in its order of February 9, 2022, and by "altering" that statutory calendar in its order of February 23, 2022. Worse, the state supreme court decided to impose the "Carter Plan" at the expense of the "reapportionment plan[] proposed by the state legislature," which violates the Supreme Court's instruction to follow the "policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature." *White v. Weiser,* 412 U.S. 783, 795 (1973). So the plaintiffs' attacks on the legality of the court-imposed map and insistence on at-large elections under 2 U.S.C. § 2a(c)(5) are entirely consistent with *Branch.* But this irrelevant to standing, so the Court should not resolve that issue at this stage of the litigation.

## E.     The Defendants' Cause-Of-Action Arguments And The Intervenors' Prudential-Standing Objections Are Meritless

The defendants and intervenors claim that the plaintiffs cannot assert claims under the Elections Clause—even if they can establish Article III standing—because (in their view) these claims may be asserted *only* by the state legislative body and not by other individuals who are harmed by the defendants' violation of the Elections Clause and 2 U.S.C. § 2a(c)(5). The defendants claim that the plaintiffs lack a "cause of action," while the intervenors say that the plaintiffs lack "prudential standing," but they are essentially making the same argument: That violations of the Elections

Clause may be asserted only by the state legislative body whose constitutional pre-rogatives have been infringed.

This argument is wrong for many reasons. First, the plaintiffs are asserting violations of *both* the Elections Clause *and* 2 U.S.C. § 2a(c)(5), and the defendants and intervenors present no argument that violations of 2 U.S.C. § 2a(c)(5) may be asserted only by state legislatures and not by individuals who suffer harm on account of the statutory violation. The defendants correctly observe that 2 U.S.C. § 2a(c)(5) does not create a private right of action,[5] but the plaintiffs *may* assert violations of federal statutes under 42 U.S.C. § 1983 even when the underlying statute fails to confer a cause of action itself—so long as that federal statute may be said to create "rights." *See Maine v. Thiboutot*, 448 U.S. 1, 6 (1980). A statute that creates an entitlement to vote for every member of a state's congressional delegation indisputably confers "rights" enforceable through 42 U.S.C. § 1983, and the defendants cite no authority to the contrary. The plurality opinion in *Branch*, which the defendants cite, never even considers this question. *See Branch*, 538 U.S. at 275 (plurality opinion of Scalia, J.).

Second, there has long existed a cause of action in equity that allows individuals to seek injunctive relief against state and federal officers who violate the Constitution or federal statutes. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal

---

5. *See* Defs.' Br., ECF No. 61, at 17; *Branch*, 538 U.S. at 300 (O'Connor, J., dissenting) ("Sections 2a(c) and 2c do not create independently enforceable private rights of action themselves.")

officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Ex parte Young*, 209 U.S. 123, 155–56 (1908). This allows the plaintiffs to sue the defendants both for their violations of the Elections Clause and for their violations of 2 U.S.C. § 2a(c)(5). The defendants argue that the Court should carve out Elections Clause claims from this longstanding equitable cause of action because the Elections Clause (in the defendants' view) is designed to protect only the institutional prerogatives of state legislatures rather than the individual interests asserted by the plaintiffs in this litigation. *See* Defs.' Br., ECF No. 61, at 16. But it is untenable to claim that a constitutional provision concerning federalism or separation-of-powers may be asserted only by the institution of government whose prerogatives have been infringed. In the line-item veto case, the Court had no hesitation allowing lawsuits by entities harmed by the President's targeted "cancellation" of federal statutory provisions, even though the relevant constitutional provisions were designed to protect Congress's institutional prerogatives against lawmaking by executive decree. *See Clinton v. City of New York*, 524 U.S. 417, 434–36 (1998). All that mattered was whether the plaintiffs could show injury from the allegedly unlawful action. *See id.* ("Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing — regardless of whether there are others who would also have standing to sue."). Individual litigants have always been granted standing to seek declaratory or injunctive relief against officers who violate (or allegedly violate) constitutional provisions concerning federalism or separation of powers. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005); *Bowsher v. Synar*, 478 U.S. 714,

721 (1986). No different result should obtain here. And neither the defendants nor the intervenors present any argument for excluding 2 U.S.C. § 2a(c)(5) violations from the equitable cause of action recognized in *Ex parte Young*.

Finally, the defendants are simply wrong to claim that the Elections Clause serves only to protect the institutional prerogatives of the state legislature. It also protects the interests of the citizenry by ensuring that state redistricting decisions are made by politically accountable legislatures rather than judges. There is no basis in reason to prohibit private individuals from seeking declaratory or injunctive relief against officers who violate the Election Clause—any more than officers who violate other constitutional provisions—so long as the plaintiffs can satisfy the constitutional standing requirements of Article III.

## II. The Defendants' Laches Argument Is Incompatible With Branch

The defendants and intervenors accuse the plaintiffs of lying in wait to spring their lawsuit, and they insist throughout their briefs that the plaintiffs should have sued weeks or months earlier than they did. The Court needs only to read *Branch v. Smith* to see how nonsensical this claim is. Under *Branch*, the state judiciary is *allowed* to impose a court-drawn map to enforce the single-member districting requirement of 2 U.S.C. § 2c. *See Branch*, 538 U.S. at 266–72 ; *id.* at 273–75 (plurality opinion of Scalia, J.). So the state courts were doing *nothing wrong* by considering the redistricting lawsuits or deciding that they would impose a new map if the state legislature failed to redistrict in time for the primary elections. All of this was being done pursuant to an Act of Congress, so none of it violated the Elections Clause. *See* U.S.

Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; *but the Congress may at any time by Law make or alter such Regulations*, except as to the Places of chusing Senators." (emphasis added)). It does not violate the Elections Clause for the Pennsylvania judiciary to impose a court-drawn map to prevent a violation of 2 U.S.C. § 2c, so long as the judiciary complies with *Branch* when doing so.

The state supreme court did not violate the Elections Clause until it decided to "suspend" the General Primary Calendar in its order of February 9, 2022. *That* violated the Elections Clause because there is no federal statute that authorizes a state court to alter or suspend the statutory deadlines and timetables established by the state legislature. It also revoked any authority that the state supreme court had to impose single-member districts under 2 U.S.C. § 2c, because *Branch* allows a court to enforce 2 U.S.C. § 2c at the expense of 2 U.S.C. § 2a(c)(5) only when it can do so "without disrupting the election process." *Branch*, 538 U.S. at 275 (plurality opinion of Scalia, J.). At that point, the state supreme court's actions demonstrating the impossibility of drawing a map without "disrupting the election process" and violating the Elections Clause, and it triggered the at-large fallback regime of 2 U.S.C. § 2a(c)(5). The plaintiffs had no case before the state supreme court's order of February 9, 2022, because the defendants and the state judiciary had been acting lawfully and in compliance with *Branch* up until that point.

The plaintiffs moved with alacrity as soon as the state supreme court violated *Branch* and the Elections Clause by suspending the primary calendar. They sued on

February 11, 2022—only two days after the state supreme court's order of February 9, 2022. The plaintiffs cannot be faulted for failing to file sooner because their lawsuit would have run headlong into *Branch* and faced an immediate dismissal (if not possible sanctions). The defendants and intervenors seem to think that we're claiming that the state judiciary can never draw maps under the Elections Clause. That is not our argument. The plaintiffs readily acknowledge that the state judiciary can draw maps to: (1) Remedy constitutional violations; and (2) Prevent violations of 2 U.S.C. § 2c, so long as they do consistent with *Branch*. The state judiciary was acting in a manner consistent with *Branch* until February 9, 2022.

Finally, the defendants' *Purcell* argument is not an argument for dismissal, but a reason to withhold injunctive *relief* on the even on an election. The primary election is more than two months away, and the defendants cite no authority that applies the *Purcell* principle that far away from an election.

## III.   The Intervenors' Remaining Arguments Are Meritless

The plaintiffs' claims are not moot because they allege that the court-imposed map is unconstitutional, and that the state therefore has not been "redistricted in the manner provided by the law thereof" within the meaning of 2 U.S.C. § 2a(c). The plaintiffs may or may not be right on the merits of this assertion, but their claims are assuredly not moot.

The intervenors are also wrong to claim that *Branch* forecloses the plaintiffs' claims, but they are wrong. The state supreme court violated *Branch* because: (1) It

was too late to impose a court-drawn map without "disrupting the election process,"[6] as evidenced by the Court's decision to "suspend" and later "modify" the General Primary Calendar in violation of the Elections Clause; and (2) The "Carter Plan" imposed by the Court failed to "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature." *Branch*, 538 U.S. at 274 (plurality opinion of Scalia, J.). The Carter Plan is also malapportioned in violation of *Wesberry v. Sanders*. That triggers the at-large fallback in 2 U.S.C. § 2a(c)(5), and the defendants are required to implement at-large elections because the state has not been "redistricted in the manner provided by the law thereof." 2 U.S.C. § 2a(c).

## CONCLUSION

The motions to dismiss for lack of subject-matter jurisdiction should be denied.

Respectfully submitted.

/s/ Jonathan F. Mitchell

| | |
|---|---|
| Walter S. Zimolong III | Jonathan F. Mitchell |
| Pennsylvania Bar No. 89151 | Pennsylvania Bar No. 91505 |
| Zimolong LLC | Mitchell Law PLLC |
| Post Office Box 552 | 111 Congress Avenue, Suite 400 |
| Villanova, Pennsylvania 19085 | Austin, Texas 78701 |
| (215) 665-0842 | (512) 686-3940 (phone) |
| wally@zimolonglaw.com | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

Dated: March 4, 2022                    *Counsel for Plaintiffs*

---

6. *Branch*, 538 U.S. at 275 (plurality opinion of Scalia, J.).

## CERTIFICATE OF SERVICE

I certify that on March 4, 2022, I served this document through CM/ECF, upon:

ROBERT A. WIYGUL
CARY L. RICE
JOHN B. HILL
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103-6933
(215) 568-6200
rwiygul@hangley.com
crice@hangley.com
jhill@hangley.com

JOSHUA A. MATZ
Kaplan, Hecker & Fink
1050 K Street NW, Suite 1040
Washington, DC 20001
(929) 294-2537
jmatz@kaplanhecker.com

*Counsel for Defendants*

ABHA KHANNA
LALITHA D. MADDURI
JYOTI JASRASARIA
TINA Y. MENG
Elias Law Group LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law
lmadduri@elias.law
jjasrasaria@elias.law
tmeng@elias.law

ELIZABETH WINGFIELD
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
(215) 665-8500 (phone)
(215) 864-8999 (fax)
wingfielde@ballardspahr.com

*Counsel for Intervenors*

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*