# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM C. TOTH, JR., et al.,<br>*Plaintiffs,*<br><br><br>v.<br><br>LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth; JESSICA MATHIS, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries; and TOM WOLF, in his official capacity as Governor of Pennsylvania,<br><br>*Defendants.* | No. 1:22 Civ. 208<br>(Jordan, Shwartz, Wilson, JJ.)<br><br><br>Electronically Filed |

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Michael J. Fischer** (Pa. I.D. No. 322311)
  *Chief Counsel and*
  *Executive Deputy Attorney General*
Aimee D. Thomson** (Pa. I.D. No. 326328)
  *Deputy Attorney General*
PENNSYLVANIA OFFICE OF
ATTORNEY GENERAL
1600 Arch Street | Suite 300
Philadelphia, PA 19103
(215) 560-2171
mfischer@attorneygeneral.gov

Joshua Matz*
Raymond P. Tolentino**
KAPLAN HECKER & FINK LLP
1050 K Street NW | Suite 1040
Washington, DC 20001
(929) 294-2537
jmatz@kaplanhecker.com
rtolentino@kaplanhecker.com

Christine P. Sun*
Marina Eisner*
STATES UNITED DEMOCRACY
CENTER
1101 17th Street NW
Washington, DC 20036
(240) 600-1316
christine@statesuniteddemocracy.org
marina@statesuniteddemocracy.org

Robert A. Wiygul (Pa. I.D. No. 310760)
Cary L. Rice* (Pa. I.D. No. 325227)
John B. Hill* (Pa. I.D. No. 328340)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
rwiygul@hangley.com

*Counsel for Defendants*

*Admitted Pro Hac Vice
**Motions for Pro Hac Vice Forthcoming*

# TABLE OF CONTENTS

**PAGES**

PRELIMINARY STATEMENT ...............................................................1

BACKGROUND .................................................................................1

  I.   State Court Developments.............................................................1

  II.  Procedural History.....................................................................4

STANDARD OF REVIEW ....................................................................6

ARGUMENT .....................................................................................6

  I.   PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF
SUCCESS ON THE MERITS OF THEIR CLAIMS ...........................7

    A.   Plaintiffs Lack Article III Standing...........................................7

    B.   Plaintiffs' Elections Clause Claims Are Meritless.......................11

  II.  THE EQUITIES CUT DECISIVELY AGAINST AN INJUNCTION ......18

    A.   Plaintiffs Fail To Demonstrate Irreparable Harm .....................18

    B.   Plaintiffs Engaged in Prejudicial and Undue Delay ..................18

    C.   Granting Plaintiffs' Requested Relief Would Sow Chaos and Confusion
in Pennsylvania's Congressional Elections ...............................19

CONCLUSION.................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) .......................................................................... 9, 16

*Assembly of State of Cal. v. Deukmejian*,
    639 P.2d 939 (Cal. 1982) ...................................................................15

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...........................................................................9

*Board of Education v. Allen*,
    392 U.S. 236 (1968) .........................................................................10

*Bognet v. Sec'y Commonwealth of Pennsylvania*,
    980 F.3d 336 (3d Cir. 2020) ...........................................................11

*Branch v. Smith*,
    538 U.S. 254 (2003) ................................................................. passim

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...........................................................................9

*Colleton Cnty. Council v. McConnell*,
    201 F. Supp. 2d 618 (D.S.C. 2002) ..................................................12

*Corman v. Torres*,
    287 F. Supp. 3d 558 (M.D. Pa. 2018) ......................................... 9, 11

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) .............................................................10

*Crookston v. Johnson*,
    841 F.3d 396 (6th Cir. 2016) .............................................................19

*Growe v. Emison*,
    507 U.S. 25 (1993) ...........................................................................12

*Johnson v. Wisconsin Elections Comm'n*,
  2021 WI 87, 399 Wis. 2d 623 (2021) ...................................................................12

*King v. Whitmer*,
  505 F. Supp. 3d 720 (E.D. Mich. 2020) ...............................................................8

*Lance v. Coffman*,
  549 U.S. 437 (2007) ........................................................................................7, 8

*League of Women Voters of Pennsylvania v. Commonwealth*,
  645 Pa. 576 (2018) ........................................................................................ 2, 15

