# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM C. TOTH JR., *et al.*, | : | |
| *Plaintiffs,* | : | |
| v. | : | |
| LEIGH M. CHAPMAN, *et al.*, | : | No. 1:22-cv-00208-JPW-KAJ-PS |
| *Defendants.* | : | Three Judge Panel Convened Pursuant to 28 U.S.C. § 2284(a) |
| v. | : | |
| CAROL ANN CARTER, *et al.*, | : | |
| *Intervenor-Defendants.* | : | |

**CARTER INTERVENORS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................1

   I.   State Court Proceedings...............................................................................1

   II.  Federal Court Proceedings..........................................................................4

LEGAL STANDARD...........................................................................................6

ARGUMENT .......................................................................................................7

   I.   Plaintiffs' right to relief is not indisputably clear.......................................7

   A.  Plaintiffs lack standing to assert the claims underlying their Motion...........8

   B.  Plaintiffs' Elections Clause claims fail as a matter of law.........................10

      1.  The relief Plaintiffs seek is foreclosed by federal statute and Supreme Court precedent................................................................................................10

      2.  Adopting Plaintiffs' theory would lead to absurd results. ......................14

   C.  Plaintiffs' equal population claim fails on the merits. ...............................15

   D.  The Eleventh Amendment bars Plaintiffs' claim that the Pennsylvania Supreme Court did not follow Pennsylvania's "policies and preferences" in choosing a congressional map..............................................................................18

   II.  Plaintiffs do not establish likely irreparable harm......................................19

   III.   Equity and the public interest weigh against an injunction. .......................20

CONCLUSION ...................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson,*
    521 U.S. ...................................................................................................16, 18

*Adams v. Freedom Forge Corp.,*
    204 F.3d 475 (3d Cir. 2000) ...............................................................19

*Aposhian v. Barr,*
    958 F.3d 969 (10th Cir. 2020) ............................................................19

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)..............................................................................11

*Balsam v. Sec'y of State,*
    607 F. App'x 177 (3d Cir. 2015) .........................................................19

*Bognet v. Sec'y Commonwealth of Pa.,*
    980 F.3d 336 (3d Cir. 2020), *cert. granted, judgment vacated as*
    *moot. Bognet v. Degraffenreid,* 141 S. Ct. 2508 (2021)......................8

*Branch v. Smith,*
    538 U.S. 254 (2003)...........................................................10, 11, 12, 14

*Colleton Cnty. Council v. McConnell,*
    201 F. Supp. 2d 618 (D.S.C. 2002) ....................................................15

*Corman v. Torres,*
    287 F. Supp. 3d 558 (M.D. Pa. 2018)...............................................9, 10

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)................................................................................8

*Diaz v. Silver,*
    932 F. Supp. 462 (E.D.N.Y. 1996) .....................................................13

*Essex v. Kobach,*
    874 F. Supp. 2d 1069 (D. Kan. 2012).................................................15

*Gill v. Whitford*,
 138 S. Ct. 1916 (2018) ........................................................................................9

*Growe v. Emison*,
 507 U.S. 25 (1993) .............................................................................1, 10, 12, 14

*Harper v. Hall*,
 No. 413P21 (N.C. Dec. 8, 2021) ......................................................................13

*Hu v. Att'y Gen. of U.S.*,
 219 F. App'x. 254 (3d Cir. 2007) .......................................................................8

*Johnson v. Miller*,
 922 F. Supp. 1556 (S.D. Ga. 1995) ..................................................................16

*Karcher v. Daggett*,
 462 U.S. 725 (1983) ..........................................................................................16

*Kos Pharms., Inc. v. Andrx Corp.*,
 369 F.3d 700 (3d Cir. 2004) ...............................................................................6

*Kowalski v. Tesmer*,
 543 U.S. 125 (2004) .......................................................................................9, 10

*Lance v. Coffman*,
 549 U.S. 437 (2007) ............................................................................................9

*Larios v. Cox*,
 305 F. Supp. 2d 1335 (N.D. Ga. 2004) ............................................................12

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ............................................................................................8

*Mellow v. Mitchell*,
 607 A.2d 204 (1992) ............................................................................13, 17, 18

*Merrill v. Milligan*,
 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ..........................................13

*Pennhurst State Sch. & Hosp. v. Halderman*,
 465 U.S. 89 (1984) ............................................................................................19

