## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM C. TOTH, JR., *et al.*, | : | Civil No. 1:22-CV-00208 |
| | : | |
| Plaintiffs, | : | Three Judge Panel Convened |
| | : | Pursuant to 28 U.S.C. § 2284(a) |
| v. | : | |
| | : | |
| LEIGH M. CHAPMAN, *et al.*,[1] | : | |
| | : | |
| Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| CAROL ANN CARTER, *et al.*, | : | |
| | : | |
| Intervenor-Defendants. | : | |

## MEMORANDUM OPINION

**BEFORE**: Kent A. Jordan, Circuit Judge, *United States Court of Appeals for the Third Circuit*; Patty Shwartz, Circuit Judge, *United States Court of Appeals for the Third Circuit*; Jennifer P. Wilson, District Judge, *United States District Court for the Middle District of Pennsylvania*

*Per Curiam*                                                    **March 16, 2022**

### INTRODUCTION

Plaintiffs William C. Toth, Jr., William J. Hall, Howard Gartland ("Gartland"), James Bognet ("Bognet"), Aaron Bashir ("Bashir"), and Alan M. Hall ("Hall") (collectively, "Plaintiffs") are all registered voters in Pennsylvania. Bognet and Bashir are also candidates for Congress from Luzerne and Philadelphia Counties, respectively. Hall is also a member of the Susquehanna County Board of

---

[1] The Clerk is directed to correct the docket to change "Lehigh" to "Leigh."

Elections.  Plaintiffs have sued Leigh Chapman, Acting Secretary of the

Commonwealth of Pennsylvania; Jessica Mathis, Director for the Pennsylvania

Bureau of Election Services and Notaries; and Tom Wolf, Governor of

Pennsylvania, in their official capacities (collectively, "Commonwealth

Defendants").  In their second amended complaint, Plaintiffs contend that

Defendants' implementation of the congressional district reapportionment plan

selected by the Pennsylvania Supreme Court (referred to as the "Carter Plan")

violates the Elections Clause of the United States Constitution and 2 U.S.C. §

2a(c)(5) and that Defendants' departure from the general primary calendar

established by the Pennsylvania legislature violates the Elections Clause (Claims

One and Two).  In addition, Plaintiffs assert that the Carter Plan violates the United

States Constitution as interpreted in *Wesberry v. Saunders*, 376 U.S. 1 (1964)

(Claim Three).  With one exception, the group of Pennsylvania voters who

proposed the Carter Plan in the earlier state court litigation sought and have been

permitted to intervene as defendants in this action ("Intervenor-Defendants" or

"Carter Group").  The Commonwealth Defendants and Intervenor-Defendants

(together, "Defendants") now move to dismiss Claims One and Two, arguing that

Plaintiffs lack standing to pursue these claims.  We agree.

## BACKGROUND

### A. Developments in the Political Branches

Pennsylvania lost one seat in the United States House of Representatives as a result of the 2020 decennial census, reducing its number of seats from 18 to 17. (Doc. 49, ¶¶ 13–14.)  The Pennsylvania General Assembly then began the process of selecting a new electoral map for the 2022 elections.  (*Id.* ¶¶ 16-17.)  The General Assembly passed in HB 2146 a map that Plaintiffs allege provided for a 9-8 Democratic tilt ("Assembly Map").  (*Id.* at 2; Doc. 49-9, p. 217.)[2]  On January 26, 2022, Governor Wolf vetoed the Assembly Map, remarking, among other things, that it was insufficiently bipartisan.  (Doc. 49, p. 2 & n.1, ¶¶ 17, 25.)  At that point, Pennsylvania did not have a new congressional map for the May 17, 2022 primary.

### B. State Court Litigation

Prior to the Governor's veto, two groups of litigants—one of which was the Carter Group—each filed suit in the Commonwealth Court of Pennsylvania seeking to have a proposed reapportionment plan implemented.  (*Id.* ¶¶ 18, 20; *see also* Doc. 49-1.)  The cases were consolidated before Judge Patricia A. McCullough, who instructed on December 20, 2021 that she would "select" a plan for reapportionment "from those plans timely filed by the parties," "[i]f the

---

[2] For ease of reference, the Court uses the page numbers from the CM/ECF header.

General Assembly and the Governor fail[ed] to enact [such a] plan by January 30, 2022." *Carter v. Degraffenreid*, No. 464 M.D. 2021, slip op. at 2 (Pa. Commw. Ct. Dec. 20, 2021). The Carter Group's plan was one of the "timely filed" plans before Judge McCullough. (Doc. 49-1.)

On December 21, 2021, the Carter Group filed an application for extraordinary relief in the Pennsylvania Supreme Court, which was denied without prejudice. (Doc. 49, ¶¶ 21, 23; Docs. 49-2, 49-3.) On January 27 and 28, 2022, Judge McCullough held an evidentiary hearing. (Doc. 49, ¶ 26.) On January 29, 2022, the Carter Group filed a renewed application in the Pennsylvania Supreme Court after Governor Wolf vetoed the Assembly Map, again asking the Court to exercise extraordinary jurisdiction. (*Id.* ¶ 27; Doc. 49-7.) On February 1, 2022, Judge McCullough issued an order indicating that she would rule by February 4, 2022. (Doc. 49, ¶ 28.)

On February 2, 2022, the Pennsylvania Supreme Court granted the application to exercise extraordinary jurisdiction, "given the impasse between the legislative and executive branches concerning the adoption of congressional districts, and in view of the impact that protracted appeals will have on the election calendar, and time being of the essence." *Carter v. Chapman*, No. 7 MM 2022, 2022 WL 304580, at *1 (Pa. Feb. 2, 2022); Doc. 49, ¶ 29; Doc. 49-8. The Pennsylvania Supreme Court designated Judge McCullough as a Special Master

4

and instructed her to submit a report and proposed map by February 7, 2022. *Chapman*, 2022 WL 304580, at *1; Doc. 49, ¶ 30; Doc. 49-8.

On February 7, Judge McCullough filed her report, which recommended the Assembly Map from among the 13 maps submitted "by the parties and their amici." (Doc. 49, ¶¶ 32–33; *see also* Doc. 49-9, pp. 50–63.) She rejected the Carter Plan, in part, because "it produces districts with a two-person deviation, which" Plaintiffs allege "is unconstitutional when it remains possible to adopt other maps that contain no more than a one-person deviation."[3] (Doc. 49, ¶ 34 (citing Doc. 49-9, pp. 198, 201, 210).)

