Received 12/27/2021 3:50:08 PM Commonwealth Court of Pennsylvania

Filed 12/27/2021 3:50:00 PM Commonwealth Court of Pennsylvania
464 MD 2021 and additional consolidated case(s)

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

No. 464 M.D. 2021

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

No. 465 M.D. 2021

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela A. Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

**APPLICATION FOR LEAVE TO INTERVENE BY BRYAN CUTLER, SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; KERRY BENNINGHOFF, MAJORITY LEADER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JAKE CORMAN, PRESIDENT PRO TEMPORE OF THE PENNSYLVANIA SENATE; AND KIM WARD, MAJORITY LEADER OF THE PENNSYLVANIA SENATE**

**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Proposed-Intervenors Jake Corman, President Pro Tempore of the Pennsylvania Senate, and Kim Ward, Majority Leader of the Pennsylvania Senate*

**BAKER & HOSTETLER, LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

*\* Pro Hac Vice application forthcoming*

*Counsel for Proposed-Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives*

A2

Pursuant to Pennsylvania Rules of Appellate Procedure 106 and 1531(b) and Pennsylvania Rules of Civil Procedure 2326 through 2329, Bryan Cutler, Speaker of the Pennsylvania House of Representatives ("Speaker Cutler"); Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives ("Leader Benninghoff" and, together with Speaker Cutler, the "House Leaders"); Jake Corman, President *Pro Tempore* of the Pennsylvania Senate ("President Corman"); and Kim Ward, Majority Leader of the Pennsylvania Senate ("Leader Ward" and, together with President Corman, the "Senate Leaders," and, together with the House Leaders, the "Proposed Intervenors") hereby respectfully apply for leave to intervene in the above-captioned matters filed by Carol Ann Carter, *et al*. ("Carter Petitioners") and Philip T. Gressman, *et at*. ("Gressman Petitioners") (collectively, "Petitioners").

In support of this Application, the Proposed Intervenors respectfully state as follows:

1.     Proposed Intervenors are the highest-ranking officers and majority leaders of the Pennsylvania House of Representatives and Pennsylvania Senate, respectively, and have been authorized by the majority, Republican caucuses of their respective bodies to intervene in redistricting matters to protect legislative interests. Pursuant to Article I, Section 4 of the United States Constitution, the General Assembly has been assigned the authority to set the "Times, Places, and

Manner" of elections to Congress—including the authority to perform congressional redistricting.

      2.     Petitioners, in their Petitions for Review (their "Petitions"), ask this Court to dilute, abrogate, impair, or abolish the prerogative of the General Assembly—led by the Proposed Intervenors—to enact a congressional redistricting plan for the 2022 elections and beyond. Proposed Intervenors are entitled to intervene under Pa.R.C.P. 2327(3) and (4) to vindicate their enforceable interest to perform redistricting for the Commonwealth, an exclusively legislative function that the U.S. and Pennsylvania Constitutions assign to the General Assembly.

      3.     Previously, this Court granted Proposed Intervenors' request to intervene in a similar lawsuit that the Carter Petitioners filed in April 2021, a lawsuit in which those petitioners sought the same relief that they are seeking here. *See Carter v. Degraffenreid*, Dkt. No. 132 M.D. 2021. The Court dismissed that case on October 8, 2021. Proposed Intervenors' interests have not changed and, as with the prior lawsuit, they are entitled to intervene in these matters.

      4.     A memorandum of law in support of this application is being filed contemporaneously herewith and is incorporated by reference.

      5.     Proposed Intervenors' proposed Answers to the Petitions are attached as **Exhibits "A" and "B,"** respectively, and incorporated by reference.

2

A4

6.     A proposed order granting this application is attached as **Exhibit "C."**

7.     Verifications, affirming the truth of the factual averments set forth in this application, are attached as **Exhibit "D."**

**WHEREFORE**, the Proposed Intervenors respectfully request that the Court grant their Application for Leave to Intervene and allow them to intervene as Respondents in these actions.

Dated: December 27, 2021

/s/ Anthony R. Holtzman
**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Proposed-Intervenors Jake*
*Corman, President Pro Tempore of the*
*Pennsylvania Senate, and Kim Ward,*
*Majority Leader of the Pennsylvania*
*Senate*

Respectfully submitted,

/s/ Jeffry Duffy
**BAKER & HOSTETLER, LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

* *Pro Hac Vice application forthcoming*

*Counsel for Proposed-Intervenors Bryan*
*Cutler, Speaker of the Pennsylvania*
*House of Representatives. and Kerry*
*Benninghoff, Majority Leader of the*
*Pennsylvania House of Representatives*

4

A6

## CERTIFICATION OF COMPLIANCE

I hereby certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

/s/ Anthony R. Holtzman
Anthony R. Holtzman

# Exhibit A

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

No. 464 MD 2021

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Balchunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

## ANSWER WITH NEW MATTER

(Counsel List On Next Page)

**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Legislative Intervenors Jake
Corman, President Pro Tempore of the
Pennsylvania Senate, and Kim Ward,
Majority Leader of the Pennsylvania
Senate*

**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

*\* Pro Hac Vice application forthcoming*

*Counsel for Legislative Intervenors
Bryan Cutler, Speaker of the
Pennsylvania House of Representatives,
and Kerry Benninghoff, Majority Leader
of the Pennsylvania House of
Representatives*

Pursuant to Pennsylvania Rules of Appellate Procedure 1516(b) and 1517, Bryan Cutler, Speaker of the Pennsylvania House of Representatives ("Speaker Cutler"); Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives ("Leader Benninghoff" and, together with Speaker Cutler, the "House Leaders"); Jake Corman, President *Pro Tempore* of the Pennsylvania Senate ("President Corman"); and Kim Ward, Majority Leader of the Pennsylvania Senate ("Leader Ward" and, together with President Corman, the "Senate Leaders," and, together with the House Leaders, the "Legislative Intervenors") hereby answer Petitioners' Petition for Review ("Petition") as follows. The numbered paragraphs of the Answer correspond to the numbered paragraphs of the Petition.

1.     Paragraph 1 contains Petitioners' characterization of their action and/or legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 1. Legislative Intervenors deny that Petitioners are entitled to the relief they seek.

2.     Legislative Intervenors admit that the U.S. Secretary of Commerce delivered the Census data in August 2020 and that Pennsylvania will be allocated 17 Members in Congress in the next decennium. The remainder of paragraph 2 contains legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 2.

3.      Paragraph 3 contains legal conclusions to which no response is required.   To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 3.

4.      Legislative Intervenors deny that it is clear that Pennsylvania's political branches will not timely act to pass a congressional redistricting plan and that the judiciary is required to step in.   By way of further answer, there is still time for the General Assembly to pass a plan that the Governor will sign for the 2022 election cycle.   The remainder of paragraph 4 contains legal conclusions to which no response is required, and the facts and circumstances of the lawsuit in *League of Women Voters v. Commonwealth* ("*LWV I*"), 178 A.3d 737 (Pa. 2018), are laid out in that opinion, which speaks for itself.   To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 4.

5.      Legislative Intervenors admit that the Pennsylvania General Assembly and the Governor have not yet reached an agreement on a congressional redistricting plan, but deny the remaining allegations in paragraph 5. Further answering, Legislative Intervenors deny that the General Assembly and the Governor do not agree on the basic criteria that a congressional redistricting plan must meet, as those criteria are set forth under federal and state law.

2

A12

6.     Legislative Intervenors admit that the Senate has recessed and the House has adjourned for the remainder of 2021 and that the General Assembly has not passed a congressional redistricting plan.  Legislative Intervenors deny the remaining allegations in paragraph 6.  Legislative Intervenors further answer that there is still time for the General Assembly to pass a plan.  While Legislative Intervenors admit that the Department of State previously indicated that a plan needed to be enacted by the end of 2021 in order for the 2022 elections to proceed timely, after reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief regarding the basis and truth of those statements and same are therefore denied.

7.     The facts and circumstances of *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) and *League of Women Voters of Pa. v. Commonwealth ("LWV II")*, 181 A.3d 1083 (Pa. 2018) are laid out in those opinions, which speak for themselves. Legislative Intervenors deny that this Court needs to intervene at this time to protect Petitioners' constitutional rights, as there is still time for a plan to be passed.  By way of further answer, the Petition's request for the Court to usurp the enactment process, if granted, would violate the General Assembly's authority to conduct congressional redistricting under Article I, Section 4 of the United States Constitution.

8.     Admitted.

3

A13

9.     After reasonable investigation, Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9 and therefore deny them.

10.     Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 10 and therefore deny them.  The remainder of paragraph 10 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 10.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Paragraph 14 contains legal conclusions to which no response is required, and the opinion in *LWV I* speaks for itself.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 14.

15.     Legislative Intervenors admit that the General Assembly was unable to enact a new map following the decision in *LWV I*, because it was given inadequate time to do so.

4

A14

16.    After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and therefore deny them.

17.    Admitted.

18.    Admitted.

19.    Admitted. By way of further answer, the release of the Census data was delayed, and the full data set that is needed for redistricting was not received until August 2021.

20.    Admitted.

21.    Admitted that the 2020 Census report indicates that Pennsylvania's resident population is 13,002,700 and that, based on the 2010 Census, the prior resident population was 12,702,379. Legislative Intervenors deny that this increase is "significant."

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Denied. By way of further answer, based upon 2020 Census results, the ideal population for each of Pennsylvania's congressional districts under a 17-seat allocation is 764,865, which is 59,177 more persons per district than under the current plan.

5

A15

26.   Admitted.

27.   Admitted.

28.   Legislative Intervenors admit only that, in light of the 2020 Census data, Congressional Districts 8, 9, 12, 13, 14, 15, 16, and 18 have less population than the ideal district and Congressional Districts 1, 2, 3, 4, 5, 6, 7, 10, 11, and 17 have more population than the ideal district. Legislative Intervenors deny that the districts are "significantly" underpopulated or overpopulated.

29.   Paragraph 29 contains legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 29.

30.   Paragraph 30 contains legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 30.

31.   Admitted.

32.   Admitted.

33.   Admitted.

34.   Admitted.

35.   Paragraph 35 contains legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 35. Legislative Intervenors further

6

answer that there is still time for the General Assembly and the Governor to reach agreement on a plan.

36.     Paragraph 36 contains legal conclusions to which no response is required.   To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 36.

37.     Legislative Intervenors admit that the P.L. 94-171 data was released in August 2021 and that the General Assembly and Governor have not yet enacted a congressional redistricting plan.   Further answering, Legislative Intervenors state that the process of drawing and reviewing proposed maps, and reaching agreement, generally takes months and, in this instance, this process was shortened due to the delays with the Census data.

38.     After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about which criteria the Governor would consider in determining whether to approve a proposed map from the General Assembly.   Legislative Intervenors further state that federal law and Pennsylvania law establish the criteria that a congressional map must meet.

39.     Denied.   Legislative Intervenors deny that the plan approved by the House State Government Committee fails to comply with the criteria that are set forth in *LWV I*.   After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief as to which criteria the

7

Governor believes are required other than the criteria set forth under Pennsylvania law and federal law, and whether the plan proposed by the House State Government Committee fails to meet those criteria.

40.    Denied.  Legislative Intervenors deny that the House State Government Committee's proposed congressional redistricting plan contains irregularly shaped districts, that it unnecessarily splits communities of interest, or that it cracks any minority communities.

41.    Admitted that the Senate has recessed and the House as adjourned for the rest of 2021.  Legislative Intervenors deny that the General Assembly has jeopardized the ability to conduct timely elections in 2022, because there is still ample time to pass a new congressional redistricting plan.

42.    Legislative Intervenors admit the existence of the statements that are contained in the Brief in Support of Preliminary Objections that the State Respondents filed in *Carter v. Degraffenreid*, No. 132 MD 2021 (Sept. 16, 2021), but, after reasonable investigation, they are without knowledge or information sufficient to form a belief as to the truth of those statements.

43.    Legislative Intervenors admit that a new congressional redistricting map is unlikely to be enacted in 2021, but deny that this factor will jeopardize Pennsylvania's ability to conduct timely elections in 2022, as there is still time for a map to be passed.   By way of further answer, Legislative Intervenors state that

8

primary election-related deadlines can be extended in Congressional elections, and in the past have been extended.

44.     After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and therefore deny them.

45.     Admitted.  Further answering, Legislative Intervenors state that such deadlines can be extended for Congressional elections, and in the past have been extended.

46.     Denied. Further answering, Legislative Intervenors state that such deadlines can be extended for Congressional elections, and in the past have been extended.

47.     The facts and circumstances of *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) and *LWV II* are laid out in those opinions and speak for themselves. Legislative Intervenors deny any characterization of those opinions.

48.     Denied.  Legislative Intervenors deny that there is an impasse or stalemate or that this Court needs to intervene at this time.

## COUNT I

49.     Legislative Intervenors incorporate their responses to paragraphs 1-48 of the Petition as if fully restated herein.

9

50.    Paragraph 50 contains legal conclusions to which no response is required.    To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 50.  Further answering, Legislative Intervenors state that the Pennsylvania Constitution's Free and Equal Elections Clause and the interpretation given to it in *LWV I* speak for themselves.

51.    Paragraph 51 contains legal conclusions to which no response is required.    To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 51.  Further answering, Legislative Intervenors state that the Free and Equal Elections Clause in the Pennsylvania Constitution and the opinion in *LWV I* speak for themselves.

52.    Paragraph 52 contains legal conclusions to which no response is required and the opinion in *LWV I* speaks for itself.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 52.

53.    Legislative Intervenors admit that, in view of the 2020 Census data, Pennsylvania's current congressional district plan would be malapportioned.  After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 53 and therefore deny them.

10

A20

54.    Paragraph 54 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 54.

## COUNT II

55.    Legislative Intervenors incorporate their responses to paragraphs 1-54 of the Petition as if fully restated herein.

56.    Paragraph 56 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 56.

57.    Paragraph 57 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 57.

58.    Legislative Intervenors admit that, in view of the 2020 Census data, Pennsylvania's current congressional district plan would be malapportioned.

59.    Paragraph 59 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 59.

## COUNT III

60.    Legislative Intervenors incorporate their responses to paragraphs 1-59 of the Petition as if fully restated herein.

11

61.     Admitted.

62.     Legislative Intervenors admit that Pennsylvania is currently allotted 18 Members to Congress but that, in light of the 2020 Census, it will only be allotted 17 Members to Congress.   The remaining allegations in paragraph 62 are legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the remaining allegations in paragraph 62.

63.     Paragraph 63 contains legal conclusions to which no response is required.   To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 63.

64.     Legislative Intervenors deny each and every factual allegation in the Petition not expressly admitted herein as true.

## NEW MATTER[1]

### FIRST AFFIRMATIVE DEFENSE

65.     One or more counts of the Petition fail to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

66.     Petitioners failed to join necessary or indispensable parties.

---

[1] Legislative Intervenors reserve the right to assert additional affirmative defenses that may arise during the course of this matter.

12

## THIRD AFFIRMATIVE DEFENSE

67.    Petitioners lack standing.

## FOURTH AFFIRMATIVE DEFENSE

68.    Petitioners' claims are not ripe.

## FIFTH AFFIRMATIVE DEFENSE

69.    The claims asserted in the Petition are non-justiciable.

## NOTICE TO PLEAD

Petitioners are notified to plead to this Answer and New Matter within 30 days

from service or a judgment may be entered against them.

13

**WHEREFORE,** Legislative Intervenors respectfully request that the Court dismiss the Petition for Review in its entirety and grant such other and further relief to them as the Court deems just and proper.

Dated:

/s/ Anthony R. Holtzman
**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Legislative Intervenors Jake*
*Corman, President Pro Tempore of the*
*Pennsylvania Senate, and Kim Ward,*
*Majority Leader of the Pennsylvania*
*Senate*

Respectfully submitted,

/s/ Jeffry Duffy
**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

* *Pro Hac Vice application forthcoming*

*Counsel for Legislative Intervenors Bryan*
*Cutler, Speaker of the Pennsylvania*
*House of Representatives, and Kerry*
*Benninghoff, Majority Leader of the*
*Pennsylvania House of Representatives*

14

**VERIFICATION**

I, _____ hereby verify that the factual averments and denials of factual averments made in the foregoing Answer with New Matter are true and correct to the best of my knowledge and information or belief.  I make this verification subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).


Date: _____                    _____

1

A25

# Exhibit B

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

No. 465 MD 2021

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak,

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

**ANSWER WITH NEW MATTER**

(Counsel List On Next Page)

**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
Anthony.Holtzman@klgates.com

*Counsel for Legislative Intervenors Jake
Corman, President Pro Tempore of the
Pennsylvania Senate, and Kim Ward,
Majority Leader of the Pennsylvania
Senate*

**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

*\* Pro Hac Vice application forthcoming*

*Counsel for Legislative Intervenors
Bryan Cutler, Speaker of the
Pennsylvania House of Representatives,
and Kerry Benninghoff, Majority Leader
of the Pennsylvania House of
Representatives*

Pursuant to Pennsylvania Rules of Appellate Procedure 1516(b) and 1517, Bryan Cutler, Speaker of the Pennsylvania House of Representatives ("Speaker Cutler"); Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives ("Leader Benninghoff" and, together with Speaker Cutler, the "House Leaders"); Jake Corman, President *Pro Tempore* of the Pennsylvania Senate ("President Corman"); and Kim Ward, Majority Leader of the Pennsylvania Senate ("Leader Ward" and, together with President Corman, the "Senate Leaders," and, together with the House Leaders, the "Legislative Intervenors") hereby answer Petitioners' Petition for Review ("Petition") as follows. The numbered paragraphs of the Answer correspond to the numbered paragraphs of the Petition.

1.     Paragraph 1 contains Petitioners' characterization of their action and/or legal conclusions to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 1. After reasonable investigation, Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations that Petitioners are registered voters and leading mathematicians and scientists and therefore deny those allegations. Legislative Intervenors deny that Petitioners are entitled to the relief they seek.

