1

1          IN THE COMMONWEALTH COURT OF

2                  PENNSYLVANIA

3                * * * * * * * *

4    Carol Ann Carter;        *
     Monica Parrilla;         * CASES
5    Rebecca Poyourow;        * CONSOLIDATED
     William Tung;            *
6    Roseanne Milazzo;        * No.
     Burt Siegel;             * 464 MD 2021
7    Susan Cassanelli;        *
     Lee Cassanelli;          *
8    Lynn Wachman;            *
     Michael Guttman;         *
9    Maya Fonkeu;             *
     Brady Hill;              *
10   Mary Ellen Balchunis;    *
     Tom DeWall;              *
11   Stephanie McNulty;       *
     And Janet Temin,         *
12        Petitioners         *
          V.                  *
13   Vernica Degraffenreid,   *
     in her official          *
14   capacity as the Acting   *
     Secretary of the         *
15   Commonwealth of          *
     Pennsylvania; and        *
16   Jessica Mathis, in her   *
     Official capacity as     *
17   Director for the         *
     Pennsylvania Bureau of   *
18   Election Services and    *
     Notaries,                *
19        Respondents         *
     * * * * * * * * * * * * * * * * * * * * * * * * * * *
20
     BEFORE:   PATRICIA A. MCCULLOUGH, JUDGE
21
     HEARING: Thursday, January 27, 20222
22
              9:40  a.m.
23

24

25      Any reproduction of this transcript
        is prohibited without authorization
            by the certifying agency

2

```
 1
         Philip T. Gressman;        *
 2       Ron Y. Donagi;            *
         Kristopher R. Tapp;        *
 3       Pamela Gorkin;            *
         David P. Marsh;           *
 4       James L. Rosenberger;      *
         Amy Meyers;               *
 5       Eugene Boman;             *
         Gary Gordojn;             *
 6       Liz McMahon;              *  No.
         Timothy G.Freman;         *  465 M.D. 2021
 7       And Garth Isakk,          *
              Petitioners          *
 8           V.                    *
         Vernica Degraffenreid,     *
 9       in her official           *
         capacity as the Acting     *
10       Secretary of the          *
         Commonwealth of           *
11       Pennsylvania; and         *
         Jessica Mathis, in her     *
12       Official capacity as       *
         Director for the          *
13       Pennsylvania Bureau of     *
         Election Services and      *
14       Notaries,                 *
              Respondents          *
15                        *  *  *  *  *  *  *  *

16

17

18       LOCATION: Pennsylvania Judicial Center

19                  601 Commonwealth Avenue

20                  Suite 1500

21                  Harrisburg, PA  17120

22       WITNESSES: Jonathan Rodden, Daryl

23       Deford, Moon Duchin, Michael Barber

24

25            Reporter: Nicole Montagano
```

3

```
1                    A P P E A R A N C E S

2

3    MICHAEL R. MCDONALD, ESQUIRE

4    Ballard Spahr, LLP

5    1735 Market Street, 51st Floor

6    Philadelphia, PA  19103

7         Counsel for Carter Petitioners

8

9    MATTHEW P. GORDON, ESQUIRE

10   Perkins Coie LLP

11   1201 Third Avenue

12   Suite 4900

13   Seattle, WA  98101

14         Counsel for Carter Petitioners

15

16   JYOTI JASRASARIA, ESQUIRE

17   JOSEPH POSIMATO, ESQUIRE

18   Elias Law Group, LLP

19   10 G St. NE, Suite 600

20   Washington, D.C. 2002

21         Counsel for Carter Petitioners

22

23

24

25
```

4

1        A P P E A R A N C E S  (con't)

2

3    JESSICA RING AMUNSON, ESQUIRE

4    SAMUEL HIRSCH, ESQUIRE

5    LINDSAY HARRISON, ESQUIRE

6    TASSITY JOHNSON, ESQUIRE

7    Jenner & Block LLP

8    1099 New York Avenue, NW

9    Suite 900

10    Washington, DC  20001

11        Counsel for Gressman Petitioners

12

13    SHANNON E. MCCLURE, ESQUIRE

14    Reed Smith, LLP

15    Three Logan Square

16    1818 Arch Street

17    Suite 3100

18    Philadelphia, PA  19103

19        Counsel for Gressman Petitioners

20

21

22

23

24

25

5

1      A P P E A R A N C E S (con't)

2

3    ROBERT WIYGUL, ESQUIRE

4    CARY L. RICE, ESQUIRE

5    JOHN HILL, ESQUIRE

6    Hangley, Aronchick, Segal, Pudlin &

7    Schiller

8    One Logan Squire, 27th Floor

9    Philadelphia, PA  19103

10        Counsel for Respondents

11

12   MARCO S. ATTISANO, ESQUIRE

13   Attisano & Romano, LLC

14   429 Fourth Avenue

15   Suite 1705

16   Pittsburgh, PA  15219

17        Counsel for Senate Democratic

18        Caucus

19

20

21

22

23

24

25

6

1        A P P E A R A N C E S  (con't)

2

3    KEVIN GREENBERG, ESQUIRE

4    Greenberg Traurig, LLP

5    1717 Arch Street

6    Suite 400

7    Philadelphia, PA  19103

8        Counsel for Intervenors Anthony

9        Williams, Katie Muth, Maria

10        Collett and Sharif Street

11

12    EMMA F.E. SHOUCAIR, ESQUIRE

13    Dentons, Cohen & Grigsby

14    625 Liberty Avenue

15    5th Floor

16    Pittsburgh, PA  15222

17        Counsel for Senate Democratic

18        Caucus

19

20

21

22

23

24

25

7

1           A P P E A R A N C E S  (con't)

2

3     ANTHONY R. HOLTZMAN, ESQUIRE

4     K&L Gates

5     17 North Second St., 18th Floor

6     Harrisburg, PA  17101-1507

7          Counsel for Proposed-Intervenors

8          Jake Corman, President Pro

9          Tempore of the Pennsylvania

10          Senate, and Kim Ward, Majority

11          Leader of the Pennsylvania Senate

12

13     JOSHUA J. VOSS, ESQUIRE

14     SHOHIN H. VANCE, ESQUIRE

15     MATT HAVERSTICK, ESQUIRE

16     SAMANTHA ZIMMER, ESQUIRE

17     Kleinbard, LLC

18     Three Logan Square

19     1717 Arch Street, 5th Floor

20     Philadelphia, PA  19103

21          Counsel for Guy Reschenthaler,

22          Jeffrey Varner, Tom Marino, Ryan

23          Costello and Bud Shuster

24

25

8

1          A P P E A R A N C E S  (con't)

2

3     DAVID S. SENOFF, ESQUIRE

4     First Law Strategy Group, LLC

5     121 S. Broad Street

6     Suite 300

7     Philadelphia, PA  19107

8          Counsel for Intervenor

9          Representative JoAnna E.

10         McClinton, Leader of the

11         Democratic Caucus of the

12         Pennsylvania House of

13         Representatives

14

15    LAM DANG TRUONG, ESQUIRE

16    PA House of Representatives

17    620 Main Capitol Building

18    Harrisburg, PA 17120

19         Counsel for Intervenor Joanna

20         McClinton

21

22

23

24

25

```
 1        A P P E A R A N C E S  (con't)

 2

 3    ROBERT J. TUCKER, ESQUIRE

 4    Baker Hostetler

 5    200 Civic Center Drive

 6    Suite 1200

 7    Columbus, OH  43215

 8         Counsel for Proposed-Intervenors

 9         Bryan Cutler, Speaker of the

10         Pennsylvania House of

11         Representatives, and Kerry

12         Beinninghoff, Majority Leader of

13         The Pennsylvania House of

14         Representatives

15

16    PATRICK T. LEWIS, ESQUIRE

17    Baker Hostetler

18    Key Tower, 127 Public Square

19    Suite 200

20    Cleveland, OH  44114

21         Counsel for Speaker Cutler and

22         Leader Benninghoff of the

23         Pennsylvania House of

24         Representatives

25
```

10

1                          E X H I B I T S

2

3                                                    P a g e

4      N u m b e r    D e s c r i p t i o n          O f f e r e d

5

6                          N O N E   M A R K E D

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

11

1                    I N D E X

2

3    DISCUSSION AMONG PARTIES          15 - 27

4    OPENING STATEMENT

5         By Attorney Jasrasaria       27 - 34

6         By Attorney Ring-Amunson     35 - 43

7         By Attorney Wiygul           43 - 52

8         By Attorney Tucker           52 - 61

9         By Attorney Holtzman         61- 67

10        By Attorney Voss             67 - 71

11        By Attorney Senoff           71 - 77

12        By Attorney Attisano         77 - 81

13   WITNESS:  JONATHAN RODDEN

14   DIRECT EXAMINATION

15        By Attorney Jasrasaria       82 - 138

16   CROSS EXAMINATION

17        By Attorney Ring-Amunson    138 - 144

18   CROSS EXAMINATION

19        By Attorney Wiygul          144 - 145

20   CROSS EXAMINATION

21        By Attorney Lewis           145 - 162

22   CROSS EXAMINATION

23        By Attorney Gordan          162 - 182

24   CROSS EXAMINATION

25        By Attorney Senoff          182 - 184

12

1                       I N D E X

2

3     CROSS EXAMINATION

4         By Attorney Attisano        185 - 194

5     DISCUSSION AMONG PARTIES        194 - 198

6     WITNESS: DARYL DEFORD

7     DIRECT EXAMINATION

8         By Attorney Ring-Amunson    198 - 246

9     CROSS EXAMINATION

10        By Attorney Gordan          246 - 262

11    CROSS EXAMINATION

12        By Attorney Wiygul          263 - 267

13    CROSS EXAMINATION

14        By Attorney Lewis           268 - 283

15    CROSS EXAMINATION

16        By Attorney Vance           284 - 300

17    CROSS EXAMINATION

18        By Attorney Senoff          300 - 314

19    CROSS EXAMINATION

20        By Attorney Attisano        314 - 319

21    REDIRECT EXAMINATION

22        By Attorney Ring-Amunson    319 - 321

23    DISCUSSION AMONG PARTIES        322 - 324

24    WITNESS: MOON DUCHIN

25

13

1                    I N D E X

2

3     DIRECT EXAMINATION

4        By Attorney Wiygul        324 - 394

5     CROSS EXAMINATION

6        By Attorney Posimato      394 - 412

7     CROSS EXAMINATION

8        By Attorney Hirsch        412 - 433

9     CROSS EXAMINATION

10       By Attorney Vance         434 - 453

11    CROSS EXAMINATION

12       By Attorney Gordan        453 - 467

13    CROSS EXAMINATION

14       By Attorney Senoff        468 - 477

15    CROSS EXAMINATION

16       By Attorney Attisano      477 - 488

17    REDIRECT EXAMINATION

18       By Attorney Wiygul        488 - 504

19    DISCUSSION AMONG PARTIES     504 - 506

20    WITNESS: MICHAEL BARBER

21    DIRECT EXAMINATION

22       By Attorney Morgan        506 - 557

23    CROSS EXAMINATION

24       By Attorney Gordan        559 - 578

25

14

1                    I N D E X

2

3   CROSS EXAMINATION

4       By Attorney Hirsch          579 - 595

5   CROSS EXAMINATION

6       By Attorney Wiygul          595 - 610

7   CROSS EXAMINATION

8       By Attorney Holcum          611 - 623

9   CROSS EXAMINATION

10      By Attorney Senoff          624 - 639

11  CROSS EXAMINATION

12      By Attorney Attisano        639 - 659

13  REDIRECT EXAMINATION

14      By Attorney Morgan          656 - 668

15  DISCUSSION AMONG PARTIES        668 - 671

16  CERTIFICATE                           672

17

18

19

20

21

22

23

24

25

15

```
 1                P R O C E E D I N G S
 2       - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 3                        COURT CRIER HOLLAND:
 4                        All rise.
 5                        JUDGE McCULLOUGH:
 6                        Good morning.
 7                        THE WITNESS:
 8                        Good morning, Your
 9       Honor.
10                        JUDGE MCCULLOUGH:
11                        So thank you for being
12       hearing, all being ready in this
13       expedited matter.  I just want to say
14       good morning to everyone.  We have
15       some people in overflow rooms because
16       of the space requirements, so
17       hopefully they are able to hear us and
18       see us.  I assume that's all
19       connected.
20                        Well, welcome to the
21       Commonwealth Court.  I'm Judge
22       Patricia McCullough, and I will be
23       presiding over these proceedings as
24       the Trial Judge.  As most of you or
25       all of you are aware, the Commonwealth
```

Timestamps:
- 00:00:00 — line 4
- 00:00:01 — line 5
- 00:00:01 — line 6
- 00:00:04 — line 7
- 00:00:04 — line 8
- 00:00:05 — line 9
- 00:00:05 — line 10
- 00:00:10 — line 11
- 00:00:12 — line 12
- 00:00:13 — line 13
- 00:00:16 — line 14
- 00:00:20 — line 15
- 00:00:23 — line 16
- 00:00:25 — line 17
- 00:00:29 — line 18
- 00:00:32 — line 19
- 00:00:32 — line 20
- 00:00:34 — line 21
- 00:00:35 — line 22
- 00:00:38 — line 23
- 00:00:38 — line 24
- 00:00:41 — line 25

16

| | | |
|---|---|---|
| 00:00:43 | 1 | Court has two types of jurisdiction, |
| 00:00:44 | 2 | one being as an appellate Court and |
| 00:00:46 | 3 | the other as a trial Court in certain |
| 00:00:49 | 4 | statewide matters.  This is one of |
| 00:00:50 | 5 | those cases.  And whatever this |
| 00:00:52 | 6 | Court's decision is, it can be |
| 00:00:53 | 7 | appealed to the Supreme Court, which, |
| 00:00:56 | 8 | of course, will have the final say. |
| 00:00:59 | 9 | Before the Court today |
| 00:01:00 | 10 | and its original jurisdiction are the |
| 00:01:04 | 11 | consolidated matters filed by two sets |
| 00:01:06 | 12 | of Petitioners against Respondents, |
| 00:01:08 | 13 | the acting Secretary of Elections and |
| 00:01:11 | 14 | the Director for the Pennsylvania |
| 00:01:13 | 15 | Bureau of Election Services and |
| 00:01:15 | 16 | Notaries.  The first case is Docketed |
| 00:01:17 | 17 | at 464 MD 2022 and captioned Carol Ann |
| 00:01:22 | 18 | Carter and 15 other Voters versus |
| 00:01:25 | 19 | Leigh Chapman, et al.  And the second |
| 00:01:27 | 20 | one is Docketed at 465 MD 2022 and |
| 00:01:27 | 21 | captioned Philip Gressman and 11 other |
| 00:01:37 | 22 | Voters versus Leigh Chapman  et. al. |
| 00:01:39 | 23 | The actions challenge Pennsylvania's |
| 00:01:39 | 24 | lack of the constitutional district |
| 00:01:41 | 25 | boundaries for the 2022 election |

17

| | | |
|---|---|---|
| 00:01:44 | 1 | cycle. |
| 00:01:47 | 2 | In 2020 the U.S. Census |
| 00:01:49 | 3 | Bureau conducted for the 24th time in |
| 00:01:50 | 4 | this country's history the decennial |
| 00:01:56 | 5 | census for the purpose of, among other |
| 00:01:57 | 6 | things, apportioning by population the |
| 00:01:58 | 7 | 435 voting members of the United |
| 00:02:01 | 8 | States House of Representatives among |
| 00:02:02 | 9 | the 50 states.  Following the 2020 |
| 00:02:02 | 10 | Census, Pennsylvania's apportionment |
| 00:02:08 | 11 | of Congressional seats was reduced yet |
| 00:02:10 | 12 | again from 18 to 17.  And Pennsylvania |
| 00:02:14 | 13 | current Congressional District, which |
| 00:02:17 | 14 | was adopted by the Supreme Court in |
| 00:02:18 | 15 | 2018 and legal voters has been used in |
| 00:02:22 | 16 | the past two primary elections in one |
| 00:02:24 | 17 | general election and contains 18 |
| 00:02:27 | 18 | districts thus, as we sit here today, |
| 00:02:31 | 19 | Pennsylvania has no Congressional |
| 00:02:32 | 20 | District map that squares with the |
| 00:02:36 | 21 | newly allotted 17 congressional |
| 00:02:38 | 22 | districts.  And the constitution |
| 00:02:40 | 23 | requires there to be an equal number |
| 00:02:40 | 24 | of citizens in each Congressional |
| 00:02:43 | 25 | District.  In light of these changes, |

18

| | |
|---|---|
| 00:02:46 | 1 | the Petitioners ask the Court to |
| 00:02:48 | 2 | declare unconstitutional the |
| 00:02:50 | 3 | Pennsylvania's current Congressional |
| 00:02:50 | 4 | District plan, enjoin the Respondents |
| 00:02:56 | 5 | from using the current plan in any |
| 00:02:56 | 6 | future elections and adopt a new |
| 00:02:59 | 7 | congressional plan. |
| 00:03:00 | 8 | To be clear, this case is |
| 00:03:02 | 9 | not about deciding whether a current |
| 00:03:04 | 10 | map is unconstitutional due to |
| 00:03:08 | 11 | partisan or racial gerrymandering. |
| 00:03:08 | 12 | The issue before the Court is that the |
| 00:03:10 | 13 | current map is now obsolete in light |
| 00:03:13 | 14 | of the new census data and the parties |
| 00:03:16 | 15 | in amici have filed proposed plans for |
| 00:03:18 | 16 | the Court's consideration.  Ordinarily |
| 00:03:21 | 17 | redistricting is left to the |
| 00:03:25 | 18 | legislature to undertake in the form |
| 00:03:26 | 19 | of an act or a statute, which must be |
| 00:03:28 | 20 | approved by the Governor to become |
| 00:03:31 | 21 | law.  The United States Constitution |
| 00:03:33 | 22 | vests the state legislatures with the |
| 00:03:34 | 23 | powers to determine the times, places |
| 00:03:35 | 24 | and manner of holding elections for |
| 00:03:38 | 25 | representatives subject to any rules |

19

| | | |
|---|---|---|
| 00:03:41 | 1 | that Congress may establish.  To date, |
| 00:03:44 | 2 | the Governor and legislature have not |
| 00:03:49 | 3 | agreed on a map.  In anticipation that |
| 00:03:50 | 4 | such approval might not be forthcoming |
| 00:03:51 | 5 | in time for the candidates to prepare |
| 00:03:55 | 6 | for the primary election and know the |
| 00:03:56 | 7 | boundaries of their districts so they |
| 00:03:58 | 8 | can circulate nomination petitions and |
| 00:04:01 | 9 | campaign, Petitioners filed these |
| 00:04:03 | 10 | lawsuits preemptively. |
| 00:04:05 | 11 | In response, this Court |
| 00:04:06 | 12 | has taken this matter very seriously |
| 00:04:08 | 13 | and acted as expeditiously and |
| 00:04:10 | 14 | proactively as possible at every turn |
| 00:04:16 | 15 | so that in the event that the |
| 00:04:17 | 16 | legislature and Governor do not reach |
| 00:04:18 | 17 | an agreement on a map by January 30th, |
| 00:04:20 | 18 | 2022, the Court imposed deadline, this |
| 00:04:22 | 19 | Court will proceed to do so as |
| 00:04:24 | 20 | expeditiously as possible. |
| 00:04:27 | 21 | On December 20th, 2021, |
| 00:04:29 | 22 | this Court issued an Order setting |
| 00:04:31 | 23 | expedited guidelines by which parties |
| 00:04:34 | 24 | were required to file applications to |
| 00:04:36 | 25 | intervene, including ordering that if |

20

| | | |
|---|---|---|
| 00:04:39 | 1 | the General Assembly has not enacted a |
| 00:04:43 | 2 | new congressional map which has been |
| 00:04:44 | 3 | approved by the Governor by |
| 00:04:45 | 4 | January 30th, 2022, the Court shall |
| 00:04:47 | 5 | proceed to issue an Opinion based on |
| 00:04:50 | 6 | the hearing and evidence presented by |
| 00:04:51 | 7 | the parties here today as well as |
| 00:04:54 | 8 | Amici. |
| 00:04:55 | 9 | In all, the Court |
| 00:04:56 | 10 | received ten applications to |
| 00:04:57 | 11 | intervene. On January 6th, 2022, I |
| 00:04:57 | 12 | presided over a hearing on the |
| 00:05:02 | 13 | applications to intervene. All ten |
| 00:05:04 | 14 | applicants were provided an |
| 00:05:05 | 15 | opportunity to argue why they should |
| 00:05:07 | 16 | be permitted to intervene under the |
| 00:05:09 | 17 | Pennsylvania Rules of Civil Procedure |
| 00:05:10 | 18 | and to argue why their participation |
| 00:05:13 | 19 | would not unduly delay or burden these |
| 00:05:16 | 20 | necessary expedited proceedings. |
| 00:05:17 | 21 | After consideration of |
| 00:05:18 | 22 | those arguments and evidence presented |
| 00:05:21 | 23 | at that hearing, I issued an Order |
| 00:05:23 | 24 | granting intervention to six parties |
| 00:05:25 | 25 | on January 14th, which are the Speaker |

21

00:05:27    1    and Majority Leader of the

00:05:28    2    Pennsylvania House of Representatives

00:05:29    3    and the President Pro Tempore and

00:05:33    4    Majority Leader of the Pennsylvania

00:05:34    5    Senate, Pennsylvania State Senators

00:05:36    6    Maria Collett, Katie Muth, Sharif

00:05:37    7    Street and Anthony Williams, Tom Wolf,

00:05:41    8    Governor of the Commonwealth of

00:05:42    9    Pennsylvania, Senator Jay Costa and

00:05:44   10    members of the Democratic Caucus of

00:05:47   11    the Senate of Pennsylvania,

00:05:48   12    Representative Joanna McClinton,

00:05:50   13    leader of the Democratic Caucus of the

00:05:51   14    Pennsylvania House of Representatives,

00:05:52   15    Congressman Guy Reschenthaler, Swatara

00:05:56   16    Township Commissioner Jeff Varner, Tom

00:05:57   17    Reno,  Ryan Costello and Bud Shuster.

00:05:59   18            These six parties and

00:06:00   19    their counsel are the ones presumably

00:06:02   20    all present here today and ready to

00:06:04   21    present evidence and legal argument on

00:06:07   22    why their map should be the one the

00:06:09   23    Court adopts.

00:06:10   24            The hearing today and

00:06:11   25    tomorrow is for the purpose of

22

| | | |
|---|---|---|
| 00:06:13 | 1 | receiving evidence from the experts to |
| 00:06:15 | 2 | explain from a technical and complex |
| 00:06:18 | 3 | point of view how map drawing works |
| 00:06:21 | 4 | and providing other opportunities an |
| 00:06:24 | 5 | opportunity to challenge those |
| 00:06:26 | 6 | opinions. |
| 00:06:26 | 7 | Four parties were |
| 00:06:27 | 8 | permitted to also participate as |
| 00:06:31 | 9 | Amici's participants.  That is they |
| 00:06:32 | 10 | were permitted to present a map, an |
| 00:06:35 | 11 | expert report and a brief due to the |
| 00:06:37 | 12 | time constraints and the expedience of |
| 00:06:40 | 13 | the proceedings, but I want to make |
| 00:06:44 | 14 | clear that that does not mean this |
| 00:06:44 | 15 | Court will not give equal |
| 00:06:46 | 16 | consideration to the maps and expert |
| 00:06:47 | 17 | reports presented by these Amici. |
| 00:06:50 | 18 | Also, as we have all |
| 00:06:51 | 19 | discussed during the various |
| 00:06:53 | 20 | conferences and hearings held to date, |
| 00:06:54 | 21 | the Court wants to hear from the |
| 00:06:55 | 22 | parties their views on whether this |
| 00:06:57 | 23 | Court will need to consider revisions |
| 00:06:59 | 24 | to the 2022 election schedule |
| 00:07:02 | 25 | calendar.  So I'm looking forward to |

23

| | | |
|---|---|---|
| 00:07:05 | 1 | hearing argument on that as well from |
| 00:07:06 | 2 | the parties.  Hopefully, we won't need |
| 00:07:11 | 3 | to do that. |
| 00:07:12 | 4 | As you can see, our staff |
| 00:07:13 | 5 | has worked hard to set up the |
| 00:07:13 | 6 | courtroom and spaces at the tables for |
| 00:07:15 | 7 | you all to sit I hope comfortably so |
| 00:07:21 | 8 | that we can be in compliance with the |
| 00:07:22 | 9 | current distancing requirements.  The |
| 00:07:23 | 10 | room capacity is limited to 23 |
| 00:07:25 | 11 | persons.  It looks like every single |
| 00:07:27 | 12 | spot is taken, so we ask that the |
| 00:07:29 | 13 | parties be mindful of who they have |
| 00:07:31 | 14 | present in the courtroom.  At our |
| 00:07:33 | 15 | pretrial conference each of you gave |
| 00:07:34 | 16 | an estimate of the number of attorneys |
| 00:07:35 | 17 | and support staff you anticipate would |
| 00:07:38 | 18 | be in the courtroom at anytime.  And |
| 00:07:39 | 19 | again, we do have overflow rooms set |
| 00:07:41 | 20 | up and prepared for you by our |
| 00:07:44 | 21 | wonderful staff who have worked night |
| 00:07:46 | 22 | and day to get everything ready in |
| 00:07:48 | 23 | time, our IT staff, our prothonotary, |
| 00:07:48 | 24 | Dion and Mark, thank you very much, |
| 00:07:48 | 25 | our Court Criers, Dion Turner. |

24

| | | |
|---|---|---|
| 00:07:56 | 1 | So it's my intent and |
| 00:07:59 | 2 | hope that we can get through what we |
| 00:08:01 | 3 | need to in these two days.  But as I |
| 00:08:01 | 4 | have cautioned the parties at the |
| 00:08:02 | 5 | pretrial conference and then this |
| 00:08:05 | 6 | morning at the status conference, if |
| 00:08:07 | 7 | necessary, the Court is prepared to |
| 00:08:08 | 8 | proceed over the weekend to make sure |
| 00:08:10 | 9 | that everyone who has something to say |
| 00:08:14 | 10 | has the opportunity to do so. |
| 00:08:17 | 11 | Hopefully, that won't be necessary |
| 00:08:19 | 12 | because, as we all discussed at the |
| 00:08:20 | 13 | pretrial conference and as confirmed |
| 00:08:22 | 14 | to you via an email from our |
| 00:08:24 | 15 | prothonotary, Mr. Mike Crimmel, we |
| 00:08:26 | 16 | have set out time limitations |
| 00:08:27 | 17 | guidelines.  I'll repeat those now so |
| 00:08:30 | 18 | there's no confusion. |
| 00:08:31 | 19 | Each party will be |
| 00:08:32 | 20 | permitted one hour to examine its |
| 00:08:34 | 21 | expert witness on Direct Examination. |
| 00:08:37 | 22 | Each party will be permitted |
| 00:08:38 | 23 | 15 minutes to cross examine each of |
| 00:08:41 | 24 | the other parties' expert witnesses. |
| 00:08:43 | 25 | And each party will be permitted 15 to |

25

| | | |
|---|---|---|
| 00:08:45 | 1 | 20 minutes to conduct Redirect |
| 00:08:48 | 2 | Examination of its expert witness. |
| 00:08:49 | 3 | And if I believe these times --- |
| 00:08:51 | 4 | there's a need to tweak them based on |
| 00:08:54 | 5 | the circumstances, I will do so.  With |
| 00:08:56 | 6 | the input of counsel pretrial |
| 00:08:58 | 7 | conference, we have also agreed that |
| 00:08:59 | 8 | each party will have eight minutes for |
| 00:09:01 | 9 | their opening statements/argument and |
| 00:09:04 | 10 | eight minutes for their closing |
| 00:09:06 | 11 | statements/argument. |
| 00:09:08 | 12 | As confirmed by Mr. |
| 00:09:11 | 13 | Crimmel in his email to --- I will |
| 00:09:13 | 14 | also state for the record the counsel |
| 00:09:17 | 15 | for the Republican Senate Intervenors |
| 00:09:17 | 16 | voluntarily offered that the Senate |
| 00:09:22 | 17 | Intervenors will not present an expert |
| 00:09:22 | 18 | witness, but will rely on the expert |
| 00:09:23 | 19 | witness presented by the Republican |
| 00:09:23 | 20 | House Intervenors.  The Republican |
| 00:09:26 | 21 | Senate Intervenors will defer to |
| 00:09:26 | 22 | Republican House Intervenors' |
| 00:09:29 | 23 | Examination and Cross Examination of |
| 00:09:31 | 24 | experts and the Republican Senate |
| 00:09:36 | 25 | Intervenors will present opening and |

26

| | | |
|---|---|---|
| 00:09:37 | 1 | closing statements. |
| 00:09:38 | 2 | I also note that the |
| 00:09:39 | 3 | parties entered into stipulations, |
| 00:09:42 | 4 | which they advised the Court of this |
| 00:09:45 | 5 | morning. They've stipulated that all |
| 00:09:48 | 6 | experts testifying are deemed as |
| 00:09:49 | 7 | qualified in their expert field. |
| 00:09:56 | 8 | Thank you for doing that. They have |
| 00:09:58 | 9 | also agreed to the admissibility of |
| 00:09:59 | 10 | the testifying experts' reports, and I |
| 00:10:01 | 11 | thank you for doing that as well. So |
| 00:10:03 | 12 | it helps us expedite to the meaty |
| 00:10:05 | 13 | matters here. |
| 00:10:06 | 14 | So as a last order of |
| 00:10:07 | 15 | business, the parties will be |
| 00:10:08 | 16 | presented in this order, as per our |
| 00:10:11 | 17 | discussions, Carter Petitioners |
| 00:10:15 | 18 | Gressman, Petitioners Respondent |
| 00:10:15 | 19 | Chapman and Mathias, Governor Tom |
| 00:10:15 | 20 | Wolf, Republican Legislative |
| 00:10:21 | 21 | Intervenors Cutler --- Representative |
| 00:10:23 | 22 | Cutler and Senator Wolf and Corman and |
| 00:10:23 | 23 | Warner, Congressional Intervenors |
| 00:10:28 | 24 | House Democratic Intervenors, that's |
| 00:10:32 | 25 | Representative McClinton and Senate |

27

| | | |
|---|---|---|
| 00:10:33 | 1 | Democratic Intervenors, Senator Jay |
| 00:10:37 | 2 | Costa, et al. |
| 00:10:38 | 3 | So does anyone have |
| 00:10:40 | 4 | anything at this point that they need |
| 00:10:42 | 5 | to bring to the Court's attention? |
| 00:10:42 | 6 | Good.  Thank you.  That's why we had a |
| 00:10:42 | 7 | status conference. |
| 00:10:43 | 8 | Okay. |
| 00:10:48 | 9 | With that in this |
| 00:10:49 | 10 | critical matter affecting the |
| 00:10:52 | 11 | constitutional rights of the people, |
| 00:10:52 | 12 | we will now proceed to hear argument, |
| 00:10:55 | 13 | receive evidence and consider the |
| 00:10:56 | 14 | proposed plans that were timely filed |
| 00:10:59 | 15 | by the parties in Amici on or before |
| 00:11:02 | 16 | January 24th, 2022.  I almost said |
| 00:11:02 | 17 | '20. |
| 00:11:11 | 18 | So would the Carter |
| 00:11:11 | 19 | Petitioners --- counsel for Carter |
| 00:11:11 | 20 | Petitioners, please come to the |
| 00:11:12 | 21 | podium, and you can make your opening |
| 00:11:14 | 22 | argument. |
| 00:11:20 | 23 | ATTORNEY JASRASARIA: |
| 00:11:32 | 24 | Good morning, Your |
| 00:11:32 | 25 | Honor.  And may it please the Court, |

28

| | |
|---|---|
| 00:11:33 | 1 |
| 00:11:34 | 2 |
| 00:11:36 | 3 |
| 00:11:38 | 4 |
| 00:11:41 | 5 |
| 00:11:43 | 6 |
| 00:11:45 | 7 |
| 00:11:47 | 8 |
| 00:11:51 | 9 |
| 00:11:52 | 10 |
| 00:11:54 | 11 |
| 00:11:56 | 12 |
| 00:11:59 | 13 |
| 00:12:01 | 14 |
| 00:12:03 | 15 |
| 00:12:06 | 16 |
| 00:12:10 | 17 |
| 00:12:12 | 18 |
| 00:12:14 | 19 |
| 00:12:16 | 20 |
| 00:12:19 | 21 |
| 00:12:24 | 22 |
| 00:12:24 | 23 |
| 00:12:26 | 24 |
| 00:12:28 | 25 |

my name is Jyoti Jasrasaria, and I
represent the Carter Petitioners who
first filed this lawsuit six weeks
ago.  I'd like to start by thanking
the Court for its time and attention
to this important matter.

This Court is faced with
an unenviable task.  Twelve (12)
parties and Amici have submitted
congressional redistricting plans for
this Court's consideration along with
metrics and arguments on a variety of
factors and the Court must sift
through the data and the arguments to
choose only one.  But fortunately this
Court need not wade into unchartered
territory to accomplish this task, for
it has not one but two Pennsylvania
Court cases that together provide a
roadmap on how to arrive at a fair and
compliant Court adopted redistricting
plan.

