Received 2/14/2022 5:32:10 PM Supreme Court Middle District

Filed 2/14/2022 5:32:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA
# MIDDLE DISTRICT

_____

## 7 MM 2022

_____

CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW,
WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN
CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL
GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS,
TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN,
*Petitioners*

v.

LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING
SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA;
JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR
THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND
NOTARIES,
*Respondents*

_____

## EXCEPTIONS OF SENATOR JAY COSTA AND THE SENATE DEMOCRATIC CAUCUS TO THE FEBRUARY 7, 2022 REPORT OF THE SPECIAL MASTER

_____

Proceedings Following Exercise of Extraordinary Jurisdiction Over
Petitioners' Petition for Review and Action Previously Filed at
Commonwealth Court of Pennsylvania Docket No. 464 M.D. 2021 and the
February 7, 2022 Special Master's Report

_____

/s/ Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219

/s/ Clifford Levine
Clifford B. Levine
Pa. Id. No. 33507
Emma F.E. Shoucair
Pa. Id. No. 325848

A1975

(412) 438-8209
mattisano@flannerygeorgalis.com

/s/ Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

/s/ A. Michael Pratt
A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg
Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

/s/ CJ Hafner
Claude J. Hafner, II
Pa Id. No. 45977
Ronald N. Jumper
Pa. Id. No. 64346
Shannon A. Sollenberger
Pa. Id. No. 308878)
Democratic Caucus Senate of
Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com

**Counsel for Intervenors**
Senator Jay Costa, Et Al. (Senate Democratic Caucus)

**EXCEPTIONS OF SENATOR JAY COSTA AND THE SENATE DEMOCRATIC CAUCUS TO THE FEBRUARY 7, 2022 REPORT OF THE SPECIAL MASTER**

With a February 2, 2022 Order, this Court granted an application to assume extraordinary jurisdiction over the proposed Congressional redistricting process that that had been initiated in the Commonwealth Court. With the same order, the Court designated Judge Patricia A. McCullough, who had been conducting the Commonwealth Court proceedings, to serve as the Special Master for the Court.  It directed her to file recommended findings of fact and conclusions of law, with a recommended redistricting plan and proposed changes to the elections calendar, by February 7, 2022.  The Court allowed any party or *amicus curiae* to file any exceptions to the Special Master's Report, with any supporting brief, by February 14, 2022.  *See id.*

In accordance with the Court's order, Senator Jay Costa and the Senate Democratic Caucus submit their Exceptions to the February 7, 2022 Report of the Special Master.  Their brief in support of the exceptions is being contemporaneously filed.

**EXCEPTIONS TO THE FEBRUARY 2, 2022 REPORT**

As further explained in the accompanying Brief in Support of the Exceptions, Senator Jay Costa and the Senate Democratic Caucus except to the Special Master's February 2, 2022 Report for the following reasons:

A1977

1. The Special Master fundamentally misinterpreted and misapplied this Court's decision in *League of Women Voters v. Com.*, 178 A.3d 737 (Pa. 2018).

2. The Special Master improperly conflated the distinct concepts of symmetry and proportionality.

3. The Special Master erred in making a finding of credibility with respect to two witnesses, Dr. Michael Barber and Dr. Keith Naughton, contrary to the record evidence and the witnesses' admissions.

4. The Special Master erred as a matter of law in incorrectly concluding that the City of Pittsburgh may never be divided into multiple Congressional districts.

5. The Special Master concluded, contrary to this Court's decision in *League of Women Voters*, that "political geography" justifies vote dilution.

6. The Special Master erred in affording deference to a redistricting plan that had passed through the General Assembly but which the Governor vetoed, instead of concluding it was a failed legislative enactment that cannot be afforded any deference without violating the separation of powers.

7. The Special Master erred in proposing an election calendar that ignores the realities of other election-related matters before this Court, particularly the Legislative Reapportionment Commission's recent approval of a Final Plan for the State House and State Senate districts.

For these reasons and for the reasons set forth in their supporting Brief, Senator Jay Costa and the Senate Democratic Caucus ask this Court to adopt one of the plans that the Senate Democratic Caucus submitted or, at a minimum, to reject the Special Master's recommendation of the map identified as HB 2146.  They also ask the Court to adopt a schedule for the

2

2022 Primary Election and pre-Primary calendar that provides for a single,

unified Primary Election involving both state and federal elections.  With

appropriate consideration of the other proceedings before this Court, it may

be possible to preserve the May 17, 2022 Primary Election date.

Respectfully Submitted:

DENTONS COHEN & GRIGSBY P.C.

By: /s/ Clifford B. Levine
Clifford B. Levine
Pa. I.D. No. 33507
Emma F.E. Shoucair
PA I.D. No. 325848
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
(412) 438-8209
mattisano@flannerygeorgalis.com

Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

3

A1979

A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg
Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

Claude J. Hafner, II
PA ID No. 45977
Ronald N. Jumper
PA ID No. 64346
Shannon A. Sollenberger
PA ID No. 308878
Democratic Caucus
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com

Dated:  February 14, 2022          *On Behalf of Counsel for Intervenors*
                                   *Democratic Senate Caucus*

4

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:  <u>Clifford B. Levine</u>

Signature._____

Attorney No. <u>33507</u>

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a true and correct copy of the foregoing document was served via PACfile Proof of Service, this 14th day of February, 2022, upon all counsel.

DENTONS COHEN & GRIGSBY P.C.

By: <u>/s/ Clifford B. Levine</u>
Clifford B. Levine
Pa. I.D. No. 33507
Emma F.E. Shoucair
PA I.D. No. 325848
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
(412) 438-8209
mattisano@flannerygeorgalis.com

Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg

2

Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

Claude J. Hafner, II
PA ID No. 45977
Ronald N. Jumper
PA ID No. 64346
Shannon A. Sollenberger
PA ID No. 308878
Democratic Caucus
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com
*On Behalf of Counsel for Intervenors*
*Democratic Senate Caucus*

Dated:  February 14, 2022

3

Received 2/14/2022 5:32:10 PM Supreme Court Middle District

Filed 2/14/2022 5:32:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA
# MIDDLE DISTRICT

_____

## 7 MM 2022

_____

CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN,
*Petitioners*
v.
LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES,
*Respondents*

_____

## BRIEF OF INTERVENORS, SENATOR JAY COSTA AND THE SENATE DEMOCRATIC CAUCUS, IN SUPPORT OF THEIR EXCEPTIONS TO THE FEBRUARY 7, 2022 REPORT OF THE SPECIAL MASTER

_____

Proceedings Following Exercise of Extraordinary Jurisdiction Over Petitioners' Petition for Review and Action Previously Filed at Commonwealth Court of Pennsylvania Docket No. 464 M.D. 2021 and the February 7, 2022 Special Master's Report

_____

/s/ Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
(412) 438-8209
mattisano@flannerygeorgalis.com

/s/ Clifford Levine
Clifford B. Levine
Pa. Id. No. 33507
Emma F.E. Shoucair
Pa. Id. No. 325848
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152

A1984

/s/ Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

/s/ A. Michael Pratt
A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg
Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

/s/ CJ Hafner
Claude J. Hafner, II
Pa Id. No. 45977
Ronald N. Jumper
Pa. Id. No. 64346
Shannon A. Sollenberger
Pa. Id. No. 308878)
Democratic Caucus Senate of
Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com

**Counsel for Intervenors**
Senator Jay Costa, Et Al. (Senate Democratic Caucus)

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................. ii

STATEMENT OF JURISDICTION .............................................. 1

INTRODUCTION ........................................................................ 2

STATEMENT OF THE CASE .................................................... 4

SUMMARY OF ARGUMENT .................................................... 25

STATEMENT OF THE STANDARD AND SCOPE OF REVIEW ............. 27

ARGUMENT ............................................................................. 28

   A.   THE PENNSYLVANIA CONSTITUTION FORBIDS THE USE OF ELECTION LAWS, INCLUDING REDISTRICTING PLANS, TO DILUTE VOTES ON THE BASIS OF POLITICAL VIEWPOINT. .......................... 28

   B.  IN DISTINCT CONSTRAST TO THE REPUBLICAN-SUPPORTED HB 2146 PLAN, THE PLANS THAT THE SENATE DEMOCRATIC CAUCUS AND SEVERAL OTHERS OFFER AVOID THE DILUTION OF PENNSYLVANIANS' VOTES. .............................................. 33

   C.  THE SPECIAL MASTER BASED HER RECOMMENDATION OF HB 2146 ON MYRIAD FACTUAL AND LEGAL ERRORS. .......................... 36

   D.  IN ANY EVENT, THIS COURT RETAINS THE AUTHORITY TO CRAFT ITS OWN MAP. .................................................... 57

CONCLUSION .......................................................................... 57

i

## TABLE OF CITATIONS

Page(s)

Cases

*Common Cause v. Lewis*,
No. 18-cvs-014001, 2019 WL 4569584 (N.C. Super. 2019) ............. 15, 35

*Cook v. Luckett*,
725 F.2d  (5th Cir. 1984) ........................................................................ 43

Court's decision in *Holt v. 2011 Legislative Reapportionment Commission*,
67 A.3d  (Pa. 2013) .............................................................. 20, 43, 45, 48

*In re Beyer*,
115 A.3d 835 (Pa. 2015) ....................................................................... 49

*In re Makhija*,
136 A.3d 539 (Pa. Commw. Ct. 2016) ................................................... 49

*In re Nomination Petition of Farnese*,
945 A.2d  (Pa. Commw. Ct. 2008) ........................................................ 49

*In re Nomination Petitions of Smith*,
182 A.3d 12 (Pa. Commw. Ct. 2018) ..................................................... 49

*In re Scroggin*,
237 A.3d 1006 (Pa. 2020) ..................................................................... 49

*In re: New Britain Borough Sch. Dist.*,
145 A. 597 (Pa. 1929) ........................................................................... 27

*Jones v. Desantis*,
462 F. Supp. 3d 1196 (N.D. Fl. 2020) .............................................. 15, 35

*Karcher v. Daggett*,
462 U.S. 725 (1983) .............................................................................. 26

*League of Woman Voters v. Commonwealth*,
178 A.3d 737 (Pa. 2018) .................................................................passim

*League of Women Voters v. Com.*,
181 A.3d 1083 (Pa. 2018) ..................................................................... 52

*Mellow v. Mitchell*,
607 A.2d 204 (Pa. 1992) ................................................................... 21, 22

*Newbold v. Osser*,
230 A.2d 54 (Pa. 1967) ......................................................................... 43

Order,
464 M.D. 2021 & 465 M.D. 2021 (filed Jan. 14, 2022) ............................ 6

*Patterson v. Barlow*,
60 Pa.  (Pa. 1869) ................................................................................. 27

*Tallahassee Branch of NAACP v. Leon Cnty.*,
  827 F.2d 1436 (11th Cir. 1987)..............................................................43
*Upham v. Seamon*,
  456 U.S. 37 (1982) ..............................................................................43
*Wesberry v. Sanders*,
  376 U.S. 1 (1964) ................................................................................26
*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) .......................................................................43, 44
*White v. Weiser*,
  412 U.S. 783 (1973) ............................................................................43
*Winston v. Moore*,
  91 A. 520 (Pa. 1914)............................................................................27

## Statutes

42 Pa.C.S. § 726 ........................................................................................1
Article I, Section 5 of the Pennsylvania Constitution ..............................4, 5
Pa. Const. art. II, § 16................................................................................5
Pa. Const. art. II, sec. 17(d) .....................................................................48
U.S. Const., art. I ....................................................................................26

## Other Authorities

2022 Transcript............................................................................ 19, 33, 48

## STATEMENT OF JURISDICTION

This Court has jurisdiction over these consolidated actions pursuant to 42 Pa.C.S. § 726 (providing this Court with authority to exercise extraordinary jurisdiction over any matter in Pennsylvania's courts), and its February 2, 2022 Order exercising extraordinary jurisdiction, *see* February 2, 2022 Order at 1.

## INTRODUCTION

In 2018, this Court held that the Free and Equal Elections Clause of the Pennsylvania Constitution requires a Congressional redistricting plan to "create representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct that majority of their day-to-day affairs, and accord equal weight to the votes of residents in each of the various districts in determining the ultimate composition of the [federal] legislature." *League of Woman Voters v. Commonwealth*, 178 A.3d 737, 814 (Pa. 2018).  Consistent with these principles, the Court invalidated the existing plan and crafted a remedial one, which satisfied the constitutional requirements and which was used in the 2018 and 2020 Congressional elections.

Following the completion of the 2020 Census, the number of congressional seats allotted to Pennsylvania has been reduced from 18 to 17, precluding use of the 2018 remedial plan.  With Congressional elections now pending, the political branches have failed to agree upon a new redistricting plan.  This matter invokes this Court's jurisdiction to resolve the impasse and to adopt a new remedial plan.

