Received 02/15/2022 Supreme Court Middle District

Filed 02/14/2022 Supreme Court Middle District

7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

CAROL ANN CARTER; MONICA
PARRILLA; REBECCA
POYOUROWN; WILLIAM TUNG;
ROSEANNE MILAZZO; BURT
SIEGEL; SUSAN CASSANELLI;
LEE CASSANELLI; LYNN
WACHMAN; MICHAEL
GUTTMAN; MAYA FONKEU;
BRADY HILL; MARY ELLEN
BALCHUNIS; TOM DEWALL;
STEPHANIE MCNULTY; and JANET
TEMIN,

Petitioners,

v.                                    No. 7 MM 2022

LEIGH M. CHAPMAN, in
her official capacity as the Acting
Secretary of the Commonwealth of
Pennsylvania; JESSICA MATHIS, in
her official capacity for the
Pennsylvania Bureau of Election
Services and Notaries,

Respondents.

PHILIP T. GRESSMAN; RON Y.
DONAGI; KRISTOPHER R. TAPP;
PAMELA GORKIN; DAVID P.
MARSH; JAMES L.
ROSENBERGER; AMY MYERS;
EUGENE BOMAN; GARY
GORDON; LIZ MCMAHON,
TIMOTHY G. FEEMAN; and GARTH
ISAAK,

Petitioners,

A2082

v.

LEIGH M. CHAPMAN, in
her official capacity as the Acting
Secretary of the Commonwealth of
Pennsylvania; JESSICA MATHIS, in
her official capacity as Director for the
Pennsylvania Bureau of Election
Services and Notaries,

Respondents.

---

**BRIEF OF INTERVENOR, REPRESENTATIVE JOANNA E.
McCLINTON, LEADER OF THE DEMOCRATIC CAUCUS OF THE
PENNSYLVANIA HOUSE OF REPRESENTATIVES IN SUPPORT OF
HER EXCEPTIONS TO THE FEBRUARY 7, 2022 REPOR OF THE
SPECIAL MASTER**

---

Tara L. Hazelwood (Pa. 200659)
Lee Ann H. Murray (Pa. 79638)
Lam D. Truong (Pa. 309555)
Matthew S. Salkowski (Pa. 320439)
Office of Chief Counsel, Democratic
Caucus Pennsylvania House of
Representatives
620 Main Capitol
Harrisburg, PA 17120
Phone: (717) 787-3002

David S. Senoff (Pa. 65278)
Daniel Fee (Pa. 328546)
First Law Strategy Group
121 S. Broad Street
Suite 300
Philadelphia, PA 19107
Phone: (215) 258-4700

*Counsel for Intervenor,
Representative Joanna E. McClinton, Leader of the Democratic Caucus of the
Pennsylvania House of Representatives*

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS .................................................................................. ii

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF THE CASE ............................................................. 3

III.    SUMMARY OF BASIC POSITION OF HOUSE DEMOCRATIC
        CAUCUS INTERVENOR ...................................................................... 3

IV.     JURISDICTION .................................................................................. 4

V.      ARGUMENT ...................................................................................... 13

        A.     The Commonwealth Court's "Noise" and "Confirmation Bias" .......... 13

        B.     Historical Perspective and the Fallacy of "The Natural State of
               Political Voting" In The Commonwealth of Pennsylvania ................... 20

        1.     The Cognitive Dissonance of the Commonwealth Court's
               Recommendation ......................................................................... 20

        2.     Congressional Election in Pennsylvania from 1966-2010 ...................... 24

        3.     2022 and Beyond .......................................................................... 26

        4.     Analysis and Application to Current Proposed Plans .......................... 28

VI.     CONCLUSION ................................................................................... 31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ariz. State Legis. V. Ariz. Indep. Redistricting Comm'n*
576 U.S. 787 (U.S. 2015)...................................................................................... 16

*Butcher v. Bloom*
203 A.2d 556 (Pa. 1964)................................................................................. 11, 12

*Carter v. Chapman*
2022 Pa. LEXIS 102, *8 (Pa. Feb. 2, 2022) ......................................................... 6

*League of Women Voters v. Commonwealth*
178 A.3d 737 (Pa. 2018)...............................................................................*passim*

*Mellow v. Mitchell*
607 A.2d 204 (Pa. 1992)...............................................................................*passim*

**Statutes**

42 Pa. C.S. § 501 ................................................................................................. 8

42 Pa. C.S. § 502 ................................................................................................. 8

42 Pa. C.S. § 562 ................................................................................................. 7

42 Pa. C.S. § 726 ............................................................................................ 4, 10

42 Pa. C.S. §§ 761-764...................................................................................... 6, 7

**Constitutional Provisions**

Pa. Const. Art. I, § 5........................................................................................ 9, 28

Pa. Const. Art. V, § 2 ....................................................................................... 6, 9

USCS Const. Art I, § 2, Cl 3............................................................................... 13

I.  **INTRODUCTION**

Pursuant to this Court's February 2, 2022 *per curiam* Order, Intervenor, Representative Joanna E. McClinton, Leader of the Democratic Caucus of the Pennsylvania House of Representatives ("House Democratic Caucus Intervenor" or "Representative McClinton"), hereby files this Brief on Exceptions to the February 7, 2022 Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule of the Commonwealth Court of Pennsylvania ("Report and Recommendation" or "R&R"), "firmly" recommending that this Court:

> **adopt and implement HB 2146 as a matter of state constitutional law as it meets all of the traditional criteria of the Free and Equal Elections Clause, and does so in respects even noted by the Governor's expert, as well as the other considerations noted by the courts, it compares favorably to all of the other maps submitted herein, including the 2018 redistricting map, it was drawn by a non-partisan good government citizen, subjected to the scrutiny of the people and duly amended, it creates a Democratic leaning map which underscores its partisan fairness and, otherwise, is a reflection of the "<u>policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature.</u>"**

*Id.* at 216 ¶97 (all emphasis in original) (citations omitted).  Additionally, the House Democratic Intervenor takes exception to the "Revised 2022 Primary Election Calendar Recommendations" submitted by the Commonwealth Court as set forth on pages 221-22 of the R&R.  Significantly, unlike the Report and Recommendation of then President

Judge Craig in *Mellow v. Mitchell,* 607 A.2d 204 (Pa. 1992), the Commonwealth Court herein refused to credit any concerns regarding the potential that its proposed schedule might lead to disparate primary election days for the congressional primary election and any other primary elections currently scheduled for the 2022 General Primary Election. Evidence of this disregard is plain on the face of the R&R herein as the proposed revised General Primary Election Schedule provides that the first day to circulate/file nomination petitions is March 1, 2022.  *Id.* at 221.

With regard to the upcoming primary election, the House Democratic Caucus maintains that the primary election should proceed as scheduled on May 17, 2022. Notwithstanding the diverse proceedings pending or shortly to be presented to this Court, there is sufficient time to complete all necessary pre-election requirements on a reasonably compressed schedule in advance of May 17.  The House Democratic Caucus urges the Court to establish a unitary, compressed election schedule for all election contests that allows for completion of the state legislative reapportionment process mandated by Article 2, Section 17 of the Pennsylvania Constitution,[1] as well as formulation of a final congressional redistricting plan.  Importantly, the Pennsylvania Constitution specifically requires that, once appeals from the state reapportionment plan are decided, the new state reapportionment map "shall be used thereafter in

---

[1] By order dated February 11, 2022, in David v. Chapman, 8 MM 2022, which involved a request to enjoin the election calendar for state legislative offices, this Court entered an Order denying Respondents' Emergency Application for Extraordinary Relief as moot given the *per curiam* Order entered in this action.

2

elections to the General Assembly."  Pa. Const. art. 2, § 17(e) ("When the Supreme Court has finally decided an appeal or when the last day for filing an appeal has passed with no appeal taken, the reapportionment plan shall have the force of law and the districts therein provided shall be used thereafter in elections in the General Assembly until the next reapportionment . . . .") (emphasis added).  Accordingly, to ensure compliance with Article 1, Section 5 and Article 2, Section 17 of the Pennsylvania Constitution and to fulfill the guarantee of equal representation in the Fourteenth Amendment to the U.S. Constitution, adjustments to the election schedule as a result of this proceeding should allow for final decision in this action and full consideration and decision of any appeals from the state legislative reapportionment plan.  The House Democratic Caucus defers to the Department of State for particular refinements of the election schedule that satisfy the competing constitutional demands.

## II.   <u>STATEMENT OF THE CASE</u>

In the interest of brevity and as this Court is already familiar with the facts of this matter together with its procedural background and the current procedural posture of the case following its January 10, 2022 and February 2, 2022, Orders as described above, House Democratic Caucus Intervenor, will not repeat same here.

## III.   SUMMARY OF BASIC POSITION OF HOUSE DEMOCRATIC <u>CAUCUS INTERVENOR</u>

The basic position of the House Democratic Caucus Intervenor remains as it did in its opening brief, trial brief, post-trial submission/brief filed in the Commonwealth

Court together with its Answer to the Petition for Extraordinary Relief filed by the *Carter* Petitioners[2]: first and foremost, preserve the rights of all citizens in the Commonwealth to participate in "free and equal" elections and that all elections in the Commonwealth be free and equal.  *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018) ("LWV").  Second, that this Court rule definitively that by virtue of it being imbued with the supreme judicial power in this Commonwealth that this Court and this Court alone, and not any inferior court has the sole power to adjudicate the constitutionality of any proposed congressional redistricting map whether that map has been previously adopted, or where the legislature and the Governor fail to agree on a proposed redistricting map.  Finally, that this Court select its proposed map, not because of any purported statistical superiority, but because it appropriately ensures that no voter in the Commonwealth of Pennsylvania will be disenfranchised nor have its vote diluted.

IV.   **JURISDICTION**

As discussed in great length in Intervenor McClinton's trial brief and Answer to the Carter Petitioners' Application for Extraordinary Relief, Intervenor McClinton position regarding jurisdiction is that only this Court through both its Extraordinary Jurisdiction (42 Pa. C. S. § 726) and King's Bench powers (Pa. Const. art. V. § 2; 42 Pa.

---

[2] All of those briefs and pleadings are incorporated herein by reference as fully as though herein set forth at length.

4

C.S. §502) can declare an in-force congressional map to be violative of Pennsylvania's

Constitution *see LWV*, or craft remedy after declaring an in-force map unconstitutional

or where, as here, the legislature and the Governor are unable or unwilling to agree on

a redistricting plan. *See Carter v. Chapman*, No. 7 MM 2022, 2022 Pa. LEXIS 102, *8

(Pa. Feb. 2, 2022) (Dougherty, J., concurring). *Accord LWV, Mellow*.

    As stated above, in *Mellow*, the last time this Court was faced with the issue of

congressional redistricting, it exercised extraordinary jurisdiction to take plenary

jurisdiction over the matter and thereafter appointed the President Judge of

Commonwealth Court to function as a master in developing the factual record and to

thereafter issue a report and recommendation. In both *LWV* and *Mellow* (relating to

congressional redistricting plans), the Supreme Court fashioned the remedy while at the

same time deputizing the Commonwealth Court to conduct "all necessary and

appropriate discovery, pre-trial and trial proceedings so as to create an evidentiary

record on which Petitioners' claims may be decided." *LWV* at 766-67. *See also Mellow*,

at 206 (designating "President Judge David W. Craig of the Commonwealth Court as

Master to conduct hearings and report to us not later than February 26, 1992."").

Regardless of the designation bestowed by this Court upon the Commonwealth Court,

in both instances, the Commonwealth Court's final determination was transmitted to

this not as a "final order and judgment" of that Court, to the contrary, on both

occasions the Commonwealth Court transmitted findings of fact, conclusions of law

and recommendations as to the remedy. *See LWV* at 838 n.1 (referring to the

Commonwealth Court's "December 29, 2017 Recommended Findings of Fact and Conclusions of Law"); and *Mellow*, at 206 (referring to Commonwealth Court President Judge Craig's submission of "'Findings, Recommended Decision and Form Order,' along with a proposed election schedule revision").

This is a "remedies case," in that all parties and the Commonwealth Court agree that the currently in-force congressional district map has 18 congressional districts and as a result of the 2020 decennial census the Commonwealth has only been apportioned 17 representatives to the United States House of Representatives, thus the currently in-force map adopted by this Court in 2018 is now obsolete.[3]  Given that this Court must now fashion a remedy in the form of a newly redistricted congressional map of the Commonwealth, there can be no doubt that this Court and only this Court has the jurisdiction, judicial authority and power to grant such relief.

It cannot be gainsaid that the Commonwealth Court is a court of limited jurisdiction.  That Court's jurisdiction is circumscribed by statute (42 Pa. C.S. §§ 761 –

---

[3] Throughout the R&R the Commonwealth Court refers to the currently in-force map adopted by this Court in 2018 as being "malapportioned." *See, e.g.,* R&R at 4.  Notwithstanding the census results, such is not the case.  "Malapportioned" as defined by the Oxford English Dictionary means: "Of a legislative or electoral body: badly or inequitably apportioned; structured or constituted in such a way as to deprive sectors of the population of fair representation."  *See* "malapportioned, adj." OED Online,  Oxford  University  Press  (Dec.  2021  Ed.)  available  online  at www.oed.com/view/Entry/243991 (last accessed Feb. 14, 2022).   The 2018 map is not "malapportioned," in the sense that it was structured in such a way as to deprive sectors of the population fair representation.   To the contrary, at the time it was adopted, it was properly proportioned, however, the population changed, resulting in Pennsylvania losing a representative in Congress.  Thus, while the 2018 map may be unconstitutionally obsolete due to the 2020 census results, there is no evidence on this record that the 2018 map was "malapportioned" as that term is defined. *Id.*

6

764).   Relevant to this matter, the Commonwealth Court's jurisdiction can only be predicated upon 42 Pa. C.S. § 761(a)(1), as the Commonwealth Court has original (but not exclusive) subject matter jurisdiction over all civil actions and proceedings against the Commonwealth government, including any officer thereof, acting in their official capacity.  *Id.*[4]   Furthermore, 42 Pa. C.S. § 562 specifically cabins the Commonwealth Court's powers by limiting those powers to issuing:

> every lawful writ and process necessary or suitable for the exercise of its jurisdiction and for the enforcement of any order which it may make, including such writs and process to or to be served or enforced by system and related personnel as the courts of common pleas are authorized by law or usage to issue. The court shall also have all powers of a court of record possessed by the courts of common pleas and all powers necessary or appropriate in aid of its appellate jurisdiction which are agreeable to the usages and principles of law.

*Id.*  Simply put the Commonwealth Court's power is limited to performing all necessary acts and the issuance of all process necessary in order to exercise its jurisdiction as an appellate court or as a court of original jurisdiction, like that of a court of common pleas within one of Pennsylvania's 60 judicial districts.  *Id.*

By contrast, this Court, the Supreme Court of Pennsylvania, possesses original, appellate, extraordinary, special, and plenary jurisdiction over all matters within Pennsylvania's Unified Judicial System.  *See* Pa. Const. art. V, §§ 1, 2, 10.  *See also* 42 Pa.

---

[4] While 42 Pa. C.S. § 764 delegates to the Commonwealth Court exclusive original jurisdiction over certain contests related to nominations and elections pursuant to the Pennsylvania Election Code, this matter does not involve any contested election or nomination for any office in particular over which the Commonwealth Court has original exclusive jurisdiction.

7

C.S. §§ 721 – 727.  No statute nor the Pennsylvania Constitution limits the judicial power of this Court within the Commonwealth of Pennsylvania.  To the contrary, "The Supreme Court (a) shall be the highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth;" Pa. Const. Art. V, § 2(a).  *See also* 42 Pa. C.S. § 501 ("The [Supreme] court shall be the highest court of this Commonwealth and in it shall be reposed the supreme judicial power of the Commonwealth.").  Finally, the "general powers" of our Supreme Court are statutorily set forth as follows:

> The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722.

> The Supreme Court shall also have and exercise the following powers:

>> (1)    All powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law.

>> (2)    The powers vested in it by statute, including the provisions of this title.

42 Pa. C. S. § 502.  Accordingly, our Constitution and judiciary code make plain that, unlike every other court in this Commonwealth, this Court has all the necessary powers in aid of its original and appellate jurisdiction, and also all "powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all

persons **and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722.**"
*Id.* (Emphasis added). As such, this Court, by definition has the power, authority, and jurisdiction to fashion **any** judicial remedy: legal, equitable, criminal, or otherwise. As is self-evident, this Court is the only court within this Commonwealth to be so invested. *Id.*

With regard to the sole issue before the Commonwealth Court in this proceeding, selecting which of more than a dozen of proposed congressional redistricting plans should be adopted by the Commonwealth following the constitutionally required census, as noted above, this Court has been called upon previously to fashion such a remedy *i.e.,* select between competing redistricting plans or simply fashioning one itself that meets both the federally mandated requirements and those of the Free and Equal Elections Clause of the Pennsylvania Constitution. Pa. Const. Art. I, § 5. *See LWV* and *Mellow. See also Butcher v. Bloom*, 203 A.2d 556, 559 (Pa. 1964) (relating to "Pennsylvania Reapportionment Acts and the election of state senators and representatives thereunder."). The *LWV* Court in summarizing those prior decisions stated:

> Thus, it is beyond peradventure that it is the legislature, in the first instance, that is primarily charged with the task of reapportionment. However, the Pennsylvania Constitution, statutory law, our Court's decisions, federal precedent, and case law from our sister states, all serve as a bedrock foundation on which stands the authority of the

9

> state judiciary to formulate a valid redistricting plan when
> necessary. Our prior Order, and this Opinion, are entirely
> consistent with such authority.[1]

*Id.* at 824.   Furthermore, the *LWV* Court held:

> When, however, the legislature is unable or chooses not to act, it
> becomes the judiciary's role to determine the appropriate
> redistricting plan. Specifically, while statutes are cloaked with the
> presumption of constitutionality, **it is the duty of this Court**, as a
> co-equal branch of government, to declare, when appropriate,
> certain acts unconstitutional. **Indeed, matters concerning the
> proper interpretation and application of our Commonwealth's
> organic charter are at the end of the day for this Court — and
> only this Court.**

*Id.* at 822 (emphasis added).  Specifically with regard to the crafting of a remedy, the

*LWV* Court found:

> **Further, our Court possesses broad authority to craft
> meaningful remedies when required**. Pa. Const. art. V, §§ 1, 2,
> 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or
> otherwise cause right and justice to be done").