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................7, 9

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ...............................................................................6

*McPherson v. Blacker*,
  146 U.S. 1 (1892) ...............................................................................................17

*Mellow v. Mitchell*,
  530 Pa. 44 (1992) ...............................................................................................12

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) .................................................................................. 19, 20

*People ex rel. Salazar v. Davidson*,
  79 P.3d 1221 (Colo. 2003) ...............................................................................12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945) ...........................................................................................18

*Rodriguez v. Pataki*,
  No. 02 Civ. 618, 2002 WL 1058054 (S.D.N.Y. May 24, 2002) ........................12

*Scott v. Germano*,
  381 U.S. 407 (1965) ...........................................................................................11

*Smiley v. Holm*,
  285 U.S. 355 (1932) ...........................................................................................17

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................................................7

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................................7

*Va. House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ......................................................................................10

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................................9

*Wilson v. Eu*,
  54 Cal. 3d 471 (1991) ........................................................................................12

*Wood v. Raffensperger*,
  981 F.3d 1307 (11th Cir. 2020) ..........................................................................8

**Statutes**

2 U.S.C. § 2a(c) ........................................................................... 13, 14, 17

2 U.S.C. § 2a(c)(5) ............................................................................ 8, 18

2 U.S.C. § 2c ........................................................................... 13, 14, 15, 19

25 P.S. § 2753 ....................................................................................14

25 P.S. § 2868 ....................................................................................18

42 Pa.C.S. § 726 ..................................................................................3

**Other**

Support of App. for Leave to Intervene of Cutler et al. at ¶ 6, No.,
  464 MD 2021 (Pa. Dec. 27, 2021) .....................................................15

Support of Judge McCullough's Report and Recommendation, No.,
  7 MM 2022 (Pa. Feb. 14, 2022) ........................................................2, 3

Support of Report and Recommendation of Special Master, No.,
  7 MM 2022 (Pa. Feb. 14, 2022) .........................................................3

## PRELIMINARY STATEMENT

The Supreme Court has affirmed time and again that federal courts should be wary of upending state election processes late in the day. Here, with nomination petitions already in circulation, Plaintiffs ask this Court to scrap Pennsylvania's entire congressional map and to order the Commonwealth to hold statewide at-large congressional elections for the first time since the 18th century. Along the way, they ask the Court to overturn a scheduling order that has been relied on by candidates and election officials across Pennsylvania, and which all parties in the state redistricting litigation (including leaders of the General Assembly) recognized the Pennsylvania Supreme Court had the authority to issue. These requests are nothing short of an invitation to chaos. Moreover, they rest on legal theories that Plaintiffs lack Article III standing to assert—and that, despite Plaintiffs' twists and turns in describing them, are foreclosed by binding precedent. For good reason, the United States Supreme Court (without any noted dissent) rejected Plaintiffs' request for an injunction. Plaintiffs' request for a preliminary injunction should meet the same fate.

## BACKGROUND

### I.    State Court Developments

Pennsylvania lost a congressional seat in the 2020 decennial census. Dkt. 49. During the months that followed, it became apparent that the General Assembly and the Governor would be unable to agree on a new congressional map: although the

General Assembly approved a proposed map (HB 2146), the Governor opposed and ultimately vetoed it. *See id.* In Pennsylvania—like in most states—when the political branches are unable to agree, "it becomes the judiciary's role to ensure a valid districting scheme." *League of Women Voters of Pennsylvania v. Commonwealth*, 645 Pa. 576, 582 n.6 (2018). On December 17, 2021, two groups of plaintiffs filed suit in the Commonwealth Court of Pennsylvania. Dkt. 49. Three days later, the Commonwealth Court directed that "if the General Assembly and the Governor fail to enact a congressional reapportionment plan by January 30, 2022, the Court will select a plan from those plans timely filed by the parties." Dkt. 8-2.

The consolidated *Carter* proceedings unfolded in the Commonwealth Court over the next six weeks. Ten parties—including Defendant Governor Wolf, as well as various state legislative coalitions and private voter groups—participated in that litigation. Although plainly aware of it, Plaintiffs made no effort to participate as parties or *amici* in the state court process, or to raise objections to that proceeding.