*Pileggi v. Aichele*,
   843 F. Supp. 2d 584 (E.D. Pa. 2012) .................................................................13

*Punnett v. Carter*,
   621 F.2d 578 (3d Cir. 1980) ...............................................................................7

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ...............................................................................................21

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) ............................6, 7

*Scott v. Germano*,
   381 U.S. 407 (1965) ...........................................................................................10

*Shayer v. Kirkpatrick*,
   541 F. Supp. 922 (W.D. Mo. 1982), *aff'd sub nom.*, *Schatzle v.*
   *Kirkpatrick*, 456 U.S. 966 (1982) ....................................................................17

*Tennant v. Jefferson Cnty. Comm'n*,
   567 U.S. 758 (2012) ...........................................................................................16

*Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*,
   735 F.3d 131 (3d Cir. 2013) ...............................................................................7

*Upham v. Seamon*,
   456 U.S. 37 (1982) .............................................................................................12

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ...............................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...............................................................................................20

*Wise v. Circosta*,
   978 F.3d 93 (4th Cir. 2020), *application for stay denied*, 141 S. Ct.
   658 (U.S. Oct. 28, 2020) .....................................................................................9

## Statutes

2 U.S.C. § 2a(c) ...........................................................................................*passim*

2 U.S.C. § 2c ..............................................................................6, 10, 11, 14

**INTRODUCTION**

While a preliminary injunction is itself an extraordinary remedy, the relief Plaintiffs seek here—to abrogate a congressional map adopted by Pennsylvania's highest court and order at-large elections—is unprecedented. No court has held that a state court violates the U.S. Constitution by implementing a lawful congressional map where the legislature has failed to do so, or by altering election-related deadlines to facilitate the implementation of that map. For good reason: the Supreme Court has instructed that federal courts must not "obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe v. Emison*, 507 U.S. 25, 34 (1993). This Court need not address Plaintiffs' meritless demands. Plaintiffs lack standing to advance the Elections Clause claims on which their Motion for Preliminary Injunction ("Motion") is based [1] and which fail as a matter of law in any event, and the other claims advanced in their most recent pleadings are either constitutionally barred or fail on the merits. The Court should deny Plaintiffs' Motion.

**BACKGROUND**

## I.     State Court Proceedings

In December 2021, when it became evident that Pennsylvania's political branches would not agree on a congressional map, the Carter Petitioners—voters in overpopulated congressional districts—filed a petition in Pennsylvania's

---

[1] As the Carter Petitioners and Defendants set forth in their motions to dismiss, the legal defects in Plaintiffs' lawsuit require its dismissal under Rule 12(b)(1).

Commonwealth Court alleging malapportionment. *See* Second Am. Compl. ("SAC") Ex. 1, ECF No. 49-1. Consistent with decades of precedent, they asked the court to adopt a map for the 2022 elections. *See id.*

On December 20, the Commonwealth Court scheduled a hearing, announcing it would adopt a map if the General Assembly and Governor failed to enact one by January 30, 2022, and that its hearing would address anticipated "revisions to the 2022 election schedule/calendar." Exhibit A at 2. The court also invited parties to seek intervention by December 31, 2021. *Id.* Ten parties moved to intervene, including the General Assembly's Republican and Democratic leadership, Governor Wolf, current and former members of Pennsylvania's congressional delegation, and multiple groups of voters. Plaintiffs did not seek intervention.

The Commonwealth Court granted intervention to six parties and *amici* status to the rest; all participated in the court's process to adopt a congressional map. *See* SAC Ex. 4, ECF No. 49-4. In their intervention applications, Pennsylvania's "Legislative Leaders" stated that they did not "contest" that, "[w]hen . . . the legislature is unable or chooses not to act, it becomes the judiciary's role to determine the appropriate redistricting plan," Exhibit B at 5 (citing *League of Women Voters v. Commonwealth*, 178 A.3d 737, 822 (2018)); and they interposed no objection to "the commencement of a judicial redistricting process," *id.* at 8, or the state courts' power to modify the election schedule, as they had done after past

impasses; Exhibit C at 6 (citing *Mellow v. Mitchell*, 607 A.2d 204, 237 (1992)). The Legislative Leaders also conceded that the case raised no Elections Clause issues, because "it is settled law that state courts have authority to declare and remedy violations of the U.S. Constitution, even with respect to laws governing congressional elections." Exhibit B at 5 n.2 (citing *Growe*, 507 U.S. at 32–36).