On February 9, 2022, the Pennsylvania Supreme Court temporarily suspended the general primary election calendar. (*Id.* ¶ 40; Doc. 49-10.) After setting a deadline for objections and holding oral argument, the Pennsylvania Supreme Court issued an order on February 23, 2022 rejecting Judge McCullough's recommendation and adopting the Carter Plan. *Carter v. Chapman*, No. 7 MM 2022, 2022 WL 549106, at *1 (Pa. Feb. 23, 2022); Doc. 49, ¶ 41; Doc. 49-11. This order also vacated the prior order that temporarily suspended the general primary election calendar, extending a few internal deadlines (including

---

[3] According to Judge McCullough's findings of fact, the magnitude of the referenced "deviation" in a map reflects the "difference in population from the largest to the[] smallest district[]" in the map. (Doc. 49-4, p. 204.) For instance, the largest district in a map with a "one person deviation" only contains one more person than the smallest district in that map. (*Id.*)

the first day to circulate and file nomination petitions), but leaving undisturbed many dates including the May 17, 2022 primary election date. *Carter v. Chapman*, 2022 WL 549106, at *1; Doc. 49, ¶ 43; Doc. 49-11.

The Justices of the Pennsylvania Supreme Court later filed majority, concurring, and dissenting opinions. Writing for the majority, Chief Justice Baer explained that the Court accepted the "unwelcome obligation" of selecting a congressional redistricting plan because the General Assembly and the Governor had failed to agree upon a plan. *Carter v. Chapman*, No. 7 MM 2022, 2022 WL 702894, at *1 (Pa. Mar. 9, 2022) (quoting *League of Women Voters of Pa. v. Commonwealth*, 178 A.3d 737, 823 (Pa. 2018) ("*LWV II*")). Chief Justice Baer then detailed the reasons why the Court selected the Carter Plan as being "superior or comparable" to all of the plans submitted based on a review of the criteria discussed in *LWV II*, Pennsylvania's Free and Equal Elections Clause, the Pennsylvania Constitution Article I, Section 5, and the Voting Rights Act, 52 U.S.C. § 10301. *Id.* at *2. Justices Donohue, Dougherty, and Wecht joined the majority opinion and filed concurring opinions. Justices Todd, Mundy, and Brobson filed dissenting opinions. *Id.* at *19–49.

### C. Federal Court Litigation

#### 1. Procedural History

This federal action was initiated via complaint on February 11, 2022.  (Doc. 1.)  Plaintiffs also filed a notice requesting that a three-judge district court be convened.  (Doc. 3.)  On February 20, 2022, Plaintiffs filed a first amended complaint.  (Doc. 7.)  The same day, Plaintiffs also filed an emergency motion for temporary restraining order ("TRO") and preliminary injunction.  (Doc. 8.)

On February 21, 2022, the Court issued a scheduling order requiring expedited briefing on Plaintiffs' request for a three-judge district court and scheduling an on-the-record telephone conference for February 25, 2022 to discuss procedural and scheduling considerations regarding Plaintiffs' motion for TRO. (Doc. 9.)

On February 22, 2022, the Carter Group moved to intervene in this action.[4] (Docs. 14, 15.)  The Court subsequently ordered expedited briefing on the motion to intervene and granted the motion on February 28, 2022.  (Docs. 21, 38, 41, 51.)

A few days earlier, on February 23, 2022, Plaintiffs filed a renewed emergency motion for TRO along with a brief in support.  (Docs. 30, 31.)  In it, Plaintiffs stated that if the Court did not grant the requested relief by midnight the

---

[4] The Intervenor-Defendants are Carol Ann Carter, Monica Parrilla, Rebecca Poyourow, Williams Tung, Roseanne Milazzo, Burt Sigal, Susan Cassanelli, Lee Cassanelli, Lynn Wachman, Michael Guttman, Maya Fonkeu, Brady Hill, Mary Ellen Balchunis, Tom Dewall, and Stephanie McNulty.

same day, they would "seek emergency relief from [U.S. Supreme Court] Justice [Samuel] Alito." (Doc. 30, p. 2.) The Court did not rule on the renewed emergency motion for TRO on the schedule requested by Plaintiffs. The Court proceeded with the on-the-record telephone conference on February 25, 2022, as scheduled by the Court's earlier order. During the call, Plaintiffs requested that the Court deny the motion for TRO so they could file an application for emergency relief with Justice Alito. By order entered following the call, the Court denied the TRO motion, set a briefing schedule on jurisdictional motions to dismiss and the remaining preliminary injunction motion, and scheduled a hearing on the motion for preliminary injunction on March 11, 2022, at 1:00 p.m., "subject to change depending on whether a three-judge district court is convened and the availability of the two other presiding judges." (Doc. 43.)

On February 28, 2022, Plaintiffs filed an emergency application for writ of injunction with Justice Alito, and also filed a notice of interlocutory appeal in this Court. (Doc. 50.) By order entered on March 7, 2022, the Supreme Court denied the application for writ of injunction, stating that the parties may exercise their right to appeal from an order resolving a request for interlocutory injunctive relief since this case had been referred to a three-judge district court. (Doc. 73.)

Prior to the Court's deadline for filing jurisdictional motions to dismiss, Plaintiffs moved to file a second amended complaint on February 27, 2022. (Doc.

48.)  Shortly thereafter, the Court granted Plaintiffs' motion for leave to file a second amended complaint and ordered that the briefing schedule would remain unchanged.  (Doc. 55.)

Defendants and Intervenor-Defendants filed motions to dismiss and briefs in support on March 1, 2022.  (Docs. 58–61.)  Following review of these filings and noting that Defendants were not challenging one of the claims (Claim Three, i.e., the *Wesberry* claim) on jurisdictional grounds, the Court promptly requested that Chief Judge Michael Chagares of the United States Court of Appeals for the Third Circuit convene a three-judge district court under 28 U.S.C. § 2284.  (Doc. 62.)  A three-judge district court was convened on March 3, 2022.[5]  (Doc. 63.)  Thereafter, Plaintiffs timely opposed the motions to dismiss, and Defendants filed reply briefs.  (Docs. 67, 69, 70.)  On March 7, 2022, the Court adjourned the March 11 hearing on the motion for preliminary injunction pending review of the briefs by the three-judge district court.  (Doc. 72.)