2.     Legislative Intervenors admit that Pennsylvania's congressional map was last drawn in 2018, that, since that time, Pennsylvania has lost a congressional

seat, and that a new map is needed for the 2022 election cycle.  Legislative Intervenors further admit that, in view of the 2020 Census results, the current congressional district map is malapportioned.  After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the allegations that unidentified candidates do not know where to run and unidentified voters cannot identify or evaluate their candidates and therefore deny those allegations.  Legislative Intervenors deny the remainder of paragraph 2. Legislative Intervenors further answer that there is still time for the General Assembly to pass a congressional redistricting plan.

3.     The Free and Fair Elections Clause, the Petition Clause, the equal-protection guarantees of the Pennsylvania Constitution, and the facts and circumstances of *League of Women Voters of Pa. v. Commonwealth ("LWV I")*, 178 A.3d 737 (2018) speak for themselves.  Legislative Intervenors deny any characterization of these legal authorities.  The remainder of paragraph 3 of the contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 3.

4.     Denied that, on December 15, 2021, the General Assembly adjourned. By way of further answer, on that date, the Pennsylvania Senate recessed until January 4, 2021 or the call of the President Pro Tempore. Further denied that the

2

congressional district plan did not receive first consideration in the House.  The remaining allegations in this paragraph are admitted.

5.      Admitted that the current schedule allows for the period for collecting nominating petitions to begin on February 15, 2022.

6.      Legislative Intervenors admit that the Acting Secretary of the Commonwealth and the Director of the Bureau of Election Services and Notaries made the representations regarding the deadlines to pass a new congressional district map.  After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief regarding the truth or accuracy of those representations.

7.      Denied.  By way of further answer, because there is still time for a new congressional redistricting plan to be passed, Legislative Intervenors deny that there is no realistic prospect that such a plan will be adopted by January 24, 2022 and that this Court needs to intervene at this time to protect Petitioners' constitutional rights.  Moreover, if the Court took this step, it would usurp the General Assembly's authority to conduct congressional redistricting under Article I, Section 4 of the United States Constitution.  Legislative Intervenors further state that the Free and Equal Elections Clause, the Petition Clause, and the equal-protection guarantees of the Pennsylvania Constitution speak for themselves.  Legislative Intervenors deny any characterization of these legal authorities.

8.      Legislative Intervenors deny that this Court needs to intervene at this time to protect Petitioners' constitutional rights, as there is still time for a plan to be passed.    Further answering, Legislative Intervenors state that Petitioners' Application for the Exercise of King's Bench Power or Extraordinary Jurisdiction speaks for itself.  Legislative Intervenors deny any characterization of that filing.

9.      Admitted.

10.      Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.    After reasonable investigation, Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 10 and therefore deny them.

11.      After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 11 and therefore deny them.

12.      After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations in paragraph 12 and therefore deny them.

13.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 13 and therefore deny them.

14.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 14 and therefore deny them.

15.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 15 and therefore deny them.

16.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations in paragraph 16 and therefore deny them.

17.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 17 and therefore deny them.

18.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 18 and therefore deny them.

19.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 19 and therefore deny them.

20.    After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations in paragraph 20 and therefore deny them.

21.   After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 21 and therefore deny them.

22.   After reasonable investigation, Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned.  Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 22 and therefore deny them.

23.   Admitted.

24.   Admitted.

25.   Admitted that Pennsylvania's current congressional district map was adopted in 2018.  The remainder of paragraph 25 contains legal conclusions to which no response is required, and the facts and circumstances in *League of Women Voters of Pa. v. Commonwealth* ("*LWV II*"), 181 A.3d 1083 (2018) are reflected in that opinion, which speaks for itself.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 25.

26.    Admitted.

27.    Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegation that "[b]ased on the 2020 Census Data, Pennsylvania's congressional districts vary in population by as much as 95,000 residents" and therefore deny it. The remaining allegations in this paragraph are admitted.

28.    Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional district plan is malapportioned. Legislative Intervenors deny that all districts are "significantly" malapportioned. After reasonable investigation, Legislative Intervenors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 28 and therefore deny them.

29.    Respondents' July 1, 2021 filing speaks for itself. Legislative Intervenors deny any characterization of that filing. Further answering, Legislative Intervenors state that there is still time for the General Assembly to pass a plan.

30.    Legislative Respondents admit that, under the current schedule, on February 15, 2022, nominating petitions can begin to be circulated and that, on March 8, 2022, they are due. Further answering, Legislative Intervenors state that such deadlines can be extended for Congressional elections, and in the past have been extended. After reasonable investigation, Legislative Intervenors lack

8

knowledge or information sufficient to form a belief about the allegation regarding what Respondents' deadlines were tethered to and therefore deny it.

31.    Legislative Intervenors admit that the Senate recessed and the House adjourned its legislative session on December 15, 2021 without enacting a new congressional district map with 17 districts. Legislative Intervenors admit that, on December 15, 2021, the House State Government Committee voted a preliminary congressional district plan out of committee. Legislative Intervenors deny that this plan has not been brought up for consideration by the House, because it did receive first consideration. It will not be brought up for second consideration by the House until the General Assembly reconvenes, on or after January 4, 2022. Legislative Intervenors deny that there is no realistic prospect that the General Assembly will pass a final congressional redistricting plan that can be approved by the Governor, as there is still time to pass and reach agreement on such a plan.

32.    Denied. Legislative Intervenors further answer that there is still time for the General Assembly and the Governor to reach agreement on a plan by the Respondents' January 24, 2022 deadline. That said, after reasonable investigation, Legislative Respondents are without knowledge or information sufficient to form a belief about whether January 24, 2022 is in fact a real deadline.

33.    Legislative Intervenors deny that this Court needs to intervene at this time to protect Petitioners' constitutional rights, as there is still time for a plan to be

passed.   Further answering, Petitioners' Application for the Exercise of King's Bench Power or Extraordinary Jurisdiction speaks for itself.  Legislative Intervenors deny any characterization of that filing.

## COUNT I

34.    Legislative Intervenors incorporate their responses to paragraphs 1-33 of the Petition as if fully restated herein.

35.    Admitted.

36.    Paragraph 36 contains legal conclusions to which no response is required, and the opinion in *LWV I* speaks for itself.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 36.

37.    Paragraph 37 contains legal conclusions to which no response is required.   To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 37.  Legislative Intervenors deny any characterization of this action, which speaks for itself.

38.    Legislative Intervenors admit that, in view of the 2020 Census, the current congressional district plan is malapportioned and the districts vary from the ideal population.

39.    Denied.  Legislative Intervenors deny that their failure to act is the cause of the imbalance in population.  Legislative Intervenors admit that a new

congressional redistricting plan is needed. By way of further answer, there is still ample time to pass such a plan.

40.     Paragraph 40 contains a legal conclusion to which no response is required. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 40.

## COUNT II

41.     Legislative Intervenors incorporate their responses to paragraphs 1-40 of the Petition as if fully restated herein.

42.     Admitted.

43.     Paragraph 43 contains legal conclusions to which no response is required and the opinions referenced in this paragraph speak for themselves. To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 43.

44.     Legislative Intervenors admit only that the General Assembly and Governor have not yet enacted a congressional redistricting plan. After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 44 and therefore deny them.

11

45.   After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 and therefore deny them.

46.   Legislative Intervenors admit only that the General Assembly and Governor have not yet enacted a congressional redistricting plan.  The remainder of paragraph 46 contains legal conclusions to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in the remainder of paragraph 46.

47.   Paragraph 47 of the Petition contains a legal conclusion to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 47.

## COUNT III

48.   Legislative Intervenors incorporate their responses to paragraphs 1-47 of the Petition as if fully restated herein.

49.   Admitted.

50.   Admitted.

51.   Legislative Intervenors admit that, in view of the 2020 Census data, the current congressional districts deviate from the ideal district population.  After reasonable investigation, Legislative Intervenors are without knowledge or information sufficient to form a belief about the truth of the allegation regarding how

12

such population imbalances impact the "weight" of each citizen's vote and therefore deny it.

52.    Paragraph 52 of the Petition contains a legal conclusion to which no response is required.  To the extent that a responsive pleading is required, Legislative Intervenors deny the allegations in paragraph 52.

53.    Legislative Intervenors deny each and every factual allegation in the Petition not expressly admitted herein as true.

### NEW MATTER[1]

### FIRST AFFIRMATIVE DEFENSE

54.    One or more counts of the Petition fail to state a claim as to which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

55.    Petitioners failed to join necessary or indispensable parties.

### THIRD AFFIRMATIVE DEFENSE

56.    Petitioners lack standing.

### FOURTH AFFIRMATIVE DEFENSE

57.    Petitioners' claims are not ripe.

---

[1] Legislative Intervenors reserve the right to assert additional affirmative defenses that may arise during the course of this matter.

13

## FIFTH AFFIRMATIVE DEFENSE

58.   The claims asserted in the Petition are non-justiciable.

## NOTICE TO PLEAD

Petitioners are notified to plead to this Answer and New Matter within 30 days

from service or a judgment may be entered against them.

14

**WHEREFORE**, the Legislative Intervenors respectfully request that the Court dismiss the Petition in its entirety and grant such other and further relief to them as the Court deems just and proper.

Dated:                                           Respectfully submitted,

/s/ Anthony R. Holtzman                          /s/ Jeffry Duffy
**K&L GATES LLP**                                **BAKER & HOSTETLER LLP**
Anthony R. Holtzman (PA No. 200053)              Jeffry Duffy (PA No. 081670)
17 North Second St., 18th Floor                  BNY Mellon Center
Harrisburg, PA 17101-1507                        1735 Market Street, Suite 3300
(717) 231-4570 / Fax (717) 231-4501              Philadelphia, PA 19103
Anthony.Holtzman@klgates.com                     (215) 568-3100 / Fax (215) 568-3439
                                                 jduffy@bakerlaw.com

*Counsel for Legislative Intervenors Jake*       Patrick T. Lewis (OH No. 0078314)*
*Corman, President Pro Tempore of the*           127 Public Square, Suite 2000
*Pennsylvania Senate, and Kim Ward,*             Cleveland, OH 44114
*Majority Leader of the Pennsylvania*            (216) 621-0200 / Fax (216) 696-0740
*Senate*                                         plewis@bakerlaw.com

                                                 Robert J. Tucker (OH No. 0082205)*
                                                 200 Civic Center Drive, Suite 1200
                                                 Columbus, OH  43215
                                                 (614) 462-2680 / Fax (614) 462-2616
                                                 rtucker@bakerlaw.com

                                                 *\* Pro Hac Vice application forthcoming*
                                                 *Counsel for Legislative Intervenors Bryan*
                                                 *Cutler, Speaker of the Pennsylvania*
                                                 *House of Representatives, and Kerry*
                                                 *Benninghoff, Majority Leader of the*
                                                 *Pennsylvania House of Representatives*

15

**VERIFICATION**

I, _____ hereby verify that the factual averments and denials of factual averments made in the foregoing Answer with New Matter are true and correct to the best of my knowledge and information or belief. I make this verification subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

Date: _____          _____

1

# Exhibit C

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

No. 464 M.D. 2021

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

No. 465 M.D. 2021

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela A. Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak

Petitioners,

vs.

Veronica Degraffenreid, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

## ORDER

AND NOW, this ___ day of _____, 202__, upon consideration of the Application for Leave to Intervene of the Speaker and Majority Leader of the Pennsylvania House of Representative and the President *Pro Tempore* and Majority Leader of the Pennsylvania Senate, and any response thereto, it is hereby ORDERED that (1) the request for leave to intervene is granted and (2) the Answers that are attached to the Application as Exhibits A & B are deemed filed.

_____
J.

# Exhibit D

**VERIFICATION**

I, Bryan D. Cutler, Speaker of the Pennsylvania House of Representatives, depose and say, subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities, that the factual allegations set forth in the foregoing Application for Leave to Intervene are true and correct to the best of my knowledge, information, and belief.

Dated this 24th day of December, 2021.

BRYAN D. CUTLER
Speaker of the House of Representatives

## **VERIFICATION**

I, Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, deposes and says, subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, that the factual allegations set forth in the foregoing Application for Leave to Intervene are true and correct to the best of my knowledge, information, and belief.

Dated this 24th day of December, 2021

KERRY BENNINGHOFF
Majority Leader, House of Representatives

**VERIFICATION**

I, Jake Corman, President *Pro Tempore* of the Pennsylvania Senate, depose and say, subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities, that the factual allegations set forth in the foregoing Application for Leave to Intervene are true and correct to the best of my knowledge, information, and belief.

Dated this 27th day of December, 2021.

JAKE CORMAN
President *Pro Tempore* of the Pennsylvania
Senate

311426426.1

**VERIFICATION**

I, Kim Ward, Majority Leader of the Pennsylvania Senate, depose and say, subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities, that the factual allegations set forth in the foregoing Application for Leave to Intervene are true and correct to the best of my knowledge, information, and belief.

Dated this 27th day of December, 2021.

_____
KIM WARD
Majority Leader of the Pennsylvania Senate

311426426.1

A52

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service by PACFile eService as follows:**

All counsel of record

Date:  December 27, 2021          /s/ Anthony R. Holtzman_____
                                  Anthony R. Holtzman

# EXPERT REPORT OF JONATHAN RODDEN, Ph.D.

**Carter v. Chapman, 464 MD 2021, 465 MD 2021 (Pa. Commw. Ct.)**
**January 24, 2022**

In this report, I describe the Carter Plan, a proposed Pennsylvania congressional redistricting map that I was asked to create and which the *Carter* Petitioners are submitting for consideration pursuant to the Court's January 14, 2022 Order.

Specifically, I was asked to use the existing court-drawn 18-district plan as a guide, and to draw a new 17-district plan that is as similar as possible to the existing plan, preserving the cores and boundaries of districts where feasible given equal population requirements, and meeting or surpassing its adherence to traditional redistricting criteria, including (1) minimizing splits of counties, municipalities, and vote tabulation districts and (2) drawing compact districts. Moreover, I was asked to be mindful of the residential addresses of congressional incumbents to avoid inadvertent pairings of incumbent legislators. Finally, after completing my map, I was asked to evaluate the districts' partisan performance.

The most important constraint shaping this task was the demographic change experienced by Pennsylvania since the 2010 census. The metropolitan areas of the state have experienced population growth on par with the United States as a whole, while rural Pennsylvania has experienced a precipitous decline in population. As a result of rural population loss, Pennsylvania lost a congressional seat. Accordingly, it is possible to make relatively small changes to the districts in Southeastern Pennsylvania and the Pittsburgh area, but the geographic size and configuration of districts in the rest of the state, which is more rural, needed to change more substantially to preserve population equality.

This report explains those demographic constraints in greater detail, and then presents a proposed congressional map that maintains continuity with the 2018 plan and adheres to traditional redistricting criteria. Despite the challenges associated with the loss of a district, this map shows that it is possible to preserve a relatively similar level of compactness as the current map, split the same number of counties, and reduce the number of split municipalities and vote tabulation districts. Furthermore, the resulting map is likely to result in a seat share that is consistent with and responsive to Pennsylvania voters' partisan preferences.

## I.    QUALIFICATIONS AND EXPERIENCE

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab—a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences. I am engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as Exhibit A.

1

In my current academic work, I conduct research on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy, Proceedings of the National Academy of Science*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy published in the last year, and another received an award from the American Political Science Association section on social networks. In 2021, I received a John Simon Guggenheim Memorial Foundation Fellowship, and received the Martha Derthick Award of the American Political Science Association for "the best book published at least ten years ago that has made a lasting contribution to the study of federalism and intergovernmental relations."

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured in more popular publications like the *Wall Street Journal*, the *New York Times*, and *Boston Review*. I recently published a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others. This book included deep analysis of Pennsylvania's political geography and redistricting.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. My PhD students frequently take academic and private sector jobs as statisticians and data scientists. I frequently work with geo-coded voter files and other large administrative data sets, including in recent paper published in the *Annals of Internal Medicine* and *The New England Journal of Medicine.* I have developed a national data set of geo-coded precinct-level election results that has been used extensively in policy-oriented research related to redistricting and representation.

I have been accepted and testified as an expert witness in six election law and redistricting cases: *Romo v. Detzner,* No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.,* No. 4:2014-CV-02077 (E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections,* No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Committee et al. v. Hobbs et al.*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Virginia State Board of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson et al. v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018). Just earlier this month, the Ohio Supreme Court credited my expert analysis in *Bennett v. Ohio Redistricting Commission*, No. 2012-1198 (Ohio 2022), and *Adams v. DeWine*, No. 2012-1428 (Ohio 2022), two redistricting cases challenging state legislative and congressional maps. I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, electoral districts, voting, ballots, and

election administration. I am currently working as a consultant for the Maryland Redistricting Commission.

I am being compensated at the rate of $550/hour for my work in this case. My compensation is not dependent upon my conclusions in any way.

## II.    DATA SOURCES

In order to assess statewide partisanship, I have collected statewide election results for selected elections from 2010 to 2020 from the Pennsylvania Department of State.[1] The specific elections and results are detailed in Table 1 below. As part of my analysis of the relationship between population change and partisanship, I also collected county-level results of those same elections from the Pennsylvania Department of State. In order to assess the partisanship of the existing Pennsylvania Congressional districts as well as the proposed Carter Plan, I also accessed precinct-level election results from the Pennsylvania Department of State for statewide elections from 2016 to 2020 that were matched to 2020 Pennsylvania vote tabulation districts by a team at Harvard University called the Algorithm-Assisted Redistricting Methodology Project.[2] I also used block-level 2020 population estimates produced by the United States Census Department for the purposes of legislative redistricting. Additionally, I accessed the boundaries of current legislative districts and counties, along with data on 2010 and 2020 population, from the National Historical GIS (nhgis.org). I also accessed a file containing addresses of incumbents that was provided to me by counsel.