Just four years ago the
Pennsylvania Supreme Court adopted the
2018 plan after striking down the

29

| | | |
|---|---|---|
| 00:12:29 | 1 | previous plan as an unconstitutional |
| 00:12:32 | 2 | gerrymander.  There the Court analyzed |
| 00:12:35 | 3 | proposed maps along four factors. |
| 00:12:40 | 4 | Contiguity, population of quality, |
| 00:12:44 | 5 | compactness and respect for political |
| 00:12:44 | 6 | subdivision boundaries. |
| 00:12:47 | 7 | When looking at these |
| 00:12:48 | 8 | four factors in this case, we just see |
| 00:12:51 | 9 | subtle variations among the proposed |
| 00:12:53 | 10 | maps.  The Carter plan is exemplary on |
| 00:12:59 | 11 | all of these measures, but for the |
| 00:13:01 | 12 | most part, all of these maps are |
| 00:13:02 | 13 | contiguous, equally populated, |
| 00:13:02 | 14 | relatively compact and respectful of |
| 00:13:07 | 15 | political subdivisions, so it's |
| 00:13:09 | 16 | difficult to draw distinctions along |
| 00:13:09 | 17 | these measures, and therefore this |
| 00:13:13 | 18 | Court is still left with the question |
| 00:13:15 | 19 | of how to choose a plan. |
| 00:13:16 | 20 | Luckily, the Supreme |
| 00:13:18 | 21 | Court's determination in Mellow V |
| 00:13:21 | 22 | Mitchell supplies the answer.  After a |
| 00:13:23 | 23 | similar impasse between the political |
| 00:13:26 | 24 | branches in 1992, the Court in Mellow |
| 00:13:28 | 25 | upheld the Commonwealth Court's choice |

30

| | |
|---|---|
| 00:13:31 | 1 |
| 00:13:34 | 2 |
| 00:13:37 | 3 |
| 00:13:39 | 4 |
| 00:13:41 | 5 |
| 00:13:45 | 6 |
| 00:13:45 | 7 |
| 00:13:46 | 8 |
| 00:13:48 | 9 |
| 00:13:49 | 10 |
| 00:13:52 | 11 |
| 00:13:54 | 12 |
| 00:13:56 | 13 |
| 00:13:59 | 14 |
| 00:14:01 | 15 |
| 00:14:04 | 16 |
| 00:14:08 | 17 |
| 00:14:11 | 18 |
| 00:14:15 | 19 |
| 00:14:17 | 20 |
| 00:14:19 | 21 |
| 00:14:20 | 22 |
| 00:14:22 | 23 |
| 00:14:25 | 24 |
| 00:14:27 | 25 |

1  of the map and did so by representing
2  that three additional criteria could
3  be considered and these were partisan
4  fairness, communities of interest and
5  preserving the cores of existing
6  districts.
7              On the first two of
8  these factors, partisan fairness and
9  communities of interest, the Carter
10  Petitioners contend that some plans
11  strike a fair and more reasonable
12  balance than others.  In particular,
13  we believe that the Carter plan does
14  well --- very well on these categories
15  and we also believe that some of the
16  plans, notably HB-2146, the voters of
17  Pennsylvania plan, the Citizen Voters
18  plan and the two Reschenthaler plans
19  should not be adopted on these
20  grounds.  But ultimately neither of
21  these two factors either provide a
22  straightforward objective standard for
23  this Court to select just one plan.
24              That leaves only the
25  preserving of the core of existing

31

| | | |
|---|---|---|
| 00:14:31 | 1 | districts, an objective metric that |
| 00:14:32 | 2 | not only follows for <u>Mellow</u>, but is |
| 00:14:34 | 3 | consistent with the least change |
| 00:14:36 | 4 | approach that Court's routinely follow |
| 00:14:38 | 5 | when tasked with taking up |
| 00:14:40 | 6 | redistricting after the political |
| 00:14:43 | 7 | branches have failed to enact a plan, |
| 00:14:47 | 8 | as they did here. |
| 00:14:48 | 9 | As set forth in our |
| 00:14:48 | 10 | papers, and as we will demonstrate |
| 00:14:49 | 11 | during this hearing, the Carter plan |
| 00:14:50 | 12 | performs in the top tier of plans on |
| 00:14:53 | 13 | all of the criteria that I've |
| 00:14:54 | 14 | mentioned. But when you focus in on |
| 00:14:57 | 15 | this final factor preserving the |
| 00:15:00 | 16 | previous core adopted congressional |
| 00:15:00 | 17 | districts, it is in a league of its |
| 00:15:03 | 18 | own. Even after the loss of a |
| 00:15:05 | 19 | Congressional district after this past |
| 00:15:11 | 20 | year's census results, 87 percent of |
| 00:15:12 | 21 | Pennsylvania voters are able to remain |
| 00:15:14 | 22 | in the same district that they were in |
| 00:15:15 | 23 | before, which is significantly higher |
| 00:15:17 | 24 | than the same measure for the next |
| 00:15:20 | 25 | best plan and all of the rest that |

32

| | | |
|---|---|---|
| 00:15:22 | 1 | follow. |
| 00:15:22 | 2 | And this isn't just a |
| 00:15:23 | 3 | percentage that's divorced from |
| 00:15:24 | 4 | reality.  Preserving the cores of |
| 00:15:25 | 5 | districts means continuity for |
| 00:15:30 | 6 | Pennsylvania voters, whose districts |
| 00:15:30 | 7 | have already changed once in the past |
| 00:15:32 | 8 | few years, and it also means |
| 00:15:33 | 9 | recognizing the very unique |
| 00:15:34 | 10 | circumstances that we're in during |
| 00:15:36 | 11 | this current cycle. |
| 00:15:37 | 12 | Today we have a |
| 00:15:38 | 13 | Congressional map that just four years |
| 00:15:40 | 14 | ago the Supreme Court held to be |
| 00:15:43 | 15 | constitutional and superior to all of |
| 00:15:45 | 16 | the many others that it considered. |
| 00:15:48 | 17 | The 2018 map reflects a long record |
| 00:15:51 | 18 | that was developed in the Commonwealth |
| 00:15:53 | 19 | Court and was the result of careful |
| 00:15:54 | 20 | consideration about the same criteria |
| 00:15:56 | 21 | that are at issue today. |
| 00:15:58 | 22 | Of course, due to |
| 00:16:00 | 23 | changes in population that have led to |
| 00:16:02 | 24 | the loss of the Congressional seat, |
| 00:16:04 | 25 | that map can't stand as it is, but it |

33

| | | |
|---|---|---|
| 00:16:06 | 1 | can and should be a starting point. |
| 00:16:08 | 2 | And there is no reason that the Court |
| 00:16:11 | 3 | shouldn't hue as closely as possible |
| 00:16:13 | 4 | to that plan.  Indeed, maintaining |
| 00:16:15 | 5 | fidelity to the 2018 map, while |
| 00:16:19 | 6 | striving to improve on it, on |
| 00:16:21 | 7 | traditional criteria grounds is not |
| 00:16:21 | 8 | just reasonable but worthwhile. |
| 00:16:24 | 9 | The 2018 map is a |
| 00:16:26 | 10 | physical manifestation of the Supreme |
| 00:16:28 | 11 | Court's criteria.  And the Carter |
| 00:16:29 | 12 | Petitioner's choice to build on it |
| 00:16:31 | 13 | paid off on all of the relevant |
| 00:16:33 | 14 | criteria, not just on lease change. |
| 00:16:37 | 15 | To explain the Carter |
| 00:16:38 | 16 | plan in more detail, the Court will |
| 00:16:40 | 17 | soon hear testimony from Doctor |
| 00:16:41 | 18 | Jonathan Rodden, a tenured political |
| 00:16:43 | 19 | science professor at Stanford |
| 00:16:44 | 20 | University, who drew the Carter plan |
| 00:16:45 | 21 | and has been qualified as an expert in |
| 00:16:48 | 22 | many redistricting voting and election |
| 00:16:51 | 23 | cases.  He'll explain his plan, how he |
| 00:16:54 | 24 | developed it, why he made certain |
| 00:16:57 | 25 | choices and how his map compares with |

34

00:17:01   1    the others before this Court on a

00:17:01   2    variety of metrics.

00:17:01   3                Based on all of the

00:17:02   4    evidence the Carter Petitioners submit

00:17:03   5    that their plan is the one that best

00:17:05   6    matches or improves upon the core

00:17:07   7    approved 2018 plans compliance with

00:17:12   8    traditional redistricting criteria, as

00:17:13   9    well as partisan fairness, preserving

00:17:16   10   communities of interest and retaining

00:17:18   11   more of that plan than any other

00:17:19   12   submissions.

00:17:20   13               The Carter Petitioners

00:17:21   14   respectfully submit that this Court

00:17:23   15   adopt the Carter plan in full.  And as

00:17:26   16   to the election deadline matter, we

00:17:29   17   agree that the Court has authority to

00:17:32   18   move election deadlines but do not

00:17:34   19   think that that will be necessary.

00:17:36   20   Thank you.

00:17:37   21               JUDGE McCULLOUGH:

00:17:37   22               Thank you very much,

00:17:39   23   Counsel.

           24               Okay.

           25               So now Counsel for

35

1    Petitioners Gressman.

2                ATTORNEY RING-AMUNSON:

3                Thank you, Your Honor.

4    Good morning, and may it please the

5    Court.  My name is Jessica

00:18:05    6    Ring-Amunson, and I represent the

00:18:07    7    Gressman Math Science Petitioners.

00:18:07    8                At the outset and on

00:18:09    9    behalf of our clients, I want to thank

00:18:10   10    the Court for the time and attention

00:18:13   11    it is devoting to this most important

00:18:15   12    matter, and also to thank the

00:18:17   13    courtroom staff.  I want to thank the

00:18:18   14    Court, in particular, for expediting

00:18:19   15    our petition.  And I will say that,

00:18:22   16    although I'm appearing before the

00:18:25   17    Court pro hac vice, as someone who was

00:18:27   18    born and raised in Jenkintown and

00:18:30   19    Montgomery County, I am also very

00:18:30   20    personally grateful to the Court.

00:18:32   21                At the outset I want to

00:18:35   22    tell you a little bit about our

00:18:37   23    clients.  They are 12 professors of

00:18:39   24    mathematics, statistics, geography and

00:18:42   25    data science at some of Pennsylvania's

36

| | | |
|---|---|---|
| 00:18:44 | 1 | leading colleges and universities. |
| 00:18:46 | 2 | They include the chairs of the |
| 00:18:49 | 3 | Mathematic Departments at Saint Joe's, |
| 00:18:53 | 4 | Lehigh and Lafayette.  They have won |
| 00:18:54 | 5 | numerous honors and recognitions from |
| 00:18:57 | 6 | organizations, such as the National |
| 00:18:59 | 7 | Science Foundation, the American |
| 00:19:02 | 8 | Mathematical Society and the American |
| 00:19:02 | 9 | Statistical Association. |
| 00:19:04 | 10 | But beyond their |
| 00:19:05 | 11 | impressive credentials in fields |
| 00:19:07 | 12 | related to redistricting, they are |
| 00:19:10 | 13 | also Pennsylvania voters, who care |
| 00:19:12 | 14 | deeply about ensuring that the |
| 00:19:15 | 15 | Congressional redistricting process is |
| 00:19:19 | 16 | fair to all Pennsylvanians. |
| 00:19:19 | 17 | The Gressman Petitioners |
| 00:19:21 | 18 | are the only parties before this Court |
| 00:19:23 | 19 | who are not here to advance the agenda |
| 00:19:26 | 20 | of a particular political party or |
| 00:19:28 | 21 | incumbent office holder.  I personally |
| 00:19:32 | 22 | do not even know the political |
| 00:19:34 | 23 | affiliation of my clients.  I do know |
| 00:19:37 | 24 | that they're not here to argue on |
| 00:19:40 | 25 | behalf of Republicans or Democrats. |

37

00:19:42  1    They're not here to engage in a power

00:19:45  2    struggle between the legislative

00:19:48  3    branch and the executive branch.

00:19:51  4    They're not here to advocate for the

00:19:52  5    interests of either federal or state

00:19:54  6    incumbent officeholders.

00:19:54  7         They're here for one

00:20:02  8    reason and one reason only.  They want

00:20:02  9    a map that is fair to all Pennsylvania

00:20:04  10   voters.  And in 2018 the Supreme Court

00:20:07  11   provided explicit guidance about how

00:20:10  12   to ensure that a map is fair to

00:20:13  13   Pennsylvania voters.  First the court

00:20:17  14   said make sure that the map is compact

00:20:18  15   and contiguous, as nearly equal in

00:20:20  16   population as practicable and does not

00:20:21  17   divide any county, city, incorporated

00:20:26  18   town, borough, township or ward more

00:20:30  19   than is absolutely necessary to

00:20:31  20   achieve a quality of population.

00:20:33  21        But the Court was

00:20:33  22   equally clear that achieving those

00:20:36  23   neutral criteria was a floor not a

00:20:39  24   ceiling.  Our remedial plan must also

00:20:43  25   fulfill the overarching objective of

38

00:20:45  1    the free and equal elections clause,

00:20:47  2    and that is to ensure that each

00:20:50  3    person's vote in the selection of

00:20:51  4    representatives for Congress is

00:20:53  5    equalized, quote, to the greatest

00:20:56  6    degree possible with all other

00:20:59  7    Pennsylvania citizens.

00:21:01  8              The Supreme Court also

00:21:02  9    explained how one might achieve these

00:21:04  10   objectives, and specifically the Court

00:21:07  11   said that advances in technology can

00:21:09  12   be used to, quote, aid in the

00:21:11  13   expeditious development of districting

00:21:14  14   maps, the boundaries of which are

00:21:15  15   drawn to scrupulously adhere to these

00:21:19  16   neutral criteria.

00:21:21  17              Along with their

00:21:22  18   experts, the Gressman Petitioners have

00:21:25  19   used these advances in technology and

00:21:27  20   specifically advances in the

00:21:29  21   relatively new field of computational

00:21:31  22   redistricting to generate a map that

00:21:33  23   scrupulously adheres to these neutral

00:21:36  24   criteria.  As we explained in our

00:21:38  25   brief, computational redistricting

39

| | | |
|---|---|---|
| 00:21:41 | 1 | works by using algorithms to optimize |
| 00:21:44 | 2 | compliance with multiple legal |
| 00:21:49 | 3 | requirements simultaneously. |
| 00:21:49 | 4 | High performance |
| 00:21:52 | 5 | computers can turn out literally |
| 00:21:52 | 6 | millions of maps and evaluate how they |
| 00:21:55 | 7 | perform in seconds to find the ones |
| 00:21:57 | 8 | that best comply with the neutral |
| 00:22:02 | 9 | criteria.  It allows the exploration |
| 00:22:02 | 10 | of alternatives and trade offs in ways |
| 00:22:03 | 11 | that hand drawn maps simply cannot do. |
| 00:22:05 | 12 | And all of the other maps before the |
| 00:22:07 | 13 | Court are hand drawn. |
| 00:22:09 | 14 | A comparison to both the |
| 00:22:12 | 15 | baseline plan and all of the other |
| 00:22:13 | 16 | parties show our computational |
| 00:22:13 | 17 | redistricting process was tremendously |
| 00:22:21 | 18 | successful.  Our plan consists of |
| 00:22:22 | 19 | compact and contiguous territory.  The |
| 00:22:24 | 20 | districts are not only easily visually |
| 00:22:27 | 21 | compact, nothing like Goofy kicking |
| 00:22:28 | 22 | Donald Duck here, but also superior or |
| 00:22:31 | 23 | comparable to all of the other |
| 00:22:34 | 24 | parties' plans on the various measures |
| 00:22:36 | 25 | of compactness. |

40

| | | |
|---|---|---|
| 00:22:36 | 1 | To be sure, just as in |
| 00:22:39 | 2 | League of Women Voters, there are |
| 00:22:39 | 3 | variations in how the parties measure |
| 00:22:42 | 4 | compactness, but by any measure, our |
| 00:22:43 | 5 | plans are compact and contiguous. Our |
| 00:22:46 | 6 | plan is as nearly equal in population |
| 00:22:48 | 7 | as possible. There is a one-person |
| 00:22:50 | 8 | deviation between the largest and |
| 00:22:52 | 9 | smallest districts, the lowest you can |
| 00:22:56 | 10 | go. And our plan out performs all of |
| 00:22:58 | 11 | the other parties' plans on the |
| 00:22:59 | 12 | requirement not to divide any county |
| 00:23:01 | 13 | city, town, borough, township or ward |
| 00:23:04 | 14 | except where absolutely necessary to |
| 00:23:07 | 15 | achieve a quality of population. |
| 00:23:09 | 16 | Indeed our plan vastly |
| 00:23:10 | 17 | improves on the performance of even |
| 00:23:12 | 18 | the 2018 map on this metric whereas |
| 00:23:15 | 19 | the 2018 map split 72 total political |
| 00:23:18 | 20 | subdivisions our map divides just 49. |
| 00:23:23 | 21 | The lowest number of all the parties. |
| 00:23:26 | 22 | And importantly our plan achieves this |
| 00:23:28 | 23 | while ensuring that there is no |
| 00:23:30 | 24 | partisan vote dilution and that all |
| 00:23:32 | 25 | voters have an equal opportunity to |

41

```
00:23:34   1    translate their votes into
00:23:35   2    representation.
00:23:37   3              I recognize there's a
00:23:39   4    lot of terminology in the briefs about
00:23:40   5    the various measures of partisan
00:23:44   6    fairness, mean median and efficiency
00:23:45   7    gap, and majoritarian outcomes, et
00:23:48   8    cetera, but they're all getting at the
00:23:49   9    same thing, that the Supreme Court
00:23:51  10    opinion, is this plan fair?  Will it
00:23:56  11    allow voters across the state to
00:23:59  12    translate their votes into
00:24:00  13    representation, or does the plan
00:24:02  14    reward a party that does not receive
00:24:04  15    the majority of votes statewide with a
00:24:07  16    majority of the Congressional
00:24:09  17    delegation?
00:24:11  18              Our plan is the most
00:24:13  19    fair to Pennsylvania voters, but you
00:24:16  20    don't have to take my word for it.
00:24:18  21    One of the other parties experts, the
00:24:22  22    Senate Democrats experts, Doctor
00:24:25  23    Caughney put in the information about
00:24:27  24    a publicly available website called
00:24:29  25    Plan Score.  When you put all of the
```

42

| | | |
|---|---|---|
| 00:24:30 | 1 | parties plans into Plan Score our map |
| 00:24:35 | 2 | scores the best as treating |
| 00:24:36 | 3 | Pennsylvania voters fairly and |
| 00:24:39 | 4 | symmetrically. |
| 00:24:43 | 5 | Conspicuously, that |
| 00:24:44 | 6 | expert when he did his analysis ran |
| 00:24:46 | 7 | all of the other parties plans but not |
| 00:24:48 | 8 | ours.  There's a reason that the other |
| 00:24:50 | 9 | parties are not talking about our |
| 00:24:53 | 10 | plan, it beats theirs.  That our plan |
| 00:24:57 | 11 | is best in achieving optimal partisan |
| 00:24:59 | 12 | fairness should not be surprising, |
| 00:25:01 | 13 | because our clients are the only |
| 00:25:03 | 14 | non-partisan party before this Court, |
| 00:25:05 | 15 | and they care only about ensuring that |
| 00:25:08 | 16 | the Court adopts a map that's fair to |
| 00:25:10 | 17 | all Pennsylvanians regardless of their |
| 00:25:12 | 18 | political affiliation. |
| 00:25:18 | 19 | Ensuring the adoption of |
| 00:25:19 | 20 | a politically fair and legally |
| 00:25:19 | 21 | compliant map that scrupulously |
| 00:25:23 | 22 | adheres to the neutral redistricting |
| 00:25:24 | 23 | criteria is particularly important, |
| 00:25:25 | 24 | whereas here the Court is, as the |
| 00:25:28 | 25 | Supreme Court put it in Mellow, thrust |

43

| | |
|---|---|
| 00:25:30 | 1 |
| 00:25:33 | 2 |
| 00:25:36 | 3 |
| 00:25:40 | 4 |
| 00:25:43 | 5 |
| 00:25:45 | 6 |
| 00:25:47 | 7 |
| 00:25:48 | 8 |
| 00:25:50 | 9 |
| 00:25:53 | 10 |
| 00:25:54 | 11 |
| 00:25:56 | 12 |
| 00:25:58 | 13 |
| 00:26:01 | 14 |
| 00:26:04 | 15 |
| 00:26:06 | 16 |
| 00:26:09 | 17 |
| 00:26:12 | 18 |
| 00:26:14 | 19 |
| 00:26:14 | 20 |
| 00:26:15 | 21 |
| 00:26:22 | 22 |
| 00:26:24 | 23 |
| 00:26:37 | 24 |
| 00:26:37 | 25 |

1  into this role with no other feasible
2  option except to take one entire plan
3  or the other.  Simply put, our plan is
4  the Court's best option.  If the Court
5  chooses our plan, the Court doesn't
6  have to choose between Democrats and
7  Republicans.  The Court doesn't have
8  to choose between the legislative
9  branch and the executive branch.  The
10  Court doesn't have to choose between
11  the House and the Senate.  The Court
12  doesn't have to choose between Federal
13  and State office holders.  Instead,
14  the Court can simply choose the best
15  plan.  And we respectfully ask that
16  the Court adopt the Gressman Math
17  Science Plan to remedy the
18  malapportionment claims before it.
19  Thank you.
20                    JUDGE McCULLOUGH:
21            Thank you, Counsel.
22  Counsel now for Acting Secretary ---
23  or Secretary Chapman.
24                    ATTORNEY WIYGUL:
25            Good morning, Your

44

00:26:38 1    Honor.  Robert Wiygul.  Just a note of
00:26:38 2    clarification, I represent, as the
00:26:41 3    Court is aware, both Respondents, the
00:26:41 4    Secretary of the Commonwealth and the
00:26:43 5    Director of Election Services and
00:26:45 6    Notaries and Intervenor Respondent
00:26:50 7    Governor Wolf.
00:26:51 8              The Respondents, the
00:26:51 9    Secretary, the Department of State,
00:26:54 10   have not proposed a map in this
00:26:55 11   litigation.  The Governor, however,
00:26:57 12   has.  And so if it pleases the Court,
00:26:59 13   I will now present an opening
00:27:01 14   statement on behalf of the Governor.
00:27:03 15              JUDGE McCULLOUGH:
00:27:03 16              Okay.
00:27:03 17              So you're not making an
00:27:05 18   opening on behalf on behalf of
00:27:07 19   Secretary Chapman.
00:27:07 20              ATTORNEY WIYGUL:
00:27:07 21              That is correct, Your
00:27:08 22   Honor.
00:27:08 23              JUDGE McCULLOUGH:
00:27:08 24              Okay.  You were next
00:27:08 25   anyway, so you may proceed.

45

| | | |
|---|---|---|
| 00:27:09 | 1 | A T T O R N E Y   W I Y G U L : |
| 00:27:10 | 2 | On one level the |
| 00:27:11 | 3 | redistricting process is a matter of |
| 00:27:13 | 4 | line drawing and division.  Thirteen |
| 00:27:16 | 5 | (13) million Pennsylvanians need to be |
| 00:27:18 | 6 | divided up into 17 different |
| 00:27:20 | 7 | districts.  But redistricting is also |
| 00:27:22 | 8 | a process in which every ten years we |
| 00:27:24 | 9 | are asked to recommit ourselves to the |
| 00:27:26 | 10 | basic principles of our democracy.  As |
| 00:27:29 | 11 | our Supreme Court said in 2018, a |
| 00:27:31 | 12 | healthy representative democracy |
| 00:27:34 | 13 | requires that all voters have an equal |
| 00:27:36 | 14 | opportunity to translate their votes |
| 00:27:38 | 15 | into representation.  All too often in |
| 00:27:41 | 16 | Pennsylvania history that requirement |
| 00:27:42 | 17 | has not been met.  Instead, |
| 00:27:45 | 18 | Pennsylvanians have voted under a |
| 00:27:47 | 19 | district map that entrenched a |
| 00:27:47 | 20 | structural partisan advantage.  Such a |
| 00:27:53 | 21 | map produces the same electoral |
| 00:27:53 | 22 | results despite changes in voter |
| 00:27:53 | 23 | preferences and systematically awards |
| 00:27:58 | 24 | more than 50 percent of the |
| 00:27:59 | 25 | Congressional seats to a party winning |

46

00:28:04    1    less than 50 percent of the votes.  As

00:28:07    2    the Supreme Court has noted, that kind

00:28:08    3    of biased map leads to a government

00:28:09    4    that is neither responsive nor

00:28:12    5    accountable to Pennsylvania voters and

00:28:14    6    it discourages voters from

00:28:15    7    participating in elections.

00:28:17    8             In 2018, in a case called

00:28:18    9    League of Women Voters, the

00:28:19   10    Pennsylvania Supreme Court struck down

00:28:20   11    the then existing Congressional map

00:28:23   12    because it was fundamentally unfair.

00:28:25   13    Because that map was skewed in favor

00:28:28   14    of certain political parties, it did

00:28:30   15    not give all voters an equal

00:28:33   16    opportunity to translate their votes

00:28:35   17    into representation and it, therefore,

00:28:38   18    violated the Pennsylvania

00:28:39   19    Constitution.

00:28:40   20             As the Court pointed out

00:28:41   21    at the beginning of this hearing, this

00:28:42   22    case is different from League of Women

00:28:45   23    Voters in an important way.  In the

00:28:47   24    League of Women Voters case the

00:28:49   25    question was whether a map passed by

47

| | | |
|---|---|---|
| 00:28:50 | 1 | the General Assembly and signed by the |
| 00:28:52 | 2 | Governor violated the Constitution and |
| 00:28:53 | 3 | should therefore, be thrown out and |
| 00:28:55 | 4 | replaced by the Courts.  This case |
| 00:28:57 | 5 | does not ask the Court to decide |
| 00:29:00 | 6 | whether a given map is |
| 00:29:02 | 7 | unconstitutional.  Here, everyone |
| 00:29:04 | 8 | agrees that Pennsylvania has to have a |
| 00:29:06 | 9 | new map and the Court's task is to |
| 00:29:08 | 10 | determine what map would be best. |
| 00:29:09 | 11 | Ideally, Pennsylvania's |
| 00:29:12 | 12 | new map would be enacted as a piece of |
| 00:29:15 | 13 | legislation passed by the General |
| 00:29:18 | 14 | Assembly and approved by the Governor. |
| 00:29:19 | 15 | The Governor's role in that process is |
| 00:29:22 | 16 | an important one because, unlike the |
| 00:29:24 | 17 | members of the Pennsylvania General |
| 00:29:25 | 18 | Assembly, the Governor is elected by |
| 00:29:27 | 19 | all Pennsylvania voters.  Governor |
| 00:29:29 | 20 | Wolf has taken this role seriously. |
| 00:29:29 | 21 | While waiting for the General Assembly |
| 00:29:29 | 22 | to present a bill for his review, he |
| 00:29:34 | 23 | has consistently advocated for a fair |
| 00:29:36 | 24 | and transparent redistricting process. |
| 00:29:39 | 25 | In September of last year |

48

00:29:40   1   he created the Pennsylvania

00:29:42   2   Redistricting Advisory Council.  The

00:29:44   3   council, after accepting testimony

00:29:45   4   from the public, issued a set of

00:29:47   5   public redistricting principles to

00:29:50   6   guide the Governor's review of any

00:29:54   7   map.  Moreover, during the General

00:29:59   8   Assembly's deliberations, the Governor

00:29:59   9   has provided public feedback on

00:30:00   10   proposed maps, highlighting examples

00:30:00   11   that are consistent with the

00:30:03   12   redistricting principles, free of

00:30:04   13   unfair partisan advantage and in full

00:30:06   14   accord with the law.

00:30:08   15           Unfortunately, despite

00:30:10   16   receiving the new census data in

00:30:12   17   August 2021, the General Assembly did

00:30:14   18   not pass any map until this week, just

00:30:17   19   days before this hearing was scheduled

00:30:18   20   to begin.  Even more unfortunate,

00:30:22   21   instead of endorsing an even-handed

00:30:24   22   map commanding bipartisan support, the

00:30:24   23   General Assembly has rammed through on

00:30:26   24   party line votes a map that

00:30:29   25   fundamentally fails the test of

49

00:30:33    1    fairness and does not comply with the

00:30:34    2    redistricting principles.

00:30:34    3              As the Governor has

00:30:35    4    previously made clear, that map is

00:30:37    5    unacceptable.  He could not in good

00:30:40    6    conscience sign it into law.  As a

00:30:41    7    result, it now falls to the courts to

00:30:43    8    give Pennsylvanians the fair map they

00:30:45    9    deserve.

00:30:46   10              The Supreme Court showed

00:30:48   11    the way in League of Women Voters.  It

00:30:51   12    identified certain neutral benchmarks

00:30:53   13    that provide a floor of protection

00:30:54   14    against unfair districting, including

00:30:56   15    equality of population, contiguity,

00:31:00   16    compactness and respect for the

00:31:01   17    boundaries of political subdivisions,

00:31:03   18    as counsel had previously identified.

00:31:05   19    But the Court made clear that these

00:31:07   20    criteria are only a floor.  Put

00:31:11   21    differently, though many plans may

00:31:12   22    satisfy these criteria, not all are

00:31:13   23    fair, not all provide a level

00:31:15   24    political playing field.  The

00:31:17   25    Governor's map does both, as will be

50

| 00:31:19 | 1 | shown by the evidence in this hearing, |
| 00:31:21 | 2 | including, in particular, testimony |
| 00:31:23 | 3 | from the Governor's expert witness, |
| 00:31:26 | 4 | Doctor Moon Duchin of Tufts |
| 00:31:26 | 5 | University, a renown mathematician and |
| 00:31:30 | 6 | leading redistricting expert.  That |
| 00:31:33 | 7 | evidence will show that the Governor's |
| 00:31:34 | 8 | map easily satisfies criteria.  It |
| 00:31:37 | 9 | also does an exemplary job of |
| 00:31:40 | 10 | protecting communities of interest and |
| 00:31:41 | 11 | protecting the cores of the previous |
| 00:31:44 | 12 | districts established by the Supreme |
| 00:31:46 | 13 | Court, which, as Counsel mentioned |
| 00:31:47 | 14 | earlier, are other factors that our |
| 00:31:49 | 15 | Supreme Court has considered.  But the |
| 00:31:51 | 16 | Governor's map does not rest on this |
| 00:31:53 | 17 | floor.  It realizes the prediction of |
| 00:31:55 | 18 | the Supreme Court in League of Women |
| 00:31:57 | 19 | Voters, which anticipated that |
| 00:31:59 | 20 | technology and computing power could |
| 00:32:02 | 21 | make it easier to create fair maps. |
| 00:32:02 | 22 | Thanks to these tools, it is possible |
| 00:32:04 | 23 | to achieve fairness, to avoid maps in |
| 00:32:06 | 24 | which parties winning less than |
| 00:32:08 | 25 | 50 percent of the votes systematically |

51

| | | |
|---|---|---|
| 00:32:11 | 1 | win more than 50 percent of the seats |
| 00:32:13 | 2 | without sacrificing the benchmark |
| 00:32:17 | 3 | criteria. |
| 00:32:18 | 4 | The evidence will show |
| 00:32:19 | 5 | that the Governor's map is among the |
| 00:32:20 | 6 | best of the maps presented to the |
| 00:32:21 | 7 | Court at satisfying the traditional |
| 00:32:25 | 8 | criteria and among that first tier |
| 00:32:26 | 9 | does the best job of protecting |
| 00:32:28 | 10 | fairness and ensuring that every |
| 00:32:30 | 11 | Pennsylvania voter has an equal |
| 00:32:31 | 12 | opportunity to elect the candidate of |
| 00:32:36 | 13 | his or her choice. |
| 00:32:37 | 14 | Some of the parties |
| 00:32:38 | 15 | before the Court, including the House |
| 00:32:38 | 16 | and Senate Republicans, suggest that |
| 00:32:41 | 17 | Pennsylvania geography unavoidably |
| 00:32:44 | 18 | entrenches partisan advantage.  The |
| 00:32:46 | 19 | Governor's map and the evidence to be |
| 00:32:47 | 20 | presented at this hearing demonstrates |
| 00:32:48 | 21 | that is wrong.  The Commonwealth can |
| 00:32:50 | 22 | have a map that amply satisfies the |
| 00:32:54 | 23 | traditional redistricting criteria and |
| 00:32:57 | 24 | establishes a level political playing |
| 00:32:59 | 25 | field,  safeguarding the basic |

52

| | |
|---|---|
| 00:33:00 | 1 |
| 00:33:03 | 2 |
| 00:33:03 | 3 |
| 00:33:05 | 4 |
| 00:33:07 | 5 |
| 00:33:08 | 6 |
| 00:33:11 | 7 |
| 00:33:11 | 8 |
| 00:33:24 | 9 |

1   principles of democracy and ensuring

2   that elected representatives are

3   responsive and accountable to the

4   voters they serve.  We respectfully

5   submit that Pennsylvania voters

6   deserve no less.  Thank you.

7                  JUDGE McCULLOUGH:

8                  Thank you, Counsel.

9   Next is Counsel for Republican

10  Legislative Intervenors, Senator

11  Corman.

12                 ATTORNEY TUCKER:

13                 Your Honor, if it's

14  preferable to the Court, Robert Tucker

15  from BakerHostetler.  I represent the

16  House Republicans that are

17  Intervenors.  I was going to present

18  first and Mr. Holtzman, on behalf of

19  the Senate, was going to present after

20  me if that is okay.