With its exercise of jurisdiction over this matter, the Court appointed Commonwealth Court Judge Patricia McCullough as a special master,

directing her to prepare a report with recommended findings of fact, conclusions of law and a recommended plan by February 7, 2022.  The report that Judge McCullough issued ("Report")[1] is marred by a number of significant factual and legal errors.  These include:

- A fundamental misinterpretation of *League of Women Voters*;
- An improper conflation of the concepts of symmetry and proportionality;
- Flawed credibility determinations;
- An unsupported conclusion that the City of Pittsburgh may never be divided into multiple Congressional districts;
- An unsupportable conclusion that "political geography" justifies vote dilution;
- A flawed conclusion that a redistricting plan, which passed through the General Assembly and which the Governor vetoed, could be afforded deference and not viewed as the failed redistricting plan it was; and
- A proposed election calendar that ignores the realities of other election-related matters before this Court.

Based on her flawed understanding of the controlling law, the Special Master ultimately recommended a plan that fails to honor this Court's dictate in *League of Women Voters* that equal weight must be accorded to the votes of residents in each of the various districts in determining the

---

[1] *See* February 2, 2022 Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule.

ultimate composition of the Pennsylvania's delegation to the United States House of Representatives.

This Court must now conduct its own review; adopt a plan that complies with constitutional dictates; and ensure the orderly administration of the 2022 elections in Pennsylvania.

## STATEMENT OF THE CASE

### A. Controlling Principles Of Redistricting

As this Court understood and explained in *League of Women Voters*, in developing a constitutionally sound Congressional map, Article I, Section 5 of the Pennsylvania Constitution forbids the dilution of voters' voices on the basis their membership in a particular group: "It is axiomatic that a diluted vote is not an equal vote, as all voters do not have an equal opportunity to translate their votes into representation."  *League of Women Voters*, 178 A.3d at 814.  Vote dilution can take the form of "lessening the power of an individual's vote based on the geographical area in which the individual resides" and is "impermissible" under Article I, Section 5.  *Id.* at 816.

To avoid the unconstitutional dilution of votes, the Court is to look to the traditional neutral redistricting criteria drawn from the Constitution's Article II, Section 16, which governs the creation of state legislative

districts: districts must be compact, contiguous, and, where concerns

Congressional districts, equal in population.  *League of Women Voters*, 178

A.3d at 815 (citing Pa. Const. art. II, § 16).  Counties, cities, incorporated

towns, boroughs, townships, and wards should not be divided unless

"absolutely necessary."  Pa. Const. art. II, § 16.

　　Adherence to these neutral criteria, in and of themselves, is not the

objective.  The "utility of these requirements [is] to prevent vote dilution."

*Id.*  Failure to adhere to these neutral criteria "is not the exclusive means by

which a violation of Article I, Section 5 may be established."  In *League of*

*Women Voters*, this Court recognized the possibility that "advances in map

drawing technology and analytical software can potentially allow

mapmakers, in the future, to engineer congressional district maps, which,

although minimally comporting with these neutral 'floor' criteria,

nevertheless operate to unfairly dilute the power of a particular group's vote

for a Congressional representative."  *Id.* at 817.  The future that the Court

anticipated has arrived.

### B. Relevant Procedural Background

### 1. Parties To The Proceeding Before The Commonwealth Court

　　The Carter Petitioners and the Gressman Petitioners filed separate

petitions with the Commonwealth Court, asking the court to select a

Congressional map.[2]  Both sets of petitioners generally alleged that the political process would not produce a valid map in time for the 2022 Primary Election to be administered.

Several parties sought leave to intervene in the Commonwealth Court proceeding, and, following a hearing before Judge McCullough, the court allowed participation as follows:

| Intervenors | *Amici Curiae* |
|---|---|
| Representative Kerry Benninghoff and Senator Jake Corman ("Republican Legislative Intervenors") | Voters of the Commonwealth of Pennsylvania |
| Representative Joanna E. McClinton et al. ("House Democratic Caucus") | Citizen-Voters |
| Senator Jay Costa et al. ("Senate Democratic Caucus") | Draw the Lines - PA |
| Governor Tom Wolf | Khalif Ali, et al. |
| Congressman Guy Reschenthaler, et al. ("Congressional Republican Intervenors") | |

---

[2] The Carter Petitioners, a group of individual Pennsylvania voters, are: Carol Ann Carter, Monica Parilla, Rebecca Poyourow, William Tung, Roseanne Milazzo, Burt Ziegel, Susan Cassanelli, Lee Cassanelli, Lynn Wachman, Michael Guttman, Maya Fonekeu, Brady Hill, Mary Ellen Balchunis, Tom DeWall, Stephany McNulty, and Janet Temin.  The Gressman Petitioners, a group of math and science professors in Pennsylvania, are: Philip T. Gressman, Ron Y. Donagi; Kristopher R. Tapp, Pamela Gorkin, David P. Marsh, James L. Rosenberger, Amy Myers, Eugene Bowman, Gary Gordon, Liz McMahon, Timothy G. Feeman, and Garth Isaak. With a December 20, 2021 order, the Commonwealth Court consolidated these cases.

*See* Order, 464 M.D. 2021 & 465 M.D. 2021 (filed Jan. 14, 2022).

### 2.    Submissions To The Commonwealth Court

The Commonwealth Court directed the parties to submit, by January 24, 2022, proposed redistricting plans, with any supporting expert reports and/or briefs.  Responsive expert reports and/or briefs were to be submitted by January 26, 2022.  *See id.*  The court scheduled an evidentiary hearing, which commenced on January 27, 2022.  *See id.*  The purpose of the hearing was to allow the parties to offer the testimony of their expert witnesses in support of their proposed maps and to give the parties the opportunity to cross-examine the expert witnesses.

### a.  Senate Democratic Caucus Maps[3]

The Senate Democratic Caucus submitted two maps, which are similar, but which contain three areas that reflect different perspectives on communities of interest:

- **Harrisburg**:  Both maps keep Greater Harrisburg connected to the City of York and extend into its West Shore suburbs of Cumberland County.  In Senate Democratic Caucus Map 1, the remainder of Dauphin County is included; and in Senate Democratic Caucus Map 2, the remainder of York County is

---

[3] Many other parties submitted maps, including the Carter Petitioners, the Gressman Petitioners, Governor Wolf, the Republican Congressional Intervenors (who submitted two maps), the House Democratic Caucus, and several amici.

included.  Both maps also keep together major areas of South-Central Pennsylvania.

- **Northeastern Pennsylvania:**  The two maps make slight changes in the Pocono and Lehigh Valley regions.  Senate Democratic Caucus Map 1 keeps the Lehigh Valley whole and includes Carbon County and the southernmost part of Monroe County.  Senate Democratic Caucus Map 2 adds Carbon County and northern Lehigh County to Schuylkill, Montour, Columbia, and Northumberland Counties, keeping Monroe County whole.  This map connects the majority of the Lehigh Valley with upper Bucks County.

- **Southeastern Pennsylvania:**  The two maps present different divisions with respect to Montgomery County and the City of Philadelphia.  Senate Democratic Caucus Map 1 keeps most of Bucks County whole and adds upper Montgomery County and southeastern Berks County.  This map then places the remainder of Montgomery County wholly within its own district.  In Senate Democratic Caucus Map 2, District 2 includes the northeast Philadelphia neighborhoods, the river wards, Center City, and lower Bucks County.  District 3 incorporates portions of north and West Philadelphia in with portions of Center City.  District 5 contains south Philadelphia and portions of Delaware County.

### b. Republican Legislative Intervenors' Map

The Republican Legislative Intervenors (House and Senate) submitted a joint map, referred to as "HB 2146."[4]  HB 2146 was initiated as a House Bill, which both houses of the General Assembly passed and which Governor Wolf vetoed.  Report at 30.  HB 2146 took two currently

---

[4] Although they submitted a joint map and relied on the same expert, the Special Master permitted the House Republican Legislative Intervenors and the Senate Republican Intervenors to otherwise operate separately, notably allowing them to give separate opening and closing statements.

Democratic districts in Allegheny County and created one solidly Democratic district and one solidly Republican district.  In the Harrisburg area, HB 2146 separated the City of Harrisburg from the rest of Dauphin County, adding Adams County and York County.

In Northeastern Pennsylvania, HB 2146 drew the Poconos and the Scranton-Wilkes Barre area together with highly rural and Republican populations in Bradford, Wyoming, and Susquehanna Counties.  The decisions reflected in HB 2146 demonstrate a lack of priority placed on creating competitive districts.

### C. Selected Evidence Presented To The Special Master

### 1.  Reports and Testimony of Dr. Devin Caughey (Witness on Behalf of the Senate Democratic Caucus)

The Senate Democratic Caucus offered the reports and testimony of Dr. Devin Caughey, Associate Professor in the Department of Political Science at the Massachusetts Institute of Technology, to assess the partisan fairness of the Senate Democratic Caucus maps, the Governor's Map, HB 2146, and Reschenthaler Map 2.  Dr. Caughey is an expert in American politics, statistics, and issues of elections and representation. 1/28/2022 Tr. at 894.  He has published academic articles on gerrymandering and has a forthcoming book on the topic.  *Id.*  at 894-95. He has also offered testimony in other redistricting cases.  *Id.* at 895.

### a. Partisan Fairness/Vote Dilution

In his pre-submitted reports and his testimony, Dr. Caughey discussed partisan fairness and vote dilution.  He outlined four measures of partisan fairness, all designed to determine whether a map has been designed to "maximize one party's prospects."  Supplemental Report at 3. Dr. Caughey calculated partisan symmetry, efficiency gap, mean-median difference, and declination differences for the 2018 Map drawn by this Court, Senate Democratic Caucus Maps 1 and 2, the Governor's Map, HB 2146, and Reschenthaler Map 2.  Dr. Caughey confirmed the partisan fairness of the 2018 Map and prudently applied his accepted methodology to the 2018 Map to ensure its reliability.

Dr. Caughey provided the following overall assessment of several of the maps, as reproduced from his Supplemental Report:

| Metric | Current | Governor | HB 2146 | SDC 1 | SDC 2 |
|---|---|---|---|---|---|
| Partisan Bias | 2.1% | 2.9% | 6.3% | 1.8% | 1.5% |
| Efficiency Gap | 2.9% | 3.5% | 6.6% | 2.3% | 2.4% |
| Mean-Median | 0.8% | 1.0% | 2.3% | 0.7% | 0.5% |
| Declination | 0.08 | 0.1 | 0.19 | 0.06 | 0.07 |

Caughey Supplemental Report at 22.  Dr. Caughey testified that all of these metrics "are trying to tap into the same thing, which is how much does this map deviate from partisan fairness."  1/28/2022 Tr. at 927.

### b. Partisan Symmetry

As Dr. Caughey explained, partisan symmetry "is grounded in the idea that under a fair redistricting plan, the translation of votes into seats is neutral with respect to party."  Caughey Supplemental Report at 4.  The parties should be treated equally with respect to the winner's bonus either party receives by winning a majority of statewide votes: if a 51% Republican win translates into a 55% share of the seats, a 51% Democratic win should also translate into a 55% share of the seats.  This concept is distinct from the concept of proportionality, which requires that a 51% vote share translate into exactly 51% of the seats.  Dr. Caughey noted that, because the United States does not have a proportional electoral system, so-called "winner's bonuses" are commonplace, where a vote share over 50% results in a super-proportional share of seats.  *Id.*  Partisan symmetry simply requires that the winner's bonus be party-neutral.  *Id.*  This means that the winner's bonus should yield the same percentage of seats regardless of whether the Democratic Party of Republican Party receives a majority of votes statewide.

As Dr. Caughey made clear, if a map awards a larger winner's bonus to one party than the other, that is evidence that that map dilutes votes.

Dr. Caughey testified that, under the Republicans' HB 2146, the winner's bonus for Republicans was "quite large[]," and that when Republicans win 51% of the votes, they would net out 58% of the seats. *Id.* at 934. He also testified that the map did not award the same size winner's bonus in the event of a Democratic win. *Id.* at 940. The partisan bias score of HB 2146 is triple that of the 2018 Map.

Dr. Caughey carefully distinguished the concepts of partisan symmetry and proportionality. Supplemental Report at 4. Proportional systems award parties the same proportion of seats as votes earned; this is not the same as insisting that a map award a winner's bonus to one party in circumstances in which it would award the same winner's bonus to the other. *See id.* Symmetry between the way the parties are treated "need not be proportional so long as seats-votes function is equally disproportionate for all parties." *Id.* To illustrate, a map in which a 51% win results in a 55% vote share for both Democrats and Republicans is symmetrical but not proportional. Dr Caughey's unrefuted testimony established that these concepts are plainly distinct analytically.

### 2. Dr. Moon Duchin (Expert Witness on Behalf of Governor Wolf)

Dr. Moon Duchin, who is a Professor of Mathematics and Senior Fellow at the College of Civic Life at Tufts University and who has published extensively on redistricting analysis, testified on behalf of Governor Wolf. 1/27/2022 Tr. at 325. Like Dr. Caughey, Dr. Duchin discussed multiple metrics for assessing the partisan fairness of a map. She offered support for the Governor's Map.