*Id.* (emphasis added).

Accordingly, what any fair reading of *LWV*, *Mellow*, and *Butcher* bring into sharp

focus is that it is this Court that uniquely possess both the jurisdiction **and power** to

"craft" the necessary remedy in this case.  The Commonwealth Court simply does not

have jurisdiction to craft a constitutional remedy in the form of either creating or

selecting a redistricting plan.

As discussed above, the fact that the Commonwealth Court lacks the jurisdiction,

power, and authority to implement one constitutionally satisfactory plan over another

10

is further buttressed by *LWV*, *Mellow*, and *Butcher*.  In each of those cases, once the legislature and governor failed to enact reapportionment or redistricting plans it was the Supreme Court that fashioned the remedy.  *LWV* at 766-67.  *See also Mellow* at 206 (designating "President Judge David W. Craig of the Commonwealth Court as Master to conduct hearings and report to us not later than February 26, 1992.").

Unlike the present case, in *LWV*, the  issue was whether the then existing and enacted "Pennsylvania Congressional Redistricting Act of 2011" violated our Commonwealth's Constitution.  *Id.* at 741.  Here, there is currently no redistricting plan in place.  Accordingly, no decision need be rendered on the constitutionality of any existing redistricting map.  Furthermore, the parties stipulated that based upon the United States 2020 Census results, Pennsylvania shall be apportioned 17 seats in the United States House of Representatives as opposed to the 18 seats apportioned by to the Commonwealth as a result of the 2010 United States Census.   As a result, the current Pennsylvania congressional map enacted by the Pennsylvania Supreme Court in 2018 as a result of the *LWV* decision, is by definition unconstitutionally obsolete as it contains one more district than the Commonwealth has been apportioned.  *See* USCS Const. Art. I, § 2, Cl 3.

Because Pennsylvania's current congressional district map provides for 18 congressional districts rather than 17 it cannot legally be used for the upcoming election.

11

As a result, the Commonwealth Court need not pass judgment upon the constitutionality of that map and, given the Governor's veto of House Bill 2146 on January 26 2022, there is no currently enacted redistricting plan for the Commonwealth Court to evaluate as to constitutionality. Rather, the Commonwealth Court was being asked to fashion a remedy in the absence of a legislatively passed and approved redistricting plan. As discussed above, the jurisdiction, power, and authority to issue such a remedy is outside the statutorily prescribed jurisdiction and power of the Commonwealth Court and instead resides solely with the Supreme Court of Pennsylvania.

Simply stated, the Commonwealth Court lacks jurisdiction to issue a final judgment and order declaring which congressional redistricting plans should be utilized in the upcoming 2022 congressional election cycle. The House Democratic Caucus Intervenor sets forth this detailed jurisdictional argument herein in hopes that consistent with *Mellow* and *LWV* this Court will issue an opinion herein which finally adopts a rule consistent with the historically understood procedure that regardless of whether a case of this nature is originated in this Court or the Commonwealth Court, that the Commonwealth Court be appointed to head evidence, conduct pre-trial and trial proceedings, submit findings of fact and conclusions of law and then issue its overall conclusions not as an order and final judgment, but instead as here as a Report and Recommendation. *See Mellow* at 206, 224; *LWV* at 838, n.36 (referring to this Court's December 29, 2017, decision as "Recommended Findings of Fact and

12

Conclusions of Law"). Such a ruling will take the "guesswork" out of this procedure, should the Court be called upon to grant such remedy in the future.

## V.   ARGUMENT

### A.   The Commonwealth Court's "Noise" and "Confirmation Bias"

The House Democratic Caucus respectfully takes exception with the R&R to the as it appears that wherever and whenever the Commonwealth Court was required to select between a Republican aligned map or suggestion, or between the credibility of experts, the Commonwealth Court almost always selected the Republican choice. This includes recommending that this Court adopt HB2146, despite it being vetoed by the Governor of the Commonwealth and his veto not being overridden by a two-thirds vote of each house of the General Assembly, accepting as credible the testimony Dr. Naughton, while not crediting or only crediting in part the testimony of other experts, despite the fact that the record in this case hardly reveals that it was a "battle of the experts." Yet despite all cross examination, agreement of experts on most issues (with only slight deviations), the Commonwealth Court when presented with a binary choice between Republican and Democrat, always chose the Republican point of view.

"Confirmation Bias" and "Noise" in system judgements have been the subject of much scholarly work over the last decade or more. *See, e.g.,* Daniel Kahneman, Olivier Sibony, & Cass R. Sunstein, *Noise: A Flaw in Human Judgment* (2021); Daniel Kahneman, *et al.*, *Noise: How to Overcome the High, Hidden Cost of Inconsistent Decision Making*, Harvard Bus. Rev., Oct. 2016, at 2; Daniel Kahneman, *Thinking, Fast and Slow*,

13

(2011).    Confirmation Bias is defined by the Oxford English Dictionary as "the tendency to seek or favour new information which supports one's existing theories or beliefs, while avoiding or rejecting that which disrupts them."  *See* "confirmation bias, n" OED Online, Oxford University Press (Jun. 2019 Draft Addition) available online at  www.oed.com/view/Entry/38852  (last accessed  Feb.  14,  2022).    Unlike "confirmation bias,"  "noise" in judgment is described as the variability of judgments by different people or experts, who are given the same data to analyze.  *See* Kahneman, *et al.*, at 4 ("The unavoidable conclusion is that professionals often make decisions that deviate significantly from those of their peers, from their own prior decisions, and from rules that they themselves claim to follow.").  As Kahneman, *et al.*, explained in their 2016 article, a "noisy judgment" can be thought of as an arrow that misses the bullseye, but does not always hit the target in the same place, they are widely scattered.  A "biased" decision also does not hit the bullseye, but all of the shots are clustered in the same location.  Finally, a "noisy and biased" decision is one where all the arrows miss the bullseye, and although they appear widely scattered, they are all still clustered in the same general area of the target.  *Id.* at 5.  Put in a legal context by Kahneman and Sunstein, while studying criminal sentencing found variability between judges in the severity of their sentencing for equivalent crimes.  *See*  Noise and the Flaws in Human Judgement – A Conversation with Daniel Kahneman & Cass R Sunstein, available on the internet at  https://thoughteconomics.com/noise/  (last accessed Feb. 14, 2020). Significantly, they found that: "Judges may issue the right sentence by the agreed upon

14

guidelines, but the increased severity or leniency created variability that adds up." *Id.* The difference between bias and noise in decision making was explained by Prof. Sunstein as follows:

> In many domains, there are biases. Over the last 30 years, bias has received a great deal of attention. They may be cognitive biases such as unrealistic optimism, or biases like discrimination on the basis of gender or skin colour. Then there's noise, unwanted variability. You could have a firm where half the time people discriminate against women, and half the time people discriminate against men. On average you may get the right distribution, but you get a lot of mistakes and unfairness on both sides – that's noise.

*Id.*

In this case, without differentiating between any potential "confirmation bias" or "noise" exhibited by the Commonwealth Court in the R&R a pattern of favoring Republican leaning parties' facts and expert testimony, as well as only partially crediting or not crediting at all the facts and expert testimony presented by other parties, culminating in the R&R's selection of the now vetoed HB2146 as the "winning map," reveals either that such a selection was the result of a subconscious confirmation bias or a decision variability (noise) which steered the Commonwealth Court's R&R away from "neutral criteria" to the subordination of that criteria to elevate subjective criteria above that of the neutral criteria that this Court set forth in *LWV*. Purely by way of example, and not intended as a full and complete list, the Commonwealth Court R&R:

- At first stated that it would review HB2146 along with all of the other proposed redistricting criteria without giving it any special deference due solely to the fact that it had been passed by the legislature. R&R at 42-42. Subsequently however, the

15

Commonwealth Court went on to do just that, stating: "Therefore, with all things being relatively equal with regard to the maps that the Court has not previously discounted or recommended not be adopted, **the Court respectfully recommends that our highest and most honorable institution in the judicial branch of government, our Supreme Court, <u>recognize and revere the expressed will of the People</u>, and the 'policies and preferences of our State,' … as previously stated, and adopt HB 2146 to represent the boundary lines for the Commonwealth of Pennsylvania in its creation of geographically-unique congressional districts so that the citizens of our great Commonwealth are ensured fair and equal representation in the United States House of Representatives.** *Id.*, at 214-15. (emphasis added; citations omitted). Accordingly, after initially stating that it would not accord the now vetoed plan embodied in HB2146 any special deference, the Court then did just that and found that all other things being equal, in its judgment HB2146 should be selected because it represents the "will of the people," despite this Court and the Supreme Court of the United States previously holding that redistricting legislation that fails the legislative process in whole or in part (including being vetoed by the executive branch) is entitled to absolutely zero deference in a judicial proceeding. *See LWV* at 742; Ariz. State *Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 862 (2015).

- In referring to the drafter of the plan which is embodied in HB2146, the Commonwealth Court repeatedly referred to it as being drafted by a "well-known nonpartisan citizen, Amanda Holt …" (R&R at 42) and "being drawn by a non-partisan good government citizen, subjected to the scrutiny of the people…". *Id.* at 216. Despite the effusive praise for the non-partisanship of the "citizen drafter" of this plan, Ms. Holt is neither non-partisan nor merely a "good government citizen." To the contrary, Ms. Holt is a former Republican member of the Lehigh County Board of Commissioners, initially appointed in 2014 to fill a vacancy on that Board. *See* Randy Kraft, *Amanda Holt of Upper Macungie appointed Lehigh County commissioner*, available on the internet at <u>https://www.wfmz.com/news/insideyourtown/amanda-holt-of-upper-macungie-appointed-lehigh-county-commissioner/article_c3b45438-9447-5022-9cf2-46b22cf85a31.html</u> (last accessed on Feb. 14, 2022). On the

16

occasion of her appointment, while being interviewed by the press: "Holt later agreed that she is a conservative Republican." Accordingly, Ms. Holt can hardly be considered a neutral, agenda-less good government citizen who is equally non-partisan.

The fact that Ms. Holt self-identifies as a conservative Republican in and of itself is of no moment to this Court's analysis. It is the Commonwealth Court's description of Ms. Holt as a "non-partisan good government citizen" and its attempt to thereafter pass off HB2146 as truly non-partisan map due to its initial authorship that reveals why this Court must look skeptically at the Commonwealth Court's R&R.

- The Commonwealth Court accepted as credible the testimony of Dr. Naughton, a political scientist who testified in support of the Republican Congressional Intervenors. Specifically, the Commonwealth Court found credible Dr. Naughton's testimony that Bucks County not be split into two separate congressional districts and further that Bucks County should add population to its district by drawing from Montgomery County as opposed to Philadelphia County, who's surplus population he suggested be added to Delaware County. R&R at 210-11. Again citing Dr. Naughton, the Commonwealth Court further stated that Bucks County should not be split, because it has not been split since the 1860s. *Id.* at 195.

  Under cross examination regarding whether the far northeast of Philadelphia County could be appropriately attached to any Bucks County congressional district, Dr. Naughton admitted "I'm not good on the city neighborhoods. I apologize." (N.T., Jan. 28, 2022, at 845). Further, when pressed on that same issue, admitted that part of the city of Philadelphia could added to a Bucks County district depending on "how much of the northeast you attach to Bucks County." *Id.* He later said: "I wouldn't recommend attaching too much of the northeast to Bucks. I don't think it would be in their best interests." *Id.* at 846. Despite Dr. Naughton's testimony, this Court can take judicial notice of the fact the far northeast of the City and County of Philadelphia is in that city's 10th Councilmanic District and has been represented in that district by a Republican Council Member, Brian J. O'Neill, since his election to that office in 1979, some 42 years now. *See*

17

https://phlcouncil.com/brianoneill/#:~:text=District%2010,ter
m%20on%20Philadelphia%20City%20Council.   Additionally,
most of that same neighborhood in the far northeast of
Philadelphia is part of District 170 of the Pennsylvania State House
of Representatives.  Since 2015, that District has been represented
by Representative Martina A. White, a Republican and House
Majority      Caucus      Secretary.           *See*
https://www.legis.state.pa.us/cfdocs/legis/home/member_infor
mation/house_bio.cfm?id=1732.   (Ms. White also serves as the
current Chair of the Philadelphia Republican City Committee).
From 2009 – 2015 the 170th district was represented by a Democrat,
Brendan Boyle, prior Mr. Boyle representing that district for 6 years
it was represented by a Republican member dating back some 41
years to the time the district was first created in 1968 and was first
represented     by     Republican     Tom     Gola.     *See*
https://en.wikipedia.org/wiki/Tom_Gola[5]

Pennsylvania House District 18, which directly borders the 170th
district, and is in Bucks County, is also a Republican, Kathleen C.
Tomlinson, who has held that post since 2020.  Prior to that the
district was represented by Gene DiGirolamo, also a Republican,
who held that seat for 25 years prior to Ms. Tomlinson.
Accordingly, the representation of the far northeast of Philadelphia
in the Pennsylvania state House of Representatives and
Philadelphia City Council has been Republican, just as the
representatives in the Pennsylvania state House of Representatives
for the abutting Bucks County District has also been Republican.
Despite this obvious similarity between the communities of the far
northeast of Philadelphia and Lower Buck County, Dr. Naughton
testified, and the Commonwealth Court found that "Philadelphia's
surplus population would best be combined with a district with
maximum commonality;" R&R at 210.  The Commonwealth Court
found that the "most sensible" plan "would attach surplus
Philadelphia residences to Delaware County; and, hence,
Philadelphia County should extend into Delaware County to obtain
additional population."  *Id.* at 210-11.

---

[5] Tom Gola is widely considered one of the greatest NCAA basketball players of all-time, having
played for Philadelphia's LaSalle University Explorers and being inducted into Naismith Memorial
Basketball Hall of Fame in 1976.  *Id.*

18

Despite this long history of similar party representation in both areas, the two bordering congressional districts the (now) 2nd district (encompassing the far northeast of Philadelphia and part of Montgomery County) has been regularly represented by a Democrat and the (now) 1st district (encompassing Bucks County and a portion of Montgomery County) has been (with the exception of four years from 2007-2011 represented by a Republican. However, in 2018 Representative Fitzpatrick (a Republican) won the seat with a majority of just over 8,000 votes and in 2020 he was reelected with a 57,929 vote margin.[6]   Accordingly, by keeping northeast Philadelphia out of the Bucks County district, the Republicans stand a better chance of maintaining control over the 1st district seat, while also maintaining control over the two abutting state house districts – the 170th and the 18th.

The above examples are but a few of the examples of either the "confirmation bias" or "noise" found in the Commonwealth Court's decision to recommend the HB2146 plan for approval.  As stated from the outset, the Commonwealth Court's R&R appears to either be biased (intentionally or not) towards the Republican party or is the product of the Commonwealth Court's variability ("noise") combined with its confirmation bias in favor of Republicans, either way, the choice is not the product of the dispassionate, non-partisan judicial review to which the citizens of the Commonwealth of Pennsylvania are entitled in order to preserve what this Court has repeatedly referred to as "…the overarching objective of this provision of our

---

[6] *See* Pennsylvania Department of State website showing election results for 2018 congressional district elections at https://www.electionreturns.pa.gov/General/OfficeResults?OfficeID=11&ElectionID=63&ElectionType=G&IsActive=0 and for the 2020 election at https://www.electionreturns.pa.gov/General/OfficeResults?OfficeID=11&ElectionID=83&ElectionType=G&IsActive=0.  (Both last accessed Feb. 14, 2022).

constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens." *LWV*, at 817.

B. **Historical Perspective And The Fallacy Of "The Natural State of Political Voting" In The Commonwealth of Pennsylvania**

1. **The Cognitive Dissonance of the Commonwealth Court's Recommendation**

Part and parcel of the House Democratic Caucus Intervenor's Exceptions to the R&R is the Commonwealth Court's constant reference to the "natural state of political voting in Pennsylvania" and that Court's conclusion that the "natural state of political voting" behavior in Pennsylvania is biased in favor of Republicans, and, thus, the Commonwealth Court with that same phrase eliminated all maps that were suggested by a Democratic elected official or had a democratic leaning advantage.[7] Yet a closer review of the actual R&R language once again reveals the Commonwealth Court's bias towards a Republican leaning map.

In dismissing Governor Wolf's proposed plan, the R&R states:

> 5) based on its **credited efficiency gap score**, **it provides a partisan advantage to the Democratic party in contravention to the natural state of political voting behavior and bias towards Republicans in Pennsylvania.**

---

[7] Bearing in mind that Pennsylvania will go from an even number of representatives in the United States House of Representatives (18) to an uneven number (17), it is beyond peradventure that one party must have one more seat than the other and that the result of any election conducted under any plan will result in, at a minimum, one additional seat for one party (*i.e.*, 9-8).

*Id.* at 201 (emphasis added).  In eliminating the so-called "Draw the Lines Map" the

Commonwealth Court found:

> 4) based on its **credited efficiency gap score, it provides a**
> **partisan advantage to the Democratic party in contravention**
> **to the natural state of political voting behavior and bias**
> **towards Republicans in Pennsylvania.**

*Id.*  Similarly, in dismissing both of the Pennsylvania Senate Democratic Caucus maps,

the R&R found:

> 5) based on its **credited efficiency gap score, it provides a**
> **partisan advantage to the Democratic party in contravention**
> **to the natural state of political voting behavior and bias**
> **towards Republicans in Pennsylvania.**

*Id.* at 202.  When it dismissed Intervenor McClinton's proposed plan, the R&R found:

> 4) based on **both its credited efficiency gap score and credited**
> **mean-median score, it provides a partisan advantage to the**
> **Democratic party in contravention to the natural state of**
> **political voting behavior and bias towards Republicans in**
> **Pennsylvania.**

*Id.* at 203.  Neither the Carter Petitioners nor the Gressman Petitioners fared any better

under the Commonwealth Court's "natural state of political behavior and bias towards

Republicans in Pennsylvania."  As to the Carter Petitioners' plan, the Court stated:

> 4) based on its **credited efficiency gap score, it provides a**
> **partisan advantage to the Democratic party in contravention**
> **to the natural state of political voting behavior and bias**
> **towards Republicans in Pennsylvania.**

*Id.* at 205.  The Gressman Petitioners got the same treatment from the Commonwealth

Court as did the House Democratic Caucus Intervenor's plan:

21

> 3) based on **both its credited efficiency gap score and credited mean-median score, it provides a partisan advantage to the Democratic party in contravention to the natural state of political voting behavior and bias towards Republicans in Pennsylvania.**

*Id.* Accordingly, every plan which the Commonwealth Court reviewed in detail with which it found either a credited efficiency gap score or credited mean-median score which provided a partisan advantage to the Democratic party, or both, the Commonwealth Court dismissed as in "contravention to the natural state of political voting behavior and bias towards Republicans in Pennsylvania." *Id.* All, that is, except one, HB2146. According to the Commonwealth Court, HB2146 also violates the natural state of political voting behavior and bias towards Republicans in Pennsylvania, and, yet, not only did the Commonwealth Court not eliminate HB2146, but it also recommended it for adoption by this Court.