On January 14, 2022, Judge McCullough of the Commonwealth Court reaffirmed that if the General Assembly "has not produced a new congressional map by January 30, 2022, the Court shall proceed to issue an opinion based on the hearing and evidence presented by the Parties." Dkts. 8-4 & 48. By January 24, the participating parties had submitted 13 proposed maps for consideration.

On January 26, 2022, Governor Wolf vetoed the General Assembly's proposed map. Dkt. 49. Over the next two days, Judge McCullough held an evidentiary hearing and reaffirmed that she would issue a new map if the political branches failed to adopt one by January 30. *See id.*

January 30 passed without any further agreement between the Governor and the General Assembly. Given the tight schedule and the need for a definitive ruling, the Pennsylvania Supreme Court exercised extraordinary jurisdiction over the case on February 2, 2022. *See* Dkt. 8-6; 42 Pa.C.S. § 726. To expedite proceedings, Judge McCullough was designated as the Special Master and instructed to submit a report and proposed map by February 7, 2022. *See* Dkt. 8-6. In her report, Judge McCullough recommended adoption of HB 2146 (the General Assembly's proposed map), as well as modest changes to the general primary election schedule that had been advocated for by the proponents of that map. *See* Dkt. 8-7.

The parties responded to Judge McCullough's report with hundreds of pages of briefs raising exceptions to her conclusions. None of these briefs denied the court's power to modify the election schedule. Following a review of those briefs— and a lengthy oral argument on February 18, 2022—the Pennsylvania Supreme Court issued an order on February 23, 2022, adopting the congressional map proposed by the Carter Intervenors (the "Carter Plan") and extending seven interim election-related deadlines by a few days, including the first day to circulate and file

nomination petitions, which had been February 15 and (given the passage of that date) was reset to February 25. Dkt. 31-1. The calendar's April and May deadlines and the General Primary Date were untouched. *Id.*

Since issuance of the Pennsylvania Supreme Court's order, Defendants (as well as county officials) have taken substantial steps in reliance on it.

## II.    Procedural History

Throughout the six weeks of litigation that led to the Pennsylvania Supreme Court's order—litigation involving officials, political parties, legislators, candidates, and voters—Plaintiffs decided not to participate in that process as parties or *amici*.

Instead, Plaintiffs waited until February 11, 2022, to file suit—and then waited again until February 20, 2022, to file an "emergency" TRO motion in which they asserted that the state court proceeding had been unconstitutional *ab initio*. Dkts. 7 & 8. They did not, at this point, challenge any particular map or schedule. Instead, they claimed that the Elections Clause forbade *any* state court from adopting *any* map unless expressly authorized by the General Assembly. Dkt. 8. They also renewed the request in their complaint for a three-judge district court. Dkt. 3.

The day that Plaintiffs filed this TRO motion, this Court established a two-day briefing schedule on the request to convene a three-judge court. Dkt. 9. It also set a TRO scheduling hearing for February 25, 2022. *Id.*

4

At sunset on February 23, 2022, Plaintiffs filed a renewed TRO motion, stating: "If the Court does not grant the requested TRO by midnight tonight, the plaintiffs will deem the request denied and seek emergency relief from Justice Alito." Dkt. 30. The Court did not respond by midnight. Plaintiffs did not, at that point, seek emergency relief from Justice Alito.

Meanwhile, Defendants—as well as the Carter Intervenors—submitted letters explaining that a three-judge district court was unnecessary because Plaintiffs lacked Article III standing for their Elections Clause claims. *See* Dkts. 36 & 37.

On February 25, 2022, the Court held a conference where, in light of its concerns as to jurisdiction, it denied Plaintiffs' motion for a TRO and held in abeyance their request to convene a three-judge court. Dkt. 43. The Court then set a compressed briefing schedule for motions to dismiss, jurisdictional statements, and Plaintiffs' pending request for a preliminary injunction. *Id.*

Two days later, Plaintiffs filed a proposed Second Amended Complaint in which they added a new plaintiff and raised (for the first time) a one-person/one-vote challenge to the Carter map. Dkt. 49. But Plaintiffs did not file (and have not since filed) a motion seeking injunctive relief on that new claim. Three days later, Plaintiffs filed a notice of appeal from the denial of their TRO motion. Dkt. 50.