Parties and *amici* submitted 13 maps to the Commonwealth Court for consideration. SAC Ex. 4. The court held a two-day evidentiary hearing, restating that it would adopt one of the proposed maps if the political process failed to result in a map by January 30, and expressly requesting comments from all parties about election deadline changes. SAC Exs. 4, 9 at 14–15, ECF No. 49-4, 49-9.

Meanwhile, Governor Wolf vetoed the General Assembly's proposed map on January 26. *Id.* On February 2, the Pennsylvania Supreme Court exercised extraordinary jurisdiction, designated as Special Master the Commonwealth Court judge who presided over the lower court proceedings, and scheduled argument for February 18. SAC Ex. 8, ECF No. 49-8. The Pennsylvania Supreme Court temporarily suspended the current primary election calendar, SAC Ex. 10, ECF No. 49-10, and entertained intervention motions and amicus briefs from new parties. Plaintiffs still did not seek to participate.

In advance of the February 18 argument, the Secretary recommended minor modifications to the existing election schedule, such as extending the deadline for

nomination petitions from March 8 to March 15, that would both be "feasible" for the Commonwealth and "minimize disruption" of the 2022 elections. Exhibit D at 2. The Secretary explained that primary elections could proceed as scheduled if the Pennsylvania Supreme Court adopted a plan by February 27. *Id.* at 8.

The Pennsylvania Supreme Court announced the adoption of the 2022 Congressional Map on February 23. SAC Ex. 11, ECF No. 49-11. The Court retained the Commonwealth's statutorily-set May 17, 2022 primary date and pushed the deadline by which petitions must be filed with the Secretary by one week. *Id.* Congressional candidates have been circulating nomination petitions under the 2022 Congressional Map for twelve days, and state officials have taken numerous steps to implement the Map. *See id.* at 3; MTD Ex. 1, ECF No. 59-1.[2]

## II.    Federal Court Proceedings

Throughout the entirety of the months-long state court proceedings, Plaintiffs not once sought to participate. They did not seek to intervene when the Commonwealth Court expressly invited intervenors, making clear both that the court intended to adopt a map if the political branches could not, and that it would move deadlines as necessary to effectuate that process. Nor did they intervene when the

---

[2] The Pennsylvania Supreme Court indicated that a written opinion explaining its decision would follow, SAC Ex. 11 at 4; that opinion has not yet issued.

case was taken up by the Pennsylvania Supreme Court, which also made clear that it intended to adopt a map.

Instead, Plaintiffs simply watched and waited. It was not until February 11, 2022 when Plaintiffs finally acted. But rather than attempt to belatedly insert themselves into the state action, they initiated litigation that collaterally attacks those proceedings and the judgment of Pennsylvania's highest court. Compl., ECF No. 1.

In their complaint, Plaintiffs alleged that Pennsylvania's state courts lacked authority to order a remedial map under any circumstances, alleging a violation of the Elections Clause and 2 U.S.C. § 2a(c)(5). *Id.* On February 20, Plaintiffs filed a first amended complaint to add a new plaintiff. Am. Compl., ECF No. 7. That same day, Plaintiffs filed the present Motion for a TRO and/or preliminary injunction, asking this Court to order Pennsylvania to conduct at-large elections on the theory that state courts are wholly barred from implementing remedial congressional plans. Motion at 8, ECF No. 11.[3]

On February 25, the Court denied Plaintiffs' motion for a TRO. Plaintiffs then moved for leave to file a second amended complaint, alleging for the first time that the 2022 Congressional Map's two-person deviation violates the principle of one-person, one-vote and that it is therefore malapportioned. *See generally* SAC, ECF

---

[3] Plaintiffs' request for preliminary relief was earlier filed as ECF No. 8 but re-filed one day later in response to this Court's scheduling order, ECF No. 9.

No. 49. The next day, *before* this Court granted leave to file, Plaintiffs sought relief from the Supreme Court on all their claims. *See* Notice of Appeal, ECF No. 50 (docketed on Feb. 28, 2022 at 4:47 a.m.); Order, *Toth v. Chapman*, No. 22-0208-JPW (M.D. Pa. Feb. 28, 2022), ECF No. 55 (docketed on Feb. 28, 2022 at 12:18 p.m.). The Carter Petitioners and Defendants opposed Plaintiffs' Supreme Court Application, and the Supreme Court denied it. *See* Order, ECF No. 73. Plaintiffs have not sought preliminary injunctive relief from this Court on their malapportionment claim.