On March 10, 2022, Plaintiffs filed a notice withdrawing their emergency motion for injunctive relief.  (Docs. 10, 30, 82.)  Plaintiffs explained that they decided to withdraw the request for emergency injunctive relief prior to the 2022 primary election because the Supreme Court denied emergency relief with respect

---

[5] Prior to the March 3, 2022 order, this action was before a single judge, Judge Jennifer P. Wilson.

to the May 17, 2022 primary election in North Carolina in *Moore v. Harper*, No.

21A455 (Mar. 7, 2022), which is the same date as Pennsylvania's primary election.

(*Id.* at 1-2.)  Plaintiffs observed that, given the outcome in *Moore*, the *Purcell*

doctrine would likely preclude injunctive relief with respect to the 2022

Pennsylvania primary election.  (*Id.*)  However, Plaintiffs indicated that they intend

to file a new motion for preliminary injunction that will seek to enjoin Defendants

from "using or implementing the Carter Plan after the 2022 elections have

occurred."  (*Id.* at 2.)

We now address the motions to dismiss Claims One and Two based on a

lack of standing.

### 2.  Factual Allegations

Plaintiffs' second amended complaint contains three claims, a variety of

requests for relief, and sets forth facts related to standing.[6]  (Doc. 49, ¶¶ 52–74.)

Claim One asserts that the Commonwealth Defendants' implementation of the

Carter Plan violates the Elections Clause of the United States Constitution and 2

U.S.C. § 2a(c)(5).  (*Id.* ¶¶ 59–63.)  Claim Two alleges that the Commonwealth

Defendants' departure from the general primary calendar violates the Elections

---

[6] The facts pleaded that are related to standing will be set forth in detail in the relevant sections *infra*.

Clause.  (*Id.* ¶¶ 64–67.)  Claim Three asserts that the Carter Plan violates the equal-population rule of *Wesberry v. Sanders*, 376 U.S. 1 (1964).  (*Id.* ¶¶ 68–74.)

In their demand for relief, Plaintiffs request, among other things, that the Court: (1) declare that the selection of the Carter Plan violates the Elections Clause, 2 U.S.C. § 2a(c)(5), and the equal-population rule of *Wesberry v. Sanders*; (2) "declare that the Elections Clause compels the defendants to adhere to the General Primary Calendar when conducting elections for the United States House and Senate;" (3) "declare that the Elections Clause and 2 U.S.C. § 2a(c)(5) require the defendants to hold at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map;" and (4) enter a preliminary and permanent injunction to restrain the implementation or enforcement of the Carter Plan, restrain departure from the General Primary Calendar, and compel at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map.[7]  (*Id.* ¶ 75.)

---

[7] In their notice withdrawing their request for a preliminary injunction, Plaintiffs notified the Court that they do not seek to enjoin the 2022 primary or general elections. (Doc. 82).

## STANDARD OF REVIEW

Defendants seek dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.[8]  Rule 12(b)(1) challenges may be "facial" or "factual."  *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  A facial attack challenges whether jurisdiction has been properly pleaded, and requires a court to "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d at 891).  Conversely, when a defendant sets forth a factual attack on subject-matter jurisdiction, "the [c]ourt is free to weigh the evidence and satisfy itself whether it has power to hear the case. . . . '[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'"  *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) (quoting *Mortensen*, 549 F.2d at 891), *overruled on other grounds*, *Animal Sci. Prods., Inc. v. China Minmetals*, 654 F.3d 462 (3d Cir. 2011).

---

[8] The Intervenor-Defendants also move to dismiss on Rule 12(b)(6) grounds.  However, for purposes of this decision, we only address the jurisdictional challenge under Rule 12(b)(1).

In this case, Defendants assert that Plaintiffs have failed to sufficiently allege Article III standing. We are thus presented with a facial attack on subject-matter jurisdiction and will "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs., Inc.*, 220 F.3d at 176 (citing *Mortensen*, 549 F.2d at 891).

## DISCUSSION

Defendants argue that Plaintiffs lack Article III standing to assert Claims One and Two. In Claim One, Plaintiffs ask us to declare as unconstitutional the Carter Plan and to enjoin the Commonwealth Defendants from enforcing it, and order Defendants to "hold at-large elections for the Pennsylvania congressional delegation, unless and until the General Assembly enacts a new congressional map." (Doc. 49, ¶ 62.) In Claim Two, Plaintiffs ask us to declare that the Commonwealth Defendants "must adhere to the General Primary Calendar" when conducting the congressional elections, and to enjoin them "from departing from that legislatively enacted primary calendar unless and until that calendar is modified or altered by the Pennsylvania legislature." (*Id.* ¶ 66.) Plaintiffs contend that the Commonwealth Defendants' implementation of the Carter Plan and the refusal to hold at-large elections for Pennsylvania's congressional delegation injures them as Pennsylvania registered voters, congressional candidates (Bognet

and Bashir), and a member of a county board of elections (Hall).  (*Id.* ¶¶ 52–53, 55–58.)

For the reasons discussed below, Plaintiffs have failed to establish that they have standing to pursue these claims because they have not shown that they have suffered an injury-in-fact as a result of the Commonwealth Defendants' actions. Because we conclude that Plaintiffs lack standing to pursue Claims One and Two, we in turn lack subject-matter jurisdiction, which renders us unable to pass on the merits of these claims.  We therefore have no occasion at this juncture to consider the Pennsylvania Supreme Court's decision adopting the Carter Map.  Our decision with respect to Plaintiffs' lack of standing to bring Claims One and Two should not be read as expressing any view with respect to the Pennsylvania Supreme Court's decision in the underlying state court proceedings.