## III.    PENNSYLVANIA'S CURRENT CONGRESSIONAL DISTRICTS

Pennsylvania's current congressional plan was adopted in 2018 by an order of the Pennsylvania Supreme Court in *League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 576 (2018) (*LWV*). In explaining its reasons for selecting this map, the Pennsylvania Supreme Court cited the map's superiority, compared with other maps that had been submitted, with respect to the traditional redistricting criteria of compactness and minimization of splits of counties, municipalities, and smaller political subdivisions. Indeed, the map stands out relative to those of many other U.S. states in that its districts are relatively compact and respectful of county and municipal boundaries.

As demonstrated by the elections of 2018 and 2020, the map also produced a congressional delegation that came very close to accurately portraying the partisan preferences of Pennsylvania's voters. In recent years, Pennsylvania has been a competitive but Democratic-leaning state. Table 1 displays results of all statewide elections since the last round of decennial redistricting. The average vote share of Democratic candidates during this period was almost 53 percent. Democratic candidates were victorious in 13 of 17 statewide races.

---

[1] https://www.electionreturns.pa.gov/ReportCenter/Reports
[2] https://alarm-redist.github.io/posts/2021-08-10-census-2020/

3

**Table 1: Pennsylvania Statewide Election Results, 2012-2020**

|  | Democratic votes | Republican votes | Democratic vote share |
|---|---|---|---|
| 2012 President | 2,990,274 | 2,680,434 | 52.73% |
| 2012 Senate | 3,021,364 | 2,509,132 | 54.63% |
| 2012 Attorney General | 3,125,557 | 2,313,506 | 57.46% |
| 2012 Auditor General | 2,729,565 | 2,548,767 | 51.71% |
| 2012 Treasurer | 2,872,344 | 2,405,654 | 54.42% |
| 2014 Governor | 1,920,355 | 1,575,511 | 54.93% |
| 2016 Presidential | 2,926,441 | 2,970,733 | 49.62% |
| 2016 U.S. Senate | 2,865,012 | 2,951,702 | 49.25% |
| 2016 Attorney General | 3,057,010 | 2,891,325 | 51.39% |
| 2016 Auditor General | 2,958,818 | 2,667,318 | 52.59% |
| 2016 Treasurer | 2,991,404 | 2,610,811 | 53.40% |
| 2018 U.S. Senate | 2,792,437 | 2,134,848 | 56.67% |
| 2018 Governor | 2,895,652 | 2,039,882 | 58.67% |
| 2020 Presidential | 3,458,229 | 3,377,674 | 50.59% |
| 2020 Attorney General | 3,461,472 | 3,153,831 | 52.33% |
| 2020 Auditor General | 3,129,131 | 3,338,009 | 48.39% |
| 2020 Treasurer | 3,239,331 | 3,291,877 | 49.60% |
|  |  |  |  |
| 2012-2020 Average |  |  | 52.85% |
| 2016-2020 Average |  |  | 52.05% |
| 2018-2020 Average |  |  | 52.71% |

Note: Democratic vote share is the Democratic share of the votes for the two major parties (Democrats and Republicans). The denominator does not include minor parties and write-in candidates.

Table 1 also provides vote share averages for more recent election cycles. From 2016 to 2020—the period for which I have accessed precinct-level election results that allow me to assess the likely partisanship of proposed new redistricting plans—the average Democratic vote share was around 52 percent. During the lifespan of the most recent redistricting plan, which was implemented in 2018, the average Democratic vote share was 52.7 percent.

Given this pattern of statewide election results, a congressional redistricting plan that produces a slight majority of Democratic members of Congress would be an accurate reflection of overall statewide partisanship. After the elections of 2018 and 2020, the Pennsylvania congressional delegation was split evenly between the two parties. In other words, the 2018 congressional plan was, if anything, slightly more favorable to the Republican Party— with 50 percent of the seats and a relatively stable statewide support base between 47 and 48 percent—than the overall statewide vote share.

However, it is important to note that several districts were quite competitive and could plausibly have been won by either party. The district-level results of the 2018 and 2020 elections are

4

presented on the left-hand side of Table 2 below, along with the average of the two. The districts are sorted from the most Republican to most Democratic, according to the average congressional vote share. Note that Districts 1 (Bucks County), 10 (metro Harrisburg), and 16 (Northwest PA) were very close in 2018—a relatively good year for Democrats—and Districts 7 (Lehigh Valley), 8 (Northeast PA), and 17 (suburban Pittsburgh) were quite close in 2020, which was a relatively good year for Republicans.

**Table 2: Actual District-Level Results of 2018 and 2020 Elections and Statewide Election Results Disaggregated by Congressional District**

| District | Democratic Congressional vote share, 2018 | Democratic Congressional vote share, 2020 | Average Democratic Congressional vote share, 2018-2020 | Average Democratic *Statewide* vote share, 2018-2020 | Over (under) performance of Democratic Congressional candidate |
|---|---|---|---|---|---|
| 13 | 29.51% | 26.51% | 28.01% | 29.35% | -1.34% |
| 15 | 32.16% | 26.54% | 29.35% | 31.56% | -2.21% |
| 12 | 33.96% | 29.16% | 31.56% | 33.22% | -1.66% |
| 9 | 40.25% | 33.67% | 36.96% | 37.12% | -0.16% |
| 14 | 42.09% | 35.31% | 38.70% | 40.66% | -1.96% |
| 11 | 41.02% | 36.88% | 38.95% | 39.02% | -0.07% |
| 16 | 47.83% | 40.66% | 44.25% | 43.36% | 0.89% |
| 1 | 48.74% | 43.44% | 46.09% | 53.62% | -7.53% |
| 10 | 48.68% | 46.69% | 47.68% | 48.74% | -1.06% |
| 8 | 54.64% | 51.78% | 53.21% | 50.94% | 2.27% |
| 7 | 55.17% | 51.87% | 53.52% | 53.68% | -0.16% |
| 17 | 56.26% | 51.15% | 53.70% | 53.99% | -0.29% |
| 6 | 58.88% | 56.05% | 57.47% | 56.71% | 0.76% |
| 4 | 63.52% | 59.53% | 61.52% | 62.41% | -0.88% |
| 5 | 65.19% | 64.70% | 64.94% | 65.40% | -0.46% |
| 18 | Uncontested | 69.25% | 69.25% | 68.06% | 1.18% |
| 2 | 79.02% | 72.54% | 75.78% | 73.54% | 2.23% |
| 3 | 93.38% | 91.03% | 92.21% | 92.34% | -0.14% |

Note: Democratic vote share is the Democratic share of the votes for the two major parties (Democrats and Republicans). The denominator does not include minor parties and write-in candidates.

It is useful to make a distinction between actual district-level congressional election results, which are affected by idiosyncratic aspects of candidates' popularity, including strategic decisions by high-quality challengers to avoid running against popular incumbents, and what might be characterized as the underlying partisanship of the district. To capture the latter, political scientists often use precinct-level results of *statewide* elections, where the same candidates are running in each district, and count up the votes within the boundaries of legislative districts. I have also undertaken this approach, using the 6 statewide elections listed in Table 1 for 2018 and 2020 and taking an average for each district. These calculations are presented in the fifth column of Table 2. In the final column, I have subtracted the average statewide Democratic vote share from the

5

average congressional vote share, which provides an indicator of the extent to which the Democratic congressional candidate outperforms his or her statewide co-partisans (positive numbers), or to which the Republican candidate outperforms his or her statewide co-partisans (negative numbers).

This exercise reveals that while statewide and congressional election results are highly correlated, there are some interesting and sometimes sizable differences between statewide and congressional races. Above all, note that if we focus only on *statewide* races, there are 10 districts with Democratic majorities rather than 9. District 1 has an average Democratic vote share of 53.6 percent, yet the Republican incumbent from the previous Bucks County district, Mike Fitzpatrick, received 51.3 percent of the vote in 2018 and a comfortable 56.6 percent in 2020.

In keeping with a narrow but consistent statewide Democratic majority, the previous plan had 10 of 18 districts where Democratic candidates received majorities in statewide races, though one of these, District 8 in Northeastern Pennsylvania, was very close to evenly divided (less than 51 percent Democratic). Additionally, one of the Republican-leaning districts, number 10 in the Harrisburg area, was also rather evenly divided (a little over 51 percent Republican). When it comes to actual congressional election results, several were quite competitive, and due to a popular Republican incumbent in District 1, the delegation ended up evenly divided between the parties.

In sum, the existing plan demonstrates several desirable features. In addition to having relatively compact districts with few splits of counties and municipalities, it also produces relatively competitive elections, and outcomes that are roughly in line with overall partisan preferences of Pennsylvania's voters. Thus, it is a very reasonable starting point for the redistricting process in 2022.

## IV.    DEMOGRAPHIC CHANGE IN PENNSYLVANIA

To understand the constraints shaping a redistricting strategy based on the preservation of existing districts, it is necessary to understand the geography of Pennsylvania's population change over the last decade.

For the most part, places that were sparsely populated in 2010 subsequently lost population and became even sparser, while relatively dense places gained population and grew denser. This simple pattern can be visualized in Figure 1, which displays the log of 2010 population density on the horizontal axis, and the change in population from 2010 to 2020 on the vertical axis. Each data marker is a county, and the size of the data marker corresponds to the overall population of the county. The county that gained the most population, on the right side of the graph, was Philadelphia—the densest county in the state. Other counties experiencing relatively large increases in population were other relatively dense counties in the metro area surrounding Philadelphia County, e.g., Chester and Montgomery. With a few exceptions, e.g., Centre County and Butler County, Pennsylvania's relatively sparse counties lost population.

6

**Figure 1: Population Density and Population Change in Pennsylvania, 2010 to 2020**



In other words, metropolitan areas gained significant population, while rural areas experienced substantial population loss. In particular, the counties of Southeastern Pennsylvania experienced sustained population growth. In fact, from the decennial census of 2010 to that of 2020, these counties grew at an average rate of 6.7 percent.[3] This is relatively close to the overall growth rate of the U.S. population during the same period, which was 7.3 percent. In fact, the rate of population growth in Chester, Lehigh, and Montgomery Counties surpassed 8 percent. Dauphin County, home to Harrisburg, grew at a rate of 8.1 percent, while Allegheny County, home to Pittsburgh, grew at a rate of 2.2 percent. Meanwhile, the rest of the state *lost* population at a rate of 2.7 percent since 2010.

These patterns can be visualized in Figure 2, which displays raw numbers of population gain and loss by county from 2010 to 2020, along with the boundaries of the current 18 congressional districts.

---

[3] I include the counties of Bucks, Berks, Chester, Delaware, Lancaster, Lehigh, Montgomery, Northampton, and Philadelphia.

**Figure 2: The Geography of Population Shifts, Pennsylvania Counties, 2010 to 2020**



Figure 2 makes it clear that Pennsylvania lost a congressional district largely because of population decline outside of metropolitan areas. As a result, major reconfigurations of existing districts are unavoidable in rural Pennsylvania, whereas the districts in metropolitan areas can be fine-tuned based on local variation in the rate of population growth.

In the previous redistricting plan, which was very careful to avoid county splits, Philadelphia County was entirely contained within two congressional districts. Because population growth in Philadelphia was not far off from that of the average national rate, its districts need not change much at all. But because Bucks and Delaware counties experienced lower growth rates, Districts 1 and 5 must expand further beyond the confines of their counties. This is somewhat challenging, since the surrounding counties of Montgomery, Chester, and Lancaster have experienced rapid population growth. The expansions of Districts 1 and 5 must either dig further into Montgomery County, making its district (District 4) narrower and less compact, or completely disrupt the current map's effort to avoid county splits in Chester, Lancaster, Lehigh, and Northampton. In the map presented below, I have elected to maintain the structure of the existing map and reach further into Montgomery County with Districts 1 and 5 (see below for more details).

8

Moving North from the Philadelphia metro area, moderate population growth in the counties contained in the current version of Districts 7 and 8 makes it possible to leave the basic structure of these districts intact. Likewise, moving West from Philadelphia, District 11 (based in Lancaster County) and District 10 (based in the Harrisburg area) require relatively minor changes due to population growth that is close to the national average.

In metro Pittsburgh, the current map places the city of Pittsburgh and its Southern and Eastern suburbs into District 18, with the remainder of Allegheny County and Beaver County placed in District 17. Again, due to moderate population growth, it is straightforward to retain the existing arrangement. This can be achieved by simply moving a small part of suburban Pittsburgh into District 17 and expanding what was formerly called District 18 a bit further into Pittsburgh's exurbs in Westmoreland County.

Due to population loss, the territories of Districts 14 and 16, in the Western corners of the state, must expand toward the central part of the state. In the central part of the state, large population losses, combined with the unavoidable expansion of Districts 14 and 16 into their territory, mean that the area formerly covered by Districts 9, 12, 13, and 15 must now be covered by only three districts rather than four. Each of these districts is currently represented by a Republican incumbent. As a result, unless the map undergoes a more extensive redesign aimed explicitly at protecting these incumbents, two of them will be forced to compete in the same district.

It is worth noting that Pennsylvania's demographic changes are highly correlated with partisanship. In Pennsylvania, as in the rest of the United States, population density is highly correlated with Democratic voting.[4] In Pennsylvania, as demonstrated in Figure 1, population growth is occurring in relatively dense areas. This means that the places that are gaining population are largely Democratic, and the places that are losing population are largely Republican. This pattern can be visualized in Figure 3, which plots the county-level change in population from 2010 to 2020 on the horizontal axis, and the average Democratic vote share from 2018 and 2020 on the vertical axis.

---

[4] See Jonathan Rodden, *Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. New York: Basic Books.

9

**Figure 3: Population Change Since 2010 and Average Democratic Vote Share, Pennsylvania Counties**



Moreover, another pronounced trend in Pennsylvania and the rest of the United States is that places that are gaining population are not only more Democratic to begin with, but are becoming *more* Democratic as they gain population. Likewise, places that are losing population are not only relatively Republican to begin with, but are becoming *more* Republican. This can be visualized in Figure 4 below, which, like Figure 3, depicts the change in population from 2010 to 2020 on the horizontal axis, but on the vertical axis, plots the *change* in the Democratic vote share from the average at the beginning of the decade (the 2010 mid-term and the 2012 presidential election) and the average at the end of the decade (the 2018 mid-term and the 2020 presidential election). Figure 4 demonstrates that many of the counties that are gaining the most population—like Chester, Montgomery, and Lancaster—are becoming more Democratic. Philadelphia—already extremely Democratic—is an exception to this pattern.

Note that some of the growing places that are becoming more Democratic, like Montgomery, Chester, and Allegheny Counties, were already quite Democratic. But others, like Lancaster and Cumberland, started out with strong Republican majorities, meaning that they are becoming more competitive over time as they gain population.

10

**Figure 4: Population Change Since 2010 and Change in Average Democratic Vote Share, Pennsylvania Counties**



11

A64

## V.      REDISTRICTING PLAN

The Carter Plan is depicted in Figure 5, which also includes the boundaries of the previous (2018) plan, in thick gray, as well as the boundaries of Pennsylvania's counties in thin gray. It is immediately clear that the district boundaries have changed very little in most of Eastern Pennsylvania and the Pittsburgh area, where, as shown in Figure 2, population has grown over the past decade. In contrast, the boundaries in the central part of the state have changed more substantially to accommodate population loss.

**Figure 5: Proposed Congressional District Boundaries**



Let us begin by taking a closer look at the Philadelphia area, which is displayed in greater detail in Figure 6. First, in the 2018 plan, Philadelphia County was divided into two relatively compact districts, Districts 2 and 3, with a small portion of South Philadelphia spilling into District 5. Since Philadelphia's population growth has been quite close to overall U.S. population growth, I was able to retain this arrangement, while only slightly altering the boundaries of Districts 2 and 3 in order to achieve population equality.

12

**Figure 6: Philadelphia Area**



The previous version of District 1 was comprised mostly of Bucks County, which was kept whole, with a small segment reaching into Montgomery County. Since population growth in Bucks County has been somewhat slow relative to the country as a whole, District 1 required additional population in order to achieve population equality. I followed the same arrangement as before, but simply added additional county subdivisions along the border between Bucks and Montgomery.

District 5 was based in Delaware County, with a portion reaching into South Philadelphia, and another reaching into Montgomery County. As with Bucks County, population growth was lackluster in District 5, so it was necessary to add population. Reaching into Chester County would have undermined the previous map's respect for several county boundaries to the West, so I elected once again to keep the structure of the existing map, reaching further into Montgomery County and including Norristown in District 5.

The downside of this approach is that it forces Montgomery County-based District 4 much further into Berks County than in the previous map. As quantified below, this makes District 4 less compact than the previous version. I considered alternative configurations that would have expanded District 5 into Chester County, but these approaches inevitably undermined the respect for county boundaries demonstrated by the previous map.

Next, the previous version of District 7 included the Lehigh Valley counties of Lehigh and Northampton and reached its population goal by extending Northward into part of Monroe County. Slow population growth in Northampton County meant that District 7 required additional population. I was able to unify Carbon County with the rest of the Lehigh Valley. The U.S. Census Department recognizes Allentown-Bethlehem-Easton as a metropolitan statistical area consisting of the entirety of Northampton, Lehigh, and Carbon Counties. These counties now constitute the core of District 7 (see Figure 7).

The previous version of District 8 was based in the Northeast corner of the state, including the Scranton-Wilkes-Barre corridor and extending to Hazelton in its Southwest corner. The district needed to add a small amount of population, which was possible to achieve by adding more of Monroe County as well as a couple of municipalities along the district's Western border in Luzerne County.

14

**Figure 7: Districts 7 and 8**



Due to healthy population growth on par with the national average, Districts 6, 10, and 11 required very little alteration (see Figure 8). As before, District 6 contains all of Chester as well as the Southwest corner of Berks County and the city of Reading. It was only necessary to add a small part of Exeter Township.