21                 JUDGE MCCULLOUGH:

22                 That's fine.

23                 ATTORNEY TUCKER:

24                 Good morning, Your

25  Honor.  And I'd also like to thank the

53

| | | |
|---|---|---|
| 00:33:36 | 1 | Court for its time, and particularly |
| 00:33:49 | 2 | the staff for setting everything up |
| 00:33:49 | 3 | for us this morning. |
| 00:33:52 | 4 | As Your Honor recognized |
| 00:33:53 | 5 | in her opening remarks, both the |
| 00:33:55 | 6 | United States and Pennsylvania |
| 00:33:55 | 7 | Constitutions task the legislature |
| 00:34:01 | 8 | with redrawing Pennsylvania's |
| 00:34:02 | 9 | Congressional Districts.  This is the |
| 00:34:05 | 10 | General Assembly's prerogative.  Even |
| 00:34:06 | 11 | with census delays, the General |
| 00:34:09 | 12 | Assembly has now passed its |
| 00:34:11 | 13 | congressional redistricting plan, |
| 00:34:11 | 14 | House Bill 2146, but the Governor has |
| 00:34:15 | 15 | inexplicably vetoed it.  The evidence |
| 00:34:18 | 16 | that has been submitted to this Court |
| 00:34:20 | 17 | and that will be further submitted at |
| 00:34:21 | 18 | this hearing demonstrates |
| 00:34:23 | 19 | unequivocally that the plan passed by |
| 00:34:27 | 20 | the General Assembly adheres to |
| 00:34:30 | 21 | traditional redistricting criteria. |
| 00:34:31 | 22 | Indeed, Carter |
| 00:34:33 | 23 | Petitioners recognize that in their |
| 00:34:34 | 24 | opening and many of the experts in |
| 00:34:35 | 25 | their reports recognize that all of |

54

| | | |
|---|---|---|
| 00:34:36 | 1 | the plans, including HB-2146 adhere to |
| 00:34:40 | 2 | traditional redistricting criteria. |
| 00:34:45 | 3 | HB-2146 has at most plus minus one |
| 00:34:49 | 4 | person population deviation. It is as |
| 00:34:54 | 5 | compact or close to compact as all of |
| 00:34:55 | 6 | the other submitted maps as well as |
| 00:34:55 | 7 | the map adopted by the Supreme Court |
| 00:34:58 | 8 | in 2018 and it splits nearly the same |
| 00:35:01 | 9 | number or fewer number of counties, |
| 00:35:03 | 10 | municipalities and precincts as both |
| 00:35:06 | 11 | the 2018 map and the other maps |
| 00:35:08 | 12 | submitted to this court. Indeed, it |
| 00:35:10 | 13 | actually fits --- splits the fewest |
| 00:35:13 | 14 | number of precincts of any of the |
| 00:35:17 | 15 | submitted maps. None of the other |
| 00:35:19 | 16 | parties can or will dispute these |
| 00:35:19 | 17 | points during this hearing. |
| 00:35:21 | 18 | Put simply, the General |
| 00:35:22 | 19 | Assembly's map adheres to traditional |
| 00:35:25 | 20 | redistricting criteria. Moreover, the |
| 00:35:27 | 21 | evidence has already been submitted |
| 00:35:29 | 22 | and that will be submitted during this |
| 00:35:32 | 23 | hearing reflects that the map passed |
| 00:35:32 | 24 | by the General Assembly is a fair map |
| 00:35:34 | 25 | to both political parties. |

55

| | | |
|---|---|---|
| 00:35:35 | 1 | You will hear from the |
| 00:35:36 | 2 | testimony of Doctor Michael Barber, |
| 00:35:38 | 3 | who will demonstrate that HB-2146 is |
| 00:35:42 | 4 | predicted to result in nine Democratic |
| 00:35:45 | 5 | leaning seats and eight Republican |
| 00:35:49 | 6 | leaning sets, one more Democratic |
| 00:35:51 | 7 | leaning seat than the most common |
| 00:35:52 | 8 | outcome in its 50,000 unbiased maps |
| 00:35:56 | 9 | using only traditional redistricting |
| 00:35:59 | 10 | criteria and no partisan data.  By any |
| 00:36:02 | 11 | account that is a fair map.  More over |
| 00:36:04 | 12 | HB-2146 compares five seats |
| 00:36:10 | 13 | significantly more than many of the |
| 00:36:13 | 14 | other maps.  Now if this --- that the |
| 00:36:15 | 15 | General Assembly has passed a map |
| 00:36:17 | 16 | traditional redistricting and is |
| 00:36:19 | 17 | generally fair that is where this |
| 00:36:20 | 18 | Court searches for a map should end. |
| 00:36:23 | 19 | HB-2146 now passed by the full General |
| 00:36:27 | 20 | Assembly is the only plan that has |
| 00:36:29 | 21 | undergone a full transparence and |
| 00:36:36 | 22 | deliberative legislative process. |
| 00:36:37 | 23 | This is a map that was initially drawn |
| 00:36:38 | 24 | by a citizen, was then selected by the |
| 00:36:40 | 25 | Pennsylvania House of Representatives |

56

| | |
|---|---|
| 00:36:42 | 1 |
| 00:36:44 | 2 |
| 00:36:47 | 3 |
| 00:36:49 | 4 |
| 00:36:51 | 5 |
| 00:36:53 | 6 |
| 00:36:55 | 7 |
| 00:36:58 | 8 |
| 00:36:59 | 9 |
| 00:37:00 | 10 |
| 00:37:02 | 11 |
| 00:37:06 | 12 |
| 00:37:06 | 13 |
| 00:37:06 | 14 |
| 00:37:06 | 15 |
| 00:37:13 | 16 |
| 00:37:14 | 17 |
| 00:37:15 | 18 |
| 00:37:16 | 19 |
| 00:37:18 | 20 |
| 00:37:20 | 21 |
| 00:37:22 | 22 |
| 00:37:23 | 23 |
| 00:37:25 | 24 |
| 00:37:27 | 25 |

1  as a map that followed traditional
2  redistricting criteria, passed with
3  few changes and then after
4  deliberations in the Senate passed
5  unchanged. And the changes that were
6  made in the House were based upon
7  public input received during this open
8  and transparent process.
9           This is still intended to
10  be a political process and one that
11  the Court should only intrude into if
12  necessary to prevent a trampling of
13  constitutional rights or where, as
14  here, it is forced to, because of an
15  impasse resulting from Governor's
16  inexplicable and outright refusal to
17  sign a fair map.
18           There will be no
19  demonstration that the map passed by
20  the General Assembly does not pass
21  constitutional muster. Rather, as
22  you've already heard this morning,
23  Your Honor, the other parties will
24  simply submit our map is better. This
25  Court need not and should not turn

57

| | | |
|---|---|---|
| 00:37:30 | 1 | this into a beauty contest of |
| 00:37:32 | 2 | selecting the, quote, unquote, |
| 00:37:34 | 3 | prettiest map.  Rather, this Court |
| 00:37:37 | 4 | should defer to the General Assembly |
| 00:37:38 | 5 | in determining the policy choices |
| 00:37:40 | 6 | necessarily involved in the drawing of |
| 00:37:42 | 7 | Congressional districting lines |
| 00:37:45 | 8 | regardless of any veto by the |
| 00:37:45 | 9 | Governor.  This Court should not allow |
| 00:37:51 | 10 | one person to hold hostage a fair plan |
| 00:37:52 | 11 | passed by the elected Representatives |
| 00:37:54 | 12 | and Senators of the people of |
| 00:37:55 | 13 | Pennsylvania. |
| 00:37:56 | 14 | The United States Supreme |
| 00:37:58 | 15 | Court determined that it did not want |
| 00:37:59 | 16 | to wade into the political thicket of |
| 00:38:02 | 17 | restricting, and for good reason.  The |
| 00:38:02 | 18 | next two days are going to demonstrate |
| 00:38:07 | 19 | why.  The Court is going to see a |
| 00:38:10 | 20 | parade of political scientists and |
| 00:38:11 | 21 | mathematicians all opining that they |
| 00:38:13 | 22 | have the best way of drawing a fair |
| 00:38:15 | 23 | map.  They each have the best super |
| 00:38:15 | 24 | computer.  They have the best |
| 00:38:18 | 25 | algorithm of determining out what's a |

58

| | | |
|---|---|---|
| 00:38:18 | 1 | fair map.  But that is not what this |
| 00:38:20 | 2 | process is supposed to be about.  Fair |
| 00:38:23 | 3 | is in the eye of the beholder and |
| 00:38:26 | 4 | determined on how you define fair. |
| 00:38:28 | 5 | There are more ways to draw a |
| 00:38:30 | 6 | Congressional district map in |
| 00:38:31 | 7 | Pennsylvania than there are atoms in |
| 00:38:33 | 8 | the universe.  There is no good way to |
| 00:38:36 | 9 | pick the best map because there is no |
| 00:38:37 | 10 | best map. |
| 00:38:40 | 11 | Inevitably, some counties |
| 00:38:42 | 12 | and municipalities have to be divided |
| 00:38:45 | 13 | and the decisions on which political |
| 00:38:47 | 14 | subdivisions are split are at the |
| 00:38:47 | 15 | behest of the map drawer.  One map |
| 00:38:50 | 16 | might be favorable to a particular |
| 00:38:51 | 17 | group of citizens while splitting a |
| 00:38:53 | 18 | different community of interest.  That |
| 00:38:55 | 19 | is why these are policy choices |
| 00:38:58 | 20 | delegated to the Representatives and |
| 00:39:01 | 21 | Senators elected by the people of |
| 00:39:03 | 22 | Pennsylvania. |
| 00:39:03 | 23 | Again, what is fair? |
| 00:39:04 | 24 | I'll refer to a recent Decision from |
| 00:39:07 | 25 | the Wisconsin Supreme Court, Your |

59

| | | |
|---|---|---|
| 00:39:11 | 1 | Honor, that struggled with this exact |
| 00:39:11 | 2 | problem when they found what |
| 00:39:13 | 3 | constitutes a fair map poses an |
| 00:39:14 | 4 | entirely subjective question with no |
| 00:39:16 | 5 | governing standards grounded in law. |
| 00:39:19 | 6 | Deciding among different versions of |
| 00:39:20 | 7 | fairness poses basic questions that |
| 00:39:22 | 8 | are political, not legal. |
| 00:39:24 | 9 | Some parties will argue |
| 00:39:26 | 10 | that strict adherence to traditional |
| 00:39:27 | 11 | redistricting principles is unfair to |
| 00:39:29 | 12 | Democrats because their supporters are |
| 00:39:32 | 13 | more densely concentrated in cities |
| 00:39:35 | 14 | and have urged the Court to adopt |
| 00:39:35 | 15 | plans that negate that advantage and |
| 00:39:38 | 16 | to seek instead a map that yields |
| 00:39:39 | 17 | proportional representation. This |
| 00:39:40 | 18 | argument unmasks their partisan |
| 00:39:40 | 19 | motivations and their pleas for |
| 00:39:40 | 20 | partisan favoritism should be soundly |
| 00:39:50 | 21 | rejected because drawing lines |
| 00:39:51 | 22 | expressly for political gain is, by |
| 00:39:56 | 23 | definition, gerrymandering. |
| 00:39:57 | 24 | Regardless, the maps submitted by the |
| 00:39:57 | 25 | Petitioners, the Governor and the |

60

| | | |
|---|---|---|
| 00:40:00 | 1 | Democratic caucuses go well past |
| 00:40:01 | 2 | correcting this disadvantage and are |
| 00:40:03 | 3 | all predicted, as Doctor Barber will |
| 00:40:05 | 4 | testify, to result in ten Democratic |
| 00:40:09 | 5 | leaning seats and seven Republican |
| 00:40:10 | 6 | leaning seats.  That isn't |
| 00:40:12 | 7 | proportional in any way and goes way |
| 00:40:14 | 8 | correcting any potential geographic |
| 00:40:18 | 9 | disadvantage.  Make no mistake, those |
| 00:40:18 | 10 | are gerrymanderers in favor of |
| 00:40:18 | 11 | Democrats. |
| 00:40:21 | 12 | Nothing in the |
| 00:40:22 | 13 | Pennsylvania Constitution requires |
| 00:40:24 | 14 | correction of the effects of the |
| 00:40:26 | 15 | clustering of Democratic voters in |
| 00:40:26 | 16 | dense areas or to create a map that |
| 00:40:28 | 17 | proportionally represents the |
| 00:40:30 | 18 | statewide two party vote chair. |
| 00:40:33 | 19 | Indeed, the Wisconsin |
| 00:40:37 | 20 | Supreme Court again recently rejected |
| 00:40:37 | 21 | that notion in selecting a plan to |
| 00:40:40 | 22 | remedy a malapportionment claim when |
| 00:40:41 | 23 | the Governor and legislature could not |
| 00:40:43 | 24 | agree.  Rather, these are choices that |
| 00:40:46 | 25 | should be made by the General |

61

| | | |
|---|---|---|
| 00:40:48 | 1 | Assembly, not by groups of |
| 00:40:49 | 2 | mathematicians or by scientists using |
| 00:40:52 | 3 | backroom computers to draw optimized |
| 00:40:54 | 4 | maps and not by this Court. |
| 00:40:56 | 5 | Moreover, this is not |
| 00:40:57 | 6 | just about preserving the cores of |
| 00:40:59 | 7 | districts either.  If that was true, |
| 00:41:03 | 8 | then we wouldn't be going from what's |
| | 9 | been a 9/9 map and losing a seat to a |
| | 10 | 10/7 map.  The General Assembly has |
| | 11 | passed a map that adheres to |
| | 12 | traditional redistricting principles |
| | 13 | and that is demonstrably fair.  That |
| 00:41:18 | 14 | is where this inquiry should end and |
| 00:41:18 | 15 | this Court should select HB-2214 as |
| 00:41:22 | 16 | the appropriate plan.  Thank you very |
| 00:41:23 | 17 | much, Your Honor. |
| 00:41:23 | 18 | JUDGE McCULLOUGH: |
| 00:41:23 | 19 | Thank you, Counsel.  So |
| 00:41:24 | 20 | now we will proceed with counsel for |
| 00:41:32 | 21 | Senators Corman and Warren. |
| 00:41:32 | 22 | ATTORNEY HOLTZMAN: |
| 00:41:32 | 23 | That's right, Your |
| 00:41:33 | 24 | Honor.  Thank you very much and thanks |
| 00:41:33 | 25 | for indulging our switching order |

62

| | | |
|---|---|---|
| 00:41:34 | 1 | there, I appreciate that.  Good |
| 00:41:35 | 2 | morning.  May it please the Court, my |
| 00:41:36 | 3 | name is Anthony Holtzman, and I |
| | 4 | represent Senator Jake Corman, the |
| | 5 | President Pro Tempore of the |
| | 6 | Pennsylvania Senate, along with |
| | 7 | Senator Kim Ward, the majority leader |
| | 8 | of the Pennsylvania Senate. |
| 00:41:47 | 9 | Your Honor, during this |
| 00:41:48 | 10 | hearing you're going to hear a lot of |
| 00:41:50 | 11 | technical and complex testimony, |
| 00:41:51 | 12 | testimony from political scientists |
| 00:41:55 | 13 | and mathematicians and testimony about |
| 00:41:57 | 14 | algorithms and various formulas and |
| 00:41:59 | 15 | analytics that can be used to evaluate |
| 00:42:01 | 16 | redistricting plans in differing ways. |
| 00:42:03 | 17 | You couldn't blame |
| 00:42:05 | 18 | someone for thinking that this case |
| 00:42:07 | 19 | must be an extremely difficult one. |
| 00:42:09 | 20 | But in our view, Your Honor, this case |
| 00:42:10 | 21 | is not a particularly difficult one. |
| 00:42:11 | 22 | The solution to the issue at hand is |
| 00:42:14 | 23 | straightforward and arises out of the |
| 00:42:16 | 24 | foundational and fundamental |
| 00:42:19 | 25 | constitution principles that are found |

63

| | |
|---|---|
| 00:42:21 | 1 |
| 00:42:22 | 2 |
| 00:42:23 | 3 |
| 00:42:24 | 4 |
| 00:42:26 | 5 |

at the very heart of this case.

        In this regard, Your
Honor, the United States and
Pennsylvania Constitutions have
assigned the task of redistricting the
Commonwealth's congressional districts
to the Pennsylvania General Assembly.
This task, in other words, is
expressly and constitutionally
committed to the people's elected
representatives and it's a
fundamentally legislative task.

        At times, such as when
there's an impasse situation like the
one at hand, a Court may be left with
what the U.S. Supreme Court has
described as, quote, the unwelcome
obligation of performing in the
legislature stead, closed quote.  When
these situations arise, however, it
does not mean that congressional
redistricting is no longer a
fundamentally legislative endeavor.
It does not mean that the task of
redistricting should suddenly be

64

| | | |
|---|---|---|
| 00:43:08 | 1 | viewed as nothing more than a |
| 00:43:08 | 2 | high-stakes cartography competition to |
| 00:43:14 | 3 | see which of various super computers, |
| 00:43:15 | 4 | mathematicians and academics can outdo |
| 00:43:18 | 5 | the others when it comes to drawing |
| 00:43:19 | 6 | maps in relation to various scientific |
| 00:43:24 | 7 | metrics that are nowhere to be found |
| 00:43:28 | 8 | in the law. |
| 00:43:28 | 9 | This point is especially |
| 00:43:29 | 10 | pronounced in this case, Your Honor. |
| 00:43:29 | 11 | Here, House Bill 2146 embodies a |
| 00:43:34 | 12 | congressional redistricting plan that |
| 00:43:34 | 13 | both the Senate and the House have |
| 00:43:37 | 14 | thoughtfully considered and passed. |
| 00:43:39 | 15 | In light of this factor, the HB-2146 |
| 00:43:41 | 16 | plan, as a plan that the people's |
| 00:43:43 | 17 | representatives have approved, should |
| 00:43:44 | 18 | be given special weight, consideration |
| 00:43:46 | 19 | or deference so long as it meets the |
| 00:43:50 | 20 | applicable redistricting requirements. |
| 00:43:51 | 21 | And it plainly does so. |
| 00:43:52 | 22 | In this regard, Your |
| 00:43:53 | 23 | Honor, as Mr. Tucker just ably |
| 00:43:56 | 24 | explained and is explained in the |
| 00:43:57 | 25 | Senate and House Republican |

65

| | | |
|---|---|---|
| 00:43:59 | 1 | Intervenors' briefs and as the |
| 00:43:59 | 2 | evidence in this hearing will show, |
| 00:44:01 | 3 | the HB-2146 plan does, in fact, meet |
| 00:44:05 | 4 | all the applicable requirements, |
| 00:44:07 | 5 | including requirements regarding |
| 00:44:08 | 6 | compact and contiguous territory, |
| 00:44:11 | 7 | population equality and respect for |
| 00:44:14 | 8 | the boundaries of political |
| 00:44:14 | 9 | subdivisions.  And what the evidence |
| 00:44:16 | 10 | will not show is that the HB-2146 plan |
| 00:44:20 | 11 | is otherwise unlawful or unfair in |
| 00:44:22 | 12 | some other way. |
| 00:44:24 | 13 | What's more, Your Honor, |
| 00:44:24 | 14 | no other party or Amici has presented |
| 00:44:27 | 15 | this Court with a proposed |
| 00:44:29 | 16 | redistricting plan that has made its |
| 00:44:31 | 17 | way through any part of any |
| 00:44:32 | 18 | legislative process, let alone a plan |
| 00:44:35 | 19 | that both the Senate and House of |
| 00:44:37 | 20 | Pennsylvania have passed.  Unlike the |
| 00:44:40 | 21 | other proposed plans, therefore, the |
| 00:44:40 | 22 | HB-2146 plan is entitled to deference |
| 00:44:40 | 23 | and special weight in recognition of |
| 00:44:40 | 24 | the General Assembly's constitutional |
| 00:44:47 | 25 | prerogative to engage in |

66

00:44:48   1   redistricting.  Indeed, the HB-2146

00:44:51   2   plan reflects a deliberative, open,

00:44:55   3   legislative process which involved

00:44:58   4   negotiations, compromise and policy

00:45:00   5   judgments in which the people's

00:45:03   6   elective representatives undertook in

00:45:03   7   order to memorialize and implement

00:45:05   8   state policy that reflects the will of

00:45:08   9   their constituents.

00:45:08   10          The Constitution does not

00:45:10   11   envision that a supercomputer or an

00:45:13   12   individual expert witness will create

00:45:14   13   a redistricting map that will govern

00:45:17   14   congressional elections for a decade,

00:45:17   15   no matter how technical or how complex

00:45:21   16   that computer's or expert's analysis

00:45:25   17   might be.  Therefore, as I said, Your

00:45:25   18   Honor, the issue before the Court is

00:45:27   19   not a particularly difficult one in

00:45:28   20   our view.  The answer is rooted in the

00:45:31   21   foundational and constitutional

00:45:31   22   principles that undergird this case.

00:45:33   23   As a legislatively approved plan that

00:45:36   24   meets all of the applicable

00:45:37   25   redistricting criteria, the HB-2146

67

| | | |
|---|---|---|
| 00:45:41 | 1 | map is entitled to deference from the |
| 00:45:41 | 2 | Court in order to honor the General |
| 00:45:44 | 3 | Assembly's constitutional prerogative |
| 00:45:44 | 4 | to engage in redistricting.  And in |
| 00:45:52 | 5 | our view, it's as simple as that. |
| 00:45:52 | 6 | Thank you, Your Honor. |
| 00:45:53 | 7 | JUDGE McCULLOUGH: |
| 00:45:53 | 8 | Thank you very much, |
| 00:45:55 | 9 | Counsel.  And the next party will be |
| 00:45:55 | 10 | Counsel for Representative |
| 00:46:02 | 11 | Reschenthaler, et al. |
| 00:46:02 | 12 | ATTORNEY VOSS: |
| 00:46:05 | 13 | Thank you, Your Honor. |
| 00:46:07 | 14 | May it please the Court, my name is |
| 00:46:07 | 15 | Joshua Voss from the Kleinbard firm. |
| 00:46:11 | 16 | And our team is happy to represent the |
| 00:46:13 | 17 | congressional delegation here today |
| 00:46:14 | 18 | and we appreciate your accommodation |
| 00:46:16 | 19 | of this schedule. |
| 00:46:18 | 20 | When I think about this |
| 00:46:19 | 21 | case I think about it like a contest. |
| 00:46:22 | 22 | And with most contests there's usually |
| 00:46:25 | 23 | a minimal barrier to entry, an entry |
| 00:46:28 | 24 | fee, perhaps success at a preliminary |
| 00:46:31 | 25 | competition, but just not everybody |

68

| | | |
|---|---|---|
| 00:46:32 | 1 | gets in.  So the entry fee in this |
| 00:46:35 | 2 | case, so to speak, is the standard set |
| 00:46:39 | 3 | forth by the Pennsylvania Supreme |
| 00:46:41 | 4 | Court, in League of Women Voters, |
| 00:46:43 | 5 | compact, contiguous in minimizing |
| 00:46:47 | 6 | splits. |
| 00:46:47 | 7 | What we will submit to |
| 00:46:48 | 8 | the Court and what we started to |
| 00:46:49 | 9 | submit to the Court yesterday in our |
| 00:46:50 | 10 | response brief is most of the maps, |
| 00:46:53 | 11 | and indeed we think all of the maps, |
| 00:46:56 | 12 | save ours, haven't paid the entry fee |
| 00:46:58 | 13 | for a variety of reasons.  But chief |
| 00:47:01 | 14 | among them is our Constitution has |
| 00:47:03 | 15 | some very specific adjectives in it. |
| 00:47:06 | 16 | Absolutely necessary, when we talk |
| 00:47:09 | 17 | about splits in our Constitution we |
| 00:47:11 | 18 | say absolutely necessary.  And that's |
| 00:47:13 | 19 | an important consideration in this |
| 00:47:14 | 20 | proceeding, which we'll develop as we |
| 00:47:17 | 21 | go along. |
| 00:47:19 | 22 | The second piece here is, |
| 00:47:21 | 23 | responding to your opening statement, |
| 00:47:22 | 24 | you said this case talks about the |
| 00:47:24 | 25 | constitutional rights of the people. |

69

00:47:28    1    We agree.  And as you learned this

00:47:30    2    morning, our expert is perhaps one off

00:47:30    3    from what everyone else is doing.  He

00:47:37    4    doesn't own a supercomputer.  He can't

00:47:38    5    spit out more maps than atoms in a

00:47:38    6    moment's notice.  But what we have

00:47:45    7    endeavored to do with Doctor Keith

00:47:45    8    Naughton is bring the people into this

00:47:47    9    proceeding.

00:47:48    10            Now, Doctor Naughton

00:47:48    11    certainly doesn't know every

00:47:50    12    Pennsylvanian, but he has run

00:47:51    13    campaigns in every county in this

00:47:54    14    state, countywide, districtwide,

00:47:57    15    statewide.  And he's learned a little

00:48:01    16    bit about the people of this state,

00:48:03    17    how they live, work and vote.  And

00:48:04    18    through that testimony we intend to

00:48:06    19    show the Court how our two proposed

00:48:08    20    maps most respect the communities of

00:48:12    21    interest or really just the people of

00:48:14    22    the state.  And we hope to bring the

00:48:15    23    people into this proceeding through

00:48:17    24    Doctor Naughton's testimony to further

00:48:19    25    underscore why our maps are, indeed,

70

00:48:22    1    the only maps that could be selected

00:48:24    2    here.

00:48:24    3               The final piece that

00:48:26    4    we'll hear perhaps at the end is the

00:48:28    5    bit about the schedule.  As we have

00:48:31    6    set forth in our opening brief at page

00:48:36    7    43, you have until February 22 to get

00:48:38    8    a map in place, you being the court

00:48:39    9    system collectively, but certainly

00:48:40   10    this Court with the first bite of the

00:48:42   11    apple with the original jurisdiction.

00:48:45   12    There is time here.  And you don't

00:48:46   13    have to take my word for it.  Take the

00:48:46   14    Secretary of State's word for it from

00:48:50   15    League of Women Voters.  And we've

00:48:50   16    certainly supported that position

00:48:52   17    where the Secretary was amenable to

00:48:54   18    moving and modifying the petition

00:48:58   19    circulation schedule.  And we want to

00:48:59   20    make sure that issue is front and

00:49:02   21    center for the Court, that there is

00:49:03   22    some time here to get this right.  And

00:49:05   23    we certainly want that to happen.

00:49:06   24               But in the end we will

00:49:07   25    urge this Court to adopt one of the

71

| | | |
|---|---|---|
| 00:49:09 | 1 | two Reschenthaler maps, as we're |
| 00:49:12 | 2 | calling them, because we believe they |
| 00:49:13 | 3 | are the only ones that satisfy the |
| 00:49:17 | 4 | barrier to entry, the admission fee, |
| 00:49:19 | 5 | so to speak, to have a map adopted for |
| 00:49:23 | 6 | the state.  Thank you, Your Honor. |
| 00:49:24 | 7 | JUDGE McCULLOUGH: |
| 00:49:25 | 8 | Okay.  Thank you very |
| 00:49:26 | 9 | much, Counsel.  Next is counsel for |
| 00:49:51 | 10 | Representative McClinton. |
| 00:49:51 | 11 | ATTORNEY SENOFF: |
| 00:49:51 | 12 | Thank you, Your Honor. |
| 00:49:53 | 13 | Good morning.  May it please the |
| 00:49:53 | 14 | Court, David Senoff on behalf of the |
| 00:49:53 | 15 | Intervenor Representative McClinton |
| 00:49:53 | 16 | and the --- as the leader of the House |
| 00:49:53 | 17 | --- Pennsylvania House of |
| 00:50:05 | 18 | Representatives Democratic Caucus. |
| 00:50:06 | 19 | We also would like to |
| 00:50:08 | 20 | thank Your Honor for the time and care |
| 00:50:10 | 21 | with which this Court has handled this |
| 00:50:13 | 22 | case, as well as thanking the staff |
| 00:50:16 | 23 | for making this go off so far |
| 00:50:23 | 24 | flawlessly. |
| 00:50:23 | 25 | Preliminarily, however, |

72

| | | |
|---|---|---|
| 00:50:24 | 1 | we would like to note for the record |
| 00:50:26 | 2 | an objection to this Court's subject |
| 00:50:28 | 3 | matter jurisdiction over the creation |
| 00:50:31 | 4 | of a remedy.  This issue was raised in |
| 00:50:35 | 5 | the trial brief we filed earlier |
| 00:50:37 | 6 | today.  And I don't want to dwell on |
| 00:50:40 | 7 | it other than to note it for the |
| 00:50:42 | 8 | record and suggest that the reasons |
| 00:50:49 | 9 | for that are set forth clearly in |
| 00:50:51 | 10 | there. |
| 00:50:51 | 11 | We believe that this |
| 00:50:53 | 12 | Court certainly has the power to find |
| 00:50:57 | 13 | facts, similarly has the power to take |
| 00:50:58 | 14 | evidence and also has the power to |
| 00:51:00 | 15 | issue a recommendation to the Supreme |
| 00:51:03 | 16 | Court based on those facts and its |
| 00:51:04 | 17 | Conclusions of Law about what the |
| 00:51:07 | 18 | appropriate remedy should be. |
| 00:51:12 | 19 | However, we do not |
| 00:51:13 | 20 | believe that this Court has the power |
| 00:51:15 | 21 | to enact by virtue of an Order or |
| 00:51:20 | 22 | Final Judgment any particular map |
| 00:51:21 | 23 | because that power is saved to the |
| 00:51:24 | 24 | Pennsylvania Supreme Court under our |
| 00:51:30 | 25 | unified judicial system. |

73

| | |
|---|---|
| 00:51:30 | 1 |
| 00:51:33 | 2 |
| 00:51:38 | 3 |
| 00:51:40 | 4 |
| 00:51:44 | 5 |
| 00:51:46 | 6 |
| 00:51:50 | 7 |
| 00:51:53 | 8 |
| 00:52:00 | 9 |
| 00:52:02 | 10 |
| 00:52:02 | 11 |
| 00:52:04 | 12 |
| 00:52:07 | 13 |
| 00:52:09 | 14 |
| 00:52:12 | 15 |
| 00:52:14 | 16 |
| 00:52:17 | 17 |
| 00:52:22 | 18 |
| 00:52:25 | 19 |
| 00:52:27 | 20 |
| 00:52:32 | 21 |
| 00:52:35 | 22 |
| 00:52:41 | 23 |
| 00:52:46 | 24 |
| 00:52:47 | 25 |

1    With that said, I want to
2  talk briefly about the maps that have
3  been submitted.  First of all, we do
4  not believe and we believe the United
5  States Supreme Court has made clear
6  that the legislature's map, however
7  that map --- however one wants to
8  refer to that, either as the now
9  vetoed House Bill 2146 or the
10  Republican Legislative Map, is not
11  entitled to deference based upon the
12  United States Supreme Court's Decision
13  in the Arizona State Legislature
14  versus Arizona Independent
15  Redistricting Commission case.  In
16  that case, the Supreme Court looked at
17  the elections clause of the United
18  States Constitution and it found,
19  quite simply, that the use of the
20  phrase the legislature thereof simply
21  means the State's normal legislative
22  processes.  And Pennsylvania, by
23  Constitution, particularly in Articles
24  3 and 4, it provides the mechanism for
25  which any bill can become a law.  It

74

| 00:52:50 | 1 | must pass by a simple majority both |
| 00:52:50 | 2 | houses separately and then the |
| 00:52:57 | 3 | Governor must sign it.  If the |
| 00:52:58 | 4 | Governor refuses to sign or approve |
| 00:53:01 | 5 | the law, the bill, then the bill is |
| 00:53:04 | 6 | vetoed, the bill is returned to both |
| 00:53:08 | 7 | houses for reconsideration.  Both |
| 00:53:11 | 8 | houses have the opportunity to vote. |
| 00:53:14 | 9 | And if there is a vote by a two-thirds |
| 00:53:16 | 10 | majority, then the Governor's veto is |
| 00:53:24 | 11 | overridden. |
| 00:53:25 | 12 | That has not happened in |
| 00:53:25 | 13 | this case.  And based upon the League |
| 00:53:30 | 14 | of Women Voters case, the courts are |
| 00:53:31 | 15 | forced to step in.  And in this case, |
| 00:53:35 | 16 | based on those League of Women Voters |
| 00:53:40 | 17 | decision, the Mellow Decision, other |
| 00:53:43 | 18 | decisions analogous to this related to |
| 00:53:48 | 19 | the State redistricting process, we |
| 00:53:53 | 20 | believe that this Court is going to |
| 00:53:54 | 21 | find variations in the maps, but only |
| 00:53:57 | 22 | subtle variations in the maps, which |
| 00:54:00 | 23 | will make it difficult to simply |
| 00:54:05 | 24 | decide this based on whether one map |
| 00:54:09 | 25 | or another map is superior simply |

75

| | |
|---|---|
| 00:54:15 | 1 |
| 00:54:18 | 2 |

1   based on the metrics set forth in

2   *League of Women Voters*.

3           In attempting to resolve

4   that question, in looking at *League of*

5   *Women Voters* and in *Mellow* the goal

6   --- the overarching goal, as everyone

7   here has said, is fairness.  But in

8   ensuring fairness, the courts also

9   have to ensure that the people are not

10  disenfranchised, that people's votes

11  are not diluted and that when we say

12  fair and equal, we mean fair and

13  equal.  One person, one vote.

14  Nobody's vote weighs more than than

15  another.

16          And so we submit that

17  when you look at the maps and the

18  relatively subtle differences between

19  the maps, that one ought to consider

20  historically what has happened with

21  these maps between 2011 and the

22  present as well as the voter

23  composition and registration in the

24  state.