Dr. Duchin testified that measures of partisan fairness allow for the assessment of whether a particular map engages in vote dilution. *Id.* at 328-29. The concept of partisan fairness, she said, "is about giving votes equal weight." *Id.* at 329. She concluded that all of the plans "are quite tightly population balanced." *Id.* at 331. She confirmed that all of the submitted plans were contiguous. *Id.* at 333. When assessing compactness, she indicated that all of the maps "are quite good" across different traditional metrics, but that some of the maps were more compact, including the Governor's Map. *Id.* at 334. By contrast, Dr. Duchin characterized HB 2146 as "one of the least compact" of the submitted maps. *Id.* at 335.

Dr. Duchin further explained that all of the maps did very well at minimizing splits, *id.* at 337, and that "absolute minimization" of splits was not the end goal of producing a map, since there are other required criteria

that must be met; the entire exercise "reflect decisions about those trade offs." *Id.* at 338.

In terms of partisan fairness, Dr. Duchin commended the "agreement from the experts" that when assessing a plan, the partisan fairness of a plan reflects "how well it upholds the norms and ideals of representative democracy. You really want to see that the plan has the ability to translate more votes into more seats." *Id.* at 351. She stated that HB 2146 misses the mark on partisan fairness and is not responsive to voter preferences. *Id.* at 364.

Dr. Duchin also discussed the political geography in Pennsylvania. She noted that the distribution of voters across the Commonwealth "manifestly doesn't prevent you from drawing a fair map." *Id.* at 380. Partisan fairness in Pennsylvania can be achieved, according to Dr. Duchin, "at no cost at all to the traditional [redistricting] principles." *Id.* at 382. The Carter Petitioners' expert, Dr. Jonathan Rodden, confirmed this point, testifying that a "good share" of simulated maps exhibit partisan fairness, and that there is "no evidence. . . whatsoever" that "the human geography in Pennsylvania somehow requires that we draw unfair districts." *Id.* at 192-93.

### 3.  Dr. Michael Barber (Expert Witness in Support of HB 2146)

Other parties offered testimony that attempted to discount the significance of vote dilution.  The House Republican expert, Dr. Michael Barber, asserted that Republicans had a natural advantage in redistricting because they are not concentrated in urban areas and therefore "waste fewer votes."  *Id.* at 509-10.  In his opinion, this disadvantage for Democrats can only be overcome "if you ignore" traditional redistricting criteria.  *Id.* at 510.  Yet, Dr. Barber also claimed that HB 2146 resulted in nine Democratic seats and eight Republican seats, an advantage to Democrats.  *Id.* at 533.  Dr. Barber indicated that he had conducted his "sequential Monte Carlo analysis" over a set of 50,000 simulated maps and asserted that the advantage of his method was that his simulated maps allowed him to compare "apples to apples" between the proposed maps and the simulated maps.  *Id.* at 517-18.  Later, however, Dr. Barber conceded that his "sequential Monte Carlo methodology," has not been peer-reviewed.  *Id.* at 598.

Further, on cross-examination, Dr. Barber admitted that his simulated maps contained population deviations of up to 3,800 people, which is not comparable to the deviation found in HB 2146.  *Id.* at 568-69.  Dr. Barber

testified that he had assessed partisan fairness metrics for the various maps. He admitted that, of the maps he had reviewed, HB 2146 was the worst map on the mean-median measurement of partisan fairness, with the exceptions of the two Reschenthaler plans.  Report at 92, 1/27/2022 Tr. at 576.

Many of the parties challenged Dr. Barber's credibility.  Dr. Barber acknowledged that he had not published any scholarship in the areas of redistricting, partisan influence in redistricting, or simulated redistricting analysis.  1/27/2022 Tr. at 562-63.  He confirmed that he had previously testified in court in *Common Cause v. Lewis*, No. 18-cvs-014001, 2019 WL 4569584 (N.C. Super. 2019) and *Jones v. Desantis*, 462 F. Supp. 3d 1196 (N.D. Fl. 2020).  1/27/2022 Tr. at 564-65.  He conceded that, in *Lewis*, the judge had concluded that because of "shortcomings" in his testimony, it would be given "little weight."  1/27/2022 Tr. at 565; *see also e.g.*, Lewis, 2019 WL 4569584 at *93-94 ("At the outset, the Court notes that none of Dr. Barber's academic research or published articles concern redistricting. . . ."). Dr. Barber also conceded that, in *Jones*, the court had also declined to give his testimony any weight.  1/27/2022 Tr. at 565; *see also e.g.*, *Jones*, 462 F. Supp. 3d at 1246-47 ("I do not credit the testimony [of Dr. Barber].  Indeed, one in search of a textbook dismantling of unfounded expert testimony would look long and hard to find a better example than the cross-examination of

16
A2004

this expert").  Mark Nordenberg, Chairman of the LRC, where Dr. Barber was also presented as an expert witness, concluded that Dr. Barber's testimony should be afforded little weight because Dr. Barber offered "general and unsupported conclusions about the dilution of the voting influence of minority groups."[5]  He further noted that Dr. Barber has "not published a single article in the areas for which his expert testimony was being presented."  *Id.* at 18.

### 4. Dr. Keith Naughton (Expert Witness in Support of the Reschenthaler Maps)

The Congressional Republican Intervenors offered Dr. Keith Naughton to support their maps.  Dr. Naughton has a PhD in Public Policy, but he is not a political scientist or mathematician.  1/27/2022 Tr. at 688.  Instead of identifying any relevant expertise, he identified the two years he spent "reading about congressional politics" and noted that "a dissertation is a very challenging thing."  *Id.*  The primary credential Dr. Naughton offered, however, was his experience with campaigns.  *Id.* at 689-90.  Dr. Naughton acknowledged that he worked exclusively for Republican candidates.  1/28/2022 Tr. at 769.  He conceded that his opinions were not based on

---

[5] Chairman Nordenberg's remarks, delivered at the February 4, 2022 meeting at which the LRC approved its Final Plan, are attached here as Exhibit A and can be found at https://www.redistricting.state.pa.us/commission/article/1096.  The Senate Democratic Caucus asks the Court to take judicial notice of Chairman Nordenberg's remarks, part of the public record in the LRC process, as yet another context in which Dr. Barber's proffered expertise was deemed not to be credible.

academic research or public opinion polling. *Id.* at 776. He has never appeared as an expert witness in a redistricting case before this one, and he has had no experience in redistricting. *Id.* at 777-78. He confirmed that his opinions were not based on any particular methodology. *Id.* at 779.

Dr. Naughton primarily testified on his opinions concerning communities of interest in Pennsylvania. His testimony tracked largely with a partisan preference for reducing the number of Democratic districts in Allegheny County by packing Democratic voters into a single district. *See id.* at 713-15. Additionally, he expressed his opinion that Bucks County shared no community of interest with northeast Philadelphia but provided only vague and general justification for such a view. *Id.* at 715-16; 844-46. He admitted he was "not good on the city neighborhoods." *Id.* at 845.

### 5. Evidence Concerning the City of Pittsburgh

Several parties offered specific evidence as to whether and under what circumstances the City of Pittsburgh could be divided between multiple Congressional districts. Dr. Barber and Dr. Naughton explained why, from their perspectives, the proposed splits of the City of Pittsburgh were inappropriate. Dr. Barber concluded that splitting Pittsburgh could only be supported on the basis of partisan advantage. 1/27/2022 Tr. at 526. Dr. Naughton opined that dividing Pittsburgh would be inappropriate under the

Constitutional directive not to split municipalities unless absolutely necessary 1/28/2022 Tr. at 713. Dr. Naughton characterized splitting Pittsburgh as "a terrible idea" because Pittsburgh is a "political unit" that "vote[s] for the same elected officials." *Id.* Splitting the city, he said, "dilutes the vote for the city" because candidates might ignore the City if portions were paired with the suburbs. *Id.* at 713-14. Dr. Naughton cited to no authority for any of the opinions he offered as testimony. He conceded, however, that a split of the City of Pittsburgh into two Congressional representatives could be beneficial to the entire City. *Id.* at 877. He also admitted that he did not fully analyze the voting patterns of City residents, and he had not taken into consideration the 2021 Mayoral Election in which the northern and southern parts of the City supported different candidates. *Id.* at 878.

In contrast, Dr. Duchin testified that she considered the split of the City of Pittsburgh to be a "reasonable choice[]" based on the relevant communities of interest analysis. *Id.* at 341. The Senate Democratic Caucus submitted an analysis that Michael Lamb, Pittsburgh's City Controller, conducted. Controller Lamb, who has been elected to multiple offices in the City of Pittsburgh and has extensive campaign experience both in Allegheny County and statewide, noted that Pittsburgh contains multiple, identifiable communities of interest within the City of Pittsburgh. Lamb Report at 1. He

19

noted that Pittsburgh's neighborhoods were historically formed by "natural topography and industrial history" rather than by any sort of central planning effort. *Id.* These neighborhoods follow natural geographic boundaries, such as hills and rivers; the Monongahela River is a particularly salient natural geographic boundary. *Id.* Controller Lamb noted that Pittsburgh's community south of the Monongahela River shares more common interests and culture with their neighboring southern suburban communities than with the city communities north of the river. *Id.* at 2. Pittsburgh's southern neighborhoods share a public transportation system, the "T," with the southern suburbs of Dormont, Castle Shannon, Mount Lebanon, and Bethel Park. *Id.* According to Lamb, it is often difficult to know when you are in the City and when you are in the surrounding southern suburbs because of the "spider-like" City boundary. *Id.*

### 6. Considerations Concerning the Election Calendar

The Secretary offered the affidavit of Jonathan Marks, Deputy Secretary for Elections, which discussed the Legislative Reapportionment Committee's ("LRC's") timeline for producing final maps for the General Assembly to lay out the timeline the Secretary needs to properly administer the 2022 Primary Election. 1/28/2022 Transcript at 1019. Judge McCullough sustained a relevance objection and struck the paragraphs in the affidavit

concerning the LRC.  *Id.* at 1022-23.  She thus did not consider the schedule for final approval for the state legislative maps when crafting her proposed calendar for the 2022 Primary Election.

### 7.  Post-Hearing Submissions

Following the hearing before the Special Master, the court allowed the parties to make post-hearing submissions by January 29, 2022.  On January 29, 2022, however, the Carter Petitioners filed an application to this Court and asked the Court to assume extraordinary jurisdiction.  *See* Order, 2/2/22. With its February 2, 2022 Order, this Court granted the application.   The Court designated Judge McCullough as the Special Master and directed her to file recommended findings of fact and conclusions of law, with a recommended redistricting plan, and proposed changes to the elections calendar, by February 7, 2022.  The Court also ordered that any party or *amicus curiae* is permitted to file any exceptions to the Special Master's Report, with any supporting brief, by February 14, 2022.  *See id.*

### D.      The Special Master's February 7, 2022 Report

As directed, the Special Master filed her report on February 7, 2022. *See generally* Report.  In the Report, the Special Master interpreted *League of Women Voters* as "constitutionalizing" traditional redistricting criteria for their own sake, rather than in service of avoiding partisan vote dilution.  *See*

*id.* at 20-29.  Despite this Court's admonitions in that case that voters should have an equal opportunity to transform their votes into representation, she concluded that:

> the constitutional criteria for legislative redistricting. . . . '[do] not impose a requirement of balancing the representation of the political parties; it does not protect the 'integrity' of any party's political expectations.  Rather, the construct speaks of the 'integrity' of political subdivisions, which bespeaks history and geography, not party affiliation or expectations.'

Report at 176.[6]

In comparing the various plans proposed, the Special Master primarily relied on the decades-old *Mellow Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992), limiting her review to the criteria set forth in that case.  She apparently disregarded how this Court modified the appropriate inquiry with its decision in *League of Women Voters.  See id.* at 29-43.

The Special Master rejected both of the Senate Democratic Caucus' plans based principally on her unsupported presumption that the City of Pittsburgh may never be divided into multiple Congressional districts, and it could not be divided to improve a plan's overall avoidance of vote dilution.

---

[6] The Special Master quoted from this Court's decision in *Holt v. 2011 Legislative Reapportionment Commission*, 67 A.3d 1213 (Pa. 2013), a *state* legislative redistricting case that discussed *different* constitutional provisions and had been decided five years before *League of Women Voters.*

She clearly viewed Republican dominance as a "natural" component of Pennsylvania's political geography.  *See id.* at 202.

Despite their lack of any relevant experience or credibility, the Special Master relied heavily on the reports and testimony of the Republicans' witnesses, Dr. Barber and Dr. Naughton, in finding that the Republican-supported HB 2146 best satisfied traditional redistricting criteria.  *See id.* at 203-14.   The primary reason she offered for this conclusion was the fact that HB 2146 had passed through the legislature, but she disregarded the fact that Governor Wolf vetoed it.  According to the Special Master, the vetoed HB 2146 reflected "the voice and will of the People," which "should be honored and respected by all means necessary."  *See id.* at 214.  Thus, the Special Master recommended HB 2146's adoption as a remedial plan.  *See id.* at 216.

The Special Master, who only considered matters in this case, included in her Repot a recommendation for a modified elections calendar, with an initial petition circulation date of March 1, 2022.  *See id.* at 221-22.