In reviewing HB2146, the Commonwealth Court made certain findings of fact regarding the testimony of Dr. Barber, the expert presented by Intervenors Benninghoff and the House and Senate Republican Caucuses, including the following:

> FF211. **On cross-examination, Dr Barber conceded that every other plan except for the two Reschenthaler plans have mean-median scores closer to zero, meaning they are less biased than HB 2146**. (N.T. at 575-78.).

*Id.* at 92. What this concession means is that of the more than one dozen maps proposed, the third most biased map submitted. *Id.* And yet, given the statements about the other plans and their disqualification for being bias towards Democrats

(although all apparently less so than HB2146), the Commonwealth Court did not exclude HB2146 for that reason. To the contrary, in recommending HB2146, the Commonwealth Court found that:

> 79. Unlike other maps that leaned Democrat, here, it is the Republican majority in the General Assembly that developed and proposed a plan, HB 2146, that favors Democrats, which ultimately underscores the partisan fairness of the plan.

*Id.* at 211. Further, the Commonwealth Court found:

> 80. The Court finds, as a result of the credible experts' opinions, reports, and concessions made during cross-examinations, that HB 2146 falls well within the acceptable constitutional ranges and indicia used to measure partisan fairness, in  the following particulars.

> 81. H.B. 2146, when analyzed with districts that have a Democratic vote share of .48 to .52, which is a common range for assessing competitive elections,  creates 5 competitive seats, 4 of which lean Democratic, and, ultimately, has  more competitive districts than any other plan.

> 82. H.B. 2146 possesses a mean-median of -0.015, which is very close to zero and virtually unbiased, and demonstrates that HB 2146 is more favorable to Democrats than 85% of the simulation results.

> 83. H.B. 2146 has an efficiency gap of -0.02, which, again, is very close to zero and virtually unbiased, and, furthermore, demonstrates that Democratic votes  are not much more likely than Republican votes to be "wasted" across districts.

*Id.* at 212-13. Accordingly, for the same reasons the Commonwealth Court eliminated other maps (they had a partisan advantage for Democrats), the Commonwealth Court recommended HB2146. The only basis for this dissonance is the Commonwealth

23

Court's deference to the plan, as it was passed in the General Assembly, although vetoed by the Governor, and that Court's belief in "the natural state of political voting behavior and bias towards Republicans in Pennsylvania." *Id.* As discussed above, the first reason, deference to the legislature is not a constitutional basis either under our Constitution nor the United States Constitution. *See LWV* at 742, *Ariz. State Legislature*, at 808.

As to the second reason given by the Commonwealth Court to support its selection of the now vetoed HB2146, the natural state of political voting behavior and bias towards Republicans in Pennsylvania, as this Court specifically detailed in *LWV*, there was never such a historic bias in favor of Republicans in the Congressional districting of Pennsylvania dating back to 1966.

### 2.    Congressional Election in Pennsylvania from 1966 - 2010

In the years leading up to this Court's 2018 *LWV* decision, from 1966 – 2010, Pennsylvania's Congressional delegation ranged in amount between 19 – 27 members of congress being elected from Pennsylvania. *Id.* at 762-763 (Table 1). Accordingly, Pennsylvania's congressional delegation during that time averaged approximately 23 (22.65%) members. During that same time the number of Democrats elected to congress averaged 12.35 members per election cycle and the number of Republicans averaged 12.30 members per election cycle. Translated into percentages, what that means is that from 1966 – 2010 of the total 521 representatives elected to the United States House of Representatives from Pennsylvania, 54.5% were Democrats and

24

54.39% were Republicans.  Simply put, given the varying number of representatives apportioned to the Commonwealth during that 44 year period, the election results were almost evenly split.[8]

In 2011, after the 2010 census, Pennsylvania's number of apportioned members to the House of Representatives was diminished by 1, from 19 to 18.  As a result, the Pennsylvania General Assembly adopted Pennsylvania Congressional Redistricting Act of 2011, which was signed into law by then Governor Corbett.  The result of that plan was that from its first use in the 2012 election through its last use in 2016, the 18 members of the United States Congress sent from Pennsylvania amounted 5 Democrats and 13 Republicans, in every one of those elections.  Accordingly, during that four year period of time the average number of Democrats elected to the House of Representatives was diminished to 27.77% and the number of Republicans elected to the House of Representatives was increased to 72.23%.  *Id.* at 765 (Table 2).[9]

Having lost only one seat due to the 2012 decennial census, the total average number of representatives for the first four years of the use of the 2011 plan resulted in a net loss of 26.73% of the seats historically (since 1966) won by Democrats and an increase of 17.84% of the seats historically (since 1966) won by Republicans.  *Id.* Accordingly, in 2018, this Court implemented a remedial redistricting plan which

---

[8] These percentages were calculated simply by averaging the numbers extant on table 1 in the *LWV* opinion.

[9] These percentages were calculated simply by averaging the numbers extant on table 1 in the LWV opinion.

25

resulted in a 9-9 split of Pennsylvania's seats in the House of Representatives for that year and again in 2020. As a result, the 2018 remedial plan restored the previous 44 year balanced historical partisan distribution Pennsylvania's congressional districts. *Id.*

What these statistics (actual congressional election results) make clear is that there is no historical or "the natural state of political voting behavior and bias towards Republicans in Pennsylvania" relative to the election of representatives to Congress nor in drawing congressional districts in Pennsylvania. To the contrary, while there were years where one party or another enjoyed more seats than the other in the House of Representatives between 1966 – 2010, the plan itself was never solely responsible for the results of any particular election during that 44 year period. *Id.* at Table 1. It was only the 2011 plan that firmly established a lopsided Republican advantage in Pennsylvania's partisan distribution of members of the House of Representatives.

### 3.   2022 and Beyond

The two days of testimony in this matter focused on the technical details of redistricting and minute differences between the maps that have been submitted has been used to obscure the larger points at issue in this case. Fortunately, none of the proposed plans are as egregiously gerrymandered as the 2011 Plan. All of the parties' maps fall within an acceptable statistical range with regard to the neutral criteria set forth in *LWV*. Yet none of the maps (except that of the House Democratic Intervenor) considers the 44 year history of Pennsylvania's congressional delegation (from 1966 – 2010), as well as the 4 year history of that same delegation since 2018, nor do the other

26

plans consider the fact that between 2011 and the present registered Democratic voters outnumber Republicans by a range of 500,000 – 1,100,000 depending upon the year. Regardless of the amount of the Democratic voter registration advantage, there can be no doubt that such advantage has existed since at least 2011.

In *LWV*, this Court, did not suggest that the judicial process for determining what plan to implement was the one that came the closest to statistical perfection regarding the "neutral criteria."   To the contrary, in *LWV*, the Supreme Court recognized that:

> Specifically, partisan gerrymandering dilutes the votes of those who in prior elections voted for the party not in power to give the party in power a lasting electoral advantage. By placing voters preferring one party's candidates in districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing), the non-favored party's votes are diluted. It is axiomatic that a diluted vote is not an equal vote, as all voters do not have an equal opportunity to translate their votes into representation. This is the antithesis of a healthy representative democracy. Indeed, for our form of government to operate as intended, each and every Pennsylvania voter must have the same free and equal opportunity to select his or her representatives.

*Id.* at 814.  Furthermore, *LWV* itself specifically predicted and provided for a situation, where, as here, a plan or plans, might statistically meet the "neutral criteria" but a future Court, might still find that even a statistically perfect plan does not comply with the Free and Equal Elections Clause of the Pennsylvania Constitution.  Pa. Const. art. I, § 5.  In clairvoyantly predicting the not too distant future from 2018, Justice Todd writing for this Court in LWV found:

27

> However, this is not the exclusive means by which a violation of Article I, Section 5 may be established. As we have repeatedly emphasized throughout our discussion, the overarching objective of this provision of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens. We recognize, then, that there exists the possibility that advances in map drawing technology and analytical software can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these neutral "floor" criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a congressional representative. *See* N.T. Trial, 12/13/17, at 839-42 (Dr. Warshaw discussing the concept of an efficiency gap based on the number of "wasted" votes for the minority political party under a particular redistricting plan).

*Id.* at 817.   Unfortunately, the *LWV* Court was not required to consider the issue presented in this case because as that Court concluded: "However, as the case at bar may be resolved solely on the basis of consideration of the degree to which neutral criteria were subordinated to the pursuit of partisan political advantage, as discussed below, we need not address at this juncture the possibility of such future claims.[]" *Id.* (Footnote omitted).

### 4.   Analysis and Application to Current Proposed Plans

As a preliminary matter, the House Democratic Intervenor reasserts its objection the claim of the Republican House and Senate Intervenors, and apparent finding of the Commonwealth Court, that the now vetoed plan found in HB2146 deserves any deference or special treatment from this Court because it represents the "will of the people of the Commonwealth of Pennsylvania."   As stated in the Trial Brief of the

28

House Democratic Intervenor filed in Commonwealth Court, at section III.B, which is incorporated by reference herein, as fully as though set forth herein at length.

By comparison to the present case, the *LWV* case was not nearly as challenging. Since the 2011 Plan was so obviously violative of the "neutral criteria" as to be unconstitutional under Pennsylvania's Free and Equal Elections Clause, not to mention that in practice over three separate election cycles it produced such lopsided results compared to the 23 election cycles that preceded it, the task of declaring that plan unconstitutional and thereafter implementing a remedial plan which restored parity to the partisan distribution of members Pennsylvania's Congressional delegation now seems relatively "easy." By contrast, the present case does not require this Court to declare any currently in force plan unconstitutional, everyone agrees the 2018 remedial plan is now unconstitutionally obsolete by virtue of the 2020 census. The only issue then is which new plan to pick.

That task is not simple. As the experts all agreed in one way or another, each of these plans meet all of the neutral criteria within such a narrow band of deviation, they could all be deemed reasonable. So, the question still remains, what should be the tiebreaking factor.

The House Democratic Caucus Intervenor suggests that there is no one factor that can be used to "break the tie." Instead, a plan which comports with the historical partisan distribution of members of Pennsylvania's congressional delegation (excluding those years that the unconstitutional 2011 Plan was in place), together with some

29

consideration of the overall partisan identification of the voters in the Commonwealth, is the fairest way to "break" the tie between these otherwise equal maps. When the results from 1966-2010 are added in with the results from 2018-2021, the total number of representatives elected to congress from Pennsylvania amounts to 557. Expressed as a percentage of those elected, approximately 54% (54.21%) were Democrats and approximately 46% (45.78%) were Republicans. Accordingly, carrying that 48 year, 25 election cycle history forward and applying it to the current 17 seats apportioned to Pennsylvania for 2022 that would result in 9 (9.17) Democratic representatives and 8 (7.82) Republicans elected.

An analysis of the House Democratic Caucus Intervenor's Plan by the "Dave's Redistricting" Website, reveals that of the 17 congressional districts in the Plan, 8 would be safely or lean Democratic, 6 would be safely or lean Republican and the remaining 3 districts would result in competitive or otherwise unpredictable district outcomes as between the two parties. *See* https://davesredistricting.org/maps#stats::95238e8e-6273-480a-bb5e-ee0dd7b122d5 (last visited Jan. 29, 2022). With 3 competitive or otherwise unpredictable districts, the outcomes could range anywhere from 11 Democratic seats to 6 Republican seats; to 9 Republican seats and 8 Democratic seats. Both of those outcomes are at the extreme of the results, but either one would comport with the results of the 25 previous election cycles (again excluding only those cycles where elections were held under the unconstitutional 2011 Plan).

30

Accordingly, having paid its "entry fee,"[10] the House Democratic Caucus Intervenor respectfully suggests to this Court that it is its Plan which is the only plan that meets the "neutral criteria" and is respectful of the historical partisan distribution of congressional representatives dating back to 1966 as well as the only plan that respects and reflects the Democratic voter registration of between 500,000 – 1,100,000 Pennsylvanians registered to vote in this Commonwealth from 2011 to the present.

Thus, it is the House Democrat Caucus Intervenor's Plan which best protects against vote dilution and voter disenfranchisement, while best protecting the right of all Pennsylvanians to participate in all elections in this Commonwealth which are both free and equal, as guaranteed by Article. I, § 5 of our constitution.

## VI.   CONCLUSION

For all the foregoing reasons, Intervenor Representative Joanna E. McClinton, Leader of the Democratic Caucus of the Pennsylvania House of Representatives, respectfully requests that this Court order that House Democratic Caucus Intervenor's congressional redistricting plan be adopted by this Court and be implemented throughout the Commonwealth of Pennsylvania for the 2022 General Primary Election.

---

[10] House Democratic Intervenor incorporates by reference herein its January 24, 2022, Brief in support of its Proposed Redistricting Plan, filed in the Commonwealth Court as fully as though herein set forth at length with regard to the data and support that its plan does, in fact, meet the *LWV* neutral criteria.

Respectfully submitted,

*David S. Senoff*

David S. Senoff (Pa. 65278)
Daniel Fee (Pa. 328546)
First Law Strategy Group
121 S. Broad Street, Suite 300
Philadelphia, PA 19107
Phone: (215) 258-4700

Tara L. Hazelwood (Pa. 200659)
Lee Ann H. Murray (Pa. 79638)
Lam D. Truong (Pa. 309555)
Matthew S. Salkowski (Pa. 320439)
Office of Chief Counsel, Democratic Caucus
Pennsylvania House of Representatives
620 Main Capitol
Harrisburg, PA 17120
Phone: (717) 787-3002

*Counsel for Intervenor,*
*Representative Joanna E. McClinton, Leader of the*
*Democratic Caucus of the Pennsylvania House of*
*Representatives*

Dated: February 15, 2022

32

A2117

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Brief contains 8,726 words.  In making this certification, I have relied upon the word count function of the word-processing system used to prepare this Brief.

I further certify that this Brief complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully submitted,

David S. Senoff (Pa. 65278)
Daniel Fee (Pa. 328546)
First Law Strategy Group
121 S. Broad Street, Suite 300
Philadelphia, PA 19107
Phone: (215) 258-4700

Received 2/14/2022 10:16:14 PM Supreme Court Middle District

Filed 2/14/2022 10:16:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

No. 7 MM 2022

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Leigh M. Chapman, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

## SENATE REPUBLICAN INTERVENORS' BRIEF IN SUPPORT OF REPORT AND RECOMMENDATION OF SPECIAL MASTER

**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
Jonathan R. Vaitl (PA No. 324164)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
anthony.holtzman@klgates.com
jon.vaitl@klgates.com
*Counsel for Senate Republican Intervenors Jake Corman, President Pro Tempore of the Pennsylvania Senate, and Kim Ward, Majority Leader of the Pennsylvania Senate*

## Table of Contents

SCOPE AND STANDARD OF REVIEW ................................................................3

ARGUMENT ...................................................................................................4

    A.    H.B. 2146 Is a Product of the Legislative Process ...............................4

    B.    H.B. 2146 Satisfies All of the Traditional Redistricting Criteria .........7

    C.    H.B. 2146 Preserves Communities of Interest and there is Nothing to Suggest that, from a Partisan Perspective, it is Unfair.....................8

        1.    H.B. 2146 Preserves Communities of Interest...........................8

        2.    There is Nothing to Suggest that, from a Partisan Perspective, H.B. 2146 Is Not Fair ...........................................11

CONCLUSION ...................................................................................................14

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Annenberg v. Com.*,
   757 A.2d 338 (Pa. 2000)........................................................................3

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015)...........................................................................1, 4

*Holt v. 2011 Legislative Reapportionment Comm'n*,
   67 A.3d 1211 (Pa. 2013)......................................................................8

*League of Women Voters of PA v. Commonwealth*,
   178 A.3d 737 (Pa. 2018)........................................................4, 7, 8, 11

*Perry v. Perez*, 132 S. Ct. 934 (2012)......................................................2

*Upham v. Seamon*, 456 U.S. 37 (1982) ...................................................2

**Statutes**

42 Pa.C.S. § 726.....................................................................................3

**Other Authorities**

Pa. Const. art I, § 5................................................................................7

Pa. Const. art. II, § 1...........................................................................1, 4

Pa. Const. art. II, § 16 ...........................................................................7

U.S. Const. art I, § 4 ..............................................................................4

During the two-day trial that the Honorable Patricia A. McCullough conducted in this matter, one fact became crystal clear: most of the congressional redistricting plans that were submitted to the Commonwealth Court satisfy all of the traditional, constitutionally-derived criteria for redistricting. But only one of the plans that meets those criteria, House Bill 2146 ("H.B. 2146" or the "Bill"), was the product of a public, transparent, and legislative process. The importance of this factor cannot be overstated or ignored. The United States and Pennsylvania Constitutions have assigned the task of redistricting the Commonwealth's congressional districts to the Pennsylvania General Assembly. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015); Pa. Const. art. II, § 1. The task, in other words, is expressly and constitutionally committed to the people's elected representatives. It is a fundamentally legislative task.

H.B. 2146 embodies a 17-district congressional redistricting plan that both the Pennsylvania Senate and House of Representatives thoughtfully considered and passed. H.B. 2146 reflects a transparent, deliberative, and open legislative process, which involved negotiations, compromise, and policy judgments, and which the people's elected representatives undertook in order to memorialize and implement state policy that reflects the will of their constituents.

During the trial, not a single expert witness testified that H.B. 2146 fails to satisfy the traditional redistricting criteria. Not a single expert witness offered

1

testimony to suggest that H.B. 2146 is otherwise unlawful, fractures communities of interest, or is insufficiently fair in light of partisan, racial, or other considerations. A witness, in fact, could not credibly offer testimony along those lines.  H.B. 2146 meets all of the applicable redistricting requirements (compact and contiguous territory, population equality, and respect for the boundaries of political subdivisions), creates more highly competitive districts than any other map, preserves communities of interest, and, despite having been passed by the Republican-controlled General Assembly, favors Democratic candidates.