On February 28, 2022, Plaintiffs filed an application at the Supreme Court seeking emergency injunctive relief. On March 1, 2022, Defendants and the Carter

Intervenors moved to dismiss Plaintiffs' Elections Clause claims, while agreeing that it would be proper to convene a three-judge district court to address Plaintiffs' one-person/one-vote claim. Dkts. 59 & 61. On March 3, 2022, Chief Judge Chagares designated a three-judge district court to hear and determine Plaintiffs' claims. Dkt. 63. On March 7, 2022, the Supreme Court issued an order without any dissents in which it denied Plaintiffs' request for emergency injunctive relief. Dkt. 73.

## STANDARD OF REVIEW

To obtain the extraordinary remedy of a preliminary injunction, the "moving party must demonstrate, first, a likelihood of success on the merits, and second, that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). "If both factors are established, . . . the district court considers the two remaining factors—whether granting relief will result in even greater harm to the nonmoving party or other interested persons and whether the public interest favors such relief." *Id.*

## ARGUMENT

The Court should deny Plaintiffs' request for a preliminary injunction because they cannot demonstrate a likelihood of success on the merits of their claims, and because the equities militate in favor of denying their requested injunction.

## I.   PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

Plaintiffs filed their preliminary injunction motion on February 20, 2022; in this motion, they addressed only their Elections Clause claims. Dkt. 8. With respect to those claims, Plaintiffs come nowhere close to demonstrating a likelihood of success on the merits: they lack Article III standing and their claims are meritless.

### A.   Plaintiffs Lack Article III Standing

To comply with Article III, Plaintiffs bear the burden of proving "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up). They fail to meet that burden on their Elections Clause claims.

### 1.   Plaintiffs Lack Standing as Voters

Plaintiffs first contend that they have been injured as "registered voter[s]" based on Defendants' implementation of the Carter Plan. That theory is foreclosed by precedent requiring Plaintiffs to prove a "concrete" and "particularized" injury, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), rather than a "generally available grievance" arising from a widely shared interest "in the proper application of the Constitution and laws," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992).

The Supreme Court's application of those principles in *Lance v. Coffman*, 549 U.S. 437 (2007), is dispositive. In *Lance*, the Colorado courts adopted a new

redistricting map after the state legislature was unable to reach agreement on a redistricting plan. *See id.* at 437-38. Four Colorado voters filed suit, alleging that adherence to the map adopted by the Colorado courts violated the Elections Clause. *See id.* The Supreme Court dismissed the voters' suit for lack of standing, holding that they "assert[ed] no particularized stake in the litigation." *Id.* at 442. Instead, the sole injury alleged by the voters was that the Elections Clause "[had] not been followed"—"precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Id.*

Plaintiffs' theory of standing-as-voters is foreclosed by *Lance* and cannot be sustained. *See, e.g.*, *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020); *King v. Whitmer*, 505 F. Supp. 3d 720, 735-36 (E.D. Mich. 2020) (same).[1]

### 2. The Congressional Candidate Plaintiffs Lack Standing

Plaintiff Bashir is a congressional candidate and claims injury because he would prefer to compete in an at-large election, rather than in the district where he resides. Dkt. 49. But "[c]ase law strongly suggests that a legislator has no legally

---

[1] Plaintiffs cannot escape *Lance* by citing 2 U.S.C. § 2a(c)(5). *First*, the actual injury they assert is traceable solely to alleged violations of the Elections Clause. *Second*, 2 U.S.C. § 2a(c)(5) creates no enforceable rights; it merely offers "a last-resort remedy" when there is no time to develop a single-member district plan. *Branch v. Smith*, 538 U.S. 254, 275 (2003) (plurality). *Finally*, any purported injury based on Section § 2a(c)(5) would be a generalized grievance, since every voter in Pennsylvania could claim to be equally aggrieved. *See Lance*, 549 U.S. at 442.

cognizable interest in the composition of the district he or she represents." *Corman v. Torres*, 287 F. Supp. 3d 558, 569 (M.D. Pa. 2018); *see Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) ("[V]oters should choose their representatives, not the other way around"). Regardless, Bashir's alleged injury is neither concrete nor certainly impending, since it rests on mere political speculation that he will face more advantageous odds in an at-large election. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