On March 4, Plaintiffs again shifted course and now "readily acknowledge that *Branch* [*v. Smith*] allows courts to remedy violations of 2 U.S.C. § 2c by drawing single-member districts." MTD Opp. at 13, ECF No. 67.

## LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quotations and citation omitted). The party seeking relief "must meet the threshold for the most critical factors: it must demonstrate that it can win on the merits," which requires more than the "mere possibility" that relief will be granted, "and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 & n.3 (3d Cir. 2017), *as amended* (June 26, 2017) (citations and quotations omitted). "If

6

these gateway factors are met, a court then considers the remaining two factors": "the possibility of harm to other interested persons from the grant or denial of the injunction" and "the public interest"—and "determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 176, 179.

Importantly, "when the preliminary injunction is directed not merely at preserving the status quo," but seeks to change the status quo through a mandatory injunction, "the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). In such a case, "the moving party's 'right to relief must be *indisputably clear.*'" *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (emphasis added) (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)).

## ARGUMENT

## I.   Plaintiffs' right to relief is not indisputably clear.

Plaintiffs fall far short of showing a "reasonable probability" of success, *see* Motion at 6, let alone that their right to relief is "indisputably clear," *Trinity Indus.*, 735 F.3d at 139.[4]

---

[4] Plaintiffs' Motion addresses only their Elections Clause claims, and those, too, on a theory they have since disclaimed. Because Plaintiffs have asserted new claims and legal theories since filing their Motion, the Carter Petitioners address Plaintiffs' latest merits arguments (asserted in their motion to dismiss opposition), while

**A.** **Plaintiffs lack standing to assert the claims underlying their Motion.**

As the Carter Petitioners set forth in their motion to dismiss, Plaintiffs do not meet the requirements of constitutional or prudential standing for their Elections Clause claims—the only claims at issue in this Motion.

Plaintiffs lack Article III standing because they fail to allege any "concrete and particularized" injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Any so-called "depriv[ation]" of an "entitlement to vote in all 17 congressional races" does not amount to a cognizable injury because it would be felt by all Pennsylvania voters equally. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (standing absent where plaintiff "suffers in some indefinite way in common with people generally").

The Third Circuit has similarly rejected the interest that candidate-Plaintiffs assert in the rules governing their elections. *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 351 (3d Cir. 2020), *cert. granted, judgment vacated as moot. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (holding election rule did not affect candidate "in a particularized way" because "all candidates in Pennsylvania . . . are subject to the same rules"). And, the Supreme Court has rejected standing based on

---

reserving their argument that Plaintiffs have waived the arguments underlying their revised legal strategy. *See Hu v. Att'y Gen. of U.S.*, 219 F. App'x. 254, 258 n. 4 (3d Cir. 2007) (finding argument waived and abandoned when not pursued in argument section of brief).

undifferentiated grievances or abstract policy statements, *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018), like an interest in overseeing the lawful administration of elections, as election official-Plaintiff alleges here. *See* SAC ¶ 57.

That none of Plaintiffs' alleged injuries are sufficient to trigger this Court's jurisdiction is further underscored by the fact that their Motion is based solely on purported Elections Clause violations, which the Supreme Court has held private citizens lack standing to prosecute because the alleged injury is "obvious[ly]" an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Consistent with *Lance*, federal courts have repeatedly declined to adjudicate Elections Clause claims brought by individual plaintiffs. *See, e.g.*, *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020), *application for stay denied*, 141 S. Ct. 658 (U.S. Oct. 28, 2020); *Corman v. Torres*, 287 F. Supp. 3d 558, 567 (M.D. Pa. 2018). This Court should follow suit.

Even if Plaintiffs had suffered a sufficient injury-in-fact, they do not possess prudential standing, as their claim is premised on the *General Assembly's* authority to draw districts, *see* SAC ¶¶ 60-61, rather than Plaintiffs' "own legal rights and interests," *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Because Plaintiffs have identified neither a "close relationship with the [General Assembly]" nor a "'hindrance' to [its] ability to

protect [its] own interests," *id.* at 130, they cannot assert the General Assembly's rights, *see Corman*, 287 F. Supp. 3d at 571–73.

Without standing, Plaintiffs have *no* right to relief, much less one that is "indisputably clear."