### A.     Article III Standing

Under Article III of the United States Constitution, federal courts are constrained to resolve only "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)). Ensuring a plaintiff has Article III standing "'serves to prevent the judicial process

from being used to usurp the powers of the political branches,' and confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

Article III standing requires that the plaintiff, who bears the burden of establishing these elements, prove: (1) an injury-in-fact; (2) that is fairly traceable to the defendant's conduct; and (3) that is likely to be redressed by a favorable decision. *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). When standing is challenged at the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

As to the first element, an injury-in-fact must be "'an invasion of a legally protected interest' that is 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). A particularized injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Further, any threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

### 1.    Plaintiffs Lack Standing as Registered Voters

Plaintiffs assert that they have standing to bring Claims One and Two under the Elections Clause and 2 U.S.C. § 2a(c)(5) as registered voters in Pennsylvania.[9] (*See* Doc. 49, ¶ 52.)  All Plaintiffs allege that they, as registered voters, are "suffering injury in fact from the defendants' implementation of the [purportedly] unconstitutional Carter Plan and their refusal to hold at-large elections for the state's congressional delegation, as required by the Elections Clause and 2 U.S.C. § 2a(c)(5)." (*Id.*)  To that end, Plaintiffs allege that they are "entitled" under 2 U.S.C. § 2a(c)(5) to cast ballots in all 17 representative races if the General Assembly fails to enact a new congressional map, and that they are thus being deprived of this entitlement by the Commonwealth Defendants' failure to hold at-large elections in contravention of the Elections Clause and 2 U.S.C. § 2a(c)(5). (*Id.* ¶ 53.)

In their motions to dismiss, the Commonwealth Defendants and Intervenor-Defendants argue that *Lance v. Coffman*, 549 U.S. 437 (2007), precludes Plaintiffs' ability to establish standing based on their status as registered voters in

---

[9] Gartland additionally alleges that he is injured because the Carter Plan violates the "equal-population rule"; because he resides in the Carter Plan's 5th Congressional District, he claims his vote will "carry less weight because the population of his district has been overweighted." (Doc. 49, ¶ 54.).  Gartland's standing allegations relate only to Plaintiffs' third claim, which is not at issue here. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("[A] plaintiff must demonstrate standing separately for each form of relief sought." (quotation marks omitted)); *Lewis v. Carey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.").

Pennsylvania.  (Doc. 59, pp. 15–17; Doc. 61, pp. 15–18.)  The Commonwealth Defendants further argue that Plaintiffs cannot side-step *Lance* by citing 2 U.S.C. § 2a(c)(5) for three reasons: (1) Plaintiffs' alleged injury is only traceable to the Elections Clause; (2) Section 2a(c)(5) only offers "a last-resort remedy" when time expires for developing a single-member district plan, rather than vesting any rights; and (3) even if an injury could be traced to Section 2a(c)(5), it, too, would be a generalized grievance affecting every Pennsylvania voter.  (Doc. 61, pp. 17–18.)

Plaintiffs, in response, argue that *Lance* is distinguishable because the plaintiffs in that case failed to allege any injury under the Elections Clause whereas, here, Plaintiffs allege that the Elections Clause violation is "depriving them of their right to vote in 16 of 17 state congressional races."  (Doc. 67, pp. 7–8.)  They further submit that the denial of Plaintiffs' ability to vote in all 17 congressional races is not a generalized grievance simply because it impacts every voter in the Commonwealth of Pennsylvania.  (*Id.* at 8.)  Rather, they say, because Plaintiffs' injury is not abstract, it does not fall into the category of a generalized grievance.  (*Id.* at 8–9.)

A generalized grievance, in contrast to a particularized injury, is "shared in substantially equal measure by all or a large class of citizens."  *Warth*, 422 U.S. at 499.  The United States Supreme Court held in *Lance* that Colorado voters lacked Article III standing to bring an Elections Clause claim.  549 U.S. at 442.  There,

following the Colorado legislature's failure to draw a congressional district map to implement the 2000 census results, the state court adopted a map for the upcoming election. *Id.* at 437–38. In 2003, the legislature agreed on a new map, but the Colorado Supreme Court enjoined implementation of the new map because the Colorado Constitution limited redistricting to once per census. *Id.* at 438. The plaintiffs filed a federal action arguing that the Colorado Supreme Court's interpretation of the Colorado Constitution violated their rights under the Elections Clause. *Id.* The Supreme Court reiterated its many decisions denying standing to hear generalized grievances, and held:

> The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring their Elections Clause claim.

*Id.* at 439–442 (citations omitted).

*Lance* is directly on point. *Lance* and this case involve private citizens seeking to compel state officials to follow what those citizens perceive to be the demands of the Elections Clause. Here, as in *Lance*, Plaintiffs have failed to establish Article III standing because they have identified only an "undifferentiated, generalized grievance" rather than a particularized and personal injury-in-fact.

*Bognet v. Secretary Commonwealth of Pennsylvania* leads to the same conclusion. 980 F.3d 336 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). There, the Court of Appeals for the Third Circuit explained that "[f]ederal courts are not venues for plaintiffs to assert a bare right 'to have the Government act in accordance with law.'" *Id.* at 348–49 (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)). "When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as 'generalized grievances' that cannot support standing." *Id.* at 349 (quoting *United States v. Richardson*, 418 U.S. 166, 173–75 (1974)). "Such is the case here insofar as Plaintiffs . . . theorize their harm as the right to have government administered in compliance with the Elections Clause" and 2 U.S.C. § 2a(c)(5). *Id.*

In an effort to avoid the impact of *Lance*, Plaintiffs point to several other Supreme Court decisions for the general proposition that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." (Doc. 67, pp. 7–9 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).) While Plaintiffs accurately quote precedent broadly addressing the right to vote, the mere fact that an individual has a right to vote does not confer standing to challenge any and all voting laws and regulations. *See Bognet*, 980 F.3d at 358.

19

Plaintiffs also cite *Gill v. Whitford*, 138 S. Ct. 1916 (2018), to support their contention that a deprivation of the right to vote is a concrete and particularized injury.  (Doc. 67, p. 7.)  However, Plaintiffs' reliance on *Gill* overlooks that the Supreme Court concluded that the voters in *Gill* lacked standing to challenge a Wisconsin districting plan as an unconstitutional partisan gerrymander.  138 S. Ct. at 1923, 1931.  Further, the Supreme Court stated that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue."  *Id.* at 1929 (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).  Here, however, Plaintiffs have not alleged any such disadvantage.  Nothing is preventing them from voting, and their votes are not otherwise disadvantaged relative to those of the entire population of Pennsylvania.