As in the previous map, District 11 contains all of Lancaster County and the Southern section of York County. It was only necessary to make small changes along the boundary between districts 10 and 11 in order to achieve population equality.

As before, District 10 is centered on the city of Harrisburg, which sits at the confluence of three counties: Dauphin, Cumberland, and York. The only noteworthy change is that the district needed to add a small amount of population by moving somewhat further West into Cumberland County.

**Figure 8: Districts 6, 10, and 11**



The boundaries of the former District 9 must change somewhat more substantially for a number of reasons (see Figure 9). The old version contained the counties of Columbia, Montour, part of Northumberland, Schuylkill, Carbon, Lebanon, and the rural Northern section of Berks County. However, Eastern counties have nowhere to grow but inwards, and as described above, Carbon County was placed in District 7 to unify a metropolitan statistical area. More importantly, Columbia, Schuylkill, Northumberland, and Montour counties all lost significant population. Thus, in order to achieve the target population, it was necessary for District 9 to grow to the North and West, taking the remainder of Northumberland, all of Bradford, Susquehanna, Sullivan, and Wyoming Counties, as well as part of Lycoming—all areas that had previously been in District 12, which due to severe population loss, cannot be retained.

## Figure 9: District 9



Due to population loss, the old version of District 15 must gain substantial population to its East. As this happens, it necessarily swallows much of the remainder of what was once District 12 (see Figure 10). The new version of District 15 is relatively compact and avoids a split of Centre County that had previously separated State College from some of its suburbs. Like District 15, District 13, which had included a number of rural counties in South-central Pennsylvania that are experiencing population loss, must expand to take the remainder of what was once District 12—the counties of Mifflin, Juniata, and Perry.

## Figure 10: Districts 13 and 15



Now, let us consider the Western part of the state. The previous configuration included District 14 in the Southwest corner of the state, and District 16 in the Northwest corner of the state. Due to population loss, both needed to expand to the East. District 16 gained the remainder of Butler County, which had previously been split, and part of Venango County. District 14 expanded Eastward by taking the remainder of Westmoreland County and most of Indiana and Somerset Counties.

**Figure 11: Western Pennsylvania (Districts 14, 12, 17, and 16)**



19

A72

Finally, it was straightforward to keep the structure of the metropolitan Pittsburgh districts the same. The previous District 18, now District 12, contained the city of Pittsburgh and its suburbs to the South and East, while District 17 contained the remaining parts of Allegheny County to the North and West of Pittsburgh, along with Beaver County. The boundary between Districts 17 and 18 was largely composed of the Pittsburgh City boundary. District 17 needed to gain a small amount of population. Without violating the boundary of the city of Pittsburgh, it was possible to do this by simply moving a handful of small suburban municipalities from District 18 to District 17. This left Pittsburgh-based District 18 (now 12) somewhat short of population, but it was possible to add this by simply appending suburban and exurban areas in Westmoreland County.

## VI.   PLAN STATISTICS

***Retention of Existing Districts:*** As described above, I set out to retain the structure of the existing plan to the extent possible. Overall, 87 percent of the population of Pennsylvania falls in the same district as before, though what was formerly called District 18 is called District 12 in the Carter Plan. Table 3 provides information on the share of the population in each individual district in the Carter Plan that remains in the same district. As described above, Districts 9 and 15 changed the most, followed by District 13, as they unavoidably captured what was District 12 in the previous plan due to population loss in Central Pennsylvania. Therefore, it's unsurprising that residents of these two districts are less likely to have lived in the same district previously.

**Table 3: Share of Population in Each Proposed District that Will be in the Same District as in the 2018 Plan**

| District | Share of population in previous version of district |
|---|---|
| 1 | 93.26% |
| 2 | 95.84% |
| 3 | 94.17% |
| 4 | 81.65% |
| 5 | 89.74% |
| 6 | 98.44% |
| 7 | 90.56% |
| 8 | 92.10% |
| 9 | 65.54% |
| 10 | 96.20% |
| 11 | 96.91% |
| 12(18) | 85.50% |
| 13 | 73.39% |
| 14 | 75.65% |
| 15 | 59.61% |
| 16 | 89.95% |
| 17 | 93.63% |

20

***Equal Population:*** Based on the 2020 Census, the ideal population of each congressional district is 764,865. The Carter Plan includes 4 districts with the ideal population and 13 districts with a deviation of plus or minus one person. District-level details are provided in Table 4.

**Table 4: District Population Deviations[5]**

| District | Population | Deviation from Ideal |
|---|---|---|
| 1 | 764866 | 1 |
| 2 | 764865 | 0 |
| 3 | 764864 | -1 |
| 4 | 764865 | 0 |
| 5 | 764866 | 1 |
| 6 | 764864 | -1 |
| 7 | 764865 | 0 |
| 8 | 764866 | 1 |
| 9 | 764864 | -1 |
| 10 | 764864 | -1 |
| 11 | 764864 | -1 |
| 12 | 764864 | -1 |
| 13 | 764864 | -1 |
| 14 | 764866 | 1 |
| 15 | 764864 | -1 |
| 16 | 764865 | 0 |
| 17 | 764864 | -1 |

***Contiguity:*** Each district in the Carter Plan is made up of contiguous territory.

***Political Subdivision Splits:*** Additionally, I have attempted to minimize county splits. The Carter Plan splits 13 counties, 10 of which are split among 2 districts, and 3 of which are split among 3 districts. This amounts to a total of 16 splits. The previous 2018 plan also splits 13 counties, but four of those are split among 3 districts, for a total of 17 county splits. Note that I do not count as a county split a technically non-contiguous fragment of Chester County that contains six people and is marooned in Delaware County due to a bend in Brandywine Creek at the intersection with the Southern state boundary. I also do not count this as a county split in the 2018 redistricting plan, consistent with the Pennsylvania Supreme Court's approach. The counties in the Carter Plan that are split among three districts are Berks, Philadelphia, and Montgomery. The 2018 plan also split these same counties among three districts, in addition to Butler County, but I was able to eliminate a split contained in the previous plan in the Southwest corner of Butler County.

---

[5] The population of each district remains the same whether one uses the 2020 Census redistricting data or the Legislative Reapportionment Commission's Data Set #1.

The Carter Plan splits the city of Philadelphia between 3 districts and also splits the following 18 county subdivisions between two districts: Horsham and Lower and Upper Marion Townships in Montgomery County; Exeter, Lower Heidelberg, and Perry Townships in Berks County; Ross Township in Monroe County; Newport and Butler Townships in Luzerne County; Jackson Township in York County; North Newton Township in Cumberland County; the city of Williamsport in Lycoming County; Victory Township in Venango County; Swissvale Borough in Allegheny County; Hempfield and South Huntingdon Townships in Westmoreland County; Conemaugh Township in Somerset County; South Mahoning Township in Indiana County. The previous plan also split 19 county subdivisions.

The Carter Plan splits only 14 vote tabulation districts. This is a substantial improvement over the previous 2018 plan, which split 32 VTDs.

***Compactness:*** I also attempted to retain the overall compactness of the previous plan. Table 5 provides compactness statistics for the same measures of compactness relied upon by the Court in its deliberations in 2018. For each of these scores, higher numbers indicate more-compact districts.

### Table 5: Compactness Statistics: Previous (2018) Plan and Proposed Plan

| District | Reock, Carter | Reock, 2018 plan | Schwartzberg, Carter | Schwartzberg, 2018 plan | Polsby-Popper, Carter | Polsby-Popper, 2018 plan | Population Polygon, Carter | Population Polygon, 2018 plan | Area/Convex Hull, Carter | Area/Convex Hull, 2018 plan |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.4 | 0.43 | 1.5 | 1.43 | 0.4 | 0.46 | 0.75 | 0.78 | 0.82 | 0.83 |
| 2 | 0.33 | 0.37 | 1.49 | 1.42 | 0.42 | 0.47 | 0.92 | 0.96 | 0.84 | 0.86 |
| 3 | 0.4 | 0.43 | 1.72 | 1.63 | 0.32 | 0.36 | 0.78 | 0.8 | 0.72 | 0.74 |
| 4 | 0.27 | 0.41 | 2.29 | 1.73 | 0.17 | 0.31 | 0.51 | 0.64 | 0.68 | 0.81 |
| 5 | 0.41 | 0.44 | 1.86 | 1.54 | 0.27 | 0.38 | 0.6 | 0.69 | 0.72 | 0.84 |
| 6 | 0.45 | 0.45 | 1.68 | 1.69 | 0.29 | 0.29 | 0.83 | 0.82 | 0.73 | 0.72 |
| 7 | 0.57 | 0.41 | 1.45 | 1.5 | 0.42 | 0.42 | 0.92 | 0.95 | 0.78 | 0.83 |
| 8 | 0.47 | 0.49 | 1.67 | 1.73 | 0.28 | 0.28 | 0.91 | 0.88 | 0.74 | 0.75 |
| 9 | 0.41 | 0.55 | 1.83 | 1.94 | 0.28 | 0.25 | 0.54 | 0.53 | 0.74 | 0.74 |
| 10 | 0.49 | 0.49 | 1.76 | 1.72 | 0.27 | 0.29 | 0.86 | 0.88 | 0.71 | 0.76 |
| 11 | 0.45 | 0.45 | 1.49 | 1.51 | 0.37 | 0.37 | 0.79 | 0.78 | 0.88 | 0.88 |
| 12 (18) | 0.63 | 0.46 | 2.13 | 2.21 | 0.18 | 0.18 | 0.75 | 0.75 | 0.78 | 0.72 |
| 13 | 0.56 | 0.4 | 1.56 | 1.81 | 0.39 | 0.26 | 0.68 | 0.75 | 0.83 | 0.79 |
| 14 | 0.47 | 0.54 | 1.76 | 1.63 | 0.3 | 0.34 | 0.35 | 0.37 | 0.76 | 0.77 |
| 15 | 0.57 | 0.67 | 1.49 | 1.46 | 0.43 | 0.42 | 0.74 | 0.69 | 0.86 | 0.86 |
| 16 | 0.36 | 0.32 | 1.42 | 1.43 | 0.39 | 0.38 | 0.92 | 0.87 | 0.87 | 0.8 |
| 17 | 0.51 | 0.51 | 1.85 | 1.8 | 0.26 | 0.28 | 0.6 | 0.6 | 0.76 | 0.76 |
| **Average** | **0.46** | **0.46** | **1.7** | **1.67** | **0.32** | **0.33** | **0.73** | **0.74** | **0.78** | **0.79** |

Averaging across all districts, the compactness of the Carter Plan is similar to that of the previous plan when examining the Reock score, and slightly more compact when considering the Schwartzberg score. The Carter Plan is very slightly less compact than the existing plan when using the Polsby-Popper, Population Polygon, and Area/Convex Hull scores. Table 5 reveals that this difference is driven largely by Districts 4 and 5, which, as described above, had to become somewhat less compact in order to accommodate asymmetries in the rate of population growth between Montgomery, Delaware, and Bucks counties while minimizing county splits in Southeastern Pennsylvania.

***Minority Representation:*** I did not consider racial data as I was drawing districts or making adjustments for population changes in the map.

***Incumbent Addresses:*** I considered incumbent addresses to confirm that I was not inadvertently double-bunking sitting congressional representatives in the same district. Since I made very minor changes to most districts, as described above, I did not inadvertently remove any incumbents from their existing districts. Note that Representative Dean, the incumbent in District 4, appears to have recently moved to a new address a short distance away from the previous address, both of which are in Montgomery County. However, the new address is also in District 4, both in its previous manifestation and in the Carter Plan's configuration. As described above, it was not possible to avoid placing Rep. Keller from District 12, which was lost due to population loss, with another rural representative. The Carter Plan ends up placing Rep. Keller in District 15, along with incumbent Rep. Thompson. The consideration of these residential addresses had no impact on the Carter Plan's satisfaction of traditional redistricting criteria.

***Partisan Performance:*** I did not consider partisan performance as I was drawing the map. However, upon analysis, the proposed redistricting plan is quite similar to the previous plan in terms of partisanship. Of course, it is not possible to examine results of congressional races that have not yet occurred. To draw inferences about the partisanship of these districts, it is useful to begin by adding up precinct-level results of recent statewide elections within the proposed boundaries. In Table 6, I do this for statewide elections from 2016 to 2020, taking an average for each district, and in order to facilitate comparisons with the previous (2018) plan, presented above in Table 2, I also focus on elections from 2018 to 2020 only.

As in the previous plan, there are 10 metropolitan districts where in statewide races, the average Democratic vote share is above 50 percent. These are the same 10 districts for which this was true in the previous plan. This is not surprising, since as described above, the metropolitan districts required minimal change to equalize population and thus retained many of the same voters.

It should be noted, however, that several of these districts are very evenly divided between the parties and, as described above, incumbent legislators often over- or under-perform relative to their statewide co-partisans—sometimes quite substantially. Fortunately, because there is so much overlap between the old and new districts, and since incumbents are running in each of the highly competitive districts, it is possible to do better than simply relying on the statewide aggregates when assessing the most likely outcomes of future elections.

23

**Table 6: Statewide Election Results Aggregated to the Proposed Congressional Boundaries**

| District | Average Democratic Statewide vote share, 2016-2020 | Average Democratic Statewide vote share, 2018-2020 |
|---|---|---|
| 1 | 51.81% | 53.00% |
| 2 | 74.57% | 74.03% |
| 3 | 91.11% | 91.32% |
| 4 | 58.59% | 60.07% |
| 5 | 64.67% | 65.82% |
| 6 | 55.01% | 56.56% |
| 7 | 50.88% | 51.70% |
| 8 | 51.01% | 51.62% |
| 9 | 33.42% | 33.82% |
| 10 | 46.81% | 48.15% |
| 11 | 38.37% | 39.30% |
| 12 | 62.03% | 63.06% |
| 13 | 29.12% | 29.19% |
| 14 | 38.39% | 38.76% |
| 15 | 33.51% | 33.51% |
| 16 | 41.55% | 42.39% |
| 17 | 53.99% | 55.52% |

In two of the districts with nominal Democratic majorities, these majorities are very narrow. In District 7, the average statewide Democratic vote share is between 50.9 percent and 51.7 percent, depending on which elections are included. As conveyed in Table 2 above, on average, the vote share of the Democratic incumbent in District 7 is slightly lower than that of her statewide Democratic co-partisans. As a result, District 7 can be viewed as a tossup district with a very slight Democratic lean.

In District 8, the average statewide Democratic vote share is between 51 percent and 51.6 percent, depending on which elections are used. Since Matt Cartwright, the Democratic incumbent, outperforms his statewide co-partisans by around 2 percentage points, this should be seen as a competitive but Democratic-leaning district. Even a relatively modest pro-Republican wave has the potential to unseat the incumbents in both Districts 7 and 8.

In District 1, the average statewide Democratic vote share is between 51.8 percent and 53 percent. However, as demonstrated above, on average, the incumbent Republican candidate, Representative Fitzpatrick, outperformed his statewide co-partisans by an astounding 7.5 percentage points. There is no reason to anticipate that this advantage will suddenly disappear, especially since 93 percent of the people in District 1 in the Carter Plan already lived in the district

24

that has repeatedly elected Representative Fitzpatrick in the past. If we use all the information at hand, District 1 should be understood as a very likely Republican district.

The other relatively competitive district is number 10, which contains metro Harrisburg and surroundings. The average Republican statewide vote share in this district is between 51.9 percent and 53.2 percent. The incumbent in this district, where 96 percent of voters are the same as before, outperforms his statewide co-partisans by a little over 1 percentage point. This makes District 10 a likely Republican seat, but one that could potentially change hands in the event of a very large pro-Democratic wave.

In sum, using all the information at our disposal, the proposed plan produces 8 districts where Democrats are expected to win, one of which (District 8) is potentially quite competitive; 8 districts where Republicans are quite likely to win, two of which are at least potentially competitive (1 and 10); and one district (District 7) that is a toss-up with a very slight Democratic lean. This level of partisan balance and competitiveness is similar to that of the existing plan, reflective of Pennsylvania's statewide partisan preferences, and consistent with changes in population as they relate to partisanship.

## VII.  CONCLUSION

The remedial redistricting plan endorsed by the Pennsylvania Supreme Court in 2018 demonstrated numerous admirable features including adherence to traditional redistricting principles as well as partisan fairness and responsiveness. This report introduces a new redistricting plan, the Carter Plan, that builds on those achievements, preserving the architecture of districts and matching or surpassing the previous plan with respect to compactness, contiguity, population equality, and splits of counties, county subdivisions, and vote tabulation districts. Moreover, this plan is likely to produce a Congressional delegation that reflects the statewide partisan preferences of Pennsylvanians, and one that changes in response to changes in those preferences.

---

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_____
Jonathan Rodden


January 24, 2022


25

Received 1/24/2022 8:13:51 PM Commonwealth Court of Pennsylvania

Filed 1/24/2022 8:13:00 PM Commonwealth Court of Pennsylvania
464 MD 2021

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## No. 464 M.D. 2021

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

**Petitioners,**

**vs.**

Leigh Chapman, in Her Official Capacity as the Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Official Capacity as Director of the Bureau of Election Services and Notaries,

**Respondents.**

## No. 465 M.D. 2021

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela A. Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak

**Petitioners,**

**vs.**

Leigh Chapman, in her Official Capacity as the Acting Secretary of the Commonwealth of Pennsylvania ; and Jessica Mathis, in Her Official Capacity as Director of the Bureau of Election Services and Notaries,

**Respondents.**

**CORRECTED OPENING BRIEF OF HOUSE REPUBLICAN
INTERVENORS KERRY BENNINGHOFF, MAJORITY LEADER, AND
BRYAN CUTLER, SPEAKER, OF THE PENNSYLVANIA HOUSE OF
REPRESENTATIVES IN SUPPORT OF PROPOSED CONGRESSIONAL
REDISTRICTING MAP**

## I.    INTRODUCTION

The map offered by Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives (collectively "Republican House Leaders"), attached as Exhibit 1 to the Affidavit of Bill Schaller, attached as Exhibit I (the "Schaller Affidavit"), was passed through a transparent and full deliberative legislative process by the Pennsylvania House of Representatives ("House Plan"). Intervenors Jake Corman, President Pro Tempore, and Kim Ward, Majority Leader, of the Pennsylvania Senate are submitting the same map on behalf of the Senate. What's more, the House Plan was drawn by a Pennsylvania citizen and good government advocate – Amanda Holt – who served as the lead plaintiff in the prior litigation over the state's legislative map.  The House made minimal changes to Ms. Holt's submission to increase the compactness of certain districts and to address other comments received during this open process.  But 95% of the map drafted by Ms. Holt remains the same in the House Plan.