25          For example, in 2011 the

76

| | | |
|---|---|---|
| 00:55:39 | 1 | Democrats enjoyed a 1.1 million voter |
| 00:55:45 | 2 | advantage over Republicans, and yet |
| 00:55:47 | 3 | that map produced 15 Republican |
| 00:55:59 | 4 | Congress people and three Democrats. |
| 00:55:59 | 5 | In 2018, after the map had been |
| 00:56:01 | 6 | redrawn, there were 840,000 additional |
| 00:56:04 | 7 | Democrats registered to vote in the |
| 00:56:06 | 8 | Commonwealth, and that map produced |
| 00:56:08 | 9 | nine Republicans and nine Democrats. |
| 00:56:10 | 10 | And so now, in fact on Monday I |
| 00:56:15 | 11 | checked the Department of State's |
| 00:56:16 | 12 | website and the Democratic voter |
| 00:56:21 | 13 | advantage is significantly down, but |
| 00:56:24 | 14 | down --- but nonetheless, an advantage |
| 00:56:27 | 15 | of approximately 540,000 voters. |
| 00:56:30 | 16 | So our point to the Court |
| 00:56:32 | 17 | is that if an 840,000 vote majority by |
| 00:56:39 | 18 | Democrats or registration advantage by |
| 00:56:44 | 19 | Democrats yields a 9/9 result, then a |
| 00:56:48 | 20 | 540,000 vote registration advantage |
| 00:56:52 | 21 | should not yield substantially more |
| 00:56:56 | 22 | than 50/50, recognizing the fact that |
| 00:56:59 | 23 | because we have an odd number of |
| 00:57:04 | 24 | Representatives now apportioned to the |
| 00:57:05 | 25 | Commonwealth, that it's impossible to |

77

| | | |
|---|---|---|
| 00:57:09 | 1 | have an even split.  However, in order |
| 00:57:11 | 2 | to avoid such a disenfranchisement and |
| 00:57:22 | 3 | the dilution of individuals' votes, we |
| 00:57:22 | 4 | submit that a plan as close to 50/50 |
| 00:57:25 | 5 | as possible would be the appropriate |
| 00:57:28 | 6 | plan and that any plan which would |
| 00:57:32 | 7 | increase the Republican --- which |
| 00:57:40 | 8 | would substantially increase the |
| 00:57:44 | 9 | Republican representation in Congress |
| 00:57:48 | 10 | above that 50/50 level would be, per |
| 00:57:53 | 11 | se, dilution of the votes and |
| 00:58:00 | 12 | disenfranchising some of the voters in |
| 00:58:00 | 13 | the Commonwealth.  Thank you, Your |
| 00:58:02 | 14 | Honor. |
| 00:58:02 | 15 | JUDGE McCULLOUGH: |
| 00:58:02 | 16 | Thank you very much, |
| 00:58:02 | 17 | Counsel. |
| 00:58:10 | 18 | Now we have counsel for |
| 00:58:11 | 19 | Senator Jay Costa, et al. |
| 00:58:25 | 20 | ATTORNEY ATTISANO: |
| 00:58:25 | 21 | Good morning, Your |
| 00:58:26 | 22 | Honor, and may it please the Court, |
| 00:58:29 | 23 | Marco Attisano  on behalf of the |
| 00:58:29 | 24 | Senate Democratic Caucus. |
| 00:58:31 | 25 | Your Honor, the law has |

78

00:58:32   1   been covered by many of the other
00:58:34   2   speakers here this morning.  You have
00:58:36   3   received introductions related to
00:58:46   4   other maps that have been proposed to
00:58:46   5   this Court.  What I would like to draw
00:58:47   6   the Court's attention to today is
00:58:49   7   that, with respect to the map put
00:58:51   8   forward by the Republican legislators,
00:58:58   9   they're asking you to do more than
00:59:00   10  simply pick a map in that instance.
00:59:00   11  They're asking you to promote the
00:59:05   12  legislature over the executive branch
00:59:07   13  in the normal legislative process.
00:59:11   14  The map put forward by the Republican
00:59:16   15  legislators failed the Democratic
00:59:19   16  process.  And for this Court to
00:59:23   17  promote that map and select that map
00:59:26   18  after it failed the Democratic process
00:59:27   19  would create an incentive going
00:59:29   20  forward that when there is split
00:59:31   21  government between the legislative
00:59:33   22  branch and the executive branch, there
00:59:35   23  would be an incentive in order to have
00:59:41   24  the legislative branch pass a map
00:59:43   25  without finding a way to enact the map

00:59:47   1    that is acceptable to the opposing

00:59:50   2    party in the executive branch.

00:59:54   3           It would be incentivized

00:59:54   4    to do that because they would know

00:59:58   5    that they could then go to the

00:59:59   6    judicial branch and receive some kind

01:00:02   7    of special deference or special

01:00:03   8    consideration. And that's something

01:00:05   9    that would affect Republican

01:00:12  10    legislators in the future and

01:00:12  11    Democratic majorities in the

01:00:12  12    legislature in the future. And that

01:00:15  13    would be something that is different

01:00:16  14    than we have right now under the law

01:00:17  15    in Pennsylvania. And so by being

01:00:19  16    asked to select that map, this Court

01:00:22  17    isn't only being asked to pick a map.

01:00:24  18    It is being asked to do something much

01:00:26  19    more than simply pick a map.

01:00:32  20           Your Honor, I would like

01:00:33  21    to just note for the record that the

01:00:35  22    Senate Democratic Caucus joins in the

01:00:37  23    objection that the House Democratic

01:00:40  24    Speaker just made related to the

01:00:43  25    subject matter jurisdiction today.

80

| | |
|---|---|
| 01:00:46 | 1         And Your Honor, moving on |
| 01:00:48 | 2 specifically to the maps put forward |
| 01:00:51 | 3 by the Senate Democratic Caucus, I |
| 01:00:54 | 4 would just like to point out for this |
| 01:00:56 | 5 Court's consideration that both of the |
| 01:00:58 | 6 maps put forward by the Senate |
| 01:01:01 | 7 Democratic Caucus, they minimize the |
| 01:01:04 | 8 vote dilution, which will be further |
| 01:01:12 | 9 explained by our expert.  And they |
| 01:01:15 | 10 also comply with the VRA by creating |
| 01:01:16 | 11 an appropriate number of |
| 01:01:18 | 12 minority/majority districts and |
| 01:01:20 | 13 additionally creating coalition |
| 01:01:23 | 14 districts where possible.  And so I |
| 01:01:25 | 15 would just ask that the Court take |
| 01:01:27 | 16 those things into consideration |
| 01:01:29 | 17 whenever determining the differences |
| 01:01:31 | 18 between maps that are put forward |
| 01:01:33 | 19 before the Court. |
| 01:01:48 | 20         And, Your Honor, one more |
| 01:01:50 | 21 point with respect to the League of |
| 01:01:53 | 22 Women Voters traditional redistricting |
| 01:01:53 | 23 factors that have been discussed |
| 01:01:55 | 24 today.  The case was very clear and I |
| 01:01:57 | 25 think some other speakers touched on |

| | |
|---|---|
| 01:01:59 | 1 |
| 01:02:02 | 2 |
| 01:02:04 | 3 |
| 01:02:06 | 4 |
| 01:02:08 | 5 |
| 01:02:11 | 6 |
| 01:02:15 | 7 |
| 01:02:16 | 8 |
| 01:02:17 | 9 |
| 01:02:21 | 10 |
| 01:02:21 | 11 |
| 01:02:22 | 12 |
| 01:02:24 | 13 |
| 01:02:24 | 14 |
| 01:02:30 | 15 |
| 01:02:33 | 16 |
| 01:02:37 | 17 |
| 01:02:47 | 18 |
| 01:03:24 | 19 |
| 01:03:24 | 20 |
| 01:03:26 | 21 |
| 01:03:49 | 22 |
| 01:04:28 | 23 |
| 01:04:29 | 24 |
| 01:04:30 | 25 |

1  it as well that simply because a map

2  meets the traditional redistricting

3  factors, the analysis does not stop

4  there, and that the traditional

5  redistricting factors can be met and a

6  map can still be unconstitutional for

7  both dilution.

8            And with that, Your

9  Honor, I'll conclude my opening to the

10  Court.  Thank you.

11            JUDGE McCULLOUGH:

12            Okay.  Thank you very

13  much, Counsel.

14            If I'm not mistaken,

15  that is the end of the opening

16  statements/arguments.  So we will move

17  now to the first witness to be called

18  by the Petitioners Carter, et al.

19            ATTORNEY JASRASARIA:

20            Your Honor, the

21  Petitioner calls Doctor Jonathan

22  Rodden.

23            COURT CRIER TURNER:

24  Raise your right hand.

25                  - - -

82

```
1              JONATHAN RODDEN,
2    CALLED AS A WITNESS IN THE FOLLOWING
3    PROCEEDINGS, HAVING FIRST BEEN DULY
4    SWORN, TESTIFIED AND SAID AS FOLLOWS:
5                   - - -
6              DIRECT EXAMINATION
7                   - - -
8    BY ATTORNEY JASRASARIA:
9    Q.      Good morning, Doctor Rodden.
10   Could you please state your name for
11   the record?
12   A.      Good morning.  My name is
13   Jonathan Rodden.
14   Q.      And what is your current
15   employment?
16   A.      I'm a professor of political
17   science at Stanford University.
18              JUDGE McCULLOUGH:
19              Sir, you can --- since
20   you already have a Plexiglass in front
21   of you, you can remove ---.
22              THE WITNESS:
23              I was hoping you would
24   say that.  Thank you.
25              JUDGE McCULLOUGH:
```

01:04:31  8
01:04:31  9
01:04:31  10
01:04:33  11
01:04:33  12
01:04:34  13
01:04:35  14
01:04:36  15
01:04:37  16
01:04:37  17
01:04:39  18
01:04:39  19
01:04:40  20
01:04:42  21
01:04:42  22
01:04:43  23
01:04:44  24
01:04:45  25

83

| | | |
|---|---|---|
| 01:04:45 | 1 | Yes, I know it's very |
| 01:04:46 | 2 | difficult to testify with that. |
| 01:04:46 | 3 | Go ahead. |
| 01:04:50 | 4 | BY ATTORNEY JASRASARIA: |
| 01:04:50 | 5 | Q.     What does your current research |
| 01:04:55 | 6 | focus on? |
| 01:04:58 | 7 | A.     I work on --- redistricting is |
| 01:05:01 | 8 | one of the most important issues I |
| 01:05:03 | 9 | work on, but a broader set of issues |
| 01:05:05 | 10 | related to political geography, |
| 01:05:08 | 11 | economic geography, I do a lot of work |
| 01:05:11 | 12 | of spatial data of various kinds and |
| 01:05:14 | 13 | census data and political data of all |
| 01:05:17 | 14 | kinds in the United States and other |
| 01:05:18 | 15 | countries. |
| 01:05:22 | 16 | Q.     Did you write a report |
| 01:05:24 | 17 | documenting your methodology opinion |
| 01:05:26 | 18 | and all the facts that you relied on |
| 01:05:28 | 19 | in this case? |
| 01:05:28 | 20 | A.     Yes, I did. |
| 01:05:33 | 21 | ATTORNEY JASRASARIA: |
| 01:05:35 | 22 | Your Honor, permission |
| 01:05:35 | 23 | to approach the witness with a copy of |
| 01:05:38 | 24 | his report. |
| 01:05:38 | 25 | JUDGE McCULLOUGH: |

84

| | | |
|---|---|---|
| 01:05:39 | 1 | You may, yes. |
| 01:05:39 | 2 | Is there an opening in |
| 01:05:39 | 3 | that screen or on the side?  That's |
| 01:05:39 | 4 | all right, I think it can --- Mr. |
| 01:05:39 | 5 | Turner will take it over for you. |
| 01:06:11 | 6 | BY ATTORNEY JASRASARIA: |
| 01:06:11 | 7 | Q.    Doctor Rodden, are those the |
| 01:06:16 | 8 | reports that you authored? |
| 01:06:17 | 9 | A.    Yes. |
| 01:06:17 | 10 | Q.    Can you briefly summarize what |
| 01:06:20 | 11 | the Carter Petitioners have asked you |
| 01:06:21 | 12 | to do in this case? |
| 01:06:22 | 13 | A.    I was asked to draw a |
| 01:06:23 | 14 | redistricting plan for the |
| 01:06:25 | 15 | Congressional Districts of the State |
| 01:06:26 | 16 | of Pennsylvania, focusing on |
| 01:06:27 | 17 | traditional redistricting criteria but |
| 01:06:29 | 18 | using the existing court ordered plan |
| 01:06:34 | 19 | from four years ago as a starting |
| 01:06:36 | 20 | point and trying to stay as close as |
| 01:06:38 | 21 | possible to that plan while, where |
| 01:06:40 | 22 | possible, improving on the traditional |
| 01:06:42 | 23 | redistricting criteria. |
| 01:06:45 | 24 | Q.    Broadly, were you able to |
| 01:06:47 | 25 | accomplish this task? |

85

| | | |
|---|---|---|
| 01:06:48 | 1 | A.        Yes. |
| 01:06:50 | 2 | Q.        What was the most significant |
| 01:06:52 | 3 | constraint that was shaping this task? |
| 01:06:54 | 4 | A.        The same constraint that faces |
| 01:06:56 | 5 | all the other map makers, which is |
| 01:06:59 | 6 | Pennsylvania's population has changed |
| 01:07:00 | 7 | overtime.  And as was pointed out |
| 01:07:02 | 8 | earlier this morning some population |
| 01:07:06 | 9 | stagnation relative to other states |
| 01:07:09 | 10 | means that Pennsylvania has lost a |
| 01:07:11 | 11 | seat, but also within the State |
| 01:07:13 | 12 | there's been a substantial |
| 01:07:15 | 13 | reorientation of population toward |
| 01:07:18 | 14 | this --- to the eastern part of the |
| 01:07:20 | 15 | state and to the Pittsburgh area.  And |
| 01:07:23 | 16 | there's been population decline |
| 01:07:24 | 17 | elsewhere. |
| 01:07:27 | 18 | Q.        Could we please turn to figure |
| 01:07:30 | 19 | two of your report, which is on page |
| 01:07:43 | 20 | eight.  And this is a diagram entitled |
| 01:07:45 | 21 | the geography of population shifts |
| 01:07:50 | 22 | Pennsylvania Counties 2010 to 2020. |
| 01:07:52 | 23 |         Doctor Rodden, what does this |
| 01:07:53 | 24 | diagram show? |
| 01:07:53 | 25 | A.        This is just a visualization of |

86

01:07:55   1   the population changes I just

01:07:57   2   mentioned.  So we have the county

01:07:57   3   level of population data from 2010 and

01:08:00   4   county level population data from

01:08:02   5   2020.  And I'm just taking the raw

01:08:05   6   changes in those population numbers

01:08:06   7   and making a map to display the places

01:08:09   8   where population has grown the most

01:08:12   9   and oriented the colors so that yellow

01:08:18   10   is --- orients us to all of the

01:08:20   11   counties that have lost population.

01:08:23   12   And then the counties with some shade

01:08:26   13   of orange have gained population,

01:08:27   14   getting to the darkest --- deepest

01:08:30   15   shade of orange in the places that

01:08:31   16   have gained the most population.

01:08:34   17   Q.       What conclusion do you draw

01:08:37   18   from Figure 2?

01:08:39   19   A.       Well, as affects redistricting,

01:08:41   20   I should point out that the figure

01:08:43   21   also contains the old 18 districts

01:08:46   22   from the previous plan, so it shows us

01:08:48   23   the starting point for redistricting

01:08:50   24   if we consider that plan, and it shows

01:08:54   25   us what has changed.  So it gives us a

87

01:08:57  1    sense of what parts of the state will

01:09:00  2    experience some change.  And this is a

01:09:02  3    constraint that faces not just --- not

01:09:04  4    just my plan but any plan.  This is

01:09:06  5    the starting point for all of the

01:09:07  6    experts who will be testifying.

01:09:11  7    Q.    Based on this figure and your

01:09:18  8    analysis of the demographic changes,

01:09:22  9    where across the State are the most

01:09:28  10   changes necessary for drawing a plan?

01:09:33  11   A.    In the places where we see

01:09:35  12   yellow on the map.  So these are the

01:09:36  13   places where it would not be possible

01:09:38  14   to keep the existing jurisdictional

01:09:41  15   arrangement because of population laws

01:09:42  16   and the places where we see more

01:09:45  17   orange colors are places where it is

01:09:47  18   possible to retain the existing

01:09:48  19   District arrangement.  And we'll see

01:09:50  20   that that has been largely the case in

01:09:52  21   my plan.

01:09:55  22   Q.    You mentioned earlier that you

01:09:57  23   were asked to use the 2018 plan as a

01:09:59  24   starting point to draw your map.  Were

01:10:01  25   you already familiar with the 2018

88

| | | |
|---|---|---|
| 01:10:03 | 1 | plan when that request was made? |
| 01:10:05 | 2 | A.      Yes, it's a plan that I've |
| 01:10:08 | 3 | examined in some of my academic work |
| 01:10:10 | 4 | and had already ascertained in that |
| 01:10:13 | 5 | work that this was a plan that was -- |
| 01:10:16 | 6 | that performed very well on |
| 01:10:17 | 7 | traditional redistricting criteria, |
| 01:10:27 | 8 | and had also noticed that it was ---. |
| 01:10:27 | 9 | COURT REPORTER: |
| 01:10:27 | 10 | Had performed very well |
| 01:10:27 | 11 | on traditional --- you're going to |
| 01:10:29 | 12 | have to slow down a little bit. |
| 01:10:29 | 13 | THE WITNESS: |
| 01:10:29 | 14 | Of course, thank you.  I |
| 01:10:30 | 15 | had noticed in a variety of metrics |
| 01:10:32 | 16 | and in some different academic work, |
| 01:10:34 | 17 | that the plan that was enacted by the |
| 01:10:37 | 18 | Supreme Court in 2018 was a plan that |
| 01:10:41 | 19 | performed very well according to |
| 01:10:43 | 20 | traditional redistricting criteria. |
| 01:10:45 | 21 | It was a compact plan and it was --- |
| 01:10:48 | 22 | it was a plan that involved relatively |
| 01:10:50 | 23 | few county splits and other |
| 01:10:53 | 24 | jurisdictional splits, so it was a |
| 01:10:55 | 25 | plan I was already familiar with on |

89

| | | |
|---|---|---|
| 01:10:57 | 1 | those grounds.  It's also a plan that |
| 01:11:00 | 2 | I examined with respect to partisan |
| 01:11:03 | 3 | fairness, and others have as well, and |
| 01:11:05 | 4 | it was broadly recognized to be quite |
| 01:11:08 | 5 | a fair plan.  I think it had that |
| 01:11:10 | 6 | reputation broadly in the community of |
| 01:11:13 | 7 | people who study redistricting. |
| 01:06:11 | 8 | BY ATTORNEY JASRASARIA: |
| 01:06:11 | 9 | Q.      Did you agree with the approach |
| 01:11:20 | 10 | of using the 2018 plan as a guide? |
| 01:11:23 | 11 | A.      Yes, that's what I was asked to |
| 01:11:25 | 12 | do, and I agreed to do it.  I thought |
| 01:11:25 | 13 | it seemed like a fine strategy, |
| 01:11:27 | 14 | especially if the goal was to abide by |
| 01:11:29 | 15 | traditional redistricting criteria, |
| 01:11:32 | 16 | this was a very good place to start. |
| 01:11:34 | 17 | Q.      I'd like to briefly discuss how |
| 01:11:38 | 18 | you created the map that has been |
| 01:11:40 | 19 | considered for the Court's |
| 01:11:41 | 20 | consideration as the Carter plan. |
| 01:11:42 | 21 | Did you construct a map based on |
| 01:11:45 | 22 | adherence to certain criteria? |
| 01:11:48 | 23 | A.      Yes.  I pay attention --- like |
| 01:11:53 | 24 | every redistricting map in the United |
| 01:11:55 | 25 | States I paid attention to population, |

90

| | |
|---|---|
| 01:11:58 | 1 | equality.  I tried to keep --- I tried |
| 01:11:59 | 2 | to keep the districts within plus or |
| 01:12:01 | 3 | minus one population deviation.  I |
| 01:12:03 | 4 | paid attention to county and municipal |
| 01:12:07 | 5 | and voting tabulation district splits, |
| 01:12:10 | 6 | so trying to keep political |
| 01:12:13 | 7 | jurisdictions together and also paid |
| 01:12:16 | 8 | attention to compactness and |
| 01:12:22 | 9 | contiguity, these four basic |
| 01:12:24 | 10 | traditional redistricting principles. |
| 01:12:24 | 11 | Q.      Let's break that down.  What |
| 01:12:26 | 12 | does contiguity mean? |
| 01:12:28 | 13 | A.      That simply means that we --- |
| 01:12:30 | 14 | when we draw a redistricting plan, we |
| 01:12:32 | 15 | don't want to have non-contiguous |
| 01:12:34 | 16 | fragments, so an example that others |
| 01:12:37 | 17 | sitting in the room might be familiar |
| 01:12:39 | 18 | with, there's a little section of |
| 01:12:42 | 19 | Chester County that is formed by a |
| 01:12:44 | 20 | bend in the river --- in a creek, |
| 01:12:46 | 21 | actually, that has six people in it |
| 01:12:48 | 22 | and it is a little fragment that is |
| 01:12:50 | 23 | not contiguous with the rest of the |
| 01:12:52 | 24 | county.  So it is not permissible to |
| 01:12:55 | 25 | take that fragment and attach it to |

91

| | | |
|---|---|---|
| 01:12:57 | 1 | the rest --- to the District that |
| 01:12:59 | 2 | contains Chester County.  It's |
| 01:13:01 | 3 | necessary to make sure that fragment |
| 01:13:03 | 4 | is contiguous with the surrounding |
| 01:13:07 | 5 | area, so all of us have to abide by |
| 01:13:12 | 6 | that constraint. |
| 01:13:12 | 7 | Q.      Was your map contiguous? |
| 01:13:15 | 8 | A.      Yes. |
| 01:13:15 | 9 | Q.      And did you evaluate the other |
| 01:13:17 | 10 | maps for contiguity? |
| 01:13:19 | 11 | A.      I did. |
| 01:13:19 | 12 | Q.      What was the result? |
| 01:13:20 | 13 | A.      They all had the same feature. |
| 01:13:21 | 14 | There were no non-contiguities.  There |
| 01:13:23 | 15 | may have been one unpopulated census |
| 01:13:24 | 16 | block that was inadvertently left in |
| 01:13:29 | 17 | one of the plans, but in general I |
| 01:13:30 | 18 | would agree that they all were |
| 01:13:33 | 19 | involved, did not produce any |
| 01:13:38 | 20 | non-contiguities. |
| 01:13:38 | 21 | Q.      Turning to compactness, how do |
| 01:13:42 | 22 | you measure compactness? |
| 01:13:44 | 23 | A.      Well, given the amount of time |
| 01:13:46 | 24 | we have today, I will not go into a |
| 01:13:49 | 25 | discourse on compactness.  It's |

92

01:13:50    1    something that we will hear a lot

01:13:53    2    about I presume.  It is a concept that

01:13:56    3    --- in which in redistricting we like

01:13:58    4    to avoid districts that have very

01:14:00    5    unnatural shapes.  Someone referred

01:14:05    6    earlier today to a district involving

01:14:08    7    Goofy and, you know, some comic

01:14:09    8    characters.

01:14:11    9                    It's a long tradition

01:14:12   10    tradition starting with Elbridge Gerry

01:14:13   11    of these districts that are very oddly

01:14:15   12    shape with claws and tentacles.  So we

01:14:18   13    want some way to measure that and try

01:14:19   14    to avoid it, and so mathematicians and

01:14:23   15    social scientists have been developing

01:14:25   16    over the years, various ways of trying

01:14:26   17    to do this, and they all --- they all

01:14:28   18    give us a little bit different

01:14:30   19    information.  They all tell us

01:14:31   20    something different about the geometry

01:14:33   21    of districts, the shape of districts.

01:14:36   22    And so we have some measures that we

01:14:39   23    use to evaluate the individual

01:14:41   24    districts and we often take an average

01:14:44   25    for the whole plan, and so I've done

93

01:14:46  1   some of that in my reports.

01:14:49  2   Q.      Is there any one compactness

01:14:54  3   metric that's more important to meet

01:14:58  4   than others?

01:14:59  5   A.      No, they are a variety of

01:14:59  6   measures, all of which capture

01:15:00  7   something subtly different.

01:15:00  8   Q.      And what are the compactness

01:15:02  9   measures that you used in your

01:15:04  10  analysis?

01:15:05  11  A.      I reported on several in my

01:15:07  12  initial report, but I discussed in

01:15:09  13  more detail the poles be proper and

01:15:15  14  REOC measures, simply because I've

01:15:16  15  noticed they receive the most

01:15:17  16  attention in previous Pennsylvania

01:15:20  17  Court decisions and also in other

01:15:24  18  judicial proceedings in other states.

01:15:29  19  Q.      Did you evaluate your plan for

01:15:31  20  compactness?

01:15:32  21  A.      I did.

01:15:32  22  Q.      And did you evaluate the other

01:15:34  23  plans for compactness?

01:15:36  24  A.      Yes.

01:15:36  25  Q.      How did your plan compare to

94

| | | |
|---|---|---|
| 01:15:39 | 1 | the other plans? |
| 01:15:45 | 2 | A.        Well, this is --- again, the |
| 01:15:46 | 3 | answer depends on which of these |
| 01:15:47 | 4 | measures we look at.  But on several |
| 01:15:49 | 5 | of the measures it was somewhere in |
| 01:15:51 | 6 | the middle of a fairly narrow range, |
| 01:15:53 | 7 | but on some of the measures it |
| 01:15:55 | 8 | performed very well.  On the REOC |
| 01:15:59 | 9 | score, it performed near the top.  I |
| 01:16:02 | 10 | think maybe the second to the top. |
| 01:16:03 | 11 | Q.        Turning to the next criteria |
| 01:16:09 | 12 | for political subdivisions.  Can you |
| 01:16:11 | 13 | explain what respect for a political |
| 01:16:13 | 14 | subdivision boundaries means? |
| 01:16:17 | 15 | A.        Yeah.  This simply means not |
| 01:16:20 | 16 | splitting counties in the first |
| 01:16:22 | 17 | instance.  And then we can also talk |
| 01:16:24 | 18 | about other sub-county jurisdictions. |
| 01:16:26 | 19 | In some states there are jurisdictions |
| 01:16:28 | 20 | that cross county boundaries, so we |
| 01:16:29 | 21 | have a trade-off between not splitting |
| 01:16:32 | 22 | a county and not splitting, say, a |
| 01:16:34 | 23 | city like Columbus, Ohio that crosses |
| 01:16:37 | 24 | county boundaries. |
| 01:16:42 | 25 | But in general the idea |

95

| 01:16:43 | 1 | is to not split these jurisdictions, |
| 01:16:45 | 2 | but there are trade-offs between |
| 01:16:47 | 3 | different jurisdictions.  We want to, |
| 01:16:51 | 4 | in many cases focusing on counties is |
| 01:16:54 | 5 | what redistricters are specially |
| 01:16:55 | 6 | attentive to.  We want to try not to |
| 01:16:57 | 7 | split counties, keep counties whole |
| 01:17:00 | 8 | when we can, and that's something I |
| 01:17:03 | 9 | took very seriously.  But I also pay |
| 01:17:05 | 10 | very close attention to vote |
| 01:17:06 | 11 | tabulation districts in my analysis |
| 01:17:08 | 12 | and try to minimize splits of vote |
| 01:17:15 | 13 | tabulation districts. |
| 01:17:19 | 14 | Q.      Why did you try to minimize the |
| 01:17:24 | 15 | splits of vote tabulation districts? |
| 01:17:24 | 16 | Or I guess, let me start --- what is a |
| 01:17:24 | 17 | a vote tabulation district? |
| 01:17:24 | 18 | A.      Yes.  This is an important |
| 01:17:27 | 19 | geographic entity in the |
| 01:17:29 | 20 | administration of elections.  This is |
| 01:17:31 | 21 | where the election really happens and |
| 01:17:35 | 22 | is administered at the level of vote |
| 01:17:38 | 23 | tabulation districts.  So in U.S. |
| 01:17:39 | 24 | elections we have so many different |
| 01:17:42 | 25 | jurisdictions, so many different |

96

01:17:44  1   offices, we have districts for city
01:17:48  2   council, we have districts for the
01:17:50  3   state legislature and for congress.
01:17:53  4   It's very important that everyone
01:17:54  5   receive a ballot that has the correct
01:17:56  6   offices on it, and this is what
01:17:58  7   happens at the level of vote
01:18:00  8   tabulation districts and precincts.
01:18:03  9           And so if we split a VTD ---
01:18:07  10  that's the short for vote tabulation
01:18:10  11  district --- this creates a serious
01:18:11  12  headache for election administrators,
01:18:16  13  and it's something I've spoken with
01:18:18  14  election administrators about and
01:18:20  15  I've, in fact, seen.  I have not been
01:18:22  16  involved directly, but have learned a
01:18:29  17  lot about lawsuits in which sometimes
01:18:30  18  the wrong ballot ends up going to the
01:18:30  19  wrong people.  It's a technical
01:18:33  20  problem.  Whenever you split a vote
01:18:34  21  tabulation district, you are forcing
01:18:35  22  election administrators to try to put
01:18:37  23  people into two bins when they come in
01:18:41  24  and try to make sure that everyone
01:18:43  25  gets the correct ballot.

97

01:18:44 1        And when we split VTDs we run

01:18:47 2   the risk that mistakes are made.  And

01:18:47 3   when there are very close elections,

01:18:50 4   these mistakes can be very

01:18:53 5   consequential and can actually affect

01:18:57 6   the outcome of the election.

01:18:59 7   Q.        Were there any subdivision

01:19:01 8   splits that your plan performed

01:19:02 9   particularly well on compared to the

01:19:04 10  other plans?

01:19:05 11  A.        It performed very well on

01:19:08 12  county splits, which is not

01:19:10 13  surprising, because I was starting

01:19:11 14  from a plan that was very low on

01:19:13 15  county splits and I was asked to even

01:19:16 16  reduce the number of county splits, if

01:19:19 17  possible, and so I was able to do

01:19:20 18  that.

01:19:21 19        So I believe my plan performs

01:19:23 20  very well relative to the others on

01:19:25 21  county splits, and I think it's

01:19:26 22  important that we not just look at the

01:19:29 23  total number of counties that were

01:19:31 24  split, but the number of actual splits

01:19:34 25  of counties.  We can achieve a very

98

01:19:37   1    low number of counties --- of split

01:19:39   2    counties if we just take some counties

01:19:41   3    and split them many times.  So I think

01:19:45   4    it's useful to look at the total

01:19:47   5    number of splits of counties.  And on

01:19:48   6    that dimension, my plan does very

01:19:53   7    well.

01:19:53   8    Q.        Did your plan also perform well

01:19:55   9    on voter tabulation districts or VTDs?

01:19:59   10   A.        Yes.  I think I paid special

01:19:59   11   attention to that.  It's something

01:20:01   12   that I really tried hard to --- I

01:20:01   13   think the number that I eventually

01:20:04   14   split was 17, and that's a number that

01:20:06   15   corresponds to the number of

01:20:08   16   districts.  So I tried at each

01:20:10   17   boundary to only split one vote

01:20:13   18   tabulation district, and then there

01:20:16   19   are some places in particular in

01:20:17   20   Philadelphia where I managed not to

01:20:19   21   split any.

01:20:25   22   Q.        Turning to the final criteria

01:20:27   23   of the first four that you mentioned,

01:20:27   24   can you explain how population quality

01:20:28   25   is measured?

99

| | | |
|---|---|---|
| 01:20:30 | 1 | A.      Right.  We simply take the most |
| 01:20:32 | 2 | recent population number for |
| 01:20:36 | 3 | Pennsylvania and divide by 17, and |
| 01:20:38 | 4 | then we have a number, I believe it's |
| 01:20:41 | 5 | 765,000, which is our --- give or take |
| 01:20:45 | 6 | --- I forgot the exact number, but |
| 01:20:46 | 7 | that is our --- all of us had that |
| 01:20:48 | 8 | same target population.  And we try to |
| 01:20:50 | 9 | draw districts by choosing county |
| 01:20:54 | 10 | subdivisions and vote tabulation |
| 01:20:56 | 11 | districts, and at the very end of the |
| 01:20:57 | 12 | process we might have to split a vote |
| 01:21:00 | 13 | tabulation district in order to get |
| 01:21:02 | 14 | that number to zero or negative one or |
| 01:21:05 | 15 | one to get it as close as possible to |
| 01:21:08 | 16 | equality. |
| 01:21:10 | 17 | Q.      Did you assess the equal |
| 01:21:11 | 18 | population for your plan? |
| 01:21:13 | 19 | A.      Yes. |
| 01:21:13 | 20 | Q.      And did you assess equal |
| 01:21:15 | 21 | population for the other plans? |
| 01:21:17 | 22 | A.      Yes. |
| 01:21:19 | 23 | Q.      From the information and data |
| 01:21:21 | 24 | that you received were all of the |
| 01:21:23 | 25 | plans equally populated under the |

100

01:21:25  1    population data that they were using?

01:21:28  2    A.      Yes.

01:21:28  3    Q.      And your plan was as well?

01:21:33  4    A.      Yes.

01:21:34  5    Q.      Could you have gotten any

01:21:36  6    closer to population equality?

01:21:38  7    A.      No, one person is --- I think

01:21:42  8    is very good.

01:21:48  9    Q.      At this time I'd like to just

01:21:49  10   ask you some questions about the

01:21:50  11   Carter plan itself.  Can we pull up

01:21:54  12   Figure 5 on page 13 of the report?

01:21:57  13   And this is a diagram that's entitled

01:22:00  14   proposed Congressional District

01:22:04  15   Boundaries.