The Special Master's recommendation of HB 2146 reflects significant errors of both law and fact, which include:

- **Prohibition against vote dilution**: The Special Master erred in classifying the clear prohibition against vote dilution as an "extra-constitutional consideration" (Report at 171);

- **Vote dilution and proportionality**:  The Special Master improperly conflated the distinct concepts of "vote dilution" and "proportionality" (Report at 176);

- **Non-credible experts**: The Special Master erred in concluding that Dr. Barber and Dr. Naughton had provided credible testimony.

- **City of Pittsburgh Splits**: The Special Master concluded, contrary to the evidence, that, in several maps, the City of Pittsburgh had been split for partisan advantage (Report at 194);

- **Calendar:**  The Special Master erred in proposing a calendar for the 2022 Primary Election that did not take into account parallel proceedings of the LRC and other election-related constraints.

The Senate Democratic Caucus ask this Court to reject the Special Master's Report and recommended map, as set forth in their exceptions and supporting brief.

## SUMMARY OF ARGUMENT

The Pennsylvania Constitution forbids the use of election laws, including redistricting plans, to reinforce a dominant political faction's political power by diluting its opponents' supporters' ability to translate votes into representation. Once a redistricting plan has satisfied federal law, it must employ traditional redistricting criteria in a way that optimizes the avoidance of partisan vote dilution. Both of the Senate Democratic Caucus' plans, which the Special Master rejected, comply with the established criteria by virtually neutralizing artificial, structural partisan advantage as measured by every metric.

The Special Master's recommendation of the Republican-supported HB 2146 rests on myriad factual and legal errors, including basic misapprehensions of evidence of record and erroneous legal conclusions. The Special Master misinterpreted this Court's holdings in *League of Women Voters* and asserted that avoidance of vote dilution is somehow an "extra-constitutional consideration." She relied on testimony from two witnesses who were manifestly not credible. She concluded that the City of Pittsburgh may never be divided into multiple Congressional districts. She also afforded deference to a bill that was never enacted. The Special Master also erred in

proposing an election calendar without considering this Court's review of the final plan that the LRC produced.

This Court has properly exercised its jurisdiction and must adopt a plan that protects Pennsylvanian voters' right to equally translate their votes into representation.  The Senate Democratic Caucus' plans protect that right, and HB 2146 does not.  The Senate Democratic Caucus thus ask this Court to adopt one of the Senate Democratic Caucus' plans, and, at a minimum, to reject HB 2146.  The Senate Democratic Caucus also asks the Court to adopt a schedule for the 2022 Primary Election and pre-Primary calendar that provides for a single, unified Primary Election and accounts for the timeline of other proceedings before this Court.

**STATEMENT OF THE STANDARD AND SCOPE OF REVIEW**

This action was previously an action in the original jurisdiction of the Commonwealth Court and is now before this Court pursuant to its exercise of extraordinary jurisdiction; accordingly, the standard of review is *de novo* and the scope of review is plenary. *See League of Women Voters*, 178 A.3d at 801 n.62; *accord* Report at 16 n.26 (noting that this Court may substitute its judgment for the Special Master's "at will" and that the Special Master's credibility and weight-of-the-evidence determinations are not entitled to deference).

**ARGUMENT**

**A.   THE PENNSYLVANIA CONSTITUTION FORBIDS THE USE OF ELECTION LAWS, INCLUDING REDISTRICTING PLANS, TO DILUTE VOTES ON THE BASIS OF POLITICAL VIEWPOINT.**

This Court most recently and comprehensively discussed the legal standard governing Congressional redistricting in *League of Women Voters*. In that case, this Court considered whether the 2011 Congressional redistricting plan had amounted to a Republican partisan gerrymander that violated the Free and Equal Elections Clause of the Pennsylvania Constitution by diluting the power of their votes for Democratic candidates. *See generally id.*  In holding that the restricting plan was unconstitutional, the Court provided a thorough discussion of the Commonwealth's history of the use of election laws to further entrench the power of dominant political factions through the disenfranchisement of their opponents' supporters.  This Court explained that the adoption of the Free and Equal Elections Clause provided a means to end that practice and to end partisan gerrymandering and vote dilution.  The Court concluded that the 2011 plan violated the Clause by entrenching Republican power through the creation of districts that diluted Democrats' votes.  *See generally id.*

In *League of Women Voters,* this Court cogently detailed the requirements under Pennsylvania law for a Congressional redistricting plan.

28

Preliminarily, a Congressional redistricting plan must comply with federal law.  *See id.* at 817 n. 72 (noting that reference to state-law requirements was not "intended to suggest that congressional district maps not also comply with federal law").  A Congressional redistricting plan in this regard must comply with the federal constitutional requirement of equal population from district to district, *see* U.S. Const., art. I, § 2; *Wesberry v. Sanders*, 376 U.S. 1 (1964); *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983) ("[W]e have required that absolute population equality be the paramount objective in . . . the case of congressional districts."),[7] and also comply with federal statutory law governing redistricting, including, most saliently, the Voting Rights Act of 1965, *see League*, 178 A.3d at 817 n.72 (referring to the Voting Rights Act).

Once a redistricting plan complies with federal law, it must also comply with Pennsylvania's constitutional requirements: namely, the Free and Equal Elections Clause.  In interpreting the proper scope of the Clause in *League of Women Voters*, this Court first noted that the Clause's language requiring that all elections be "equal," at its core, prohibits partisan gerrymandering via partisan vote dilution: "the actual and plain language of [the Clause] mandates that all voters have an equal opportunity to translate their votes

---

[7] Obviously, if a state's number of Congressional districts is not a factor of its total population, a district-to-district deviation becomes mathematically necessary.

into representation." *Id.* at 804.  Holding that "a diluted vote is not an equal

vote," the Court singled out partisan gerrymandering as "dilut[ing] the votes

of those who in prior elections voted for the party not in power to give the

party in power a lasting electoral advantage." *Id.* at 814.

The Court reviewed the history of the Clause's adoption and its intent

as a means to end – "once and for all" – the practice of vote dilution, including

the vote dilution that can be accomplished through partisan gerrymandering.

*Id.* at 808; *see also id.* at 804-08 (providing a lengthy discussion of Colonial-

era internecine factional and coalitional disputes that led to the Clause's

adoption).  The Court further explained that the prohibition on vote dilution is

consistent with its application of the Clause in its body of precedent.  *See id.*

at 809-13 (citing, *inter alia*, *Patterson v. Barlow*, 60 Pa. 564 (Pa. 1869);

*Winston v. Moore*, 91 A. 520 (Pa. 1914); *In re: New Britain Borough Sch.*

*Dist.*, 145 A. 597 (Pa. 1929)).

The Court described the salutary effects of banning partisan vote

dilution, holding that enforcement of the ban serves not only to avoid partisan

takeovers of the levers of state government without voter consent, but also

to reinforce the fundamental legitimacy of state government and promote

citizens' confidence in and engagement in representative democracy.  *See*

*id.* at 813-14.

Having identified the Clause's chief objective – to prevent the violation of Pennsylvanians' constitutional rights by diluting their votes – this Court articulated the means to accomplish that goal.  *See id.* at 814-18.  First, the Court explained that a plan that subordinates traditional redistricting criteria – specifically, "compactness, contiguity, and the maintenance of the integrity of the boundaries of political subdivisions" except where to achieve equal population of districts – "to extraneous considerations," like partisan advantage, violates the Clause by diluting voters' ability to translate their votes into representation.  *Id.* at 815-17.[8]

The Court did not, however, substitute traditional redistricting criteria in and of themselves for the avoidance of vote dilution.   The Court contemplated that a plan that used those traditional factors might, nevertheless, violate the Clause by diluting Pennsylvanians' votes, which is the overarching, paramount inquiry.  *See id.*  It noted that "there exists the possibility that . . . mapmakers, in the future, [could] engineer [C]ongressional districting maps, which, although minimally comporting with these neutral 'floor' criteria, nevertheless operate to unfairly dilute the power of a particular

---

[8] Applying these principles, this Court explained that the 2011 Plan did, in fact, subordinate these traditional redistricting criteria to the extraneous consideration of Republican partisan advantage, noting, *inter alia*, expert testimony demonstrating that the 2011 Plan was so far outside the normal distribution of random maps using those criteria that it could not have primarily considered, much less prioritized, those criteria over partisan advantage.  *See League of Women Voters*, 178 A.3d at 818-21.

group's vote for a [C]ongressional representative." *Id.*  This prediction has been borne out with the situation now presented to the Court.

A political faction violates the Clause when it draws districts that sprawl geographically throughout the Commonwealth, unnecessarily dividing political subdivisions, and thereby minimizing an opposing faction's ability to translate votes into representation.  However, it is not the meandering nature of the districts as drawn, but the minimization, that constitutes a violation.  Even facially compact, contiguous districts that preserve political subdivisions may lead to the vote dilution, which, as the Court held in *League of Women Voters*, must be avoided.  Following that case, a Congressional redistricting plan must not only employ traditional redistricting criteria, but must employ them in a way that *avoids* vote dilution.

The matter at issue here is procedurally and analytically distinct from *League of Women Voters* in only one way. The petitioners in that case challenged a duly enacted redistricting plan. Here, by contrast, the parties are faced with a political "impasse," and are asking the Court to adopt an appropriate remedial plan.  *Accord Mellow*, 607 A.2d (involving the last political impasse over Congressional redistricting).   The distinction is meaningful because this Court is not faced with an enacted law that any presumption of constitutionality would protect.  The Court is not required to

determine whether one or other of the proposed plans is an unconstitutional partisan gerrymander to reject it.  Rather, the Court is free to select, *ab initio*, a plan that complies with federal law and truly honors the Pennsylvania Constitution's prohibition on vote dilution by optimizing the avoidance of partisan vote dilution.

**B.   IN DISTINCT CONSTRAST TO THE REPUBLICAN-SUPPORTED HB 2146 PLAN, THE PLANS THAT THE SENATE DEMOCRATIC CAUCUS AND SEVERAL OTHERS OFFER AVOID THE DILUTION OF PENNSYLVANIANS' VOTES.**

This Court has been presented with numerous proposed plans.  All of the experts who testified before the Special Master agreed that the Senate Democratic Caucus Maps, as well as other submitted maps, adhered to the traditional redistricting criteria of contiguity, compactness, and minimal splits of political subdivisions.  *See, e.g.*, the testimony of Dr. Duchin that none of the submitted plans "can be said to ignore the traditional principles." 1/27/2022 Tr. at 494.  The various maps do, however, "make trade-offs and some manage those trade-offs somewhat more effectively than others."  *Id.*

The inquiry here is not simply a mechanistic "which-map-contains-the-fewest-splits" question.  The traditional redistricting criteria create a "floor" of protection against vote dilution and are indicia as to whether a particular map dilutes votes on the basis of political viewpoint.  If a plan wholly ignores traditional redistricting criteria, it was likely drafted in service of some other

extraneous consideration.  When all of the submissions meet this "floor," as here, whether vote dilution is occurring can be determined by looking at the partisan fairness of the maps.

The reports and testimony of the Senate Democratic Caucus' expert, Dr. Caughey, are instructive.  Dr. Caughey provided extensive explanations of partisan fairness measures, which indicate whether partisan vote dilution has taken place.  *See, e.g.*, Caughey Supplemental Report at 3-6.  The Senate Democratic Caucus Maps both scored significantly better than HB 2146 across all metrics that measure partisan fairness, as clearly demonstrated with Dr. Caughey's calculations:

| Metric | Current | Governor | HB 2146 | SDC 1 | SDC 2 |
|---|---|---|---|---|---|
| Partisan Bias | 2.1% | 2.9% | 6.3% | 1.8% | 1.5% |
| Efficiency Gap | 2.9% | 3.5% | 6.6% | 2.3% | 2.4% |
| Mean-Median | 0.8% | 1.0% | 2.3% | 0.7% | 0.5% |
| Declination | 0.08 | 0.1 | 0.19 | 0.06 | 0.07 |

Caughey Supplemental Report at 22.  This summary of Dr. Caughey's findings clearly indicates that the Senate Democratic Caucus Maps and the Governor's Map all significantly outperform HB 2146 across all partisan fairness metrics.  Thus, these maps have, pursuant to this Court's direction

in *League of Women Voters*, optimized the avoidance of vote dilution. HB 2146 quite plainly has not.

Dr. Caughey's discussion of partisan *symmetry* deserves special emphasis. HB 2146 has a partisan bias (symmetry) score of 6.3%, which is more than double that of the Governor's Map and more than triple those of the current map and both Senate Democratic Caucus Maps. This means that the "winner's bonus" for Republicans, which the Republicans promote with HB 2146, is grossly asymmetric, and results in a partisan skew that palpably dilutes Democratic votes. Not only does HB 2146 favor Republicans more than another in close elections, but it also favors them *more* in less competitive elections.