Against this backdrop, Judge McCullough was correct to conclude that "with all things being relatively equal with regard to the maps that the Court has not previously discounted or recommended not to be adopted, the Court respectfully recommends that our highest and most honorable institution in the judicial branch of government, our Supreme Court, recognize and revere the expressed will of the People, and the 'policies and preferences of our State,' as previously stated, and adopt HB 2146 to represent the boundary lines for the Commonwealth of Pennsylvania in its creation of geographically-unique congressional districts so that the citizens of our great Commonwealth are ensured fair and equal representation in the United States House of Representatives."  Report & Recommendation ("RR") at 214-15 at ¶ 95 (quoting *Upham v. Seamon*, 456 U.S. 37, 41 (1982) and citing *Perry v. Perez*, 132 S. Ct. 934, 941 (2012)).

Senate Republican Intervenors Jake Corman, President *pro tempore* of the Pennsylvania Senate, and Kim Ward, Majority Leader of the Pennsylvania Senate, support Judge McCullough's report and recommendation and respectfully request that this Court adopt H.B. 2146.  In addition to the points that are discussed below, the Senate Republican Intervenors expressly reserve the right to present arguments at the oral argument in response to any exceptions that the parties and *amici* file to Judge McCullough's report and recommendation.

## SCOPE AND STANDARD OF REVIEW

Under 42 Pa.C.S. § 726, this Court has exercised extraordinary jurisdiction over this matter and, in doing so, designated Judge McCullough as the Special Master. Under these circumstances, the Court's scope of review is plenary and its standard of review is *de novo*. But where, as here, the Court designates a special master, the special master's findings of fact, while not binding, are afforded "due consideration, as the jurist who presided over the hearings was in the best position to determine the facts." *Annenberg v. Com.*, 757 A.2d 338, 343 (Pa. 2000). In this case, Judge McCullough presided over a two-day trial, heard extensive testimony from six expert witnesses, reviewed expert reports that those witnesses prepared, and likewise reviewed expert reports that several non-testifying experts prepared. Judge McCullough authored a comprehensive report and recommendation, setting forth more than 600 findings of fact and conclusions of law. Judge McCullough was in

3

the best position to make factual findings and credibility determinations and, accordingly, her report and recommendation is entitled to this Court's careful consideration.

## ARGUMENT

### A.    H.B. 2146 Is a Product of the Legislative Process

As the U.S. Supreme Court has stressed, under Article I, Section 4 of the United States Constitution, congressional "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015). Pennsylvania's legislative power (and therefore its power to engage in congressional redistricting) is vested exclusively in the General Assembly.  *See* Pa. Const. art. II, § 1.  In Pennsylvania, in other words, the "primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." *League of Women Voters of PA v. Commonwealth*, 178 A.3d 737, 821-22 (Pa. 2018).

Of the multitude of plans that were submitted to the Commonwealth Court, only H.B. 2146 reflects this constitutional directive and represents the deliberation, compromise, and public input that is a part of a transparent legislative process.  No other party or *amici* submitted a redistricting plan that has made its way through *any* part of the legislative process, let alone a plan that both the Senate and House have

4

passed – or even a plan that has been subject to any sort of meaningful public input process at all.

On December 8, 2021, H.B. 2146 was introduced and referred to the House State Government Committee.  RR at 47 (FF5).  The Bill "embodied a 17-district congressional redistricting plan that a citizen and good-government advocate, Amanda Holt, had created on her own."  RR at 47 (FF6).  The House State Government Committee made the bill available for public comment, leading to 399 comments, which resulted in amendments to the bill that were designed to increase the compactness of certain districts and ensure that certain communities of interest were preserved. RR at 48 (FF8 & FF9). On January 11, 2022, the Bill was brought up for second consideration and, on January 12, 2022, the House of Representatives passed it.  RR at 48 (FF10).

In the Senate, H.B. 2146 was referred to the State Government Committee. On January 18, 2022, the Bill was reported out of that committee and brought up for first consideration.  RR at 48 (FF11).  On January 19, 2022, the Bill was brought up for second consideration.  RR at 48 (FF12).  On January 24, 2022, it was referred to the Senate Appropriations Committee, reported out of that committee, and brought up for third consideration.  RR at 48 (FF13).  On the same day, the Senate passed H.B. 2146 and the Bill was presented to the Governor, who then vetoed it on January 26, 2022.  RR at 48 (FF13 & FF14).

5

No other party's or *amici*'s plan has been through a similar process. Indeed, both the House Democrats and the Senate Democrats, as members of the General Assembly, could have circulated co-sponsorship memos for proposed plans, introduced their own bills that embodied proposed plans, or offered amendments to H.B. 2146 during the legislative process. They did not do so, instead choosing to forego the legislative process altogether. Similarly, between August 2021 and January 2022, the Governor refused to engage with legislative leaders on the drawing of congressional maps, suggesting that, in this context, he has "no role" in the bill passage process. His claimed lack of any role in the process is belied by his own position in this case, as well as his mid-January release of the very map that he now submits to this Court for consideration, which was essentially presented as a take-it-or-leave it option for the General Assembly at the last legislative moment.

The importance of these dynamics should not be overlooked or diminished. Undertaking redistricting through legislative means and a transparent public process is a fundamental constitutional principle that, as Judge McCullough correctly concluded, elevates H.B. 2146 above the plans that the other parties and *amici* have presented. RR at 214 at ¶ 95. The Constitution envisions that the legislature, not a supercomputer or individual expert witness, will create the redistricting map that governs Pennsylvania's congressional elections for the next decade.

### B. H.B. 2146 Satisfies All of the Traditional Redistricting Criteria

H.B. 2146 unquestionably satisfies all of the traditional, constitutionally-derived criteria for a redistricting plan: compact and contiguous territory, population equality, and respect for the boundaries of political subdivisions. *See League of Women Voters*, 178 A.3d at 816 (determining that, under Article I, Section 5 of the Pennsylvania Constitution, *i.e.*, the "Free and Equal Elections Clause," the criteria in Article II, Section 16, which apply to the creation of state legislative districts, likewise apply to congressional redistricting).

The experts agreed, and Judge McCullough found, that all of the proposed plans satisfy the contiguity requirement. RR at 137 (CL1), 192 (¶ 16). All of the plans, moreover, perform well on the compactness metrics that the experts used. RR at 147 (FF1 & FF3), 193 (¶ 22). And, with the exception of the Carter Petitioners' Plan and the House Democratic Plan, all of the plans also achieve population equality within a one-person deviation. RR at 138 (CL2), 192 (¶ 18).

With respect to maintaining the boundaries of political subdivisions, the Pennsylvania Constitution identifies six types of subdivisions to consider: counties, cities, incorporated towns, boroughs, townships, and wards. Pa. Const. art. II, § 16. H.B. 2146, in this regard, is among the plans that split the lowest total number of these subdivisions. RR at 147 (FF3), 193 (¶ 23).

It follows that, when it comes to the four fundamental constitutional requirements for a redistricting map, H.B. 2146 performs well, as do other plans. But what sets H.B. 2146 apart, as explained above, is its status as the only plan that has passed through the legislative process or, for that matter, *any* meaningful public input process at all.

As explained below, moreover, there is nothing to suggest that, in meeting the traditional redistricting criteria, H.B. 2146 is otherwise unlawful or fails to preserve communities of interest or, from a partisan perspective, is not sufficiently fair.  To the contrary, H.B. 2146 performs *better* on these metrics than the other plans.

### C.   H.B. 2146 Preserves Communities of Interest and there is Nothing to Suggest that, from a Partisan Perspective, it is Unfair

#### 1.   H.B. 2146 Preserves Communities of Interest

As Judge McCullough noted, this Court in *League of Women Voters* emphasized the importance of "creating representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs[.]" RR at 152-53 (quoting *League of Women Voters*, 178 A.3d at 814).  *See also Holt v. 2011 Legislative Reapportionment Comm'n*, 67 A.3d 1211, 1241 (Pa. 2013) ("*Holt II*") ("redistricting efforts may properly seek to preserve communities of interest which may not dovetail precisely with the static lines of political subdivisions").

8

On this point, the proposed plans can be distinguished from one another based on whether they split the City of Pittsburgh. RR at 151 at CL3 (concluding that "the maintenance of the City of Pittsburgh within one district is an important factor, which is entitled to weight in the ultimate analysis"); RR at 155 (FF5). This variable is important because, as Judge McCullough observed, "it is undisputed that Pittsburgh's population is not so great that it is *necessary* to divide the city into multiple congressional districts, as is the case with Philadelphia." RR at 149 (FF4) (emphasis in original). As Judge McCullough likewise observed, "[t]he Court further heard credible evidence which supports the conclusion that the City of Pittsburgh in many ways constitutes a community of interest, such that its division would not be in the best interests of its residents." RR at 149 (FF9). Judge McCullough heard evidence, for example, that Pittsburgh voters tend to favor local candidates in statewide elections and share common interests in acquiring federal funds and obtaining constituent services. RR at 150 (FF10 & FF11).

Despite the fact that Pittsburgh "in many ways constitutes a community of interest," the plans from the Governor, the Senate Democratic Caucus, Draw the Lines PA, and Khalif Ali all split Pittsburgh. RR at 151. The House Democratic Caucus's Plan, for its part, preserves Pittsburgh but "draws a Freddy Krueger-like claw district in Allegheny County to 'grab' Pittsburgh to combine it with small Republican-leaning areas to the north." RR at 152 (FF20). Judge McCullough

determined that these tactics suggest a partisan aim to turn one Democratic-leaning district into two such districts. RR at 151 (FF18), 194 (¶ 28). H.B. 2146, on the other hand, preserves Pittsburgh.

Judge McCullough reached similar conclusions in connection with the parties' and *amici*'s approach to Philadelphia, which, as noted above, must be split based on the size of its population. Judge McCullough found that Philadelphia's surplus population should not be joined with Bucks County in order to form a district. RR at 157-58 (FF16). She correctly determined, in this regard, that lower and upper Bucks County communities are similar to one another, but different from Philadelphia, when it comes to demography, economics, land use, and commercial and commuting interests, and that "[a]ttaching the lower Bucks communities to Philadelphia would render those communities 'orphans' from an interest and advocacy standpoint." RR at 158 (FF17) (quoting Dr. Naughton expert report). Crediting Dr. Naughton's unrebutted expert testimony, Judge McCullough, as a corollary, explained that "Philadelphia's surplus population would be best combined with a district with maximum commonality – that is, with common interests with Philadelphia, such as use of public transit, recipient of federal transfer payments and common commercial and industrial interests" and that communities in Delaware County fit this description. RR at 159 (FF18-FF21). H.B. 2146 accomplishes these preferred groupings unlike, for example, the Governor's proposed plan, which splits

Bucks County and connects Philadelphia's surplus population to the southern part of Bucks County instead of Delaware County. RR at 160 (FF22-FF26).

### 2. There is Nothing to Suggest that, from a Partisan Perspective, H.B. 2146 Is Not Fair

In *League of Women Voters*, this Court acknowledged that, under the Commonwealth's Constitution, factors like "protection of incumbents" and "the maintenance of the political balance which existed after the prior reapportionment" can play a role in the creation of a redistricting plan.  178 A.3d at 817.  But the Court also concluded that, under the Free and Equal Elections Clause, those factors must be "wholly subordinate" to the "neutral [redistricting] criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among…districts." *Id*.  The Court then stated that, along similar lines, when a redistricting body crafts a redistricting plan, it may not "unfairly dilute the power of a particular group's vote for a…representative." *Id*.  It did not attempt to define the contours of "unfair" vote-dilution.

Although, during the trial in this matter, the experts testified at length about various ways to measure the partisan fairness of a map, no single metric can determine whether a map is fair. *See* RR at 164-176 (discussing the various metrics). Further, no expert opined that H.B. 2146 is unfair.

In this context, as Judge McCullough explained, any discussion of partisan fairness must take into account Pennsylvania's political geography. RR at 162 at FF2

11

("Based upon the evidence credited, the Court finds that Pennsylvania's unique 'political geography' affects the analysis of partisan advantage in any proposed map."). In particular, a redistricting map for the Commonwealth that is drawn randomly and that complies with the traditional redistricting criteria, but that is not drawn with reference to any partisan data, will tend to yield more seats for Republicans than Democrats in comparison to vote share. RR at 162. As Judge McCullough noted, even Governor Wolf's own expert, Dr. Moon Duchin, acknowledged this point. RR at 84-85 (FF166). The pro-Republican "tilt" is a function of the fact that Democratic voters tend to be concentrated in urban regions of Pennsylvania, while Republican voters tend to be distributed throughout the other parts of the Commonwealth. RR at 162 (FF1-FF3). And if a mapmaker, in drawing a congressional redistricting map, attempts to "adjust" or "control" for this phenomenon, that person is necessarily drawing the map with an intent to achieve a particular partisan outcome. RR 162-63 (FF4-FF6).

One way to evaluate partisan fairness, while properly taking account of political geography, involves comparing a proposed map to a set of randomly-generated simulated maps that follows only the traditional redistricting criteria. RR at 164 (FF1). As Judge McCullough correctly observed, in light of the Commonwealth's political geography, "if a plan is not evaluated against a non-partisan set of maps, the potential issues or red flags in the maps may not at all be

12

due to partisan gerrymandering, but rather the geographic distribution of voters in the state." RR at 164 (FF3) (citing Dr. Barber expert report at 11). The House Republican Intervenors' expert, Dr. Michael Barber, therefore compared H.B. 2146 to a set of 50,000 simulated 17-district maps, all of which adhere to the traditional redistricting criteria and none of which were created with reference to any partisan data. RR 164-165 (FF4-FF6). And, as Judge McCullough confirmed, "[t]he simulation analysis performed by Dr. Barber demonstrates that HB 2146 is predicted to result in nine Democratic-leaning seats and eight Republican-leaning seats using an index of statewide elections from 2012-2020, whereas the most likely outcome in his 50,000 simulated maps, created without using partisan data, is eight Democratic-leaning seats and nine Republican-leaning seats." RR at 165 (FF7).

What is more, H.B. 2146 creates five competitive seats, which is more competitive districts than any other plan, and four of those seats lean Democratic. RR at 212 (¶ 81). It also scores as a fair and unbiased plan under all of the other metrics that the experts used to assess partisan bias. RR at 212 (¶¶ 82-83).

All of these factors underscore that, as Judge McCullough correctly determined, H.B. 2146 is a fair map, and nothing in the record suggests otherwise.

13

**CONCLUSION**

The legislative process is one that, under both the United States and Pennsylvania Constitutions, is the principal and preferred method for drawing congressional districts. As a legislatively-approved plan that meets all of the applicable redistricting criteria, the H.B. 2146 map is not only a reasonable choice, but should be the preferred choice in order to honor the General Assembly's constitutional prerogative to engage in redistricting and express the will of the voters.

For these reasons, the Senate Republican Intervenors respectfully request that the Court adopt the H.B. 2146 map.

Dated: February 14, 2022                Respectfully submitted,

/s/ Anthony R. Holtzman
**K&L GATES LLP**
Anthony R. Holtzman (PA No. 200053)
Jonathan R. Vaitl (PA No. 324164)
17 North Second St., 18th Floor
Harrisburg, PA 17101-1507
(717) 231-4570 / Fax (717) 231-4501
anthony.holtzman@klgates.com
jon.vaitl@klgates.com

*Counsel for the Senate Republican Intervenors*

14

## CERTIFICATION OF COMPLIANCE

I hereby certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

/s/ Anthony R. Holtzman
Anthony R. Holtzman

15

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service by PACFile eService as follows:**

All counsel of record

Date: February 14, 2022          /s/ Anthony R. Holtzman_____
                                 Anthony R. Holtzman

Received 2/14/2022 10:19:07 PM Supreme Court Middle District

Filed 2/14/2022 10:19:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

---

## No. 7 MM 2022

---

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Balchunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

vs.

Leigh M. Chapman, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

---

Philip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela A. Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak

Petitioners,

vs.