As a fallback, Bashir (along with Plaintiff Bognet) claims injury based on his "uncertainty" about "how he should campaign" given the risk that the current map will be invalidated. Dkt. 49. But that asserted risk exists only by virtue of a lawsuit that Plaintiffs *themselves* filed. *See Lujan*, 504 U.S. at 564 n.2 (holding it stretches standing "beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control"). Moreover, federal judicial invalidation of Pennsylvania's congressional maps is not "certainly impending," and plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).[2]

---

[2] Similarly, Bashir cannot establish injury based on uncertainty purportedly experienced by his donors. *See Clapper*, 568 U.S. at 416. And any such injury would not be traceable to Defendants. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997)

### 3.     Plaintiff Hall Lacks Standing

Plaintiff Alan M. Hall, a member of the Susquehanna County Board of Elections, alleges two forms of injury. He first alleges that Defendants are injuring him by forcing him to implement an unconstitutional order in violation of his oath of office. Dkt. 49. But that boundless theory of oath-breaker standing—sometimes mistakenly attributed to dicta in a footnote from the 1960s, *see Board of Education v. Allen,* 392 U.S. 236, 241 n.5 (1968)—has been widely rejected, *see, e.g.*, *Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) ("[T]he violation of one's oath alone is an insufficient injury to support standing.").

Nor is there merit to Hall's assertion that he will be injured by having to complete his duties on a faster schedule. Dkt. 49. Plaintiffs cite no precedent to support the sweeping proposition that government officials suffer an injury-in-fact when forced to do their job. In any case, it is especially unlikely that a single member of a county board of elections could have standing on that theory, since any potential injury would accrue to the board as an institution (not to its members). *Cf. Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) ("[I]ndividual members lack standing to assert the institutional interests of a legislature.").

\* \* \*

---

("[T]he injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

For these reasons, Plaintiffs lack standing to maintain their Elections Clause claims. One final consideration reinforces that conclusion: Plaintiffs are not the proper party to assert an injury under the Elections Clause. As this Court and the Third Circuit have recognized, the proper party to vindicate alleged violations of that provision will generally be the state legislature itself. *See Corman*, 287 F. Supp. 3d at 573; *see also Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 349-50 (3d Cir. 2020), *judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). There is no reason to depart from that reasoning here.

## B.   Plaintiffs' Elections Clause Claims Are Meritless

### 1.   Adopting the Congressional Map

Plaintiffs' principal contention is that the Elections Clause prohibited the Pennsylvania Supreme Court from adopting a congressional map when the General Assembly and Governor reached an impasse. Dkt. 49. That is mistaken.

The Supreme Court has repeatedly affirmed the propriety of state courts drawing districts when the legislative process fails to produce one. In *Scott v. Germano*, for example, the Court emphasized that "[t]he power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged." 381 U.S. 407, 409 (1965) (citations omitted). Decades later, in *Growe v. Emison*, the Court addressed a case in which

11

(as here) the state legislature had adopted a redistricting plan, the Governor had vetoed it, and so a state court had prepared a congressional map of its own. *See* 507 U.S. 25, 30-31 (1993). Speaking through Justice Scalia, the Court overturned a federal injunction that had blocked the state court from issuing its congressional map. *See id.* at 32-37. In so doing, the Court added that, "[i]n the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or judicial branch*, has begun to address that highly political task itself." *Id.* at 33 (emphasis added).

Ten years later, in *Branch v. Smith*—discussed in more detail below—the Court again held that while federal redistricting law "assuredly envisions legislative action, it also embraces action by state and federal courts when the prescribed legislative action has not been forthcoming." 538 U.S. 254, 272 (2003).

State and lower federal courts have repeatedly reached the same conclusion— including in cases where the legislature failed to produce a map of congressional districts or (as here) proposed one that the governor then vetoed. *See, e.g.*, *Rodriguez v. Pataki*, No. 02 Civ. 618, 2002 WL 1058054, at *1 (S.D.N.Y. May 24, 2002); *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C. 2002); *Johnson v. Wisconsin Elections Comm'n*, 2021 WI 87, ¶ 2, 399 Wis. 2d 623, 630-31 (2021); *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1229 (Colo. 2003); *Mellow v. Mitchell*, 530 Pa. 44, 48 (1992); *Wilson v. Eu*, 54 Cal. 3d 471, 472 (1991).