**B.    Plaintiffs' Elections Clause claims fail as a matter of law.**

**1. The relief Plaintiffs seek is foreclosed by federal statute and Supreme Court precedent.**

Plaintiffs' original theory of this case—that the Elections Clause bars a state court from adopting a congressional plan when the legislative process fails—is foreclosed by binding Supreme Court precedent and congressional enactments pursuant to the Elections Clause itself. *See, e.g.*, *Branch v. Smith*, 538 U.S. 254, 272 (2003) (explaining that congressional enactment "embraces action by state and federal courts when the prescribed legislative action has not been forthcoming"); *Growe*, 507 U.S. at 33 (finding state court's "issuance of its plan (conditioned on the legislature's failure to enact a constitutionally acceptable plan)" by date certain was "precisely the sort of state judicial supervision of redistricting [the Court] has encouraged"); *Scott v. Germano*, 381 U.S. 407, 409 (1965); *see also* 2 U.S.C. § 2c ("There shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled . . . ."); *id.* § 2a(c) (listing processes for election of congressional representatives "[u]ntil a State is redistricted in the

10

manner provided by the law thereof . . . ."); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 812 (2015).

The Motion does not grapple with this controlling authority; that alone warrants its denial. Instead, Plaintiffs have since morphed their theory of the case, but their latest theory similarly fails.[5] Plaintiffs now claim that it is solely the Pennsylvania Supreme Court's modification of *election-related deadlines* that requires at-large elections. MTD Opp. at 18. Namely, Plaintiffs assert it became too late for the state court to act the moment it changed *any* election-related deadline, regardless of when the change was made or that the primary date remained the same.

In support, Plaintiffs grasp at an isolated phrase from *Branch* about "disrupting the election process," *see* MTD Opp. at 5, 13, 14, 18, 20, and ignore the very limited circumstance in which a plurality of justices found § 2a(c)(5) would apply.[6] Indeed, in the same paragraph Plaintiffs cite, the plurality unequivocally found that § 2a(c)(5) is "inapplicable *unless* the state legislature, *and* state . . . courts, have all failed to redistrict pursuant to § 2c," *Branch*, 538 U.S. at 275, and is only "a *last-resort* remedy" in the narrow circumstance when, "on the eve of a

---

[5] Plaintiffs now "readily acknowledge that the state judiciary can draw maps." at 19; *compare id.* at 17 *with* SAC ¶ 60.

[6] Three other justices found that § 2a(c)(5) had been impliedly repealed and would never require at-large elections. *Branch*, 538 U.S. at 285 (2003) (Stevens, J., concurring).

congressional election, no constitutional redistricting plan exists and there is *no time* for either the State's legislature *or the courts* to develop one," *id.* (emphases added).

Here, there was undoubtedly "time" for the Pennsylvania courts to develop a new congressional map—it did so, twelve weeks before the primary election. Nothing in federal law or Supreme Court precedent bars courts from altering pre-election deadlines to facilitate implementation of a congressional map. Such alterations are essential to crafting a remedy for the underlying legal violations caused by a political impasse—a remedy the Supreme Court has encouraged state courts to formulate. *See, e.g.*, *Growe*, 507 U.S. at 37. There is no reasonable way to read binding precedent "specifically encourag[ing]" state courts to adopt congressional maps upon a political impasse, *Growe*, 507 U.S. at 34, to simultaneously prohibit those courts from altering election deadlines to effectuate that remedy.

State and federal courts alike modify election deadlines when needed to enforce lawful redistricting plans, and the Supreme Court has authorized judicial alteration of the election schedule in these circumstances. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 44 (1982) ("[W]e leave it to [the District Court] in the first instance to determine whether to . . . reschedule the [congressional] primary elections."); *see also Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004); Order, *In the Matter of 2022 Legislative Districting of the State*, Misc. Nos. 21, 24,

25, 26, 27 (Md. Feb. 11, 2022) (postponing 2022 primary filing deadlines); Order,

*Harper v. Hall*, No. 413P21 (N.C. Dec. 8, 2021) (same); *Mellow*, 607 A.2d at 237,

244 (revising pre-primary deadlines after impasse "to provide for an orderly election

process").