Plaintiffs' reliance on *Iowa Voter Alliance v. Black Hawk County*, 515 F. Supp. 3d 980 (N.D. Iowa 2021), and *Carney v. Adams*, 141 S. Ct. 493 (2020), is also misplaced because the plaintiffs in those cases did not establish an injury-in-fact to confer Article III standing.  *See Iowa Voter Alliance*, 515 F. Supp. 3d at 992 (holding that plaintiffs lacked standing because they failed to show "a concrete and particularized injury beyond the generalized grievance arising from a violation of law"); *Carney*, 141 S. Ct. at 499–503 (concluding that plaintiff could not establish an injury-in-fact).

Next, Plaintiffs attempt to distinguish *Lance* by saying that the
Commonwealth Defendants are failing to comply not only with the Elections
Clause but also with 2 U.S.C. § 2a(c)(5).  (Doc. 67, p. 8.)  Other than making this
observation, Plaintiffs have not explained *why* they have standing merely by virtue
of seeking to have Pennsylvania act in conformity with both a statute and the
Constitution as opposed to just the Constitution.  Their grievance remains
generalized.  *See Lance*, 549 U.S. at 439 ("[A] plaintiff raising only a generally
available grievance about government—claiming only harm to his and every
citizen's interest in proper application of the Constitution and laws, and seeking
relief that no more directly and tangibly benefits him than it does the public at
large—does not state an Article III case or controversy.").

Second, Plaintiffs contend that they, unlike the plaintiffs in *Lance*, have
explained how they will be injured—that is, by being deprived of the "right" to
vote in all 17 Pennsylvania races.[10]  (Doc. 67, p. 8.)  Once again, aside from
alleging "how" they are being injured by the government's purported failure to act
in conformity with a statute and the Constitution, Plaintiffs have not explained *why*
that transforms their generalized grievance into a concrete and particularized one.
In any event, such a theory is inconsistent with Supreme Court precedent.  In

---

[10] Whether 2 U.S.C. § 2a(c)(5) creates such a right is not something we need to decide here.  *See
Grammar v. John J. Kane Reg'l Cntrs.-Glen Hazel*, 570 F.3d 520, 526 (3d Cir. 2009).

*DaimlerChrysler Corp v. Cuno*, for example, the plaintiffs alleged that "the franchise tax credit 'deplete[d] the funds of the State of Ohio to which the Plaintiffs contribute[d] through their tax payments' and thus 'diminish[ed] the total funds available for lawful uses and impos[ed] disproportionate burdens on' them." 547 U.S. 332, 342–43 (2006) (alteration in original).  In other words, the plaintiffs explained "how" they were "injured" (or the mechanism that could cause injury), but the Supreme Court nonetheless concluded they lacked standing because they were not injured in a way different from all other taxpayers, and thus they had a generalized injury.  *Id.* at 344, 346.

Plaintiffs' alleged injury—the right to vote in an at-large election versus a specific-district election, if such a right exists—belongs to every voter in Pennsylvania.  This is not an injury that affects Plaintiffs "in a concrete and personalized way."  *See Lujan*, 504 U.S. at 560 n.1.  Their purported injuries are shared by all Pennsylvania voters; such an "undifferentiated" injury does not support standing as it is equally shared by "every citizen" and relief "would . . . no more directly benefit[] [Plaintiffs] than the public at large."  *Bognet*, 980 F.3d at 349 (citing *Lance*, 549 U.S. at 442); *see also Richardson*, 418 U.S. at 176–77 ("This is surely . . . a generalized grievance . . . since the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.'" (citations omitted)).

Try as they might, the registered voter Plaintiffs cannot avoid the fact that their Elections Clause claims amount to a "generalized grievance." We will not disregard the precedent established by *Lance*, and Plaintiffs have not persuaded us that *Lance* does not apply to their Elections Clause and 2 U.S.C. § 2a(c)(5) claims. Accordingly, Plaintiffs, as registered voters in Pennsylvania, fail to establish an injury-in-fact and thus lack Article III standing to bring Claims One and Two.

## 2. Bognet and Bashir Lack Standing as Congressional Candidates

Bognet and Bashir also assert that they have standing as congressional candidates because they are injured in several ways. (Doc. 49, ¶¶ 55–56.) First, Bashir avers that he is injured because he is now forced "to run in a congressional district with a massive Democratic voter-registration advantage, rather than in a statewide at-large election where the number of Democratic and Republican voters are more evenly split." (*Id.* ¶ 55.) Together, Bognet and Bashir submit that they are injured by the uncertainty about how they should campaign because "the defendants' implementation of a patently unconstitutional congressional map creates a substantial risk that a federal court or the Supreme Court of the United States will declare the map unlawful after they have spent time and resources campaigning in the court-drawn congressional districts." (*Id.* ¶ 56.) Finally, Bognet and Bashir both contend that they are injured by the "cloud of legal

uncertainty over the court-drawn map . . . making it difficult . . . to raise money from donors to finance their campaigns."[11]  (*Id.*)

In their motions to dismiss, Defendants argue that Bognet and Bashir have not alleged a sufficiently specific injury; rather, the injury is "based on their own subjective anxiety that a federal court might someday invalidate the map adopted by the Supreme Court of Pennsylvania"—which is a self-generated anxiety caused by filing the instant lawsuit.  (Doc. 61, p. 18; Doc. 59, pp. 17–18; Doc. 69, pp. 14–18; Doc. 70, pp. 13–15.)  Second, Bognet's and Bashir's challenges in fundraising depend on potential decisions made by third parties, but federal courts cannot base decisions on the independent actions of third parties.  (Doc. 59, pp. 18–19; Doc. 61, pp. 19–20; Doc. 69, pp. 16–17; Doc. 70, p. 14.)  Lastly, Defendants assert that Bashir's alleged injury of running in a largely Democratic district is unfounded since he, as a candidate, has no legal interest in the composition of his district. (Doc. 59, pp. 19–20; Doc. 61, pp. 20–22; Doc. 69, pp. 17–18; Doc. 70, p. 15.)

Bognet and Bashir, however, submit that they have a "certainly impending" injury under *Clapper v. Amnesty International USA*, 568 U.S. 398.   (Doc. 67, p.