Importantly, the House Plan follows traditional redistricting principles, including the criteria in Pa. Const., Art. II, § 16, which, although applicable to legislative reapportionment, have been adopted as important considerations in

A80

congressional redistricting in *League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 1, 120-21 (2018). The House Plan has a population deviation of at most one person, is compact and contiguous, and splits only 15 counties and 16 municipalities–less than or comparable to the current map adopted by the Pennsylvania Supreme Court in 2018. There can be no dispute that the House Plan adheres to these traditional redistricting criteria.

Moreover, the House did not "use partisan data in [its] consideration of submitted maps, in the selection of Ms. Amanda Holt's citizen's map, or in [its] adjustments made to the maps through amendment."[1] Perhaps unsurprisingly, this honest and fair process produced an honest and fair map: one demonstrably fair to both political parties as measured by numerous partisan fairness metrics. Simulation analysis performed by Dr. Michael Barber demonstrates that the House Plan is predicted to result in 9 Democratic seats and 8 Republican seats using an index of statewide elections from 2012-2020, whereas the most likely outcome in the 50,000 simulated maps without using partisan data is 8 Democratic seats and 9 Republican seats. In other words, the House Plan is more favorable to Democrats than the most likely outcome of 50,000 computer drawn maps using no partisan data. Other

---

[1] Ltr. from Rep. Grove to Gov. Wolf, Jan. 6, 2022, at 5, copy attached as **Exhibit A,** http://repgrove.com/Display/SiteFiles/418/OtherDocuments/2022/CongressionalRedistrictingRes ponsetoGovWolf.pdf (the "Grove Letter") (last visited Jan. 24, 2022). *See also* Pennsylvania House of Representatives, State Government Committee Meeting, December 15, 2021, at timecode 6:30 (comments of Rep. Grove), at http://www.pahousegop.com/embed/33680/Voting-meeting-on-HB-2146-and-any-other-business-that-may-come-before-the-committee.

partisan fairness metrics prove that the House Plan is fair and will allow both parties the opportunity to translate their votes into seats.

It is the General Assembly's prerogative to redraw the state's congressional districts under Article I, § 4 of the United States Constitution and the Pennsylvania Constitution.  The Pennsylvania House of Representatives passed a map that meets constitutional criteria and there is still time for the Senate to pass that map and submit it to the Governor before the January 30, 2022 deadline.  If, however, the Senate does not pass the map in time, or the Governor vetoes it, the House Plan should be given deference or at least special consideration as it is the only map the truly reflects the will of the people of Pennsylvania.  It is the only map that has gone through a transparent and deliberative process by the people's elected representatives.

## II.   DICUSSION

### A.   *League of Women Voters of Pa. v. Commonwealth.*

In *League of Women Voters of Pa. v. Commonwealth* ("LWV"), the Pennsylvania Supreme Court laid out the framework for evaluating the constitutionality of a congressional redistricting plan under the Pennsylvania Constitution's Free and Equal Elections Clause, Art. I, § 5.  645 Pa. 1 (2018).  The Pennsylvania Supreme Court interpreted the Free and Equal Elections Clause to require that "an individual's electoral power not be diminished through any law which discriminatorily dilutes the power of his or her vote..." *LWV*, 645 Pa. at 120.

3

To help assess that question, the Court relied upon the Article II, Section 16 factors applicable for legislative redistricting:

> [g]iven the great concern of the delegates over the practice of gerrymandering occasioned by their recognition of the corrosive effects on our entire democratic process through the deliberate dilution of our citizenry's individual votes, the focus on these neutral factors must be viewed, then, as part of a broader effort by the delegates to that convention to establish 'the best methods of representation to secure a just expression of the popular will.' Consequently, these factors have broader applicability beyond setting standards for the drawing of electoral districts for state legislative office.

*Id.* at 119 (internal citation omitted).  It also found that

> the use of compactness, contiguity, and the maintenance of the integrity of the boundaries of political subdivisions maintains the strength of an individual's vote in electing a congressional representative. When an individual is grouped with other members of his or her community in a congressional district for purposes of voting, the commonality of the interests shared with the other voters in the community increases the ability of the individual to elect a congressional representative for the district who reflects his or her personal preferences. This approach inures to no political party's benefit or detriment. It simply achieves the constitutional goal of fair and equal elections for all of our Commonwealth's voters.

*Id.* at 120-21.

The Court relied upon the Article II, Section 16 criteria as a basis to strike down the 2011 congressional plan, finding that when "it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I,

Section 5 of the Pennsylvania Constitution." *Id*. at 122. This subordination is an effects-based test and does not "require a showing that the creators of congressional districts intentionally subordinated these traditional criteria..." *Id.*

These principles should thus guide this Court in selecting the appropriate congressional plan to govern elections for the next decade.

**B.    The House Plan Was Passed by the House Following a Transparent and Full Deliberative Process and Is Nearly Identical to the Map Drawn By a Citizen and Good Government Advocate.**

In the most open and transparent Congressional redistricting process in recent history, the House State Government Committee held a series of eleven hearings around the Commonwealth from July 22, 2011 to October 28, 2021 to take input from the Commonwealth's citizens, as well as one joint hearing with the State Senate.[2] In addition to those hearings, the Pennsylvania State Government Committee Chair established a website with options for citizen input, including input about specific communities of interest as well as the ability to submit maps.[3]

---

[2] *See* Pennsylvania House Republican Caucus, *Regional Hearings,* copy attached as **Exhibit B**, also available at http://paredistricting.com/hearingschedule (last visited Jan. 24, 2022).

[3] *See* Pennsylvania House of Representatives, Republican Caucus, Redistricting Input Site*,* copy attached as **Exhibit C**, also available at http://paredistricting.com/input (last visited Jan. 24, 2022) (providing access to submitted communities of interest, public comments on the 2018 Pennsylvania Supreme Court plan, and publicly submitted maps). *See also* Pennsylvania House of Representatives, House Republican Caucus, Updated Preliminary Congressional Plan, at https://app.mydistricting.com/legdistricting/pennsylvania/updated_preliminary_map (last visited Jan. 24, 2022) (listing public comments on House Bill 2146); *see also* 225 Pa. §§ 803(8) and 902(5).

House Bill 2146 was first introduced and referred to State Government Committee on December 8, 2021. The bill introduced, for what might be a first in the history of the Pennsylvania House, a plan proposed by a citizen and good-government advocate, Ms. Amanda Holt, in unaltered form. The State Government Committee selected Ms. Holt's proposal from among 19 submitted by the public because, as Rep. Seth Grove indicated, it was drawn without political influence, met constitutional standards, limited the splits of townships and other municipalities, and offered districts that were compact and contiguous.[4] These factors "were highlighted as priorities by the majority of testifiers and residents throughout the committee's extensive regional hearings and online public input process."[5]

It was amended into the current form (PN 2541) and reported from the State Government Committee on December 15, 2021. *See* Pennsylvania General Assembly, *Bill Information – History, House Bill 2146; Regular Session 2021-2022,* attached as **Exhibit E** (the "Bill History").[6] After it was released and open for public

---

[4] *See* Rep. Seth Grove, *Grove Announces Citizen Map Selected As Preliminary Congressional Plan, Invites Public Comment,* Dec. 8, 2021, copy attached as **Exhibit D**, also available at http://www.repgrove.com/News/22950/Latest-News/Grove-Announces-Citizen-Map-Selected-as-Preliminary-Congressional-Plan,-Invites-Public-Comment- (last visited Jan. 24, 2022); *see also* 225 Pa. §§ 803(8) and 902(5).

[5] *Id.*

[6] The Court can take judicial notice of official records, 225 Pa. Code § 201(b)(2), and this public record falls within a recognized exception to the hearsay rule, *id.* § 803(8) and 902(5).

comments, a total of 399 comments were received from citizens and numerous changes made based upon those requests.[7]

Although several changes were made, the resulting map was 95% the same as the map originally drawn by Ms. Holt in terms of population and surface area.[8] Many of the changes that were made were to increase the compactness of specific districts or to address comments received during the process.[9] In particular, certain changes were made to ensure communities of interest were kept whole and to address inclusion of certain communities within particular congressional districts at the request of citizens.[10]

HB 2146 received first consideration on December 15, 2021, but did not receive second consideration until January 11, 2022, i.e., almost a month later. Bill History, Ex. E. *See also* Pa. Const. Art. III, § 4 ("Every bill shall be considered on three different days in each House."). Under the Rules of the Pennsylvania House of Representatives, second consideration of a bill is the opportunity for any House Member to introduce and offer amendments to a bill.  House Rules 21 and 23.  While Members had ample to time to draft and file amendments to the bill, no amendment was timely filed to House Bill 2146, Printer's Number 2541. Bill History, Ex. E. It

---

[7] *See* Grove Ltr. at 2, Ex. A.
[8] *See* Video of Pennsylvania House of Representatives State Government Committee Meeting, December 15, 2021 Hearing, at 7:26, at https://s3.us-east 2.amazonaws.com/pagopvideo/366117649.mp4.
[9] *Id*.; *see also* Grove Ltr. at 3, Ex. A.
[10] *Id*.

7

received third consideration and final passage in the House on January 12, 2021. *Id.* So, from the time the bill was amended in the House State Government Committee on December 15, 2021, until the bill was passed by the House, the public had 28 days to view the contents of the bill and review the House's proposed congressional plan.[11]  In contrast, the preliminary legislative reapportionment plan produced by the Pennsylvania Legislative Reapportionment Commission, which redistricts Pennsylvania's House and Senate Districts, released its preliminary legislative reapportionment plan on December 13, 2021 and adopted the plan on December 16, 2021, a mere three days later.

HB2146 was referred to the Senate State Government Committee, which passed it on January 12, 2022. *See* Bill History, Ex. E.  The Senate gave HB 2146 first consideration on January 18, 2022 and second consideration on January 19, 2022. *Id*.  The Senate is scheduled to be in session on January 24, 25, and 26, 2022, and HB 2146 is eligible for third consideration and final passage on any of those dates, or on any future legislative session that may be convened.

---

[11] *See Pennsylvania House of Representatives, House Republican Caucus, Updated Preliminary Plan Page,* copy attached as **Exhibit F,** *also available at* http://paredistricting.com/pcplan. House Bill 2146 was posted immediately to this website and made accessible to the public.

**C.    It Is the Prerogative of the General Assembly To Perform Congressional Redistricting in the First Instance.  To the Extent the House Plan Adheres to Traditional Redistricting Principles, as Enunciated in *LWV v. Commonwealth*, It Should Be Given Special Consideration.**

The United States and Pennsylvania Constitutions vest the General Assembly with the authority to redistrict this Commonwealth's congressional districts. Specifically, Article I, Section 4 of the United States Constitution (the "Elections Clause") provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof...." Pursuant to the Elections Clause, as a matter of federal law, "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015). The Commonwealth's legislative power is vested in the General Assembly. PA. CONST. ART. II, § 1.

As Petitioners concede (*see* Carter Petition ¶ 36), congressional districting plans are legislative enactments of the General Assembly, passed like any other legislation. The Pennsylvania Supreme Court has confirmed that the "primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." *League of Women Voters v. Com.*, 178 A.3d 737, 821–22 (Pa. 2018), citing *Butcher v. Bloom*, 216 A.2d 457, 458 (Pa. 1966) (identifying the General Assembly as "the organ of government with the primary

responsibility for the task of apportionment") and *Growe v. Emison*, 507 U.S. 25, 34 (1993) ("the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts").

All impasse cases necessarily involve scenarios where the legislature and governor are unable to agree on a redistricting plan. But impasse does not mean that the General Assembly's plan—despite the failure of the Governor to sign it into law—is entitled to no special consideration when the judiciary must take up the unwelcome obligation of redistricting the Commonwealth. After all,

> The task of reapportionment is…a function which can be best accomplished by that elected branch of government. The composition of the Legislature, the knowledge which its members from every part of the state bring to its deliberations, its techniques for gathering information, and other factors inherent in the legislative process, make it the most appropriate body for the drawing of [district] lines...

*Butcher v. Bloom*, 203 A.2d 556, 569 (Pa. 1964). Because of the legislature's constitutionally protected role to redistrict, the Court should select a map that reflects "the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court." *Tallahassee Branch of NAACP v. Leon Cty.*, 827 F.2d 1436, 1439 (11th Cir. 1987).

In *Donnelly v. Meskill*, 345 F. Supp. 962 (D. Conn. 1972), for example, the legislature passed a congressional plan that the governor vetoed. When the job of redistricting was thrust upon the court, three plans were submitted, including a plan from the legislature. The court adopted the legislature's proposed plan and explained

that "[t]he legislative adoption of Public Act 807 tips the scales in favor of the plan in Exhibit B-1, which provides districts essentially as outlined by the legislature, with adjustments necessary to bring about virtually complete population equality." *Id.* at 965. Recognizing the constitutionally protected role of the legislature in redistricting, the court emphasized that the plan it adopted had "the added advantage that it is basically the plan adopted by the legislature." *Id.*

Similarly, in *Skolnick v. State Electoral Bd. of Ill.*, 336 F. Supp. 839 (N.D. Ill. 1971), an impasse occurred after a congressional plan had passed the Illinois House but stalled out in the Senate. The court, in fashioning a remedial plan, considered four proposed plans—including one submitted by three U.S. House Representatives that "was, with one minor exception, the same as the one passed by the Illinois House and introduced into the Senate" but not passed. *Id.* at 842. The court selected that plan because it satisfied the required criteria and, in part, because it had received the "approval of one house of the legislature." *Id.* at 846.

So too, the House Plan here should receive special consideration, notwithstanding any potential Governor veto, because it best reflects state policies and the people's preferences. "[T]he fundamental principle is that reapportionment is primarily a legislative function and that the courts should defer to the legislative judgment where constitutional and statutory standards have been satisfied." *In re Ross Twp. Election Dist. Reapportionment*, 489 A.2d 297, 302–03 (1985), *aff'd*, 514

11

Pa. 41, 522 A.2d 553 (Pa. 1987); *see also Newbold v. Osser*, 230 A.2d 54, 59 (Pa. 1967) (recognizing "the importance of permitting reapportionment by the Legislature wherever possible").

The House Plan has been submitted by both the legislative leaders of the Pennsylvania House of Representative and the Senate for adoption by this Court so it has support of the General Assembly. The Pennsylvania House of Representatives passed a plan through a full deliberative and transparent process. And there is still time for the Senate to likewise pass the map as it has already received first and second consideration with time for third consideration before the end of the month. The House Plan, which as discussed more fully below, closely adheres to traditional redistricting principles, best reflects the will of the people as it was passed by their elected representatives. None of the other plans Republican House Leaders are aware of have been subjected to this open and democratic process, and one suspects many of the plans submitted by other parties in this case have been drawn behind closed doors without any opportunity for comment. At a minimum, the House Plan should receive special consideration. And given that the plan adheres to traditional redistricting principles as well as the Governor's stated principles, any ultimate veto by the Governor can be seen only as a partisan political ploy. This Court should adopt the House Plan regardless of whether it is ultimately vetoed by the Governor.

**D.    The House Plan Was Drawn Without Partisan Data and Consistent with the Traditional Redistricting Criteria in Pa. Const., Art. II, § 16 and this Court's Decision in *League of Women Voters of Pa. v. Commonwealth.***

The constitutional criteria in Art. II, § 16 of the Pennsylvania Constitution – equal population, contiguity, compactness, and avoiding political subdivisions splits except where absolutely necessary – were held in *LWV* to be appropriate benchmarks in determining whether a congressional districting plan dilutes the votes of Pennsylvania's citizens.  In addition, the Governor's Redistricting Advisory Council has recognized that federal and state law require compliance with these same elements.[12]  The House Plan does exceptionally well on these traditional redistricting factors.

First, the House Plan has a population deviation of +/- one, as good as can be achieved.[13]  Second, the map contains contiguous and compact districts.  Indeed, the average Polsby-Popper score for the proposed map is .324, which is very similar to the plan adopted by the Pennsylvania Supreme Court in 2018 which is .327.[14]  In

---

[12] *See* Pennsylvania Redistricting Advisory Council, Redistricting Principles, attached as **Exhibit G**; also available at: https://www.governor.pa.gov/congressional-districts-map-proposals/#fair-maps (last visited Jan. 24, 2022).

[13] *See* Exhibit I, Schaller Aff., at Ex. 2, p. 1 (Report of Legislative Data Processing Center on H.B. 2146).

[14] *See* Remedial Plan Compactness Report available at: https://www.pacourts.us/Storage/media/pdfs/manual_uploads/file-6844.zip?cb=c50222 (last visited Jan. 24, 2022). *See also* Exhibit I, Schaller Aff., at Ex. 3 (Report of Compactness Scores for H.B. 2146).

13

other words, the House Plan is as compact as a map that the Pennsylvania Supreme Court previously adopted.

Finally, the House Plan splits only 15 counties with 18 total splits.[15]  This is very similar to the current plan adopted by the Pennsylvania Supreme Court in 2018 that splits 14[16] counties 19 times.  It likewise splits fewer municipalities than the current map.  The proposed map splits only 16 municipalities with a total of only 18 splits.[17]  The current map adopted in 2018, however, splits 18 municipalities a total of 19 times.[18]  A certain number of municipal splits are necessary to reach population equality.  Thus, it is not only important to examine the total splits, but which municipalities are split.