01:22:05  16         And Doctor Rodden, can you

01:22:09  17   describe what this figure is showing

01:22:10  18   us?

01:22:11  19   A.      Yes.  What we see here are the

01:22:12  20   proposed Carter plan boundaries that

01:22:18  21   are --- that correspond to different

01:22:19  22   colors.  And so you can see each color

01:22:22  23   corresponds to a proposed district.

01:22:23  24   But what this plan --- what this

01:22:26  25   figure also shows us is of, course,

101

01:22:29   1   the Pennsylvania counties, and it also

01:22:31   2   shows us in, kind of, dark somewhat

01:22:34   3   transparent grey, it shows us the old

01:22:36   4   2018 district boundaries.  So we can

01:22:40   5   compare where the changes have been

01:22:41   6   made.

01:22:59   7   Q.      And what kinds of changes ---

01:23:01   8   what was the major change that you had

01:23:03   9   to make here?

01:23:04   10   A.      Yeah.  What we can see from

01:23:06   11   looking at this level of Zoom at the

01:23:07   12   whole state, I think it's helpful to

01:23:09   13   think back to that orange and yellow

01:23:12   14   map we were considering a moment ago.

01:23:13   15   The places that looked orange on that

01:23:17   16   map where the population is growing,

01:23:19   17   and particularly where it's growing at

01:23:20   18   about the rate of the U.S. population

01:23:23   19   in the southeast part of the state, it

01:23:25   20   was easy to keep the district

01:23:27   21   boundaries relatively similar.

01:23:30   22          And so we see that the - that

01:23:31   23   the correspondence between the new

01:23:34   24   districts represented in colors and

01:23:37   25   the old districts with the grey lines,

102

01:23:40    1    the correspondence is quite strong as
01:23:43    2    we go through --- going from northeast
01:23:47    3    to kind of around clockwise, it's
01:23:50    4    quite strong in eight, seven, one,
01:23:56    5    four, two and three, both of those are
01:23:58    6    Philadelphia districts, and in five,
01:24:01    7    which is based in Delaware County.
01:24:03    8    And District 6, which is based in
01:24:05    9    Chester County, as well as Districts
01:24:08   10    10 and 11.
01:24:09   11         Those districts have
01:24:10   12    experienced, in the Carter plan,
01:24:12   13    relatively minor changes from their
01:24:14   14    orientation in the previous plan.
01:24:17   15    And the same is true of districts on
01:24:21   16    the west side of the state of
01:24:23   17    Districts 12 and 17, which you may
01:24:25   18    remember also experienced some
01:24:27   19    population growth since the last
01:24:28   20    census, not quite as much growth as
01:24:32   21    the U.S. as a whole, but experienced
01:24:35   22    growth.  So it was possible to keep
01:24:37   23    the existing orientation rather
01:24:39   24    similar.
01:24:39   25         And so we see, just looking at

103

| 01:24:41 | 1 | this broad Zoom we can also understand |
| 01:24:45 | 2 | that Districts 16 and 14 on the west |
| 01:24:48 | 3 | --- on the western boundary of the |
| 01:24:50 | 4 | state, because there's a state |
| 01:24:52 | 5 | boundary there, because the population |
| 01:24:55 | 6 | loss is relatively large in these |
| 01:24:57 | 7 | counties, they have to move a little |
| 01:25:01 | 8 | bit to the east.  There's really no |
| 01:25:03 | 9 | other place for them to go, other than |
| 01:25:04 | 10 | to take up some space moving further |
| 01:25:07 | 11 | east into Pennsylvania.  And so this |
| 01:25:11 | 12 | is something, that, again, it's not |
| 01:25:13 | 13 | just my approach that has this |
| 01:25:15 | 14 | problem. |
| 01:25:16 | 15 | Anyone drawing the District of |
| 01:25:18 | 16 | Pennsylvania has the problem that in |
| 01:25:19 | 17 | the middle of the state where the |
| 01:25:21 | 18 | population loss happens, the districts |
| 01:25:23 | 19 | will change more substantially from |
| 01:25:27 | 20 | the old plan.  And that's why we see |
| 01:25:29 | 21 | less correspondence between the old |
| 01:25:33 | 22 | and new boundaries out there. |
| 01:25:38 | 23 | Q.      Let's pull up Figure 6, which |
| 01:25:42 | 24 | is on page 13 of the report, and this |
| 01:25:45 | 25 | is entitled the Philadelphia Area. |

104

01:25:49  1   Can you describe what you did with the

01:25:51  2   districts here, Doctor Rodden?

01:25:53  3   A.      Sure.  I'll try to do so

01:25:55  4   briefly.  District 1 in Bucks County,

01:25:58  5   this is a place that was gaining

01:26:07  6   population, but not at a very rapid

01:26:12  7   rate, so it's --- it's relative to the

01:26:12  8   new ideal population.  It was

01:26:12  9   underpopulated, and so it needed to

01:26:12  10  pick up some people.

01:26:16  11         So we can see I've kept the

01:26:18  12  arrangement very similar to before,

01:26:19  13  but added some additional parts of

01:26:20  14  Montgomery County in order to make

01:26:23  15  that District reach population

01:26:25  16  equality.  And the choices of places

01:26:27  17  in Montgomery were based on trying to

01:26:28  18  keep --- trying to keep municipalities

01:26:29  19  together and trying to avoid VTD

01:26:29  20  splits and achieve one person

01:26:35  21  population deviation equality.

01:26:36  22         So that's what's happening in

01:26:37  23  District 1.  Districts 2 and 3, the

01:26:40  24  Philadelphia County population is

01:26:42  25  actually growing at a very similar

105

| | | |
|---|---|---|
| 01:26:44 | 1 | rate to the national population.  So |
| 01:26:48 | 2 | it's really not necessary to change |
| 01:26:51 | 3 | much at all from Districts 2 to 3 in |
| 01:26:53 | 4 | the existing map.  So there's just a |
| 01:26:55 | 5 | little alteration needed there to |
| 01:26:58 | 6 | reach population equality. |
| 01:27:00 | 7 | District 5 is similar to |
| 01:27:02 | 8 | District 1 in that its population |
| 01:27:10 | 9 | growth was somewhat slower, and so it |
| 01:27:10 | 10 | also was below the target population, |
| 01:27:12 | 11 | and so it needed to pick up some |
| 01:27:13 | 12 | places.  And this is the kind of thing |
| 01:27:15 | 13 | where we can appreciate the trade-offs |
| 01:27:17 | 14 | that someone makes when they're |
| 01:27:18 | 15 | drawing a districting plan.  It has to |
| 01:27:21 | 16 | pick up some people in someplace.  It |
| 01:27:23 | 17 | already was going into Montgomery |
| 01:27:25 | 18 | County.  It can go further into |
| 01:27:27 | 19 | Montgomery County and add some more |
| 01:27:29 | 20 | people, or it can go up into Chester |
| 01:27:32 | 21 | County and which then creates a split |
| 01:27:35 | 22 | in Chester County, which then |
| 01:27:37 | 23 | unfortunately has a cascading effect |
| 01:27:41 | 24 | and creates splits in many of the |
| 01:27:42 | 25 | surrounding counties. |

106

01:27:43    1          And so this is an example of a
01:27:44    2    place where there's a trade-off where
01:27:46    3    an redistricting expert has to face,
01:27:51    4    between --- between splits in
01:27:52    5    different places and also involving
01:27:54    6    compactness.  So what I decided was
01:27:57    7    that by keeping the existing
01:27:58    8    arrangement and moving District 5 into
01:28:01    9    Montgomery County, that it would then
01:28:04   10    --- that what then has to happen is
01:28:05   11    Montgomery County has to --- has to
01:28:08   12    --- also needs some population that
01:28:10   13    needs to move further up into Berks
01:28:10   14    County.
01:28:13   15          And that is the arrangement
01:28:15   16    that I chose, and it's one that I
01:28:16   17    chose purely for reasons of avoiding
01:28:19   18    other splits and other places, so this
01:28:22   19    is why my county splits number is low,
01:28:24   20    because of a choice like that.
01:28:27   21    Q.      Let's turn to Figure 7 on the
01:28:29   22    next page.  Thanks.  So this is a
01:28:37   23    diagram entitled District 7 and 8.
01:28:40   24    Could you describe what you did with
01:28:41   25    these districts in your plan?

107

| | | |
|---|---|---|
| 01:28:44 | 1 | A.       Yes, I hope the colors are |
| 01:28:46 | 2 | clear to people.  There's a shade of |
| 01:28:49 | 3 | green and a shade of blue that may not |
| 01:28:51 | 4 | be great for people who are |
| 01:28:53 | 5 | colorblind.  But there is a --- |
| 01:28:54 | 6 | there's a District 7, which is a |
| 01:28:57 | 7 | Lehigh Valley District that was |
| 01:29:00 | 8 | already in existence, but it needed |
| 01:29:02 | 9 | some more population, and the |
| 01:29:10 | 10 | metropolitan statistical area of --- |
| 01:29:15 | 11 | of Easton and Bethlehem and --- you |
| 01:29:15 | 12 | know, of the Lehigh Valley, it |
| 01:29:18 | 13 | includes Carbon County.  In that |
| 01:29:18 | 14 | Carbon County in the past had been --- |
| 01:29:26 | 15 | had been separated from this district. |
| 01:29:27 | 16 | So I was able to combine the entire |
| 01:29:27 | 17 | metropolitan statistical area in, kind |
| 01:29:27 | 18 | of, a communities of interest |
| 01:29:27 | 19 | consideration.  I was able to combine |
| 01:29:34 | 20 | that entire MSA into a district that |
| 01:29:36 | 21 | became District 7, but its basic |
| 01:29:41 | 22 | structure is not very different than |
| 01:29:42 | 23 | before. |
| 01:29:43 | 24 | And then District 8 is --- is |
| 01:29:44 | 25 | also very similar to before.  This is |

108

01:29:45    1    one that contains the Scranton,

01:29:47    2    Wilkes-Barre and surrounding areas and

01:29:50    3    it was possible just to add a little

01:29:56    4    bit of --- its population growth was a

01:30:02    5    little low relative to other places,

01:30:02    6    so it was necessary to add a little

01:30:02    7    bit of territory in Monroe County and

01:30:02    8    very small amount of territory in ---

01:30:10    9    outside of Wilkes-Barre.

01:30:13   10    Q.      Let's look to Figure 8, and

01:30:17   11    this one is entitled District 6, 10

01:30:17   12    and 11.

01:30:17   13           Could you briefly describe what

01:30:26   14    you did with the districts here?

01:30:26   15    A.      Yes.  This is another one where

01:30:26   16    I can be very brief, because as we saw

01:30:29   17    in that initial map, the population

01:30:30   18    growth was very similar to the

01:30:34   19    national average and so these

01:30:35   20    districts were already very close to

01:30:37   21    the target population.

01:30:38   22           District 6 had to just make

01:30:40   23    minimal changes by taking in an

01:30:43   24    additional part of a township that had

01:30:44   25    already been split in the earlier

109

| | | |
|---|---|---|
| 01:30:46 | 1 | plan.  I just took in a little bit |
| 01:30:50 | 2 | more of that township and it had |
| 01:30:50 | 3 | population of equality. |
| 01:30:51 | 4 | District 11, only some small |
| 01:30:53 | 5 | changes on its western boundary.  And |
| 01:30:57 | 6 | District 10 was one that is --- it's |
| 01:31:01 | 7 | clearly constructed in a communities |
| 01:31:05 | 8 | of interest framework.  It's one that |
| 01:31:07 | 9 | is attempting to keep Harrisburg |
| 01:31:09 | 10 | together.  It is at the confluence of |
| 01:31:12 | 11 | three counties.  And this is a |
| 01:31:13 | 12 | district that tries to keep that city |
| 01:31:14 | 13 | together in the same district.  And so |
| 01:31:16 | 14 | I retained that structure and dealt |
| 01:31:19 | 15 | with population equality by simply |
| 01:31:25 | 16 | moving the boundary --- we already had |
| 01:31:25 | 17 | split Cumberland County, simply move |
| 01:31:25 | 18 | the boundaries somewhat to the west in |
| 01:31:28 | 19 | order to accommodate that. |
| 01:31:28 | 20 | Q.     Let's pull up Figure 9.  And |
| 01:31:32 | 21 | this one is just describing District |
| 01:31:32 | 22 | 9. |
| 01:31:38 | 23 | Can you also briefly describe |
| 01:31:42 | 24 | what you did here? |
| 01:31:43 | 25 | A.     This is a district that was |

110

01:31:44  1   previously smaller, but this is an

01:31:46  2   area, as we saw in that earlier map,

01:31:48  3   where population loss is happening.

01:31:51  4   And some of these other --- some of

01:31:54  5   the moves I just described involve

01:31:56  6   some incursion into what used to be

01:32:00  7   District 9's territory.

01:32:00  8          So you have incursions --- for

01:32:03  9   example, District 4 into Berks County,

01:32:05  10  District 8 moving a little bit further

01:32:08  11  out to the west.  And --- but above

01:32:12  12  all population loss, it just requires

01:32:14  13  the footprint of District 9 to expand

01:32:17  14  in order to have --- for it to have

01:32:24  15  enough people.

01:32:24  16  Q.      Let's turn to Figure 10.  This

01:32:27  17  figure is describing Districts 13 and

01:32:31  18  15.

01:32:32  19          Could you describe what you did

01:32:33  20  here?

01:32:33  21  A.      This is an area whereas I

01:32:35  22  described some things --- some of

01:32:36  23  these districts, with 9 is taking over

01:32:38  24  some of the territory that was

01:32:40  25  previously in District 12.  And

111

| | |
|---|---|
| 01:32:44 | 1 |
| 01:32:46 | 2 |
| 01:32:48 | 3 |
| 01:32:51 | 4 |
| 01:32:52 | 5 |
| 01:32:55 | 6 |
| 01:32:57 | 7 |
| 01:33:00 | 8 |
| 01:33:04 | 9 |
| 01:33:06 | 10 |
| 01:33:07 | 11 |
| 01:33:10 | 12 |
| 01:33:12 | 13 |
| 01:33:16 | 14 |
| 01:33:18 | 15 |
| 01:33:23 | 16 |
| 01:33:25 | 17 |
| 01:33:26 | 18 |
| 01:33:30 | 19 |
| 01:33:33 | 20 |
| 01:33:37 | 21 |
| 01:33:39 | 22 |
| 01:33:42 | 23 |
| 01:33:45 | 24 |
| 01:33:46 | 25 |

District 10 is expanding somewhat to the east.  And as we'll see in a moment District 16 and 14 are expanding to the east.

I'm sorry, I misspoke a moment ago.  Those other places were expanding a bit to the west.  So the center part of the state is being squeezed by these population changes.  And so this is a place where the retention of District 12, 13 and 15 was not --- was not possible.  And so it was --- I tried to --- in making that reorientation of that area, tried to make compact districts, and again tried to minimize county splits.

And also, in terms of communities of interest, the old plan had split State College from some of its suburbs.  So this plan makes a rather compact and rectangular District 15 and resolves that problem and also creates a relatively compact version of District 13, but also attempts to minimize splits.

112

| | | |
|---|---|---|
| 01:33:48 | 1 | Q.      And finally, let's move to |
| 01:33:50 | 2 | Figure 11.  This one describes the |
| 01:33:56 | 3 | western Pennsylvania Districts 14, 12, |
| 01:33:58 | 4 | 17 and 16.  I know we discussed this |
| 01:34:01 | 5 | briefly with the larger map, and so if |
| 01:34:03 | 6 | there's anything that you would like |
| 01:34:04 | 7 | to add to your description about what |
| 01:34:07 | 8 | you did here. |
| 01:34:09 | 9 | A.      Merely that --- that the old |
| 01:34:11 | 10 | plan was --- was clearly attempting to |
| 01:34:18 | 11 | keep the City of Pittsburgh together |
| 01:34:19 | 12 | in one district, and that district was |
| 01:34:20 | 13 | previously known as District 18, but |
| 01:34:21 | 14 | we've lost districts.  That number |
| 01:34:24 | 15 | doesn't work for us anymore.  I've |
| 01:34:26 | 16 | called it District 12. |
| 01:34:27 | 17 | And this is a --- this is a |
| 01:34:30 | 18 | district that stays much the same, but |
| 01:34:33 | 19 | in order to keep this orientation that |
| 01:34:36 | 20 | the previous map had between Allegheny |
| 01:34:39 | 21 | County and its surroundings, it was |
| 01:34:43 | 22 | possible to simply alter, very |
| 01:34:44 | 23 | slightly, the border between 12 and |
| 01:34:49 | 24 | 17, and then expand 12 in a way that |
| 01:34:53 | 25 | --- that really just expand Pittsburgh |

113

| | | |
|---|---|---|
| 01:34:54 | 1 | --- the southern Pittsburgh district |
| 01:34:56 | 2 | into more of its suburbs and exurbs |
| 01:35:02 | 3 | over in Westmoreland County.  And |
| 01:35:02 | 4 | then, with respect to 14 and 16, they |
| 01:35:04 | 5 | simply, as described earlier, have |
| 01:35:06 | 6 | their existing orientation but have to |
| 01:35:08 | 7 | pick up population by moving slightly |
| 01:35:17 | 8 | eastward. |
| 01:35:17 | 9 | Q.      So now that we've gone through |
| 01:35:18 | 10 | the whole plan, how does the Carter |
| 01:35:21 | 11 | plan respect communities of interest? |
| 01:35:24 | 12 | A.      Well, I've walked through a few |
| 01:35:26 | 13 | examples of that.  For me the most |
| 01:35:28 | 14 | important thing is to think about --- |
| 01:35:30 | 15 | it's similar in spirit to the idea of |
| 01:35:33 | 16 | minimizing jurisdictional splits. |
| 01:35:34 | 17 | Sometimes counties split cities in |
| 01:35:38 | 18 | ways that even though formally it's |
| 01:35:42 | 19 | not --- we're not minimizing county |
| 01:35:45 | 20 | splits if we divide Harrisburg up into |
| 01:35:50 | 21 | three.  But it would be --- it makes a |
| 01:35:51 | 22 | lot of sense from a districting |
| 01:35:53 | 23 | perspective to try to keep whole |
| 01:35:55 | 24 | places like Harrisburg, the Lehigh |
| 01:35:58 | 25 | Valley, State College --- there's some |

114

01:35:58  1   other examples of places like that,
01:36:03  2   that in drawing the lines, even though
01:36:04  3   I was making small changes from the
01:36:05  4   existing plan I attempted to avoid
01:36:08  5   splitting apart those types of
01:36:12  6   communities.
01:36:19  7   Q.     What are your overall
01:36:20  8   conclusions, based on your analysis
01:36:22  9   about how the Carter plan compares to
01:36:23  10  the 2018 plan?
01:36:26  11  A.     Well, I was able to --- I was
01:36:28  12  able to quantitatively analyze that by
01:36:31  13  just looking at the --- looking at the
01:36:34  14  population data and overlaying the
01:36:34  15  maps and trying to get just a simple
01:36:37  16  measure that says what percentage of
01:36:38  17  the population in each district that I
01:36:40  18  created was already in that district,
01:36:47  19  so I did that district by district and
01:36:50  20  looked at the plan as a whole.
01:37:02  21         But the conclusion from that, I
01:37:05  22  should --- I think --- I didn't fully
01:37:06  23  answer your question.  The conclusion
01:37:06  24  from that is that they were very ---
01:37:07  25  that the maps were very similar.  They

115

01:37:09   1   were certainly similar as I could make

01:37:10   2   them.  And they --- and the share of

01:37:13   3   the population that was contained in

01:37:16   4   the --- in each district, if we take

01:37:19   5   average, it was very high.  I believe

01:37:20   6   it was 87 percent.

01:37:23   7   Q.      Did you look at that similar

01:37:25   8   population, lease change metric on the

01:37:35   9   other plans that were submitted to the

01:37:36   10  Court?

01:37:36   11  A.      Yes, I did.

01:37:36   12  Q.      And can you explain what the

01:37:36   13  utility of that metric is in cases

01:37:38   14  like this one, where the number of

01:37:38   15  districts in the plan has actually

01:37:43   16  changed?

01:37:43   17  A.      Well, we can still find --- we

01:37:45   18  can find what district was the --- in

01:37:46   19  the new proposed district what is the

01:37:49   20  largest overlapping district from the

01:37:54   21  past and we can figure out what the

01:37:56   22  population overlap is, and there will

01:37:58   23  still be some.  In all of the

01:38:00   24  districts I created it was well over

01:38:04   25  50 percent.  So it was certainly not

116

01:38:05    1    --- you know, but you can imagine if

01:38:06    2    we just start from scratch and we

01:38:08    3    start drawing districts as if there

01:38:10    4    was no regard at all for the old plan.

01:38:12    5    We would have several districts that

01:38:14    6    would be quite low like that.

01:38:21    7    Q.       Could we pull up Table One,

01:38:25    8    which is on page two of the rebuttal

01:38:26    9    --- or of the response report.  This

01:38:28   10    is entitled Retained Population Share

01:38:30   11    in the 14 Submitted Congressional

01:38:32   12    Plans.

01:38:33   13             Could you explain to us what

01:38:35   14    this table shows?

01:38:36   15    A.       Yes.  I was just describing the

01:38:38   16    approach I took to these calculations

01:38:42   17    just overlap --- again, overlaying

01:38:44   18    those maps, finding the largest

01:38:46   19    fragment in each district from the old

01:38:47   20    plan and asking what share of the

01:38:49   21    people in the new plan, the proposed

01:38:53   22    plan would be in the same district as

01:38:56   23    the old plan, the same district being

01:38:59   24    described as --- being defined as the

01:39:01   25    largest overlapping one.

117

01:39:03   1          And so what --- what I did, I
01:39:06   2   took averages for all the districts
01:39:09   3   and this is what we see for the ---
01:39:18   4   for each of the plans.
01:39:18   5   Q.      Based on this analysis, what
01:39:21   6   can you conclude about the Carter plan
01:39:22   7   as compared to the other plans that
01:39:24   8   are being considered on this
01:39:27   9   particular metric?
01:39:27  10   A.      Yes.  On this metric, which I
01:39:29  11   called Retained Population Share, my
01:39:30  12   plan --- the Carter plan is 87 percent
01:39:33  13   and the --- perhaps, let's see the
01:39:37  14   next largest one is the Citizen voters
01:39:40  15   plan and there are several that follow
01:39:43  16   later, but they're all --- they're all
01:39:43  17   quite a bit lower.
01:39:52  18   Q.      So now that we've talked about
01:39:54  19   some other criteria that you
01:39:55  20   considered and the decisions that you
01:39:57  21   have made in drawing your plan, did
01:39:59  22   you consider any racial data when
01:40:02  23   drawing your plan?
01:40:02  24   A.      No.
01:40:03  25   Q.      And do you consider partisan

118

01:40:04    1    data when drawing your plan?

01:40:08    2    A.        No.

01:40:08    3    Q.        Did you evaluate the

01:40:09    4    partisanship of your map at any point?

01:40:14    5    A.        At the end.  I created some

01:40:15    6    partisan indices and I discussed those

01:40:18    7    in my report.

01:40:20    8    Q.        And did you evaluate the

01:40:22    9    partisanship of the other maps that

01:40:26   10    were submitted to the Court?

01:40:27   11    A.        I did.

01:40:27   12    Q.        Were you aware of the

01:40:28   13    identities of the groups that either

01:40:29   14    supported or supported the maps that

01:40:31   15    were sent to the Court?

01:40:32   16    A.        No, the maps were provided to

01:40:34   17    me with abbreviations and strange

01:40:37   18    names that were not familiar to me, so

01:40:40   19    I was unfamiliar with who produced

01:40:41   20    those maps.  I'm still actually foggy

01:40:47   21    on who some of the parties are, so

01:40:48   22    they were unknown to me.

01:40:50   23    Q.        So you started mentioning this,

01:40:54   24    what methodology did you take to

01:40:57   25    examine the partisanship in the

119

| | | |
|---|---|---|
| 01:41:02 | 1 | existing maps? |
| 01:41:03 | 2 | A.      The same methodology I used in |
| 01:41:04 | 3 | my --- in my map, which was to take |
| 01:41:06 | 4 | precinct level data from statewide |
| 01:41:07 | 5 | elections, and I had access to and |
| 01:41:10 | 6 | used data from 2016, 2018 and 2020 |
| 01:41:15 | 7 | used those precinct level data to |
| 01:41:20 | 8 | aggregate to the level of the proposed |
| 01:41:23 | 9 | districts to my plan and the other |
| 01:41:25 | 10 | plans, and then analyzed the statewide |
| 01:41:28 | 11 | vote shares that would be obtained if |
| 01:41:33 | 12 | we were just looking --- just using |
| 01:41:35 | 13 | statewide vote chairs somehow to |
| 01:41:37 | 14 | determine the winners of those |
| 01:41:38 | 15 | districts.  Use that as a rule of |
| 01:41:41 | 16 | thumb to just starting the process to |
| 01:41:44 | 17 | try to understand what kind of |
| 01:41:45 | 18 | partisan outcomes we might get from |
| 01:41:48 | 19 | this type of map. |
| 01:41:51 | 20 | Q.      Can you explain why you would |
| 01:41:52 | 21 | use a statewide data for this type of |
| 01:41:55 | 22 | analysis? |
| 01:41:58 | 23 | A.      Well, we are trying to think |
| 01:41:59 | 24 | about what this map might produce in |
| 01:42:02 | 25 | the future, so the legislative |

| | | |
|---|---|---|
| 01:42:04 | 1 | elections haven't happened yet and we |
| 01:42:06 | 2 | can't really use old legislative |
| 01:42:08 | 3 | elections, because all of the changes |
| 01:42:10 | 4 | that have been made.  So statewide |
| 01:42:13 | 5 | races are useful because the same |
| 01:42:15 | 6 | candidates are competing for the same |
| 01:42:17 | 7 | offices throughout the state.  So they |
| 01:42:18 | 8 | give us a rule of thumb sense of what |
| 01:42:21 | 9 | the partisanship of a district looks |
| 01:42:28 | 10 | like. |
| 01:42:28 | 11 | Q.      Let's pull up Table 5, which is |
| 01:42:31 | 12 | on page nine of the Response Report. |
| 01:42:43 | 13 | So this is figure is titled number of |
| 01:42:46 | 14 | seats in various categories in all of |
| 01:42:47 | 15 | the plans. |
| 01:42:47 | 16 | ATTORNEY JASRASARAI: |
| 01:42:48 | 17 | Could we highlight the |
| 01:42:49 | 18 | row that says Carter plan?  It's like |
| 01:42:51 | 19 | halfway down. |
| 01:42:51 | 20 | BY ATTORNEY JASRASARAI: |
| 01:43:03 | 21 | Q.      Can you describe what this |
| 01:43:04 | 22 | table shows with regard to the seats? |
| 01:43:06 | 23 | A.      Yes, I would like to begin by |
| 01:43:14 | 24 | informing the Court of the mistake in |
| 01:43:15 | 25 | this --- in this --- at this table, |

121

01:43:15   1    which I don't want to confuse anyone.
          2    The far right column says number of
          3    seats with statewide dem vote share.
          4    That should say Rep.  It should be
          5    Republican.
          6            So with that in mind, what ---
          7    what I've done here is simply in the
          8    far left and far right column, I've
          9    just asked a simple question.  When I
         10    perform that task of aggregating up
         11    all of those precinct level results to
         12    the level of the proposed districts in
         13    these plans, how many of those
         14    districts have a statewide average
01:43:20  15    Democratic vote share in these 2016 to
01:43:20  16    2020 races that is above 50 percent.
01:43:20  17    I'm just adding those things up.  And
01:43:59  18    in the far right column, I'm doing the
01:44:00  19    same thing for Republicans.  What is
01:44:02  20    the number of seats with a statewide
01:44:03  21    Republican vote share above
01:44:06  22    50 percent?  So that is a first
01:44:11  23    approximation of just what the
01:44:14  24    partisanship of these districts look
01:44:15  25    like.

122

| | | |
|---|---|---|
| 01:44:15 | 1 | But what I've done further is |
| 01:44:17 | 2 | ask some questions about --- I mean, I |
| 01:44:19 | 3 | think it's very important that we |
| 01:44:20 | 4 | address not just is it above |
| 01:44:25 | 5 | 50 percent, but how competitive of |
| 01:44:27 | 6 | these districts.  If we're really |
| 01:44:31 | 7 | trying to get a realistic sense of how |
| 01:44:33 | 8 | responsive the plan will be and what |
| 01:44:35 | 9 | might happen over a ten-year period, |
| 01:44:38 | 10 | it's very valuable to know that some |
| 01:44:38 | 11 | of these districts are really |
| 01:44:39 | 12 | essentially coin tosses even though we |
| 01:44:44 | 13 | have some number that, say, 50 percent |
| 01:44:45 | 14 | plus, you know, 50.05 or something |
| 01:44:46 | 15 | like that.  It's important when |
| 01:44:48 | 16 | considering the partisanship of these |
| 01:44:51 | 17 | plans to know about that. |
| 01:44:52 | 18 | So what I've done here is |
| 01:44:53 | 19 | simply as a first cut taken this |
| 01:44:56 | 20 | 52 percent as a cut point, and I think |
| 01:44:58 | 21 | that's a --- that's one that |
| 01:45:00 | 22 | reasonable people can disagree about. |
| 01:45:02 | 23 | We can say that the cut point should |
| 01:45:07 | 24 | be 53, we can say it should be 54. |
| 01:45:07 | 25 | But I thought this was a useful one |

123

01:45:07    1    just for getting a sense of what are

01:45:11    2    the really competitive districts that

01:45:11    3    are potentially like toss ups and what

01:45:11    4    are the districts that are a little

01:45:11    5    bit more comfortable for one of the

01:45:11    6    parties.

01:45:20    7            And so when we add this up we

01:45:21    8    get this --- we get this column for

01:45:22    9    the Democrats that's in a darker shade

01:45:25    10    blue and we get a similar column for

01:45:30    11    the Republicans that's in a darker

01:45:32    12    shade of red.  In the middle we get a

01:45:38    13    sense of what kind of really razor's

01:45:38    14    edge districts are these plans

01:45:39    15    producing?  How many districts are

01:45:41    16    there that lean a little Democratic or

01:45:43    17    a little bit Republican?  So that's

01:45:45    18    what we see there in the middle

01:45:48    19    columns.

01:45:48    20    Q.      So looking at the Carter plan

01:45:51    21    in particular, which the row has been

01:45:52    22    highlighted, how many seats are above

01:45:54    23    50 percent Democratic vote share?

01:45:58    24    A.      There are ten.

01:45:59    25    Q.      And in the Carter plan again,

124

01:46:01  1  how many seats are above 50 percent

01:46:04  2  Republican vote share?

01:46:05  3  A.      Seven.

01:46:05  4  Q.      Does that mean that the Carter

01:46:06  5  plan will result in ten Democrats and

01:46:09  6  seven Republicans being elected to

01:46:11  7  congress from Pennsylvania?

01:46:13  8  A.      No, I think that would require

01:46:15  9  a very naive idea about the way the

01:46:21  10  statewide vote shares translate into

01:46:22  11  actual Congressional elections.  I

01:46:25  12  don't think very many political

01:46:27  13  analysts would --- would anticipate

01:46:29  14  that kind of an outcome for a couple

01:46:31  15  of reasons.