Senate Democratic Caucus Maps 1 and 2, and the Governor's Map, all performed well on all metrics assessing partisan fairness, indicating that these maps do not dilute votes on the basis of the political viewpoint of the Commonwealth's voters. Despite its obvious flaws, chiefly that HB 2146 performs markedly less well and would unconstitutionally dilute the votes of Pennsylvanians, the Special Master recommended the adoption of HB 2146. Based on the substantial and credible record evidence and following the dictates of *League of Women Voters*, this Court must reject that recommendation.

## C. THE SPECIAL MASTER BASED HER RECOMMENDATION OF HB 2146 ON MYRIAD FACTUAL AND LEGAL ERRORS.

### 1. The Special Master Misinterpreted *League of Women Voters*.

In her Report, the Special Master relied extensively on principles that turn *League of Women Voters* on its head. Most alarmingly, the Special Master repeatedly found that "partisan fairness," or, more properly termed, the avoidance of vote dilution, was subordinate to traditional redistricting criteria, and even an "extra-constitutional consideration" or equivalent to proportional representation systems. Report at 161, 172, 198-99, 212-13. Yet, the Pennsylvania Constitution's Free and Equal Elections Clause incorporates "traditional redistricting criteria" only as a means to an end: they are *benchmarks* for determining whether a dominant political faction has subordinated its task to solidifying its advantage by using state power to dilute its opponents' supporters' votes. A plan's failure to minimally comport with traditional redistricting criteria is *evidence* that it is diluting votes and is a prophylactic consideration. The Constitution's actual ban is on vote dilution.

### 2. The Special Master conflated the concepts of "symmetry" and "proportionality."

The Special Master's apparent presumption that prohibiting an in-power faction from using the law to solidify its power could somehow be

36

construed as the equivalent of proportional representation is flatly wrong. Paying attention to the partisan symmetry of a map merely equalizes the degree to which the winner of a particular electoral contest is able to capitalize on incremental increases in popular support. As Dr. Caughey cogently explained in his report:

> Symmetry is not the same as *proportionality*, which requires that a party's expected seat share is equal to its vote share. Due to the well-known "winner's bonus" in majoritarian electoral systems, the majority party in a state usually wins a super-proportional share of seats unless the map is biased strongly against it. How much seat share changes as a function of a change in vote share–*i.e.*, the steepness of the seats-votes function–is called its *responsiveness*. . . . A symmetrical districting scheme need not be proportional so long as seats-votes function is equally disproportionate for all parties, and reasonable arguments can be made for various degrees of responsiveness.

Caughey Supplemental Report at 3-5; *see also* 1/28/22 Tr. at 211-66. The minimization of vote dilution does not eliminate a party's advantages gained by winning a first-past-the-post election; it eliminates a party's advantages gained by artificially drawing district lines that inflate its supporters' ability to translate votes into representation and diminish its opponents' supporters' ability to do the same.

On this basis alone, this Court should decline to adopt the Special Master's recommendations, should conduct its own analysis, and make its own decision *de novo* as to the appropriate remedial plan.

**3. The Special Master further erred in concluding that the witnesses that the House Republicans and the Congressional Republican Intervenors offered are "credible."**

The Special Master's disregard for this Court's directives with regard to avoidance of vote dilution provides sufficient basis, alone, to reject the Special Master's Report.   Several other aspects of the Report that lack factual and/or legal support should also be noted.

The Special Master erred in determining that the House Republican expert, Dr. Barber, was credible. Dr. Barber offered inconsistent and conflicting testimony.  He testified that the natural advantage Republicans have due to their diffuse population could not be overcome without ignoring traditional redistricting criteria.  1/27/2022 Tr. at 510.  He somehow reached this conclusion while examining maps that did better on partisan fairness scores than HB 2146, while also doing better at the traditional criteria.  *See., e.g.*, Barber Supplemental Report at 21. Further, he testified in support of a map that he claimed had created nine Democratic and eight Republican seats, but, he maintained, managed somehow to also adhere to the traditional redistricting criteria.   *Id.* at 533.   He conceded on cross-examination that the "sequential Monte Carlo methodology" that he had employed to reach this strained conclusion had not yet been peer-reviewed. *Id.* at 598.

Further, other courts have rejected Dr. Barber's testimony regarding elections maps because it was simply not credible. See *Common Cause v. Lewis*, No. 18-cvs-014001, 2019 WL 4569584 (N.C. Super. 2019); *Jones v. Desantis*, 462 F. Supp. 3d 1196 (N.D. Fl. 2020). 1/27/2022 Tr. at 564-65. LRC Chairman Nordenberg also concluded that Dr. Barber's testimony should be afforded little weight because Dr. Barber offered "general and unsupported conclusions about the dilution of the voting influence of minority groups." Nordenberg Remarks at 17. He further remarked that Dr. Barber has "not published a single article in the areas for which his expert testimony was being presented." *Id.* at 18.

Despite these repeated findings of his lack of credibility and lack of legitimate expert opinion foundation, even Dr. Barber admitted that HB 2146 was the worst map on the mean-median measurement of partisan fairness, with the exceptions of the somehow-more-partisan Reschenthaler plans. Report at 92, 1/27/2022 Tr. at 576. The Special Master's reliance on Dr. Barber's testimony ignored both his lack of credibility and this significant admission.

The Special Master also erred in crediting throughout her Report the testimony of Dr. Keith Naughton, who is not a political scientist and whose opinions are not supported by any academic research or public opinion

polling.  *Id.* at 776.  Dr. Naughton conceded that he has never appeared as an expert witness in a redistricting case before this one, and he has no experience in redistricting.  *Id.* at 777-78.

Dr. Naughton is a not an expert with any credentials regarding the drawing of maps.  He admitted that he is a Republican campaign operative and conceded on cross-examination that he worked exclusively for Republican candidates.  His perspective is purely partisan.  1/28/2022 Tr. at 769.  He identified no methodology to support his opinions, which are based solely on his subjective experience as a political operative in Pennsylvania Republican politics.

Although the Special Master accepted, without any reasonable basis, Dr. Naughton's testimony, she discredited the opinions of City Controller Michael Lamb, who is a respected elected official of long standing in the City of Pittsburgh and has significant professional experience in elections.  The Special Master dismissed Controller Lamb's testimony as "subjective personal experiences."  Report at 150.  In contrast to Dr. Naugton, Controller Lamb has experience representing members of both parties as an elected official.  Dr. Naughton's opinions should have been rejected for what they truly were: partisan-motivated lay opinions.  The Special Master clearly erred in finding any evidentiary merit in his opinions.

### 4. No authority supports the Special Master's determination that redistricting plan may not divide the City of Pittsburgh.

The Special Master erred when she concluded that the proponents of splitting the City of Pittsburgh had "failed to present any credible evidence as to why it was 'necessary' to split the second largest city in Pennsylvania in order to achieve equal population. . . ." Report at 194. This conclusion misunderstands the endeavor of redistricting as a whole. To achieve equal population, even the House Republican expert, Dr. Barber, conceded that Allegheny County can contain two municipal splits.[9] 1/27/2022 Tr. at 649; *see League*, 178 A.3d at 816-17. The dispute then, is over whether Pittsburgh itself, the largest municipality in Allegheny County, can permissibly be one of municipalities that is split.

Splits are to be avoided because splitting a political subdivision can destroy that subdivision's voting power. This is particularly true of smaller subdivisions, like wards, which are more likely to be politically cohesive. As the second-largest city in the Commonwealth, (Report at 151) the City of Pittsburgh is "a diverse city" with "lots of different interests." Testimony of Dr. Naughton, 1/28/2022 Tr. at 713. Dr. Duchin testified that there is no

---

[9] The map that this Court developed in *League* of Women Voters contained two municipal splits in Allegheny County.

"traditional preference" that only small municipalities be split, and that vote dilution has to be a consideration when determining which splits to make. 1/27/2022 Tr. at 481.  Splitting Pittsburgh into two districts, which would both be the largest components of the two resulting districts, would not reduce but would amplify the voting power of the residents of the City of Pittsburgh. Splitting the City would also prevent the split of smaller municipalities where the split would reduce that smaller municipality's voting power.[10]  Viewed in this way, the split of the City of Pittsburgh is absolutely necessary to achieve equal population and is also the split that does the least damage to the voices of the Commonwealth's voters.

Dr. Naughton's unsupported opinion testimony to the contrary was singularly unpersuasive.  He stated that he thought splitting Pittsburgh was "a terrible idea" for reasons that amounted reductively to Pittsburgh being a municipality:  Pittsburgh voters vote "for the same elected officials."

---

[10] The population of the City of Pittsburgh, the largest municipality in Allegheny County, is 302,971.  *See* https://www.census.gov/quickfacts/pittsburghcitypennsylvania.  In contrast, the next-largest municipalities in Allegheny County (Penn Hills, Mount Lebanon, Bethel Park, Ross, and Monroeville, range from 29,640 to 41,059.  *See* https://www.census.gov/quickfacts/fact/table/monroevillemunicipalitypennsylvania,rosst ownshipalleghenycountypennsylvania,bethelparkmunicipalitypennsylvania,mountlebano ntownshipalleghenycountypennsylvania,pennhillstownshipalleghenycountypennsylvania ,pittsburghcitypennsylvania/POP010220.  A split of one of these smaller municipalities has a far more serious effect on that municipality's voting power because splitting the City of Pittsburgh in half still results in a voting bloc over three times the size of the next largest municipality.

1/28/2022 Tr. at 713.   They are "within this municipality unit [which] gives them a series of common interests."  *Id.*  These are not specific arguments; these are merely biased assertions about splitting a municipality.

Dr. Naughton also opined that putting sections of Pittsburgh with neighboring suburban areas would dilute the voice of the City.  *Id.* at 714-15.  To the contrary, both Senate Democratic Caucus maps split the City of Pittsburgh to give voice to different communities of interest within Pittsburgh.  As the Lamb Analysis demonstrates, identifiable communities of interest exist within the City of Pittsburgh: the neighborhoods in Pittsburgh were historically formed by "natural topography and industrial history" and not through any sort of central planning effort.   Lamb Report at 1.   The Monongahela River is a particularly salient natural geographic boundary.  *Id.*  The city community south of the Monongahela River shares more common interests and culture with their neighboring suburban communities than with the city communities north of the river.  *Id.* at 2.  Not so long ago, many of the southern and western hilltop neighborhoods and the industrial valley communities were their own distinct municipalities. [11]   *Id.*   The natural geographic divide of the Monongahela River, which has been in place much

---

[11] It is noteworthy that Mt. Oliver Borough continues to operate as its own municipality, despite being completely surrounded geographically by various south City of Pittsburgh neighborhoods.  *Id.*

longer than the current City of Pittsburgh geographic borders and has exerted a more meaningful and lasting influence on the distinct cultural habits and community connections than the meandering city municipal borders, should be given consideration when determining the multiple communities of interest that make up the City of Pittsburgh.

Contrary to these unrefuted facts, the Special Master also erroneously concluded that the split of the City of Pittsburgh was done to achieve "impermissible partisan advantage" by creating two Democratic districts in the west.  Report at 194.  To reach this conclusion, the Special Master was required to ignore the fact that two Democratic districts already exist in Allegheny County: one held by Representative Mike Doyle and one held by Representative Conor Lamb, a fact that Dr. Barber acknowledged. 1/27/2022 Tr. at 655.  Congressman Lamb's district is sufficiently Democratic without the City of Pittsburgh for him to have won reelection there twice. Democrats simply do not need to split the City of Pittsburgh to maintain two Democratic districts in Allegheny County.

The Senate Democratic Caucus posits that which municipalities split matters, and that the proposed split of the City of Pittsburgh respects communities of interest and actually increases the voices of the voters of the City by pairing them with closely identifying suburban communities.  This split

also preserves the voices of voters in smaller municipalities by sparing them from being split.  The decisions of which municipalities to split should be a holistic inquiry that takes into consideration vote dilution and communities of interest.

###### 5. No record evidence or authority supports the Special Master's presumption that "political geography" could somehow validate vote dilution.

In her Report, the Special Master repeatedly refers to what amounts to "natural" political geography that creates "natural" vote dilution.  She even suggests that overriding a "natural" political advantage would violate the Free and Equal Elections Clause.  *See*, *e.g.*, Report at 198 ("[O]ne of the overriding constitutional precepts applied in redistricting cases is that any map that prioritizes proportional election outcomes, for example, by negating the natural geographic disadvantage to achieve proportionality at the expense of traditional redistricting criteria, violates the Pennsylvania Constitution's Free and Equal Elections Clause.").

The Special Master expressly stated that she would not select a map that does not impermissibly advantage Republican at the expense of Democratic voters (Report at 197).  The Special Master cited no authority for this proposition other than *League of Women Voters*, which, far from supporting, clearly rejects this view.  The Special Master was unable to cite

any other authority – because none exists.  The Free and Equal Elections Clause forbids the use of election laws, including redistricting plans, to reinforce political power by diluting their opponents' supporters' equal ability to translate votes into representation.  Contrary to the Special Master's conception, this Court explained in *League of Women Voters* that the Free and Equal Elections expressly contemplated that, even in the circumstance that a future proposed plan *does* comport with traditional redistricting criteria, it may nevertheless dilute votes.  *League of Women Voters*, 178 A.3d at 815-817 ("[M]apmakers, in the future, [could] engineer [C]ongressional districting maps, which, although minimally comporting with these neutral 'floor' criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a [C]ongressional representative.").  A plan may respect "natural" political geography, but if it nevertheless serves to dilute votes, it offends our Constitution and is illegal.  Thus, to the extent that the Special Master seemed to find otherwise, she clearly erred.