Leigh Chapman, in her Official Capacity as the Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Mathis, in Her Official Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

---

## BRIEF OF INTERVENORS BRYAN CUTLER, SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES, AND KERRY BENNINGHOFF, MAJORITY LEADER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES, IN SUPPORT OF JUDGE MCCULLOUGH'S REPORT AND RECOMMENDATION

---

A2138

BAKER & HOSTETLER LLP
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

James G. Mann (PA 85810)
jmann@pahousegop.com
Pennsylvania House of Representatives
Republican Caucus
Main Capitol Building, Suite B-6
P.O. Box 202228
Harrisburg, PA  17120-2228
Telephone: 717.783.1510

*Admitted Pro Hac Vice, Cmwlth Ct. Nos. 464MD2021, 465MD2021*

*Counsel for Intervenors Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives*

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ........................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................4

    I.    Framework of Redistricting ..................................................4

    II.   Development of H.B. 2146 ..................................................9

    III.  Proceedings Below.........................................................12

LAW AND ANALYSIS...................................................................16

    I.    The Commonwealth Court Correctly Recognized that H.B.
        2146 Adheres to the Traditional Redistricting Criteria Set Forth
        in Article II,  Section 16, of the Pennsylvania Constitution,
        Which this Court Recognized as Neutral Benchmarks to Be
        Used in Detecting Gerrymanders. .......................................16

    II.   The Commonwealth Court Correctly Recognized that H.B.
        2146 Is Fair to the Political Parties. ....................................19

        A. Dr. Barber's Simulation Analysis....................................19

        B. Partisan Fairness Metrics.............................................26

            1.    H.B. 2146's partisan fairness metric scores are good
                and do not indicate the plan confers an unfair
                advantage to any political party.....................................26

            2.    There is no requirement that partisan fairness metrics
                get to "zero"; the focus is on whether a plan is within
                a given range..............................................................29

    III.  Intentionally Drawing District Lines To "Correct For" A Slight,
        Natural Republican Tilt In The State's Political Geography Is
        Gerrymandering.........................................................35

A. All experts confirmed that Pennsylvania's political geography has a Republican tilt because Democratic voters are clustered in cities and urban areas, but Republican voters are more evenly distributed in the rest of the state. .................36

B. The Commonwealth Court correctly concluded that deliberate efforts to "correct" for a naturally occurring political tilt in a plan is a subspecies of partisan gerrymandering that this Court found violated the Free and Equal Elections Clause. .....37

IV.   H.B. 2146 Is the Only Plan Submitted to the Commonwealth Court That Went Through Any Meaningful Public Process. ..............44

A. The General Assembly undertook a transparent, deliberative, and meaningful redistricting process that led to the passage of H.B. 2146. .............................................................................45

B. The Governor's plan was only published Nine Days before his submission was due in Court, and much of it is shrouded in secrecy. .........................................................................47

C. The House and Senate Democratic Caucuses never proposed their plans during the legislative process. .................................48

D. The *Gressman* plan was drawn in secret by a computer "optimization" algorithm. .........................................................49

V.   The Commonwealth Court Properly Rejected the "Least Change" Approach Advocated by the Carter Petitioners ..................50

CONCLUSION .......................................................................54

CERTIFICATE OF COMPLIANCE ....................................................56

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Johnson*,
521 U.S. 74 (1997)...............................................................................52

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021)..........................................................................33

*Butcher v. Bloom*,
203 A.2d 556 (Pa. 1964).......................................................................46

*Butcher v. Bloom*,
216 A.2d 457 (Pa. 1966).......................................................................47

*Carter v. Chapman*
No. 7 MM 2022, Order of Feb. 2, 2022.........................................15, 16

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020) ................................................................33

*Hippert v. Ritchie*,
813 N.W.2d 374 (Minn. 2012) .............................................................51

*Holt v. 2011 Legislative Reapportionment Comm'n*,
38 A.3d 711 (Pa. 2012)....................................................................50, 51

*Holt v. 2011 Legislative Reapportionment Comm'n*,
67 A.3d 1211 (Pa. 2013)...................................................................38, 50

*Johnson v. Wis. Elections Comm'n*,
2021 WI 87, 399 Wis. 2d 623 (Nov. 30, 2021) ...............................51, 52

*Karcher v. Daggett*,
462 U.S. 725 (1983).................................................................5, 17, 52

*LaComb v. Growe*,
541 F. Supp. 145 (D. Minn. 1982), *aff'd sub nom. Orwoll v.
LaComb*, 456 U.S. 966, 102 S. Ct. 2228, 72 L. Ed. 2d 841 (1982)....................51

*League of United Latin American Citizens v. Perry*,
    548 U.S 399 (2006)........................................................................................31, 32

*League of Women Voters v. Com.*,
    178 A.3d 737 (Pa. 2018)..........................................................................*passim*

*League of Women Voters v. Commonwealth*,
    181 A.3d 1083 (Pa. 2018)............................................................................8, 17

*Mellow v. Mitchell*,
    607 A.2d 204 (Pa. 1992)..........................................................................*passim*

*Ohio A. Philip Randolph Institute v. Householder*,
    373 F. Supp. 3d 978 (S.D. Ohio 2019), *rev'd on other grounds*,
    140 S. Ct. 102....................................................................................................31

*Perry v. Perez*,
    132 S. Ct. 934 (2012)........................................................................................46

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019)........................................................................................5

*Stone v. Hechler*,
    782 F. Supp. 1116 (N.D. W.Va. 1992)............................................................52

*Tennant v. Jefferson Co. Comm'n*,
    567 U.S. 758 (2012)..........................................................................................33

**Statutes and Constitutional Provisions**

2 U.S.C. § 2a(c)(5)......................................................................................................5

52 U.S.C. § 10301...................................................................................................7, 32

Pa. Const. art. I, § 5...........................................................................................8, 37, 39

Pa. Const. art. IV, § 15.............................................................................................6

U.S. Const. art. I, § 2.................................................................................................4

U.S. Const. art. I, § 4............................................................................................2, 5

iv

**Other Authorities**

Barry Burden & Corwin Smidt, *Evaluating Legislative Districts Using Measures of Partisan Bias and Simulations* (2020), https://doi.org/10.1177/ 215824402098105 ......................................................29

Peter Buisseret et al., *Party Nomination Strategies in List Proportional Representation Systems*, Am. J. Pol'y Sci. (Jan. 14, 2022), https://doi.org/10.1111/ajps.12691 ...................................................44

Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering & the Efficiency Gap*, 82 U. Chi. L. Rev. 831, 837 (2015) ....................................................................................................30, 32

## INTRODUCTION

This Court's decision in *League of Women Voters v. Com.*, 178 A.3d 737 (Pa. 2018) ("*LWV*"), striking down the 2011 congressional plan, re-affirmed the primacy of adherence to traditional districting criteria and held that subordination of those traditional principles for partisan advantage violated the Free and Equal Elections Clause. The General Assembly took the guidance from this Court in *LWV* to heart, and passed House Bill 2146 ("H.B. 2146") to redistrict the Commonwealth into seventeen congressional districts through the fairest and most transparent redistricting process in modern history.  H.B. 2146 is not the 2011 congressional plan. It adheres to all traditional redistricting criteria and is a fair map—creating nine Democratic-leaning districts, eight Republican-leaning districts, and several highly competitive districts in this closely-divided state. An honest process yielded an honest map that does not discriminate against voters on the basis of their political views—consistent with the holding of *LWV*.

The Commonwealth Court issued an exhaustive 222-page report and recommendation after conducting a thorough analysis of the politics of this State, hearing the testimony of several expert witnesses, and reviewing hundreds of pages of briefing concerning the 13 proposed plans. That exhaustive record confirms that H.B. 2146 fulfills all the constitutional criteria and provides a plan that does not unfairly dilute the vote of any citizen of the Commonwealth on account of

partisanship. Due to the practically infinite number of ways a congressional map can be drawn, and the competing criteria, there is no "best" or "optimal" map other than one that achieves the goals of the map-drawer. But those are decisions best left to the Representatives and Senators elected by the people of Pennsylvania who are best suited to make those policy choices, and to whom the Framers of the U.S. Constitution assigned that responsibility. *See* U.S. Const. art. I, § 4.

The same cannot be said for many of the other map submissions. As set forth more fully herein and in the Special Master's Report, several of the plans submitted—including those by the *Carter* Petitioners, the *Gressman* Petitioners, Governor Wolf, the Senate Democratic Caucus (Maps 1 and 2), and the House Democratic Caucus—either subordinate traditional districting principles for partisan gain, or otherwise intentionally draw districts for unfair partisan advantage. In particular, the Governor's Plan and both Senate Democratic Caucus Plans split the City of Pittsburgh in half for partisan purposes, and the House Democratic Caucus kept Pittsburgh whole but instead drew a Freddy Krueger Claw district to "grab" Pittsburgh and combine it with Republican-leaning areas to the north.

Additionally, the *Carter* Petitioners, *Gressman* Petitioners, Governor Wolf, the Senate Democratic Caucus, and the House Democratic Caucus all gerrymander their proposed plans by drawing the four most competitive districts in their simulated plans to be as strongly Democratic-leaning as possible. Through this and other

means, those parties manage to draw plans that contain *ten* Democratic-leaning districts—a highly uncommon outcome when compared to a set of 50,000 simulated plans created without political data and that follow this state's traditional criteria.

Several of these parties have attempted to defend their rigged proposed plans by saying those plans counteract or "override" a slight, naturally occurring Republican tilt in the state's political geography. Such a methodology is an express invitation for the Court to override the actual voting patterns and preferences of the voters as expressed at the ballot boxes in their community, which is the literal subordination of political subdivision integrity in favor of partisan advantage. Judge McCullough rightly rejected this argument as a "subspecies" of unfair partisan gerrymandering of the sort prohibited in *LWV*, and so should this Court.

The *Carter* Petitioners also urge the adoption of their plan on the grounds that it is a "least change" plan from the Court's 2018 remedial plan in *LWV*. However, they ground this argument on a fundamental misunderstanding of the "least change" case law (which does not apply here), and as a factual matter, their plan takes the remedial plan's politically even, 9-9 plan and converts it to a heavily Democratic-advantaged 10-7 plan. Surely that is not a "least change" plan.

In the end, Judge McCullough recommended that:

> our Supreme Court adopt and implement HB 2146 as a matter of state constitutional law as it meets all of the traditional criteria of the Free and Equal Elections Clause, and does so in respects even noted by the Governor's expert, as well as the other considerations noted by the

courts, it compares favorably to all of the other maps submitted herein, including the 2018 redistricting map, it was drawn by a non-partisan good government citizen, subjected to the scrutiny of the people and duly amended, it creates a Democratic leaning map which underscores its partisan fairness, and, otherwise, is a reflection of the "<u>policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature</u>."

Report of Special Master, 464 M.D. 2021, at 216 (Feb. 7, 2022) (bold removed, underline in original) (citing *Perry v. Perez*, 132 S. Ct. 934, 941 (2012)).

For all the reasons set forth in this brief as well as in the House Republican Legislative Intervenors' briefing to the Commonwealth Court, and any further arguments advanced in response to any Exceptions filed by other parties, the House Republican Legislative Intervenors urge the Court to adopt the Special Master's Report in its entirety and to select H.B. 2146 as the congressional district plan to govern the Commonwealth's congressional elections.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Framework of Redistricting

At issue in this case is the congressional redistricting process mandated by the U.S. Constitution.  Every ten years, a national census is conducted, and the 435 voting members of the U.S. House of Representatives are reapportioned among the states on the basis of population. U.S. Const. art. I, § 2. The federally conducted census determines the number of House seats apportioned to each state, and Congress can and does make regulations which govern the states' redistricting

process. *See* U.S. Const. art. I, § 4. For example, if a state loses a seat in the apportionment process and fails to enact a new, valid redistricting plan, that state's House delegation "shall be elected from the State at large." 2 U.S.C. § 2a(c)(5).

In the first instance, the Constitution entrusts the "Times, Places and Manner" of House elections, including the task of drawing congressional districts, to state legislatures. *See id*. Thus, each decade, pursuant to this delegated constitutional authority, the Pennsylvania General Assembly, on behalf of the People of the Commonwealth, is tasked with creating a new congressional map for the Commonwealth that reflects the results of the latest census. As a general rule, each of these districts will have one member and will be of equal population, consistent with the one person, one vote principle, though minor deviations to achieve traditional redistricting objectives may be permissible. *See, e.g., Karcher v. Daggett*, 462 U.S. 725, 740 (1983) ("Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives."); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019) ("[E]ach representative must be accountable to (approximately) the same number of constituents. That requirement does not extend to political parties.  It does not mean that each party must be influential in proportion to its number of supporters.").

This familiar framework has received further elaboration in Pennsylvania law. In Pennsylvania, congressional redistricting plans are handled as regular legislation—that is, a congressional redistricting plan must pass both chambers of the General Assembly and be signed into law by the Governor in order to take effect. *See* Pa. Const. art. IV, § 15. A plan that emerges from the constitutionally created state legislative process is subject to review by the judicial branch, as occurred in 2018. *LWV*, 178 A.3d at 742-43.

Impasse cases, like this one, arise when the political branches deadlock and fail to redistrict the Commonwealth following the decennial census and apportionment. *See Mellow v. Mitchell*, 607 A.2d 204, 214 (Pa. 1992). Prior to Intervenors' intervention, the Commonwealth Court entered an order on December 20, 2021 essentially finding that an impasse had occurred. Unfortunately, after failing to engage with the legislature during the process, Governor Wolf vetoed H.B. 2146 only a day before trial—in the apparent hope that this Court would adopt a map he publicly proposed only on January 15, 2022.

The Court has described the task of selecting a congressional map as an "unwelcome obligation." *LWV*, 178 A.3d at 823 (citation and internal quotation marks omitted). But in assuming this unhappy task in the past, the Court has also clearly articulated the controlling constitutional and legal principles that govern

congressional redistricting plans in this Commonwealth.  Those principles are worth recounting here.

The Court was last presented with an impasse situation similar to the one it faces now in 1992.  *See Mellow*, 607 A.2d at 204-05. The 1990 census found that Pennsylvania was entitled to only 21 House members, where it previously had 23. *Id.* at 205. The General Assembly then failed to pass a 21-member map. *Id*. Thus, in the absence of a map approved by the General Assembly, the Court decided to select an appropriate redistricting plan. *Id*. at 205-07, 211.

After the political branches deadlocked, eight Members of the Pennsylvania Senate brought an action requesting judicial intervention. The Court ultimately approved a plan proposed by those eight Senators, and in its opinion, described the factors it considered. First, it evaluated the plans to ensure they complied with the one-person, one-vote standard required by federal law. *Id.* at 207-08. Second, it reviewed for compliance with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. *Id*. at 208-10. And finally, it reviewed for minimization of political subdivision splits, and to evaluate whether the plan was "politically fair" in terms of the allocation of Democratic and Republican-leaning districts, and, in particular, how the maps dealt with the state's loss of two congressional seats. *Id*. at 210-211.

The Court's recent decision in *LWV* further elucidates this legal framework, although *LWV* arose from a challenge to an enacted map, and not, as here and in

*Mellow*, from a legislative impasse between the General Assembly and the Governor after a reduction in the number of House seats following the census. In *LWV*, the Court considered the Pennsylvania Constitution's Free and Equal Elections Clause, which provides, "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5. The Court concluded that this provision invalidated the then-existing congressional map from 2011 as an unconstitutional partisan gerrymander. *See LWV*, 178 A.3d at 824-25. The Court subsequently ordered the use of a remedial plan that has been in place since the 2018 elections. *League of Women Voters v. Commonwealth*, 181 A.3d 1083 (Pa. 2018) ("*LWV II*").

The reasoning behind the Court's decision in *LWV* was that the Free and Fair Elections Clause requires that "an individual's electoral power not be diminished through any law which discriminatorily dilutes the power of his or her vote . . . ." *LWV*, 178 A.3d at 816. In framing this interpretation, the Court looked to Article II, Section 16, of the Pennsylvania Constitution, in which the Court identified the "neutral benchmarks" that serve to prevent the dilution of individual votes. *Id*. Thus, the Court held that to comply with the Free and Equal Elections Clause, congressional districts must (1) be compact, (2) be contiguous, (3) be "as nearly equal in population as practicable," and (4) not divide any "county, city, incorporated town, borough, township, or ward, except where necessary to ensure

equality of population." *See id.* at 816-17 (citations and internal quotation marks omitted). But while other factors "have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment," such extraneous, political factors are "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *Id.* at 817.

Thus, in evaluating the constitutionality of a congressional redistricting plan, whose creation is constitutionally committed to the General Assembly in the first instance, the Court must begin with the neutral redistricting criteria identified in *Mellow* and *LWV*. Other relevant factors, such as the preservation of communities of interest, preventing an undue departure from the existing map, and various metrics of partisan fairness may be considered, but not in ways that supplant or detract from the traditional, non-political factors that this Court has articulated over the course of several decades now.

## II.    <u>Development of H.B. 2146</u>

Exercising their prerogative and fulfilling their duty under both the United States and Pennsylvania Constitutions, the House and Senate passed H.B. 2146, which redistricts the Commonwealth into 17 congressional districts.

H.B. 2146 was first introduced and referred to State Government Committee on December 8, 2021. *See* Bill History, House Republican Legislative Intervenors' Opening Br., Ex. E ("Bill History"). The bill introduced, for what might be a first in the history of the Pennsylvania House, a plan proposed by "well-known nonpartisan citizen," and good-government advocate, Ms. Amanda Holt. *See* Report of The Honorable Patricia McCullough, Special Master, Feb. 7, 2022, 42 ("the Report" or "Rep."). The State Government Committee selected Ms. Holt's proposal from among 19 submitted by the public because, as Rep. Seth Grove indicated, Ms. Holt drew it without political influence, it met constitutional standards, and it limited the splits of townships and other municipalities, offering compact and contiguous districts. House Republican Legislative Intervenors' Opening Br., Ex. A, Grove Letter (Jan. 6, 2022) ("Grove Letter"); Ex. 1 to Ex. I, Affidavit of Bill Schaller.

The State Government Committee received 399 comments concerning the map in H.B. 2146 as introduced. *See* Grove Letter; Rep. at 48, FF8. The legislature considered and implemented changes based on these comments, increasing the compactness of certain districts and ensuring that the map preserved certain communities of interest. Rep. at 48; *see also* Grove Letter. From the time the bill was amended in, and reported from, the House State Government Committee on December 15, 2021, until the bill was passed by the House, the public had 28 days

to view the contents of the bill and review the proposed congressional plan. *See* Grove Letter; Bill History.

Under the Rules of the Pennsylvania House of Representatives, second consideration of a bill is the opportunity for any House Member to introduce and offer amendments to a bill. House Rules 21 and 23. While Members had ample time to draft and file amendments to the bill, no amendment was timely filed to H.B. 2146. It received third consideration and final passage in the House on January 12, 2021. Rep. at 48.

The Senate then referred H.B. 2146 to the Senate State Government Committee. After being reported from committee without amendment, the Senate gave H.B. 2146 first consideration on January 18, 2022 and second consideration on January 19, 2022. The Senate passed H.B. 2146 on January 24, 2022, by a vote of 29 to 20. *See* Bill History; Rep. at 48.

The legislature then presented H.B. 2146 to Governor Tom Wolf on January 24, 2022. As described above, this bill included a map subject to public comment, review, and multiple revisions in response to those comments. At that point, 40 days had passed since H.B. 2146 had last been amended in the House State Government Committee. But only one day before this trial began, on January 26, 2022, Governor Wolf vetoed H.B. 2146. Throughout this process, the Governor had refused to meet with the legislature. *See* Grove Letter. He did not negotiate a redistricting plan with

either the House or the Senate, but instead proposed his own map, absent any legislative input.

## III.   Proceedings Below

Before the commencement of the present action, the Carter Petitioners filed a case in the Commonwealth Court ("*Carter I*") challenging the 2018 remedial plan as constitutionally deficient based on the 2020 census results.  *See* Rep at 4 n.10. Subsequently, a three-judge panel of the Commonwealth Court dismissed that action without prejudice for lack of standing and ripeness.  *Id.*

On December 17, 2021, the *Carter* Petitioners filed the instant Petition for Review ("*Carter II*") directed to the Commonwealth Court's original jurisdiction, again claiming that the 2018 remedial congressional map was malapportioned and that the judiciary needed to step in and adopt the *Carter* Petitioners' plan for the upcoming 2022 elections. Rep. at 4. On the same day, the *Gressman* Petitioners filed their own petition for review, making substantially similar claims and offering up their own map for the Commonwealth Court's adoption. *Id.* at 7-8.

By order dated December 20, 2021, the Commonwealth Court consolidated both petitions for review, set December 31, 2021 as the deadline for applications to intervene, and ruled that any party to the consolidated cases could submit a proposed 17-district congressional redistricting plan. *Id.* at 10. The Commonwealth Court's December 10 order further provided that the Commonwealth Court would select

from among the timely filed plans if a legislatively enacted plan was not in place by January 30, 2022. *Id.* at 10-11.