This unbroken line of authority coheres with the Constitution and federal statutory law. Under the Elections Clause, Congress "may at any time by Law make or alter such Regulations" as concern the "Manner" of federal legislative elections. Congress exercised that power in 2 U.S.C. § 2c, which (as relevant) provides: "In each State entitled . . . to more than one Representative . . . there *shall be established by law a number of districts* equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative[.]" (emphasis added).

In *Branch v. Smith*, the Supreme Court found that § 2c "requires States entitled to more than one Representative to elect their Representatives from single-member districts." 538 U.S. at 267-68. It next recognized that where the legislative process comes up short, § 2c contemplates that the "courts" will "draw single-member districts whenever possible." *Id.* at 270. In other words, *Branch* found that courts are directed by § 2c "to redistrict." *Id.* Finally, *Branch* held "that while § 2c assuredly envisions legislative action, it also embraces action by *state* and federal courts when the prescribed legislative action has not been forthcoming." *Id.* at 272 (emphasis added). "In sum, § 2c is as readily enforced by courts as it is by state legislatures, and is just as binding on courts—federal or state—as it is on legislatures." *Id.*

Along the way, *Branch* rejected the argument that 2 U.S.C. § 2a(c) requires at-large elections when the state legislature has failed to redistrict. *See id.* at 268. It

deemed this view to be inconsistent with text, precedent, prior practice, and congressional purpose. *See id.* at 268-72. A plurality instead held that § 2a(c) is merely a "last-resort remedy to be applied when, on the eve of a congressional election, no constitutional redistricting plan exists and there is no time for either the State's legislature *or the courts* to develop one." *Id.* (emphasis added).

For these reasons, Plaintiffs advance a fundamentally meritless claim. The Elections Clause empowers Congress to regulate by "Law" the "Manner" of congressional elections. Congress exercised that power in 2 U.S.C. § 2c. The Supreme Court has authoritatively interpreted § 2c as requiring state courts to draw single-member districts when the legislative process fails to do so. These principles confirm the propriety of the decision by the Pennsylvania Supreme Court.

### 2.    Modifying the Election Schedule

As a fallback, Plaintiffs claim that the Pennsylvania Supreme Court violated the Elections Clause by slightly modifying the primary election schedule. *See* Dkt. 49. This claim is meritless—and factually overstated. The Pennsylvania Supreme Court did not change the date of the primary election. *See* 25 P.S. § 2753 (May 17). Instead, to ensure sufficient time for candidates to obtain nominating signatures after the congressional districts were announced, it modified—by roughly a week—only a handful of preliminary deadlines related to nomination petitions. This decision was either advocated or acquiesced to by every party in the state court proceedings,

including the leadership of the General Assembly. *See* Memo. of Law in Support of App. for Leave to Intervene by Cutler et al., ¶ 6, No. 464 MD 2021 (Pa. Dec. 27, 2021) ("[I]n the past, those nominating petition deadlines have been moved for Congressional elections, and therefore could still be moved in this election cycle.").

Moreover, courts have long reasonably understood themselves to have the power to modify election deadlines as a necessary incident to their authority to implement congressional maps (where the legislature fails to produce one). *See, e.g.*, Order at 2, *Perez v. Perry*, No. 5:11 Civ. 360 (W.D. Tx. Mar. 1, 2012), ECF 68; *League of Women Voters of Pennsylvania v. Commonwealth*, 645 Pa. 576, 585-86 (2018); *Assembly of State of Cal. v. Deukmejian*, 639 P.2d 939, 964 (Cal. 1982).

This understanding is supported by § 2c, which directs courts to redistrict when state "legislative action has not been forthcoming," *Branch*, 538 U.S. at 272, and which is properly read as authorizing schedule modifications inherent to (and necessary to effectuate) that limited judicial role. Otherwise, federal law would assign courts a crucial fallback function in the redistricting process, would direct them to wait as long as possible to give the state legislature an opportunity to enact a map, but would strip them of the ability to include in their redistricting orders even *de minimis* modifications of the schedule necessary to implement those plans. No court has ever understood itself as so limited. That is particularly true when courts have not altered the date of any election, but instead direct only reasoned

modifications of preliminary deadlines. Thus, the Pennsylvania Supreme Court's decision is supported by an Act of Congress and complies with the Elections Clause.