Following this well-worn path, Pennsylvania's Supreme Court made minor

modifications to certain election deadlines leading up to the May 17 primary "[t]o

provide for an orderly election process" alongside its adoption of a congressional

map. SAC Ex. 11 at 3, ECF No. 49-11. These slight modifications were made

"easily," on the Secretary's own recommendation, without any evidence of "undue

collateral effect"—all while leaving the date of the primary election intact.[7] *Cf.*

*Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring)

("How close to an election is too close may depend in part on . . . how easily the

State could make the change without undue collateral effects."). Notably, the

Legislative Leaders expressly endorsed the state courts' power to modify the

---

[7] Plaintiffs fail to acknowledge that their requested relief would itself upend the election calendar currently in place. The fact that the 2022 Congressional Map is being implemented only underscores that this case is the *opposite* of those in which courts have chosen *not* to shift election deadlines. *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 596 (E.D. Pa. 2012) ("With election deadlines quickly approaching, and no existing alternative reapportionment plan, Defendant needs certainty as to how to proceed."); *see Diaz v. Silver,* 932 F. Supp. 462, 468–69 (E.D.N.Y. 1996) (listing cases holding that, without any alternative redistricting plan readily available, harm to the public in changing election rules or dates outweighs likely benefit to plaintiffs of granting a preliminary injunction).

election schedule, arguing that "nominating petition deadlines" have been moved by state courts in the past and "could still be moved in this election cycle." Exhibit C at 6 (citing *Mellow*, 607 A.2d at 237). And at no point did they object to the election calendar changes that were proposed by either the Special Master or the Secretary.

Plaintiffs offer no authority or evidence to the contrary. A constitutional congressional map was implemented in "time," and elections are proceeding accordingly. Therefore, "§ 2a(c) cannot be properly applied" because the state "court[] . . . effect[ed] the redistricting mandated by § 2c." *Branch*, 538 U.S. at 275.

### 2.   Adopting Plaintiffs' theory would lead to absurd results.

The practical effect of Plaintiffs' theory would be absurd. Since Congress enacted § 2c in 1967, no state has conducted at-large congressional elections. And Plaintiffs' rigid theory of "timeliness" under § 2c would functionally preclude state courts from resolving political impasses in redistricting. State courts typically wait to adjudicate impasse actions until later in the process, when it becomes abundantly clear that the political branches will not be able to agree. But if they take steps to redistrict "too late," the federal courts may step in. *See Growe*, 507 U.S. at 34 (explaining federal courts must defer to state courts on reapportionment "[a]bsent evidence that [the state court] will fail to timely perform that duty"). Plaintiffs would add a new complication to this process: at some point (although exactly when is not perfectly clear from Plaintiffs' papers) a litigant who is unhappy with the trajectory

of the state court proceedings could run to federal court and demand at-large elections. Plaintiffs' theory thus cannot be squared with the Supreme Court's endorsement of state courts' role in remedying impasses, *see supra* pp. 10–11.

### C. Plaintiffs' equal population claim fails on the merits.

Plaintiffs' Motion does not seek an injunction based on their malapportionment claim, but that claim is also meritless. Article I, § 2 of the U.S. Constitution establishes that congressional districts must be apportioned to contain equal population "as nearly as practicable." *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964). No court has ever held that a congressional map with a plus-or-minus-one-person deviation (like the 2022 Congressional Map)—as opposed to an absolute one-person deviation—does not satisfy this requirement. Indeed, the opposite is true. *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 664 (D.S.C. 2002) (finding court plan with two-person deviation "complies with the 'as nearly as practicable' population equality requirement . . . with a deviation of plus or minus one person." (citing *Karcher v. Daggett*, 462 U.S. 725, 730 (1983))); *see also Essex v. Kobach*, 874 F. Supp. 2d 1069, 1088 (D. Kan. 2012) ("The Court's plan results in two districts with populations of 713,278 and two with populations of 713,281 . . . [which] satisfies Article I, Section 2.").[8]

---

[8] Likewise, since 2000, at least six states have adopted congressional apportionment plans with two-person deviations. *See, e.g.*, Oregon and Georgia (two-person

Additionally, Supreme Court precedent speaks only of "*significant* variance between districts" as raising constitutional concerns. *Karcher*, 462 U.S. at 730–31 (emphasis added). Even if the 2022 Congressional Map's two-person deviation—a difference of only one person from perfect equality, given the odd number of districts—did not fall within the plus-or-minus one person requirement of population equality, it is not the kind of *significant* deviation that requires further review or justification. *Cf. Tennant*, 567 U.S. at 762–65 (accepting justifications for 4,871-person deviation in congressional plan); *Abrams v. Johnson*, 521 U.S. at 99–100 (finding court-ordered congressional plan with "slight deviation[]" of 2,047 persons justified); *see also Johnson v. Miller*, 922 F. Supp. 1556, 1571–72 (S.D. Ga. 1995) (listing absolute population of each district in the map at issue in *Abrams*). Thus, Plaintiffs' malapportionment claim fails as a matter of law.