---

[11] Plaintiffs' second and third alleged injuries arise from their allegation that there is uncertainty about how the 2022 primary election will be conducted due to this federal litigation.  However, Plaintiffs have withdrawn their emergency motion for injunctive relief with respect to the 2022 elections in favor of pursuing relief for subsequent elections.  (Doc. 82, p. 2.)   As a practical matter, then, it appears that the alleged uncertainty regarding the 2022 election has been eliminated.  Nonetheless, the Court will address whether these alleged injuries are sufficient to confer standing.

9.)  While Bognet and Bashir acknowledge that the outcome of this litigation may not qualify as "certainly impending," they assert that the "present-day uncertainty" regarding where they should campaign is an immediate injury that they are presently suffering.  (*Id.* at 9–10.)  Next, to support their claim of a fundraising injury, Bognet and Bashir argue that the "predicable effect" of Defendants' actions is a factual question for later decision, not an issue to resolve at the motion to dismiss stage.  (*Id.* at 10.)  And, Bashir asserts that his injury of running in an overwhelmingly Democratic district, rather than in a statewide election, has long been recognized by courts for standing purposes.  (*Id.* at 11–12.)

Once again, Bognet's and Bashir's allegations fail to establish an injury-in-fact sufficient for purposes of Article III standing.  As the Supreme Court explained, a "core principle of republican government" is "that the voters should choose their representatives, not the other way around."  *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) (citation omitted).  Consequently, Bashir's assertion that he is harmed by running in his Democratic-leaning district rather than in an at-large election is not an injury-in-fact.  A legislator, or potential legislator, has "no legally cognizable interest in the composition of the district he or she represents."  *Corman v. Torres*, 287 F. Supp. 3d 558, 569 (M.D. Pa. 2018).  Further, an elected official "suffers no cognizable injury, in a due process sense or otherwise, when the boundaries of his district are

adjusted by reapportionment. . . . While the voters in a representative's district have an interest in being represented, a representative has no like interest in representing any particular constituency." *City of Phila. v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980).

Notwithstanding this precedent, Bashir asserts that "courts have long permitted candidates for office to sue over redistricting decisions that adversely affect their election prospects." (Doc. 67, p. 11.)  Plaintiffs cite only one case that purportedly recognizes that sort of harm as sufficient to confer standing, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 475 (2006) (Stevens, J., concurring). (*Id.*)  Justice Stevens's concurring opinion is not binding, however, and the Supreme Court has not said that unfavorable changes in the voter composition of a candidate's electorate resulting from redistricting create an injury-in-fact for standing purposes. *See, e.g.*, *Wittman v. Personhuballah*, 578 U.S. 539, 545 (2016) (assuming but not deciding—because it made no difference to the outcome—that Representatives had standing to challenge a redistricting plan where they argued that "a portion of the[ir] 'base electorate' will necessarily be replaced with 'unfavorable Democratic voters,' thereby reducing the likelihood of the Representatives' reelection").

Courts in this Circuit have suggested, rather, that competitive harm is not cognizable under Article III.  Indeed, the *Corman* court explained that "[c]ase law

strongly suggests that a legislator has no legally cognizable interest in the composition of the district he or she represents." 287 F. Supp. 3d at 569; *see Klutznick*, 503 F. Supp. at 672; *see also Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 915 (M.D. Pa.) (rejecting campaign's "theory . . . that it ha[d] 'competitive standing' based upon disparate state action leading to the 'potential loss of an election'"), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377 (3d Cir. 2020).

Plaintiffs argue that in *Corman*, the question of whether an interest is legally cognizable wrongly conflated a merits question with a jurisdictional question. (Doc. 67, p. 11 (citing *Cottrell v. Alcon Lab'y*, 874 F.3d 154, 164 (3d Cir. 2017); *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006).) As noted in the cases Plaintiffs cite on this point, the Supreme Court uses the phrase "legally protected interest" when discussing standing. *See Cottrell*, 874 F.3d at 163 (noting that the Supreme Court used the term in *Lujan* and *Spokeo*, though infrequently in cases in between); *In re Special Grand Jury 89-2*, 450 F.3d at 1172 (noting that the Supreme Court used the term in *Lujan*). Thus, neither of the two cases Plaintiffs cite, *Cottrell v. Alcon Laboratories* and *In re Special Grand Jury 89-2*, concluded that whether a plaintiff has a "legally protected interest" is exclusively a merits question. Furthermore, those two cases explained that the "legally protected interest" aspect of standing should not be conflated with the merits of the lawsuit.

*Cottrell*, 874 F.3d at 164 ("[W]hether a plaintiff has alleged an invasion of a 'legally protected interest' does not hinge on whether the conduct alleged to violate a statute does, as a matter of law, violate the statute."); *In re Special Grand Jury 89-2*, 450 F.3d at 1172 ("The term *legally protected interest* has generated some confusion because the Court has made clear that a plaintiff can have standing despite losing on the merits—that is, even though the interest would not be protected by the law in that case." (emphasis in original)).

   *Corman* certainly did not conflate the merits and jurisdictional analyses. First, the language at issue is found in the portion of the decision discussing injury-in-fact. *Corman*, 287 F. Supp. 3d at 568–70.  Second, *Corman* cited another case from within this Circuit, *City of Philadelphia v. Klutznick*, 503 F. Supp. at 672, in support of its conclusion regarding "legally cognizable interest[s]" with respect to the injury-in-fact prong of standing.  In *Klutznick*, the court held that "[a] legislative representative suffers no cognizable injury . . . when the boundaries of his district are adjusted by reapportionment," and "[t]o demonstrate that a person has suffered an injury, a person must show that some interest has been infringed." 503 F. Supp. at 672.  Together, then, the location of the language within *Corman*'s discussion of injury-in-fact for purposes of standing and its citation to *Klutznick* make clear that when *Corman* said "legally cognizable interest," it meant the

standing variant noted in *Lujan* and *Spokeo*.  Plaintiffs' citations, therefore, present

no obstacle to following *Corman* and *Klutznick*.