Philadelphia is the only municipality in the Commonwealth that is larger than the population of a single congressional district.  Thus, it must be split into two districts. The remainder of municipalities split in the House Plan are small in population.  *See* Report of Michael ("Barber Rep.") at 16, attached as **Exhibit H.**

---

[15] *See* Exhibit I, Schaller Aff., at Ex. 2 (Report of Legislative Data Processing Center on H.B. 2146, "Counties Split by Congressional Districts").

[16] *See* Remedial Plan Split Report, available at: https://www.pacourts.us/Storage/media/pdfs/manual_uploads/file-6844.zip?cb=c50222 (last visited Jan. 24, 2022).  In *LWV*, the Pennsylvania Supreme Court recognized that the number of counties split was only 13 because "[a]n additional county split may appear in some GIS program calculations, but that is due to the fact that a non-contiguous Chester County census block with zero population is located inside Delaware County. That census block and its adjoining water is appropriately placed inside the district that contains Delaware County." 181 A.3d 1083, 1087 n. 10 (2018).

[17] *See* Exhibit I, Schaller Aff., at Ex. 2 (Legislative Processing Data Center Report, "Places Split By Congressional Districts").

[18] *See id.*

14

These splits were necessary to reach population equality and have minimal, to zero, impact on the likely partisan outcomes of the map. *See also* Ex. I, Schaller Aff. at Ex. 4, Precinct Split Reports for H.B. 2146 (reflecting precinct population splits).

Additionally, although not a stated goal of HB2146, following traditional redistricting criteria also resulted in the creation of two districts with a minority voting age population greater than 50% including one with a Black voting age population over 50%. Barber Rep. at 35, Table 2.

### E.   Although Not a Requirement of the Constitution, the House Plan is Demonstrably Fair Under Numerous Partisan Fairness Measures.

In *League of Women Voters*, the Pennsylvania Supreme Court held that "when . . . it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I, Section 5 of the Pennsylvania Constitution." 645 Pa. at 122. As demonstrated above, the House Plan adheres to traditional redistricting criteria. But as demonstrated further below, it also does not give any unfair political advantage to any party. To the contrary, the House Plan is fair and gives both major political parties an opportunity to translate their votes into seats.

One way to evaluate the partisan fairness of a map is by comparing it to a set of simulated maps that follow only traditional redistricting criteria. This set of simulated districts is helpful because it provides a set of maps to which one can

compare the proposed map that also accounts for the geographic distribution of voters in the state. Because voters are not distributed evenly across Pennsylvania, one cannot evaluate the fairness of a proposed plan without an apples-to-apples comparison. In other words, if a plan is not evaluated against a non-partisan set of maps, then potential issues or red flags in the map may not at all be due to partisan gerrymandering, but rather the geographic distribution of voters in the state. Barber Rep. at 11. This process has been recognized in a variety of redistricting cases including in Pennsylvania. Barber Rep. at 11-12.

Dr. Michael Barber – Associate Professor of Political Science at Brigham Young University – prepared a set of 50,000 simulated maps using only the traditional redistricting criteria of equal population, compactness, contiguity, and minimizing political subdivision splits. Barber Rep. at 13-14. Dr. Barber's results demonstrate that the House Plan follows these traditional redistricting criteria similar to that of the simulated plans. Barber Rep. at 16, Table 1. Moreover, his analysis demonstrates that, if anything, the House Plan is more favorable to Democrats.

The proposed plan is predicted to result in 9 Democratic-leaning seats and 8 Republican-leaning seats using an index of statewide elections from 2012 to 2020. Barber Rep. at 23, Figure 3. That result occurs in 32.1% of the 50,000 simulated plans. *Id*. The most common outcome, however, is 9 Republican-leaning seats and 8 Democratic-leaning seats, occurring in 34.9% of the 50,000 simulated maps. *Id*.

16

In other words, using that index of elections, the House Plan is predicted to result in an additional Democratic-leaning seat than the most common outcome in the 50,000 plans simulated created without use of any partisan data. As Dr. Barber concludes:

> Recall that in using the simulations we are comparing the proposed map to a set of maps drawn by the computer using only those criteria that I instructed the algorithm to follow - namely the pre-specified nonpartisan criteria of equal population, contiguity, geographic compactness and a preference for fewer county splits. Both the HB2146 plan and the simulations account for the unique political geography of Pennsylvania. Doing so shows us that the HB2146 plan is within the middle portion of simulation results and if anything leans slightly towards the Democratic party by generating 9 Democratic-leaning districts rather than 8, which is the modal outcome in the simulations. By no standard definition would the plan be considered an outlier.

Barber Rep. at 22 (emphasis added). However, using a partisan index of 2014-2020 statewide elections, the House Plan is predicted to result in 8 Democratic-leaning seats and 9 Republican-leaning seats, showing how the House Plan is fair and can flip seats depending on different election outcomes. Barber Rep. at 44 (App'x A).

Dr. Barber also analyzed the House Plan under various other partisan fairness metrics commonly utilized by political scientists to test the partisan fairness of a districting map. The downside with many of these metrics, however, is that they do not take into account the political geography of the state. Barber Rep. at 28, 31. Yet, they still all demonstrate that the House Plan is fair.

Dr. Barber calculates that the House Plan has a mean-median of -.015, which is very close to zero. Barber Rep. at 27-28 & Figure 5. "The median-mean measure

is calculated by taking the median value (the value for which half of the observations are smaller and half the observations are larger) of the partisan index across all 17 districts in a plan and subtracting from that the mean (the simple average) from the median." Barber Rep. at 27. Dr. Barber concludes that

> First, without comparing to the simulations, the HB2146 plan is very nearly unbiased. The median-mean value for the HB2146 plan is -.015, which is very close to zero. In other words, the median district and the mean district in the HB2146 plan are different by less than two percentage points. Second, when comparing the HB2146 plan to the simulations, the HB2146 plan is more favorable to Democratic voters than the vast majority of the simulated districting plans. The HB2146 plan has a median-mean value that is smaller (in absolute value) than 85 percent of the simulated plans. In other words, using only the non-partisan criteria described above to draw the simulated districts, 85% of them generate districts with a greater median-mean value, indicating a less efficient distribution of Democratic voters than the HB2146 plan contains.

Barber Rep. at 28.

Dr. Barber likewise calculates an efficiency gap for the House Plan. The efficiency gap "looks for the degree to which a party's votes statewide are translated into seats in each district." Barber Rep. at 28-29. It analyzes how the parties are wasting votes with any vote for a losing candidate and any vote above 50%+1 considered wasted. Barber Rep. at 29-30. Dr. Barber calculates the efficiency gap for the House Plan is -.02, which is also very close to zero. Barber Rep. at 31. But even more telling, the efficiency gap for the House Plan is more favorable to Democratic voters than the majority of the simulated districting plans. Barber Rep.

18

at 31-32, Figure 6.  It is, in fact, smaller than all other outcomes in the simulated

plans. Barber Rep. at 32.  This demonstrates that the House Plan eliminates at least

some of the natural geographic advantage of Republican voters.

Dr. Barber also performs a uniform swing analysis, which considers how a

plan performs under a variety of different electoral environments by randomly

adding certain percentages from previous elections uniformly to each district in the

plan. Barber Rep. at 33-34.  Like the other metrics, Dr. Barber's uniform swing

analysis demonstrates that the House Plan is fair.  The House Plan is nearly exactly

in the middle of the distribution, meaning roughly half of the simulations are worse

for Democrats and nearly half are better. Barber Rep. at 34, Figure 7.

In addition, and although not a requirement, the House Plan creates a number

of competitive districts. Barber Rep. at 18.  Based upon the same set of elections

form 2012-2020, Dr. Barber concludes that six of the districts in the House Plan will

be competitive – over one-third – with five of them having a partisan index between

.48 and .52.  Barber Rep. at 21, Figure 2. And, of these competitive districts, four of

them lean Democratic. Barber Rep. at 19.

By any number of different metrics, the House Plan is demonstrably fair to

both political parties.  If anything, the House Plan does much to negate the natural

geographic disadvantage faced by Democratic voters being packed in urban cities,

and is predicted to result in more Democratic seats than the most common outcome

in the 50,000 simulated plans. By several metrics, it has also been shown that the plan fairly allows the political parties to each translate their votes into seats and creates numerous competitive districts.

In 2018, the Pennsylvania Supreme Court adopted a map that was predicted to result in 9 Republican-leaning seats and 9 Democratic-leaning seats. Indeed, that was the outcome following the 2020 election. Pennsylvania is losing one congressional seat following the 2020 Census. Yet, the House Plan is predicted to result in 9 Democratic-leaning seats and 8 Republican-leaning seats. Barber Rep. at 23, Figure 3. Any claim that the House Plan was drawn to somehow benefit Republican voters and candidates belies common sense.

Finally, although Dr. Barber's simulations were drawn without consideration of racial data, his core finding is robust even when the House Plan is compared to "race conscious" simulations under two scenarios. First, Dr. Barber examined the 1,852 simulated plans from his race-blind sample that likewise created two majority-minority districts including one majority Black district. Barber Rep. at 35-36. Second, Dr. Barber also generated another set of 5,000 simulated race conscious maps where he instructed the model to ensure that every simulated plan had at least three districts that have at least 35% non-white voting age population. Barber Rep. at 36. Dr. Barber's analysis reflects that even when using "race conscious" simulations, a map with 9 Democratic-leaning seats–the same as the House Plan–

remains the most common outcome, occurring in 70.6% of the simulations.  Barber

Rep. at 37-38, Figure 8.

> **F.      This Court Should Reject Maps That Subordinate Traditional Redistricting Criteria in Favor of a Map That Seeks Proportional Representation.**

In *LWV*, the Pennsylvania Supreme Court explained:

> We recognize that other factors have historically played a role in the drawing of legislative districts… However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts. These neutral criteria provide a "floor" of protection for an individual against the dilution of his or her vote in the creation of such districts.

> When, however, it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I, Section 5 of the Pennsylvania Constitution.

645 Pa. at 122.  Moreover, in analyzing the constitutional criteria for legislative

redistricting in Article II, Section 16, the Pennsylvania Supreme Court has stated

that "[t]he constitutional reapportionment scheme does not impose a requirement of

balancing the representation of the political parties; it does not protect the 'integrity'

of any party's political expectations.  Rather, the construct speaks of the 'integrity'

of political subdivisions, which bespeaks history and geography, not party affiliation

or expectations." *Holt v. 2011 Legislative Reapportionment Commission*, 620 Pa.

373, 413-14 (2013).

The Pennsylvania State Government Committee, and the House Republican Caucus, did not use partisan data in consideration of submitted maps, in the selection of Ms. Amanda Holt's citizen's map, or in our adjustments made to the map through amendment.   Instead, it focused on traditional redistricting criteria which, as acknowledged by the Court, provide protection against the dilution of votes. The Pennsylvania Supreme Court was very clear: the neutral criteria explicitly provided for by the Pennsylvania Constitution cannot be subordinated to partisan concerns or considerations.

But, a map prioritizing the neutral criteria found in the Pennsylvania Constitution – equal population, compactness and the avoidance of county, municipal, and ward splits unless absolutely necessary – may not result in a proportional congressional delegation due to the spatial dispersion of the political groups throughout the state. That is a fundamental reality of Pennsylvania's current political geography. According to Dave Wasserman, among the foremost nonpartisan redistricting experts in the country, developing a congressional map that provides proportional election outcomes, in Pennsylvania at least, "requires conscious pro-Dem[ocrat] mapping choices."[19] Even the *LWV* opinion acknowledged, when discussing the expert testimony presented by Petitioners'

---

[19] *See* https://twitter.com/redistrict/status/965719652188991488.

expert (Dr. Warshaw), that "historically Democratic voters tend to self-sort into metropolitan areas." *LWV*, 645 Pa. at 127.

Like many states, Democratic voters in Pennsylvania are clustered in cities and urban areas while Republican voters are more evenly distributed in rural areas. Thus, Democratic voters tend to be more inefficiently packed into homogeneous districts. Political science scholars have thus recognized that to overcome this natural geographic disadvantage "Democrats would need a redistricting process that intentionally carved up large cities like pizza slices or spokes of a wheel, so as to combine some very Democratic urban neighborhoods with some Republican exurbs in an effort to spread Democrats more efficiently across districts."[20] The decision in *LWV*, however, does not allow for such division of cities for political gain in subordination of the traditional redistricting criteria of preserving the lines of political subdivisions.

Thus, any map that prioritizes proportional election outcomes, such as negating a natural geographic disadvantage to achieve proportionality, at the expense of traditional redistricting criteria violates the Pennsylvania Constitution's Free and Equal Elections Clause. Additionally, the U.S. Supreme Court in *Vieth v. Jubelirer,* a case originating in Pennsylvania, stated that "[t]he Constitution provides

---

[20] Barber Rep. at 10 (quoting Jonathan A. Rodden, *Why Cities Lose: The Deep Roots Of The Urban-Rural Political Divide* 155 (Basic Books 2019))*.*

no right to proportional representation." 541 U.S. 267, syllabus ¶ 3 (2004). "It guarantees equal protection of the law to persons, not equal representation . . . to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers." *Id*. at 288.

Proportionality is neither a requirement nor a goal of redistricting under federal or state law; in fact, the very nature and design of our representative democracy is in many ways at odds with the pursuit of proportionality. This conflict is heightened by Pennsylvania's constitutional requirement that districts be compact and must avoid county, municipal, and ward splits unless absolutely necessary. Thus, any plan that seeks to achieve proportionality at the expense of traditional redistricting factors should be disregarded.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Republican House Leaders respectfully request that the Court adopt the House Plan, which was passed by the Pennsylvania House of Representatives following a full transparent and deliberative process and therefore reflects the will of the people, complies with traditional redistricting criteria, and has been demonstrated to be fair based upon any number of different metrics.

Dated: January 24, 2022

Respectfully submitted,

*/s/ Jeffry Duffy*

**BAKER & HOSTETLER, LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

James G. Mann (PA 85810)
jmann@pahousegop.com
Pennsylvania House of Representatives
Republican Caucus
Main Capitol Building, Suite B-6
P.O. Box 202228
Harrisburg, PA  17120-2228
Telephone: 717.783.1510


*Admitted Pro Hac Vice*

*Counsel for Proposed Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives*

25

A104

# EXHIBIT A

HONORABLE
**SETH M. GROVE**
196TH LEGISLATIVE DISTRICT

**HARRISBURG OFFICE**
7 EAST WING
P.O. BOX 202196
HARRISBURG. PA 17120-2196
PHONE: (717) 783-2655

**DISTRICT OFFICE**
2501 CATHERINE STREET
SUITE 10
YORK, PA 17408
PHONE: (717) 767-3947

Website: RepGrove.com
Twitter: @RepGrove
Facebook.com/RepSethGrove



*House of Representatives*

Commonwealth of Pennsylvania

**CHAIR**
STATE GOVERNMENT COMMITTEE

**COMMITTEES**
REPUBLICAN POLICY COMMITTEE

**LEGISLATIVE APPOINTMENTS**
STATE PLANNING BOARD
YAMPO

January 6, 2022

The Honorable Tom Wolf
Governor
Commonwealth of Pennsylvania
225 Main Capitol Building
Harrisburg, PA 17120

Dear Governor Wolf,

 While I am disappointed you have declined my offer to publicly discuss the congressional districts proposed by HB 2146, P.N. 2541 or the Updated Preliminary Citizens' Congressional Redistricting Map, I wanted to address some serious fallacies in your letter to Speaker Culter and Leader Benninghoff.  Further, I wanted to ensure you had factual information presented to you from the prime sponsor of the legislation, which I hope you will read prior to making any decisions. We both agree misinformation and disinformation are dangerous and the people of Pennsylvania deserve to know the truth.  I think we can also agree that developing congressional maps is a constitutional mandate placed on the General Assembly and the Governor through legislative duties granted by our state and federal constitutions.  Whether you decide to actively participate in the legislative process or to sit on the bench is wholly your decision.  But if your goal is for the courts to draw the maps, then you are failing the people of Pennsylvania, your constitutional obligations, and treating the independent judiciary as your personal attorneys for hire.

**Myth**: The districts have a deviation of 9,000 people between the largest and smallest district, and this discrepancy may be successfully challenged as unconstitutional.

**Fact**: Fair Districts Pennsylvania[1] loaded the districts created by the Updated Preliminary Citizens' Congressional Redistricting Map to DavesRedistricting.org website[2][3].  Here is their breakdown of population by district, when using the data set of total population provided by the 2020 Census:

---

[1] Preliminary Maps: Review and Offer Comment | Fair Districts PA
[2] DRA 2020 (davesredistricting.org)
[3] Comments | MyDistricting

A106

| District 1 | 764,865 | District 10 | 764,865 |
| District 2 | 764,865 | District 11 | 764,865 |
| District 3 | 764,865 | District 12 | 764,865 |
| District 4 | 764,865 | District 13 | 764,864 |
| District 5 | 764,865 | District 14 | 764,865 |
| District 6 | 764,865 | District 15 | 764,864 |
| District 7 | 764,864 | District 16 | 764,865 |
| District 8 | 764,864 | District 17 | 764,865 |
| District 9 | 764,864 | | |

I can only imagine your claim has been based on an analysis of the bill using the adjusted data set approved by the Legislative Reapportionment Commission for the drawing of General Assembly maps. If that data set is applied to the plan proposed by the Updated Preliminary Citizens' Congressional Redistricting Map, it would result in the nearly 9,000 person 'deviation' you claim.