01:46:33  16        The first reason is that we can

01:46:34  17  see that there are two districts here

01:46:37  18  that are essentially toss ups.  They

01:46:41  19  are very close to 50 percent, but what

01:46:43  20  I've done in my report, in addition,

01:46:45  21  is also tried to consider if our goal

01:46:49  22  in this type of analysis is to think

01:46:51  23  about what the likely partisanship is

01:46:55  24  of the plan, of the Congressional

01:46:56  25  delegation.  We would be missing some

125

| | | |
|---|---|---|
| 01:46:58 | 1 | very valuable information if we did |
| 01:47:00 | 2 | not pay any attention to incumbency. |
| 01:47:05 | 3 | So one simple way to think |
| 01:47:07 | 4 | about incumbency is just to look at |
| 01:47:10 | 5 | --- because again, you asked earlier, |
| 01:47:12 | 6 | well, why use statewide elections, why |
| 01:47:15 | 7 | can't we maybe use actual |
| 01:47:16 | 8 | Congressional elections.  Well, the |
| 01:47:19 | 9 | nice thing about the previous plan is |
| 01:47:20 | 10 | we can do that, but at the same time |
| 01:47:22 | 11 | we can see what happened in these |
| 01:47:23 | 12 | districts in the actual election for |
| 01:47:26 | 13 | Congress and what happened in these |
| 01:47:27 | 14 | statewide races. |
| 01:47:28 | 15 | And many of the districts are |
| 01:47:29 | 16 | relatively similar.  In some places |
| 01:47:32 | 17 | the incumbents over perform relative |
| 01:47:35 | 18 | to their --- to the statewide vote |
| 01:47:38 | 19 | share.  Now, that's useful information |
| 01:47:39 | 20 | for us.  Again, if our --- if our |
| 01:47:42 | 21 | exercise here is to really try to |
| 01:47:43 | 22 | understand what these plans will |
| 01:47:45 | 23 | produce in terms of partisanship, then |
| 01:47:49 | 24 | we --- then we would want that |
| 01:47:50 | 25 | information, we would want to pay |

126

| | | |
|---|---|---|
| 01:47:52 | 1 | attention to that information. |
| 01:47:54 | 2 | And so in these two relatively |
| 01:47:58 | 3 | highly contested districts in my plan |
| 01:48:00 | 4 | that are in the --- that --- and those |
| 01:48:02 | 5 | are Districts 8 and 7, those are the |
| 01:48:05 | 6 | Lehigh Valley districts and the |
| 01:48:08 | 7 | Northeast District, those are |
| 01:48:09 | 8 | districts where the incumbent is |
| 01:48:13 | 9 | either very similar to the statewide |
| 01:48:15 | 10 | vote share or does slightly better |
| 01:48:17 | 11 | than the statewide vote share.  So no |
| 01:48:19 | 12 | matter how we look at those, those are |
| 01:48:21 | 13 | very competitive districts. |
| 01:48:22 | 14 | However, there's another |
| 01:48:23 | 15 | District here that currently is |
| 01:48:25 | 16 | classified in my plan, and in fact, |
| 01:48:27 | 17 | in, I believe, all of the other plans |
| 01:48:29 | 18 | is classified as a Democrat --- as a |
| 01:48:33 | 19 | strong Democratic District.  And this |
| 01:48:35 | 20 | District is, in fact, currently |
| 01:48:37 | 21 | represented by a Republican incumbent |
| 01:48:41 | 22 | who over performs consistently |
| 01:48:44 | 23 | relative to statewide co-partisans to |
| 01:48:46 | 24 | the --- to the extent of seven |
| 01:48:46 | 25 | percentage points. |

127

01:48:50   1        So this is District 1 in Bucks
01:48:53   2   County, which for reasons that we just
01:48:54   3   walked through, because of its place
01:48:58   4   in the corner of the state, and
01:49:03   5   because the fact its population is
01:49:05   6   very similar to the --- is very close
01:49:05   7   to the population of a Congressional
01:49:06   8   district, Bucks County is kept whole
01:49:10   9   in all of these --- in all these plans
01:49:11   10   more or less with some exceptions.
01:49:13   11   But there is a District that is
01:49:15   12   overwhelmingly based on Bucks County
01:49:18   13   and all of these plans.  And all of
01:49:19   14   these plans are counting this as a
01:49:21   15   Democratic District when, in fact,
01:49:23   16   it's not, and everyone knows that.
01:49:26   17        And so this is --- if you put
01:49:31   18   all this together and you realize that
01:49:33   19   this whole exercise --- and I suspect
01:49:35   20   we will here a lot about this type of
01:49:37   21   exercise throughout the day, this
01:49:39   22   exercise of adding up the number of
01:49:41   23   districts in which something is above
01:49:43   24   --- some index is above .5, needs to
01:49:48   25   be taken with a --- we need to

128

01:49:50   1   consider these numbers with a great

01:49:51   2   deal of care and we need to understand

01:49:53   3   that these numbers, when we have a lot

01:49:55   4   of very competitive districts in the

01:49:57   5   middle a very small change can lead

01:50:01   6   --- can turn what appears to be a 10

01:50:03   7   to 7 District 1 way into very easily a

01:50:06   8   10 to 7 District the other way.

01:50:08   9        So in the Carter plan, we

01:50:10   10  already established that one of these

01:50:12   11  so-called Democratic districts is

01:50:14   12  actually represented by a rather safe

01:50:19   13  Republican incumbent, and we've also

01:50:21   14  established that there are these two

01:50:24   15  very competitive districts in the

01:50:25   16  middle.  You put all of that together

01:50:27   17  in a --- in a somewhat pro Republican

01:50:29   18  election, this is --- this is a 10 to

01:50:31   19  7 plan in the other direction.

01:50:33   20       So that needs to be kept in

01:50:35   21  mind about all of these plans and

01:50:37   22  about all of the --- all of the

01:50:37   23  considerations we'll make about

01:50:40   24  partisanship is based on kind of seat

01:50:45   25  counting.

129

| | | |
|---|---|---|
| 01:50:46 | 1 | Q.       So given all of that, is the |
| 01:50:49 | 2 | Carter plan reflective of voter |
| 01:50:51 | 3 | preferences in Pennsylvania? |
| 01:50:53 | 4 | A.       Yeah, for all the reasons I |
| 01:50:55 | 5 | just described, I believe it is, |
| 01:50:56 | 6 | because as I think has been pointed |
| 01:50:58 | 7 | out earlier today it is a state that |
| 01:51:00 | 8 | has had Democratic vote share between |
| 01:51:04 | 9 | 52 and 53 percent in statewide |
| 01:51:06 | 10 | elections, so we would anticipate a |
| 01:51:09 | 11 | set of districts in which there's more |
| 01:51:12 | 12 | likely than not, especially since we |
| 01:51:15 | 13 | have an odd number of districts, a |
| 01:51:17 | 14 | slight Democratic majority, but we |
| 01:51:20 | 15 | would expect to see the opportunity |
| 01:51:21 | 16 | for that to flip in a pro Republican |
| 01:51:28 | 17 | election and we would expect to see |
| 01:51:30 | 18 | some tight districts in the middle, |
| 01:51:31 | 19 | and that's what we see here. |
| 01:51:32 | 20 | Q.       Is the Carter plan also |
| 01:51:34 | 21 | responsive to changes in voter |
| 01:51:39 | 22 | preferences in Pennsylvania? |
| 01:51:40 | 23 | A.       I believe because it has, you |
| 01:51:41 | 24 | know, several districts that are |
| 01:51:42 | 25 | competitive.  And in fact, if I don't |

130

| | | |
|---|---|---|
| 01:51:44 | 1 | use 52 percent, but if I widen that |
| 01:51:46 | 2 | out a little bit further, we'd see |
| 01:51:48 | 3 | even more competitive districts.  I |
| 01:51:50 | 4 | described the District in where we're |
| 01:51:53 | 5 | sitting now, in the Harrisburg area, |
| 01:51:55 | 6 | as one that could also be potentially |
| 01:51:57 | 7 | --- could also be potentially |
| 01:52:00 | 8 | competitive and one that's not |
| 01:52:01 | 9 | classified as competitive here, but I |
| 01:52:03 | 10 | think it very well is very close and |
| 01:52:06 | 11 | could be is one in the western suburbs |
| 01:52:11 | 12 | of Pittsburgh as well. |
| 01:52:14 | 13 | So there are a number of |
| 01:52:15 | 14 | competitive districts here where again |
| 01:52:17 | 15 | a very small shift away from patterns |
| 01:52:20 | 16 | we've seen in the last couple of |
| 01:52:22 | 17 | elections toward the Republican party |
| 01:52:25 | 18 | would --- would yield a number of |
| 01:52:26 | 19 | seats changing hands.  I don't think |
| 01:52:29 | 20 | there's any --- I don't think that can |
| 01:52:31 | 21 | be disputed. |
| 01:52:34 | 22 | Q.    So you can refer to page ten of |
| 01:52:38 | 23 | your response report.  Based on this |
| 01:52:44 | 24 | table and pages nine and ten of your |
| 01:52:47 | 25 | report what about the other pages are |

131

01:52:49  1    there any that stand out to you as

01:52:51  2    outliers in this analysis pages nine

01:52:53  3    and ten of your report?

01:52:57  4    A.      I hesitate to call them safe

01:52:59  5    seats because I don't think that

01:53:00  6    captures at all what --- what we're

01:53:02  7    seeing here.  But if you look at those

01:53:05  8    seats that have a Democratic vote

01:53:07  9    share above 52 percent, we see that

01:53:12  10   --- you know, a couple of --- some of

01:53:14  11   them are a bit, you know, lower than

01:53:17  12   others.  We see HB-12146 and the

01:53:21  13   Reschenthaler plan and the senate

01:53:25  14   Democratic plan, number one, have that

01:53:29  15   feature.

01:53:30  16          We also see that --- we see

01:53:31  17   differences in the plan with respect

01:53:32  18   to the number of competitive seats, we

01:53:35  19   see --- we also see, I think,

01:53:38  20   especially what stands out about the

01:53:43  21   Reschenthaler 1 and 2 plans, is they

01:53:45  22   have a greater number of seats with

01:53:48  23   statewide Republican vote share above

01:53:51  24   52 percent.  Those are some of the

01:54:01  25   observations that I --- I made in the

132

01:54:03    1    report.

01:54:03    2    Q.        Are there any other plans that

01:54:04    3    lean the other way before towards a

01:54:06    4    Democratic advantage?

01:54:08    5    A.        If we look at the --- if we

01:54:10    6    just look at a very simple way at the

01:54:12    7    number of --- the number of seats we

01:54:14    8    see that the house Democratic caucus

01:54:21    9    plan produces 11 with a share above

01:54:24    10   50 percent, although I certainly have

01:54:24    11   more in the bit about how to interpret

01:54:25    12   those numbers.  But that one, you can

01:54:31    13   just see it's an outlier relative to

01:54:33    14   the others and that the number is 11

01:54:35    15   rather than 10.

01:54:36    16        But also when we look at the

01:54:37    17   --- at the safe --- you know, the more

01:54:43    18   than 52 percent Republican seats, we

01:54:46    19   see that that plan also has --- has

01:54:52    20   won fewer than the others.

01:55:01    21   Q.        Did you conduct any other

01:55:03    22   analyses on the topic of partisanship

01:55:04    23   in these plans?

01:55:05    24   A.        Yes.  I was --- I focused at

01:55:06    25   the end of my report briefly on the

133

01:55:08  1    difference between the mean and the

01:55:09  2    median and the distribution of

01:55:12  3    District level vote shares.  So it was

01:55:15  4    something --- the distribution of

01:55:17  5    support across districts, I think, is

01:55:19  6    a useful way for the Court to wade

01:55:22  7    through all of this, and I presented

01:55:24  8    some information, some displays about

01:55:27  9    those distributions and then a simple

01:55:34  10   summary statistic about those

01:55:34  11   Districts and those distributions is

01:55:36  12   to examine the mean and to examine the

01:55:38  13   median and to look at the difference

01:55:40  14   between those two.

01:55:41  15   Q.      Let's just pull up that table,

01:55:42  16   it's Table 6 on page 11 of the

01:55:45  17   response report.

01:55:56  18          Is this the summary statistic

01:55:58  19   that you were describing?

01:55:59  20   A.      Yes.

01:56:02  21   Q.      And can you tell us what it

01:56:05  22   shows?

01:56:05  23   A.      Yes.  Again, what's happening

01:56:06  24   here is we're taking those statewide

01:56:10  25   election results we're aggregating

134

| | | |
|---|---|---|
| 01:56:13 | 1 | them to the districts of these |
| 01:56:14 | 2 | proposed plans, and we're doing |
| 01:56:16 | 3 | something very simple, which is we're |
| 01:56:17 | 4 | just trying to understand what is the |
| 01:56:18 | 5 | mean of the expected --- from |
| 01:56:21 | 6 | statewide vote share, expected |
| 01:56:25 | 7 | statewide vote share and what is the |
| 01:56:27 | 8 | median across the districts. |
| 01:56:30 | 9 | And what we see is that in most |
| 01:56:33 | 10 | of the plans --- again, this is using |
| 01:56:35 | 11 | data from 2016 to 2020, in most of the |
| 01:56:39 | 12 | plans the mean and the median are very |
| 01:56:43 | 13 | similar. We see just trivial |
| 01:56:46 | 14 | differences between the mean and the |
| 01:56:48 | 15 | median, which suggests that there |
| 01:56:50 | 16 | aren't --- that suggests there's not a |
| 01:56:52 | 17 | pack of districts in the tail of the |
| 01:56:54 | 18 | distribution where a lot of voters |
| 01:56:56 | 19 | from one of the parties are focused |
| 01:56:58 | 20 | and there isn't sort of a nice peak in |
| 01:57:02 | 21 | the distribution where one of the |
| 01:57:03 | 22 | parties has an unusual number of |
| 01:57:06 | 23 | comfortable victories. |
| 01:57:10 | 24 | So we just don't see anything |
| 01:57:11 | 25 | like that. We see no difference |

135

| | |
|---|---|
| 01:57:13 | 1 |
| 01:57:15 | 2 |
| 01:57:17 | 3 |
| 01:57:18 | 4 |
| 01:57:20 | 5 |
| 01:57:22 | 6 |
| 01:57:24 | 7 |
| 01:57:27 | 8 |
| 01:57:29 | 9 |
| 01:57:31 | 10 |
| 01:57:31 | 11 |
| 01:57:31 | 12 |
| 01:57:31 | 13 |
| 01:57:31 | 14 |
| 01:57:43 | 15 |
| 01:57:43 | 16 |
| 01:57:45 | 17 |
| 01:57:55 | 18 |
| 01:57:57 | 19 |
| 01:57:59 | 20 |
| 01:57:59 | 21 |
| 01:58:02 | 22 |
| 01:58:02 | 23 |
| 01:58:02 | 24 |
| 01:58:11 | 25 |

between the mean and the median in
most of the plans.  But then there are
some here where we do see a
substantial difference, a difference
of the kind where the median district
is more Republican than the average
across the districts.  So it doesn't
necessarily tell us that that's
evidence that someone has been working
to produce districts with a partisan
advantage, but it is interesting that
lots of people sat down and tried to
draw some plans.

        But a couple of these plans
ended up with a median district that
is more Republican than the average.
And those are the HB-2146 plan, the
Voters of Pennsylvania plan.  Those
are the two that really stand out the
most, although if we're looking --- if
we go a little bit further down we can
see that the Citizen Voters plan has a
difference of 1.4 percentage points.
And both of the --- both of the
Reschenthaler plans are around one

136

01:58:12    1    percent, so --- and everything else is

01:58:15    2    very close to zero.  So that's just

01:58:18    3    one very, very quick or simple way of

01:58:20    4    understanding --- just characterizing

01:58:23    5    the distribution of partisanship

01:58:39    6    across plans.

01:58:39    7    Q.      And so would your conclusion

01:58:41    8    based on that be that some of those

01:58:44    9    plans are outliers on partisanship?

01:58:46   10    A.      Yes, and it corresponds to the

01:58:49   11    simpler analysis of just looking at

01:58:51   12    the number of seats.  You know, if we

01:58:52   13    look at the number of seats produced

01:58:54   14    in these plans and we think about

01:58:57   15    realistic scenarios, we take into

01:58:58   16    account things like incumbency, we

01:58:58   17    have potential that these plans would

01:58:58   18    produce counter-majoritarian outcomes

01:58:58   19    where a 50-percent vote share would

01:59:07   20    lead to a Republican seat share that

01:59:08   21    was well above 50 percent.

01:59:12   22    Q.      Thank you.  Well, we only have

01:59:14   23    a few minutes left, so I just wanted

01:59:15   24    to conclude by asking you, you know,

01:59:18   25    based on what we've talked about

137

01:59:19  1    today, what --- how does the Carter
01:59:23  2    plan compare to the other plans that
01:59:24  3    were --- what are your conclusions,
01:59:27  4    your summary conclusions, about how
01:59:28  5    the Carter plan compares to the other
01:59:30  6    plans that were submitted by the
01:59:32  7    Court?
01:59:32  8    A.      I started by comparing it with
01:59:34  9    the existing plan and then received a
01:59:36  10   large stack of plans, which I could
01:59:38  11   then sort through and see how my plan
01:59:41  12   compared.  And on the whole, I was
01:59:44  13   very pleased with the way my plan
01:59:46  14   performed in terms of traditional
01:59:48  15   redistricting criteria.  It looks ---
01:59:52  16   it looks on some indicators of
01:59:54  17   compactness very good.  On others,
01:59:58  18   it's sort of in the middle.  On county
01:59:59  19   splits it does very well.  On vote
02:00:02  20   tabulation splits it does very well.
02:00:04  21   And I think that when it comes to
02:00:06  22   partisan fairness, it is --- it also
02:00:10  23   performs very well.  And
02:00:11  24   responsiveness to changing preferences
02:00:20  25   of Pennsylvania voters, I think it

138

02:00:20  1   clearly performs well on that

02:00:23  2   dimension as well.

02:00:27  3                    ATTORNEY JASRASARIA:

02:00:28  4            Thank you.  That's all

02:00:29  5   of my questions.  I will pass the

02:00:31  6   witness.

02:00:31  7                    JUDGE McCULLOUGH:

02:00:31  8            Okay.

02:00:31  9            We're going to proceed

02:00:33  10  to Cross Examination now, and the

02:00:35  11  first one on the list would be

02:00:37  12  Petitioner Gressman attorney.  Do you

02:00:45  13  have Cross.

02:00:45  14                   ATTORNEY RING-AMUNSON:

02:00:57  15           Thank you.

02:00:57  16                    - - -

02:00:57  17              CROSS EXAMINATION

02:00:57  18                    - - -

02:00:58  19  BY ATTORNEY RING-AMUNSON:

02:00:58  20  Q.      Good morning, Doctor Rodden.

02:00:58  21  It's nice to see you.  I'm Jessie

02:01:01  22  Amunson, and I represent the Gressman

02:01:02  23  Math and Science Petitioners.

02:01:04  24  A.      Good morning.

02:01:04  25  Q.       I have just a few questions for

139

| 02:01:05 | 1 | you this morning.  In your analysis of |
| 02:01:10 | 2 | which plan has the least amount of |
| 02:01:12 | 3 | change as compared to the 2018 |
| 02:01:14 | 4 | remedial plan, did you consider how |
| 02:01:16 | 5 | improving on the 2018 mapped |
| 02:01:19 | 6 | performance with respect to the |
| 02:01:20 | 7 | various criteria, for example, respect |
| 02:01:23 | 8 | for political subdivisions, would |
| 02:01:25 | 9 | affect the numbers that you report on |
| 02:01:26 | 10 | retained population share? |
| 02:01:31 | 11 | A.      That would involve me trying to |
| 02:01:34 | 12 | make some different kind of map that |
| 02:01:40 | 13 | --- the question, if I understand it |
| 02:01:42 | 14 | correctly, is is there a trade-off |
| 02:01:44 | 15 | between trying to achieve overlap and |
| 02:01:51 | 16 | --- was the question about splits in |
| 02:01:54 | 17 | particular or --- let me make sure I |
| 02:01:57 | 18 | just understand the question. |
| 02:01:57 | 19 | Q.      Yes.  So let me rephrase it. |
| 02:01:59 | 20 | So would you agree that if a party |
| 02:02:01 | 21 | prioritized compliance with, for |
| 02:02:05 | 22 | example, respect for the political |
| 02:02:05 | 23 | subdivisions to keep even more |
| 02:02:05 | 24 | political subdivisions intact than the |
| 02:02:05 | 25 | 2018 plan, that would impact the least |

140

| | | |
|---|---|---|
| 02:02:05 | 1 | changed metrics that you report? |
| 02:02:18 | 2 | A.    I don't think so.  I think on |
| 02:02:19 | 3 | county splits I was already --- I was |
| 02:02:19 | 4 | already I think as low as any of us |
| 02:02:22 | 5 | will get.  And then so were there |
| 02:02:24 | 6 | instances of municipal splits that I |
| 02:02:27 | 7 | had to make because I was in this kind |
| 02:02:29 | 8 | of straightjacket of the initial plan? |
| 02:02:32 | 9 | No, because it wasn't a |
| 02:02:34 | 10 | straightjacket.  You would see that I |
| 02:02:36 | 11 | did have to make changes.  So did --- |
| 02:02:38 | 12 | did the attempt to minimize the |
| 02:02:44 | 13 | changes from the existing plan force |
| 02:02:47 | 14 | me into unwanted splits, I don't |
| 02:02:49 | 15 | recall any situations like that. |
| 02:02:51 | 16 | Q.    So if I told you that with |
| 02:02:54 | 17 | respect to the specific constitutional |
| 02:02:57 | 18 | criteria, the six political |
| 02:02:59 | 19 | subdivisions that are enumerated in |
| 02:03:02 | 20 | the Constitution, which are counties, |
| 02:03:03 | 21 | cities, incorporated towns, boroughs, |
| 02:03:07 | 22 | townships and wards, if I told you |
| 02:03:10 | 23 | that the 2018 plan split 72 of them |
| 02:03:15 | 24 | and the Gressman plan split only 49 of |
| 02:03:20 | 25 | them, would you expect that the |

141

| | | |
|---|---|---|
| 02:03:22 | 1 | Gressman plan's choice not to split |
| 02:03:24 | 2 | political subdivisions would impact |
| 02:03:27 | 3 | the least changed metrics that you |
| 02:03:30 | 4 | report? |
| 02:03:31 | 5 | A.       It would be an analysis I would |
| 02:03:33 | 6 | have to do.  It's not clear to me that |
| 02:03:39 | 7 | --- I think you're implying there's a |
| 02:03:40 | 8 | trade-off, and I'm not --- without |
| 02:03:42 | 9 | doing some analysis, I'm not ready to |
| 02:03:45 | 10 | --- to agree that that trade-off is |
| 02:03:47 | 11 | strong or that it's there at all.  I'm |
| 02:03:50 | 12 | just not sure. |
| 02:03:51 | 13 | Q.       So if you --- if you are |
| 02:03:52 | 14 | attempting to actually improve on the |
| 02:03:54 | 15 | constitutional criteria --- you |
| 02:03:56 | 16 | reported on counties, but there are |
| 02:03:58 | 17 | actually six different political |
| 02:04:01 | 18 | subdivisions in the Constitution.  And |
| 02:04:02 | 19 | if you tried to maximize compliance on |
| 02:04:05 | 20 | keeping all of them whole, not |
| 02:04:08 | 21 | dividing any of them more than |
| 02:04:11 | 22 | absolutely necessary, would you expect |
| 02:04:12 | 23 | to see some actual trade-off with the |
| 02:04:14 | 24 | least change metrics? |
| 02:04:17 | 25 | A.       Well, I think we should not |

142

| | |
|---|---|
| 02:04:22 | 1 |
| 02:04:25 | 2 |
| 02:04:26 | 3 |
| 02:04:29 | 4 |

1  lump all these different counties ---

2  these entities smaller than a county

3  into one bucket.  I should be clear

4  that I paid attention to county

5  subdivisions when I was --- when I was

6  working.  There are a variety of other

7  jurisdictions like --- like wards and

8  census designated places and other

9  things that I was not --- I was not

10  focusing on in my analysis.  So if I

11  came to this with the approach that

12  I'm going to minimize the split of

13  census designated places, would that

14  approach yield a different number in

15  terms of retained population, it

16  probably would.

17  Q.      And you mentioned wards, for

18  example, is not something that you

19  were looking at, but wards is one of

20  the six subdivisions that are

21  specifically enumerated in the

22  Pennsylvania Constitution.

23          Correct?

24  A.      That's right, wards were not

25  something I focused on.

143

| | |
|---|---|
| 02:05:20 | 1 |
| 02:05:23 | 2 |
| 02:05:31 | 3 |
| 02:05:31 | 4 |
| 02:05:32 | 5 |
| 02:05:34 | 6 |
| 02:05:36 | 7 |
| 02:05:38 | 8 |
| 02:05:38 | 9 |
| 02:05:39 | 10 |
| 02:05:48 | 11 |
| 02:05:50 | 12 |
| 02:05:53 | 13 |
| 02:05:54 | 14 |
| 02:05:56 | 15 |
| 02:05:58 | 16 |
| 02:06:00 | 17 |
| 02:06:03 | 18 |
| 02:06:04 | 19 |
| 02:06:09 | 20 |
| 02:06:10 | 21 |
| 02:06:11 | 22 |
| 02:06:11 | 23 |
| 02:06:11 | 24 |
| 02:06:17 | 25 |

Q.     And you also mentioned that you did focus on keeping VTDs, Voter Tabulation Districts, together, but those are not one of the six political subdivisions that the Pennsylvania Constitution prioritizes not dividing more than absolutely necessary.

Correct?

A.     That's correct.

Q.     And can you just tell me the least change approach that you reported on as measured by retained population share, are you aware of any Court using that whereas here the number of districts has changed from the old plan to the new?

A.     I don't have enough knowledge of Court cases to be able to answer that question.  I'm not aware of any.

                    ATTORNEY RING-AMUNSON:

                    Thank you.  I have no further questions.

                    JUDGE McCULLOUGH:

                    Thank you, Counsel.

Attorney for Secretary Chapman, is

144

02:06:18   1    there any Cross?  Or are you crossing

02:06:21   2    for Governor Wolf.

3                    ATTORNEY WIYGUL:

4                    I think primarily, Your

5    Honor, I'll be appearing for the

6    Governor.  Thank you.

7                         - - -

8                    CROSS EXAMINATION

02:06:35   9                    - - -

02:06:35   10   BY ATTORNEY WIYGUL:

11   Q.       Good afternoon, Doctor Rodden.

12                    COURT REPORTER:

13                    I'm so sorry, what's

14   your name.

15                    ATTORNEY WIYGUL:

16                    Robert Wiygul on behalf

17   of Governor Wolf.

18   BY ATTORNEY WIYGUL:

19   Q.       You've showed during your

20   Direct Examination some scoring you

02:06:37   21   had done of mean median metrics and

02:06:40   22   also number of seats.

02:06:41   23                    Do you recall that?

02:06:42   24   A.       Yes.

02:06:42   25   Q.       And that was based on your

145

02:06:45    1    analysis of the results of a certain
02:06:47    2    number of statewide elections.
02:06:49    3            Is that right?
02:06:49    4    A.      Yes.
02:06:50    5    Q.      How many, again, elections did
02:06:52    6    you look at?
02:06:53    7    A.      I looked at all of the
02:06:54    8    statewide elections from 2016 to 2020.
02:06:57    9    Q.      And just to be clear, was the
02:07:00   10    scoring you did with respect to mean,
02:07:02   11    median and number of seats, was that
02:07:03   12    based on an average of those election
02:07:06   13    results?
02:07:06   14    A.      Yes.
02:07:10   15                    ATTORNEY WIYGUL:
02:07:10   16            Thank you.
02:07:15   17                    JUDGE McCULLOUGH:
           18            That was fast.  Counsel
           19    for --- excuse me, Representative
           20    Cutler's group, is that going first.
           21            Okay.
           22                    - - -
           23            CROSS EXAMINATION
02:08:05   24                    - - -
02:08:05   25    BY ATTORNEY LEWIS:

146

| | |
|---|---|
| 02:08:05 | 1 |
| 02:08:06 | 2 |
| 02:08:09 | 3 |
| 02:08:10 | 4 |
| 02:08:11 | 5 |
| 02:08:15 | 6 |
| 02:08:17 | 7 |
| 02:08:25 | 8 |
| 02:08:28 | 9 |
| 02:08:29 | 10 |
| 02:08:31 | 11 |
| 02:08:31 | 12 |
| 02:08:34 | 13 |
| 02:08:39 | 14 |
| 02:08:41 | 15 |
| 02:08:43 | 16 |
| 02:09:04 | 17 |
| 02:09:05 | 18 |
| 02:09:07 | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

Q.      Good morning, Doctor Rodden. My name is Patrick Lewis.  I represent Speaker Cutler and Leader Benninghoff of the Pennsylvania House of Representatives.

Doctor Rodden, would you agree that House Bill --- would you agree that House Bill 2146 complies --- or excuse me, is within the narrow band with all the other plans that you considered with respect to the traditional districting criteria of equal population, contiguity with respect to county, municipal and precinct splits as well as compactness?

ATTORNEY SENOFF:
Objection to the form of the question, compound.

JUDGE MCCULLOUGH:
Counsel, I can't understand.

ATTORNEY SENOFF:
It's a compound question.

147

1          JUDGE McCULLOUGH:

2          Hold on one second.

3   Okay.  I think she's saying would you

4   say your name when you stand up,

5   please.

6          ATTORNEY SENOFF:

7          Certainly Your Honor.

8   David Senoff.  Objection to the form

9   of the question and the nature of a

10  compound question.

11          JUDGE McCULLOUGH:

12          Your response?  Do you

13  have a response to the objection.

14          ATTORNEY LEWIS:

15          I mean, Your Honor, I

16  think we have all been referring to

17  the criteria collectively.  I don't

18  believe it's ---.

19          JUDGE McCULLOUGH:

20          I agree so overruled.

21          THE WITNESS:

22          Would you mind just

23  repeating the question?

24  BY ATTORNEY LEWIS:

25  Q.     Doctor Rodden, would you agree

02:09:08   10
02:09:08   11
02:09:13   12
02:09:14   13
02:09:16   14
02:09:16   15
02:09:17   16
02:09:19   17
02:09:22   18
02:09:22   19
02:09:22   20
02:09:22   21
02:09:25   22
02:09:26   23
02:09:29   24
02:09:30   25

148

| | | |
|---|---|---|
| 02:09:31 | 1 | that House Bill 2146 is in the same |
| 02:09:33 | 2 | narrow band with the other plans with |
| 02:09:36 | 3 | respect to the traditional criteria of |
| 02:09:38 | 4 | equal population, contiguity with |
| 02:09:41 | 5 | respect to county, municipal and |
| 02:09:48 | 6 | precinct splits and compactness? |
| 02:09:50 | 7 | A.      That is a --- there are --- I |
| 02:09:50 | 8 | analyzed a lot of plans and there's a |
| 02:09:53 | 9 | lot of --- lot of different indicators |
| 02:09:54 | 10 | that you mentioned.  So I think I |
| 02:09:58 | 11 | would be remiss in not looking at my |
| 02:10:02 | 12 | report and make sure I give an |
| 02:10:06 | 13 | accurate answer, but it is --- when it |
| 02:10:08 | 14 | comes to total county splits, it is |
| 02:10:12 | 15 | one of the --- one of the plans with |
| 02:10:15 | 16 | one of the higher numbers.  But when |
| 02:10:20 | 17 | it comes to --- to VTD splits, it is |
| 02:10:27 | 18 | --- it is relatively low.  And I don't |
| 02:10:40 | 19 | recall --- I don't have a specific |
| 02:10:42 | 20 | recollection about compactness, but I |
| 02:10:42 | 21 | believe it was --- I believe I |
| 02:10:42 | 22 | characterized in my report that all of |
| 02:10:42 | 23 | the plans were in a relatively narrow |
| 02:10:49 | 24 | band, and so I would put it in that |
| 02:10:50 | 25 | category all the plans, so yes. |

149

| | |
|---|---|
| 02:10:57 | 1 |
| 02:10:59 | 2 |
| 02:11:01 | 3 |
| 02:11:03 | 4 |
| 02:11:05 | 5 |
| 02:11:06 | 6 |
| 02:11:10 | 7 |
| 02:11:11 | 8 |
| 02:11:17 | 9 |
| 02:11:17 | 10 |
| 02:11:18 | 11 |
| 02:11:18 | 12 |
| 02:11:26 | 13 |
| 02:11:31 | 14 |
| 02:11:33 | 15 |
| 02:11:33 | 16 |
| 02:11:33 | 17 |
| 02:11:34 | 18 |
| 02:11:36 | 19 |
| 02:11:38 | 20 |
| 02:11:40 | 21 |
| 02:11:43 | 22 |
| 02:11:44 | 23 |
| 02:11:45 | 24 |
| 02:11:50 | 25 |

Q.      Thank you.  I'd like to now
direct your attention to page four of
your rebuttal report.  Give me one
second here to get it up on the
screen.  And this is your list of ---
this Table 2 this is your list of
county splits and then total county
lists in the plans.

        Is that right?
A.      Yes.
Q.      Okay.

        In here you show the Carter
plan as having 14 splits and House
Bill 2146 as having 15?

        Correct?  Split counties I
should ---.
A.      Yes.  And I think I'd already
like to amend my answer to your
previous question.  I realize I was
looking at the wrong table.  I think I
gave an answer a moment ago that was
not correct about --- about county
splits.  I was looking at a different
table so I take back the earlier ---
earlier comment that it was high on

150

02:11:51   1    the total number of county splits.

02:11:57   2    Q.      Okay.

02:11:59   3            Now, you do identify --- okay.

02:12:12   4    We can move on from there.

02:12:14   5            Now, we go to Table 3, and this

02:12:14   6    is what you call your county

02:12:14   7    subdivision splits.  Those are your

02:12:14   8    municipalities, your cities, your

02:12:14   9    townships.

02:12:22   10           Correct?

02:12:22   11   A.      Yes.

02:12:23   12   Q.      Okay.

02:12:23   13           And here you've identified that

02:12:24   14   House Bill 2146 has four less split

02:12:28   15   county subdivisions than the Carter

02:12:30   16   plan.

02:12:31   17           Is that right?

02:12:34   18   A.      Yeah, this is the one that I

02:12:35   19   was --- I misspoke about a moment ago.

02:12:38   20   It is relatively low on the ---

02:12:41   21   relative to the Carter plan on the

02:12:42   22   number of split subdivisions, but on

02:12:44   23   the total splits it's --- it's a bit

02:12:48   24   higher.

02:12:53   25   Q.      Okay.