**6. The Special Master's conclusion that a legislative enactment never became law should be accorded deference is unsupported and unsupportable where the sovereign power is divided into legislative, executive and judicial branches.**

Before the Special Master, Republican Legislative Intervenors argued that their proposed plan was worthy of "special consideration," or deference," because it tracked a legislative enactment that passed in the General

Assembly.  *See* Republican House Leaders Brief, 1/24/22, at 9- Republican Senate Leaders Brief at 10-12.

In her Report, the Special Master agreed by finding that the Republican Legislative Intervenors' plan represents "the policies and preference of the state" and "constitutes a profound depiction of what the voters in the Commonwealth of Pennsylvania desire."  Report at 214.

The underlying conceit, that the Legislature unapproved bill should be given more deference that the Governor's veto, offends centuries-old principles that have, like *League of Women Voters*, protected individual citizens' rights against the transient power of an ambitious majoritarian faction.  Most of the decisions that the Republican Legislative Intervenors cited and on which the Special Master apparently relied are extra-jurisdictional and nonbinding.  Further, none support their claim that a court charged with considering remedial plans should afford deference or special consideration to a failed legislative enactment.  *See*, *e.g.*, *Tallahassee Branch of NAACP v. Leon Cnty.*, 827 F.2d 1436 (11th Cir. 1987) (involving question of whether a plan was legislatively or judicially adopted to determine the level of deference required in assessing whether governing law required

single-member districts).[12]  The two decisions that do seem to support that proposition lack any meaningful analysis.  *See Donnelly*, *supra* (adopting a party-proposed plan that slightly modified a legislatively enacted plan, without reliance on precedent or analysis, on the ground that the fact it only slightly modified a legislatively enacted plan was a "tiebreaker" of sorts); *Skolnick*, *supra* (adopting a party-proposed plan that passed one chamber of the state legislative house without any explanation as to the fact's relevance).

The claim that a failed legislative enactment could be accorded any deference at all promotes a vision of legislative supremacy that contradicts the bedrock constitutional principle of separation of powers.  Presentment to the executive is a fundamental part of enacting legislation, and has been since the founding of the Nation.  Secretary Hamilton wrote in *The Federalist*:

> It not only serves as a shield to the Executive, but it furnishes an additional security against the enaction of improper laws. It establishes a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good, which may happen to influence a majority of that body.

---

[12] *See also In re Ross Twp. Election Dist. Reapportionment Commn.*, 67 A.3d 1211 (Pa. 2013) (involving duly enacted local reapportionment plan); *Newbold v. Osser*, 230 A.2d 54 (Pa. 1967); *Cook v. Luckett*, 725 F.2d 912 (5th Cir. 1984) (involving challenge and modification to duly enacted reapportionment plan); *Upham v. Seamon*, 456 U.S. 37 (1982) (involving challenge to duly enacted redistricting plan); *White v. Weiser*, 412 U.S. 783 (1973) (same); *Whitcomb v. Chavis*, 403 U.S. 124 (1971) (same).

The Federalist No. 78 (Hamilton); *see also id.* ("The propriety of the thing does not turn upon the supposition of superior wisdom or virtue in the Executive, but upon the supposition that the legislature will not be infallible; that the love of power may sometimes betray it into a disposition to encroach upon the rights of other members of the government; that a spirit of faction may sometimes pervert its deliberations; that impressions of the moment may sometimes hurry it into measures which itself, on maturer reflection, would condemn."); The Federalist No. 47 (J. Madison) (noting that the accumulation of all powers of government "in the same hands . . . may justly be pronounced the very definition of tyranny").

The argument for deference to an unadopted legislative bill rests on highly dubious precepts.  It assumes that policy preferences of a majority of each house of the General Assembly adequately reflect the Commonwealth's political will.[13]  These majorities represent a series of constituencies across the Commonwealth, that representatives of other constituencies have opposed the plan, and that the Governor, who vetoed the failed legislative enactment, is the only public official with a statewide

---

[13] Many, including the former Republican local official whose plan provided the basis for the failed enactment at issue, have argued that the existing state legislative districts that provide for those majorities are themselves grotesquely gerrymandered, *see Holt v. 2011 Legislative Reapportionment Commission*, 67 A.3d 1211 (Pa. 2013),

constituency who has addressed it.  Under these circumstances, it could also be argued that the Governor's veto authority was appropriately employed to "guard the community against the effects of faction."

Accepting the Special Master's presumption of deference to an unadopted legislative bill would pervert the redistricting process every time it occurs.  At present, where the political branches are divided, they have a significant incentive to work together to find consensus on how redistricting should be accomplished.  Accepting any degree deference for unadopted bills eliminate any incentive for future legislatures to even attempt to find consensus and they would be free to adopt a self-serving plan, submit it for a preordained veto, and rely on "deference" to do outside ordinary constitutional bounds what they cannot do within them.  That simply cannot be the law.

### 7. The Special Master erred in proposing a calendar for the 2022 Primary Election that ignored essential related matters.

It is absolutely essential for this Court to craft a schedule for the 2022 Primary Election that provides sufficient time for the Secretary and the Department of State to administer the election in an efficient and effective way but also, importantly, keeps the primary unitary and allows, subject to this Court's review and approval, the State House and State Senate maps, which the LRC approved by a bipartisan vote of 4-1 on February 4, 2022, to

go into effect.  The 2022 Primary Election is currently scheduled for May 17, 2022.  Report at 221.

In the LRC process, the Commission has replaced the old, gerrymandered state legislative maps with maps that do not dilute votes on a partisan basis.[14]  The gerrymandered nature of the old maps is evidenced by the election results obtained under them:

| | | | |
|---|---|---|---|
| **Prior to General Election in November, 2014** | Republican-27 | Democrat-23 | Republican percentage: 54% |
| **General Election in November, 2014** | Republican-30 | Democrat-20 | Republican percentage: 60% |
| **General Election in November, 2016** | Republican-34 | Democrat-16 | Republican percentage: 68% |
| **General Election in November, 2018** | Republican-29 | Democrat-21 | Republican percentage: 58% |

---

[14]  The Senate Democratic Caucus respectfully requests that this Court take judicial notice of the elections results, which are publicly available and can be found at https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=41&ElectionType=G&IsActive=0 (2014); https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=54&ElectionType=G&IsActive=0 (2016); https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=63&ElectionType=G&IsActive=0 (2018); and https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=83&ElectionType=G&IsActive=0 (2020).

| General Election in November, 2020 | Republican-29[15] | Democrat-21 | Republican percentage: 58% |
|---|---|---|---|

As is evident from these figures, the current Senate lines are not responsive to statewide voter preference and unconstitutionally dilute votes under this Court's standard in *League of Women Voters*. The LRC has approved a Final Plan, on a bipartisan basis, to rectify this vote dilution and increase the partisan fairness of the state legislative maps. These maps now meet the standards set out in *League* for avoiding partisan vote dilution. It is essential that these maps go into effect to prevent another two years of unconstitutional state legislative maps. Accordingly, the 2022 Primary Election as a whole must be moved back to accommodate not only the Congressional map process, but also the LRC apportionment process.

In her Report, the Special Master recommended keeping the 2022 Primary Election on its currently scheduled date. Report at 221. Instead of moving the primary, Judge McCullough recommended setting the first day for the collection of nomination petitions as March 1, 2022, the last day for the circulating of nomination petitions as March 15, 2022, and the last day to file objections to nomination petitions as March 22, 2022. *Id.* In doing so,

---

[15] Includes one Independent who caucuses with Republicans.

Judge McCullough explicitly refused to consider the parallel process of the LRC: at trial, the Secretary offered the affidavit of Jonathan Marks, Deputy Secretary for Elections, which discussed the LRC's timeline.  1/28/2022 Transcript at 1019.  Judge McCullough sustained a relevance objection and struck the paragraphs in the affidavit concerning the LRC.  *Id.* at 1022-23.

Judge McCullough erred when she refused to consider the LRC timeline, and consider how it would relate to and be integrated within a compressed Primary Election calendar.  As noted, the LRC voted to approve a final plan on February 4, 2022.  These maps are subject to a constitutionally mandated 30-day appeal period.  Pa. Const. art. II, sec. 17(d).  That means this Court will not be able to consider challenges to the LRC's final plan until March 7, 2022.  Thus, Judge McCullough's refusal to consider the timing associated with this Court's resolution of the LRC appeals clearly creates needless confusion as to the upcoming election calendar and fails to address how the LRC process can be incorporated into the calendar.

Additionally, Judge McCullough failed to consider that challenges to nominating petitions must be *resolved* before ballots can be printed.  Recent challenges to nomination petitions indicate that the time to resolve these challenges will vary, depending on the scope of the evidentiary hearing and

whether the unsuccessful party files an appeal to this Court.  *See, e.g.*, *In re Nomination Petition of Farnese*, 945 A.2d 276 (Pa. Commw. Ct. 2008), *aff'd in part sub nom. In re Farnese*, 989 A.2d 1274 (2008) (six weeks to resolve, including a Supreme Court appeal); *In re Beyer*, 115 A.3d 835 (Pa. 2015) (seven weeks to resolve, including a Supreme Court appeal); *In re Makhija*, 136 A.3d 539 (Pa. Commw. Ct. 2016) (three and a half weeks to resolve, without a Supreme Court appeal); *In re Nomination Petitions of Smith*, 182 A.3d 12 (Pa. Commw. Ct. 2018) (two and a half weeks to resolve, without a Supreme Court appeal); *In re Scroggin*, 237 A.3d 1006 (Pa. 2020) (five and a half weeks to resolve, including a Supreme Court appeal).  This often lengthy process cannot even begin until the collection period for nomination petitions closes.

In addition to the LRC timeline, this Court will also be considering the constitutionality of Act 77.  *See McLinko v. Dept of State, et al.*, 14 MAP 2022; *Bonner v. Dept of State, et al.*, 15 MAP 2022.  That oral argument is set for March 8, 2022.  Whether mail-in balloting can proceed for the 2022 Primary Election will have implications for the timeline, as mail-in ballots must be prepared (with multiple permutations) at the county level and distributed to voters at least two weeks prior to the Primary election.

In considering adjustments to the Primary Election calendar, and in evaluating Judge McCullough's proposal, it is first appropriate consider the fact that Jonathan Marks, Deputy Secretary for Elections, has indicated that the Department of State requires a minimum of two weeks to prepare for the petition period.  Affidavit of Jonathan Marks, ¶ 15.  Conceivably, in respect to the LRC's Final Plan, such preparation could be undertaken in anticipation of this Court's consideration of the likely appeals.

A generic summary of the calendar requirements set forth in the Election Code, as provided in weeks, is as follows:[16]

### Generic Election Calendar Schedule

| Weeks 1-3 | Period to circulate and file nomination petitions |
|---|---|
| Week 4 | Period to challenge nomination petitions |
| Weeks 5-8 | Estimated period for courts to consider and resolve challenges |
| Weeks 9-10 | Preparation of ballots by county boards |
| Weeks 10-11 | Mailing ballots oversees and to absentee and mail in voters |
| Week 13 | Primary Election |

The Senate Democratic Caucus is aware that the Department of State is presenting a proposed schedule that seeks to compress the normal 13-

---

[16] *See, e.g.*, 25 P.S. §§ 2868, 2937, 3146(b)(1).

week schedule into a 9-week schedule by reducing the time for certain functions. Of course, these assumptions involve decisions that the judiciary must resolve, including when this Court will (1) select a Congressional map; (2) make a final determination as to the LRC's Final Plan; and, with the Commonwealth Court, (3) resolve the various challenges to the nomination petitions.

The Senate Democratic Caucus, however, emphatically requests that, subject to this court's approval, the 2022 State Senate races be conducted under the Final Plan that the LRC adopted on February 4, 2022, and that a single Primary Election be conducted involving both federal and state races. Anything other than a single Primary Election would create confusion, needless cost of taxpayer monies, and potentially unforeseen administrative difficulties in reusing old voting machines throughout the Commonwealth on a compressed time frame.

For the very reasons set forth in *League of Women Voters*, the voters of Pennsylvania are entitled to exercise their voice for representation in the Pennsylvania General Assembly under maps that comport with the Free and Equal Elections Clause of the Pennsylvania Constitution.

**D.    In any event, this Court retains the authority to craft its own map.**

Finally on the subject of remedy, in *League*, this Honorable Court ultimately found that none of the proposed plans were appropriate for adoption, and instead fashioned its own remedial plan, which it noted was superior to all proposed plans.  *League of Women Voters v. Com.*, 181 A.3d 1083 (Pa. 2018) (per curiam).  To the extent that this Honorable Court is inclined to craft a remedial plan of its own herein, it remains free to do so.