Immediately after the Commonwealth Court's December 20 order, both the *Carter* and *Gressman* Petitioners filed applications for extraordinary relief, requesting that this Court exercise extraordinary jurisdiction over these matters. *Id.* at 11. This Court denied those applications on January 10, 2022. *Id.* at 12.

By order dated January 14, 2022, the Commonwealth Court granted applications to intervene by (i) the Speaker and Majority Leader of the Pennsylvania House of Representatives ("House Republican Legislative Intervenors") and the President Pro Tempore and Majority Leader of the Pennsylvania State Senate ("Senate Republican Legislative Intervenors") (collectively, "Republican Legislative Intervenors"), (ii) Pennsylvania State Senators Maria Collett, Katie J. Muth, Sharif Street, and Anthony H. Williams ("Democratic Senator Intervenors")[1]; (iii) Tom Wolf, Governor of the Commonwealth of Pennsylvania ("Governor"); (iv) Senator Jay Costa and members of the Democratic Caucus of the Senate of Pennsylvania ("Senate Democratic Caucus Intervenors"); (v) Representative Joanna E. McClinton, Leader of the Democratic Caucus of the Pennsylvania House of Representatives ("House Democratic Caucus Intervenors"); and (vi) Congressman

---

[1] The Democratic Senator Intervenors and Senate Democratic Caucus Intervenors were joined as a single party. Rep. at 12-13, n.21.

Guy Reschenthaler, Swatara Township Commissioner Jeffrey Varner, and former Congressmen Tom Marino, Ryan Costello, and Bud Shuster ("Congressional Intervenors"). *Id.* at 12-13. The remaining applications to intervene were denied, but the entities that filed them were permitted to submit plans, briefs, and supporting materials as *amici*. *Id.* at 14.

The Commonwealth Court's January 14 order also superseded the prior procedural schedule and required submission, by each party, of one or two proposed congressional plans and a supporting brief and/or expert report by January 24, 2022, with responsive briefs and/or expert reports by January 26, 2022. *Id.* at 13. The Commonwealth Court also directed the filing of a joint stipulation of facts and accelerated the trial to January 27 and 28, 2022. *Id.* at 14. The Commonwealth Court further indicated that it planned to issue an opinion based on the parties' submissions and the record evidence if a legislative plan was not enacted by January 30, 2022. *Id.*

The parties submitted their briefs and expert reports in due course on January 24 and 26. Consistent with the Commonwealth Court's amended procedural schedule, the Court conducted the trial on January 27 and 28, 2022. *Id.* at 58. Each party conducted a one-hour direct examination of one expert witness, with each party permitted to conduct a fifteen-minute cross-examination of every other party's expert witness. *Id.* Each party was permitted to make an opening and closing

14
A2158

statement.  *Id.*  The expert reports and testimony submitted by the parties and *amici*
are summarized in the Report. *See generally id.* at 58-114. The Report further
provided that "exhibits introduced in trial and attached briefs were admitted into
evidence.  All exhibits are part of the record in this matter." *Id.* at 117.

The day after trial, on Saturday, January 29, 2022, the parties made written
post-hearing submissions.

Then, on January 29, 2022, the Carter Petitioners renewed their application
for extraordinary relief, which this Court had previously denied on January 10. *Id.*
at 15. On February 2, 2022, this Court granted the application for extraordinary
relief, assumed jurisdiction over the proceedings, designated Commonwealth Court
Judge McCullough as Special Master, and directed Judge McCullough to identify
proposed findings of fact and conclusions of law, and a recommendation as to which
plan should be selected and as to potential election calendar revisions, no later than
February 7, 2022. Order, No. 7 MM 2022, 1-2 (Feb. 2, 2022.) The Court further
ordered that parties and *amici* could file exceptions to the Special Master's Report
by February 14, and set oral argument for February 18. *Id.* at 2.

Judge McCullough's Report was filed on February 7, 2022.  The Report,
coming in at 222 pages, exhaustively recounts the procedural history of these cases,
the controlling constitutional and legal principles, proposed findings of fact and
conclusions of law, a detailed analysis and comparison of each proposed map, and a

recommendation regarding which map should be selected and how the 2022 election schedule should be revised. *See generally* Report. Judge McCullough recommended adoption of H.B. 2146. *Id.* at 216.

Following the release of the Report, the Court issued a *per curiam* order dated Friday, February 11, 2022, in which it denied a joint application for leave to file briefs in response to exceptions and directed that parties and *amici* file any briefs in support of the Report by Monday, February 14, 2022.  Order, No. 7 MM 2022, 2 (Feb. 11, 2022).[2]

The House Republican Legislative Intervenors now respectfully submit this brief in support of the Report.

## LAW AND ANALYSIS

**I.**     **The Commonwealth Court Correctly Recognized that H.B. 2146 Adheres to the Traditional Redistricting Criteria Set Forth in Article II,  Section 16, of the Pennsylvania Constitution, Which this Court Recognized as Neutral Benchmarks to Be Used in Detecting Gerrymanders.**

There is no dispute that H.B. 2146 adheres to the traditional redistricting criteria set forth in Article II, Section 16, of the Pennsylvania Constitution, which this Court indicated were "neutral benchmarks" in determining whether a plan violates the Free and Equal Elections Clause of the Pennsylvania Constitution. *LWV*,

---

[2] Unfortunately, due to the denial of this application, the House Republican Legislative Intervenors will not be able to file a comprehensive brief responding to the various Exceptions anticipated to be filed challenging the Report and its recommendation that this Court adopt H.B. 2146.

178 A.3d at 815-16. H.B. 2146 is comprised of contiguous districts and has at most a plus/minus one-person population deviation between districts. Rep. at 137-39. Moreover, with a Polsby-Popper score of .324, it is reasonably compact and similar to the compactness score of the map adopted by this Court in *LWV II*, 181 A.3d 1083, 1087. *See* Rep. at 141, 211. It also does considerably well on political subdivision splits, splitting only 15 counties, 16 municipalities, and 18 wards. *Id*. at 144. H.B. 2146 splits the fewest municipalities of any plan. *Id*. at 146. As the Governor's expert, Dr. Duchin, opined, "[t]he Congressional districting plan passed by the Pennsylvania House of Representatives (HB - 2146) is population-balanced and contiguous, shows strong respect for political boundaries, and is reasonably compact." Duchin Opening Rep. at 2.

Not all plans even meet these neutral benchmarks. Unlike H.B. 2146, two plans have a population deviation of greater than one person. Both the Carter Plan and the House Democratic Caucus Plan have deviations of two-persons. Rep. at 138. While that might not seem like a big difference, the U.S. Supreme Court has recognized that congressional districts must be mathematically equal in population unless necessary to achieve a legitimate state objective. *Karcher*, 462 U.S. at 730, 740. Neither the *Carter* Petitioners nor the House Democratic Caucus identify a reason for their departure from mathematical equality. That other plans, like H.B. 2146, were able to achieve such equality without sacrificing other redistricting

criteria demonstrates that these plans are unconstitutional. Thus, Judge McCullough appropriately gave them less weight. Rep. at 139.

In addition, many of the plans unnecessarily split the City of Pittsburgh, including the Governor, Senate Democratic Caucus, Draw the Lines, and Ali *amici* plans. None of these parties or *amici* provide an explanation for splitting the state's second largest city. *Id.* at 151-52. The lack of any explanation is telling. As Dr. Barber found, splitting the city may allow a plan to use Pittsburgh's Democratic-leaning population to create two districts in the immediately surrounding area that are likely Democratic-leaning, instead of only one. *Id.* at 149. But achieving this partisan advantage at the behest of traditional redistricting criteria of avoiding city splits violates the principles enunciated by this Court in *LWV.* In addition, the City of Pittsburgh is a community of interest that should be preserved to best respect the interest of its residents. *Id*. at 149-50. Absent explanation, any plan that unnecessarily splits the City of Pittsburgh for partisan gain violates the Free and Equal Elections Clause as stated by this Court in *LWV*. Thus, Judge McCullough appropriately gave plans that split Pittsburgh with no explanation less weight. *Id.* at 195.

In addition, many plans unnecessarily split Bucks County and pair portions of it with Philadelphia to more evenly distribute Democratic voters. But the only evidence before the Court demonstrates that splitting Bucks County unnecessarily

divides a community of interest for partisan gain. *Id.* at 157-60. H.B. 2146 protects this community of interest and does not split Bucks County. Based upon this undisputed evidence, Judge McCullough appropriately gave less weight to maps that split Bucks County. Rep. at 195.

As such, Judge McCullough properly recognized based upon all the evidence submitted, including testimony from experts of proponents of other submitted plans, that "HB 2146 does not contravene, and in fact sufficiently satisfies, the standards of the Free and Equal Elections Clause of the Pennsylvania Constitution, the other criteria discussed by our Supreme Court in *LWV*, and further, reflects a non-partisan tilt in favor of Democrats." Rep. at 191.

## II.   The Commonwealth Court Correctly Recognized that H.B. 2146 Is Fair to the Political Parties.

### A.   Dr. Barber's Simulation Analysis

Dr. Barber conducted a simulation analysis generating 50,000 simulated congressional redistricting plans for Pennsylvania following only the constitutional criteria outlined in this Court's decision in *LWV*. Barber Opening Rep. at 13-14. Notably, this simulation analysis is very similar to the simulation analyses utilized by Dr. Chen and Dr. Pegden and relied upon by this Court in *LWV*. 178 A.3d at 770-75, 776-77.[3] Dr. Barber's simulation, like those of Dr. Chen and Dr. Pegden, use a

---

[3] During the hearing, Dr. Barber's simulation analysis was weakly attacked as unreliable because the algorithm he utilized was not peer reviewed. However, the

set of unbiased alternative maps to compare to a proposed map, like H.B. 2146, and to determine if the proposed map is an outlier from the simulated maps. Barber Opening Rep. at 11; Tr. 515-17. Dr. Barber's simulated plans do not consider partisanship, race,[4] the location of incumbent legislators, or other political factors. They only consider the traditional redistricting criteria of contiguity, compactness, equalizing population, and minimizing political subdivision splits. Barber Opening Rep. at 13-14; Rep. at 87. Thus, if a map, like H.B. 2146, "significantly diverges from the set of simulated maps, it suggests that some other criteria that were not used in drawing the comparison set of maps may have guided the decisions made in drawing the proposed map." *Id*.

Based upon an index of statewide elections from 2012-2020,[5] Dr. Barber predicts that H.B. 2146 will result in nine Democratic-leaning seats and eight

---

algorithm has been validated. Tr. 662:7-25. And, the same algorithm has been used by other experts and relied upon in the recent Ohio redistricting litigation by Dr. Kosuke Imai. Tr. 663:24-664:4. Indeed, Dr. Imai used the same algorithm to provide a report and testimony before the Pennsylvania Legislative Reapportionment Commission who likewise relied upon his analysis. In addition, Judge McCullough, who had the benefit of viewing Dr. Barber's testimony during the hearing, credited his opinions and methodology. Rep. at 165.

[4] Dr. Barber did, however, check the impact of race on his results. He reviewed a subset of his 50,000 simulations that contained two majority-minority districts, and ran a second set of simulations that drew three minority-influence districts, to check the robustness of his results. Barber Opening Rep. 35-37. His results were robust. *Id.*

[5] In *LWV*, Dr. Chen likewise used an index of statewide elections from 2008 and 2010, and this Court found his methodology reliable and utilized it in holding the 2011 congressional plan unconstitutional. *LWV*, 178 A.3d at 772-73, 818-21.

Republican-leaning seats.[6] Barber Opening Rep. at 23; Rep. at 88. Given that the current map adopted by this Court in 2018 has resulted in nine Democratic seats and nine Republican seats for the past two congressional elections, a map predicted to result in nine Democratic seats and eight Republican seats is demonstrably fair.

But Dr. Barber also then compared his prediction for the partisan lean of H.B. 2146 against the 50,000 unbiased simulated plans drawn only using traditional redistricting criteria and with no partisan data. The distribution of predicted seats for his simulated plans is below:



Figure 3: Partisan Composition of HB2146 plan and Simulations

---

[6] When using an index of statewide elections from 2014-2020, Dr. Barber predicts that H.B. 2146 will result in eight Democratic-leaning seats and nine Republican-leaning seats. Barber Opening Rep. at 44 (App'x A). But this simply shows that different elections can lead to different outcomes. A map that sometimes results in eight Republican seats and sometimes nine Republican seats is fair.

Barber Opening Rep. at 23, Fig. 3. The most common outcome (34.9%) is eight Democratic-leaning seats—one less than Dr. Barber predicts for H.B. 2146. *Id*.; Rep. at 165. Nine Democratic-leaning seats results 32.1% of the time—very consistent with H.B. 2146. Barber Opening Rep. at 22. In other words, unlike the conclusions reached by Dr. Chen and Dr. Pegden in *LWV* that the 2011 plan was a partisan outlier when compared to a set of simulated maps, H.B. 2146 falls well within the range of likely outcomes and on the Democratic-favorable side of outcomes in the distribution of simulated plans. Dr. Barber's analysis demonstrates that H.B. 2146 is not a partisan outlier and is fair to both political parties.

Dr. Barber next analyzed how the other plans submitted to the Commonwealth Court compared to the 50,000 simulated plans. Many of the plans (*Carter*, *Gressman*, Governor, Senate D2, CCFD, Citizen Voters, Draw the Lines, Ali) are predicted to result in 10 Democratic-leaning seats. Barber Reb. Rep. at 15, Table 3. However, only 13.7% of the simulations are predicted to result in 10 Democratic-leaning seats—significantly less than the other likely outcomes. Barber Opening Rep. at 23, Fig. 3. The much more common outcomes are either eight or nine Democratic-leaning seats. The House Democratic Caucus Plan is an extreme outlier, predicted to result in 11 Democratic-leaning seats, which occurs in ***none*** of the 50,000 simulated plans. Barber Reb. Report at 15, Table 3.

H.B. 2146 also creates the most competitive districts of any of the plans.  H.B. 2146 creates five districts with a predicted Democratic vote share between .48 and .52. Barber Opening Rep. at 18-21, Fig. 2; Rep. at 89.  No other plan creates as many competitive districts, and most create from zero to three such districts. Rep. at 89; Barber Reb. Rep. at 13. What is more, Dr. Barber's analysis further shows that numerous plans draw these most competitive "up for grab" districts to generate more Democratic-leaning seats, making them much less competitive and safer for Democrats. In analyzing the most competitive seats, Dr. Barber found that, for example, both the *Gressman* and Governor plans "systematically generate districts that are at the most Democratic edge of the simulations in these competitive districts." Barber Reb. Rep. at 17.  He found similar results with many of the other plans. *Id*. at 19, Table 4. Thus, in the districts that are most up for grabs, these plans create districts that are more Democratic-leaning than nearly every one of the simulated plans. *Id*. This does not occur by accident. These plans are optimized to create more favorable Democratic-leaning seats in the districts that are the most competitive. To the contrary, these same middle districts in H.B. 2146 are generally within the middle range of the simulations:



Figure 4: Partisan Composition of HB2146 plan and Simulations

Note: The grey 'clusters' show the range of vote margins for each district, ordered from least Democratic to most Democratic in the 50,000 simulations. The black dot inside of each cluster shows the partisan index for the HB2146 plan. Next to each cluster is the percentile, or relative position of the HB2146 plan within each cluster of simulation results for each district.

Barber Opening Rep. at 26, Fig. 4; Rep. at 89. Thus, H.B. 2146 stands out as the least biased of all the proposals across these most competitive districts. Barber Reb. Rep. at 19.

Finally, during the hearing, several parties made unfounded accusations that Dr. Barber's failure to consider race in his simulations was skewing the partisan results. Not so. Dr. Barber analyzed 1,852 of his 50,000 simulated plans that likewise created two majority-minority districts including one majority-Black district just by

following traditional redistricting criteria. Barber Opening Rep. at 35-36; Rep. at 90-91. He also generated another set of 5,000 simulated plans that had at least three districts that contained 35% or greater non-white voting age population for purposes of comparison. Barber Opening Rep. at 36; Rep. at 9. Even these race-conscious simulations demonstrated that the most common outcome in the simulated plans was eight or nine Democratic-leaning seats, the same as H.B. 2146 or less, and one or two less than the majority of the plans submitted to the Court. Barber Opening Rep. at 35-36; Rep. at 91. In other words, the alleged failure to intentionally draw certain majority-minority districts, for which there is no support in the record, is not the cause of any partisan skew shown by Dr. Barber's analysis.

In sum, Judge McCullough appropriately credited Dr. Barber's methodology and reasoning and found it to be persuasive. Rep. at 209. There is no reason to depart from that finding. Dr. Barber's analysis clearly and unequivocally demonstrates that H.B. 2146 is fair when compared to a set of unbiased maps. Based upon Dr. Barber's analysis, H.B. 2146 is actually the most "fair" map when comparing to a set of unbiased maps. This Court previously relied upon a similar methodology in evaluating the 2011 map's compliance with the Free and Equal Elections Clause and it should do so again here.

### B.   Partisan Fairness Metrics

1.   H.B. 2146's partisan fairness metric scores are good and do not indicate the plan confers an unfair advantage to any political party.

Under numerous partisan fairness metrics, H.B. 2146 is also very fair.  Dr. Barber calculated a mean-median of -.015 and an efficiency gap of -.02 for H.B. 2146, which are close to zero but tilt slightly in favor of Republicans. Barber Opening Rep. at 28, 31. This is consistent with the political geography of Pennsylvania that all experts agree results in a natural tilt in favor of Republicans.

But these raw scores do not tell you much unless you have something to compare them to. They simply indicate a bias in favor of one party or another; they do not tell you the cause of that bias. Thus, Dr. Barber also calculated the mean-median and efficiency gap scores for each of his 50,000 simulated plans and found that H.B. 2146 has a mean-median that is smaller (more favorable to Democrats) than 85% of the simulated plans, and an efficiency gap that is smaller (more favorable to Democrats) than all of the 50,000 simulated plans. Barber Opening Rep. at 28-29, 32, Figs. 5 & 6.  In other words, the bias seen in H.B. 2146 is consistent with the bias seen in plans drawn by a computer with no partisan data, and that simply follow traditional redistricting principles. This proves that the small Republican bias seen in H.B. 2146 is the result of political geography, not any intentional gerrymander. That is in stark contrast with the opinions of Dr. Chen and

Dr. Pegden in *LWV* regarding the 2011 congressional plan—namely, that it was a statistical outlier that could *not* be explained by political geography. *LWV*, *LWV*, 178 A.3d at 772-75, 776-77.