That same conclusion follows from a recognition that the General Assembly played an essential role in adopting and maintaining the Free and Equal Elections Clause of the Pennsylvania Constitution—a state constitutional provision that fully authorized the Pennsylvania Supreme Court's order directing minor modifications to the schedule. *See* Amicus Br. of Tom Ridge et al., *Republican Party of Pennsylvania v. Boockvar*, 20A54, at 3-10. (Oct. 2, 2020). This grant of state constitutional power to the Pennsylvania Supreme Court—undertaken by the people of Pennsylvania when they ratified the 1874 Constitution and endorsed by the state legislature in 1967—further authorized its order modifying election deadlines. *See Arizona Redistricting*, 576 U.S. at 814; *id.* at 841-42 (Roberts, C.J., dissenting) (recognizing that the legislature need not be "exclusive" in redistricting). Plaintiffs offer no argument that the Pennsylvania Supreme Court's scheduling order was *ultra vires* under the Pennsylvania Constitution, including the Free and Equal Elections Clause. There is simply no basis for finding a violation of the Elections Clause here.

Finally, even apart from the fact that federal law authorized the Pennsylvania Supreme Court's order, and apart from the fact that the General Assembly vested the Pennsylvania Supreme Court with the state constitutional power it exercised here, Plaintiffs' claims reflect a mistaken understanding of the Elections Clause itself.

The Framers expected that the "exercise of the [legislative] authority" had to be "in accordance with the method" prescribed in a state's constitution. *Smiley v. Holm*, 285 U.S. 355, 367 (1932). Thus, nothing in the Elections Clause "attempt[s] to endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted." *Id.* at 368; *see McPherson v. Blacker*, 146 U.S. 1, 25 (1892) ("The legislative power is the supreme authority, except as limited by the constitution of the state.").

\*     \*     \*

For these reasons, Plaintiffs' constitutional challenge to the Pennsylvania Supreme Court's order is meritless. At bare minimum, they have not demonstrated that they are likely to succeed on the merits—and so their motion should be denied.[3]

---

[3] Plaintiffs' theory of the alleged Elections Clause violation here has been a moving target. The arguments set forth above respond to what they argue in their preliminary injunction papers. In more recent filings, Plaintiffs appear to retreat from some of their original legal arguments. To the extent Plaintiffs now insist that the last-resort remedy of at-large elections provided by § 2a(c) is triggered the moment a state statutory election deadline is passed—even if that deadline is preliminary and is subject to modification under ordinary principles of state constitutional law—that theory fails. It is unsupported by any precedent, lacks any basis in *Branch* or the statutory text, and is inconsistent with the substantial authority recognizing judicial prerogatives to modify preliminary circulation and filing deadlines.

In addition, to the extent Plaintiffs assert that their one-person/one-vote claim is properly before the Court, they have offered no briefing, argument or evidence in support of that claim—and thus have not carried their burden at the preliminary injunction stage. Defendants are prepared to submit supplemental briefing on that issue to the extent it would aid the Court's decisional process.

## II.    THE EQUITIES CUT DECISIVELY AGAINST AN INJUNCTION

### A.    Plaintiffs Fail to Demonstrate Irreparable Harm

Plaintiffs have failed to demonstrate that they will suffer any cognizable injury—much less irreparable harm—absent immediate relief on their claims. As explained above, the harms they identify as to their Elections Clause claims are too generalized, too speculative, or foreclosed by precedent. *See supra* at Section I.A.1.

### B.    Plaintiffs Engaged in Prejudicial and Undue Delay

Moreover, Plaintiffs should not receive extraordinary relief after their delay created the very exigent circumstances that supposedly animate their request for relief. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

As explained *supra*, Plaintiffs stood on the sidelines for over six weeks—throughout the duration of the state court *Carter* proceedings—while taking no measures in state or federal court (including in the *Carter* case itself) to protect the asserted interests that they now insist justify a preliminary injunction. Then, after filing suit here, they waited nine more days—until after the February 15, 2022, deadline for circulating and filing nomination petitions, *see* 25 P.S. § 2868—to first seek a TRO. Plaintiffs' delay in bringing this suit was as inexcusable as it was prejudicial: when it comes to the primary elections calendar, time is of the essence.