In any event, the 2022 Congressional Map's two-person deviation *is* justified—and the justification precisely aligns with the Supreme Court's prior decisions. Although the Pennsylvania Supreme Court has not yet issued an opinion

---

population range after 2010 redistricting cycle); South Carolina and Colorado (two-person population range in court-enacted plans after 2000 redistricting cycle); and Kentucky and Maryland (two-person population range after 2000 redistricting cycle); *see also* "2010 Redistricting Deviation Table," Nat'l Conf. State Legislatures (Jan. 15, 2020), https://www.ncsl.org/research/redistricting/2010-ncsl-redistricting-deviation-table.aspx; "Designing P.S. 94-171 Redistricting Data for the Year 2010 Census," U.S. Census Bureau (Sept. 2004), https://www2.census.gov/programs-surveys/rdo/2010_pl94-171rv.pdf, at 26.

setting forth its reasons for adopting the 2022 Congressional Map, it was aware that any steps to further equalize population in that Map would have required an additional election precinct split.[9] Courts have approved such tradeoffs as sufficient justification for much greater population deviations than the one here. *See Shayer v. Kirkpatrick*, 541 F. Supp. 922, 933–34 (W.D. Mo. 1982), *aff'd sub nom.*, *Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982) (adopting court-drawn plan with 961-person deviation and holding that such "minor deviations based on preserving definitive county and political subdivisions are permissible"); *Mellow*, 607 A.2d at 208, 218, 237–43 (holding 63-person deviation was "fully justified by the policy of preserving the boundaries of municipalities and precincts" and adopting conclusion that "a serious election administration problem arises from requiring the voters in a single precinct to look to two different sets of congressional candidates").

Plaintiffs provide no reason to second-guess the judgment of the Commonwealth's highest court that the 2022 Congressional Map (and its two-person deviation) achieves a legitimate state goal. The fact that the Special Master's recommended map has a one-person deviation does not change that conclusion. That map—which was vetoed by the Governor—scored worse than the 2022

---

[9] The Carter Petitioners provided the Pennsylvania Supreme Court with an alternative map that had a one-person population deviation at the expense of an additional voting district split. *See* Exhibit E. That court chose not to adopt the alternative.

Congressional Map on a variety of metrics, including county splits and retention of prior district populations. *See* Exhibit F at 2, 4. The Pennsylvania Supreme Court had to consider similar tradeoffs between the 2022 Congressional Map and each of the proposed maps, *see id.*, and ultimately chose the map that adhered most closely to all of the state's map-drawing criteria.

Finally, even if the 2022 Congressional Map's population deviation were "unacceptable," the proper remedy would be to "require some very minor changes in the court's plan—a few shiftings of precincts—to even out districts with the greatest deviations." *Abrams*, 521 U.S. at 100. It would not warrant the unprecedented elimination of congressional districts altogether.

### D.   The Eleventh Amendment bars Plaintiffs' claim that the Pennsylvania Supreme Court did not follow Pennsylvania's "policies and preferences" in choosing a congressional map.

To the extent Plaintiffs now assert that their Elections Clause claims are grounded in the Pennsylvania Supreme Court's failure to abide by *Pennsylvania* law in its choice of a congressional map, that claim is barred by the Eleventh Amendment. *See* MTD Opp. at 21.

While Plaintiffs try to disguise their gripe with the 2022 Congressional Map as a federal constitutional violation, they advance nothing more than disagreements over the application of Pennsylvania's "policies and preferences." As such, they seek a federal injunction against state officials for alleged violations of state law—

precisely the relief barred under the Eleventh Amendment. *Pennhurst State Sch. &
Hosp. v. Halderman*, 465 U.S. 89, 117 (1984) (holding "a federal suit against state
officials on the basis of state law contravenes the Eleventh Amendment when . . .
the relief sought and ordered has an impact directly on the State itself"); *Balsam v.
Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (Eleventh Amendment bars
state law claims even when "premised on violations of the federal Constitution").