Next, the supposed uncertainty surrounding where Bognet and Bashir should

campaign because a federal court may declare the map chosen by the Pennsylvania

Supreme Court unconstitutional is not an injury-in-fact that confers standing.  An

injury-in-fact must be "actual or imminent."  To qualify as "imminent," a

"threatened injury must be *certainly impending*," whereas "[a]llegations of

*possible* future injury" are insufficient.  *Clapper*, 568 U.S. at 409 (quoting

*Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Litigants "cannot manufacture

standing merely by inflicting harm on themselves based on their fears of

hypothetical future harm that is not certainly impending."  *Id.* at 416 (citing

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976); *Nat'l Fam. Plan. & Reprod.*

*Health Ass'n, Inc.*, 468 F.3d 826 (D.C. Cir. 2006)).  Furthermore, the Supreme

Court has explained that "[i]t is just not possible for a litigant to prove in advance

that the judicial system will lead to any particular result in his case."  *Id.* at 413–14

(quoting *Whitmore*, 495 U.S. at 159–60).  In fact, Bognet and Bashir effectively

concede that the outcome of this litigation does not qualify as "certainly

impending" under *Clapper*, since they cannot prove that this case will lead to a

particular result.  *See id.* (quoting *Whitmore*, 495 U.S. at 159–60).

Plaintiffs' alleged "present-day uncertainty" about whether they should campaign in one district or another is of their own making by filing this lawsuit. There currently exists a congressional district map that establishes the districts in which Bognet and Bashir may choose to run for office. To find that Bashir and Bognet have established an injury based on filing this lawsuit would be stretching standing "beyond the breaking point" because "the acts necessary to make the injury happen are at least partly within [Plaintiffs'] own control." *Lujan*, 504 U.S. at 564 n.2; *see also Clapper*, 568 U.S. at 416.

Bognet and Bashir argue that their injury is not self-inflicted because the other Plaintiffs would have brought this suit and created the same uncertainty. (Doc. 667, pp. 10–11.) There are several problems with accepting this argument. First, Plaintiffs cite no authority to support this asserted basis for standing, which is based on a hypothetical situation. Second, Plaintiffs' argument appears to concede that their alleged injuries are caused by the pendency of this lawsuit rather than the actions of Defendants. Third, the Intervenor-Defendants make the appropriate point that "[b]y that logic, a group of plaintiffs could file a lawsuit to generate Article III standing simply by pointing to one another to pretend such a lawsuit was inevitable." (Doc. 69, p. 15.) Courts cannot allow plaintiffs to "manufacture standing," which is the inevitable result of this argument. *See Clapper*, 568 U.S. at 422. Fourth, we have already determined that Plaintiffs, as registered

Pennsylvania voters, lack Article III standing.  As a result, any separate lawsuit by voters would not survive dismissal.  Bognet's and Bashir's choice to bring this litigation therefore cannot support a finding of an injury-in-fact.

As for the challenge Bognet and Bashir allegedly face in raising campaign funds, that too is not an injury-in-fact.  As an initial matter, it is unclear from the second amended complaint and accompanying affidavits whether Plaintiffs are alleging that they *expect* to struggle to find campaign donors or whether they are *currently* struggling to raise funds.  However, Plaintiffs assert in their brief in opposition to the motions to dismiss "that the defendants' actions *will hinder* their fundraising efforts."  (Doc. 67, p. 10 (emphasis added).)  Regardless of whether this purported injury is alleged to be expected or current, it suffers from many of the same defects as their purported campaigning uncertainty injury.  For example, Plaintiffs caused the donors' uncertainty by filing this lawsuit and seeking to have this Court mandate at-large voting.  *Cf. Vita Nuova, Inc. v. Azar*, 458 F. Supp. 3d 546, 556–57 (N.D. Tex. 2020) (holding that the plaintiff "may not manufacture standing through the affidavits of potential donors withholding funds when it cannot show a certainly impending future injury").  And, Plaintiffs cite no case in which the uncertainty of third parties—an uncertainty produced by Plaintiffs' own actions—was sufficient for Article III standing purposes.

Plaintiffs nevertheless assert that we must accept as true their allegations that the present legal uncertainty "will hinder their fundraising efforts," and that standing can be established in any event by the "predictable effect of Government action on the decision of third parties." (Doc. 67, p. 10 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).) The case they cite, though, *Department of Commence v. New York*, was decided after a trial and it did not discuss what needed to be pled to overcome the ordinary rule that courts should be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413. Indeed, there must be *some* factual basis alleged for a prediction of independent decisionmaker harm under Rule 12(b), and Plaintiffs have not sufficiently alleged that fundraising difficulties are a "predictable" result of Defendants' actions. The conclusory allegation that the present legal uncertainty causes injury by "making it difficult . . . to raise money" (Doc. 49, ¶ 56; *see also* Doc. 49–12, ¶ 6) is not sufficient. If it were, then the "independent decisionmaker" limitation would be essentially nonexistent. *See Clapper*, 568 U.S. at 413. Plaintiffs' assertion that "[m]any donors want to know the particulars of a race before committing financial resources to it," is also insufficient. (Doc. 49-12, ¶ 7.) That general statement sheds little to no light on what donors' responses would be

to the situation at hand.  And, again, the limits on Article III standing would be undermined were such an allegation found to be sufficient.

Ultimately, Bognet and Bashir fail to identify any cognizable injury-in-fact they have suffered under any of their theories, and so they have not established that they have standing in their capacities as congressional candidates.

### 3. Hall Lacks Standing as a Member of the Susquehanna County Board of Elections

Separately, Hall asserts that he has suffered three injuries in his capacity as a member of the Susquehanna County Board of Elections.  (Doc. 49, ¶¶ 57–58.) Specifically, he asserts that he is injured first because he will be forced to "conduct an election under an unconstitutional map," second because he will have to depart from the General Primary Calendar, "in contravention of [his] oath of office" (*Id.* ¶ 57), and third because implementation of the "revised" General Primary Calendar shortens by several days his timeframe for preparing and mailing overseas military absentee ballots.  (*Id.* ¶ 58.)