However, this 'deviation' certainly could not give rise to a claim of unconstitutionality. It has always been the practice of Pennsylvania, as well as nearly every other state, to count prisoners where they reside and where they are counted by the Census. Despite recent changes in some states, it remains obvious that states may continue to constitutionally reapportion districts on the basis of the total population numbers provided by the Census. And in fact, the vast majority of states are continuing to do so.

The unadjusted Census figures provide the data set used by Ms. Amanda Holt in designing her citizen's map, as well as the data set used in making the various improvements enacted through amendment. According to the actual Census numbers, population deviation is zeroed out.

You may wish for the map to use the adjusted data set and you may even decide using an adjusted data set is a litmus test for your approval of a Congressional mapping plan. Those discussions would be a natural part of any dialogue and negotiation between the General Assembly and your office on the basis for an agreed-upon map. That is, if you are willing to engage in any type of honest dialogue.

But you cannot and should not be dishonest with the people of Pennsylvania by claiming that the citizen's map advanced within the Updated Preliminary Citizens' Congressional Redistricting Map contains an unconstitutional population deviation. If anything, it is the constitutionality of adjusted population schemes like the one approved by the Legislative Reapportionment Commission that are more novel, and that present legal and constitutional questions still to be resolved by the courts.

**Myth:** "When Republican members of the House State Government Committee objected to aspects of the map submitted by Ms. Amanda Holt, Chairman Grove quickly abandoned the pretext of a citizen-selected map and redrew lines in ways that completely undermine the principles that motivated Ms. Amanda Holt's map in the first place.  The result is a highly skewed map."

**Fact:** After the Preliminary Citizens' Congressional Redistricting Map was originally released, it was open for public comment on PaRedistricting.com[4].  There were 399 total comments submitted by citizens.  The amendment in committee made changes based on requests by citizens or to increase compactness.:

---

[4] Comments | MyDistricting

Here are the specific changes:

- District 3 went from 49% African American Voting Age Population to 52.49%.   In compliance with traditional redistricting principles, precincts were shifted between District 3 and District 2.
- District 5 was adjusted to increase compactness and we received numerous public comments from Williston Township residents requesting to be part of District 6, so while we increased the compactness of District 5, we also moved Williston Township into District 6.
- Districts 6, 10, 11, & 13 were all adjusted to increase compactness.  Further, residents of the Camp Hill area filed numerous public comments requesting to be connected with the Capitol region.
- The "left-hand pinky" in District 10 was eliminated to increase compactness.
- District 9 was adjusted to increase compactness, to ensure the Susquehanna River communities were whole, and to eliminate the "zipper" in Potter County.
- District 7 was shifted back into Monroe County to increase compactness and align new boundaries with the current map developed by the PA Supreme Court.
- District 8 was adjusted to increase compactness.
- District 12 was adjusted to increase compactness, notably the zippers in Butler County were eliminated.
- District 17 was adjusted after receiving citizen feedback on Washington Borough not being in District 17.  District 17 and District 14 were adjusted to meet constitutional population requirements.

I specifically addressed these changes at the House State Government Committee voting meeting on Wednesday, December 15.  I do not know why your staff did not provide you this information or reach out to me to request this information.

During the committee vote on the Updated Preliminary Citizens' Congressional Redistricting Map, I addressed how the amendment makes overall adjustments to the original map submitted by Ms. Amanda Holt[5].  In both population and land area, the current map is **95%** the same as the original map.[6] [7] Here are tables for your review on comparing the two maps:

---

[5] http://www.paredistricting.com/Video/Redistricting
[6] Preliminary Plan and Updated Plan Comparison by Population.xlsx (paredistricting.com)
[7] Preliminary Plan and Updated Plan Compactness Comparison.pdf (paredistricting.com)

## Compactness Comparison

| District | Citizen's Map Submission Square Miles | Polsby-Popper | Reock | District | Updated Map - Amendment A03209 Square Miles | Polsby-Popper | Reock | Square Miles % Change Between Citizen's Map Submission & Updated Amendment |
|---|---|---|---|---|---|---|---|---|
| 1 | 713 | 0.39 | 0.4 | 1 | 713 | 0.39 | 0.4 | 100% |
| 2 | 65 | 0.25 | 0.32 | 2 | 65 | 0.22 | 0.3 | 100% |
| 3 | 56 | 0.25 | 0.37 | 3 | 56 | 0.23 | 0.37 | 100% |
| 4 | 399 | 0.25 | 0.36 | 4 | 399 | 0.25 | 0.36 | 100% |
| 5 | 499 | 0.15 | 0.21 | 5 | 339 | 0.25 | 0.34 | 68% |
| 6 | 1,139 | 0.12 | 0.26 | 6 | 1,246 | 0.19 | 0.38 | 91% |
| 7 | 1,038 | 0.36 | 0.34 | 7 | 1,071 | 0.37 | 0.4 | 97% |
| 8 | 5,071 | 0.36 | 0.42 | 8 | 4,979 | 0.35 | 0.41 | 98% |
| 9 | 7,304 | 0.28 | 0.38 | 9 | 6,984 | 0.3 | 0.33 | 96% |
| 10 | 1,825 | 0.43 | 0.38 | 10 | 1,557 | 0.44 | 0.44 | 85% |
| 11 | 1,514 | 0.21 | 0.35 | 11 | 1,455 | 0.49 | 0.49 | 96% |
| 12 | 9,977 | 0.23 | 0.57 | 12 | 10,301 | 0.42 | 0.62 | 97% |
| 13 | 4,932 | 0.23 | 0.4 | 13 | 5,350 | 0.29 | 0.43 | 92% |
| 14 | 5,085 | 0.24 | 0.38 | 14 | 5,051 | 0.24 | 0.38 | 99% |
| 15 | 308 | 0.29 | 0.58 | 15 | 308 | 0.29 | 0.58 | 100% |
| 16 | 4,877 | 0.4 | 0.37 | 16 | 4,896 | 0.49 | 0.38 | 100% |
| 17 | 1,249 | 0.23 | 0.44 | 17 | 1,284 | 0.24 | 0.45 | 97% |
| **Citizen's Map Submission** | | | | | | | Average | **95%** |

Average Compactness Polsby-Popper : 0.27
Average Compactness Reock: 0.38
**Updated Map - Amendment A03209**
Average Compactness Polsby-Popper : 0.32
Average Compactness Reock: 0.42

## Difference between Preliminary Map and Updated Preliminary Map by Population

| District | Final Population | Unchanged Population | Preliminary Distrcts that Remains Unchanged |
|---|---|---|---|
| 1 | 764,865 | 764,865 | 100.00% |
| 2 | 764,865 | 727,974 | 95.18% |
| 3 | 764,865 | 727,974 | 95.18% |
| 4 | 764,865 | 764,865 | 100.00% |
| 5 | 764,865 | 665,110 | 86.96% |
| 6 | 764,865 | 664,660 | 86.90% |
| 7 | 764,864 | 744,414 | 97.33% |
| 8 | 764,864 | 745,298 | 97.44% |
| 9 | 764,864 | 710,269 | 92.86% |
| 10 | 764,865 | 685,726 | 89.65% |
| 11 | 764,865 | 745,299 | 97.44% |
| 12 | 764,865 | 720,103 | 94.15% |
| 13 | 764,864 | 642,606 | 84.02% |
| 14 | 764,865 | 741,290 | 96.92% |
| 15 | 764,864 | 764,864 | 100.00% |
| 16 | 764,865 | 755,133 | 98.73% |
| 17 | 764,865 | 741,290 | 96.92% |
| | | **Average Same** | **95%** |

| Split Analysis from LDPC | | | | | |
|---|---|---|---|---|---|
| **County** | | **Municipal** | | **Voting Precinct** | |
| *Original* | *Update* | *Original* | *Update* | *Original* | *Update* |
| 14 County Splits | 15 County Splits | 16 Municipalities Split | 18 Municipalities Split | 11 Precincts Split | 19 Precincts Split |
| 16 Total Splits | 18 Total Splits | 18 Total Splits | 18 Total Splits | 11 Total Splits | 19 Total Splits |

As you can see, the Updated Preliminary Citizens' Congressional Redistricting Map is based upon the same pretext and principles as Ms. Amanda Holt's original map.  Further, I would urge you to actually watch the Informational Meeting the House State Government Committee held on Thursday, December 9 with Ms. Amanda Holt: https://s3.us-east-2.amazonaws.com/pagopvideo/946333055.mp4.    Again, I do not know why your staff did not provide you this information or reach out to me for this information.

**Myth:** ". . . the council also recommended that I review proposed maps to determine whether their expected performance is proportional to statewide voter preference.  The HB 2146 map falls short on this basic measure of partisan fairness."

**Fact:** In *League of Women Voters of Pennsylvania et. al. vs. the Commonwealth of Pennsylvania (2018)*, the Pennsylvania Supreme Court gave specific criteria for the development of redistricting maps.[8]  Specifically, the court explained:

> *"We recognize that other factors have historically played a role in the drawing of legislative districts… However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts. These neutral criteria provide a "floor" of protection for an individual against the dilution of his or her vote in the creation of such districts.*

> *When, however, it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I, Section 5 of the Pennsylvania Constitution."*

The Pennsylvania State Government Committee, and the House Republican Caucus, did not use partisan data in our consideration of submitted maps, in the selection of Ms. Amanda Holt's citizen's map, or in our adjustments made to the map through amendment.

Instead, we focused on traditional redistricting criteria which, as acknowledged by the Court, provide protection against the dilution of votes. The Pennsylvania Supreme Court was very clear: the neutral criteria explicitly provided for by the Pennsylvania Constitution cannot be subordinated to partisan concerns or considerations. By demanding a map that is likely to result in a Congressional delegation proportional to some theoretical statewide vote of each party, you are essentially asking us to violate the Constitution as it was interpreted by *League of Women Voters.*

A map prioritizing the neutral criteria found in the Pennsylvania Constitution- compactness and the avoidance of county, municipal, and ward splits unless 'absolutely necessary,' will not, at this time, likely result in a proportional congressional delegation. That is a fundamental reality of Pennsylvania's current political geography. According to Dave Wasserman, among the foremost nonpartisan redistricting experts in the country, developing a congressional map that provides

---

[8] 194537-feb.19,2018-opinionandorderadoptingremedialplan.pdf (pacourts.us)

proportional election outcomes, in Pennsylvania at least, "requires conscious pro-Dem[ocrat] mapping choices[9]."

By demanding a map that provides proportional outcomes, you are demanding that we violate the Pennsylvania Constitution in developing any map that would be acceptable to you- by ignoring the neutral and explicit criteria found in Article II of the PA Constitution and elevating partisan data, and pro-Democratic mapping choices, above the prioritization of Pennsylvanians' communities and daily lives.

Additionally, the U.S. Supreme Court in *Vieth v. Jubelirer, 541 U.S. 267*, a case originating in Pennsylvania, already addressed concerns regarding proportionality:

> *"The Constitution provides no right to proportional representation . . . It guarantees equal protection of the law to persons, not equal representation . . . to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers."*

Proportionality is neither a requirement nor a goal of redistricting under federal or state law; in fact, the very nature and design of our representative democracy is in many ways at odds with the pursuit of proportionality. This conflict is heightened by Pennsylvania's constitutional requirement that districts be compact and must avoid county, municipal, and ward splits **unless absolutely necessary**. Even the *League of Women Voters* opinion acknowledged, when discussing the expert testimony presented by Petitioners' expert (Dr. Warshaw), that "historically Democratic voters tend to self-sort into metropolitan areas." Where the natural political geography of the Commonwealth puts the two in conflict, the pursuit of proportionality cannot prevail over neutral constitutional mandates.

You, as Governor, have constitutional legislative powers and are involved in the mapmaking process.   Whether you engage in this process is your decision, but you are constitutionally bound with the General Assembly to administer your powers on an equal basis. Neither the Governor nor the General Assembly can ignore these specific directions by the Pennsylvania Supreme Court to ensure that those involved in the constitutional legislation process adopt acceptable maps.

I would further point out the hypocrisy of demanding proportionality in the name of 'fairness.' In 2018, the political data site *Fivethirtyeight* conducted a redistricting analytics project that it referred to as *The Atlas of Redistricting*.[10] This analysis makes clear that, based on Pennsylvania's recent political geography, a map drawn to pursue proportionality is no different than a map drawn to be the best possible gerrymander to advance Democratic political interests. I encourage you or any Pennsylvanian who has concerns regarding the redistricting process to access this site and see the evidence for themselves.

We have a duty to be honest with the people of Pennsylvania. It is dishonest to claim that our map does not meet your criteria for fairness, when in fact you have established criteria that can only be pursued through an unconstitutional map-making process.

---

[9] https://twitter.com/redistrict/status/965719652188991488
[10] https://projects.fivethirtyeight.com/redistricting-maps/pennsylvania/

It is even more dishonest to claim that a map may only be 'fair' if it has been drawn to neglect the constitutionally required, apolitical criteria of compactness and the preservation of local communities, and instead to pursue a thinly veiled Democratic gerrymander.

That is what the prioritization of proportionality entails: partisan gerrymandering. If you do not want to participate in partisan gerrymandering, then do not base your decisions on partisan data, and certainly do not subordinate the neutral criteria found in Pennsylvania's Constitution to those partisan concerns. The House Republican Caucus is not doing so, and you should join us in avoiding these mistakes.

**Myth:** ". . . the revised map splits multiple communities of interest, including splits in Luzerne, Dauphin, Philadelphia, and Chester counties that do not appear to be motivated by compelling legal principles, but rather by a desire to make districts more favorable to Republican Candidates."

**Fact:** Neither the House State Government Committee nor the House Republican Caucus have used political data in any portion of developing the Updated Preliminary Citizens' Congressional Redistricting Map. It is our understanding that this also applies to Ms. Amanda Holt and her development of her original map. The House State Government Committee and the House Republican Caucus will not be involved in any map or development of a map which are in violation of the established principles laid in any court case, the U.S. and Pennsylvania Constitutions, and federal and state laws.

In 2018, you submitted a map to the Pennsylvania Supreme Court.[11] Three years later, not only do you not want to participate in the legislative process, but you are also going out of your way to claim that your only recourse is a veto.



---

[11] League of Women Voters, et al. v. the Commonwealth of Pennsylvania, et al. – 159 MM 2017 | Cases of Public Interest | News & Statistics | Unified Judicial System of Pennsylvania (pacourts.us)

Your 2018 map county split analysis:[12]

| Gov. Wolf Map County Split Analysis | |
|---|---|
| Allegheny County – 2 | Lehigh County – 2 |
| Beaver County – 2 | Luzerne County – 2 |
| Berks County – 3 | Mifflin County – 2 |
| Bucks County – 2 | Montogomery County – 3 |
| Centre County – 2 | Northampton County – 2 |
| Cumberland County – 2 | Philadelphia City – 3 |
| Delaware County – 2 | Somerset County – 2 |
| Lebanon County - 2 | Tioga County – 2 |
| 16 Counties Split 35 Times | |

      The Updated Preliminary Citizens' Congressional Redistricting Map has a total of 15 counties split with 18 total splits and only one county is split three times, where your 2018 map has three counties split three times.  Further, under the Updated Preliminary Citizens' Congressional Redistricting Map, Philadelphia City is only split twice unlike your 2018 proposed congressional redistricting map.  I fail to see how in 2021 you have issues with the county splits contained in the Updated Preliminary Citizens' Congressional Redistricting Map, when there are fewer splits than in your proposed 2018 congressional redistricting map.  Even more puzzling, two of the counties you are questioning, Luzerne County and City of Philadelphia, were also split in your proposed map.

**Myth:** ". . . the manner in which Chairman Grove has conducted the recent steps of the crucial process has been disgraceful.  Despite his promise to conduct the "most open and transparent congressional redistricting process sin PA history," it is not clear that he consulted with even the Republican members of his own Committee prior to selecting the Ms. Amanda Holt map – much less the Democratic members, who have been completely cut out of the process.  And despite Chairman Grove's attempt make up a narrative as he goes, there is no explanation for the changes that were made beyond the fact that some of them seem to correlate with complaints aired by members of his Committee when the original map was released."

**Fact:** If you or your staff took the time to engage in the process, you would find we did institute the most open and transparent congressional redistricting process in the history of the commonwealth.  As a matter of fact, it has been so good, you copied it.[13]



**The Center Square**

TOP STORY

**Pennsylvania governor launches familiar public congressional redistricting effort**

Gov. Tom Wolf Commonwealth Media Services

By Christen Smith | The Center Square
Sep 13, 2021

(The Center Square) – Pennsylvania Gov. Tom Wolf launched a website on Monday to collect public input about the state's new congressional district map in an effort that resembles House Republicans' own **strategy** for redrawing the boundaries.

---

[12] md-report.pdf (pa.gov)
[13] https://www.thecentersquare.com/pennsylvania/pennsylvania-governor-launches-familiar-public-congressional-redistricting-effort/article_3e9deb4e-14dd-11ec-af4e-8310de694fa1.html

If you or your staff want any information on the House redistricting process, just go to www.PaRedistricting.com.  It has all the testimony received from our hearings, citizen drawn communities of interest, public comment, all the verified citizens drawn maps, all the pertinent information on the preliminary map including the testimony from Ms. Amanda Holt, and the voting meeting of the Updated Preliminary Citizens' Congressional Redistricting Map, during which I went into specific detail on the amendment to HB 2146.  House Democrats, your Administration and the public had full access to this information.  Unfortunately, you and your staff also failed to engage me or the committee at any time thus I am not surprised by these egregious accusations.

As this letter already contains the exact explanation I will not reiterate, but recommend you view these two hearings, both of which are found on www.PaRedistricting.com:

- House State Government Committee Information Hearing with Ms. Amanda Holt: https://s3.us-east-2.amazonaws.com/pagopvideo/946333055.mp4
- House State Government Committee Voting Meeting on HB 2146: http://www.paredistricting.com/Video/Redistricting

**Myth:** ". . . I have significant concern about the timeline for the final passage of this map. As Acting Secretary Degraffenreid noted in a June 28, 2021 letter to the leaders of the four legislative caucuses as well as the Chair of the Legislative Reapportionment Commission, the Department of State and county boards of elections have historically needed at least three weeks to prepare the Statewide Uniform Registry of Electors ("SURE") to facilitate the nomination petition process, which is statutorily mandated to begin on February 15, 2022."