151

| | | |
|---|---|---|
| 02:12:54 | 1 | Now, I will represent to you |
| 02:12:55 | 2 | I'm going to put up on the screen what |
| 02:12:56 | 3 | has been attached to our opening --- |
| 02:12:56 | 4 | Republican Intervenor Respondents |
| 02:13:04 | 5 | opening brief at Exhibit I and |
| 02:13:04 | 6 | sub-Exhibit 1  And this is a report, |
| 02:13:10 | 7 | Doctor Rodden, generated by the |
| 02:13:15 | 8 | Legislative Data Processing Center for |
| 02:13:16 | 9 | HB-2146.  And I'm going to direct you |
| 02:13:19 | 10 | to what I believe is page 12. |
| 02:13:21 | 11 | Unfortunately, these are not |
| 02:13:23 | 12 | numbered pages, but this is a report |
| 02:13:29 | 13 | identifying the number of places |
| 02:13:32 | 14 | within counties where there are splits |
| 02:13:33 | 15 | in the plan.  Let me zoom this out for |
| 02:13:36 | 16 | you so you can see the whole page. |
| 02:13:38 | 17 | Let me know if you can't read this. |
| 02:13:39 | 18 | A.      It's very hard to read, but I |
| 02:13:43 | 19 | think we might just ---. |
| 02:13:45 | 20 | Q.      We'll do our best.  All right. |
| 02:13:48 | 21 | I'll zoom in if you need me to, Doctor |
| 02:13:49 | 22 | Rodden. |
| 02:13:49 | 23 | Now, you computed us as having |
| 02:13:55 | 24 | 25 total municipal splits in your |
| 02:13:55 | 25 | report. |

152

| | | |
|---|---|---|
| 02:13:56 | 1 | Is that right? |
| 02:13:57 | 2 | A.      These are county subdivisions. |
| 02:13:59 | 3 | That's a specific category that the |
| 02:14:01 | 4 | census puts together.  So it doesn't |
| 02:14:05 | 5 | --- it's different than the census |
| 02:14:07 | 6 | place, it's different from --- there |
| 02:14:08 | 7 | are lots of different municipal |
| 02:14:10 | 8 | terminologies that we might be using. |
| 02:14:13 | 9 | That one was county subdivisions. |
| 02:14:15 | 10 | Q.      Okay. |
| 02:14:16 | 11 | So that split could be |
| 02:14:17 | 12 | something then other than just |
| 02:14:19 | 13 | splitting a city line or splitting a |
| 02:14:21 | 14 | township line.  Is that what you're |
| 02:14:22 | 15 | saying? |
| 02:14:22 | 16 | A.      Well, it's just that the |
| 02:14:25 | 17 | townships are --- they are census --- |
| 02:14:28 | 18 | they are county subdivisions, but |
| 02:14:31 | 19 | there are --- but there are other |
| 02:14:32 | 20 | things that are also county |
| 02:14:33 | 21 | subdivisions that are not townships. |
| 02:14:36 | 22 | So it's just possible that we're |
| 02:14:38 | 23 | talking about --- I just want to make |
| 02:14:41 | 24 | sure we're talking about the same |
| 02:14:43 | 25 | census geography. |

153

| 02:14:45 | 1 | Q.    Okay. |
| 02:14:45 | 2 |        Well, you can see here that |
| 02:14:46 | 3 | this reports a city, the City of |
| 02:14:49 | 4 | Philadelphia, it has townships, it has |
| 02:14:56 | 5 | boroughs on it. |
| 02:14:57 | 6 |        Right? |
| 02:14:57 | 7 | A.    Yes. |
| 02:14:57 | 8 | Q.    Okay. |
| 02:14:58 | 9 |        And it actually identifies |
| 02:15:00 | 10 | exactly which political subdivisions |
| 02:15:03 | 11 | are split and how many times. |
| 02:15:04 | 12 |        Correct? |
| 02:15:05 | 13 | A.    Yes. |
| 02:15:05 | 14 | Q.    Okay. |
| 02:15:09 | 15 |        And it tabulates 18 total |
| 02:15:11 | 16 | splits of the 16 political |
| 02:15:13 | 17 | subdivisions. |
| 02:15:14 | 18 |        Correct? |
| 02:15:23 | 19 | A.    Again, I would want to make |
| 02:15:25 | 20 | sure I understand what is being |
| 02:15:27 | 21 | considered as a subdivision.  This is |
| 02:15:29 | 22 | something that's hard for me to --- if |
| 02:15:32 | 23 | there's a slight discrepancy, it's --- |
| 02:15:34 | 24 | it's probably due to something like |
| 02:15:36 | 25 | that. |

154

| | | |
|---|---|---|
| 02:15:36 | 1 | Q.      Okay.  We can --- we can move |
| 02:15:38 | 2 | on, Doctor Rodden. |
| 02:15:41 | 3 |         I would like now to turn to |
| 02:15:43 | 4 | your analysis of --- briefly of |
| 02:15:44 | 5 | partisan fairness.  And specifically, |
| 02:15:52 | 6 | we're going to go to that Table 5 in |
| 02:15:55 | 7 | your rebuttal report.  I believe it's |
| 02:15:57 | 8 | on page nine.  Here we are.  Okay. |
| 02:16:08 | 9 | Now, just as a matter of mathematics, |
| 02:16:11 | 10 | if a party wins 9 out of 17 |
| 02:16:15 | 11 | congressional districts, that would be |
| 02:16:17 | 12 | about 52.9 percent of the seats. |
| 02:16:20 | 13 |         Right? |
| 02:16:20 | 14 | A.      Yes. |
| 02:16:20 | 15 | Q.      Okay. |
| 02:16:20 | 16 |         And if a party wins 10 out of |
| 02:16:24 | 17 | 17 seats, that would be about 58.8 |
| 02:16:24 | 18 | percent. |
| 02:16:28 | 19 |         Correct? |
| 02:16:28 | 20 | A.      That's right. |
| 02:16:29 | 21 | Q.      Okay. |
| 02:16:29 | 22 |         And again, you've calculated |
| 02:16:30 | 23 | using your election index, about 52 |
| 02:16:30 | 24 | percent Democratic statewide vote |
| 02:16:30 | 25 | share. |

155

| | | |
|---|---|---|
| 02:16:39 | 1 | Is that right? |
| 02:16:39 | 2 | A.      That's one of the things that |
| 02:16:41 | 3 | it displays, yes. |
| 02:16:43 | 4 | Q.      Okay. |
| 02:16:48 | 5 | Now, you identified that the |
| 02:16:50 | 6 | Carter plan has ten Democratic leaning |
| 02:16:54 | 7 | districts, of which two are --- you |
| 02:16:57 | 8 | would call these are your really |
| 02:16:59 | 9 | competitive, I heard you call coin |
| 02:17:03 | 10 | toss, razor's edge districts, is that |
| 02:17:08 | 11 | right, the two there? |
| 02:17:09 | 12 | A.      Yes. |
| 02:17:09 | 13 | Q.      Okay. |
| 02:17:09 | 14 | And those districts, as I |
| 02:17:11 | 15 | recall, those districts could flip to |
| 02:17:13 | 16 | Republicans under the right election |
| 02:17:17 | 17 | circumstances. |
| 02:17:19 | 18 | Right? |
| 02:17:20 | 19 | A.      Yes. |
| 02:17:20 | 20 | Q.      Okay. |
| 02:17:21 | 21 | So for the House Bill 2146 |
| 02:17:24 | 22 | plan, you have one Democratic razor's |
| 02:17:27 | 23 | edge district and you have two |
| 02:17:29 | 24 | Republican razor's edge districts, do |
| 02:17:33 | 25 | you not? |

156

02:17:33    1    A.        Yes.

02:17:33    2    Q.        Okay.

02:17:34    3              So in fact, under a favorable

02:17:36    4    election environment for Democrats,

02:17:39    5    House Bill 2146 could also yield 10

02:17:46    6    Democratic seats, couldn't it?

02:17:46    7    A.        I just want to make sure I'm

02:17:48    8    looking at the right thing.  So you're

02:17:48    9    looking at the eight plus ---?

02:17:52   10    Q.        Yes.  Here.  If I highlight it,

           11    it won't work out well for either of

           12    us, so ---.

           13    A.        But ---.

           14    Q.        Right here in the middle.

           15    Seven, plus one plus two is 10.

           16              Right?

02:18:18   17    A.        Yes, with the caveat that I

02:18:19   18    made earlier about District 1 that I

02:18:21   19    think is worth considering.

02:18:30   20    Q.        And in fact, when you look at

02:18:32   21    these razor's edge districts, do you

02:18:36   22    identify a single plan on here with

02:18:39   23    more than three of those razor's edge,

02:18:45   24    coin toss districts?

02:18:47   25    A.        Does any have --- more than

157

| | | |
|---|---|---|
| 02:18:47 | 1 | three if we add the two --- the two |
| 02:18:49 | 2 | --- those two middle columns together? |
| 02:18:51 | 3 | Q.    That's correct. |
| 02:18:53 | 4 | A.    No, I don't believe so. |
| 02:18:54 | 5 | Q.    All right. |
| 02:18:59 | 6 | Now, you've spoken generally, |
| 02:19:02 | 7 | Doctor Rodden, about describing some |
| 02:19:04 | 8 | of the plans, including House Bill |
| 02:19:06 | 9 | 2146, as outliers.  Do you recall that |
| 02:19:10 | 10 | testimony? |
| 02:19:11 | 11 | A.    Yes. |
| 02:19:11 | 12 | Q.    Outliers compared to what, |
| 02:19:12 | 13 | Doctor Rodden? |
| 02:19:16 | 14 | A.    The other plans submitted in |
| 02:19:17 | 15 | this process. |
| 02:19:18 | 16 | Q.    Okay. |
| 02:19:26 | 17 | Now, you and Professor Jowei |
| 02:19:26 | 18 | Chen have written several articles |
| 02:19:30 | 19 | talking about the use of simulations |
| 02:19:33 | 20 | methodologies to measure partisan |
| 02:19:38 | 21 | fairness in the plan. |
| 02:19:39 | 22 | Is that right? |
| 02:19:40 | 23 | A.    Yes. |
| 02:19:40 | 24 | Q.    And in fact, your article, |
| 02:19:40 | 25 | Unintentional Gerrymandering, is sort |

158

02:19:47  1    of routinely cited as a lead

02:19:47  2    publication in that field, is it not?

02:19:50  3    A.      The effort we made in that ---

02:19:53  4    in that --- in that article was to run

02:19:54  5    simulations to try to get a sense of

02:19:56  6    what the predicted seat chairs would

02:19:58  7    be from the simulations, and that

02:19:59  8    gives us something to contrast with

02:20:01  9    what we see in realty.

02:20:03  10   Q.      Yet you didn't perform a

02:20:06  11   simulations analysis in this case, did

02:20:08  12   you?

02:20:09  13   A.      This is a --- this is a

02:20:10  14   technique that's used to identify

02:20:13  15   gerrymandering and to understand some

02:20:17  16   aspects of political geography.  This

02:20:19  17   is a case in which I was asked to draw

02:20:20  18   a --- draw a plan and evaluate its

02:20:23  19   fairness, so it didn't occur to me

02:20:25  20   that drawing a 100,000 other plans was

02:20:31  21   something that I should do.

02:20:32  22   Q.      But it's within your technical

02:20:34  23   capability to conduct a simulations

02:20:38  24   analysis if you wanted to?

02:20:39  25   A.      Yes.

159

| | | |
|---|---|---|
| 02:20:39 | 1 | Q.      Okay. |
| 02:20:40 | 2 | Now, you described HB-2146 as |
| 02:20:43 | 3 | an outlier because I believe it was |
| 02:20:45 | 4 | not aligned with that state vote share |
| 02:20:48 | 5 | you indicated what produced a counter |
| 02:20:50 | 6 | majority outcome. |
| 02:20:53 | 7 | Right? |
| 02:20:55 | 8 | A.      Yes. |
| 02:20:55 | 9 | Q.      All right. |
| 02:20:57 | 10 | And that's because you would |
| 02:20:59 | 11 | expect a plan --- again, with that |
| 02:21:02 | 12 | 52 percent statewide vote share for |
| 02:21:05 | 13 | Democrats, you would expect the plan |
| 02:21:07 | 14 | to have about nine Democratic leaning |
| 02:21:10 | 15 | districts, and yet you have on your |
| 02:21:12 | 16 | report here that HB-2146 generates |
| 02:21:15 | 17 | eight. |
| 02:21:16 | 18 | Correct? |
| 02:21:16 | 19 | A.      I'm sorry.  Would you repeat |
| 02:21:18 | 20 | the question? |
| 02:21:19 | 21 | Q.      Sure.  So the basis for you |
| 02:21:21 | 22 | claiming HB-2146 as an outlier here is |
| 02:21:27 | 23 | that it generates eight expected |
| 02:21:29 | 24 | Democratic seats under your analysis. |
| 02:21:31 | 25 | Right? |

160

| | | |
|---|---|---|
| 02:21:32 | 1 | A.      I think that, yeah, that was an |
| 02:21:34 | 2 | answer to a specific question in the |
| 02:21:35 | 3 | previous testimony. |
| 02:21:36 | 4 | Q.      And if that's the case, why is |
| 02:21:37 | 5 | the ten seats in Carter not equally an |
| 02:21:43 | 6 | outlier? |
| 02:21:43 | 7 | A.      Well, again, I was just --- |
| 02:21:44 | 8 | this relates to an earlier question. |
| 02:21:46 | 9 | I was just answering a specific |
| 02:21:48 | 10 | question about the plans that I |
| 02:21:49 | 11 | received and just characterizing the |
| 02:21:55 | 12 | distribution of those plans.  I was |
| 02:21:56 | 13 | not --- I was not suggesting it is an |
| 02:21:59 | 14 | outlier relative to some other |
| 02:22:01 | 15 | distribution, just what's on the |
| 02:22:03 | 16 | table. |
| 02:22:04 | 17 | Q.      Now, you testified that you |
| 02:22:05 | 18 | were not aware of who the different |
| 02:22:07 | 19 | groups were here who submitted the 14 |
| 02:22:13 | 20 | plans? |
| 02:22:13 | 21 | A.      That's correct. |
| 02:22:13 | 22 | Q.      So you didn't know who Governor |
| 02:22:13 | 23 | Wolf was? |
| 02:22:14 | 24 | A.      I did know who Governor Wolf |
| 02:22:17 | 25 | was, yes. |

| | | |
|---|---|---|
| 02:22:17 | 1 | Q.       And you knew HB-2146 were my |
| 02:22:21 | 2 | clients. |
| 02:22:21 | 3 |          Right? |
| 02:22:22 | 4 | A.       I believe it was actually |
| 02:22:24 | 5 | marked in my --- the name given to the |
| 02:22:27 | 6 | file.  I eventually put HB-2146 on the |
| 02:22:31 | 7 | tables at the last minute because it |
| 02:22:34 | 8 | looked ugly to have the name that was |
| 02:22:38 | 9 | on there which was I believe some |
| 02:22:39 | 10 | names of individuals.  So when I was |
| 02:22:41 | 11 | doing the analysis, I was not aware |
| 02:22:43 | 12 | that this was a plan that had been |
| 02:22:46 | 13 | submitted to the legislature, but I am |
| 02:22:51 | 14 | now.  And when finalizing the report, |
| 02:22:52 | 15 | I became aware of that. |
| 02:22:56 | 16 |               ATTORNEY LEWIS: |
| 02:22:56 | 17 |               I have nothing further. |
| 02:22:58 | 18 | Thank you. |
| 02:22:58 | 19 |               JUDGE McCULLOUGH: |
| 02:22:58 | 20 |               Okay. |
| 02:23:07 | 21 |               Thank you, Counsel.  And |
| 02:23:07 | 22 | then we will move to Congressional |
| 02:23:07 | 23 | Intervenors, Congressman |
| 02:23:12 | 24 | Reschenthaler, et al. |
| 02:23:14 | 25 |               ATTORNEY GORDON: |

162

| | | |
|---|---|---|
| 02:23:16 | 1 | I'll alert Court staff |
| 02:23:17 | 2 | up front, I may briefly need to use |
| 02:23:18 | 3 | that also, so if I could get that |
| 02:23:21 | 4 | fired up, that would be helpful. |
| 02:23:21 | 5 | --- |
| 02:23:21 | 6 | CROSS EXAMINATION |
| 02:23:23 | 7 | --- |
| 02:23:23 | 8 | BY ATTORNEY GORDON: |
| 02:23:24 | 9 | Q.      Good afternoon. |
| 02:23:25 | 10 | A.      Good afternoon.  We're just |
| 02:23:26 | 11 | past noon.  So I represent the |
| 02:23:29 | 12 | Congressional Intervenors for the |
| 02:23:30 | 13 | Reschenthaler Maps 1 and 2.  So I'll |
| 02:23:33 | 14 | give you an easy one here.  Of all the |
| 02:23:36 | 15 | maps you looked at, which one is the |
| 02:23:39 | 16 | best one, in your opinion? |
| 02:23:40 | 17 | A.      Of course I have to say that I |
| 02:23:42 | 18 | like my map.  I spent a lot of time on |
| 02:23:46 | 19 | it, so it's unlikely I'll give any |
| 02:23:53 | 20 | other answer. |
| 02:23:53 | 21 | Q.      I suspected that's what you |
| 02:23:53 | 22 | would answer.  And you, in fact, drew |
| 02:23:54 | 23 | that map yourself? |
| 02:23:54 | 24 | A.      Yes. |
| 02:23:55 | 25 | Q.      Is it the only one you drew? |

163

| | | |
|---|---|---|
| 02:23:57 | 1 | A.        In this --- in this case? |
| 02:23:58 | 2 | Q.        In this case. |
| 02:23:59 | 3 | A.        Yes. |
| 02:24:00 | 4 | Q.        Very good. |
| 02:24:00 | 5 | So I want to run you through |
| 02:24:02 | 6 | your response report for the most |
| 02:24:04 | 7 | part.  So I'll flip to page two.  You |
| 02:24:07 | 8 | got Table 1 there, retain share |
| 02:24:10 | 9 | population.  I'll skip down to |
| 02:24:10 | 10 | Reschenthaler 1.  In fact, this is |
| 02:24:14 | 11 | just kind of an omnibus question for |
| 02:24:15 | 12 | all of the stats in your response |
| 02:24:17 | 13 | report.  You're very --- what is your |
| 02:24:17 | 14 | level of confidence in these numbers? |
| 02:24:20 | 15 | A.        In the --- in the population |
| 02:24:22 | 16 | overlap numbers I believe these are |
| 02:24:25 | 17 | --- these are correct.  I don't think |
| 02:24:26 | 18 | there's a lot of room for trouble |
| 02:24:30 | 19 | there. |
| 02:24:31 | 20 | Q.        Sure.  And in fact, in all of |
| 02:24:32 | 21 | the numbers in your report, is it safe |
| 02:24:35 | 22 | to say you're confident in their |
| 02:24:37 | 23 | accuracy? |
| 02:24:40 | 24 | A.        Yes.  I will --- I will |
| 02:24:42 | 25 | stipulate that this is a calendar |

164

02:24:44  1    under which I've never had to work
02:24:46  2    before.  I had --- I had one day to
02:24:48  3    look at the maps, a day during which I
02:24:51  4    had some faculty meetings and other
02:24:53  5    things.  So I am confident because I
02:24:55  6    think the techniques I used make me
02:24:59  7    confident.
02:25:00  8    Q.      Very good.  So as it concerns
02:25:02  9    this chart, 76 and a half, 76 and a
02:25:06  10   half, Reschenthaler 1, Reschenthaler
02:25:09  11   2, you're confident those numbers are
02:25:09  12   correct?
02:25:11  13   A.      I am.
02:25:11  14   Q.      Okay.
02:25:11  15           And on page three of your
02:25:13  16   report, at the top you make a
02:25:14  17   conclusion about population equality
02:25:14  18   and you say each of these plans --- in
02:25:14  19   each of these population as close to
02:25:22  20   as equal as is possible given the
02:25:22  21   constraints of the data.  Do you still
02:25:24  22   agree with that statement?
02:25:25  23   A.      Yes.
02:25:25  24   Q.      And that includes the
02:25:27  25   Reschenthaler 1 and Reschenthaler 2

165

| | | |
|---|---|---|
| 02:25:29 | 1 | plans? |
| 02:25:29 | 2 | A.        Yes. |
| 02:25:29 | 3 | Q.        And then continuity --- |
| 02:25:32 | 4 | contiguity, I'm the first one to |
| 02:25:32 | 5 | fumble it, but I guarantee I won't be |
| 02:25:37 | 6 | the last, you agree that the |
| 02:25:38 | 7 | Reschenthaler 1 and 2 maps meet the |
| 02:25:42 | 8 | contiguity standard? |
| 02:25:43 | 9 | A.        I do. |
| 02:25:44 | 10 | Q.        Very good.  And at the |
| 02:25:46 | 11 | conclusion or compactness section you |
| 02:25:49 | 12 | say none of the submitted plans |
| 02:25:52 | 13 | features high non-compact districts of |
| 02:25:55 | 14 | ten --- clause and the like.  Would |
| 02:25:55 | 15 | you agree that's true about |
| 02:25:57 | 16 | Reschenthaler 1 and Reschenthaler 2? |
| 02:26:00 | 17 | A.        Yes, I would. |
| 02:26:01 | 18 | Q.        Okay.  Very good. |
| 02:26:02 | 19 | So I want to flip to Table 2. |
| 02:26:07 | 20 | You list the split counties and you |
| 02:26:09 | 21 | show Reschenthaler 1 at 13 and |
| 02:26:12 | 22 | Reschenthaler 2 at 13.  Do you see |
| 02:26:13 | 23 | where I'm looking there? |
| 02:26:17 | 24 | A.        Yes. |
| 02:26:17 | 25 | Q.        And you believe that's correct? |

166

| | | |
|---|---|---|
| 02:26:18 | 1 | A.      I do believe so. |
| 02:26:19 | 2 | Q.      Okay. |
| 02:26:20 | 3 | And would you agree with me |
| 02:26:21 | 4 | that's the lowest number of split |
| 02:26:23 | 5 | counties in all the maps you reviewed? |
| 02:26:27 | 6 | A.      Yes.  When we define it as just |
| 02:26:30 | 7 | whether or not the county is split, |
| 02:26:32 | 8 | that's correct, 13 is the lowest |
| 02:26:33 | 9 | number we see in this table. |
| 02:26:35 | 10 | Q.      Correct.  And what I don't see |
| 02:26:36 | 11 | in your chart is something that I do |
| 02:26:37 | 12 | see in some of the other reports.  It |
| 02:26:39 | 13 | talks about segments.  Are you |
| 02:26:40 | 14 | familiar with what segment are? |
| 02:26:44 | 15 | A.      That is --- that's I believe |
| 02:26:47 | 16 | what I'm doing in the second column. |
| 02:26:48 | 17 | Q.      Well, I think it might be a |
| 02:26:50 | 18 | little bit different, so let me |
| 02:26:52 | 19 | explain what I'm asking when I say |
| 02:26:54 | 20 | segment.  So if we had a rectangle and |
| 02:26:56 | 21 | we cut it in half once, it's got two |
| 02:26:56 | 22 | segments.  If we split one of the |
| 02:27:00 | 23 | halves in half, now it's got three |
| 02:27:01 | 24 | segments.  Do you see what I'm |
| 02:27:01 | 25 | referring to? |

167

| 02:27:02 | 1 | A.       Larger numbers if we just |
|---|---|---|

A.       Larger numbers if we just


02:27:02  1   A.       Larger numbers if we just
02:27:03  2   counted up all the segments.
02:27:04  3   Q.       Right.
02:27:04  4   Well, would you agree that the Carter
02:27:06  5   map produces 31 county segments?  And
02:27:22  6   if the you can't recall ---.
02:27:22  7   A.       A little bit, but this is not
02:27:22  8   --- this is not a statistic that I ---
02:27:23  9   that I included.
02:27:23  10  Q.       Fair enough.  The Governor's
02:27:25  11  expert testifies in her report, and
02:27:27  12  she'll testify on the stand, that you
02:27:28  13  have 31 segments.  So I suspect you
02:27:32  14  don't know whether it's true or not if
02:27:37  15  the Reschenthaler 1 and 2 have 29
02:27:39  16  segments?
02:27:41  17  A.       I do not.  That's not an
02:27:41  18  analysis that I conducted.
02:27:41  19  Q.       Well, let me ask you this.  Do
02:27:44  20  you agree that a 17-district, compact,
02:27:51  21  contiguous and equal population map
02:27:51  22  can be drawn with just 13 split
02:27:54  23  counties?
02:27:56  24  A.       Yes, I believe that
02:28:01  25  characterizes this --- this map.

168

| Time | Line | |
|---|---|---|
| 02:28:02 | 1 | Q.      Okay.  Let's jump ahead to |
| 02:28:05 | 2 | page five. |
| 02:28:05 | 3 | Briefly in figure one I believe |
| 02:28:09 | 4 | you have Reschenthaler 1 and |
| 02:28:11 | 5 | Reschenthaler 2, if I'm reading this |
| 02:28:13 | 6 | correctly, and a REOC score around |
| 02:28:15 | 7 | approximately .42 for Reschenthaler 2 |
| 02:28:18 | 8 | and .41 for Reschenthaler 1.  Is that |
| 02:28:20 | 9 | --- is that what that chart reflects? |
| 02:28:23 | 10 | A.      It might be more like .42 and |
| 02:28:26 | 11 | .43. |
| 02:28:27 | 12 | Q.      Fair enough. |
| 02:28:28 | 13 | A.      Yeah. |
| 02:28:28 | 14 | Q.      And you believe those numbers |
| 02:28:29 | 15 | to be correct to the best of your |
| 02:28:31 | 16 | professional degree of certainty? |
| 02:28:33 | 17 | A.      Yes. |
| 02:28:33 | 18 | Q.      Okay.  Very good.  All right. |
| 02:28:37 | 19 | Let's look at Table 3, number |
| 02:28:38 | 20 | of split county subdivisions.  And |
| 02:28:40 | 21 | when you say subdivisions, is that |
| 02:28:42 | 22 | municipalities, townships, boroughs, |
| 02:28:47 | 23 | cities, et cetera? |
| 02:28:48 | 24 | A.      This is the census category |
| 02:28:48 | 25 | called county subdivisions, and so I |

169

02:28:52  1    believe there are --- as I was saying
02:28:53  2    earlier, there are some other
02:28:55  3    categorizations that would give us
02:28:58  4    larger numbers that include some other
02:29:01  5    kinds of entities like
02:29:03  6    census-designated places and things
02:29:05  7    like that.
02:29:05  8    Q.      Sure.
02:29:06  9    A.      This is just this one category.
02:29:08  10   Q.      So these are smaller than a
02:29:13  11   county, bigger than a ward?
02:29:14  12   A.      Yes, I believe that --- that
02:29:15  13   captures it, although I'm not entirely
02:29:17  14   sure.
02:29:18  15   Q.      Okay.
02:29:18  16           Well, if you look at
02:29:19  17   Reschenthaler 1 and Reschenthaler 2,
02:29:21  18   you show them at 15 county subdivision
02:29:24  19   splits.  Are you confident that those
02:29:27  20   numbers are correct?
02:29:28  21   A.      Based on the analysis I did,
02:29:29  22   yes.
02:29:29  23   Q.      And here I would ask is that
02:29:31  24   the lowest number of splits, but I
02:29:33  25   show you have CCFD at 14.

170

| | | |
|---|---|---|
| 02:29:38 | 1 | Is that correct?  That's number |
| 02:29:38 | 2 | two? |
| 02:29:38 | 3 | A.       Yes. |
| 02:29:39 | 4 | Q.       Now, this is something you |
| 02:29:41 | 5 | probably don't know, but late |
| 02:29:43 | 6 | yesterday the Court entered an Order |
| 02:29:45 | 7 | discarding the CCFD map as being |
| 02:29:49 | 8 | untimely filed.  So if you accept my |
| 02:29:52 | 9 | representation that that map is no |
| 02:29:53 | 10 | longer before the Court, would you |
| 02:29:54 | 11 | agree that 15 is the lowest of the |
| 02:29:56 | 12 | remaining maps? |
| 02:29:57 | 13 | A.       Yes. |
| 02:29:57 | 14 | Q.       Okay. |
| 02:30:01 | 15 | So do you agree that a |
| 02:30:01 | 16 | 17-district congressional map that is |
| 02:30:03 | 17 | both compact, contiguous and equal |
| 02:30:08 | 18 | population can be drawn with just 15 |
| 02:30:11 | 19 | county subdivision splits? |
| 02:30:13 | 20 | A.       Yes. |
| 02:30:22 | 21 | Q.       Just quickly on page six, Table |
| 02:30:25 | 22 | 4, VTDs, are they bigger or smaller |
| 02:30:28 | 23 | than a ward, if you know? |
| 02:30:29 | 24 | A.       Smaller. |
| 02:30:29 | 25 | Q.       Smaller.  All right. |

171

| | | |
|---|---|---|
| 02:30:34 | 1 | Page 9, Table 5, so |
| 02:30:40 | 2 | Reschenthaler 1 and 2, you have --- |
| 02:30:42 | 3 | I'm going to look at the extreme |
| 02:30:42 | 4 | columns, as in on either end.  So you |
| 02:30:42 | 5 | show the Carter map as ten and that |
| 02:30:42 | 6 | Democrat vote share greater than .5. |
| 02:30:54 | 7 | And then you show Reschenthaler 1 as 9 |
| 02:30:56 | 8 | and Reschenthaler 2 as nine. |
| 02:30:58 | 9 | Is that correct? |
| 02:30:58 | 10 | A.      Yes. |
| 02:30:58 | 11 | Q.      And that's a difference of just |
| 02:31:01 | 12 | one? |
| 02:31:01 | 13 | A.      Yes. |
| 02:31:01 | 14 | Q.      One seat out of 17? |
| 02:31:04 | 15 | A.      Yes. |
| 02:31:04 | 16 | Q.      Okay. |
| 02:31:05 | 17 | And then we'll go to the |
| 02:31:06 | 18 | extreme far right column, same column |
| 02:31:09 | 19 | where you amended the heading here in |
| 02:31:11 | 20 | Court.  The Carter plan shows seven |
| 02:31:14 | 21 | and Reschenthaler 1 is eight and |
| 02:31:17 | 22 | Reschenthaler 2 is eight.  And that's |
| 02:31:19 | 23 | a difference of just one. |
| 02:31:21 | 24 | Is that correct? |
| 02:31:22 | 25 | A.      That's correct. |

172

| | | |
|---|---|---|
| 02:31:23 | 1 | Q.      Okay. |
| 02:31:33 | 2 | Briefly then again on table --- |
| 02:31:36 | 3 | we'll jump ahead on Table 6 on page |
| 02:31:38 | 4 | 11.  You show Reschenthaler 1 and 2 on |
| 02:31:38 | 5 | the mean and median difference as --- |
| 02:31:38 | 6 | I believe you testified one percent. |
| 02:31:47 | 7 | Is that correct? |
| 02:31:47 | 8 | A.      Yes. |
| 02:31:47 | 9 | Q.      And you further testified that |
| 02:31:48 | 10 | you didn't run a simulation for |
| 02:31:51 | 11 | drawing this map, you just drew one |
| 02:31:53 | 12 | map? |
| 02:31:53 | 13 | A.      That's correct. |
| 02:31:54 | 14 | Q.      So you didn't draw say 500 maps |
| 02:31:56 | 15 | as Doctor Chen did in League of Women |
| 02:32:00 | 16 | Voters? |
| 02:32:00 | 17 | A.      No. |
| 02:32:00 | 18 | Q.      And are you aware that under |
| 02:32:02 | 19 | those 500 maps in League of Women |
| 02:32:05 | 20 | Voters the Court made Findings of Fact |
| 02:32:06 | 21 | about what the range of mean median |
| 02:32:12 | 22 | was over those 500 maps.  Are you |
| 02:32:12 | 23 | aware of that --- that statistic from |
| 02:32:16 | 24 | that prior proceeding? |
| 02:32:17 | 25 | A.      No, I don't recall it. |

173

| | | |
|---|---|---|
| 02:32:17 | 1 | Q.     Fair enough.  No questions on |
| 02:32:19 | 2 | that then. |
| 02:32:19 | 3 | I wanted to go to your main |
| 02:32:21 | 4 | report now.  And I'm going to refer to |
| 02:32:23 | 5 | Figure 2, where you show sort of a |
| 02:32:26 | 6 | dynamic shifts of Pennsylvania |
| 02:32:28 | 7 | population over the last ten years. |
| 02:32:32 | 8 | And I'm hoping I can educate myself a |
| 02:32:34 | 9 | little bit on this.  Does this map |
| 02:32:38 | 10 | reflect that Pennsylvania has become |
| 02:32:41 | 11 | more tightly packed in urban areas and |
| 02:32:44 | 12 | less tightly packed in rural areas? |
| 02:32:48 | 13 | A.     That would be one way you might |
| 02:32:53 | 14 | summarize the fact that population is |
| 02:32:55 | 15 | growing in places that are relatively |
| 02:32:57 | 16 | dense and falling in places that are |
| 02:33:00 | 17 | relatively sparse. |
| 02:33:02 | 18 | Q.     So in effect, more populous, |
| 02:33:02 | 19 | tightly-packed cities and less |
| 02:33:07 | 20 | populous rural communities, whatever |
| 02:33:08 | 21 | those things may be, boroughs or et |
| 02:33:11 | 22 | cetera? |
| 02:33:11 | 23 | A.     No, I would push back a little |
| 02:33:14 | 24 | on that.  I don't consider Lancaster |
| 02:33:14 | 25 | County to be a --- to be tightly |

174

| | |
|---|---|
| 02:33:14 | 1 |

packed.  I mean, it has tightly-packed

neighborhoods in Lancaster itself, the

city, but some of the places that are

growing rather quickly are more

suburban areas, like Montgomery County

and Lancaster County and parts of

Chester County.

Q.       Fair enough.

Well, if we look at page ten of

this report, and this is --- this is

where I'm sort of where I'm trying to

merge this chart with something you're

saying here.  Is the way to interpret

the sentence that begins with

moreover, another pronounced trend in

Pennsylvania and the rest of the

United States is that places that are

gaining population are not only more

Democratic to begin with but are

becoming more Democratic as they gain

population.  That sentence, does that

mean that as these areas become

tighter, Lancaster County or city or

otherwise, they tend to become more

Democratic?