## CONCLUSION

This Court is called upon to adopt a plan that protects Pennsylvanian voters' right to translate their votes into representation.   The Senate Democratic Caucus' Maps protect that right, and HB 2146 does not. Accordingly, this Court should adopt one of the Senate Democratic Caucus' plans, and, at a minimum, should not under any circumstances adopt HB 2146.  Furthermore, this Court should adopt a schedule for the 2022 Primary Election and pre-Primary calendar that provides for a single, unified Primary Election and accounts for the timeline of other proceedings before this Court.

Respectfully submitted,

DENTONS COHEN & GRIGSBY P.C.

By: /s/ Clifford B. Levine
Clifford B. Levine

Pa. I.D. No. 33507
Emma F.E. Shoucair
PA I.D. No. 325848
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
(412) 438-8209
mattisano@flannerygeorgalis.com

Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg
Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

Claude J. Hafner, II
PA ID No. 45977
Ronald N. Jumper
PA ID No. 64346
Shannon A. Sollenberger
PA ID No. 308878

58

Democratic Caucus
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com
*On Behalf of Counsel for Intervenors*

Dated:  February 14, 2022                    *Democratic Senate Caucus*

## **CERTIFICATE OF LENGTH**

Pursuant to Pennsylvania Rule of Appellate Procedure 2135(a), I hereby certify that this brief has a word count of 11,631, as counted by Microsoft Word's word count tool.

s/ Clifford B. Levine
Clifford B. Levine

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:  Clifford B. Levine

Signature.

Attorney No. 33507

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was

served via PACfile Proof of Service, this 14th day of February, 2022, upon

all counsel.

DENTONS COHEN & GRIGSBY P.C.

By: /s/ Clifford B. Levine
Clifford B. Levine
Pa. I.D. No. 33507
Emma F.E. Shoucair
PA I.D. No. 325848
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
(412) 297-4900
clifford.levine@dentons.com
emma.shoucair@dentons.com

Marco Attisano
Pa. Id. No. 316736
Flannery Georgalis, LLC
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
(412) 438-8209
mattisano@flannerygeorgalis.com

Corrie Woods
Pa. Id. No. 314580
Woods Law Offices PLLC
200 Commerce Drive, Suite 210
Moon Township, PA 15108
(412) 329-7751
cwoods@woodslawoffices.com

A2050

A. Michael Pratt
Pa. Id. No. 044973
Kevin Greenberg
Pa. Id. No. 082311
Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
greenbergk@gtlaw.com

Claude J. Hafner, II
PA ID No. 45977
Ronald N. Jumper
PA ID No. 64346
Shannon A. Sollenberger
PA ID No. 308878
Democratic Caucus
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-3736
cj.hafner@pasenate.com
ron.jumper@pasenate.com
shannon.sollenberger@pasenate.com
*On Behalf of Counsel for Intervenors*

Dated:  February 14, 2022                    *Democratic Senate Caucus*

# EXHIBIT A

**Meeting of the Pennsylvania Legislative Reapportionment Commission**

**Approval of a Final Plan; Senate Hearing Room #1; February 4, 2022**

Good afternoon.  My name is Mark Nordenberg.  As Chair of
the Pennsylvania Legislative Reapportionment Commission, it is
my privilege to call this meeting to order.  It has been my habit
to welcome those in attendance, either here in the Capitol or
through our livestream, not only for myself but for the
distinguished legislative leaders who serve as members of the
Commission.  They are:  Senator Kim Ward, the Senate Majority
Leader; Senator Jay Costa, the Democratic Leader of the
Senate; Representative Kerry Benninghoff, the Majority Leader
of the House of Representatives; and Representative Joanna
McClinton, the Democratic Leader of the House.  Today, I also
want to take this opportunity to thank them, both for all that
they have contributed to this effort and for the many courtesies
that they each have extended to me.

I also want to thank the talented and dedicated members of
their caucus teams, people I have come to know and respect
and with whom I have enjoyed working.  Of course, we never
would have reached this point in the process except for the
work of the Commission's own team, which includes:  Rob Byer,
our Chief Counsel; Jonathan Cervas, our Redistricting
Consultant; Renny Clark, our Executive Director; Ann-Marie
Sweeney, our Director of Administration; and Cheri Mizdail, our
Administrative Assistant.  Also indispensable to so much of

1

what we have accomplished are Brent McClintock, the Executive Director of the Legislative Data Processing Center and Leah Mintz – who, like Rob Byer, is an attorney with the Duane Morris law firm.  Without going into more detail, let me simply describe this team as both talented and tireless.

Though the other Commission members had done some work before then, it might be said that the journey that the five of us have made together began at our Organizational Meeting on May 26, 2021.  Since that time, we have conducted seven public meetings and hosted sixteen public hearings.  At those hearings, we heard from thirty-six invited witnesses, typically experts, and from 145 citizen-witnesses, who offered both perspectives on this process and information about their home communities.  We created a website portal to receive citizen comments, which attracted 5,856 submissions.  We also received 155 submissions that came to us through mail or email, for a grand total of more than 6,000 submissions. All of them were read by at least two members of the Commission team, and they were organized to make them accessible to us as we moved forward with our work.

As I have indicated in past meetings, a Legislative Reapportionment Commission is convened every ten years to redraw Pennsylvania House and Senate districts in ways that reflect population changes as revealed in census data, that comply with constitutional and statutory requirements and that advance the democratic ideal of one person / one vote.  The

2

most significant changes revealed by the most recent census were: declining population in Pennsylvania's rural areas; substantial population growth in the Commonwealth's urban areas, particularly in the Southeast; and a marked increase in our state's non-white population.

On December 16, 2021, the Commission met to vote on its preliminary plan.  Though we will vote on our proposed final plan as a whole today, consistent both with past practice and with the language of the state Constitution, in that session we took separate votes on the preliminary House map, which passed by a 3 – 2 majority, and the preliminary Senate map, which was approved on a 5 – 0 vote.  Today, I plan to provide an overview of the current state of both maps, including a comparison to the 2012 plan, which was found by the Pennsylvania Supreme Court to meet constitutional standards.

In doing so, let me begin with an overarching statement.  In drafting the preliminary and final reapportionment plans for the House of Representatives and Senate, our predominant purpose has been to create districts that comply in all respects with the requirements of the Pennsylvania Constitution, most notably, Article II, Section 16 (which sets forth requirements for legislative districts); Article I, Section 5 (also known as the "Free and Equal Elections" clause); and Article I, Section 29 (the racial and ethnic equality clause).  Of course, we also were attentive to the requirements of the 14th Amendment to the United States Constitution and the Federal Voting Rights Act.  In fact,

we heard from a sizable array of experts about the Voting Rights Act, both before and after we approved the preliminary plan.

When circumstances permitted us to do so, and after ensuring compliance with state and federal law, we fashioned districts to create additional opportunities beyond the minimum requirements of the Voting Rights Act, positioning voters in racial and ethnic minority groups to influence the election of candidates of their choice.  Going beyond those minimum requirements not only is consistent with the Voting Rights Act but is consistent with, and possibly required by, both the Free and Equal Elections clause and the Racial and Ethnic Equality Clause of the Pennsylvania Constitution.

Where we were able to do so, we drew those minority opportunity and influence districts without an incumbent, thereby providing the greatest potential for racial and ethnic minority voters to influence the election of candidates of their choice.  Again, we did so while being mindful of the traditional redistricting criteria of Article II, Section 16 and other constitutional mandates.

Measuring the Maps

My starting point in this presentation, then, is the same starting point that we used in all of our work, the language of Article II, Section 16 of the Pennsylvania Constitution, which provides:

4

> The Commonwealth shall be divided into 50 senatorial and 203 representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. . . . Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or a representative district.

That seemingly simple, straightforward language actually frames a daunting task. There are 2,560 municipalities in Pennsylvania, and when the assignment is to draw 253 House and Senate district lines through them, there are boundaries that will need to be cut. And even though school districts are not listed in the Constitution, they often function as communities of interest that also may be entitled to a level of deference. Since there are 500 school districts within the Commonwealth, that further complicates the process.

5

## Plan Comparisons

| | Current House | LRC-H-Final | | Current Senate | LRC-S-Final |
|---|---|---|---|---|---|
| Counties Split | 50 | 45 | | 25 | 23 |
| Number of County Splits | 221 | 186 | | 53 | 47 |
| Municipalities Splits | 77 | 54 | | 2 | 4 |
| Number of Municipality Splits | 124 | 92 | | 11 | 10 |
| Reock | 0.39 | 0.42 | | 0.38 | 0.39 |
| Polsby-Popper | 0.28 | 0.35 | | 0.27 | 0.33 |
| Overall Deviation | 7.87% | 8.65% | | 7.96% | 8.11% |
| Average Deviation | 2.0% | 2.1% | | 2.3% | 2.1% |

The chart now on the screen displays the relevant comparisons between the plan being considered today and the plan that was approved by the Pennsylvania Supreme Court in 2012.  As you will see, both our House and Senate maps compare very favorably to that 2021 map.

Looking first at the House map, both county and municipal splits are markedly lower, and our districts are more compact, though our overall and average deviations are somewhat higher, something that very often happens when splits are reduced.  The Senate map, too, has a reduction in counties split, number of county splits and number of municipality splits, with a slight increase in municipalities split.  It also has a reduction in average deviation and a slight increase in overall deviation.

### The House of Representatives Map

6

Let me next comment on our House and Senate maps separately to highlight some of the changes that have been made since the preliminary maps were approved on December 16. In doing so, I will begin with the House, to some considerable extent, framing my comments around issues that have been raised by the House Majority Leader, who may have been the most vocal critic of it. In his remarks at the time the preliminary plan was approved, he stated that it had been his desire to support the Commission's plan; indicated that, because of the problems he saw in the House plan, he could not support it; but expressed the hope that "we can make changes before this thing is cemented permanently and finalized" and that we would take the time to listen to the people.

From my earlier comments, you already know that we did a great deal of listening, attracting an historic number of citizen suggestions, through our website portal and through our hearings. What may be less clear is the extent of the changes that have been made. However, we also have tried to be responsive, so let me update you on some of those changes.

The Well-Fed Salamander.

7



The most compelling visual from the meeting to approve the preliminary plan was the side-by-side presentation of the outline of Pennsylvania House District 84 and the salamander that has become a widely recognized symbol of gerrymandering.  As I already have stated publicly, District 84 is a Republican district that is completely surrounded by other Republican districts.  The way that it is drawn, then, cannot possibly benefit any Democrat, meaning that, by definition, this is NOT a partisan gerrymander.

However, I also did agree that there almost certainly would be more aesthetically pleasing ways to draw District 84 and the districts adjacent to it.

8



That now has been done, and in showing you the proposed final map of Districts 76, 83 and 84, let me acknowledge the assistance of Rep. Hamm, the Republican House member who represents the 84th District and who shared his thoughts, particularly regarding the communities of interest in Union, Lycoming and Sullivan Counties.

The Pairing of Republican Incumbents.

Probably the most vocal criticism of the preliminary map was directed at what was labeled the disproportionate pairing of Republican incumbents – which, in that map, involved six such pairings or twelve Republican incumbents.  In earlier meetings, I explained that a majority party naturally would experience a higher level of pairings; I showed, because so many Republican

9

incumbents live very near district lines, how easy it would have been to target more of them if that had been our goal; and I offered two different points of comparison. The first was the redistricting plan that had been recently approved by the Virginia Supreme Court and pitted nearly half of the sitting legislative members against each other; and the second was the preliminary maps that had been submitted by Fair Districts PA and Amanda Holt, each of which pitted 36 Republican incumbents against each other, compared to the twelve in our preliminary plan.

Today, though, I want to talk about what has happened since then, and to do so, I want to return to the preliminary House map and look, in particular, to the western part of the state.



- Let me first call your attention to the Southwest corner of the state, where you will see the pairing of a Democrat

10

and a Republican in Greene and Washington Counties and
a pairing of two Republican incumbents in Westmoreland
County.  Creating such pairings was necessary to deal with
populations losses in that region – which, after all, is the
principal purpose of reapportionment.  However, let me
be clear in saying that the particular pairings were not
made by the Commission but came from the caucuses.



- The preliminary map also paired two Republican
  incumbents in northern Washington County, and that <u>was</u>
  done by my team and me, as part of an effort not to split
  the border between Allegheny and Washington Counties.
  However, a bipartisan group of four members of the
  House – Representatives Gaydos, Ortitay, Kinkead and
  Kulik -- made a persuasive, professional presentation,
  supported by submissions from local officials, about the
  damage that might be done unless we retreated from that

11

decision.  To be clear, this was not a generic plea but one that focused on distinctive regional needs, including coordinated responses to flooding, key economic development initiatives that cross county lines, and the needs of the Greater Pittsburgh International Airport.  I will say that, for me, their approach was one of the high points of this entire process.



We found it to be persuasive, so we re-designed our plan for that region, permitted the cut of the border between the two counties – and, in the process, unpaired the Republican incumbents and also were able to eliminate some municipal splits.