Many of the experts in this case opine that H.B. 2146 is less "fair" than other maps because other maps have partisan fairness metric scores that are closer to zero. Their idea of a "fair" map is one that has partisan fairness metric scores as close to zero as possible. But that is not the correct way of analyzing it. Only Dr. Duchin compares these measures of partisan fairness to any simulation result. *See* Barber Reb. Rep. at 20. As discussed more fully below, her analysis confirms Dr. Barber's conclusions. Without comparing these metrics to a set of unbiased maps one "cannot disentangle any measures of partisan bias from impacts due to the political geography of the state." *Id*.

Dr. Barber calculated the mean-median and efficiency gaps scores for each of the other submitted plans and compared them to the simulated maps. He was the only expert to do such an analysis. He concluded that all of the other plans are ***more*** Democratic-leaning than the non-partisan simulations. *Id*. at 21. In many cases, the other plans are in the 97-100th percentile of the simulations. *Id*. In other words, they are partisan outliers in favor of Democrats. To the contrary, H.B. 2146 is in the middle, Barber Reb. Rep. at 21, demonstrating its fairness when compared to a set of unbiased maps—the same methodology previously adopted by this Court to

evaluate the partisan fairness of the 2011 congressional plan in *LWV*. 178 A.3d at 828 (Baer, J., concurring in part) ("a petitioner may establish that partisan considerations predominated in the drawing of the map by, *inter alia*, introducing expert analysis and testimony that the adopted map is a statistical outlier in contrast with other maps drawn using traditional redistricting criteria . . .").

Dr. Duchin is the only other expert that performed a simulation analysis, though she provided no details on her methodology or the parameters used to generate her "ensemble" of 100,000 maps. Tr. 445:1-23. Still, Dr. Duchin overtly admits, "[r]andom plans tend to exhibit pronounced advantage to Republicans across this full suite of recent elections." Duchin Opening Rep. at 18, Fig. 7. The Governor's plan, and many of the other plans, are drawn to overcome this tendency. *See id*. But in doing so, these plans are partisan outliers in favor of Democrats. Dr. Duchin admitted during cross-examination that the Governor's map was an outlier when compared to her ensemble of maps. Tr. 452:20-25. It had a partisan bias score that was outside all of her ensemble of 100,000 maps. *See* Duchin Opening Rep. at 19, Fig. 8. Dr. Duchin absurdly asserts, however, that an outlier here is good. Tr. 450:10-16. But this Court rejected that notion in *LWV*.

Dr. Duchin's analysis confirms Dr. Barber's work. It confirms that drawing a set of random plans results in plans that have a natural tilt in favor of Republicans. Nobody disputes that H.B. 2146 has a partisan bias consistent with the unbiased

simulated plans. The plans that have lower partisan fairness scores (*i.e.*, closer to zero) based on metrics like mean-median and efficiency gap are drawn to intentionally overcome this unintentional geographic bias, and result in statistical outliers. They demonstrate that partisan considerations dominated the drawing of these maps as opposed to following traditional redistricting criteria, which is why many of them split cities like Pittsburgh, or split Bucks County to pair with parts of Philadelphia. But that is drawing lines to intentionally benefit one political party over another—gerrymandering—and this Court rejected that practice in *LWV*.

> 2. There is no requirement that partisan fairness metrics get to "zero"; the focus is on whether a plan is within a given range.

In addition, Judge McCullough properly rejected an attempt to "get to zero" on these partisan-fairness metrics. These measures do not point to ideals and condemn small variations from them. "One thing all the measures have in common is that they" look to "the *magnitude* of the bias." Barry Burden & Corwin Smidt, *Evaluating Legislative Districts Using Measures of Partisan Bias and Simulations*, SAGE Publishing, Vol. 10 No. 4, at 2 (2020), https://doi.org/10.1177/2158244020981054.

Indeed, no other approach would make sense. Partisan-fairness measures are imperfect estimates that attempt to forecast future election results based on past results, often from different electoral units. Reading significance into small differences is like seeing two news channels make slightly different weather

forecasts—one predicts 30 degrees and the other 32 degrees—and concluding they are dramatically different when they offer practically the same forecast. Partisan fairness measures are like that—imprecise. They do not command adherence to *zero*. They afford a range and signal cause for concern when plans stray outside the range.

a. The Efficiency Gap. The efficiency gap defines all votes for a losing candidate as "wasted" and creates a measurement of the difference in the parties' "wasted" votes divided by the total number of votes. A party benefitting from a partisan gerrymander will have fewer wasted votes than the burdened party. The authors of the efficiency gap metric did not argue for a "zero" efficiency gap. Rather, they proposed a limit of "two seats for congressional plans and 8 percent for state house plans" above which an efficiency gap score would be identified as a "presumptive[]" gerrymander. Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering & the Efficiency Gap*, 82 U. Chi. L. Rev. 831, 837 (2015). The authors included the important caveat that "plans not be expected, based on sensitivity testing, ever to have an efficiency gap of zero over their lifetimes." Stephanopoulos & McGhee, 82 U. Chi. L. Rev. at 837. In fact, they did not recommend that a court adopt a "zero threshold" for several reasons, including that the efficiency gap's calculation varies so much from election to election. *Id.* at 887. In practice, "beginning in 2000, there was a 'very modest Republican advantage,' but the efficiency gaps 'were never very far from zero'" and some 75% of efficiency

gaps in Pennsylvania ranged from -10% to 10%. *LWV*, 178 A.3d at 778 (citations omitted).

b.      The Mean-Median Measure. The mean-median measurement identifies the difference between the median or middle vote share across all districts and the mean or average vote share across all districts. When these numbers diverge significantly, the district vote distribution is skewed in favor of one party and, conversely, when it is close, that distribution is more symmetric. Among those limitations is the reality that it is "sensitive to the outcome in the median district." *Ohio A. Philip Randolph Institute v. Householder*, 373 F. Supp. 3d 978, 1028 (S.D. Ohio 2019) (citation and internal quotation marks omitted), *rev'd on other grounds*, 140 S. Ct. 102. In *LWV,* Dr. Chen found his simulated plans ranged from "a little over 0 percent to the vast majority of them being under 3 percent," a range he explained as "normal." 178 A.3d at 774.

c.      Partisan Symmetry. Another measure of partisan fairness is a partisan symmetry analysis that analyzes a "vote-seat curve." The vote-seat curve is a computer-generated graph that plots the portion of seats a party will win for a certain vote share. The theory behind this metric is that a difference between seats won and vote share—*e.g.*, 70% of the seats won with only 50% of the overall votes—would suggest an asymmetrical partisan skew. This partisan symmetry metric was proposed during the 1990s and was the subject of debate in *League of United Latin American*

*Citizens v. Perry*, 548 U.S 399 (2006) ("*LULAC*"). *See generally* Stephanopoulos & McGhee, 82 U. Chi. L. Rev. at 844-45. Both Justice Stevens, the metric's main proponent, and Justice Kennedy, the "swing" justice, in their respective opinions acknowledged that any departure from zero was not suspect, and the debate—then, as now—is when a deviation exceeds a reasonable range and becomes suspect. *See, e.g.*, *LULAC*, 548 U.S. at 420 (Kennedy, J.) (recognizing the need for a judicially-manageable standard based on partisan symmetry to evaluate "how much partisan dominance is too much"); *id.* at 468 n.9 (Stevens, J., concurring in part) (suggesting either that "deviations of over 10% from symmetry create a prima facie case of an unconstitutional gerrymander" or that "a significant departure from symmetry is one relevant factor in analyzing whether . . . a districting plan is an unconstitutional partisan gerrymander"). One of the principal concerns with the partisan symmetry standard, according to Justice Kennedy, is the measure's resort to hypothetical, or "counterfactual," elections; "the existence or degree of asymmetry may in large part depend on conjecture about where possible vote-switchers will reside." *Id.* at 420 (Kennedy, J.).

      d.    The use of these partisan metrics as a range, rather than an absolute-zero standard, is consistent with the judicial scrutiny applied to other voting laws. For example, when evaluating a challenge to a voting law under the Voting Rights Act, "the size of the burden imposed by a challenged voting rule is highly relevant."

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). "The concepts of 'openness' and 'opportunity' connote the absence of obstacles and burdens that block or seriously hinder voting, and therefore the size of the burden imposed by a voting rule is important." *Id.* (edit marks omitted). The same is true under the so-called *Anderson-Burdick* framework for assessing burdens on the fundamental right to vote under the Equal Protection Clause. *See Daunt v. Benson*, 956 F.3d 396, 406-07 (6th Cir. 2020). "The level of scrutiny under this test 'depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.'" *Id.* at 407 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters," no strict-scrutiny standard applies, and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434). The same is true with the one-person, one-vote standard under the federal Equal Protection Clause for congressional districts. *See Tennant v. Jefferson Co. Comm'n*, 567 U.S. 758, 760 (2012) (recognizing the vote-dilution standard "is a 'flexible' one" that depends, among other things, on "the size of the deviations").

e.     And using partisan fairness measurements as a comparison to a range, rather than as an absolute zero target, is not only consistent with that body of federal case law, but is also consistent with the Court's treatment of these metrics in *LWV*.

In its discussion of the 2011 Plan, the Court viewed Dr. Chen's simulations analysis as "the most compelling evidence." 178 A.3d at 818. In relevant part, the Court credited Dr. Chen's analysis that showed his set of simulated non-partisan plans exhibited pro-Republican mean-median gap ranging between 0 and 4%, whereas the 2011 Plan's score was 5.9%. *Id.* at 820. The difference between the simulation range and the 2011 Plan was treated as an "outlier"—one that could not be explained as "an attempt to account for Pennsylvania's political geography" or other non-partisan reasons. *Id.*

Likewise, the Court credited Dr. Warshaw's testimony that:

similarly detailed how the 2011 Plan *not only preserves the modest natural advantage, or vote efficiency gap, in favor of Republican congressional candidates relative to Republicans' statewide vote share*—which owes to the fact that historically Democratic voters tend to self-sort into metropolitan areas and which he testified, until the 2011 Plan, was "never far from zero" percent—but also creates districts that *increase* that advantage to between 15 to 24% relative to statewide vote share.

*Id.* (emphasis added). Hence, just four years ago, this Court recognized that there is a range of typical or normal values for these metrics attributable to Pennsylvania's political geography—and this Court struck down the 2011 Plan for exhibiting "unfair partisan advantage," *id.* at 821, in part because the 2011 Plan fell outside that range. All of the Court's analysis and its studious comparison of these scores to a non-partisan baseline (*i.e.*, Dr. Chen's simulated plans) would have been a complete waste if the real test was a comparison between the 2011 Plan and zero.

As demonstrated above, the mean-median and efficiency gap scores for H.B. 2146 fall well within the range of reasonableness as opined by Dr. Chen and Dr. Warshaw four years ago. Although scoring can depend on the elections utilized by the expert, no expert found that H.B. 2146 had a mean-median gap greater than three percent, and no expert found that H.B. 2146 had an efficiency gap greater than seven percent. This demonstrates that the modest bias is the result of political geography, not the result of an intention to create a partisan advantage.

### III.   Intentionally Drawing District Lines To "Correct For" A Slight, Natural Republican Tilt In The State's Political Geography Is Gerrymandering.

It is an undisputed fact that the present political geography of Pennsylvania has a slight tilt in favor of Republicans. This tilt is not caused by gerrymandering, but simply because voters who support Democratic candidates are densely clustered in urban areas and voters who support Republican candidates are more widely dispersed in the rural and suburban areas. Petitioners and other parties urged the Commonwealth Court to adopt plans with a strong Democratic skew, which they justify in the name of "correcting" that small tilt. But nothing in Pennsylvania's Free and Equal Elections Clause or *LWV* either compels or permits that outcome—sorting voters based on their politics does *not* "equalize" the power of voters. And sorting voters by their partisan preferences is, by definition, gerrymandering.

**A.** **All experts confirmed that Pennsylvania's political geography has a Republican tilt because Democratic voters are clustered in cities and urban areas, but Republican voters are more evenly distributed in the rest of the state.**

It is an undisputed fact in this case that the natural political geography in Pennsylvania today has a slight Republican tilt due to the geographic concentration of Democratic voters in cities. This Court noted that phenomenon in *LWV*. *See* 178 A.3d at 774 (recognizing a "small" advantage for Republicans). In that case, Dr. Chen attributed the small advantage to "the way that Democratic voters are clustered and Republican voters are a bit more spread out across different geographies of Pennsylvania." Rep. at 162 (quoting *LWV,* 178 A.3d at 774).

As Judge McCullough concluded, the experts in this case confirmed that political geography exists today and results in a small (or slight) tilt. *See, e.g.,* Rep. at 162-64 (citing testimony of Drs. Rodden, DeFord, and Duchin). Most notably, Governor Wolf's expert, Dr. Duchin, created an ensemble of 100,000 simulated redistricting plans for Pennsylvania that were drawn using non-partisan criteria and without partisan data, and she found that her ensemble "tend[ed] to exhibit pronounced advantage to Republicans across this full suite of recent elections." *Id.* at 164 (quoting Duchin Opening Rep. at 18).

**B.** **The Commonwealth Court correctly concluded that deliberate efforts to "correct" for a naturally occurring political tilt in a plan is a subspecies of partisan gerrymandering that this Court found violated the Free and Equal Elections Clause.**

This Court recognized in *LWV* the possibility that technological advances "can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these neutral 'floor' criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a congressional representative." 178 A.3d at 817. Petitioners and certain other parties in this case have, using advanced computational tools, presented the Commonwealth Court—and now this Court—with plans that do just that. They asked the Commonwealth Court to adopt plans that are intended to "overcome" the slight tilt in favor of Republicans found in Pennsylvania's political geography, and have invoked *LWV* to do so. But nothing in Article I, Section 5, gives Petitioners a right to a rigged plan that "overcomes" a neutral and small pro-Republican tilt based on the state's political geography. Their view, in fact, vaults political party interests over those of voters' and turns over 200 years of Pennsylvania history and precedent on its head. Judge McCullough rightly rejected this theory, calling it a "subspecies of unfair partisan gerrymandering," Rep. at 197, and so should this Court.

Pennsylvania elects its Representatives to Congress in single-member districts, a geographic-based system of representation. Respecting the integrity of counties and political subdivisions has *always* been paramount to the

Commonwealth's redistricting policy. Since 1790, standards grounded in "neutral criteria" governed the crafting of General Assembly districts. *LWV*, 178 A.3d at 814. "These standards place the greatest emphasis on creating representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs, and accord equal weight to the votes of residents in each of the various districts in determining the ultimate composition of the state legislature." *Id.* The prevention of the "dilution of an individual's vote was of paramount concern" to the framers of the Pennsylvania Constitution, and they "considered maintaining the geographical contiguity of political subdivisions . . . to afford important safeguards against that pernicious prospect." *Id.* at 815.

Balancing the expectation of political parties has not been part of the equation. As this Court found, "[t]he constitutional reapportionment scheme [of Article II, Section 16] does not impose a requirement of balancing the representation of the political parties; it does not protect the 'integrity' of any party's political expectations. Rather, the construct speaks of the 'integrity' of political subdivisions, which bespeaks history and geography, not party affiliation or expectations." *Holt v. 2011 Legislative Reapportionment Comm'n*, 67 A.3d 1211, 1235-36 (Pa. 2013) ("*Holt II*"). That makes sense: redistricting law focuses on the rights of *voters*, not *parties*.

In *LWV*, this Court again recognized the primacy of using *geography*—and not *political preferences*—as the basis for drawing fair representational districts. By focusing on the neutral criteria, a map-drawer "maintains the strength of an individual's vote in electing a congressional representative." 178 A.3d at 816. The Court went on: "[w]hen an individual is grouped with other members of his or her community in a congressional district for purposes of voting, the commonality of the interests shared with other voters in the community increases the ability of the individual to elect a congressional representative for the district who reflects his or her personal preferences." *Id.* Importantly, "[t]his approach inures to no political party's benefit or detriment," but "simply achieves the constitutional goal of fair and equal elections for all of our Commonwealth's voters." *Id.*

But if this Court were to select a plan intended to "overcome" any slight, naturally occurring Republican-leaning tilt in the state's political geography, the Court would thereby place its thumb on the scale for Democrats—an approach that will "inure[]" to the Democratic Party's benefit.

Petitioners believe this thumb-on-the-scale is defensible under *LWV* based on dicta in that case describing the intent of Article I, Section 5, as ensuring that each voter's "power . . . in the selection of representatives be equalized to the greatest degree possible with other Pennsylvania citizens." 178 A.3d at 817. If today's political geography happens to offer a slight advantage to Republicans, to

Petitioners, it is essential to jimmy the district lines until that political geography is "overcome" and Democrats get the number of districts they desire. But when the Court spoke of "equalizing" voting power, it was doing so in the framework of hundreds of years of precedent that spoke of "equality" of representation in terms grounded in the number of people in each district and respecting the integrity of the boundaries of the counties and municipalities that form a major part of Pennsylvanians' daily lives.

"Political geography" means the will of the voters as expressed in their own communities. Petitioners and other parties treat the voting patterns of Pennsylvania's communities as an obstacle to be "overcome" through clever redistricting using computer algorithms and mathematical metrics. But "overcoming" a "tilt" in the state's "political geography" is not an innocuous act, akin to the old barkeeper's trick of putting sugar packets under an unlevel table leg to prevent the table from tilting. It requires conscious state action to treat the voters of urban areas (that are heavily Democratic) differently than voters in suburban areas (that are politically mixed), and both of those groups differently than rural areas (that are Republican-leaning), to convey a partisan advantage on Democrats. As *Carter* Petitioners' expert, Dr. Rodden, explained in a 2019 book, to overcome this natural tilt, "Democrats would need a redistricting process that intentionally carved up large cities like pizza slices or spokes of a wheel, so as to combine some very Democratic urban areas with some

Republican exurbs in an effort to spread Democrats more efficiently across districts." Rep. at 162-63 (citations omitted); *see also id.* at 177 (quoting public comments of Dr. David Wasserman that the process requires "conscious pro-Dem[ocrat] mapping choices" to give Democrats an advantage). Rather than do the work of persuading voters to elect their preferred candidates to Congress, Petitioners ask this Court to rig the map to spare them the effort. That is the very definition of gerrymandering, and it violates the rights of voters as enshrined in the Free and Equal Elections Clause.