Disturbingly, Plaintiffs' delay appears to have been calculated. Their attempt to invoke the remedy of last resort set forth in 2 U.S.C. § 2a(c)(5) would necessarily

fail if they filed suit earlier, since there would still be time for state or federal courts to redistrict under 2 U.S.C. § 2c (or for the political branches to re-engage). *See Branch*, 538 U.S. at 267-72. Thus, Plaintiffs could achieve their stated goals only by exploding the map and election calendar with no time left on the clock. And that is exactly what they are trying to do. This Court should not reward that gambit.

## C. Granting Plaintiffs' Requested Relief Would Sow Chaos and Confusion in Pennsylvania's Congressional Elections

"Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (Sutton, J.). As Justice Kavanaugh has explained, "[i]t is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

That principle applies here with full force. *See generally* Affidavit of Jonathan Marks (Exhibit A). Since the Pennsylvania Supreme Court adopted a congressional map, Defendants have taken major steps to administer the 2022 election in conformity with that order, including by making internal changes in the Secretary of State's office, *see id.* ¶¶ 3-4, updating the Commonwealth's voter registry, *see id.* ¶¶ 5-8, and publicizing the revised election schedule, *see id.* ¶ 9. In addition, many

candidates have already relied on the Pennsylvania Supreme Court's order in deciding when and where to circulate nomination petitions. *See id.* ¶ 10.

Forcing Pennsylvania to abruptly reverse all that and undertake statewide at-large congressional elections for the first time since the 18th century would invite chaos. For example, officials in many counties would be required to print multi-page ballots for every eligible voter, see *id.* ¶ 15, which would surely confuse the many voters unfamiliar with casting 17 votes for approximately a hundred candidates, *see id.* ¶¶ 17-18. This would also raise significant logistical concerns about the available paper supply, postage budgets, and ballot tabulation processes. *See id.* ¶¶ 19-23.

In short, issuing a preliminary injunction would "lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Under these circumstances, law and equity both compel denial of Plaintiffs' motion.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:           March 8, 2022                    Respectfully submitted,


                                                  /s/ Joshua Matz

Michael J. Fischer** (Pa. I.D. No. 322311)        Joshua Matz*
    *Chief Counsel and*                            Raymond P. Tolentino**
    *Executive Deputy Attorney General*           KAPLAN HECKER & FINK LLP
Aimee D. Thomson** (Pa. I.D. No. 326328)          1050 K Street NW | Suite 1040
    *Deputy Attorney General*                     Washington, DC 20001
PENNSYLVANIA OFFICE OF                            (929) 294-2537
ATTORNEY GENERAL                                  jmatz@kaplanhecker.com
1600 Arch Street | Suite 300                      rtolentino@kaplanhecker.com
Philadelphia, PA 19103
(215) 560-2171
mfischer@attorneygeneral.gov


Christine P. Sun*                                 Robert A. Wiygul (Pa. I.D. No. 310760)
Marina Eisner*                                    Cary L. Rice* (Pa. I.D. No. 325227)
STATES UNITED DEMOCRACY                           John B. Hill* (Pa. I.D. No. 328340)
CENTER                                            HANGLEY ARONCHICK SEGAL
1101 17th Street NW                               PUDLIN & SCHILLER
Washington, DC 20036                              One Logan Square, 27th Floor
(240) 600-1316                                    Philadelphia, PA 19103
christine@statesuniteddemocracy.org               (215) 568-6200
marina@statesuniteddemocracy.org                  rwiygul@hangley.com


*Counsel for Defendants*

*\*Admitted Pro Hac Vice*
*\*\*Motions for Pro Hac Vice Forthcoming*

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.8, I certify that this brief contains 4,956 words and thus complies with the 5,000 word limitation.

Dated:  March 8, 2022                          /s/ Joshua Matz
                                               Joshua Matz

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of March 2022, a true and correct copy of the foregoing was served upon all counsel of record via the court's CM/ECF electronic filing system.

Dated:        March 8, 2022                        /s/ Joshua Matz
                                                          Joshua Matz