## II.   Plaintiffs do not establish likely irreparable harm.

Plaintiffs' failure to allege a cognizable injury is fatal to their ability to
demonstrate irreparable harm. "A court may not grant . . . injunctive relief without"
a showing that plaintiffs "are likely to experience irreparable harm without an
injunction." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).
Although Plaintiffs claim they are "suffering irreparable harm from the defendants'
failure to obey the requirements of the Elections Clause and 2 U.S.C. § 2a(c)," they
cannot rely on generalized injuries arising out of novel Elections Clause claims to
show irreparable harm. *See supra* pp. 8–9. "To the contrary," courts "finding that a
violation of a constitutional right alone constitutes irreparable harm are limited to
cases involving individual rights, not the allocation of powers among the" federal
and state legislatures under the Elections Clause. *Aposhian v. Barr*, 958 F.3d 969,
990 (10th Cir. 2020) (rejecting finding of irreparable harm where plaintiff alleged
"generalized separation of powers" violation).

Moreover, the purported harms Plaintiffs identify have since been rendered moot: the Pennsylvania Supreme Court has ordered elections to proceed under a new schedule that not only permits candidate-Plaintiffs to collect signatures and campaign, but ensures that election official-Plaintiff may timely execute the election. SAC Ex. 11. These new facts only further demonstrate that Plaintiffs' alleged harms were *never* actual or imminent, but instead arise from Plaintiffs' own conduct or are speculative. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the courts' recognition that] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Plaintiffs have failed to carry their burden of showing irreparable harm.

## III.    Equity and the public interest weigh against an injunction.

Both the "balance of the equities" and the "public interest" strongly disfavor enjoining the 2022 Congressional Map and ordering at-large elections. The Supreme Court has counseled that "[a]s an election draws closer," court orders affecting election rules "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). This principle is especially salient here.

The election is already proceeding under the 2022 Congressional Map: candidates are more than halfway through the nomination process; the deadline to file nomination petitions is one week away; and Defendants are readying for the primary under that Map in ten weeks. Enjoining the Map now would require substantial revisions to the election calendar (at significant expense to the Commonwealth), severely prejudice the congressional campaigns already underway, and create massive confusion for candidates, voters, and election officials alike—not to mention the disruption and inequities of eliminating districted congressional elections in Pennsylvania for the first time in more than 200 years.

Plaintiffs also have no justification for seeking emergency relief on the eve of an election where they strategically elected not to participate in the process until the eleventh hour. *See supra* pp. 1–6. The equities and the public interest clearly cut against granting an injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: March 8, 2022

Abha Khanna**
Elias Law Group LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
akhanna@elias.law
T: (206) 656-0177

Lalitha D. Madduri**
Jyoti Jasrasaria**
Christina Ford*
Joseph Posimato*
Tina Meng**
Elias Law Group LLP
10 G St. NE, Suite 600
Washington, D.C. 20002
lmadduri@elias.law
jjasrasaria@elias.law
tmeng@elias.law
T: (202) 968-4490

Matthew Gordon**
Perkins Coie LLP
1201 Third Avenue Suite 4900
Seattle, WA 98101
MGordon@perkinscoie.com
T: (206) 359-3552

Respectfully submitted,

*/s/ Elizabeth V. Wingfield*
Timothy D. Katsiff (PA 75490)
Elizabeth V. Wingfield (PA 32477)
Edward D. Rogers (PA 69337)*
Marcel S. Pratt (PA 307483)*
Robert J. Clark (PA 308105)*
Michael R. McDonald (PA 326873)**
Paul K. Ort (PA 326044)*
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
KatsiffT@ballardspahr.com
WingfieldE@ballardspahr.com
RogersE@ballardspahr.com
PrattM@ballardspahr.com
ClarkR@ballardspahr.com
McDonaldM@ballardspahr.com
OrtP@ballardspahr.com
T: (215) 665-8500
F: (215) 864-8999

*Counsel for Carter Petitioners*

*\*Motions for Pro Hac Vice*
*Forthcoming*
*\*\*Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Opposition to Plaintiffs' Preliminary Injunction contains 4,992 words, based on the word count of the word processing system used to prepare this brief, and thereby complies with the Local Civil Rule 7.8.

Dated: March 8, 2022                          */s/ Elizabeth V. Wingfield*