The Intervenor-Defendants submit that Hall lacks "oath of office" standing for many of the same reasons that he lacks voter standing and Bognet and Bashir lack candidate standing: Hall alleges only generalized grievances, and there is only uncertainty about how to proceed with the election now because of the lawsuit which he and his fellow plaintiffs have initiated.  (Doc. 59, p. 20.)  The Commonwealth Defendants set forth essentially the same arguments and add that

Hall's "theory of standing would allow any official charged with implementing any statute or rule to challenge it on any ground [which] has been rejected by many courts." (Doc. 61, pp. 22–23.) They further assert that the likelihood that "a single member of a county board of elections could have standing" is slim since "any potential burden would accrue to the board in an institutional capacity rather than to its individual members." (*Id.* at 23.)

Hall argues that the Supreme Court has endorsed his theory of standing in *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236 (1968). (Doc. 67, pp. 12–13.) To that end, Hall submits that Defendants' "actions are not only forcing him to violate the law but *also* compressing his window of time for preparing and mailing overseas military ballots." (*Id.* at 13.)

In *Allen*, the Supreme Court considered whether a law requiring school districts to loan textbooks to students in public, private, and parochial schools was constitutional. 392 U.S. at 238. The Court stated:

> Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation.

*Id.* at 241 n.5; *but see Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 n.7 (1986) (citing *Allen* but finding no standing). Although the Court found that

the choice confronting the plaintiffs in *Allen* between violating an oath of office
and refusing to violate the oath at the risk of expulsion from office and a harm to
the school district was sufficient to confer standing, *Allen* is not controlling here
for two reasons.  First, *Allen* has limited precedential significance, and second,
*Allen* is distinguishable in any event.

On the first point, numerous circuit court decisions have distinguished *Allen*
and expressed the view that its holding with respect to standing is either very
limited or implicitly overruled.  *See, e.g.*, *Baca v. Colo. Dep't of State*, 935 F.3d
887, 916 (10th Cir. 2019) (noting "subsequent decisions from the Supreme Court
have limited [*Allen's*] reach," citing to generalized grievance cases, and finding no
standing even assuming *Allen* is still good law), *rev'd on other grounds*, 140 S. Ct.
2316 (2020); *Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) (not expressly
citing *Allen*, but noting that a "violation of one's oath alone is an insufficient injury
to support standing"); *Drake v. Obama*, 664 F.3d 774, 780 (9th Cir. 2011)
(explaining that *Allen's* footnote is not binding, and that "oath taker's claims are,
under contemporary jurisprudence, 'abstract constitutional grievances' insufficient
to meet the requirements of Article III"); *City of Hugo v. Nichols*, 656 F.3d 1251,
1260 (10th Cir. 2011) (distinguishing *Allen* on the ground that "standing was based
on the individual board members' personal stake in losing their jobs"); *Donelon v.
La. Div. of Admin. L. ex rel. Wise*, 522 F.3d 564, 567 n.5 (5th Cir. 2008) (noting a

prior case had "explained that later standing decisions limited *Allen*,"

distinguishing *Allen*, and citing to Wright & Miller for the proposition that *Allen's*

holding had been undermined); *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v.*

*New York State Tchrs. Ret. Sys.*, 60 F.3d 106, 112 (2d Cir. 1995) (distinguishing

*Allen* on the grounds that the purported harms to plaintiffs would result "from

compliance with [the relevant law], rather than from a refusal to comply," and

because plaintiffs' additional harms were too speculative).  As is implicit in these

decisions, allowing standing on a violation-of-oath theory would greatly expand

standing.  It would, as the Commonwealth Defendants point out, permit "any

official charged with implementing any statute or rule to challenge it on any

ground."  (Doc. 61, p. 22.)  No standing case of recent vintage embraces such an

expansive view of standing.

In addition, this case is easily distinguishable from *Allen*.  In this case,

unlike in *Allen*, Hall has not alleged that he will lose his position or that there

would be some adverse impact on Susquehanna County or its Board of Elections—

even assuming he could represent the County's or Board's interests.

Plaintiffs respond that Hall has alleged more than just a violation of his oath;

he has also alleged that he is forced to operate under a compressed timeline to

fulfill his duties.  (Doc. 67, p. 13.)  Hall makes this point but provides no authority

for the proposition that the need to work faster is a sufficient injury to confer

Article III standing.  Supreme Court precedent suggests it is not.  When

determining whether a harm is "concrete," "courts should assess whether the

alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally'

recognized as providing a basis for a lawsuit in American courts."  *TransUnion*

*LLC*, 141 S. Ct. at 2204.  Hall does not identify a harm traditionally recognized as

providing a basis for a lawsuit that is like his "compressed timeline" harm.  That is

likely because the compressed timeline harm does not fit into any of the

preexisting concrete injury categories the Supreme Court has identified.  For

example, Hall does not allege he will suffer "physical," "monetary," or

"reputational" harm, or that his "private information" will be disclosed, or his

"seclusion" intruded upon.  *Id.* (collecting cases).  He also does not allege that his

compressed timeline harm violates the Constitution.  *Id.*  Conversely, Intervenor-

Defendants identify cases that suggest such an injury is *not* cognizable.  *See*

*Corman*, 287 F. Supp. 3d at 562 ("[F]rustration, even frustration emanating from

arduous time constraints . . . does not accord the Plaintiffs a right to relief."); *see*

*also Crane*, 783 F.3d at 253–54 (rejecting contention that the burden of complying

with DACA created standing and noting that it had "not found[] any case where a

plaintiff has had standing . . . because [a policy] required [] employees to change

their practices").  In addition, as a practical matter, if we granted the relief

requested and ordered an at-large election, Hall would have even less time to prepare and mail overseas ballots.

In sum, the absence of caselaw or a "close historical or common-law analogue" supporting the existence of Hall's injury, along with caselaw suggesting a contrary result, leads us to conclude that Hall's alleged harm is not a cognizable injury for purposes of standing. *TransUnion LLC*, 141 S. Ct. at 2204. Accordingly, because an oath violation is insufficient without more, and because Hall alleges no other cognizable injury, he lacks an injury sufficient for Article III standing.

### 4. Causation and redressability

Because Plaintiffs have not alleged an injury-in-fact sufficient for Article III standing, we need not address the final two elements of Article III standing: causation and redressability.

## CONCLUSION

For the reasons stated herein, we conclude that Plaintiffs lack standing to bring Claims One and Two. As a result, we will grant the motions to dismiss, Docs. 58 & 60, and we will dismiss Claims One and Two of the second amended complaint. An order shall issue.