**Fact:** When the PA Supreme Court adopted their maps in 2018, it took the Department of State far less time to update the SURE system.  I have full confidence we will get a congressional redistricting map to your desk within your department's arbitrary date of January 24th.

In closing, we have a historic opportunity to sign a non-partisan, citizens' Congressional redistricting map into law.  We have a historic opportunity to reset how we develop and approve Congressional redistricting maps.  I am willing to work with you and hope you are able to put any issues you have with me aside for the greater good of our beloved Commonwealth.  The decision is yours.  I hope you side with the people of Pennsylvania over political partisanship.

Sincerely,

**Seth M. Grove**
State Representative
196th District

Cc:    Speaker Bryan Cutler
       House Majority Leader Kerry Benninghoff
       President Pro Tempe Jake Corman
       Senate Majority Leader Kim Ward
       Geoff Moulton, Court Administrator of Pennsylvania

A114

# EXHIBIT B

1/24/22, 1:14 PM                                           PA Congressional - Regional Hearings

Regional Hearings        Provide Your Input        Search

PA CONGRESSIONAL
# REDISTRICTING
PA House Republican Caucus

HOME        ABOUT        HEARINGS        PROVIDE INPUT        PRELIMINARY PLAN        RESOURCES        CONTACT

HOME

# Regional Hearings

Each hearing link includes video of the completed hearing, schedule and written testimony, and counties included in the region.

*Disclaimer: The general geographic regions are being provided for guidance only to help Pennsylvania residents determine the regional hearing(s) in which they want to participate. Generally, testifiers should participate in the hearing(s) most closely associated with their primary place of residence.*

## COMPLETED HEARINGS

**Congressional Redistricting 101: Harrisburg**
Thursday, July 22

**Stakeholder Input: Harrisburg**
Thursday, July 22

**Regional Hearing: Northwest**
Tuesday, August 24

**Regional Hearing: Allegheny**
Wednesday, August 25

**Regional Hearing: Southwest**
Thursday, August 26

**Regional Hearing: North Central**
Tuesday, Oct. 12

**Regional Hearing: South Central**
Wednesday, Oct 13

**Regional Hearing: Northeast**
Monday, Oct. 18

**Regional Hearing: Southeast**
Tuesday, Oct. 19

**Regional Hearing: Philadelphia**
Wednesday, Oct. 20

**Hearing on Congressional Redistricting and Census Data Analysis**
Thursday, Oct. 28

**Informational Meeting on Citizen Map**
Thursday, Dec. 9

**Voting Meeting on Preliminary Plan**
Monday, Dec. 13

**Voting Meeting on Citizens Map**
Wednesday, Dec. 15

Sign up for updates here.

A116

1/24/22, 1:14 PM                                  PA Congressional - Regional Hearings

Regional Hearings       Provide Your Input       Search

© 2022 PA HOUSE REPUBLICAN CAUCUS. TERMS OF USE

A117

# EXHIBIT C

Regional Hearings        Provide Your Input        Search

PA CONGRESSIONAL
# REDISTRICTING
PA House Republican Caucus

HOME        ABOUT        HEARINGS        PROVIDE INPUT        PRELIMINARY PLAN        RESOURCES        CONTACT

HOME

# Thank You for Providing Your Input

Thank you to every resident who submitted their own congressional district map for consideration, shared with the Chair of the House State Government Committee about their community of interest or took the time to comment on the 2018 Supreme Court map with our online mapping tool. Your involvement to date in this once-in-a-decade process has been very much appreciated.

While the window for providing input into map development is closed, residents can view previously submitted maps, communities of interest and public comments at the links below:



*Click here to view validated, publicly submitted maps.*



*Click here to view communities of interest identified by Pennsylvanians across the Commonwealth.*



*Click here to read the comments received on the current congressional district map, drawn by the PA Supreme Court in 2018.*

Click here to view additional public comments received by the Chair.

© 2022 PA HOUSE REPUBLICAN CAUCUS. TERMS OF USE

A119

# EXHIBIT D

Contact Rep. Grove          Search

PA STATE REP.

# SETH GROVE

Serving PA's 196th Legislative District

HOME      ABOUT      NEWSROOM      196TH DISTRICT      INITIATIVES      RESOURCES      CONTACT

HOME / LATEST NEWS

# Grove Announces Citizen Map Selected as Preliminary Congressional Plan, Invites Public Comment

DEC. 08, 2021      

HARRISBURG – Rep. Seth Grove (R-York), chairman of the House State Government Committee, announced today that following the most open and transparent congressional redistricting process in Pennsylvania history, the committee has selected a citizen map as its preliminary congressional plan. The preliminary plan, submitted through the committee's online mapping tool by Lehigh County resident Amanda Holt, is now posted for public comment.

"Over the last several months, advocates and every-day Pennsylvanians told us they didn't want the process of years' past," Grove said. "The people of Pennsylvania asked for increased public involvement, a map that was drawn by people, not by politicians, and the opportunity to offer comment on a preliminary plan before a final vote was taken."

"Today, I am proud to announce that a citizen's map, not a map drawn by legislators, has been introduced for consideration by the General Assembly, and for the first time in Pennsylvania history is posted for public view and comment."

Holt's map was one of the 19 verified statewide maps submitted to the committee through its online mapping tool. To view the preliminary map, residents should visit paredistricting.com and click on "Preliminary Map." There, users will be able to view the map and offer public comments.

"The introduction of this map is a starting point, and we look forward to hearing the thoughts of residents across Pennsylvania about how this map would impact their community and how they are represented in Washington, D.C.," Grove said.

Holt's map was introduced by Grove because it was drawn without political influence; complies with constitutionally mandated criteria; satisfies equal population requirements; limits splits of townships, municipalities and other local subdivisions; and is comprised of districts that are compact and contiguous, all of which were highlighted as priorities by the majority of testifiers and residents throughout the committee's extensive regional hearings and online public input process.

"This is a historic step forward in transparency and good government," Grove said.

Grove also announced the House State Government Committee would be holding two meetings in Harrisburg on the preliminary plan:

• **Informational meeting** on Thursday, Dec. 9, at 5:30 p.m. in Room G50, Irvis Office Building.
• **Voting meeting** on Monday, Dec. 13, at 8 a.m. in Room 523, Irvis Office Building.

The meetings will also be livestreamed at paredistricting.com.

"I look forward to kicking off the legislative process and getting a map before the people of Pennsylvania for feedback and consideration," Grove said.

In addition to the ability to comment on the preliminary citizen map, residents can also watch or read testimony from one of the 12 previously held hearings and view previously submitted statewide maps, communities of interest and public comments.

**Representative Seth Grove**
**196th District**

Contact Rep. Grove                      Search

ggross@pahousegop.com
RepGrove.com / Facebook.com/RepSethGrove

**Share**  f  🐦

### District Office

2501 Catherine St.
York, PA 17408
717-767-3947
Mon – Fri 8:30 a.m. - 4:30 p.m.

### Capitol Office

7 East Wing
PO Box 202196
Harrisburg, PA 17120
717-783-2655

© 2022 PA HOUSE REPUBLICAN CAUCUS. TERMS OF USE

A122

# EXHIBIT E

# Pennsylvania General Assembly

**01/24/2022 01:46 PM**

https://www.legis.state.pa.us/cfdocs/billinfo/bill_history.cfm?syear=2021&sind=0&body=H&type=B&bn=2146

Home  /  Bill and Amendments  /  Bill Information

## Bill Information - History

### House Bill 2146; Regular Session 2021-2022

| | |
|---|---|
| **Sponsors:** | GROVE |
| **Printer's No.(PN):** | 2541* , 2491 |
| **Short Title:** | An Act apportioning this Commonwealth into congressional districts in conformity with constitutional requirements; providing for the nomination and election of Congressmen; and requiring publication of notice of the establishment of congressional districts following the Federal decennial census. |

**Actions:**

| | |
|---|---|
| PN 2491 | Referred to STATE GOVERNMENT, Dec. 8, 2021 |
| PN 2541 | Reported as amended, Dec. 15, 2021 |
| | First consideration, Dec. 15, 2021 |
| | Laid on the table, Dec. 15, 2021 |
| | Removed from table, Jan. 10, 2022 |
| | Second consideration, Jan. 11, 2022 |
| | Re-committed to APPROPRIATIONS, Jan. 11, 2022 |
| | Re-reported as committed, Jan. 12, 2022 |
| | Third consideration and final passage, Jan. 12, 2022 (110-91) |
| | (Remarks see House Journal Page ), Jan. 12, 2022 |
| | In the Senate |
| | Referred to STATE GOVERNMENT, Jan. 12, 2022 |
| | Reported as committed, Jan. 18, 2022 |
| | First consideration, Jan. 18, 2022 |
| | Second consideration, Jan. 19, 2022 |
| | Re-referred to APPROPRIATIONS, Jan. 24, 2022 |

\* denotes current Printer's Number

? How to Read a Bill   ? About PDF Documents

A124

# EXHIBIT F

1/24/22, 1:22 PM                          PA Congressional - Updated Preliminary Congressional Plan

Regional Hearings      Provide Your Input      Search

PA CONGRESSIONAL
## REDISTRICTING
PA House Republican Caucus

HOME        ABOUT        HEARINGS        PROVIDE INPUT        PRELIMINARY PLAN        RESOURCES        CONTACT

HOME

# Updated Preliminary Congressional Plan

On Dec. 8, 2021, Chairman Grove announced a citizen map was selected as the preliminary congressional plan. On Dec. 15, the citizen's map was updated in committee to incorporate additional public feed back.



*Click here for larger map*



*To view and comment on the updated preliminary congressional plan, click here.*

Click here to download the updated preliminary plan shapefiles.

Click here to download the preliminary plan block equivalency file.

Click here to view a preliminary plan and updated plan comparison by population.

Click here to view a compactness comparison between the preliminary plan and the updated plan.

Click here to view additional public comments received to date on the updated preliminary plan outside of the online mapping tool.

The updated preliminary plan took into consideration input from the citizens across Pennsylvania. To read the comments received on the initial preliminary plan, click here.

Click here to watch previously held informational meetings and hearings on the preliminary plan.

A126

1/24/22, 1:22 PM                              PA Congressional - Updated Preliminary Congressional Plan

Regional Hearings        Provide Your Input        Search

© 2022 PA HOUSE REPUBLICAN CAUCUS. TERMS OF USE

A127

# EXHIBIT G



## Pennsylvania Redistricting Advisory Council

### Redistricting Principles

Under existing state law, Pennsylvania's congressional districts are drawn by the General Assembly and passed as a regular statute, subject to veto by the Governor. On September 13, 2021, Governor Wolf issued Executive Order 2021-05 establishing the Pennsylvania Redistricting Advisory Council and charging the Council with developing recommendations for the Governor in evaluating a congressional district map passed by the General Assembly.

The Council has identified three types of principles that it believes the Governor should adopt in determining the fairness and propriety of any proposed congressional map presented   by the General Assembly. The first are legal principles, drawn from settled constitutional and legal requirements, that serve as a minimal floor of protection against improper maps. Second are principles of representation, three in particular, as described below, that are crucial to assuring equal representation and fairness in a resulting map. Finally, there are procedural principles that should be in place to ensure that Pennsylvania's congressional districts are drawn through a fair and transparent process.

### Legal Principles

As an initial step in analyzing a proposed congressional map, the Council believes that the Governor should evaluate the map's fidelity to traditional neutral criteria that form a "floor" of protection against the dilution of votes in the creation of districts. The Free and Equal Elections Clause of the Pennsylvania Constitution requires that each congressional district be composed of compact and contiguous territory and minimize the division of political subdivisions as practicable.

The Pennsylvania Supreme Court has noted that the goal is to create "representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs." In addition, any proposed map must comply with the requirements of federal law, including most specifically, the constitutional requirement to maintain population equality among congressional districts and the provisions of the Voting Rights Act as they apply in Pennsylvania. *These federal and state legal principles require that, in evaluating a proposed Congressional map, the Governor ensure that these legally mandated elements are complied with, along with other principles noted below.*

- Maintenance of population equality among congressional districts refers to the principle that that each district should be as nearly equal in population as practicable. As a result of the 2020 Census, the ideal Congressional district in Pennsylvania will contain 764,865 residents. *In evaluating a map, the Governor should ensure that the deviations in populations between districts comply with the requirements of the Constitution.*



- Assurance of contiguity refers to the principle that all territory within a district connect to the rest of the district. *In evaluating a map, the Governor should ensure that all parts of the district are in contact with another part of the district and should disfavor any proposed map in which territory is only connected at a narrow single point.*

- Maintaining compactness refers to the principle that the boundaries of a district should not be irregularly shaped or sprawl unnecessarily from a central area. Evaluation of compactness tends to focus formulaically on the relationship of the district's perimeter to its area, or the extent to which the district spreads from a central core. *In evaluating a proposed map, the Governor should prioritize plan level geographic compactness unless dispersion is required to advance another positive districting principle, such as preserving communities of interest or avoiding political-subdivision splits.*

- Minimization of division of political subdivisions refers to the principle that local political subdivisions–such as counties or, where possible, municipalities and school districts– not be arbitrarily split into multiple districts. *In evaluating a proposed map, the Governor should prioritize fewer subdivision splits unless a division is necessary to preserve a cohesive–and clearly identified–community of interest.*

- Finally, in certain circumstances, but only in those circumstances, the Voting Rights Act requires the creation of "majority-minority" districts to prevent the denial or abridgement of the right to vote based on race, color, or membership in a language minority. *In evaluating a proposed map, the Governor should independently consider whether the Voting Rights Act requires the creation of proposed majority-minority districts.*

**Principles of Representation**

Assuming a proposed congressional map from the General Assembly complies with the principles above, the Governor should further evaluate the map to ensure that it does not unfairly dilute the power of a particular group's vote. Essential to this evaluation are three additional principles of representation which contribute to the ultimate fairness of a proposed map: communities of interest should be maintained, the composition of the congressional delegation should be proportional to statewide voter preference, and the map should be responsive to changing voter preference. These principles operate as a further check on the two features of partisan gerrymandering: the splitting of communities of voters across several districts to dilute their voting power (cracking), and squeezing as many voters of one political interest into just one or a few districts, thereby wasting their votes in those districts, which decreases the likelihood of success elsewhere (packing). *In evaluating a proposed map, the Governor should consider the extent to which these principles of representation are met, when compared to other potential maps that could have been drawn.*



- Communities of interest are contiguous geographic areas or neighborhoods in which residents share common socio-economic and cultural interests which the residents of the region may seek to translate into effective representation. Examples of shared interests include those common to rural, urban, industrial or agricultural areas, where residents have similar work opportunities, share similar standards of living, use the same transportation facilities, or share common environmental, healthcare, or educational concerns, among others. In statewide listening sessions held by the Council, Pennsylvanians frequently emphasized communities of interest focused around school districts, colleges, industrial corridors, and commuting patterns, and urged particular attention to emerging communities of interest and demographic groups that are growing in Pennsylvania. While a community of interest may be contained within a single political subdivision, they often extend across borders within a region, and may be better represented by regional planning entities such as Councils of Governments. *In evaluating a proposed map, the Governor should consider the extent to which a map preserves cohesive communities of interest, particularly where failure to do so cannot be easily explained by compelling neutral factors outlined above.*

- Ensuring partisan fairness and proportionality requires that parties have the opportunity to translate their popular support into legislative representation with approximately equal efficiency such that the proportion of districts whose voters favor each political party should correlate to the statewide preferences of the voters. Partisan fairness requires preventing structural advantage from being baked into the map so as to allow one party to more efficiently translate votes into seats in the delegation. *In evaluating a proposed map, the Governor should analyze how it would have performed in a full range of prior statewide elections when compared to other potential maps which could have been drawn. A map with expected performance proportional to statewide voter preference should be favored as comporting with broad principles of fairness.*

- Responsiveness and competitiveness require that there are enough districts "in play" that changes in electoral sentiment can translate into clear changes in the overall composition of the congressional delegation. A competitive district is one in which the electoral outcome is close enough that the district can change with shifting voter preferences. A responsive map is one with enough competitive districts to allow for changes in the composition of the delegation with changes in proportion of votes for the parties. Voters should not be deprived of their choice and a fair opportunity to elect candidates they support. *In evaluating a proposed map, the Governor should analyze how it would have performed in a full range of prior statewide elections and favor a map with districts where partisan swings were reflected in changes in the congressional delegation.*

**Principles of Process**

Beyond both the floor of protection and the additional checks on a partisan gerrymander endorsed above, it is critical that the map passed by the General Assembly be the result of a process that provides an opportunity for meaningful public input, comment, and participation. In the Council's listening sessions, many participants pointed to the public processes that have accompanied citizen-mapping efforts over the past several months as exemplifying the level of transparency that is expected. Procedural fairness begins with strong engagement with members of the public as to their priorities for the redistricting process, with particular focus on hearing about what ordinary Pennsylvanians identify as their communities of interest.

And when the General Assembly's proposed map is shared publicly, a process of robust public engagement and transparency dictates that there be a public record accompanying the map setting forth why specific decisions were made as they were. For instance, if certain counties were split in the map the public is entitled to know the justification for doing so. Likewise, if the proposed map prioritizes specific communities of interest, the public should be told what those communities are and how they were defined. If majority-minority districts are created, there should be a discussion of the factors that resulted in the minority group's denial of equal opportunity to participate in the political processes. *In evaluating a proposed map, the Governor should disfavor any map that is made public and passed quickly with limited legislative debate or opportunity for public consideration. In addition, the Governor should more closely scrutinize any map that is not accompanied by a public record or narrative which explains the rationale for decisions which were made.*