175

| | | |
|---|---|---|
| 02:34:07 | 1 | A.      That's just the pattern that's |
| 02:34:08 | 2 | displayed in Figure 3, that over time |
| 02:34:11 | 3 | the places that have experienced the |
| 02:34:12 | 4 | largest population change, which are |
| 02:34:14 | 5 | also the places that are becoming more |
| 02:34:16 | 6 | dense, are the --- are places where |
| 02:34:18 | 7 | the Democratic vote share has |
| 02:34:19 | 8 | increased.  There's a positive |
| 02:34:23 | 9 | correlation there between those |
| 02:34:25 | 10 | things. |
| 02:34:25 | 11 | Q.      So in the last ten years |
| 02:34:25 | 12 | Pennsylvania has generally become |
| 02:34:25 | 13 | tighter in certain areas and more |
| 02:34:25 | 14 | Democrat in those areas that have |
| 02:34:32 | 15 | become tighter. |
| 02:34:33 | 16 |         Is that correct? |
| 02:34:37 | 17 | A.      Yes, with --- with the caveat |
| 02:34:38 | 18 | that some of the --- some of the |
| 02:34:39 | 19 | places --- we're talking about |
| 02:34:39 | 20 | counties here.  And some of them are |
| 02:34:42 | 21 | --- have areas that are really growing |
| 02:34:42 | 22 | that are not especially dense. |
| 02:34:43 | 23 | Q.      Sure.  And I want to ask you a |
| 02:34:45 | 24 | question about the next sentence on |
| 02:34:47 | 25 | that same page.  Likewise, places that |

176

02:34:47    1    are losing population are not only

02:34:49    2    relatively Republican, to begin with,

02:34:52    3    but are becoming more Republican and

02:34:55    4    you actually emphasize more.

02:34:57    5          Does that reflect the

02:34:58    6    phenomenon that as people go in the

02:34:58    7    city, these cities and tighter-packed

02:34:58    8    counties, the places they leave behind

02:35:07    9    tend to become more Republican?

02:35:08    10   A.      Well, it's --- it's --- the way

02:35:10    11   you described it kind of implies that

02:35:12    12   the population changed, that people

02:35:17    13   who are leaving are Democrats or

02:35:20    14   something like that.  We don't know

02:35:21    15   that.  All we know from this --- from

02:35:23    16   this figure is that in the lower left

02:35:24    17   corner, the places that are losing

02:35:25    18   population are becoming more

02:35:27    19   Republican.  So I think this really

02:35:30    20   more has to do with a --- with a

02:35:33    21   longstanding trend where population

02:35:35    22   density and voting are becoming more

02:35:40    23   correlated over time.  So rural areas

02:35:41    24   are becoming more Republican and urban

02:35:45    25   areas are becoming more Democratic.

177

02:35:45    1    That's the main thing that's being

02:35:48    2    captured here.

02:35:48    3    Q.      Is what you're talking about

02:35:49    4    here the concept of human geography?

02:35:51    5    A.      We could call it that, yes.

02:35:52    6    Q.      Well, I'm asking if you would

02:35:53    7    call it that.

02:35:54    8    A.      Sure.

02:35:54    9    Q.      Okay.

02:35:55   10            And in fact, have you called it

02:35:57   11    that before in any of your --- your

02:36:02   12    publications?

02:36:03   13    A.      Probably.

02:36:03   14    Q.      Okay.

02:36:04   15            And I noted in your --- your

02:36:06   16    resume attached to your report there's

02:36:12   17    a number of peer-reviewed journal

02:36:12   18    articles.  What's it mean for an

02:36:16   19    article to be peer reviewed?

02:36:17   20    A.      It means that it's submitted to

02:36:18   21    a journal and various --- the journal

02:36:21   22    editor chooses some reviewers who work

02:36:22   23    in the same field and those reviewers

02:36:24   24    have to say nice things about it or

02:36:26   25    the editor will reject it.  And if the

178

| | | |
|---|---|---|
| 02:36:29 | 1 | editor decides to go forward, then it |
| 02:36:32 | 2 | gets published in the journal. |
| 02:36:33 | 3 | Q.     So in effect, what you say is |
| 02:36:36 | 4 | tested by someone else? |
| 02:36:40 | 5 | A.     Tested? |
| 02:36:41 | 6 | Q.     Reviewed? |
| 02:36:41 | 7 | A.     Reviewed, yes.  In the ideal |
| 02:36:45 | 8 | world perhaps they would take the data |
| 02:36:47 | 9 | and rerun it, but that doesn't always |
| 02:36:49 | 10 | happen. |
| 02:36:49 | 11 | Q.     Sure.  In your peer-reviewed |
| 02:36:51 | 12 | articles that you list here in your |
| 02:36:52 | 13 | resume that you submitted to the |
| 02:36:54 | 14 | Court, did you believe at the time you |
| 02:36:56 | 15 | published these articles that you were |
| 02:36:57 | 16 | being truthful, accurate and |
| 02:36:59 | 17 | descriptive of the conclusions and |
| 02:37:02 | 18 | findings you were putting in your |
| 02:37:03 | 19 | article? |
| 02:37:04 | 20 | A.     Yes. |
| 02:37:05 | 21 | Q.     Okay. |
| 02:37:06 | 22 | And I want to direct your |
| 02:37:07 | 23 | attention to Unintentional |
| 02:37:11 | 24 | Gerrymandering.  This is on page three |
| 02:37:12 | 25 | of your report.  It was referenced a |

179

| | | |
|---|---|---|
| 02:37:13 | 1 | moment ago.  Is that a report, a |
| 02:37:24 | 2 | peer-reviewed article that you wrote? |
| 02:37:25 | 3 | A.      Yes. |
| 02:37:25 | 4 | Q.      Do you recall the abstract from |
| 02:37:27 | 5 | that report? |
| 02:37:28 | 6 | A.      No. |
| 02:37:30 | 7 | Q.      Probably not.  Eight years ago. |
| 02:37:35 | 8 | All right.  If I could get that |
| 02:37:36 | 9 | projected on the screen.  Does that |
| 02:37:38 | 10 | look like the article that you |
| 02:37:39 | 11 | created? |
| 02:37:40 | 12 | A.      Yes. |
| 02:37:41 | 13 | Q.      Okay. |
| 02:37:41 | 14 |                 ATTORNEY GORDON: |
| 02:37:42 | 15 |                 And I will note for the |
| 02:37:44 | 16 | record there are some stamps on this. |
| 02:37:46 | 17 | It appears to have been used in a |
| 02:37:49 | 18 | proceeding at some point in time. |
| 02:37:51 | 19 | Those markings are not intended as |
| 02:37:53 | 20 | evidentiary markings by my party or |
| 02:37:56 | 21 | for this case. |
| 02:37:56 | 22 | BY ATTORNEY GORDON: |
| 02:38:02 | 23 | Q.      So let's have a look at that |
| 02:38:04 | 24 | --- that abstract.  In fact, if you've |
| 02:38:06 | 25 | had a chance to review that, my |

180

| | | |
|---|---|---|
| 02:38:08 | 1 | question is really on the terminal |
| 02:38:11 | 2 | sentence which appears on the next |
| 02:38:12 | 3 | page.  And it reads, our results |
| 02:38:14 | 4 | illustrate a strong relationship |
| 02:38:16 | 5 | between the geographic concentration |
| 02:38:19 | 6 | of Democratic voters and electoral |
| 02:38:22 | 7 | bias favoring Republicans. |
| 02:38:24 | 8 | Did I read that correctly? |
| 02:38:25 | 9 | A.      Yes. |
| 02:38:25 | 10 | Q.      Was that true at the time you |
| 02:38:27 | 11 | said it? |
| 02:38:27 | 12 | A.      Yes. |
| 02:38:27 | 13 | Q.      Is it true today? |
| 02:38:30 | 14 | A.      Yes. |
| 02:38:30 | 15 | Q.      And do you think that applies |
| 02:38:32 | 16 | to Pennsylvania? |
| 02:38:34 | 17 | A.      Well, I've written a book on |
| 02:38:36 | 18 | that topic, so I'd be happy to talk |
| 02:38:39 | 19 | about that.  Yes, there's a |
| 02:38:41 | 20 | considerable analysis in the book. |
| 02:38:44 | 21 | There's a chapter on Pennsylvania in |
| 02:38:46 | 22 | particular, and it considers exactly |
| 02:38:48 | 23 | this question.  I also have a |
| 02:38:52 | 24 | follow-up article on --- that focuses |
| 02:38:53 | 25 | on Pennsylvania.  And in that analysis |

181

| | | |
|---|---|---|
| 02:38:56 | 1 | one of the things we --- one of the |
| 02:39:01 | 2 | things we see is that if we just run a |
| 02:39:03 | 3 | lot of simulations ---. |
| 02:39:04 | 4 | Q.     If I could interrupt you.  I'm |
| 02:39:06 | 5 | on the clock.  Your counsel has |
| 02:39:07 | 6 | rebuttal.  I really just want to get |
| 02:39:09 | 7 | to the terminal statement of this --- |
| 02:39:12 | 8 | this report. |
| 02:39:14 | 9 | Proving such intent in court |
| 02:39:15 | 10 | will be difficult in states where |
| 02:39:17 | 11 | equally egregious electoral bias can |
| 02:39:21 | 12 | emerge purely from human geography? |
| 02:39:23 | 13 | Did I read that correctly? |
| 02:39:25 | 14 | A.     Yes. |
| 02:39:25 | 15 | Q.     And is that --- was that true |
| 02:39:26 | 16 | when you said it? |
| 02:39:27 | 17 | A.     Yes. |
| 02:39:27 | 18 | Q.     And is it still true today |
| 02:39:30 | 19 | about Pennsylvania? |
| 02:39:31 | 20 | A.     Yes.  I wasn't under the |
| 02:39:33 | 21 | understanding of this Court --- this |
| 02:39:35 | 22 | case was about gerrymandering.  So I'm |
| 02:39:36 | 23 | not --- not something I considered in |
| 02:39:39 | 24 | this --- in my report. |
| 02:39:39 | 25 | Q.     Fair enough.  Thank you, |

182

02:39:42   1    Doctor.
02:39:42   2                    ATTORNEY GORDON:
02:39:43   3            Those are all the
02:39:44   4    questions I have at this time.
02:39:45   5                    JUDGE McCULLOUGH:
02:39:45   6            Thank you, Counsel.  We
02:39:52   7    have the counsel for Representative
02:39:52   8    McClinton.
02:40:03   9                    ATTORNEY SENOFF:
02:40:03   10           Thank you, Your Honor.
02:40:05   11   David Senoff for Representative
02:40:08   12   McClinton.
02:40:08   13                    - - -
02:40:08   14            CROSS EXAMINATION
02:40:08   15                    - - -
02:40:08   16   BY ATTORNEY SENOFF:
02:40:09   17   Q.      Good afternoon, Doctor.  I just
02:40:10   18   have a few questions, which I know is
02:40:12   19   the death nail for any attorney to say
02:40:12   20   at the beginning of a Cross
02:40:12   21   Examination.
02:40:19   22           Doctor, when you were retained
02:40:22   23   and asked to come here today, your
02:40:24   24   role was not to give an opinion on
02:40:26   25   whether any particular map was

183

| | | |
|---|---|---|
| 02:40:28 | 1 | constitutional or not? |
| 02:40:30 | 2 | Am I correct? |
| 02:40:31 | 3 | A.        That's correct.  I'm not |
| 02:40:32 | 4 | usually asked to make that kind of |
| 02:40:34 | 5 | conclusion. |
| 02:40:35 | 6 | Q.        And that's because only a court |
| 02:40:38 | 7 | or the Supreme Court can do that. |
| 02:40:41 | 8 | Right? |
| 02:40:41 | 9 | A.        Correct. |
| 02:40:41 | 10 | Q.        Now, in creating your plan in |
| 02:40:45 | 11 | specific that's been gone over, did |
| 02:40:48 | 12 | you consider Pennsylvanian's statewide |
| 02:40:54 | 13 | voter registration data as it reflects |
| 02:40:59 | 14 | party registration? |
| 02:41:02 | 15 | A.        I did not make use of |
| 02:41:04 | 16 | registration data.  I just --- I only |
| 02:41:06 | 17 | made use of observed election results |
| 02:41:10 | 18 | at the precinct level. |
| 02:41:10 | 19 | Q.        And in reaching your |
| 02:41:11 | 20 | conclusions, did you give any thought |
| 02:41:13 | 21 | to vote dilution or disenfranchisement |
| 02:41:18 | 22 | in any way? |
| 02:41:19 | 23 | A.        I was only thinking in broad |
| 02:41:21 | 24 | terms about partisan fairness after |
| 02:41:24 | 25 | drawing my map and did some |

184

```
02:41:26   1    rudimentary analysis.  But vote
02:41:26   2    dilution in particular was not a
02:41:26   3    concept that I tried to --- that I
02:41:35   4    tried to evaluate.
02:41:35   5    Q.      And in looking at your map, as
02:41:37   6    you said, in a rudimentary way with
02:41:41   7    regard to those factors, did you make
02:41:44   8    any changes to the map as a result?
02:41:46   9    A.      No.
02:41:51  10    Q.      Thank you, Doctor.
02:41:51  11                ATTORNEY SENOFF:
02:41:53  12                I don't have any - any
02:41:54  13    other questions.
02:41:54  14                JUDGE McCULLOUGH:
02:41:54  15                You stood by your words.
02:41:56  16                ATTORNEY SENOFF:
02:41:56  17                I'm going to try to do
02:41:58  18    that through the whole trial.
02:41:58  19                JUDGE McCULLOUGH:
02:41:59  20                Okay, Counsel.  You can
02:42:01  21    do what you need.  Thank you.  And
02:42:02  22    then for Senator Costa, Counsel,
02:42:02  23    please.
02:42:02  24                    ---
02:42:02  25                CROSS EXAMINATION
```

185

--- 

02:42:21  1

02:42:21  2  BY ATTORNEY ATTISANO:

02:42:22  3  Q.    Hi, Doctor Rodden.  When you

02:42:22  4  referred to partisan fairness, can you

02:42:24  5  just tell us briefly what you're

02:42:25  6  referring to?

02:42:25  7  A.    I think many of us have the

02:42:27  8  notion that 50 percent of the votes

02:42:30  9  should correspond to 50 percent of the

02:42:31  10  seats in expectation, that there's a

02:42:33  11  correspondence between the statewide

02:42:35  12  vote share and the statewide seat

02:42:38  13  share.  That's the basic concept I had

02:42:40  14  in mind.

02:42:40  15  Q.    Is that --- on your reply

02:42:40  16  report, page nine, Table 5, is that

02:42:47  17  what that table is about?

02:42:47  18  A.    Yes, that's just an effort to

02:43:01  19  provide for the Court some basic

02:43:03  20  information that is related to the

02:43:05  21  partisanship of the map.  I don't

02:43:09  22  think it clearly translates into ---

02:43:11  23  there's not a measure of fairness that

02:43:14  24  we can extract from this.  I've tried

02:43:19  25  to communicate it's a little more

186

| | | |
|---|---|---|
| 02:43:19 | 1 | subtle than that. |
| 02:43:20 | 2 | Q.      Is it fair to say that when you |
| 02:43:22 | 3 | did those statistics you used a |
| 02:43:24 | 4 | statewide vote share of 50/50 split |
| 02:43:27 | 5 | between Democrats and Republicans |
| 02:43:27 | 6 | based on the historical election data |
| 02:43:29 | 7 | that you drew from. |
| 02:43:31 | 8 | Is that fair? |
| 02:43:31 | 9 | A.      The data that --- the data I |
| 02:43:33 | 10 | drew from, as I explained in the |
| 02:43:35 | 11 | initial report, if we look at those |
| 02:43:37 | 12 | elections, I think it's something like |
| 02:43:39 | 13 | 52 percent Democratic, on average. |
| 02:43:42 | 14 | Q.      Okay. |
| 02:43:45 | 15 | Did you adjust any data to test |
| 02:43:47 | 16 | this whenever you increased the vote |
| 02:43:52 | 17 | share statewide for Democrats, for |
| 02:43:55 | 18 | example, taking it from 52 percent to |
| 02:43:58 | 19 | 54 or 55 percent? Did you run an |
| 02:44:00 | 20 | analysis like that? |
| 02:44:02 | 21 | A.      Well, we can mentally run that |
| 02:44:06 | 22 | analysis by looking at this table and |
| 02:44:08 | 23 | knowing what the statewide vote share |
| 02:44:11 | 24 | from which I drew the data, what it |
| 02:44:13 | 25 | looked like. And if we just imagine |

187

| 02:44:14 | 1 | that that share, that shift, say a two |
| 02:44:14 | 2 | percentage point shift happens equally |
| 02:44:22 | 3 | across all districts, then we can --- |
| 02:44:23 | 4 | we can ask ourselves what would happen |
| 02:44:25 | 5 | to these districts under that |
| 02:44:27 | 6 | situation and we could certainly do a |
| 02:44:29 | 7 | more thorough analysis like that.  But |
| 02:44:31 | 8 | that's not something I included in my |
| 02:44:34 | 9 | report. |
| 02:44:34 | 10 | Q.      Okay. |
| 02:44:34 | 11 | And so you agree, though, you |
| 02:44:35 | 12 | didn't run that analysis? |
| 02:44:37 | 13 | Correct? |
| 02:44:37 | 14 | A.      Correct. |
| 02:44:38 | 15 | Q.      Isn't it possible that with an |
| 02:44:41 | 16 | analysis like that the increase in |
| 02:44:43 | 17 | statewide vote share will not |
| 02:44:45 | 18 | automatically proportionally increase |
| 02:44:51 | 19 | the proportion of seats in a map?  Is |
| 02:44:57 | 20 | that possible? |
| 02:44:58 | 21 | A.      Well, I think in the --- if I |
|  | 22 | understand you correctly, the question |
|  | 23 | seems to be about if we wanted to |
|  | 24 | conduct that exercise, would it be |
|  | 25 | realistic to imagine that a two |

188

1    percentage point swing was experienced

2    in exactly the same way in every

3    district.  That's the way analysts

02:45:13    4    often do this.  If I understand the

02:45:14    5    question correctly, it's --- the

02:45:15    6    question is whether that makes -

02:45:17    7    whether we should do that, is that

02:45:18    8    realistic.  Is that --- is that the

02:45:19    9    question?

02:45:20    10    Q.      The question is, is it possible

02:45:26    11    that the analysis could come out that

02:45:30    12    it is not a proportional increase in

02:45:34    13    seat share?

02:45:37    14    A.      Well, right.  So if we imagine

02:45:39    15    that there's a shift in the vote

02:45:43    16    share, might we get --- yes, if we

02:45:45    17    have a large shift in the --- in the

02:45:46    18    vote share, then the seat share may

02:45:51    19    very well not be proportional to the

02:45:54    20    vote share.  That's correct.

02:45:55    21    Q.      And for example, if the

02:45:58    22    increase in vote share statewide for

02:46:03    23    one party showed a more dramatic shift

02:46:10    24    in proportional gain of seats, would

02:46:13    25    that tell us --- more dramatic shift

189

02:46:16    1    as opposed to the other parties'
02:46:18    2    statewide increase, would that tell us
02:46:20    3    anything about the partisanship of a
02:46:28    4    map?
02:46:28    5    A.      Well, that's just a different
02:46:29    6    way of defining, I guess, the
02:46:30    7    partisanship of the map, that yes, if
02:46:30    8    we --- we are interested in knowing
02:46:30    9    the responsiveness of the map to
02:46:35   10    changes in the vote share, so what
02:46:35   11    would happen if there was a big shift
02:46:40   12    in one direction or the other, and we
02:46:40   13    could certainly conduct an analysis
02:46:42   14    where we just imagine that shift to
02:46:44   15    happen to all the districts and we see
02:46:47   16    what happens, and one of the things we
02:46:48   17    know about the transformation of votes
           18    to seats in general is that as one
           19    party gets a larger and larger
           20    majority, its --- its seat share ends
           21    up increasing by --- by more than its
           22    vote share.  That's something that
02:47:06   23    traditionally happens when a party
02:47:08   24    wins by a large majority.
02:47:08   25    Q.      And Doctor, I believe on Direct

190

02:47:10   1    you said you didn't consider any
02:47:11   2    racial data in your analysis.
02:47:14   3         Is that correct?
02:47:14   4    A.    That's correct.
02:47:15   5    Q.    Okay.
02:47:16   6         Why don't --- why didn't you do
02:47:19   7    that?
02:47:19   8    A.    Well, that's one thing I know
02:47:21   9    to be illegal, to draw district
02:47:24  10    boundaries.  Though I'm no lawyer, I
02:47:28  11    do know that it's not permissible to
02:47:29  12    draw district boundaries with race as
02:47:31  13    a predominant guiding principle.
02:47:36  14    Typically, it would also be --- it
02:47:38  15    would make sense after drawing a plan
02:47:39  16    to then assess its compliance with the
02:47:43  17    Voting Rights Act.  This was a
02:47:45  18    situation in which I was drawing from
02:47:46  19    a plan and deviating very little from
02:47:49  20    a plan that was --- that I understood
02:47:51  21    to not have been challenged in any
02:47:54  22    way.  It just made it through the
02:47:55  23    process four years ago in the Supreme
02:47:57  24    Court of Pennsylvania and there was no
02:48:00  25    VRA challenge that I was aware of.

191

| | | |
|---|---|---|
| 02:48:04 | 1 | And the districts in the surroundings |
| 02:48:07 | 2 | of minority communities changed hardly |
| 02:48:11 | 3 | at all in my plan.  So that was the |
| 02:48:12 | 4 | extent of my consideration of Voting |
| 02:48:14 | 5 | Rights Act claims. |
| 02:48:14 | 6 | Q.      You were asked by another |
| 02:48:15 | 7 | counsel about human geography in |
| 02:48:21 | 8 | Pennsylvania, and you were giving an |
| 02:48:22 | 9 | answer and then it got cut off.  Do |
| 02:48:25 | 10 | you remember that? |
| 02:48:25 | 11 | A.      Yes. |
| 02:48:25 | 12 | Q.      Could you go ahead and please |
| 02:48:27 | 13 | address that issue of human geography |
| 02:48:29 | 14 | in Pennsylvania that you were |
| 02:48:30 | 15 | addressing in which you were cut off? |
| 02:48:32 | 16 | A.      Yes.  And might still have to |
| 02:48:34 | 17 | cut me off because it's a topic on |
| 02:48:36 | 18 | which I'm very interested. |
| 02:48:37 | 19 | Q.      I got eight minutes, so I hope |
| 02:48:38 | 20 | I don't have to. |
| 02:48:38 | 21 | A.      But let me give you the very |
| 02:48:39 | 22 | brief version of it.  It's just that |
| 02:48:45 | 23 | the --- that the --- that at the scale |
| 02:48:45 | 24 | of congressional districts, the |
| 02:48:49 | 25 | problem I described in the paper with |

192

```
02:48:49    1    Jowei Chen had to do with
02:48:52    2    concentrations of Democrats in very
02:48:53    3    large cities, but also to some extent
02:48:53    4    a concentration of Democrats in
02:48:57    5    smaller cities in such a way that the
02:48:59    6    distribution of Democrats across
02:49:01    7    districts ended up being inefficient
02:49:04    8    for the Democratic party.  And I
02:49:06    9    pointed out in this work that similar
02:49:07   10    things have happened in other context.
02:49:11   11         But we can't make broad
02:49:12   12    statements about that regarding every
02:49:14   13    context.  It's necessary to focus on a
02:49:16   14    specific context, and I've done that
02:49:18   15    in the Pennsylvania congressional
02:49:20   16    context.  And one thing we see is when
02:49:22   17    we do a lot of simulations a good
02:49:26   18    share of those simulations end up in a
02:49:32   19    range that --- that is --- that
02:49:34   20    produces the kind of partisan fairness
02:49:36   21    we're talking about.  So it is not the
02:49:38   22    case that the human geography in
02:49:40   23    Pennsylvania somehow requires that we
02:49:41   24    draw unfair districts.  There's just
02:49:44   25    no --- there's no evidence for that
```

193

| | | |
|---|---|---|
| 02:49:46 | 1 | whatsoever. |
| 02:49:46 | 2 | Q.      When it comes to drawing unfair |
| 02:49:50 | 3 | districts, is it possible to |
| 02:49:53 | 4 | unintentionally draw an unfair |
| 02:49:54 | 5 | district? |
| 02:49:54 | 6 | A.      Yes. |
| 02:49:54 | 7 | Q.      And it's possible to |
| 02:49:56 | 8 | intentionally draw an unfair district. |
| 02:49:58 | 9 | Correct? |
| 02:49:58 | 10 | A.      Yes. |
| 02:49:59 | 11 | Q.      And with respect to |
| 02:50:00 | 12 | gerrymandering, is it possible to |
| 02:50:02 | 13 | unintentionally draw a gerrymandered |
| 02:50:06 | 14 | district? |
| 02:50:06 | 15 | A.      Then it depends on how we |
| 02:50:08 | 16 | define gerrymandering.  Then we get |
| 02:50:10 | 17 | into some philosophical conversations. |
| 02:50:14 | 18 | Do we --- do we define gerrymandering |
| 02:50:16 | 19 | to be any deviation from something |
| 02:50:18 | 20 | that would emerge from a million |
| 02:50:22 | 21 | simulations or do we find |
| 02:50:23 | 22 | gerrymandering to be an intentional |
| 02:50:28 | 23 | effort to favor a party.  If we define |
| 02:50:29 | 24 | it that way, then if it's |
| 02:50:30 | 25 | unintentional, then we wouldn't |

194

```
02:50:33   1   include it in the definition of
02:50:34   2   gerrymandering.
02:50:35   3   Q.      And you agree that it's
02:50:38   4   possible to unintentionally draw an
02:50:40   5   unfairly partisan district.
02:50:44   6           Correct?
02:50:46   7   A.      Yes.
02:50:50   8                 ATTORNEY ATTISANO:
02:50:51   9                 Thank you.
02:50:51  10                 JUDGE McCULLOUGH:
02:50:51  11                 Thank you, Counsel.  I
02:50:52  12   believe that's all on Cross.  Does the
02:50:59  13   Petitioner have Redirect?
02:51:16  14                 ATTORNEY JASRASARIA:
02:51:17  15                 Good morning, Your
02:51:19  16   Honor.  Again Jyoti Jasrasaria for the
02:51:20  17   Carter Petitioners.  Hello, Doctor
02:51:23  18   Rodden.  I don't have any Redirect
02:51:25  19   questions, but I just wanted to ask
02:51:26  20   Your Honor, I understand, based on a
02:51:31  21   stipulation this morning, that Doctor
02:51:34  22   Rodden's report has already been
02:51:34  23   admitted.  But if necessary, I would
02:51:36  24   move to admit that.  And I'm happy to
02:51:38  25   offer hard copies if that's necessary
```

195

02:51:40  1   this morning to confirm that.

02:51:42  2                   JUDGE McCULLOUGH:

02:51:42  3                   I think we have

02:51:43  4   everything on the docket, if I'm

02:51:43  5   correct.  And they --- you're correct,

02:51:51  6   they were admitted per the

02:51:51  7   stipulations of counsel this morning.

02:51:53  8                   ATTORNEY JASRASARIA:

02:51:53  9                   Okay.  Excellent.

02:51:55  10                  And I also just wanted

02:51:56  11  to raise the issue of declarations

02:51:58  12  from the Carter Petitioners.  I

02:51:59  13  understand that no party is

02:52:02  14  challenging standing, but I'm just

02:52:05  15  offering declarations from most of our

02:52:08  16  Petitioners to establish where they

02:52:11  17  live and where they intend to vote.

02:52:12  18  And I believe my colleague, Matthew

02:52:17  19  Gordon, has already made these

02:52:18  20  available to other counsel.

02:52:20  21                  JUDGE McCULLOUGH:

02:52:21  22                  All right.

02:52:21  23                  Does anyone have any

02:52:22  24  objection?  Then they can be

02:52:26  25  admitted ---

196

| | | |
|---|---|---|
| 02:52:28 | 1 | ATTORNEY JASRASARIA: |
| 02:52:29 | 2 | Thank you. |
| 02:52:30 | 3 | JUDGE McCULLOUGH: |
| 02:52:30 | 4 | --- if there's no |
| 02:52:30 | 5 | objections.  Do you have hard copies? |
| 02:52:32 | 6 | ATTORNEY JASRASARIA: |
| 02:52:32 | 7 | I do.  Thank you, Your |
| 02:52:55 | 8 | Honor.  That's all for me. |
| 02:52:56 | 9 | JUDGE McCULLOUGH: |
| 02:52:56 | 10 | All right. |
| 02:52:56 | 11 | Thank you very much. |
| 02:52:57 | 12 | And then you're finished with your |
| 02:52:59 | 13 | witness? |
| 02:53:00 | 14 | ATTORNEY JASRASARIA: |
| 02:53:00 | 15 | Yes. |
| 02:53:00 | 16 | JUDGE McCULLOUGH: |
| 02:53:01 | 17 | And Doctor Rodden, thank |
| 02:53:02 | 18 | you very much.  You may step down. |
| 02:53:02 | 19 | THE WITNESS: |
| 02:53:04 | 20 | Thank you. |
| 02:53:10 | 21 | JUDGE McCULLOUGH: |
| 02:53:10 | 22 | I was just looking at |
| 02:53:11 | 23 | the time.  As I had told counsel, I |
| 02:53:13 | 24 | don't want to take long breaks, but I |
| 02:53:14 | 25 | think maybe you might need a 15-minute |

197

| | | |
|---|---|---|
| 02:53:16 | 1 | break, comfort break. Can I have a |
| 02:53:19 | 2 | nod of heads yes or no? Yes. Okay. |
| 02:53:21 | 3 | We'll take a 15-minute break and then |
| 02:53:24 | 4 | reconvene to begin Direct Examination |
| 02:53:24 | 5 | of Gressman --- Petitioner Gressman's |
| 02:53:39 | 6 | witness. Thank you. |
| 02:53:39 | 7 | COURT CRIER HOLLAND: |
| 02:53:40 | 8 | Commonwealth Court is |
| 02:53:41 | 9 | now in recess. |
| | 10 | --- |
| | 11 | (WHEREUPON, A SHORT BREAK WAS TAKEN.) |
| | 12 | --- |
| | 13 | COURT CRIER HOLLAND: |
| | 14 | Commonwealth Court is |
| 03:19:55 | 15 | back in session. |
| 03:19:55 | 16 | JUDGE McCULLOUGH: |
| | 17 | Please be seated. Thank |
| | 18 | you all for doing that quickly. |
| | 19 | So now we will proceed |
| | 20 | with the Petitioners Gressman calling |
| | 21 | their expert witness. |
| 03:19:58 | 22 | Counsel? |
| 03:19:58 | 23 | ATTORNEY RING-AMUNSON: |
| 03:19:58 | 24 | Thank you, Your Honor. |
| 03:19:59 | 25 | We call Doctor Daryl DeFord. |

198

| | | |
|---|---|---|
| 03:19:59 | 1 | JUDGE MCCULLOUGH: |
| 03:19:59 | 2 | He knows his way around |
| 03:19:59 | 3 | to the witness stand now, because |
| 03:19:59 | 4 | Doctor Rodden had to do it first. |
| 03:20:23 | 5 | Okay. |
| 03:20:23 | 6 | COURT CRIER TURNER: |
| 03:20:24 | 7 | Please raise your right |
| 03:20:25 | 8 | hand. |
| 03:20:25 | 9 | - - - |
| | 10 | DARYL DEFORD, |
| | 11 | CALLED AS A WITNESS IN THE FOLLOWING |
| | 12 | PROCEEDINGS, HAVING FIRST BEEN DULY |
| | 13 | SWORN, TESTIFIED AND SAID AS FOLLOWS: |
| | 14 | - - - |
| | 15 | DIRECT EXAMINATION |
| 03:20:43 | 16 | - - - |
| 03:20:43 | 17 | BY ATTORNEY RING-AMUNSON: |
| 03:20:44 | 18 | Q.      Good afternoon, Doctor DeFord. |
| 03:20:44 | 19 | You can take your mask off if you |
| 03:20:44 | 20 | want.  Thank you. |
| 03:20:45 | 21 | Could you please introduce |
| 03:20:46 | 22 | yourself to the Court? |
| 03:20:47 | 23 | A.      Sure.  Good morning.  My name |
| 03:20:48 | 24 | is Darryl DeFord.  I'm an assistant |
| 03:20:50 | 25 | professor of data analytics in the |

199

| | | |
|---|---|---|
| 03:20:53 | 1 | department of mathematics and |
| 03:20:55 | 2 | statistics at Washington State |
| 03:20:56 | 3 | University. |
| 03:20:56 | 4 | Q.      And Doctor DeFord, do you have |
| 03:20:58 | 5 | experience evaluating electoral maps? |
| 03:21:01 | 6 | A.      I do, yes. |
| 03:21:02 | 7 | Q.      Could you please summarize it |
| 03:21:03 | 8 | for the Court? |
| 03:21:06 | 9 | A.      Sure.  So for the last three |
| 03:21:08 | 10 | years most of my main, sort of |
| 03:21:09 | 11 | research work has focused on studying |
| 03:21:09 | 12 | sort of the mathematical and |
| 03:21:09 | 13 | computational methods for evaluating |
| 03:21:09 | 14 | redistricting plans, including any |
| 03:21:19 | 15 | sort of peer-reviewed academic |
| 03:21:19 | 16 | publications as well as practical work |
| 03:21:23 | 17 | with actual maps. |
| 03:21:23 | 18 | Q.      And I'm going to ask you to |
| 03:21:25 | 19 | speak slowly and clearly so the Court |
| 03:21:29 | 20 | Reporter can get down everything |
| 03:21:30 | 21 | you're saying without breaking any |
| 03:21:32 | 22 | fingers. |
| 03:21:36 | 23 | Are you aware that the Court is |
| 03:21:37 | 24 | here to evaluate which congressional |
| 03:21:40 | 25 | math to adopt for Pennsylvania based |