12



- Moving north to the area of Butler, Lawrence and Mercer Counties, I first need to show you what a "mapping mess" this region is in the map that was enacted ten years ago. Butler County is an area that has experienced strong growth and is perfectly sized for three full House districts. However, under the 2012 plan, Butler County was divided into seven House districts, with only two of those representatives living within the County.  Similarly, Mercer and Lawrence Counties together are perfectly sized for three full House districts.  However, under the 2012 plan, those two counties were divided into five districts and partial districts, including a district that stretches from Lawrence County through Mercer, Crawford and Erie Counties to Lake Erie.

13



In our preliminary plan, we treated Butler County alone and treated Lawrence and Mercer together as a two-county unit and made maps accordingly.  However, after the preliminary map was released, we did begin to receive comments explaining that there were communities of interest that crossed county lines in that region and, with the encouragement and help of the Republican caucus leadership, we ultimately treated the area as a three-county unit, producing this map and eliminating another pairing of Republican incumbents.

14



I hope this conveys some sense that this was a thoughtful process, not an exercise in targeting incumbents of either party. To summarize where we stand on the pairings of Republican incumbents, there are some pairings that were suggested to us because one incumbent of the pair has announced plans to retire.  Putting those to the side, there are at most three sets of Republican incumbents paired against each other in the House map that is being advanced as our final plan – which, given the size of the House, by most standards, certainly is not out-of-line.

Community Impact

Beyond being responsive to incumbent pairings, we also were attentive to expressed community needs.  Perhaps the most easily understood example of that part of the process can be traced to hearings held by the House Republican caucus in

15

McCandless and Mechanicsburg, as a way of highlighting their opposition to the splits in those communities and others in the preliminary plan.  Those hearings, quite predictably, generated citizen comments directed to those issues.

Among them was a request for information from a North Allegheny High School student who was writing an article for her school newspaper about the splits of the Town of McCandless and the North Allegheny School District.  She did not realize that, when I was her age, I lived in McCandless Township and attended North Allegheny. And I am sad to say that while we were able to cure the municipality split, the final plan could not make the school district whole.

So, we eliminated the McCandless and Mechanicsburg splits, as well as some of the other municipal splits in our preliminary plan.  Other examples include Moon, Murrysville and Horsham, all of which had been the subject of comment.  But what everyone needs to understand about this process is that when a cut is eliminated in one municipality, it most often is just moved to another municipality.  As I noted earlier, there are 2,560 municipalities in Pennsylvania and inevitably some will need to be split.

Statistical Unfairness

The effort of the House Republican caucus to discredit the Commission's preliminary plan rested heavily on the report and

16

testimony of the only witness they presented during the hearing devoted to expert witnesses.  The two main themes of his testimony were the use of statistical simulations in an attempt to establish that our plan was an unfair partisan gerrymander and the offering of general and unsupported conclusions about the dilution of the voting influence of minority groups.

A half-century ago, I was a math major, but I claim no expertise in statistical simulations.  A quarter-century ago, I taught courses in civil procedure, evidence and trial advocacy, each of which dealt with the qualifications and testimony of expert witnesses, but that work, too, is dated and I would not claim any current expertise.

However, I have decades of distinctive experience that is directly relevant to this particular dimension of the Commission's work – for much of my career, one of my most important responsibilities was to review the academic work of faculty members -- at all levels and across all disciplines, in one of this country's leading research universities -- in connection with such important professional decisions as recruitment, promotion, the award of tenure, and elevation to the ranks of distinguished faculty.

When I reviewed the resume of the young faculty member called as an expert by the House Republican caucus, there were positive features of his record that stood out, including the fact that he has written articles in areas of interest to me.  However,

17

what really caught my attention is that this academic expert has not published a single academic article in the areas for which his expert testimony was being presented.

Contrast that with the truly amazing record of Prof. Kosuke Imai, who was the House Democrats' first witness and is regarded by many to be the world's leading quantitative political scientist.  He was on the Princeton faculty for fifteen years, where he was the founder of its Program in Statistics and Machine Learning.  He now is at Harvard, where he is the first faculty member in that university's history to hold appointments in both the Department of Government and the Department of Statistics.  Not only does he have an outstanding publication record in the field that was the subject of his testimony, but he actually developed the algorithm used by the House Republicans' witness to analyze our preliminary plan.

Prof. Imai found three things when he analyzed the study that was conducted by the House Republicans' witness:  (1) he could not replicate the results, which raises questions;  (2) when he used the algorithm that he had developed to assess the preliminary plan himself, he found that plan to be less of a statistical outlier than the House Republicans had claimed;  and (3) that  became even more true when he factored in racial data.  In fact, he concluded that when "majority-minority districts are considered, there is no empirical evidence that the preliminary plan is a partisan gerrymander."

18

Also called by the House Democrats was Prof. Christopher Warshaw, a faculty member from the George Washington University Department of Political Science, who also held an appointment at MIT.  Prof. Warshaw is a Pennsylvania native whose expert opinion was cited by the Pennsylvania Supreme Court in the 2018 League of Women Voters case. He has published papers directly related to his testimony and also is a member of the Advisory Board of Plan Score.  His three conclusions about the Preliminary Plan all were very positive. This is what he said:

- The plan is likely to be responsive to shifts in voter preferences;
- On this plan, the party that wins the majority of the votes is likely to usually win the majority of the seats; and
- Based on three methods of projecting future elections and four different, generally accepted partisan bias metrics, I find that the plan is fair, with just a small pro-Republican bias.

John Nagle, a professor emeritus from Carnegie Mellon University, had appeared as a citizen-witness at one of our earlier hearings and returned in that role in January.  Dr. Nagle was a professor of physics and the biological sciences at Carnegie Mellon and used statistical simulations extensively in his work.  Interestingly, though this was not his original field, he now has published four directly relevant papers in *Election Law,* a top-ranked, peer-reviewed political science journal.  He also

has invented two of the partisan bias metrics used by Dave's Redistricting App.

In addition to his more scientific observations, Dr. Nagle offered a down-to-earth, but thought-provoking, perspective on the methods employed by the House Republicans' witness. To quote: "The fallacy of averaging the ensemble of simulations can be revealed by an analogy. A professional basketball coach could consider 1,000 people who know how to play the game and then randomly choose an average one to play center. That is like choosing a plan from many simulated plans in the middle of the ensemble of simulated plans. Or the coach could hire Lebron James. That is like picking the LRC proposed plan."

The Use of Racial Data

At the very beginning of his report, the House Republicans' witness declared that his "simulation process ignores all . . . racial considerations when drawing districts."   That is a puzzling choice, since, under certain circumstances, the Commission is <u>required</u> to take account of racial considerations and in a broader set of circumstances is <u>permitted</u> to do so. Presumably, that is why Prof. Imai included such data in his simulations.

Neither the fact that his simulations included no racial data nor the fact that this is another area in which he has no academic publications to his credit kept the House Republicans' witness from basing much of his analysis on the sweeping theme that, if minority-group voters are spread across multiple legislative

20

districts, their influence is inevitably diluted.  Of course, all of us know that voter-influence can be diluted either by cracking or by packing and, under the law, knowing where the correct balance can be struck requires an intensive local appraisal, which the Republicans' witness did not perform.

To conduct such an analysis, the House Democrats retained Dr. Matt Barreto, one of the country's leading scholars of Latino politics and of the Voting Rights Act.  Prof. Barreto is a faculty member with appointments in both Political Science & Chicana / Chicano Studies at UCLA, where he also is the Faculty Director of the UCLA Voting Rights Project.  In analyzing the 2012 House map that currently is in place, Dr. Barreto said this:

- Multiple Black-performing and Latino-performing districts are packed and exhibit wasted Minority votes, which results in vote-dilution; and
- Given growth of the Minority population in certain regions of the state, it is clear that existing Minority districts should be unpacked and that new Minority-performing districts [should be] created to comply with the [Voting Rights Act] VRA.

In analyzing this Commission's preliminary plan, Dr. Baretto concluded, "Minority-performing districts in the preliminary plan will perform for minority voters."  That, of course, was very important to us because, as I said when the Commission approved the preliminary plan, "This plan includes seven minority opportunity districts – true VRA districts, minority

influence districts, and coalition districts – in which there is not an incumbent, creating special opportunities" for the election of minority-preferred candidates.

I probably should add, for the record, that the House Republican caucus did belatedly offer the written report of a second expert who took issue with some of Prof. Baretto's work.  However, even though they had earlier identified this expert as a witness they did not deliver his report as scheduled or make that witness available for questioning by the Commission, but Prof. Baretto did offer his own powerful and persuasive reply.

The Commission's efforts to create these districts also were hailed by those who probably have the best-informed insights – the three Latino members of the current House of Representatives and the leadership of the Pennsylvania Legislative Black Caucus, which has served, since 1973, as "an information and advocacy vehicle to advance the interests of African American, Latino, and other people of color of the Commonwealth of Pennsylvania."



This is some of what Representatives Danillo Burgos, Angel Cruz and Manuel Guzman said in their letter to the Commission:

"Since the approval of the preliminary plan for Pennsylvania's state House of Representatives on December 16, 2021, there has been a significant amount of discussion about how this map impacts communities of color across the Commonwealth.  As Latino members of the House we feel compelled to address these important concerns.

"We applaud the work that you have done to ensure these communities, which have been underrepresented in the legislature for far too long, are fairly represented. . . .

"The LRC's Preliminary Plan is responsive to [the] growth of the Latino population in many important ways.  Statewide, this plan creates nine districts in which Latino communities should be

23

able to elect their candidates of choice.  Three of those districts will be open seats with no incumbent member, meaning a Latino candidate of choice would not need to overcome the power of incumbency in order to be elected. . . .

" . . .Latino representation is lacking in Pennsylvania, particularly when you consider the growth that has occurred across Pennsylvania over the last decade.  The Preliminary Plan for House Districts makes major strides in correcting this injustice and restoring fairness in representation in Pennsylvania.  As Latino members of the House, we embrace the goal of the LRC and applaud their work.  We look forward to serving in a more diverse legislature."



Representative Donna Bullock, the Chair of the Pennsylvania Legislative Black Caucus, sent a letter that, though addressed to

me, really was intended for the entire Commission.  Let me quote briefly from it.

"I have watched the reapportionment process closely.  I am truly impressed by the process . . . and the commitment to fairness and transparency that you have demonstrated in the creation of a preliminary map.  I am pleased to fully endorse this preliminary plan [as] responsive to the growth of communities of color across the Commonwealth.

"As many have noted, statewide the number of Pennsylvanians who identify as Black, Hispanic, Asian or multi-racial increased by more than 800,000 since the last census, while the White population decreased by more than 540,000. . . .

"In addition to preserving and expanding districts in which a racial minority group makes up the majority of the population, the preliminary plan takes the important step of including coalition districts.

"These districts, in which diverse communities of color make up a majority or plurality of the population, recognize the commonalties of Black, Latino, Asian and Indigenous Pennsylvanians and will allow these communities to fully realize their political power. . . .

"I want to thank you . . . for your tireless efforts in the redistricting-cycle and for recognizing that the diversity of this Commonwealth is a strength.  Your efforts have led to a plan that will uplift – rather than dilute – our voices."

## The Senate Map

Similar efforts were undertaken in our work on the Senate map. Because Senate districts are so much larger, though, that process is far more challenging.

Our preliminary Senate map included the foundation for what was an inspiring idea advanced by Majority Leader Ward – moving a district into the Lehigh Valley to create a Hispanic-influence district there.  To maximize the Hispanic population in that district would have required stretching the district from Allentown in Lehigh County to include Bethlehem and other communities in Northampton County.  Taking that step drew questions and criticisms from the involved communities, from elected officials and from some good-governance groups, so we decided not to take that step now.



Senate District 14
Deviation: 2.78%
Hispanic Voting Age: 26.4%
Black Voting Age: 6.4%

However, our new Senate District 14 does already present opportunities for influence.  Its Hispanic voting age population is 26.37%, and its Black voting age population is 6.37%.  From population growth trends, state-wide and in that region, those numbers will only continue to grow.  Consistent with our efforts in the House, it also is a district with no incumbent.

27



Senate District 2
Deviation: 0.09%
Hispanic Voting Age: 37%
Black Voting Age: 24.1%

The most dramatic change in the Senate map, since our approval of the preliminary plan, is the creation of a new Hispanic-influence District in Philadelphia.  District 2 has a Hispanic voting age population of 36.75% and a Black voting age population of 24.1%.

## Conclusion

Because the Super Bowl is coming soon, I thought it might be appropriate to close with a quote from Vince Lombardi – the late, legendary Hall of Fame coach and the person after whom the Super Bowl trophy is named.  Coach Lombardi said, "Perfection is not attainable, but if we chase perfection, we can catch excellence."

As has been said before, there is no such thing as a perfect map.  There also is no such thing as a perfect process.  What I can say, though, is that no one involved in this effort just wanted to get the job done.  Instead, we wanted to do the job well, and I believe we have succeeded.  By virtually any measure these are very good maps that are fair, that responsive to the requirements of the law, and that will serve the people of Pennsylvania well for the next ten years.

29