Perhaps this point is illustrated most clearly with Governor Wolf's proposed plan and evidentiary presentation. His expert, Dr. Duchin, praised the plans submitted by the Governor, the *Carter* Petitioners, and the House Democratic Caucus as "dominating the field" on her partisan-fairness metrics. Duchin Reb. Rep. at 5. But the Governor's plan saws the City of Pittsburgh practically in half, placing 176,425 people into one district and 126,546 people into another. Barber Reb. Rep. at 10, Tbl. 2.[7] Governor Wolf's plan also splits Bucks County unnecessarily. Rep. at

---

[7] This analysis illustrates the danger in just looking at metrics like the number of split cities—doing so can mask important differences between plans. As Dr. Barber explained in his study of the various proposed plans' municipal splits, "aside from necessary divisions of Philadelphia and unnecessary divisions of Pittsburgh [in some plans], . . . all of the remaining municipal splits are of very small municipalities and townships across the state that shift only a small population." Barber Reb. Rep. at 9. Splitting a small municipality to move a few thousand people into another district (*e.g.*, to achieve population equality) is one thing; moving 96,829, 126,546, or

160. Although the House Democratic Caucus plan draws Pittsburgh into a single district, it does so by combining it with northern areas in a shape the Commonwealth Court described as a "Freddy-Krueger like claw." *Id.* at 203. Yet Dr. Duchin defended the Governor's plan—despite her own analysis revealing it to be an "outlier" on partisan metrics—by saying it went the farthest to "overcome" the natural geographic "tilt." Duchin Opening Rep. 2. Although Dr. Duchin may view these plans as "dominating the field" in certain mathematical metrics, Duchin Reb. Rep. at 5, the Pennsylvania Constitution and this Court's precedents would say otherwise. In fact, they are all partisan outliers that draw *ten* Democratic-leaning districts (and eleven, in the case of the House Democratic Caucus plan).

But while several of these plans might "dominate the field" in terms of maximizing the number of Democrat-leaning seats, they do so at representational cost to the voters. As Dr. Naughton testified at trial with respect to Pittsburgh, keeping the City together "unites people's interests for resources" and "gives them a [series] of common interests." Rep. at 96 (quoting Tr. 713.) After all, a Member of Congress represents *all* the constituents of the Member's district—not only those of the Member's party. Splitting Pittsburgh up might serve national Democratic interests by eking out one more Democratic seat, but dividing Pittsburgh's voters

---

140,884 Pittsburgh residents into another district is another. *See id.* at 10. Yet the metrics count each as "one" split even though the latter has a much larger impact.

into two districts "dilutes their advocacy" and reduces those voters' power and influence in Washington, D.C. *Id.*

In addition to these other problems, trying to rig a redistricting plan to "correct" for the state's political geography presumes political geography is static— that every blue and red dot on today's map is no more likely to move than the Allegheny Mountains. That assumption is wrong: political geography is dynamic and unpredictable. As Dr. Rodden explained, a "pronounced trend in Pennsylvania" over the past decade was that "places that are gaining population are not only more Democratic to begin with, but are becoming *more* Democratic as they gain population" and that places losing population are becoming more Republican. Rodden Opening Rep. 10 (emphasis in original). Hence, places "like Lancaster and Cumberland, started out with strong Republican majorities, meaning that they are becoming more competitive over time as they gain population." *Id.* After discussing Dr. Rodden's analysis and other data about Pennsylvania voting patterns over the past decade, Dr. Barber concluded:

> The upshot of these patterns is that if a map drawer is using contemporary partisan trends to guide their decision-making, we have no way of knowing if the geographic patterns they are trying to "correct" for will 1.) remain the same, 2.) perhaps become more pronounced, or 3.) reverse in direction. It very well could be the case that over the next 10 years Democratic voters start to win more in suburban and rural areas while Republicans begin to make inroads in the cities. In fact, recent research shows that the issues that divide the parties are shifting from economic to social and educational-based,

43

which could easily lead to a shift in the partisan coalitions that looks very different than it does today.

Barber Reb. Rep. 6-7.

At bottom, our nation elects Representatives to Congress using single-member districts—a fundamentally geographic-based system of representation. Our nation does so even though other electoral systems are available that are less tied to geography, like the party-list proportional representation system used in 94 countries. *See* Peter Buisseret et al., *Party Nomination Strategies in List Proportional Representation Systems*, Am. J. Pol'y Sci. (Jan. 14, 2022), https://doi.org/10.1111/ajps.12691, at 1 n.1. And that choice of system matters, and it must be respected—even if the current spatial distribution of voters produces a small advantage for Republicans.

**IV.**   **H.B. 2146 Is the Only Plan Submitted to the Commonwealth Court That Went Through Any Meaningful Public Process.**

House Bill 2146 not only was legislation passed by both houses of the General Assembly, but it went through an open, public, and transparent process. It was drafted studiously over the course of months, with 11 public hearings, the work of non-partisan activists, and extensive public comments. This Court should not adopt the other proposals drafted under the cover of darkness with little or no public scrutiny.

A. **The General Assembly undertook a transparent, deliberative, and meaningful redistricting process that led to the passage of H.B. 2146.**

As described *supra*, H.B. 2146 went through a full transparent, deliberative, and meaningful process that ultimately led to its passage by both chambers of the General Assembly. The House began by soliciting proposals, and after evaluating the 19 proposals, chose one drafted by a well-known nonpartisan citizen, Amanda Holt. She drew this map without political influence, met constitutional requirements, and it limited unnecessary splits of communities, while creating compact, contiguous districts. Grove Letter; Ex. 1 to Schaller Aff. The legislature did not stop its request for input there, but again solicited the public's input, this time in the form of public comments. *See* Grove Letter; Rep. at 48. After considering each of the 399 comments they received, the legislature incorporated many of these suggestions to increase compactness and preserve certain communities of interest. *Id.* The public had four weeks to review and comment on every part of this plan. *See* Grove Letter. The legislature had the opportunity to review and amend the bill, and then passed it out of the House on January 12, 2021. The Senate then reviewed and considered the map for twelve days before ultimately passing it as well.

This means that H.B. 2146 was initiated with an open and transparent process. The legislature not only solicited additional input from citizens themselves and from the people's elected representatives in both the House and the Senate, but adjusted

the map in response to Pennsylvanian's concerns and comments. This orderly legislative process allowed appropriate consideration of various parties' concerns and ultimately, created a map that had gone through the entire legislative process with no short cuts or back-room deals. Even the Governor's expert admitted that this process led to a map which fulfilled traditional criteria for evaluating redistricting maps, because H.B. 2146 "is population-balanced and contiguous, shows strong respect for political boundaries, and is reasonably compact." Duchin Opening Rep. at 2.

The voice and will of the people of a state is expressed through their elected representatives, so the actions of the legislature are devices of "monumental import, and should be honored and respected by all means necessary." Rep. at 214. The legislative branch, in this case, the General Assembly, is uniquely equipped to evaluate redistricting maps because of "the knowledge which its members from every part of the state bring to its deliberations, its techniques for gathering information, and other factors inherent in the legislative process." *Butcher v. Bloom*, 203 A.2d 556, 569 (Pa. 1964). The legislature is able to "weigh[] and evaluate[]" key "criteria and standards" and "exercise its political judgment" in a way that no other branch of government can. *Perry v. Perez*, 132 S. Ct. 934, 941 (2012). The legislature's unique position and tools to evaluate necessary criteria for redistricting while expressing the will of the people is why the General Assembly must be "the

organ of government with the primary responsibility for the task of apportionment."

*Butcher v. Bloom*, 216 A.2d 457, 458 (Pa. 1966).

**B.    The Governor's plan was only published Nine Days before his submission was due in Court, and much of it is shrouded in secrecy.**

Rather than work with the General Assembly to agree on a congressional redistricting plan, or provide any meaningful and valid feedback on how H.B. 2146 was unconstitutional, the Governor simply created his own map.  But in contrast to H.B. 2146, the Governor's plan evaded any meaningful review or public input. To begin with, the origins of the Governor's plan are a mystery. The Governor's own expert, Dr. Duchin, does not know who drew the Governor's plan. Tr. 436:24-437:8. There is no information regarding the process or considerations used by the architect of the Governor's plan. Tr. 437:9-13. And the Governor has never shared that information with the public. Tr. 437:14-18. The governor then purposefully avoided any meaningful public review or consideration of his map, by introducing his map on January 15, 2022, less than two weeks before this trial began (and nearly forty days after the legislature introduced H.B. 2146). The governor released his own map only *after* the Commonwealth Court's January 14, 2022 order requiring the intervenors to submit maps in this case, raising the question of whether he would have shared this map for public view *at all* if not required to do so by the court.

The Governor did not approach this redistricting process with the legislature in good faith. Although redistricting is inherently a legislative activity, as discussed

above, the Governor did not communicate at all with the legislature while drafting this plan. *See* Grove Letter. The House State Government Committee released detailed information regarding the choices it made to update H.B. 2146's maps, but the Governor's staff either did not reach out to Rep. Grove for this information or ignored it when it was provided on the "paredistricting.com" website. *Id.* at 3, 8-9. The Governor argued that his only ability to influence the maps was a veto, but that was only because he refused to participate in any earlier discussions. *Id.* A decision that permits the Governor to opt out of the legislative redistricting process, and then adopts his eleventh-hour plan (suited to his own interests) would create a perverse incentive for the executive branch to avoid the legislative process and responsibilities required of it by both state and federal law.[8]

C.   **The House and Senate Democratic Caucuses never proposed their plans during the legislative process.**

Similarly, the House and Senate Democratic Caucuses have drafted plans from whole cloth without any input from the legislative process or from the People of Pennsylvania. These maps were never proposed during the lengthy legislative

---

[8] During closing argument, the Senate Democratic Caucus argued that the General Assembly's plan should not receive any special consideration because, counsel argued, it would create a perverse incentive for future legislators to refuse to compromise and then demand that the Court blindly defer to their plan. *See* Tr. 1027-28. But that is not what occurred here. It was Governor Wolf and the Democratic caucuses in the General Assembly that did not meaningfully engage in the legislative process—apparently in the hope that this Court would simply rubber-stamp one of their plans.

process, and none of the members of these caucuses proposed any of these maps as amendments to H.B. 2146. *See* Bill History, Republican Legislative Intervenors' Opening Br., Ex. E ("Bill History"). This Court should reject the attempt by a handful of officials to circumvent the legislative process and flood the court with maps that could not garner support in the duly-elected General Assembly.

> ### D.   The *Gressman* plan was drawn in secret by a computer "optimization" algorithm.

The *Gressman* plan is the most mysterious of all. Using a "computer algorithmic technique" to draw its districts, Tr. 276:21-22, the *Gressman* plan has no input from anyone besides the *Gressman* plaintiffs. The expert testifying in support of that plan did not know what technique was used—he only knew that it was an algorithm. Tr. 276:19-277:4. And he did not disagree that the "computational techniques" could have included optimizing for partisan fairness. Tr. 278:13-23. This is yet another plan that had no benefit of the legislative process or input from the public.

None of the above plans acknowledge the Legislature's "primary role in redistricting." *LWV*, 178 A.3d at 822. Moreover, they may be motivated by impermissible political criteria, and they involved minimal or no input from the public. Only H.B. 2146 can trace its origins, explain the traditional redistricting criteria and constitutional requirements it achieves, and show its implementation of broad public comment and support.

**V.    The Commonwealth Court Properly Rejected the "Least Change" Approach Advocated by the Carter Petitioners.**

The *Carter* Petitioners argued below that their proposed plan is superior because it "takes a least-change approach" relative to the 2018 plan.  Carter Post-Trial Br. at 22. Consistent with this Court's existing case law, Judge McCullough correctly held that "using least-change metrics here is of limited utility because an 18-district plan is being replaced by a 17-district plan," and that there is no legal requirement that the Court defer to its own prior redistricting choices in such circumstances. Rep. at 184, 186. Those conclusions should be affirmed.

First, when a version of the "least changes" argument was pressed in legislative reapportionment litigation a decade ago, the Supreme Court rejected it and reiterated that "the governing 'law' for redistricting" is "applicable constitutional and statutory provisions and on-point decisional law," not "the specifics of prior reapportionment plans 'approved' by the Court." *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 735 (Pa. 2012) ("*Holt I*").

Then, in *Holt II*, the Court again criticized arguments about "the supposed constitutionalization of prior redistricting plans" and emphasized the "limited constitutional relevance" of maintaining the outcomes of previous plans. *Holt II*, 67 A.3d at 1236.  When a similar argument was again raised in 2018 in *LWV II*, the Court again rejected it and reiterated that "the preservation of prior district lines" is a consideration that is "wholly subordinate to the neutral criteria of compactness,

50

contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *LWV*, 178 A.3d at 817.

Aside from the fact that their argument flies in the face of prior precedent, *Carter* Petitioners' contention that making the "least changes" from the previous map is somehow a virtue is not sound.  As the Supreme Court explained when rejecting the argument in *Holt I*, prioritizing similarity to a previous plan is not a traditional redistricting principle.  That is because "prior 'approvals' of plans do not establish that those plans survived . . . all possible challenges.  Instead, in the prior redistricting appeals, this Court merely passed upon the specific challenges that were made." *Holt I*, 38 A.3d at 735-36.

The cases that the *Carter* Petitioners have identified on this point are inapplicable.  In each case, unlike Pennsylvania in this cycle, the state "ha[d] not lost or gained any congressional seats," *Johnson v. Wis. Elections Comm'n,* 2021 WI 87, ¶ 15, 399 Wis. 2d 623, 637 (Nov. 30, 2021); *see also LaComb v. Growe*, 541 F. Supp. 145, 154 (D. Minn. 1982), *aff'd sub nom. Orwoll v. LaComb*, 456 U.S. 966, 102 S. Ct. 2228, 72 L. Ed. 2d 841 (1982) (eight district plan was first enacted after the 1960 census, and revised eight district plan was challenged after the 1970 census) (Alsop, J. dissenting); *Hippert v. Ritchie*, 813 N.W.2d 374, 381 (Minn. 2012) (adjusting state house and senate districts).  None of the courts in those cases grappled with a map where the number of districts itself had to change.  Instead, they

recognized the fundamental principle that "[n]otwithstanding a history of political involvement in redistricting . . . it remains the legislatures' duty," *Johnson*, 2021 WL 87 at ¶ 19 (citations omitted).  In other words, the goal of a "least change" approach is to respect the most recent choices of the *legislature*—not some imagined fidelity to calcified district lines.  *See LWV*, 178 A.3d at 822 (the legislature has the "primary role in districting").

Moreover, the *Carter* Petitioners are simply wrong when they argue that the 2018 remedial plan is the "benchmark" for any plan evaluated by this Court. Courts have recognized that "preserving the cores" of prior districts may be a "legitimate *state* objective[]" in redistricting, *Mellow*, 607 A.2d at 207-08 (emphasis added), but no cases cited by the *Carter* Petitioners require *courts* to follow this objective as a constitutional directive. *See Karcher*, 462 U.S. at 740 (recognizing that "[a]ny number of consistently applied legislative policies might justify some variance . . . [including] preserving the cores of prior districts"); *see also Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997) (requiring any judicial changes to a legislative plan to be consistent with the legislature's "redistricting principles"); *Stone v. Hechler*, 782 F. Supp. 1116, 1126 (N.D. W.Va. 1992) (deferring to legislature's definition of what "preserving the core" meant).

In addition to lacking a sound basis in the case law, a constitutional enshrinement of the "least change" approach would undermine the integrity of the

redistricting process. Evaluating redistricting plans against the traditional criteria—instead of similarity to previous plans—ensures that the new plan is scrutinized in each and every redistricting cycle against the applicable constitutional and statutory standards, and with reference to population and other changes. By contrast, the *Carter* Petitioners' position would ensure that choices from prior plans would be "frozen" into future plans and tie the hands of future legislators, an outcome that Judge McCullough deemed "deeply troubl[ing]." Rep. at 188.

The record evidence and testimony further reinforce the weakness of the *Carter* Petitioners' "least change" argument. As the Report noted, the *Carter* Petitioners' expert, Dr. Rodden, "admitted in his report and testimony that, in the past 10 years, there has been dramatic population shifts in Pennsylvania and fluctuating levels of density in specific areas throughout the Commonwealth, which presumably would have resulted in differing communities of interest." Rep. at 156-57. Even worse, by the admission of the *Carter* Petitioners' own expert, their putatively "least-change approach" takes the current 9-9 partisan split and produces a 10-7 pro-Democrat map. Rodden Reb. Rep. at 9, Table 5.

For these reasons, comparing the prior map against any proposed map is not a viable or virtuous principle for redistricting, as this Court has recognized every time the argument surfaces. *Carter* Petitioners' arguments touting the similarity of their plan to the previous map should fare no better than when this same contention

was rejected in previous redistricting cycles. This Court should reject them once more, in line with existing precedent.

## **CONCLUSION**

For all these reasons, plus those set forth in the House Republican Legislative Intervenors' briefs before the Commonwealth Court (that are incorporated herein by this reference) and that will be set forth in oral argument, House Republican Legislative Intervenors respectfully request that the Court adopt Judge McCullough's Special Master's Report in its entirety.

Dated: February 14, 2022

Respectfully submitted,

*/s/ Jeffry Duffy*

**BAKER & HOSTETLER LLP**
Jeffry Duffy (PA No. 081670)
BNY Mellon Center
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 568-3100 / Fax (215) 568-3439
jduffy@bakerlaw.com

Patrick T. Lewis (OH No. 0078314)*
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200 / Fax (216) 696-0740
plewis@bakerlaw.com

Robert J. Tucker (OH No. 0082205)*
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
(614) 462-2680 / Fax (614) 462-2616
rtucker@bakerlaw.com

James G. Mann (PA 85810)
jmann@pahousegop.com
Pennsylvania House of Representatives
Republican Caucus
Main Capitol Building, Suite B-6
P.O. Box 202228
Harrisburg, PA  17120-2228
Telephone: 717.783.1510

*\* Admitted Pro Hac Vice, Cmwlth Ct.
Nos. 464 MD 2021, 465 MD 2021*

*Counsel for Intervenors Bryan Cutler,
Speaker of the Pennsylvania House of
Representatives, and Kerry Benninghoff,
Majority Leader of the Pennsylvania
House of Representatives*

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Jeffry Duffy*
Jeffry Duffy (PA No. 081670)