Received 2/14/2022 8:46:46 PM Supreme Court Middle District

Filed 2/14/2022 8:46:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL ANN CARTER, et al., | : | No. 7 MM 2022 |
| | : | |
| Petitioners, | : | |
| v. | : | |
| | : | |
| LEIGH M. CHAPMAN, et al.,, | : | |
| | : | |
| Respondents. | : | |
| *** | : | |
| PHILIP T. GRESSMAN, et al., | : | |
| | : | |
| Petitioners, | : | |
| v. | : | |
| | : | |
| LEIGH M. CHAPMAN, et al., | : | |
| | : | |
| Respondents. | : | |

## EXCEPTIONS TO SPECIAL MASTER'S REPORT BY GUY RESCHENTHALER, JEFFREY VARNER, RYAN COSTELLO, TOM MARINO, AND BUD SHUSTER

Per paragraph 5 of the Court's Order of February 2, 2022,

Guy Reschenthaler, Jeffrey Varner, Ryan Costello, Tom Marino, and

Bud Shuster (collectively, "the Congressional Intervenors") respectfully

submit the following exceptions to the Report Containing Proposed

Findings of Fact and Conclusion of Law Supporting Recommendation of

Congressional Redistricting Plan and Proposed Revision to the 2022

Election Calendar/Schedule (hereafter, "the Report") issued on February 7, 2022:

1.    The Congressional Intervenors take exception to, and this Court should decline to adopt, the Report's recommendation to adopt HB 2146 as the congressional plan for Pennsylvania; instead, the Court should adopt Reschenthaler 1 or 2 as the congressional plan for Pennsylvania.

2.    The Congressional Intervenors take exception to, and this Court should decline to adopt, the following components of the Report's recommendations:

> a.    The Report's proposed finding that the Carter plan splits only 13 Counties;
>
> b.    The Report's proposed finding that only one plan violates the equal population requirement;
>
> c.    The Report's proposed finding that all of the proposed plans comply with the Voting Rights Act and the Fourteenth Amendment on the present record;
>
> d.    The Report's misinterpretation of the prohibition against splitting political subdivisions unless "absolutely necessary"; and
>
> e.    The other flaws discussed in the accompanying brief, which addresses these exceptions (and related errors) more fully.

WHEREFORE, the Congressional Intervenors respectfully request that the Court select Reschenthaler 1 or Reschenthaler 2 as the congressional redistricting plan for Pennsylvania.

Respectfully submitted,

Dated: February 14, 2022

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samatha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
jvoss@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Attorneys for Congressional Intervenors*

Received 2/14/2022 8:46:46 PM Supreme Court Middle District

Filed 2/14/2022 8:46:46 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

No. 7 MM 2022

CAROL ANN CARTER, ET AL.

v.

LEIGH M. CHAPMAN, ET AL.

\*\*\*

PHILIP T. GRESSMAN, ET AL.

v.

LEIGH M. CHAPMAN, ET AL.

**BRIEF IN SUPPORT OF SPECIAL MASTER'S REPORT AND
EXCEPTIONS TO SPECIAL MASTER'S REPORT
BY GUY RESCHENTHALER, JEFFREY VARNER,
TOM MARINO, RYAN COSTELLO, AND BUD SHUSTER**

Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000 | Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
jvoss@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com
*Attorneys for Congressional Intervenors*

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT .........1

II.  BACKGROUND ...................................................................3

   A. Constitutional Factors for a Congressional Plan ...........................3

      1. Equal Population ...........................................................3

      2. Compactness...................................................................3

      3. Contiguity ......................................................................5

      4. Splits of Counties, Municipalities, and Wards ...........................5

      5. Communities of Interest.................................................7

      6. Partisan Fairness and Pennsylvania Geography ......................9

         (a)  Mean-Median Scores .........................................9

         (b)  Other Methods of Evaluating Partisan Fairness—Seat Counts.............................................................11

         (c)  Political Geography .......................................12

   B. Voting Rights Act ......................................................15

   C. The "Best Map".............................................................16

   D. Snapshot of the Reschenthaler Maps ...........................17

III.  ARGUMENT IN SUPPORT OF SPECIAL MASTER'S REPORT 20

   A. Inasmuch as the Special Master's factual findings are supported by record, this Court should adopt them. ......................................20

   B. This Court should adopt in full the Special Master's analysis of compactness and contiguity, communities of interest, partisan "fairness," and the "least change" approach. .................................24

1. The Special Master properly concluded that all of the proposed redistricting plans are sufficiently compact and contiguous....24

2. The Special Master's factual and legal recommendations relative to communities of interest should be adopted............28

3. The Special Master's assessment of partisanship in the redistricting plans should be adopted......................................31

4. Because the "least change" approach does not afford sufficient attention to the neutral criteria under the Free and Equal Elections Clause, it should be rejected. ....................................35

5. This Court should adopt the Special Master's recommendation that a redistricting plan based on prisoner-adjusted data does not comport with the constitutional requirements for equal population. ................................................................................37

IV.   ARGUMENT IN SUPPORT OF EXCEPTIONS TO SPECIAL MASTER'S REPORT........................................................................40

A. The Special Masters' Report errs in concluding the Carter map has 13 county splits instead of 14 county splits. ..........................40

B. The Special Master's Report errs in concluding that all of the plans satisfy the equal population requirement of the United States Constitution. ......................................................................42

C. The Special Master's Report errs in its analysis of the interplay between Fourteenth Amendment's prohibition against racial gerrymandering and the Voting Rights Act. ................................48

1. The VRA and the Fourteenth Amendment................................49

2. The proposed plans of Governor Wolf, the Gressman Petitioners, and the Senate Democrats. ....................................50

D. The Special Master's Report errs in the interpretation of the prohibition against splits of counties and municipalities unless "absolutely necessary."................................................................54

iii

1.  Article II, Section 16. .................................................... 55

2.  Wards. .......................................................................... 59

E.  The Special Master erred in recommending HB 2146 over
Reschenthaler 1 or 2. .................................................... 61

V.   CONCLUSION ................................................................. 66

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) .....................................................50

*Abrams v. Johnson*, 521 U.S. 74 (1997) ...................................................45

*Annenberg v. Com.*, 757 A.2d 338 (Pa. 2000) ....................................21, 23

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ...........................................49, 51

*Com. v. Banks*, 29 A.3d 1129 (Pa. 2011) ...........................................21, 22

*Com. v. Banks*, 989 A.2d 1 (Pa. 2009) .....................................................22

*Com. v. McGarrell*, 87 A.3d 809 (Pa. 2014) ............................................21

*Davison v. City of Cranston*, 837 F.3d 135 (1st Cir. 2016) ...............38, 39

*Evenwel v. Abbott*, 578 U.S. 54 (2016) .............................................37, 43

*Holt v. 2011 Legislative Reapportionment Com'n*, 38 A.3d 711 (Pa. 2012) ......................................................................................................30

*Holt v. 2011 Legislative Reapportionment Com'n*, 67 A.3d 1211 (Pa. 2013) .................................................................................................34, 36

*In re Breyer's Est.*, 37 A.2d 589 (Pa. 1944) ............................................23

*In re J.V.R.*, No. 81 MM 2008 (Pa. Mar. 26, 2009) ................................21

*In re Off. of Philadelphia Dist. Att'y*, 244 A.3d 319 (Pa. 2020) .........21, 22

*In re Thirty-Fifth Statewide Investigating Grand Jury*, 112 A.3d 624 (Pa. 2015) ..............................................................................................21

*Johnson v. Wisconsin Elections Com'n*, 967 N.W.2d 469 (Wisc. 2021) .29, 34

*Karcher v. Daggett*, 462 U.S. 725 (1983) ...............................36, 44, 45, 46

v

*League of Women Voters v. Com.*, 178 A.3d 737 (Pa. 2018)............ passim

*League of Women Voters v. Com.*, 181 A.3d 1083 (Pa. 2018)................. 40

*M'Culloch v. State*, 17 U.S. 316 (1819) ............................................. 58, 59

*Mahan v. Howell*, 410 U.S. 315 (1973) ...................................................... 43

*Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992).......................................... 31

*Navajo Nation v. Arizona Indep. Redistricting Com'n*, 230 F. Supp. 2d 998 (D. Ariz. 2002)................................................................................. 45

*Reynolds v. Sims*, 377 U.S. 533 (1964)..................................................... 37

*Shaw v. Reno*, 509 U.S. 630 (1993) .................................................... 53, 54

*Tennant v. Jefferson Cty. Com'n,* 567 U.S. 758 (2012) .................... 44, 47

*Thornburg v. Gingles*, 478 U.S. 30 (1986)......................................... 49, 50

*Vieth v. Pennsylvania*, 195 F. Supp. 2d 672 (M.D. Pa. 2002) ................ 44

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................. 44

## Statutes

25 Pa.C.S. § 1302................................................................................... 38

52 U.S.C. §§ 10301, *et seq.*.................................................................... 48

53 Pa.C.S. § 8801 *et seq.*........................................................................ 60

72 P.S. § 5020-301 ................................................................................. 60

72 P.S. §§ 5020-102 ............................................................................... 60

Cal. Elec. Code § 21003 ......................................................................... 39

Colo Rev. Stat. § 2-2-902 ....................................................................... 39

Md. Elec. Law § 8-701 ................................................................ 39

N.J.S.A. 52:4-1.1 – 1.6 .............................................................. 39

Nev. Rev. Stat. § 360.288 .......................................................... 39

Va. Code Ann. § 24.2-304.04 ..................................................... 39

Wash. Rev. Code § 44.05.140 .................................................... 39

## Constitutional Provisions

Pa. Const. art. II, § 16 ..........................................................55, 56

Pa. Const. of 1776, art. I, § VII .............................................. 29

Pa. Const. of 1874, art. V, § 11 .............................................. 60

U.S. Const. art I, § 10 .............................................................. 58

U.S. Const. art. I, § 2 ....................................................... 43, 45, 47

## Other Authorities

Charles R. Buckalew, *An Examination of the Constitution of Pennsylvania. Exhibiting The Derivation and History of Its Several Provisions* (1883) ............................................................... 27

Daniel D. Polsby & Robert D. Popper, *The Third Criterion: Compactness As A Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301 (1991) ................................................. 26

*Debates of the Convention to Amend the Constitution of Pennsylvania*, Vol. I (1967) ......................................................................... 57

*Debates of the Convention to Amend the Constitution of Pennsylvania*, Vol. II (1968) ........................................................................ 57

Micah Altman, *The Computational Complexity of Automated Redistricting: Is Automation the Answer?*, 23 Rutgers Computer & Tech. L.J. 81 (1997) .......................................................... 26

vii

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

As developed in the ensuing pages, the Congressional Intervenors are in full accord with many aspect of the Special Master's recommendations. Indeed, in terms of the proposed findings of fact, the Special Master's Report ("SMR") ably and fairly relays the content and nature of the facts adduced in the proceedings and, with the exception of a few minor miscalculations that are undoubtedly the product of the expedited nature of these proceedings, its factual rendition is free of error. Similarly, a substantial portion of the Special Master's proposed legal conclusions are well reasoned and should be adopted. In particular, the SMR's recommendations are cogent and well-grounded with regard to compactness and contiguity, the importance of communities of interest, the role of partisan considerations in the present matter, the "least change" approach to redistricting advocated by the Carter Petitions, and the use of prisoner-adjusted census data.

Nevertheless, some errors warrant closer scrutiny from this Court. *First*, the Special Master's proposed finding that the Carter Plan splits only 13 counties, rather than 14, is not supported by the record and is contrary to law. *Second*, the Special Master's assessment of the equal

population requirement under the United States Constitution is legally flawed. *Third*, the Special Master misconstrued the United States Constitution's prohibition against racial gerrymandering, as applied to the present action. *Fourth*, the Special Master misinterpreted the prohibition against splitting political subdivisions unless "absolutely necessary" and did not afford this consideration sufficient weight. *Finally*, in light of the foregoing, the Special Master also erred in her ultimate recommendation that this Court should select HB 2146, rather than Reschenthaler 1 or 2.

A2212

## II.   BACKGROUND

### A.   Constitutional Factors for a Congressional Plan

#### 1.   Equal Population

Reschenthaler 1 and 2 achieve equal population because both maps have only a one person deviation between districts—which is the lowest possible deviation. *See* **Special Master Report ("SMR") at 138, ¶¶ CL1-CL2**; *see also* N.T. 1/27/22 at 164:15-23 (Dr. Rodden); *id.* at 284:21-285:8 (Dr. DeFord); *id.* at 458:9-13 (Dr. Duchin); Brunell Report at 1-2.

Only the House Democratic Caucus map and the Carter map deviate by ***more*** than one person—both have a two person deviation. *See* **SMR at 138, ¶ CL2**; *see also* N.T. 204:4-20 (Dr. Rodden).

#### 2.   Compactness

Reschenthaler 1 and Reschenthaler 2 have compactness scores in a narrow range and do not feature highly non-compact districts based upon Dr. Rodden's calculations. *See* **SMR at 65, ¶ FF48**; *see also* Rodden Reply Report at 3; N.T. 1/27/22 at 166:10-17. Dr. Rodden is "confident" in the numbers in his report. *See* N.T. 1/27/22 at 163:20-164:7.

Further, based upon Dr. DeFord's review, Reschenthaler 1 and Reschenthaler 2 have equal or better compactness scores on every measure as compared to the Gressman Map. *See* **SMR at 69, ¶¶ FF77-FF78**; *see also* N.T. 1/27/22 at 285:13-22; DeFord Reply Report at 9.

Dr. Duchin agrees that Reschenthaler 1 and Reschenthaler 2 have compact districts. *See* **SMR at 79, ¶¶ FF137-FF138; SMR at 147-148, ¶¶ FF1-3**; *see also* N.T. 1/27/22 at 458:15-22. Dr. Duchin is "very confident in her numbers." *See* N.T. 1/27/22 at 457:16-458:1. She rated Reschenthaler 1 as a plan that meets "a high excellence standard for traditional criteria," and rated Reschenthaler 2 as a plan that meets "an excellence standard for traditional criteria[.]" *See* **SMR at 79-80, ¶¶ FF138-139**; *see also* Duchin Reply Report at 3.

Reschenthaler 1 has an average Reock score of .435. *See* Brunell Report at 3; N.T. 1/27/22 at 168:3-11 (Dr. Rodden testifying, stating Reschenthaler 1 has a Reock score of .43). Reschenthaler 1 has an average Polsby-Popper score of .363. *See* Brunell Report at 3. Reschenthaler 2 has an average Reock score of .424. *See* Brunell Report at 3; N.T. 1/27/22 at 168:3-11 (Dr. Rodden testifying). Reschenthaler 2 has an average Polsby-Popper score of .352. Brunell Report at 3.

Reschenthaler 1 and Reschenthaler 2 are reasonably compact. *See* **SMR at 104, ¶ FF278**; *see also* Brunell Report at 2-3.

### 3. Contiguity

All 17 districts in Reschenthaler 1 are contiguous, as multiple experts concluded. *See* **SMR at 137-138, ¶¶ CL1-CL3**; *see also* N.T. 1/27/22 at 165:3-9 (Dr. Rodden); N.T. 1/27/22 at 285:9-12 (Dr. DeFord); N.T. 1/27/22 at 458:4-8 (Dr. Duchin); Brunell Report at 2.

### 4. Splits of Counties, Municipalities, and Wards

Reschenthaler 1 and 2 split just 13 counties. *See* **SMR at 144-145, ¶¶ FF21-FF22; SMR at 147, ¶ FF41-FF42; SMR at 193, ¶ 24**; *see also* N.T. 1/27/22 at 166: 3-9 (Dr. Rodden); *id.* at 458:23-459:4 (Dr. Duchin); Brunell Report at 4. No other maps before the Court split *fewer* Counties.[1] *See* **SMR at 146, ¶ FF36; SMR at 147, ¶ FF41; SMR at 193, ¶ 24**.

---

[1] While the Special Master's Report finds that the Carter map also only splits 13 counties, *see* **SMR at 143, ¶ FF 7**, that finding is predicated on an error, as explained in the argument section below. And even if true, Reschenthaler 1 and 2 remain the *only* maps that split just 13 counties **and** just 16 municipalities; all others split more in one or both government units. *See* **SMR at 147, ¶ FF41**("It is worth emphasizing, however, that of all the plans proposed, only the Reschenthaler Plans were able to divide only 13 counties and 16 municipalities—the lowest number in both categories."); *see* **SMR at 193, ¶ 24** ("The Reschenthaler Plans remarkably divide only 13 counties and 16 municipalities, which is the lowest numbers in both categories.").

Reschenthaler 1 and 2 also had only 29 county "pieces" or "segments," which was also the fewest of all the maps before the Court. *See* **SMR at 206-07, ¶ 54.**

Reschenthaler 1 and 2 split just 16 municipalities. *See* **SMR at 144-145, ¶¶ FF21-FF22; at 147, ¶ FF41-FF42; SMR at 193, ¶ 24**; *see also* Duchin Reply Report at 2 (Table 1); Barber Reply Report at 8; Brunell Report at 5 (Table 5).

No other maps before the Court split *fewer* municipalities (though some split an equal amount). *See* **SMR at 146, ¶ FF37; SMR at 147, ¶ FF41; SMR at 193, ¶ 24** ("The Reschenthaler Plans remarkably divide only 13 counties and 16 municipalities, which is the lowest numbers in both categories.").

Reschenthaler 1 and 2 split those municipalities into only 33 "segments," or "pieces." *See* **SMR at 206-07, ¶ 54.** Again, although some split an equal amount, no other proposal before the Court contained fewer municipal "segments" or "pieces."

At least three experts—none of whom were experts for the Congressional Intervenors—testified that it is possible to create a 17-district plan that splits only 13 counties and 16 municipalities, and still

6

has equal population, is contiguous, and is reasonably compact—just as Reschenthaler 1 and 2 propose. *See* **SMR at 147, ¶¶ FF42-FF43**; *see also* N.T. 1/27/22 at 43:19-25; 170:15-20 (Dr. Rodden); N.T. 1/27/22 at 287:11-20 (Dr. DeFord); N.T. 1/27/22 at 461:5-21 (Dr. Duchin).

Finally, Reschenthaler 1 and 2 split 25 wards and 24 wards, respectively. *See* **SMR at 144-145, ¶¶ FF21-FF22**; *see also* DeFord Reply Report at 7, ¶ 20 (Table 5); Brunell Report at 6 (Table 7).

### 5.    Communities of Interest

Dr. Keith Naughton explained that in order to achieve a good score under certain compactness models, certain communities may be included where they would not otherwise fit in terms of a community of interest. *See* **SMR at 154, ¶¶ FF2-FF4; SMR at 155, ¶¶ FF7, FF9**; *see also* N.T. 1/28/22 at 709:12-710:12. Dr. Naughton found that a compactness score may not be satisfied when communities are grouped together based upon their interests. **SMR at 154, ¶¶ FF2-FF4; SMR at 155, ¶¶ FF7, FF9**; *see also* N.T. 1/28/22 at 712:1-16. Dr. Naughton testified that keeping people with common interests together allows for better representation of those interests. *See* **SMR at 155, ¶¶ FF6-FF7**; *see also* N.T. 1/28/22 at 697:5-698:3.

To support his opinion regarding communities of interest, Dr. Naughton focused on a few key areas in the Commonwealth. For instance, he noted that Reschenthaler 1 and 2 keep Pittsburgh within one district. *See* **SMR at 95, ¶ FF228**. Dr. Naughton testified that Pittsburgh's communities of interests are best represented by keeping the city within the same district. *See* **SMR at 96, ¶ FF229; SMR at 155, ¶ FF5**; *see also* N.T. 1/28/22 at 712:21-715:13.

Dr. Naughton further noted that Reschenthaler 1 and 2 keep Bucks County within one District, and not with Philadelphia County. *See* **SMR at 157, ¶ FF15**. Dr. Naughton testified that the communities within Bucks County are best served by keeping the County within the same district and connecting it with nearby Montgomery County instead of with Philadelphia. *See* **SMR at 157-159, ¶¶ FF15-FF21;** *see also* N.T. 1/28/22 at 715:14-716:13. In a similar vein, he noted that Reschenthaler 1 and 2 connect Philadelphia with Delaware County in District 16. *See* **SMR at 96, ¶ FF230**. Dr. Naughton testified that Delaware County and Philadelphia county share similar communities of interest along their border, and that a map connecting them was ideal.

8

*See* **SMR at 159, ¶¶ FF19-FF21**; *see also* N.T. 1/28/22 at 786: 19-24; 840: 21-841:2.

Finally, Dr. Naughton observed that Reschenthaler 1 and 2 place Scranton and Wilkes-Barre in different districts. *See* **SMR at 96, ¶ FF231**. Dr. Naughton testified that Scranton and Wilkes-Barre, in the past, were in separate districts and that those communities prefer being in separate districts. *See* **SMR at 96, ¶ FF231**; *see also* N.T. 1/28/22 at 734:2-736:12.

### 6.   Partisan Fairness and Pennsylvania Geography

### (a)   Mean-Median Scores

Reschenthaler 1 and 2 score well on the mean-median metric, regardless of the expert consulted; indeed, by expert, the scores were found to be as follows:

9

| MEAN-MEDIAN | | | |
|---|---|---|---|
| Expert | Resch. 1 | Resch. 2 | Source |
| Barber | -2.1% | -2.2% | **SMR at 170, ¶¶ FF18-FF19** |
| Brunell | 1.6% | 1.89% | **SMR at 170, ¶¶ FF18-FF19** |
| DeFord | -2.7% | -2.6% | **SMR at 170, ¶¶ FF18-FF19** |
| Duchin | -2.1% | -2.1% | **SMR at 170, ¶¶ FF18-FF19**[2] |
| Rodden | 1% | 1% | **SMR at 170, ¶¶ FF18-FF19** |

As is material to mean-median, in *League of Women Voters*, the Supreme Court noted that in Dr. Chen's simulation of 500 potential plans that relied only on Pennsylvania's traditional districting criteria, the average mean-median gap created by the simulated plans was generally between 0% and 3%, with some plans reaching a maximum of 4%. *See* **SMR at 166**; *see also League of Women Voters*, 178 A.3d at 770, 774. In this matter, Dr. Duchin, like Dr. Chen, also ran simulations, but this time for 100,000 plans using only traditional districting criteria. *See* **SMR at 76, ¶ FF119**; *see also* Duchin Reply Report at 2 (discussing criteria used to create simulations), at 18 (discussing number of

---

[2] The Special Master's Report finds Dr. Duchin's numbers to be -25.24% and -25.34% respectively, and then suggests her analysis can be discredited because it was an outlier. *See* **SMR at 170, ¶¶ FF18-FF9**; **SMR at 172, ¶ FF26**. However, Dr. Duchin testified at trial that her numbers were a raw number, aggregated from across 12 elections; thus to convert it to a percent, the raw number should be first divided by 12 before converted to a percentage. *See* N.T. 1/27/22 at 455:14-456:12 (Dr. Duchin explaining how to convert chart to a percentage). Thus, the numbers reported in this Brief attributed to Dr. Duchin reflect the division by 12 that she explained at trial.

simulations). According to her reply report, as elaborated at trial (specifically, with her explanation of how to convert her units of measure to a percentage), no *range* of mean/median results for the simulations were reported, but an average was, which was **-2.39%**. *See* Duchin Reply Report at 4 (Table 3: column three labeled "total mean-median"; row labeled "ensemble mean"; divided by 12 and multiplied times 100); N.T. 1/27/22 at 455:14-456:12 (Dr. Duchin explaining how to convert chart to a percentage). Her chart reveals that Reschenthaler 1 and 2 both scored a *lower* mean/median average than the 100,000 simulations, with averages of **-2.10%** and **-2.11%** respectively. *See* Duchin Reply Report at 4 (Table 3: column three labeled "total mean-median"; rows labeled "Reschenthaler 1" and "Reschenthaler 2"; divided by 12 and multiplied times 100).

### (b)   Other Methods of Evaluating Partisan Fairness—Seat Counts

According to various experts in this case, the two Reschenthaler maps project to produce a variety of expected outcomes by seat counts (R v. D), though each of the experts reported the information in somewhat different ways (as noted) and based on different elections to simulate the results:

11

| PARTISAN MEASURES BY VARIOUS SEAT COUNTS | | | |
|---|---|---|---|
| Expert | Resch. 1 | Resch. 2 | Source |
| Barber | 9 D<br>8 R | 9 D<br>8 R | Barber Reply at 15<br>(Table 3)[3] |
| Brunell | 5 D<br>8 R<br>4 Toss-Up | 5 D<br>8 R<br>4 Toss-Up | Brunell Report at 8 (Table 9) |
| DeFord | 3 R Safe<br>5 D Safe<br>9 Responsive | 3 R Safe<br>5 D Safe<br>9 Responsive | DeFord Reply at 12<br>(Table 11)[4] |
| Duchin | 8 D<br>9 R | 8 D<br>9 R | Duchin Reply Report at 4<br>(Table 2)[5] |
| Rodden | 6 D<br>8 R<br>3 Toss-Up | 7 D<br>8 R<br>2 Toss-Up | Rodden Reply Report at 9<br>(Table 5); N.T. 1/27/22 at<br>171:1-25 (Dr. Rodden) |

### (c)   Political Geography

Pennsylvania's unique political geography affects the analysis of partisan advantage in any proposed map. **SMR at 162, ¶ FF2**. In a 2013 article authored by Dr. Rodden regarding unintentional gerrymandering, his results "illustrate[d] a strong relationship between

---

[3] Dr. Barber's chart reflects "Democratic-leaning" districts. Barber Reply at 15 (Table 3).

[4] Dr. DeFord's chart reports on "safe" districts versus "responsive" districts, which describes where only one party was preferred in that district over 18 elections (a safe district) or where a candidate from each party was projected to be selected (a responsive district). DeFord Reply at 12 (Table 11).

[5] Adding all lines for Reschenthaler 1 or Reschenthaler 2 in Dr. Duchin's Table 2 produces 91 elected Democrats under the projections. Dividing that by the number of elections simulated—12—yields an average of 7.58 Democrats elected. Rounding up, since .58 of a person cannot be elected, the Reschenthaler maps project to elect 8 Democrats in any given election out of 17 possible seats, thus projecting to elect 9 Republicans in any given election (a difference of *just one*).

the geographic concentration of Democratic voters and electoral bias favoring Republicans." *See* **SMR at 162, ¶ FF3**; *see also* N.T. 1/27/22 at 178:22-179:3, 179:23-180:9. Dr. Rodden also concluded in this article that "proving such intent in court will be difficult in states where equally egregious electoral bias can emerge purely from human geography." *See* **SMR at 163, at ¶ FF5**; *see also* N.T. 1/27/22 at 181:6-14. Dr. Rodden believes these statements to be true today about Pennsylvania. *See* **SMR at 163, at ¶ FF6**; N.T. 1/27/22 at 181:18-20.

Dr. DeFord also acknowledges that there is a "partisan advantage to Republicans based on the political geography of the state[,]" so it is "not necessarily a surprise to see a slight tilt favoring Republicans" on the metrics he used. *See* **SMR at 163, ¶ FF7**; *see also* DeFord Initial Report 40, ¶ 104; N.T. 1/27/22 at 291:13-23. Analyzing the 2020 presidential election, Dr. DeFord found that "there is not a part of the state where Republican voters are as heavily concentrated as Democratic voters are in the Philadelphia and Pittsburgh areas." *See* **SMR at 163, at ¶ FF8**; *see also* DeFord Initial Report 40, ¶ 104; N.T. 1/27/22 at 291:24-292:16.

Dr. Duchin's report most compellingly demonstrates the partisan political geography of the Commonwealth. *See* **SMR at 164, ¶ FF9**. In her expert report, Dr. Duchin found that 100,000 randomly drawn districting plans "tend[ed] to exhibit pronounced advantage to Republicans across this full suite of recent elections." *See* **SMR at 164, ¶ FF10**; **SMR at 196, ¶ 38**; *see also* Duchin Initial Report at 18. Dr. Duchin further found in metrics from the partisan symmetry family, including the mean-median score, "random plans favor Republicans," while the Governor's Plan "temper[s] that tendency." *See* **SMR at 164, ¶ FF10**; *see also* Duchin Initial Report at 19.

With regard to partisan fairness and the effect of political geography, Dr. Naughton agrees that nonpolitical issues cause voters and nonvoters to coalesce in certain parts of the state. *See* **SMR at 96, ¶ FF232**; *see also* N.T. 1/28/22 at 696:13-17. Scientific models predicting future elections cannot account for the various factors that contribute to winning an election, including the party of the current president, whether it is a mid-term election, the state of the economy, and campaign fundraising. *See* **SMR at 96-97, ¶ FF233**; *see also* N.T. 1/28/252 at 700-15:24; 701:6-703:8, 704:10-16. Dr. Naughton agrees that

scientific models used by Dr. Rodden, Dr. DeFord, and Dr. Duchin do not account for these extraneous factors that contribute to winning an election. *See* **SMR at 97, ¶ FF234**; *see also* N.T. 1/28/22 at 703:9-12. Moreover, running congressional races in Pennsylvania is "very geographical," and certain mapping choices, such as splitting the City of Pittsburgh or splitting Bucks County and Philadelphia can result in losing representation. *See* **SMR at 97, ¶ FF235**; *see also* N.T. 1/28/22 at 713:20-715:24. In Dr. Naughton's expert opinion, there is no perfect variable to put in the equation to create a perfect map because there is going to be subjectivity. *See* **SMR at 97, ¶ FF236**; *see also* N.T. 1/28/22 at 766:6-22.

## B.    Voting Rights Act

Analyzing the results of the 2012 Presidential election, the 2018 House of Representatives election for District 3, and the 2017 Pennsylvania Supreme Court election, Dr. Brunell conducted a racial bloc voting analysis to determine whether or not a minority-majority district was required under the Voting Rights Act. *See* Brunell Report at 10. Based on the homogeneous precincts, Dr. Brunell found that the majority of both black and white voters supported the minority

candidate, indicating an absence of racially polarized voting. *See* Brunell Report at 10. Looking to ecological regression, Dr. Brunell again found that racially polarized voting is not present. *See* Brunell Report at 11.

The Gressman map has three majority-minority districts. *See* **SMR at 182, ¶ FF4** DeFord Initial Report at 44, ¶ 117. All other maps have two majority-minority districts. *See* **SMR at 182, ¶ FF5**.

### C. The "Best Map"

Many experts in this matter offered inconsistent, and thus not credible, testimony regarding which was the "best" map for the Court to choose. Indeed, when asked a near identical question—some version of "which map is best?"—the testimony produced the following answers:

> Dr. Rodden (Carter's expert): Carter map, *see* N.T. 1/27/22 at 162:13-20;
>
> Dr. DeFord (Gressman's expert): Gressman map, *see* N.T. 1/27/22 at 284:15-19; and
>
> Dr. Duchin (Governor's expert): Governor's map, *see* N.T. 1/27/22 at 457:2-8.

The testimony was so inconsistent that Dr. Duchin actually stated when told she was the third expert to give a third different answer to the

question, "I am sure that there will be as many opinions as there are experts." *See* N.T. 1/27/22 at 457:9-14.

Dr. Naughton opined, however, that there can be no such thing as a "best map" because that determination is too subjective. N.T. 1/28/22 at 164:25-765:13. Although there can be no best map, in Dr. Naughton's expert opinion, Reschenthaler 1 and Reschenthaler 2 are good maps that would "represent the state well." N.T. 1/28/22 at 772:8-14.

### D. Snapshot of the Reschenthaler Maps

The characteristics of Reschenthaler 1 and Reschenthaler 2 can be summarized as follows:

| Snapshot of Resch. Maps | Resch. 1 | Resch. 2 | Source |
|---|---|---|---|
| County Splits | 13 | 13 | **SMR at 141, ¶ FF4**; **SMR at 144, ¶ FF21**; **SMR at 145, ¶ FF22**; *see also* DeFord Reply Report at 5, ¶ 14; Duchin Reply Report at 2 (Table 1); Rodden Reply Report at 4 (Table 2); Barber Reply Report at 8 (Table 1); Brunell Report at 4 (Table 3) |
| County Segments | 29 | 29 | **SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1); Brunell Report at 4 (Table 3) |
| Municipal Splits | 16 | 16 | **SMR at 141, ¶ FF4**; **SMR at 144, ¶ FF21**; **SMR at 145, ¶ FF22**; *see also* Duchin Reply Report at 2 (Table 1); Barber |

| Snapshot of Resch. Maps | Resch. 1 | Resch. 2 | Source |
|---|---|---|---|
|  |  |  | Reply Report at 8; Brunell Report at 5 (Table 5) |
| Municipal Segments | 33 | 33 | **SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1); Brunell Report at 5 (Table 5) |
| Ward Splits | 25 | 24 | **SMR at 144, ¶ FF21; SMR at 144, ¶ FF21; SMR at 145, ¶ FF22**; *see also* DeFord Reply Report at 7, ¶ 20 (Table 5); Brunell Report at 6 (Table 7) |
| Ward Segments | 50 | 48 | Brunell Report at 6 (Table 7) |
| Equal Population (Y/N) | Y | Y | **SMR at 138, ¶¶ CL1-CL2**; *see also* DeFord Reply Report at 4, ¶ 13; Duchin Reply Report at 2; Rodden Reply Report at 3; Brunell Report at 1 |
| Contiguous (Y/N) | Y | Y | **SMR at 137-138, ¶¶ CL1-CL3**; *see also* DeFord Reply Report at 9, ¶ 27; Duchin Reply Report at 2; Rodden Reply Report at 3; Brunell Report at 2 |
| Reock | **a.** 0.435 **b.** 0.4347 **c.** 0.43 | **a.** 0.424 **b.** 0.4231 **c.** 0.41 | **a.** Brunell Report at 3 (Table 2) **b. SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) **c.** DeFord Reply Report at 9, ¶ 25 (Table 8) |
| Polsby-Popper | **a.** 0.37 **b.** 0.363 **c.** 0.3629 **d.** 0.35 | **a.** 0.36 **b.** 0.352 **c.** 0.3524 **d.** 0.34 | **a.** Barber Reply Report at 8 (Table 1) **b.** Brunell Report at 3 (Table 2) **c. SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) |

18

A2228

| Snapshot of Resch. Maps | Resch. 1 | Resch. 2 | Source |
|---|---|---|---|
| | | | **d.** DeFord Reply Report at 9, ¶ 25 (Table 8) |
| Schwartz | 1.6859 | 1.7127 | **SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) |
| ConvHull | **a.** 0.8238 **b.** 0.81 | **a.** 0.8161 **b.** 0.80 | **a. SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) **b.** DeFord Reply Report at 9, ¶ 25 (Table 8) |
| PopPoly | 0.7737 | 0.7658 | **SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) |
| Cut Edges | **a.** 5090 **b.** 5061 | **a.** 5237 **b.** 5208 | **a. SMR at 141, ¶ FF4**; *see also* Duchin Reply Report at 2 (Table 1) **b.** DeFord Reply Report at 9, ¶ 25 (Table 8) |
| Retained Population of Prior Map | 76.5% | 76.5% | **SMR at 185, ¶ FF3**; *see also* Rodden Reply Report at 2 |
| Number of Districts w/ Incumbents Paired | 2 | 1 | **SMR at 180, ¶ FF15; SMR at 181, ¶¶ FF20-FF21**; *see also* DeFord Reply Report at 21, ¶ 45 (Table 15) |
| Splits Pittsburgh (Y/N) | N | N | **SMR at 52-53, ¶ FF17; SMR at 95, ¶ FF228; SMR at 151, ¶ FF18** |
| Splits Bucks County (Y/N) | N | N | **SMR at 52-53, ¶ FF17; SMR at 157, ¶ FF15** |

19

## III.   ARGUMENT IN SUPPORT OF SPECIAL MASTER'S REPORT

With the exception of two isolated errors—which are likely the byproduct of the expedited nature of the proceedings—the Special Master's factual findings and recommendations are supported by significant record evidence and, thus, should not be disturbed. Similarly, the SMR also ably applies prevailing legal principles to the facts presented relative to: (1) contiguity and compactness; (2) communities of interest; (3) extra-constitutional considerations; (4) the "least change" approach advocated by the Carter Petitioners; and (5) the use of prisoner-adjusted data for redistricting. According, these facts of the SMR's analysis and recommendations should be adopted in full.

### A.   Inasmuch as the Special Master's factual findings are supported by record, this Court should adopt them.

As explained in *League of Women Voters*, "following . . . grant of extraordinary jurisdiction, [this Court's] standard of review is *de novo*." *League of Women Voters v. Com.*, 178 A.3d 737, 801 n.62 (Pa. 2018) ("*LWV I*"). Nevertheless, this Court has cautioned that a special master's findings of fact must be afforded "due consideration," since "the

jurist who presided over the hearings [is] in the best position to determine the facts." *Id.* (quoting *Annenberg v. Com.*, 757 A.2d 338, 343 (Pa. 2000)).[6] Moreover, although the Court has noted that it ***may*** conduct *de novo* review, as a practical matter, it has rarely (if ever) applied such a standard. *See, e.g.*, *Com. v. Banks*, 29 A.3d 1129, 1135 (Pa. 2011); *In re J.V.R.*, No. 81 MM 2008 (Pa. Mar. 26, 2009) (*per curiam*) (adopting and approving the special master's recommendations); *Com. v. McGarrell*, 87 A.3d 809, 810 (Pa. 2014) (*per curiam*) (accepting the special master's report); *In re Off. of Philadelphia Dist. Att'y*, 244 A.3d 319 (Pa. 2020) (*per curiam*) ("[T]he King's Bench petition is hereby dismissed in accordance with the special master's recommendation."); *see also id.* at 326 (Dougherty, J., concurring statement) (recognizing that a special master's factual findings are afforded "due consideration").

In this regard, this Court's exercise of extraordinary jurisdiction in *Banks* aptly illustrates circumstances that would warrant rejection of a special master's proposed factual findings, as compared against the

---

[6] *See generally In re Thirty-Fifth Statewide Investigating Grand Jury*, 112 A.3d 624, 633-34 (Pa. 2015) (Baer, J., concurring) ("Special masters operate as an arm of the court, investigating facts on behalf of the court and communicating with it to keep it apprised of its findings[.]").

general rule that such proposed findings are entitled to significant
deference. Specifically, in *Banks* this Court exercised jurisdiction and
appointed Judge Michael T. Conohan as special master, who was
instructed to submit proposed findings of fact and law. Upon receiving
Judge Conohan's report, this Court rejected the report, citing his failure
to offer "an autonomous judicial expression" and, thus, appointed a
different jurist as special master. *Com. v. Banks*, 989 A.2d 1 (Pa. 2009)
(*per curiam*). Upon receipt of the second report, this Court expressly
rejected the argument that its exercise of extraordinary jurisdiction and
subsequent appointment of a trial judge to act as master warranted "a
*de novo* standard of review . . . which would be less deferential to the
hearing judge." *Banks*, 29 A.3d at 1135. A "circumstantial anomaly"
that compels the Court to assume jurisdiction, the *Banks* panel
explained, "does not operate to alter the nature of a competency
determination, or the respective roles of trial judges and appellate
courts." Accordingly, the Court held there was "no need to depart from
the settled abuse of discretion standard in reviewing [the special
master]'s findings of fact and conclusions of law." *Id.*; *accord*
*Philadelphia Dist. Att'y*, 244 A.3d at 333 (Wecht, J., concurring

22

statement) ("In cases predicated upon the exercise of our King's Bench jurisdiction, we must afford 'due consideration' to supported factual findings, *to which we then apply a de novo standard of review*." (emphasis added)).

Viewed in this light, the Special Master's factual conclusions should be adopted. To begin, save for several minor oversights, her findings are supported by ample record testimony and evidence. Furthermore, insofar as she was required to weigh competing evidence and make credibility determinations, the Special Master's assessment in this respect should not be disturbed absent showing of manifest abuse of discretion. *Accord In re Breyer's Est.*, 37 A.2d 589, 592 (Pa. 1944) ("[F]inding of the master and the court below on this point must be accepted because supported by evidence."). After all, as this Court has recognized, when serving as the special master, "the jurist who presided over the hearings [is] in the best position to determine the facts." *LWV I*, 178 A.3d at 801 n.62 (quoting *Annenberg*, 757 A.2d at 343).

**B.    This Court should adopt in full the Special Master's analysis of compactness and contiguity, communities of interest, partisan "fairness," and the "least change" approach.**

Although the Congressional Intervenors differ with the Special Master on several discrete points of law, as well as her ultimate recommendation that HB 2146 should be chosen instead of Reschenthaler 1 or 2, they are in full accord with her recommendations in many respects. In particular, four overarching facets of the Special Master's proposed conclusions of law warrant emphasis.

**1.    The Special Master properly concluded that all of the proposed redistricting plans are sufficiently compact and contiguous.**

A central tenet of this Court's decision in *League of Women Voters* was that a congressional redistricting plan must be both compact and contiguous to pass constitutional muster. As that panel explained, these factors—alongside population equality and minimization of split political subdivisions—are neutral benchmarks that "provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *LWV I*, 178 A.3d at 817. Under the present circumstances, the Special Master correctly concluded that all of the

plans are sufficiently compact and contiguous and that they are materially indistinguishable in this respect.

Turning initially to compactness, the Special Master found that "[b]ased on the credible testimony and charts provided by Governor Wolf's expert, Dr. Duchin, regarding the metrics used to evaluate compactness, as corroborated by various other experts in their testimony and submissions," all of the proposed "plans and maps fulfill the constitutional requirement that a map be composed of compact territory." SMR at 193, ¶ 22. Because this conclusion was correct as a matter of law and is supported by the record, this Court should decline any invitation to differentiate between the plans based on compactness alone. In this regard, as relayed in the Special Master's submission to this Court, a number of the experts testified that all of the plans "fell within a fairly 'narrow range' of acceptable compactness scores." *Id.* at 60, ¶ FF18 (quoting Rodden Resp. Report at 3; N.T. at 93-94); *see also* SMR, at 79, ¶ FF137. Moreover, all of the experts acknowledged that, because each of the numeric scores are designed to evaluate different

aspects of compactness, reliance on any single measurement is ill-advised. *See* SMR, at 60, ¶ FF14; *see also id.* at 70, ¶ FF79.[7]

The Special Master's assessment of compactness is also legally sound. To begin, despite directing the General Assembly to enact a remedial congressional redistricting plan to comport with the compactness requirement, in *League of Women Voters*, this Court declined to establish a formulaic standard for compactness and, instead, delineated a range constitutionally permissible outcomes. *See* 178 A.3d at 819 (explaining that in a computer simulation that applied only the traditional redistricting criteria, the appropriate range of scores for an 18-district plan based on the 2010 census data was between .31 and .46 under the Reock measurement, and between .29 and .35 under the Polsby-Popper test).

---

[7] Notably, the expert testimony in this regard is consistent with the views of a host of scholars in this field. *See, e.g.*, Micah Altman, *The Computational Complexity of Automated Redistricting: Is Automation the Answer?*, 23 Rutgers Computer & Tech. L.J. 81, 131 (1997) (noting that there are "twenty-four quantifications for the goal of 'compactness,' most of which will differ in the values they assign to districts"); *see also* Daniel D. Polsby & Robert D. Popper, *The Third Criterion: Compactness As A Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301, 346 (1991) (discussing the strengths and weaknesses of the various compactness calculations).

This approach is also constituent with the plain language of Article II, Section 16 of the Pennsylvania Constitution, which, under *League of Women Voters*, governs the present analysis. Specifically, while that provision requires redistricting plans to avoid splitting counties and political subdivision unless "absolutely necessary," it does not require a plan to achieve ***maximum*** compactness. Indeed, as Charles Buckalew relays in his oft-cited treatise on the Pennsylvania Constitution, the compactness requirement, which first appeared in the State Constitution in 1857, "admits only of approximation to exactness, but good faith alone is required for a substantial execution of the rule of the Constitution." Charles R. Buckalew, *An Examination of the Constitution of Pennsylvania. Exhibiting The Derivation and History of Its Several Provisions*, at 53 (1883).[8] In short, given the multitude of acceptable methods of calculating compactness, as well as the language and structure of the State Constitution, this Court should refuse to draw any material distinctions between the proposals based on compactness.

---

[8] *Available at* https://www.google.com/books/edition/_/vOWeAQAACAAJ?hl=en&gbpv=1.

As it relates to the contiguity requirement, none of the plans were challenged on such grounds and no evidence was offered tending to show that any of the districts were non-contiguous. Accordingly, this Court should adopt The Special Master's finding that, "[o]n their face, and as supported by the evidence of record, all the maps in the proposed plans contain districts that are comprised within a contiguous territory and comply with the contiguity' requirement of the Pennsylvania Constitution." SMR at 192, ¶ 16.

>   **2.    The Special Master's factual and legal
>           recommendations relative to communities of
>           interest should be adopted.**

This Court should adopt the Special Master's recommendations relative to communities of interest, as they are legally and factually sound. In terms of the Special Master's legal analysis, she correctly concluded that the communities of interest doctrine is rooted in the Free and Equal Elections Clause, as interpreted by *League of Women Voters*.

To begin, as the Special Master recognized, a common thread running through *League of Women Voters* is that, to the greatest degree practicable, a congressional redistricting plan should avoid dividing a

community with shared interests and concerns. Specifically, this Court's decision in *League of Women Voters* repeatedly emphasized that safeguarding the interests of communities is central to a constitutional analysis of a redistricting plan;[9] in fact, as relayed by the panel, compactness, contiguity, and respect for municipal boundaries were adopted as the as the neutral redistricting benchmarks precisely ***because*** "[t]hese standards place the greatest emphasis on creating representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs[.]" *Id.* at 814; *see also Johnson v. Wisconsin Elections Com'n*, 967 N.W.2d 469, 484 (Wisc. 2021) ("[D]rawing contiguous and compact single-member districts of

---

[9] *See LWV I*, 178 A.3d at 816 ("When an individual is grouped with other members of his or her community in a congressional district for purposes of voting, the commonality of the interests shared with the other voters in the community increases the ability of the individual to elect a congressional representative for the district who reflects his or her personal preferences."). Moreover, in evaluating the historic underpinnings that lead to the development of the neutral criteria it prescribed, the Court emphasized that the Free and Equal Elections Clause, in its original form, provided that "all elections ought to be free; and that all free men having a sufficient evident common interest with, and ***attachment to the community***, have a right to elect officers, or to be elected into office." *Id.* (quoting Pa. Const. of 1776, art. I, § VII) (emphasis added); *see also id.* ("[I]t is evident that [our founders] considered maintaining the geographical contiguity of political subdivision, and barring the splitting thereof in the process of creating legislative districts").

29

approximately equal population often leads to grouping large numbers of Democrats in a few districts and dispersing rural Republicans among several. These requirements tend to preserve communities of interest, but the resulting districts may not be politically competitive—at least if the competition is defined as an inter-rather than intra-party contest.").

Accordingly, although compactness, contiguity, and respect for municipal boundaries, are undoubtedly the primary tool for evaluating the constitutionality of a redistricting plan, properly understood these principles serve to advance the Free and Equal Elections Clause's overarching goal of protecting the interest of communities. While not susceptible to the precise mathematic measurement, this Court has recognized that the term "communities of interests" encompasses, among other things, "school districts, religious communities, ethnic communities, geographic communities which share common bonds due to locations of rivers, mountains and highways[.]" *Holt v. 2011 Legislative Reapportionment Com'n*, 38 A.3d 711, 746 (Pa. 2012) ("*Holt I*"). This concept may also refer to a community's "circulation arteries, its common news media … its organization and cultural ties[,]" its "common economic base[,]" and the relationship among "schools of

30

higher education as well as others." *Mellow v. Mitchell*, 607 A.2d 204, 220-21 (Pa. 1992).

Applying the foregoing settled framework, the Special Master highlighted two recurring features that—based on Dr. Naughton's detailed and unrebutted testimony—she found evince a plan's disregard for communities of interest: (1) splitting the City of Pittsburgh, and (2) splitting Bucks County. Because the Special Master's assessment of the communities of interest is grounded in this Court's precedent and supported by ample record evidence, this Court should adopt her recommendations insofar as they relate to the various submissions' attention to communities of interest; i.e., insofar as any given plan splits Pittsburgh or Bucks County, that plan should be discounted and set aside.

### 3.   The Special Master's assessment of partisanship in the redistricting plans should be adopted.

A central—if not overriding—theme in most of the briefing in support of the proposed maps submitted by the parties and *amici* is each plan's partisan breakdown. Carefully examining the competing arguments, the Special Master concluded that, as a matter of law, partisan considerations in redistricting—regardless of the label

31

attached to them—must yield to the neutral criteria identified above (*i.e.*, equal population, compactness, contiguity, and respect for political boundaries). In this regard, given that numerous experts credibly testified that a redistricting plan principally guided by the constitutionally derived neutral factors would produce a pronounced Republican advantage in terms of likely electoral outcomes, the Special Master found that any plan which ***expressly*** sought to alter this natural state of affairs—namely the proposals submitted by the Gressman Petitioners, Governor Wolf, and Draw the Lines *amici*— improperly subordinated partisan considerations to the neutral benchmarks established by this Court in *League of Women Voters*. Because these conclusions are consistent with the Free and Equal Elections Clause, as interpreted by this Court in *League of Women Voters*, and supported by ample record evidence, the Special Master's recommendations in this respect should be adopted.

In terms of the controlling legal principles, the Special Master accurately relayed this Court's admonition that while other factors, including political considerations, may continue to play a role in the redistricting process, the Free and Equal Elections Clause requires

them to be "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *LWV I*, 178 A.3d at 817. Accordingly, the Special Master rejected the argument that the Free and Equal Elections Clause requires a redistricting plan to be fashioned in such a way that it will allow the party whose candidates, on average, garner the majority of the statewide share of the vote, to also win a majority of the congressional districts.

The Special Master's cogent analysis in this regard should be adopted, as it is consistent with this Court's interpretation of the Free and Equal Elections Clause, as well as its precedent in the redistricting context. In terms of the constitutional requirements, as aptly summarized in *League of Women Voters*, the Free and Equal Elections Clause prohibits "subordinat[ing] the traditional redistricting criteria in the service of partisan advantage." 178 A.3d at 818. A plan designed to overcome a partisan *disadvantage* that exists because of neutral factors, is necessarily is "in the service of partisan advantage." *Id.* Moreover, this Court has previously considered—and expressly rejected—

proportionality as a valid principle. Specifically, emphasizing that compactness, contiguity, and respect for political subdivisions are the paramount goals in redistricting, the *Holt* panel admonished that "[t]he constitutional reapportionment scheme does not impose a requirement of balancing the representation of the political parties; it does not protect the 'integrity' of any party's political expectations." *Holt v. 2011 Legislative Reapportionment Com'n*, 67 A.3d 1211, 1235 (Pa. 2013) ("*Holt II*"). Instead, the panel explained, "the construct speaks of the 'integrity' of political subdivisions, which bespeaks history and geography, not party affiliation or expectations." *Id.*; *see also Johnson*, 967 N.W.2d at 484.

In short, the Special Master's recommendation relative to proportionality in the context of redistricting is firmly rooted in this Court's precedent and predicated on a robust factual record. Thus, the analysis should be adopted by this Court.

**4.  Because the "least change" approach does not afford sufficient attention to the neutral criteria under the Free and Equal Elections Clause, it should be rejected.**

Consistent with the Special Master's recommendations, this Court should also reject the "least-change" principle urged by the Carter Petitioners.

First, in *League of Women Voters*, this Court made clear that "the preservation of prior district lines" is a factor that must be "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." 178 A.3d at 817. Notwithstanding *League of Women Voters*'s clear directive, the Carter Petitioners' expert witness and map-maker, Dr. Rodden, relayed that this consideration, which he described as the "least-change approach," was his **central** focus in reconfiguring Pennsylvania's congressional map. *See* SMR at 184, ¶¶ FF1. The fact that the Carter Petitioners' primary motive was minimizing changes to the extant redistricting plan, rather than adherence to the neutral redistricting criteria is— without more—sufficient grounds for summarily rejecting the Carter Petitioners' plan.

Moreover, this Court has been particularly skeptical of this approach, cautioning that "the notion that the Constitution independently, and tacitly, commands special respect for prior districting plans or incumbencies can be a mischievous one." *Holt II*, 67 A.3d at 1234. Specifically, the Court recognized that this approach, in practice, is a thinly-veiled argument for entrenching incumbents and the existing political interests:

> In the [Legislative Reapportionment Commission]'s view, upheaval or uncertainty in the electoral process must be avoided, and "historical" legislative districts should be preserved out of respect for the choices of the voting public and in the interest of efficiency. However, we are not so naïve as not to recognize that the redistricting process may also entail an attempt to arrange districts in such a way that some election outcomes are essentially predetermined for voters—"safe seats" and the like.

*Id*. at 1235. Notably, in reaching this conclusion, the Court also explained that *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)—which the Carter Petitioners cite as authority in their brief—was wholly inapposite, noting that "the Court [in Karcher] was not speaking of 'inherent' constitutional considerations under Pennsylvania state law, or under any state constitution for that matter." *Holt II*, 67 A.3d at 1234.

**5.    This Court should adopt the Special Master's recommendation that a redistricting plan based on prisoner-adjusted data does not comport with the constitutional requirements for equal population.**

The Special Master correctly concluded that a proposed redistricting plan which attempts to count incarcerated individuals at their home address rather than their prison address violates the one-person, one-vote requirement for congressional districting.

In redistricting, states must comply with the one person, one vote principle by "designing districts with total equal populations," *Evenwel v. Abbott*, 578 U.S. 54, 71 (2016), which ensures equality of representation for equal numbers of people. *Reynolds v. Sims*, 377 U.S. 533, 560-61 (1964). Traditionally, states use census numbers as the basis for populations. *Evenwel*, 578 U.S. at 73 (noting that adopting voter-eligible population as the basis for apportionment would "upset a well-functioning approach to districting that all 50 states and countless local jurisdictions have followed for decades, even centuries"). Using census numbers for redrawing congressional districts is consistent with the fundamental understanding that elected officials represent all residents, regardless of their voter eligibility. *Id.* at 74. Relying upon

the principles articulated in *Evenwel*, the First Circuit has found that including prisoners as population in the ward where they are incarcerated does not raise a constitutional concern. *Davison v. City of Cranston*, 837 F.3d 135 (1st Cir. 2016). The First Circuit rejected the argument that inclusion of prisoners in the apportionment constituted vote dilution to those outside the district in question, emphasizing that the status quo is to base apportionment on census data. *Id.* at 144.

The Ali *amici*, who use this adjusted data set, place mistaken reliance upon Section 1302 of the Election Code for doing so. Section 1302 defines the residence of incarcerated electors for election purposes as the place where they were last registered to vote prior to incarceration. 25 Pa.C.S. § 1302. An individual's voter registration address does not necessarily correspond to the individual's residence for census purposes and thus does not warrant readjusting the data upon which the maps are drawn. College students, for example, are counted for census purposes in the places where they attend college, but may maintain a different voter registration address. Counting incarcerated individuals in their place of incarceration is consistent with the census and with the one-person, one-vote principle, and is not invalidated by

Section 1302 of the Election Code. Indeed, Pennsylvania's consistent and traditional approach to counting incarcerated individuals where they are incarcerated for congressional redistricting is the majority view across the country.[10]

In light of the foregoing, Judge McCullough concluded that the Ali plan's compliance with the one-person one-vote requirement must be assessed under the unadjusted census data used by all of the remaining parties, which resulted in a deviation of over 8,500 people. Because such a discrepancy violates the one-person, one-vote principle, Judge McCullough recommended that this Court reject the proposed redistricting plan submitted by the Ali *amici*.

As reflected in the foregoing discussion, Special Master's analysis of this issue comports with controlling legal precepts and, thus, should be adopted.

_____

[10] Washington, Nevada, California, Colorado, Virginia, Maryland, and New Jersey are the only states that adjust census data to account for prisoners in home districts in congressional districting and do so pursuant to state statute. *See* Cal. Elec. Code § 21003; Colo Rev. Stat. § 2-2-902; Md. Elec. Law § 8-701; Nev. Rev. Stat. § 360.288; N.J.S.A. 52:4-1.1 – 1.6; Va. Code Ann. § 24.2-304.04; Wash. Rev. Code § 44.05.140. *See also Davidson*, 837 F.3d at 144 (noting that the decision whether to include or exclude prisoners in apportionment "is one for the political process").

## IV.   ARGUMENT IN SUPPORT OF EXCEPTIONS TO SPECIAL MASTER'S REPORT

### A.   The Special Masters' Report errs in concluding the Carter map has 13 county splits instead of 14 county splits.

Whether the Carter map splits 13 or 14 Counties comes down to an issue somewhat familiar to this Court, but which, under the facts now present, should generate a different finding. To explain, in adopting the 2018 Remedial Plan, this Court posted a footnote explaining that even though the Plan technically split Chester County due to a zero-population segment of Chester located within Delaware County, the Court would not consider that a split. *See League of Women Voters v. Com.*, 181 A.3d 1083,1088 n.10 (Pa. 2018) (*"LMV II"*). The proposed Carter map likewise has that same issue, specifically regarding Birmingham Township, precinct 02, which is a non-contiguous portion of that municipality bordering the state of Delaware, shown immediately below (from the Carter map, showing Birmingham in proposed districts five and six). The Carter Petitioners argued to the Special Master that this split should not be construed as a split at all, *see* Carter Pet. Proposed Findings of Fact and Conclusions of Law at 30

40

A2250

n.1 (Jan. 29, 2022), and the Special Master appeared to agree. *See* SMR at 143, ¶ FF7.



This proposed finding of the SMR should be rejected for at least two reasons. *First*, while this particular segment of Chester County in 2018 had no population, and thus was essentially a mere parcel of land, it now has six reported inhabitants. *See* Carter Pet. Proposed Findings of Fact and Conclusions of Law at 30 n.1. This rightly justifies now considering that small segment of population part of Chester County for "splits" purposes, since those six persons are residents of Chester County. *Second*, multiple experts construed the Carter map as having 14 county splits, including the Carter Petitioners' *own expert* in his

41

reply report. *See* Rodden Reply Report at 4 (Table 2); N.T. 1/27/2022 at 166: 3-9 (Dr. Rodden discussing Table 2); *see also* DeFord Reply Report at 5 (Table 2); Duchin Reply Report at 2 (Table 1). Thus, the factual record supports finding this division to be a county "split" for purposes of this Court's analysis.

Accordingly, the Court should find that Reschenthaler 1 and Reschenthaler 2 are the *only* maps before the Court that split just 13 counties.

## B.    The Special Master's Report errs in concluding that all of the plans satisfy the equal population requirement of the United States Constitution.

The Special Master erred in concluding that all of the proposed plans satisfy the equal population requirement of the United States Constitution for at least two reasons. *First*, while the SMR correctly observes that a total population deviation of up to 10% is permissible in the context of state or local districts, the population equality requirements are far more stringent for ***congressional*** redistricting plans. *Second*, court-ordered congressional plan are held to an even more stringent standard. Examining the plans through the proper lens, this Court should reject the plans submitted by the House Democratic

Caucus and the Carter Petitioners without further inquiry, as they are constitutionally infirm.

To explain, in concluding that all of the redistricting proposals, with the exception of the prison-adjusted plan submitted by the Ali amici, satisfy the equal population requirement, the Special Master relied on the general principle that "[w]here the maximum population deviation between the largest and smallest district is less than 10%, the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule." *Evenwel v. Abbott*, 578 U.S. 54, 60 (2016). As *Evenwel* itself notes, however, congressional districts are judged by a different standard. *See id.* (observing that while "[s]tates must draw congressional districts with populations as close to perfect equality as possible[,] … when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat"); *Mahan v. Howell*, 410 U.S. 315, 321 (1973) (explaining that "more flexibility [is] constitutionally permissible with respect to state legislative reapportionment than in congressional redistricting"), *modified*, 411 U.S. 922 (1973). Specifically, Article I, Section 2 of the United States Constitution "establishes a 'high standard of justice and common sense'

for the apportionment of congressional districts: 'equal representation for equal numbers of people.'" *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964)). Indeed, "[t]he Supreme Court has been exceedingly clear in requiring lower courts to balance population among the districts with precision." *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672, 675 (M.D. Pa. 2002) (holding 19-person total deviation violated the Federal Constitution's one person, one vote requirement).

While courts have recognized that mathematical precision is not always achievable, the "nearly as practicable" standard require '"the State make a good-faith effort to achieve precise mathematical equality." *Karcher*, 462 U.S. at 730.

A challenge to a plan's equal population involves two inquiries. *First*, the party challenging the redistricting plan bears the initial burden of "proving the existence of population differences that 'could practicably be avoided.'" *Tennant v. Jefferson Cty. Com'n*, 567 U.S. 758, 760 (2012) (quoting *Karcher*, 462 U.S. at 734). Second, if this burden is met, the burden shifts to the State "to show with some specificity that the population differences were necessary to achieve some legitimate

state objective." *Id.* To meet its burden, "the State must justify each

variance, ***no matter how small***." *Karcher*, 462 U.S. at 780 (emphasis

added). Importantly, "there are no de minimis population variations,

which could practicably be avoided, but nonetheless meet the standard

of [Article I, Section 2] without justification." *Id.* at 734.

Moreover, this standard—which, as the discussion above

demonstrates, is quite exacting in its own right—is even more stringent

when a redistricting plan is implemented by court order, rather than by

legislative action. *See Abrams v. Johnson*, 521 U.S. 74, 98 (1997)

("Court-ordered districts are held to higher standards of population

equality than legislative ones."); *Navajo Nation v. Arizona Indep.*

*Redistricting Com'n*, 230 F. Supp. 2d 998, 1009 (D. Ariz. 2002) ("A

court-ordered plan is held to an even stricter *de minimis* standard of

population equality than one drawn by a state legislature.").

Against this backdrop, the Special Master erred in concluding that

the plans submitted by the Carter Petitioners and the House

Democratic Caucus pass constitutional muster, despite containing a

two-person deviation. Although this action is not, strictly speaking, a

challenge under Article I, Section 2 of the United States Constitution's

equal population requirement, *Karcher*'s two-prong test is nevertheless instructive.

Thus, turning to the first part of the test, there is no doubt that the population difference in the Carter and House Democratic Caucus proposals "could practically be avoided[,]" 462 U.S. at 734, since ten of the thirteen maps submitted to the Special Master ***did*** avoid such a discrepancy. With regard to the second part of the inquiry, neither plan can credibly justify its deviation as necessary to achieve some "legitimate state objective." As it pertains to the House Democratic Caucus' plan, they did not even attempt to justify their failure to achieve population equality and, in fact, they were the only party that failed to offer any testimony—expert or otherwise. Similarly, the Carter Petitioners have not established that such a population deviation is necessary to advance a compelling state interest. Indeed—aside from being remarkable in that it is one of only two plans to violate the core precept of "one person one vote"—the Carter plan is remarkable in no other way. For example, it is not (and does not purport to be) the most compact, the most contiguous, or the most respectful of political subdivisions and municipalities.

Furthermore, to the extent the Carter Petitioners intend to argue that their non-compliance with Article I, Section 2 of the United States Constitution is warranted because of their "least change" approach to redistricting, that argument is unavailing. Specifically, as explained elsewhere in this Brief, maintenance of the core of a district is—at most—a secondary consideration that is wholly subordinate to the constitutionally prescribed neutral criteria. Accordingly, whatever role "the least" change rubric may have in the process, it is certainly not the type of "consistently applied legislative policies [that] might justify some variance," *Tennant*, 567 U.S. at 761-62 (internal quotation marks omitted), since it is neither a "legislative polic[y]," nor has it been "consistently applied." To the contrary, under *Holt*, reliance on this consideration is strictly circumscribed.

In short, a ***one*** person deviation is "as nearly as practicable" to equal population, and adhering to this deviation did not preclude the Carter Petitioners or the House Democrats from complying with the other constitutionally required redistricting criteria. It is manifest, therefore, that no compelling interest required the unconstitutional deviation.

47

**C. The Special Master's Report errs in its analysis of the interplay between Fourteenth Amendment's prohibition against racial gerrymandering and the Voting Rights Act.**

Although arguably not erroneous as such, the Special Master's analysis of the Federal Voting Rights Act, *see* 52 U.S.C. §§ 10301, *et seq.* (the "VRA"), is incomplete in several material ways. At bottom, the question before the Special Master—and now this Court—is not whether any of the proposals comply with or violate the VRA, but rather, whether some of the plans have been constructed with an impermissible emphasis on race. As explained below, where the *Gingles* factors have not been satisfied, constructing a plan with an emphasis on race—regardless of subjective intent—risks running afoul of the United States Constitution's prohibition against racial gerrymandering. Viewed in this light, the Special Master should have rejected the plans offered by the Governor, the Gressman Petitioners, and the Senate Democrats because the required record to complete a VRA and constitutional analysis of each is lacking (i.e., whether each plan does or does not violate the VRA and/or the Fourteenth Amendment is presently unknown, thus each should have been rejected).

48

### 1.  The VRA and the Fourteenth Amendment.

As a prefatory matter, it is important to emphasize that there are two separate strands of federal law relating to racial gerrymandering. First, under Section 2 of the VRA, a state may be required to draw a majority-minority district if the three *Gingles* factors are satisfied. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). Specifically, such a redistricting plan is mandatory if: "(1) [t]he minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate.'" *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (quoting *Gingles*, *supra* at 50-51).

A distinct, but closely-related line of cases pertain to racial gerrymandering under the Fourteenth Amendment, which prohibits states from drawing district lines on the basis of race absent a **compelling interest**. Of course, given that compliance with federal law is presumptively "a compelling interest," where the VRA requires creation of a majority-minority district, a claim of racial gerrymandering is unlikely to succeed. *See Abbott v. Perez*, 138 S. Ct.

2305 (2018) ("[T]he Court has assumed that compliance with the VRA is a compelling State interest for Fourteenth Amendment purposes[.]"). But where the VRA does not require creation of a majority-minority district, a State must proffer a "significant reason" for drawing district lines based on race. Therefore, if one of the *Gingles* factors, such as white bloc-voting, cannot be established, then the requisite good reason for drawing a minority-majority district does not exist. *See Gingles*, 478 U.S. at 49 n.15 (noting that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters").

> **2.    The proposed plans of Governor Wolf, the Gressman Petitioners, and the Senate Democrats.**

In this matter, Dr. Brunell's unrebutted expert report demonstrates that there is no racially polarized voting in Philadelphia County, which forms the core of all of the districts in question. Despite the absence of racially polarized voting in Pennsylvania, Governor Wolf, the Gressman Petitioners, and the Senate Democrats have created three districts that attempt to achieve a certain racial composition.[11]

---

[11] Congressional Intervenors do not dispute that one of the districts is, by virtue of Philadelphia's geography and demographics, likely to be a majority-

For instance, in their submissions to the Special Master, the Senate Democrats make a passing reference to *Gingles*, *see* Senate Democrats' Br. at 10, but did not even mention, let alone develop, any of the three factors. Nor did their expert's report suggest that this this analysis had been undertaken, and the expert did not offer any testimony in this respect. The Senate Democrats cited *Bartlett* (again in passing, and without pinpoint citation) in support of drawing coalition districts; however, *Bartlett* did not consider a coalition district. *See Bartlett*, 556 U.S. at 13-14 (distinguishing between "crossover districts"—where minority and majority voters vote for a minority candidate—and "coalition districts" where "two minority groups form a coalition to elect a candidate" of that coalition's choice, and expressly stating "[w]e do not address … coalition district[s] here"). And, even if *Bartlett* supported drawing coalition districts, the Senate Democrats would still be required to prove all three *Gingles* factors, which in the context of a coalition district requires the State to show that the minority group votes as a sufficiently cohesive unit. But they did not.

_____

minority district based on the application of the neutral criteria outlined in *League of Women Voters*.

And that flaw casts significant doubt on the constitutionality of their proposal.

Similarly while the Governor and the Gressman Petitioners suggest that *Gingles* applies, their experts did not—and, as Dr. Brunell's report demonstrates, *could* not—establish that the third factor is satisfied. Notably, as well, while the Governor (and to some extent, the Senate Democrats) occasionally downplay their emphasis on race in drawing the districts, the Gressman Petitioners have advocated for their map precisely ***because*** it is able to pack more minority groups into the three districts than any other proposal. *See* SMR at 121.

Because the Governor, the Senate Democrats, and the Gressman Petitioners did not prove *Gingles* is met, and acknowledged that their plans were drawn (at least in part) to achieve certain racial compositions in the districts, the only way to withstand a challenge under the Fourteenth Amendment would be a showing of some other "significant reason" (beyond compliance with the VRA) for drawing district lines based on race. These particular plans fail on this score as well.

52

In *Shaw v. Reno*, 509 U.S. 630 (1993), the High Court concluded that a race-neutral redistricting plan, which separates voters into separate districts based predominantly on race, violates the Fourteenth Amendment when "that separation lacks sufficient justification." *Id.* at 650. While the Court acknowledged that racial gerrymandering cases might be difficult to prove, but noted in "some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to segregate voters on the basis of race[,]" the *Shaw* court offered a scenario where "a State concentrated a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Id*. at 646; *see also id*. (these objective factors are important because "they may serve to defeat a claim that a district has been gerrymandered on racial lines"). As aptly relayed by the Court, grouping together individuals who share a common race, but no other commonality— geography, political boundaries, etc.—"reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike,

53

share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes." *Id*. These concerns are even more pounced where the plans at issue have prioritized the amalgamation of different races simply because they are not white.

To summarize, whether the plans discussed above actually violate Federal law is unclear and that question is not properly before the Court. Indeed, absent discovery and access to the mapmakers and the process utilized for creating the plans proposed by these parties, it would be nearly impossible to definitively make an assessment on this point at this juncture. What is clear, however, is that these plans, if adopted, will face questions that may result in their invalidation in Federal Court. Regardless, they should have been rejected by the Special Master due to the incomplete record.

### D. The Special Master's Report errs in the interpretation of the prohibition against splits of counties and municipalities unless "absolutely necessary."

In evaluating the various plans, the Special Master did not accord sufficient legal weight to the prohibition against splitting municipalities and municipalities unless "absolutely necessary." Specifically, although

the Special Master recognized that the prohibition against splitting counties and municipalities is one of the core neutral benchmarks under *League of Women Voters*, the SMR's analysis in this regard was flawed in two important ways: *first*, it misinterpreted this directive as simply one of the factors that is weighted in the analysis; and *second*, it mistakenly placed wards on the same footing as counties and other political subdivisions. As explained below, the text, structure, and history of the State Constitution suggest that minimizing county and municipal splits is a paramount objective that is second only to the equal population requirement. Furthermore, consistent with the rules of textual interpretation, Article II, Section 16's reference to "wards" should be given less weight.

### 1.   Article II, Section 16.

As the Special Master recognized, in *League of Women Voters* this Court held that the neutral criteria articulated in Article II, Section 16 of the State Constitution properly governed its assessment of congressional redistricting plans. The full text of that provision is as follows:

> The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be

> composed of compact and contiguous territory as nearly
> equal in population as practicable. Each senatorial district
> shall elect one Senator, and each representative district one
> Representative. **_Unless absolutely_** necessary no county,
> city, incorporated town, borough, township or ward shall be
> divided in forming either a senatorial or representative
> district.

Pa. Const. art. II, § 16 (emphasis added). Explaining that this provision is deeply rooted in the Commonwealth's constitutional history and is an outgrowth of the various efforts aimed at preventing voter dilution, the Court incorporated its three core requirements: (1) compactness; (2) contiguity; and (3) the prohibition against splitting political subdivisions "[u]nless absolutely necessary." While the phrase "absolutely necessary" was not further developed in *League of Women Voters*, the debates of the 1968 Pennsylvania Constitutional Convention, as well as the interpretation of the United States Constitution, suggest that strict emphasis on keeping counties and political subdivisions whole is a central part of our organic law.

To illuminate, from the inception of the 1968 Convention, the delegates plainly regarded the maintenance of political boundaries as an overriding concern. Indeed, on the opening day, when the question of

implementing certain guidelines in the legislative reapportionment process was first raised, Mr. Stahl offered the following remarks:

> The maintenance of political subdivision boundary lines is the principal non-population factor sanctioned by the courts. This can be accomplished by separate representation for local government units, or by preventing the splitting up of political subdivisions in the formation of legislative districts. The Supreme Court has recognized that the establishment of legislative districts along political subdivision lines may also serve to deter gerrymandering.

*Debates of the Convention to Amend the Constitution of Pennsylvania*, Vol. I at 32 (1967).

And the best evidence that the word "absolutely" was intended to elevate this requirement is found in the procedural history of the particular phrase. Specifically, after extensive debate—and before a final vote—an amendment regard it was referred to the Convention's Committee on Style and Drafting. With the input of the Substantive Committee on Redistricting, the Chairman of the Committee on Style and Drafting specifically stated "[t]he Committee acquiesces in the substantive committee's insistence upon the inclusion of the adverb 'absolutely[,]'" *Debates of the Convention to Amend the Constitution of Pennsylvania*, Vol. II at 1161 (1968). Thus, in addition to the settled maxim that every word in the Constitution must be given effect, the

57

"substantive committee's instance upon" the included adverb suggests an intent by the framers of the present version of our Constitution to create organic law that is more forceful than one where the word "necessary" stands alone.

Furthermore, a case that is familiar to every first-year law student also confirms the heightened emphasis that should be placed on "absolutely necessary." Specifically, examining the meaning of the word "necessary" as used in the Necessary and Proper Clause, the U.S. Supreme Court explained that the word "standing by itself, has no inflexible meaning; it is used in a sense more or less strict, according to the subject." *M'Culloch v. State*, 17 U.S. 316, 388 (1819). The Court further observed, however, that this word "may be qualified by the addition of adverbs of diminution or enlargement, such as very, indispensably, more, less, or absolutely necessary[.]" *Id.* In this regard, the Court pointed to Article I, Section 10, which "prohibits a state from laying 'imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws[.]" U.S. Const. art I, § 10. While the Necessary and Proper Clause granted flexibility, Justice Marshall explained, Article I, Section 10's prohibition was

58

decidedly more stringent, since "the convention understood itself to change materially the meaning of the word 'necessary,' by prefixing the word 'absolutely.'" *M'Culloch*, 17 U.S. at 414-15.

The foregoing leads to the inescapable conclusion that the prohibition against dividing counties and municipalities requires particularly close attention when redistricting under Pennsylvania law. The question, then, is what constitutes absolute necessity? The only logical conclusion is that such a division is appropriate where it is absolutely necessary to comply with another clear constitutional directive. Accordingly, in the present context, this directive can be read as mandating a strict regard for county and municipal boundaries, unless splitting them is necessary to comply with the equal population requirement.

### 2.   Wards.

Because the nature of "wards" has changed drastically over the last century, the Special Master erred in placing equal legal weight on ward divisions. Specifically, at the time this constitutional provision was adopted, wards were an essential municipal unit within boroughs and cities of the Second and Third Class. Among other things, each

ward elected its own officers, such justice of the peace, aldermen,[12]

assessors,[13] and auditors. Moreover, given that municipal legislative

bodies had not yet been made subject to equal population requirements,

members of borough council were elected by ward. Wards, therefore,

were integral to the municipal structure.

Over time, however, that began to change, beginning with the

abolition of aldermen and justices of the peace.[14] Furthermore, as the

population distribution among wards continued to become more

---

[12] Pa. Const. of 1874, art. V, § 11 provided:

Except as otherwise provided in this Constitution, justices of the peace
or aldermen shall be elected in the several wards, districts, boroughs
and townships, at the time of the election of constables, by the
qualified electors thereof, in such manner as shall be directed by law,
and shall be commissioned by the Governor for a term of five years. No
township, ward, district, or borough shall elect more than two justices
of the peace or aldermen without the consent of a majority of the
qualified electors within such township, ward, or borough; no person
shall be elected to such office unless he shall have resided within the
township, borough, ward or district for one year next preceding his
election. In cities containing over fifty thousand inhabitants, not more
than one alderman shall be elected in each ward or district.

[13] *See, e.g.*, 72 P.S. §§ 5020-102 (defining the role of assessors); 72 P.S. § 5020-
301 ("The qualified voters of each ward in cities of the third class shall, at the
municipal election in the year one thousand nine hundred and thirty five, and every
four years thereafter, vote for and elect a properly qualified person, according to
law, to act as county assessor in each of said wards under the provisions of this act,
who shall serve for four years."), *repealed by* 53 Pa.C.S. § 8801 *et seq*.

[14] *See* Pa. Const. Sched. art. V, § 12 (abolishing office of alderman and justice
of the peace).

lopsided and the application of one-person-one-vote principles to local reapportionment was firmly established, boroughs and cities also ceased elected council members by ward and, instead, either shifted to at-large representation, or decennial districting. At present, one of the only function wards serve is in the election administration process.[15] Thus putting splits of wards on equal footing as splits of counties and municipalities in assessing redistricting plans is unjustified.

### E.   The Special Master erred in recommending HB 2146 over Reschenthaler 1 or 2.

In the end, this case comes down to "absolutely necessary." Here, the ***only*** maps before the Court that have split counties and municipalities the least number of times (13 and 16 respectively)—i.e., only as absolutely necessary—are Reschenthaler 1 and Reschenthaler 2. Multiple experts (Dr. Rodden, Dr. DeFord, and Dr. Duchin), none of whom were experts for the Congressional Intervenors, testified that it was absolutely possible to draw a 17-district congressional map that contained only 13 county splits and 16 municipal splits, just as the

---

[15] The only remnant of the old regime of ward officers appear to be constables. *See* 44 Pa.C.S. § 7113(b) ("The qualified voters of every borough divided into wards shall vote for and elect a properly qualified person for constable in each ward and a properly constable for high constable in the borough.").

61

Congressional Intervenors have done. *See* SMR at 147, ¶¶ FF42-FF43; *see also* N.T. 1/27/22 at 43:19-25; 170:15-20 (Dr. Rodden); N.T. 1/27/22 at 287:11-20 (Dr. DeFord); N.T. 1/27/22 at 461:5-21 (Dr. Duchin). Here's what that means: a congressional plan for Pennsylvania **cannot** contain more than 13 county splits or 16 municipal splits because multiple experts admitted splitting more than that was not absolutely necessary to achieve constitutional compliance.

That should be the end of the inquiry for this Court. The Congressional Intervenors are the only participants in this proceeding who *to the letter* followed the Pennsylvania Constitution. While others submitted maps that have this or that feature purporting to be better in some one way or other, those maps all fail for the same reason: they split more counties and municipalities than is "absolutely necessary." Thus, comparing their various metrics to those of the Congressional Intervenors' maps is a comparison of apples to oranges: none of them presented testimony, and thus it is utterly unknown, how they would have fared in these metrics had they followed the Constitution.

A2272

N.T. 1/27/22 at 465:16-25 (Dr. Duchin testifying).[16] Even if the Court could consider maps with higher numbers of splits, consideration of all neutral factors compels selecting one of the Reschenthaler maps: they are top of the class in compactness scores, share the least amount of municipal splits and segments, and of course stand alone with fewest county splits and segments. No other map checks as many of the neutral factor boxes as the Reschenthaler maps. Accordingly, the other parties' stats, and the maps themselves, should be summarily ignored.

Finally, various experts reported a variety of purported partisan measures about each of the *submitted* maps, but the most resounding detail was about ones *not* submitted. Indeed, Dr. Duchin—the Governor's expert—disclosed to the Court that in generating **100,000** random plans (i.e., maps) with a computer, which was programmed only to honor Pennsylvania's minimum constitutional requirements, the "[r]andom plans tend to exhibit **pronounced advantage** to

---

[16] Q.   So your representation to the Court is if these maps changed or produced fewer county splits, the scores don't change?
A.   They might remain unchanged.
Q.   They might remain unchanged, but they might change?
A.   But they might change.
Q.   Indeed.
A.   I agree.
N.T. 1/27/22 at 465:16-25.

Republicans across this full suite of elections." *See* Duchin Initial Report at 18 (emphasis added); SMR at 164, ¶ FF10. And that wasn't a typo; indeed, on the next page of her report, still analyzing the 100,000 plans drawn by a non-partisan, non-biased computer, she once again concluded that "random plans favor Republicans[.]" Duchin Initial Report at 19. Further, far from backing away from this analysis, at trial she agreed that these 100,000 plans produced a "pronounced advantage to Republicans." N.T. 1/27/22 at 449:1-12.[17]

In other words, the most "typical outcome" for any randomly drawn, constitutionally compliant plan, which takes no account for impermissible partisan considerations, is one that will produce a Republican "tilt" based on election projections. N.T. 1/27/22 at 450:10-10-16 (Dr. Duchin testifying).[18] And the *reason* for that typical outcome is not anything nefarious but, in fact, something readily acknowledged

---

[17] Q.   Now, as I understand what you're saying is that you agree that the random plans that are drawn in your ensemble without any partisan data, Exhibit A, pronounced advantage to Republicans. Correct?
A.   That's a qualitative assessment, but I would call this pronounced.
Q.   You would call it pronounced?
A.   I would.
N.T. 1/27/22 at 449:1-12 (testimony of Dr. Duchin).
[18] Q.   But the most typical outcome is plans with a Republican tilt. Fair?
A.   Absolutely. And I'm not aware of any rule that requires that we pick the most typical. I think we're trying to choose an excellent plan.
N.T. 1/27/22 at 450:10-10-16 (testimony of Dr. Duchin).

at trial: Pennsylvania's human geography (sometimes referred to as political geography) results in its citizens living in population-dense urban areas, which are more Democrat, and also in population-dispersed rural areas, which are more Republican. *See* SMR at 162-164, ¶¶ FF1-FF10; *see also* N.T. 1/27/22 at 174:3-181:24 (Dr. Rodden testifying); ); Duchin Initial Report at 17 ("In this section, I present a series of images that reinforce the theme elaborated above: the political geography of Pennsylvania creates a districting landscape that is tilted toward Republican advantage.")[19] Thus, in drawing population-equal districts, yet still compact and contiguous, those voters become grouped into divisions that, solely as a function of how people have self-sorted, tend to have a Republican lean. *See* SMR at 162-164, ¶¶ FF1-FF10; *see also* N.T. 1/27/22 at 181:9-20 (Dr. Rodden testifying).

---

[19] The most poignant admission by Dr. Rodden of the phenomenon of Pennsylvania's human geography yielding a Republican tilt in maps was as follows:

> Q.      I really just want to get to the terminal statement of this --- this report. Proving such intent in court will be difficult in states where equally egregious electoral bias can emerge purely from human geography? Did I read that correctly?
> A.   Yes.
> Q.   And is that --- was that true when you said it?
> A.   Yes.
> Q.   And is it still true today about Pennsylvania?
> A.   Yes.

N.T. 1/27/22 at 181:6-20.

65

And the foregoing most "typical outcome" is precisely reflected in Reschenthaler 1 and Reschenthaler 2. According to various experts in this case, these two maps produce a slight Republican tilt. *See supra.* This is utterly consistent with Pennsylvania's political geography.

In the end, for these reasons, and for the reasons stated above, the Court's choice in this matter is binary: pick either Reschenthaler 1 or Reschenthaler 2. All of the other proposed maps fail, in among other ways, the unequivocal constitutional requirement that they split counties and political subdivisions only when "absolutely necessary." All of the parties submitting these maps could have done better—as multiple experts acknowledged—but they elected not to, for reasons unknown. Their failing winnows the wheat from the chaff, leaving only two maps that have met the constitutional requirements to be selected as Pennsylvania's congressional plan. Accordingly, the Congressional Intervenors respectfully submit the Special Master erred in not recommending one of the Reschenthaler maps.

## V.    CONCLUSION

For the foregoing reasons, Reschenthaler 1 and Reschenthaler 2 are the only maps that meet *all of* the constitutional requirements for a

congressional district map. They should therefore be adopted by this

Court.

Respectfully submitted,

Dated: February 14, 2022          /s/ Matthew H. Haverstick
                                  Matthew H. Haverstick (No. 85072)
                                  Joshua J. Voss (No. 306853)
                                  Shohin H. Vance (No. 323551)
                                  Samantha G. Zimmer (No. 325650)
                                  KLEINBARD LLC
                                  Three Logan Square
                                  1717 Arch Street, 5th Floor
                                  Philadelphia, PA 19103
                                  Ph: (215) 568-2000
                                  Fax: (215) 568-0140
                                  Eml: mhaverstick@kleinbard.com
                                  jvoss@kleinbard.com
                                  svance@kleinbard.com
                                  szimmer@kleinbard.com

                                  *Attorneys for Congressional*
                                  *Intervenors*

67

Received 2/14/2022 8:50:24 PM Supreme Court Middle District

Filed 2/14/2022 8:50:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| CAROL ANN CARTER; MONICA PARRILLA; REBECCA POYOUROWN; WILLIAM TUNG; ROSEANNE MILAZZO; BURT SIEGEL; SUSAN CASSANELLI; LEE CASSANELLI; LYNN WACHMAN; MICHAEL GUTTMAN; MAYA FONKEU; BRADY HILL; MARY ELLEN BALCHUNIS; TOM DEWALL; STEPHANIE MCNULTY; & JANET TEMIN, | |
| Petitioners | |
| v. | 7 MM 2022 |
| LEIGH M. CHAPMAN, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania; JESSICA MATHIS, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries, | |
| Respondents | |

*CONSOLIDATED WITH*

| |
|---|
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; & GARTH ISAAK, |
| Petitioners |
| v. |
| LEIGH M. CHAPMAN, in her capacity as Acting Secretary of the Commonwealth of Pennsylvania; & JESSICA MATHIS, in her capacity as Director for the Pennsylvania Bureau of Election Services and Notaries, |
| Respondents |

**Exceptions to Report of Special Master of Amici Khalif Ali, Maryn Formley, Richard Rafferty, Patrick Beaty, Susan Gobreski, Barbara Hill, Judy Hines, Jodi Greene, John Thompson, Cynthia Alvarado, and Timothy L. Kauffman**

A2278

Amici Khalif Ali *et al.* respectfully submit the following exceptions to the Report of the Special Master, dated February 7, 2022:

1. Amici take exception to, and this Court should decline to adopt, the Special Master's recommendation that HB 2146 be selected as Pennsylvania's new congressional plan.

2. Amici take exception to, and this Court should decline to adopt, the Special Master's legal conclusion that in an impasse case, courts owe any degree of deference to a congressional plan passed by the General Assembly but vetoed by the Governor.

3. Amici take exception to, and this Court should decline to adopt, factual findings or mixed factual findings and legal conclusions that underlie the Special Master's selection of HB 2146 and rejection of the Ali Plan, including:

   a. Elimination from consideration of any plans that split the City of Pittsburgh or the County of Bucks;

   b. A failure to take into account whether plans split the Capital Region or the urban centers of Northeastern Pennsylvania; and

   c. Elimination from consideration, and non-prioritization, of the Ali Plan on the grounds that it is based on residence data treating prisoners as residents of their homes instead of their cells.

4. Amici take exception to, and this Court should decline to adopt, the Special

   Master's recommendation that the Ali Plan not be selected as Pennsylvania's

   new congressional plan.


   Amici's accompanying brief more fully addresses the above exceptions and

related errors.


Respectfully submitted,

*/s/ Benjamin D. Geffen*

| | |
|---|---|
| Mary M. McKenzie, Bar No. 47434 | Martin J. Black, Bar No. 54319 |
| Benjamin D. Geffen, Bar No. 310134 | Andrew M. Rocco, Bar No. 330751 |
| PUBLIC INTEREST LAW CENTER | DECHERT LLP |
| 1500 JFK Blvd., Suite 802 | Cira Centre |
| Philadelphia, PA 19102 | 2929 Arch Street |
| mmckenzie@pubintlaw.org | Philadelphia, PA 19104 |
| 267-546-1319 | martin.black@dechert.com |
| bgeffen@pubintlaw.org | andrew.rocco@dechert.com |
| 267-546-1308 | 215-994-4000 |

*Counsel for Amici Khalif Ali et al.*

Suzanne R. Almeida, Bar No. 309558
COMMON CAUSE
800 N. 3rd Street, Suite 401
Harrisburg, PA 17102
salmeida@commoncause.org
717-232-9951

*Counsel for Amicus Khalif Ali*

Dated: February 14, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the Case Records

Public Access Policy of the Unified Judicial System of Pennsylvania that require

filing confidential information and documents differently than non-confidential

information and documents.


<u>*/s/ Benjamin D. Geffen*</u>
Benjamin D. Geffen

Dated: February 14, 2022

Received 2/14/2022 8:50:24 PM Supreme Court Middle District

Filed 2/14/2022 8:50:24 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

CAROL ANN CARTER; MONICA PARRILLA;
REBECCA POYOUROW; WILLIAM TUNG;
ROSEANNE MILAZZO; BURT SIEGEL; SUSAN
CASSANELLI; LEE CASSANELLI; LYNN WACHMAN;
MICHAEL GUTTMAN; MAYA FONKEU; BRADY
HILL; MARY ELLEN BALCHUNIS; TOM DEWALL;
STEPHANIE MCNULTY; & JANET TEMIN,

Petitioners

v.    7 MM 2022

LEIGH M. CHAPMAN, in her official capacity as the
Acting Secretary of the Commonwealth of Pennsylvania;
JESSICA MATHIS, in her official capacity as Director for
the Pennsylvania Bureau of Election Services and Notaries,

Respondents

*CONSOLIDATED WITH*

PHILIP T. GRESSMAN; RON Y. DONAGI;
KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P.
MARSH; JAMES L. ROSENBERGER; AMY MYERS;
EUGENE BOMAN; GARY GORDON; LIZ MCMAHON,
TIMOTHY G. FEEMAN; & GARTH ISAAK,

Petitioners

v.

LEIGH M. CHAPMAN, in her capacity as Acting Secretary
of the Commonwealth of Pennsylvania; & JESSICA
MATHIS, in her capacity as Director for the Pennsylvania
Bureau of Election Services and Notaries,

Respondents

**Brief of Amici Khalif Ali, Maryn Formley, Richard Rafferty,
Patrick Beaty, Susan Gobreski, Barbara Hill, Judy Hines, Jodi Greene,
John Thompson, Cynthia Alvarado, and Timothy L. Kauffman**

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ..................................................................................1

INTERESTS OF THE AMICI.................................................................2

STATEMENT OF THE SCOPE AND STANDARD OF REVIEW ......................8

QUESTIONS INVOLVED.......................................................................9

SUMMARY OF ARGUMENT ...............................................................10

ARGUMENT .....................................................................................11

    I.    The Elections Clause Does Not Stack the Deck for the General Assembly ..................................................................................11

        A.    *Smiley v. Holm* Rejects Any Special Role in Redistricting for the General Assembly Vis-à-vis the Governor .................12

        B.    Post-*Smiley* Precedents Reaffirm the General Assembly's Lack of Primacy in Congressional Redistricting Impasses .....14

        C.    The Special Master's Deference Theory Would Radically Alter the Separation of Powers .................................................16

    II.    Several Plans, Including the Ali Plan, Manage Splits and Communities of Interest Better Than HB 2146 .................17

        A.    The Special Master Wrongly Elevated Not Splitting Pittsburgh to Quasi-Constitutional Status...............................18

        B.    The Special Master's Treatment of Bucks County Was Equally Flawed .........................................................................20

        C.    The Special Master Arbitrarily Ignored Other Communities of Interest That This Court Grouped Together in the 2018 Plan ..........................................21

            1.    The Harrisburg Area ......................................................21

            2.    Northeastern Pennsylvania ............................................24

        D.    The Court Should Make its Own Determination, Prioritizing Communities of Interest .......................................25

    III.    As a Tiebreaker, the Court Should Select a Plan Based on Prisoners' Home Addresses ..............................................28

i

# TABLE OF CONTENTS
(continued)

**Page**

A.   Counting Prisoners in their Cells Unfairly Distorts Districts ................................................................29

B.   State Law Treats Prisoners as Residents of Their Homes .......31

C.   Districting Plans Can Be Based On Adjusted Census Data .......................................................... 33

CONCLUSION ................................................................35

## TABLE OF CITATIONS

**Page(s)**

**CASES**

*Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ..............................................................................15

*Bethel Park v. Stans*,
    449 F.2d 575 (3d Cir. 1971) .................................................................34

*Carroll v. Becker*,
    285 U.S. 380 (1932) ..............................................................................13

*Donnelly v. Meskill*,
    345 F. Supp. 962 (D. Conn. 1972) ........................................................14

*Evenwel v. Abbott*,
    578 U.S. 54 (2016) ................................................................................34

*Fletcher v. Lamone*,
    831 F. Supp. 2d 887 (D. Md. 2011) ........................................29, 30, 33

*Holt v. 2011 Legislative Reapportionment Comm'n*,
    38 A.3d 711 (Pa. 2012) .........................................................................34

*In re Initiative Petition No. 426, State Question No. 810*,
    465 P.3d 1244 (Okla. 2020) ..................................................................33

*Jubelirer v. Rendell*,
    953 A.2d 514 (Pa. 2008) .......................................................................14

*Koenig v. Flynn*,
    285 U.S. 375 (1932) ..............................................................................13

*League of Women Voters of Pa. v. Commonwealth (LWV-PA)*,
    178 A.3d 737 (Pa. 2018) ................................................................*passim*

*League of Women Voters of Pa. v. Commonwealth*,
    181 A.3d 1083 (Pa. 2018) ..............................................................16, 22

*Little v. N.Y. State Legislative Task Force on Demographic Research*
   *& Reapportionment*,
   No. 2310-2011 (N.Y. Sup. Ct. Dec. 1, 2011) ......................................................33

*McKenna v. McKenna*,
   422 A.2d 668 (Pa. Super. Ct. 1980)..................................................................31

*Perry v. Perez*,
   565 U.S. 388 (2012) ..........................................................................................14

*Rucho v. Common Cause*,
   139 S.Ct. 2484 (2019)........................................................................................15

*Scarnati v. Wolf*,
   173 A.3d 1110 (Pa. 2017) ...........................................................................13, 14

*Smiley v. Holm*,
   285 U.S. 355 (1932)......................................................................................12, 13

*State ex rel. Smiley v. Holm*,
   238 N.W. 494 (Minn. 1931) ..............................................................................12

*United States v. Stabler*,
   169 F.2d 995 (3d Cir. 1948) ..............................................................................31

*Upham v. Seamon*,
   456 U.S. 37 (1982)............................................................................................14

## CONSTITUTIONAL PROVISIONS

Pa. Const. art. I, § 5....................................................................................................32

Pa. Const. art. II, § 16 ................................................................................................19

Pa. Const. art. IV, § 15..........................................................................................13, 15

U.S. Const. art. I, § 4..................................................................................................12

iv

**STATUTES**

25 Pa.C.S. § 1302(a)(3)..................................................................31

42 Pa.C.S. § 726 ..........................................................................8

Cal. Elec. Code § 21003 ...............................................................33

Colo. Rev. Stat. § 2-2-902 ............................................................33

Md. Code Ann., Elec. Law, § 8-701 ..............................................33

N.J.S.A. §§ 52:4-1.1 to -1.6 ..........................................................34

Nev. Rev. Stat. §§ 304.065, 360.288 .............................................34

Va. Code Ann. § 24.2-304.04(9)...................................................34

Wash. Rev. Code § 44.05.140........................................................34

**OTHER AUTHORITIES**

The Federalist No. 48 (James Madison) (J.R. Pole ed., 2005) ..............................17

Legislative Reapportionment Commission, *The Legislative Guide to Redistricting in Pennsylvania* (last updated May 8, 2013)..................................34

LRC Resolution 4A (Aug. 24, 2021), *available at* https://www.redistricting.state.pa.us/resources/press/Resolution%204A.pdf; .......................................................................................28

LRC Resolution 5A (Sept. 21, 2021), *available at* https://www.redistricting.state.pa.us/resources/press/Resolution%205A.pdf ...................................................................................28, 29

## INTRODUCTION

The Special Master recommended selecting the congressional plan proposed by the Republican Legislative Intervenors (HB 2146). This recommendation is premised on serious legal and factual errors and should be rejected. As a legal matter, a plan passed by the General Assembly but vetoed by the Governor deserves no deference whatsoever. And the Report's selection of HB 2146 is premised on arbitrary and flawed preferences about which local government units to split.

The Court should instead select one of several superior plans in the record, the best of which is the Ali Plan, which keeps key communities of interest intact and counts prisoners at their home addresses. In the alternative, the Court should appoint an expert to craft its own fair and neutral plan, drawing on the best features of the Ali Plan.

## INTERESTS OF THE AMICI

Amici are Khalif Ali, Maryn Formley, Richard Rafferty, Patrick Beaty, Susan Gobreski, Barbara Hill, Judy Hines, Jodi Greene, John Thompson, Cynthia Alvarado, and Timothy L. Kauffman.[1] All of the Amici are Pennsylvania voters who have demonstrated a longstanding commitment to free and equal elections. They come from across the Commonwealth, belong to different political parties, and have all advocated at the local or state level for better redistricting for Pennsylvania. None is a politician. All are active in their communities and believe their communities should be fully and fairly represented in any congressional districting plan. Amici share a belief in the fundamental importance of neutral, nonpartisan standards for congressional redistricting.

The Ali Plan builds on Governor Wolf's Plan, proposing two modifications: (1) the use of prison-adjusted population data, a step already taken by the Legislative Reapportionment Commission (LRC) for redrawing legislative districts; and (2) adjustments to communities of interest, concentrating in three

---

[1] This brief was paid for and authored entirely by amici; counsel for amici; and staff, contractors, and volunteers from Common Cause, the League of Women Voters of Pennsylvania, and Fair Districts PA.

different parts of the Commonwealth, to ensure the integrity of those communities.[2]

<u>Khalif Ali</u>

Khalif Ali was born and raised in Pittsburgh and has spent the last five years living in the Hazelwood neighborhood. Since November of 2020, Mr. Ali has served as the Executive Director of Common Cause Pennsylvania, a nonpartisan nonprofit organization dedicated to upholding the core values of American democracy, including working to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process. Common Cause Pennsylvania has approximately 35,000 members and supporters across the Commonwealth, including members in every congressional district. As Executive Director, Mr. Ali has been heavily involved in advocating for a fair, transparent, and representative redistricting process, including by submitting testimony to the relevant committees, lobbying individual members of the legislature and executive branch, as well as organizing and educating activists across Pennsylvania to make their voices heard in the process.

---

[2] Details about the crafting of the Ali Plan are available in the Brief of Amici Khalif Ali *et al.* (Jan. 24, 2022) at 1-2 & n.2, and the Expert Report of Sarah Andre (attached as Exhibit to *id.*).

<u>Maryn Formley</u>

Maryn Formley is a voter in Allegheny County and is the founder and Executive Chair for the Voter Empowerment Education and Enrichment Movement (VEEEM), a non-profit organization dedicated to increasing voter turnout in Allegheny County. She believes that representation is the core of our democracy and works to educate and empower voters, particularly Black voters, to make their voices heard.

<u>Richard Rafferty</u>

Richard Rafferty is a voter in Lafayette Hill, Montgomery County, and has been consistently voting in congressional elections there for some 30 years. After retiring as an IT Director five years ago, Mr. Rafferty joined Fair Districts PA as a volunteer. In 2019, he became the Montgomery County Local Lead for Fair Districts PA, leading organizing and advocacy across the county in support of transparent, impartial, and fair redistricting.

<u>Patrick Beaty</u>

Patrick Beaty is a voter in Huntingdon Valley, Montgomery County. He is a retired attorney who served for many years in state government. For the last five years, he has volunteered as the Legislative Director for Fair Districts PA, a nonpartisan, statewide coalition of organizations and individuals working to create a process for redistricting that is transparent, impartial, and fair. As a leader of Fair

Districts PA, he has been heavily involved in the coalition's efforts to educate and mobilize Pennsylvanians around ending gerrymandering, and he has given testimony in both houses of the General Assembly regarding congressional redistricting.

Susan Gobreski

Susan Gobreski is a voter in Philadelphia who serves on the Board of Directors for the League of Women Voters of Pennsylvania. As the League's Board Director for Government Policy, she works to protect voting rights. In that capacity she testified before the House State Government Committee on Congressional Redistricting on October 19, 2021. There she advocated for a fair process and outcome, including that the congressional plan follow the imperatives stated in the Pennsylvania Constitution; that the geography of the plan make sense, with minimal division of existing governance structures; and that there be no discriminatory effect on the basis of voters' political affiliations or preferences.

Barbara Hill

Barbara Hill is a voter in Stroudsburg, Monroe County. She has been a member of the League of Women Voters for decades, joining chapters wherever she lived. As a volunteer with the Monroe County League of Women Voters, Ms. Hill has worked on publishing their Voters Guide and their Government Directory. She believes a fair congressional plan is fundamental to democracy.

Judy Hines

Judy Hines is a voter in Mercer in Mercer County. She is an active member of the League of Women Voters of Mercer County, where she has regularly participated in advocating for a fairer, more representative congressional redistricting process. She also has served as the membership chair of the Mercer County NAACP and has been active in political campaigns.

Jodi Greene

Jodi Greene is a voter in Birdsboro in Berks County and a professor of history at Reading Area Community College. She is active in her community, including having served as President of the League of Women Voters of Berks County. She has regularly advocated for a fair, representative, and transparent redistricting process, including organizing in Berks County to ensure residents understand the impact of redistricting on their daily lives.

John Thompson

John Thompson is a lifelong Philadelphian. From 1980 to 2016, Mr. Thompson was incarcerated in a series of Pennsylvania State Correctional Institutions, most recently in SCI Smithfield. Immediately upon his release from prison in 2016, Mr. Thompson returned home to Philadelphia and registered to vote. Since 2020, Mr. Thompson has been employed as a social and political organizer with the Abolitionist Law Center, primarily working and advocating to

eliminate death by incarceration, solitary confinement, and the release of all aging and geriatric prisoners.

Cynthia Alvarado

Cynthia Alvarado grew up in and still lives in Philadelphia. From 2008 to 2020, Ms. Alvarado was incarcerated in the State Correctional Institution at Muncy, in Lycoming County, where she had no community ties outside the prison's walls. While growing up in the deeply impoverished Badlands section of Philadelphia, Ms. Alvarado felt politically disempowered and did not vote. But during her time in prison, she had a political awakening, and she is now an outspoken member of her community, promoting criminal-justice reform at the federal, state, and local levels. She recently registered to vote for the first time in her life and looks forward to voting in the 2022 congressional elections.

Timothy L. Kauffman

Timothy L. Kauffman was born in Lancaster City and graduated from JP McCaskey High School. He attended Gettysburg College and joined the Reserve Officer Training Corps in 1968. Dr. Kauffman served in the United States Army Reserves for 39 years, during which time he regularly encouraged his military associates to register and vote. He resides in Manheim Township in Lancaster County. Dr. Kauffman is concerned for the new congressional plan to fairly and adequately represent his community.

**STATEMENT OF THE SCOPE AND STANDARD OF REVIEW**

The scope of review is plenary. 42 Pa.C.S. § 726. The standard of review is

*de novo. E.g.*, *League of Women Voters of Pa. v. Commonwealth* (*LWV-PA*), 178

A.3d 737, 802 n.62 (Pa. 2018).

## QUESTIONS INVOLVED

1. In an impasse case, how much deference should a court extend to a congressional plan passed by the General Assembly but vetoed by the Governor?

   *Proposed answer: None.*

2. Do considerations of minimizing splits of local government units and protecting communities of interest support the selection of HB 2146 over the Ali Plan?

   *Suggested answer: No.*

3. Should the Court prioritize a plan that treats prisoners as residents of their homes instead of their cells?

   *Suggested answer: Yes.*

## SUMMARY OF ARGUMENT

The Special Master pressed a heavy hand on the scale in favor of the congressional plan described in HB 2146 on the grounds that the General Assembly had approved that plan in the name of the people. But HB 2146 did not secure a single bipartisan vote, and the Governor vetoed it. The Special Master committed a serious legal error in giving preeminence to the politically charged HB 2146 plan. This Court should not compound the error by issuing a judicial stamp of approval to a failed bill passed by one party in the middle of impasse litigation. That would send the wrong message to future lawmakers and is hardly the way to instill confidence in the fairness of the judicial mapmaking process now forced on the Court.

Because of the failure of the legislative process, this Court must now select or draw a plan based on neutral principles. The Special Master rejected the Ali Plan and others for splitting Pittsburgh and Bucks County, but the decision to prioritize these splits over others was arbitrary. Indeed, the Ali Plan does a better job overall of keeping key local government units and communities of interest intact. Moreover, only the Ali Plan properly accounts for the treatment of prisoners. Nothing prohibits the selection of a plan that counts prisoners at their homes, and indeed this is a plus factor in favor of the Ali Plan.

**ARGUMENT**

**I.    The Elections Clause Does Not Stack the Deck for the General Assembly**

In a casino, the house always wins; in a redistricting case, the House enjoys no such advantage, nor the Senate. Under binding decisional law, when the General Assembly and the Governor disagree about a proposed congressional plan, the Elections Clause deals the General Assembly nothing—***zero***—in the nature of special powers, freestanding authority, or entitlement to judicial deference.

The Special Master's Report endorses a radical theory of the General Assembly's prerogatives that is contrary to controlling precedents and ruinous to the separation of powers. In the proceedings below, the Senate Republicans insisted that HB 2146 "is entitled to deference from the Court." Brief of Senate Republicans (Jan. 24, 2022), at 12. Similarly, the House Republicans urged that the Special Master "should adopt the House Plan regardless of whether it is ultimately vetoed by the Governor." Brief of House Republicans (Jan. 24, 2022), at 12. The Report adopts this theory. Although the Special Master declined to "summarily" defer to HB 2146 without a hearing, Report at 208 ¶ 61, the Report ultimately selects HB 2146 on the grounds that courts should defer to a vetoed but otherwise constitutional congressional plan, *id.* at 216 ¶ 97.

The U.S. Supreme Court and this Court have squarely rejected this dangerous theory over and over again. The Court should put it to rest.

### A. *Smiley v. Holm* Rejects Any Special Role in Redistricting for the General Assembly Vis-à-vis the Governor

In an impasse just like the one now before the Court, the 1930 Census cost Minnesota one seat in the U.S. House of Representatives, and after the Minnesota House and Senate passed a new congressional districting plan, Governor Floyd B. Olson vetoed it. *Smiley v. Holm*, 285 U.S. 355, 361 (1932). A legal dispute ensued as to whether he **could** veto it, in light of Article I, § 4 of the U.S. Constitution (the "Elections Clause"), which says: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Prefiguring the Special Master's theory, the Supreme Court of Minnesota held that the Elections Clause empowered the state legislature to act alone in congressional redistricting, and that "[i]t follows that the Governor's veto herein was a nullity." *State ex rel. Smiley v. Holm*, 238 N.W. 494, 499 (Minn. 1931).

The U.S. Supreme Court unanimously reversed in a decision that eliminates any notion the General Assembly has primacy in an impasse case:

> We find no suggestion in the federal constitutional provision of an attempt to endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted. Whether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity.

*Smiley*, 285 U.S. at 367-68. In other words, the term "Legislature" in the Elections Clause refers not narrowly to the State House and State Senate, but broadly to the lawmaking power of the State, which includes a role for the Governor. *See Smiley*, 285 U.S. at 372-73 ("[T]here is nothing in Article I, section 4, which precludes a State from providing that legislative action in districting the State for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power.").

In companion cases decided the same day as *Smiley*, the Court reiterated that where the two state houses have agreed on a congressional redistricting plan but the governor has not approved it, a state court has the power to end the impasse with a redistricting plan that differs from that passed by the two houses. *Koenig v. Flynn*, 285 U.S. 375, 379 (1932) (noting that a state court can reject a congressional plan that passed both houses but does not meet "the requirements of the Constitution of the state in relation to the enactment of laws," including gubernatorial approval); *accord Carroll v. Becker*, 285 U.S. 380, 381-82 (1932).

This is as true in Pennsylvania in 2022 as it was in Minnesota in 1932. *See, e.g.*, *Scarnati v. Wolf*, 173 A.3d 1110, 1120 (Pa. 2017) ("By conferring upon the Governor the authority to nullify legislation that has passed both legislative houses, [Pa. Const. art. IV,] Section 15 entrusts him with the obligation both to examine the provisions of the legislation within the ten days allotted by Section 15 and to

either approve it or return it, disapproved, for legislative reconsideration."); *id.*

("The Governor is thereby an integral part of the lawmaking power of the state. No

bill may become law without first being submitted to the Governor for approval or

disapproval." (quotation marks and citation omitted)); *id.* ("[W]e have described

the Governor's authority to veto a bill as a form of 'limited legislative power.'"

(quoting *Jubelirer v. Rendell*, 953 A.2d 514, 529 (Pa. 2008))). In other words, as a

matter of Pennsylvania law, the term "Legislature" as used in the Elections Clause

encompasses both the General Assembly and the Governor.

## B.   Post-*Smiley* Precedents Reaffirm the General Assembly's Lack of Primacy in Congressional Redistricting Impasses

The Report cites a single U.S. district court case that extended some

deference to a vetoed congressional plan. Report at 43, 216 (citing *Donnelly v.

Meskill*, 345 F. Supp. 962, 963 (D. Conn. 1972)).[3] *Donnelly* failed to mention

*Smiley*, *Koenig*, or *Carroll* and was wrongly decided. And even the court in

*Donnelly* made adjustments to the vetoed plan. *See* 345 F. Supp. at 965.

Since *Donnelly* the U.S. Supreme Court has reemphasized *Smiley*'s core

holding. In 2015, the Court underlined that *Smiley* means that for Elections Clause

---

[3] The Report mentions two other cases alongside *Donnelly* in its deference discussion. Report at 43 (citing *Perry v. Perez*, 565 U.S. 388 (2012) (per curiam) and *Upham v. Seamon*, 456 U.S. 37 (1982) (per curiam)). *Perry* and *Upham* are of no relevance to this issue, because both concerned congressional plans that passed the Texas House and Senate **and** were signed by the Governor.

purposes, "Minnesota's legislative authority includes not just the two houses of the legislature; it includes, in addition, a make-or-break role for the Governor." *Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 806 (2015); *accord id.* at 808 ("Thus 'the Legislature' comprises the referendum and the Governor's veto in the context of regulating congressional elections.").

Of dispositive significance to the present case, *Arizona* states: "Nothing in [Article I, § 4] instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution." *Id.* at 817-18. In Pennsylvania, a controlling "provision of the State's constitution" is Article IV, § 15, which directs that a bill not approved by the Governor shall not become law.

Even the *Arizona* dissent acknowledged that "the state legislature need not be exclusive in congressional districting, but neither may it be excluded." 576 U.S. at 842 (Roberts, C.J., dissenting). More recently, Chief Justice Roberts wrote a majority opinion recognizing that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply" when evaluating congressional plans that exhibit "excessive partisan gerrymandering." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2507 (2019). *Rucho* forecloses any suggestion that the Elections Clause obligates state courts to rubber-stamp even

congressional plans passed by both houses and signed by the governor, let alone vetoed plans.

In Pennsylvania, this Court has recognized both that "the primary responsibility for drawing congressional districts rest[s] squarely with the legislature," *League of Women Voters of Pa. v. Commonwealth*, 181 A.3d 1083, 1085 (Pa. 2018), and that "legislature" in this context means the General Assembly *plus* the Governor, *see id.* ("[I]n the eventuality of the General Assembly not submitting a plan to the Governor, or the Governor not approving the General Assembly's plan within the time specified, it would fall to this Court expeditiously to adopt a plan . . . ."); *id.* at 1086 ("The General Assembly failed to pass legislation for the Governor's approval, thereby making it impossible for our sister branches to meet the Court's deadline."). That decision is fully consistent with *Smiley* and *Arizona*, and it eliminates any inkling that Pennsylvania law entitles the General Assembly, acting alone, to deference or special treatment when an impasse forces a court to draw a congressional plan.

> **C.    The Special Master's Deference Theory Would Radically Alter the Separation of Powers**

Apart from being barred by nearly a century of precedent, the Special Master's deference theory would work an astonishing reallocation of power among Pennsylvania's three co-equal branches of government. Under this theory, every time the General Assembly and Governor negotiate a congressional plan, the

General Assembly gets dealt an extra ace. If there is an impasse, the General Assembly can play its ace, by marching into court and demanding judicial "deference" to its preferred plan—deference neither the Governor nor any other party would enjoy.

For the General Assembly to clinch permanent advantage over the Governor, and a superpower before the judiciary, would represent a stunning departure from basic constitutional principles of checks and balances. It should not be countenanced by this Court. *See generally* The Federalist No. 48 (James Madison) (J.R. Pole ed., 2005) ("It is agreed on all sides, that the powers properly belonging to one of the departments, ought not to be directly and compleatly administered by either of the other departments. It is equally evident, that neither of them ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers. It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.").

## II.   Several Plans, Including the Ali Plan, Manage Splits and Communities of Interest Better Than HB 2146

The Special Master followed a two-step process: (1) screen the proposed plans for the bare constitutional minimum and (2) then identify the purportedly best plan from among those that passed the constitutional bar. The first step is one courts have been doing for many years, assisted in recent years by well-established

advances in political science and mathematics. The second step—the selection of a plan from among viable options—presents a judgment call that should not be left to a single jurist randomly chosen on the Commonwealth Court wheel. That is particularly true here where the Special Master arbitrarily zeroed in on splits in Pittsburgh and Bucks County while ignoring unnecessary and harmful splits elsewhere, like HB 2146's splits in of the Capital Region and Northeastern urban areas. Giving pride of place to intactness for Pittsburgh and Bucks County is certainly one way to draw a map, but it is not the only way. The Special Master's recommendation rests on unsupported policy judgments, not legal principle, and pays only lip service to maintaining communities of interest. As such it is entitled to no weight in this Court. Instead, the Court should select (or draw) a plan with better treatment of all these communities.

### A.    The Special Master Wrongly Elevated Not Splitting Pittsburgh to Quasi-Constitutional Status

The Report's analysis begins on page 137 with a discussion of "Traditional Neutral Criteria." The Report identifies six supposedly "traditional" criteria: (1) contiguity, (2) population equality, (3) political subdivision splits, (4) compactness, *(5) splitting of Pittsburgh*, and (6) communities of interest. The first four are standard fare in redistricting cases. The last—communities of interest—is another traditional criterion, albeit one that can be difficult to apply.

But the treatment of Pittsburgh is not a "traditional" criterion on par with matters like compactness and equipopulation.

The Special Master proclaimed that any plan that splits Pittsburgh must be rejected as a matter of law, regardless of its merits in other respects. Report at 151, FF16; *see also* Report at 194, ¶ 27. The Report elevated a "never split Pittsburgh" rule to quasi-constitutional status based on the following reasoning:

> It cannot be gainsaid that, under the standards listed in the Pennsylvania Constitution and applied to congressional redistricting by our Supreme Court, boundaries such as those of City of Pittsburgh should not be divided across multiple districts unless it is *absolutely necessary* to achieve population equality. *See* Pa. Const. art. II, § 16 ("Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided . . . ."); *LWV II*, 178 A.3d at 816-17 (congressional districts shall not "divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population").

Report at 148, CL1.

The analysis is deeply flawed. The "absolutely necessary" language of Article II, § 16 refers first to counties; yet all of the plans split numerous counties. No single county split is "absolutely necessary," but many such splits *are* necessary when a statewide plan is considered in the aggregate. For the same reason, there is nothing magical about keeping the City of Pittsburgh in one district. Indeed, by splitting Pittsburgh the Ali Plan ensures Allegheny County is split only twice, and also keeps most of Pittsburgh intact, keeps Black communities whole, and respects suburban communities of interest. Expert Report of Sarah

Andre at 11-12 (attached as Exhibit to Brief of Amici Khalif Ali *et al.* (Jan. 24, 2022)). The Special Master could just as easily have excluded all plans that split Dauphin County, the Capital Region, or the Wilkes Barre/Scranton/Hazleton area. By summarily rejecting any split of Pittsburgh, the Special Master made a political judgment that the integrity of that city's boundaries must be given primacy. The Court should not adopt this simplistic approach.

> **B.    The Special Master's Treatment of Bucks County Was Equally Flawed**

The Special Master made a similar error regarding the division of Bucks County, declaring a split of this county unacceptable under any circumstance. Report at 195, ¶ 31 ("[A]ny map that divides Bucks County for the first time since the 1860s, including Governor Wolf's map, is not an appropriate choice."). Again, the Special Master failed to look at the entire map in context.

It is common ground that given the size of Philadelphia County, at least one Philadelphia district must incorporate population from a neighboring county— Bucks, Montgomery or Delaware. Report at 149, FF6. The Special Master concluded that splitting Bucks County was inappropriate as a matter of law. Under a sort of cartographic stare decisis theory, the Special Master reasoned that Bucks County has been together in one district for many years, so it would be unacceptable to split it now. There is no logic in this, and indeed, the position is inconsistent with the Special Master's rejection of the "least change" approach on

the ground that "it focuses on the preexisting status of a map's boundary lines" when "in the past 10 years, there has been dramatic population shifts in Pennsylvania," Report at 156-57, FF13. Plans are redrawn after each census for a reason, and district boundaries must change to reflect new demographic realities. The Special Master's denigration of proposed plans that append population from Bucks County, rather than Delaware County, reflects the preferences of the Special Master, not any reasoned legal rule. The thin findings on the subject are conclusory and ultimately rest on subjective testimony about the nature of the Philadelphia collar counties by a biased expert. *See* Report at 210-11, FF70-75. The Special Master's conclusion that Bucks County (and not Delaware County) must be held together at all costs should be rejected.

### C.   The Special Master Arbitrarily Ignored Other Communities of Interest That This Court Grouped Together in the 2018 Plan

While heavy on discussion of Pittsburgh and Bucks County, the Report barely addresses the treatment of Harrisburg and Northeastern Pennsylvania, including the cities of Scranton, Wilkes Barre, and Hazleton. In these areas, HB 2146 departs dramatically from the plan this Court adopted just four years ago.

#### 1.   The Harrisburg Area

According to the 2020 Census, Dauphin County has 286,401 residents. The ideal population for a Pennsylvania congressional district is 765,536. Thus, as with

Pittsburgh, it is readily possible to put all of Dauphin County in a single district. The current District 10, as drawn by this Court in 2018, does just that. District 10 encompasses the entirety of Dauphin, eastern Cumberland County including Carlisle, and northern York County including the city of York:



See *League of Women Voters of Pa. v. Commonwealth*, 181 A.3d 1083, 1097 (Pa. 2018).

HB 2146 trisects Dauphin County. It separates the City of Harrisburg from its southeastern suburbs, as well as the airport, and then carves out the northern suburbs, splitting off Penbrook and Colonial Park:



*See* Brief of Senate Republicans (Jan. 24, 2022), at 191. No good reason was offered for dividing these communities of interest.

This configuration directly harms the Capital Region community of interest by cleaving the Black and Latino population in Dauphin County into two parts, undermining the ability of these groups to elect a representative of their choice. Expert Report of Sarah Andre at 10 (attached as Exhibit to Brief of Amici Khalif Ali *et al.* (Jan. 24, 2022)). This configuration breaks up the long-standing economic community of interest that surrounds the Capital Region. *Id.* (describing the Capital Region's economic community of interest).

Nor does the Report acknowledge that the proffered configuration in HB 2146 is an outlier. Of the proposed plans, only HB 2146 and the Congressional

Republicans' plans fracture Dauphin County into three parts. All the rest followed this Court's lead in the current plan, leaving these communities of interest intact.

2.      Northeastern Pennsylvania

The Northeastern Pennsylvania region is anchored by the community of interest connecting Scranton, Wilkes-Barre, and Hazelton. The current plan groups these cities in a single district, District 8:



*See* 181 A.3d at 1095.

HB 2146 would divide the municipalities of Scranton/Wilkes-Barre/Hazelton into two separate districts:



*See* Brief of Senate Republicans (Jan. 24, 2022), at 189-90. HB 2146 and the

Congressional Republicans' plans were the only proposals to split these cities.

Wilkes-Barre, Scranton, and Hazelton have significant Latino and Black

populations. Holding these communities in a single district would allow these

groups to have a greater voice in electing a representative of their choice. Expert

Report of Sarah Andre at 7 (attached as Exhibit to Brief of Amici Khalif Ali *et al.*

(Jan. 24, 2022)).

**D.     The Court Should Make its Own Determination,
Prioritizing Communities of Interest**

The reality is that there is no "one true map," and reducing the mapmaking

process to a simple yet arbitrary rule like "never split Pittsburgh" is an inadequate

way to solve a complicated problem. The Court must now make its own

determination based on neutral principles. In doing so, the Court has a special duty

to respect communities of interest. *LWV-PA*, 178 A.3d at 816. That requires much more than noting the boundaries of the City of Pittsburgh or Bucks County. This Court should rely on publicly available historic, economic, and cultural resources as well as the testimony on communities of interest provided to the Governor's Redistricting Commission, the Pennsylvania General Assembly through its online portal, and the LRC's online comment portal. *See* Expert Report of Sarah Andre at 1 (attached as Exhibit to Brief of Amici Khalif Ali *et al.* (Jan. 24, 2022)). In short, the Pennsylvania Constitution requires an affirmative and unbiased investigation by the Court to ensure that an individual's vote is "equalized to the greatest degree possible with all other Pennsylvania citizens." *LWV-PA*, 178 A.3d at 817.

Happily, the proceedings below have produced a diversity of plans for the Court to choose from; or, of course, the Court can draw its own plan, as it did during the remedial mapping process in 2018. To assist the Court in the analysis, Amici identify how each plan treats the splitting of four important communities of interest discussed at length across the briefing: Pittsburgh, Bucks County, the Capital Region, and the Northeast.

| Plan | Pittsburgh | Bucks | Capital Region | Northeast Region |
|------|-----------|-------|----------------|------------------|
| Ali | Split | Split | Whole | Whole |
| Carter | Whole | Whole | Whole | Whole |
| Gressman | Whole | Split | Split | Whole |
| Senate Dem Caucus #1 | Split | Split | Whole | Whole |
| Senate Dem Caucus #2 | Split | Split | Split | Whole |
| Congressional Rs #1 | Whole | Whole | Split | Split |
| Congressional Rs #2 | Whole | Whole | Split | Split |
| Wolf | Split | Split | Split | Whole |
| House Dem Caucus | Whole | Split | Split | Whole |
| HB 2146 | Whole | Whole | Split | Split |
| CCFD | Whole | Whole | Split | Whole |
| Draw the Lines | Split | Whole | Split | Whole |
| Citizen-Voters | Whole | Whole | Split | Whole |
| Voters of PA | Whole | Whole | Split | Whole |

Amici submit that to the extent the Court prioritizes intactness for any specific subset of local government units and communities of interest, it should focus primarily on keeping both the Capital Region and the Northeast Region cities intact, for the reasons set forth above and at greater length in the Expert Report of Sarah Andre (attached as Exhibit to Brief of Amici Khalif Ali *et al.*, (Jan. 24, 2022)). This would narrow the field to three plans: Ali, Carter, and Senate Democratic Caucus #1.

### III.   As a Tiebreaker, the Court Should Select a Plan Based on Prisoners' Home Addresses

In drawing new legislative districts, the LRC has made adjustments to U.S. Census Bureau data so that legislative districts will not continue the practice of "prison-based gerrymandering." It has done so by adjusting residence data to return nearly 30,000 state prisoners to their home addresses from their cell addresses. *See* LRC Resolution 4A (Aug. 24, 2021), *available at* https://www.redistricting.state.pa.us/resources/press/Resolution%204A.pdf; LRC Resolution 5A (Sept. 21, 2021), *available at* https://www.redistricting.state.pa.us/resources/press/Resolution%205A.pdf. The Special Master should not have rejected the Ali Plan for using the LRC's prisoner-adjusted data. *See* Report at 56, FF 25; 107, FF 296; 133-34; 139-40, FF 5, CL 5-7; 192-93, ¶¶ 19-21; 199.

In light of Pennsylvania's equipopulation requirement, and principles of fairness and consistency, this Court should select a congressional districting plan that makes use of the same adjusted address data as the LRC's maps. The Ali Plan is the only plan before the Court drawn based on these prisoner-adjusted data. Although Amici do not contend at this juncture that the 2022 congressional plan *must* be drawn on the basis of the LRC's adjusted data, the Court should consider

the Ali Plan's use of this data set as a plus factor that further supports adoption of

the Ali Plan.[4]

### A.    Counting Prisoners in their Cells Unfairly Distorts Districts

As the LRC rightly noted:

> The practice of counting inmates as residents of their prisons rather
> than from the districts from which they came artificially inflates the
> population count of districts where prisons are located and artificially
> reduces the population count of districts from which the inmates
> came, likely continue to have ties to and likely will return to post
> incarceration.

LRC Resolution 4A (Aug. 24, 2021). Before this redistricting cycle, home address

information for prisoners was unavailable to mapmakers in Pennsylvania,[5] who

thus had no choice but to use unadjusted Census data, which counts prisoners at

their cells regardless of state residency laws.[6] As a result, in previous decades'

---

[4] The Special Master noted that House Resolution 165 rejected the use of the
LRC's prisoner-adjusted data set for congressional redistricting. Report at 193 ¶
21. This Resolution was never presented to the Governor, and should not be a
factor in this Court's decision, as detailed in Section I.

[5] The LRC's adjusted address data set reassigns most but not all incarcerated
people to their home addresses, omitting people who will be incarcerated beyond
April 1, 2030, as well as those in federal and county facilities. LRC Resolution 5A
(Sept. 21, 2021). In spite of these omissions, any correction to address data for
incarcerated people is better than none. *See Fletcher v. Lamone*, 831 F. Supp. 2d
887, 897 (D. Md. 2011) (three-judge panel) ("Because some correction is better
than no correction, the State's adjusted data will likewise be more accurate than the
information contained in the initial census reports, which does not take prisoners'
community ties into account at all."), *aff'd without opinion*, 567 U.S. 930 (2012).

[6] *See generally Fletcher* 831 F.Supp.2d at 895-96 ("According to the Census
Bureau, prisoners are counted where they are incarcerated for pragmatic and

districting plans for Pennsylvania, prisoners swelled the populations of regions near state correctional institutions, even though prisoners cannot vote if serving felony sentences and have no say in those regions' civic life. At the same time, imprisoned people's hometowns—where their families still live, where their children attend school, and where prisoners normally will return when released— have seen their representation diluted in Pennsylvania's congressional delegations. These distortions have especially weakened electoral strength for Black and Latino communities, both because they are overrepresented in the prison population, and because Pennsylvania's state correctional institutions are largely located in areas with few Black or Latino residents.

Amici John Thompson and Cynthia Alvarado have experienced the harms of prison-based gerrymandering firsthand. They are both Philadelphians who have recently returned home after spending a combined total of nearly fifty years in faraway State Correctional Institutions. Today they live in, and regularly work or volunteer in, communities that are among the hardest-hit by the reduced representative power that flows from prison-based gerrymandering. In particular, as a Black man and a Latino woman, both have seen how even after regaining the

administrative reasons, not legal ones. . . . [A]lthough the Census Bureau was not itself willing to undertake the steps required to count prisoners at their home addresses, it has supported efforts by States to do so.").

right to vote, many former prisoners feel discouraged from participating in democracy because they do not believe their communities are fairly represented in congressional elections.

Through using prisoner home addresses, Philadelphia gains 7,019 residents. And cities including Pittsburgh, Reading, Allentown and Lancaster gain 839, 619, 519, and 450 residents, respectively. Expert Report of Sarah Andre at 3 (attached as Exhibit to Brief of Amici Khalif Ali *et al.* (Jan. 24, 2022)).

### B.   State Law Treats Prisoners as Residents of Their Homes

The Pennsylvania Election Code states:

> Except as otherwise provided in this subsection, no individual who is confined in a penal institution shall be deemed a resident of the election district where the institution is located. The individual shall be deemed to reside where the individual was last registered before being confined in the penal institution, or, if there was no registration prior to confinement, the individual shall be deemed to reside at the last known address before confinement.

25 Pa.C.S. § 1302(a)(3). In other words, Pennsylvania law defines prisoners to be residents of their hometowns, not their cells. This is consistent with the long-established general legal principle that incarceration does not automatically change one's residence. *See, e.g.*, *United States v. Stabler*, 169 F.2d 995, 998 (3d Cir. 1948); *McKenna v. McKenna*, 422 A.2d 668, 670 (Pa. Super. Ct. 1980).

Since the last redistricting cycle, this Election Code provision has taken on new significance. Congressional districts must be "as nearly equal in population as practicable." *LWV-PA*, 178 A.3d 737, 816 (Pa. 2018). Specifically, this Court

clarified that the equipopulation mandate requires a plan to "accord equal weight to the votes of **residents** in each of the various districts." *Id.* at 814 (emphasis added). In other words, the equipopulation standard in Pennsylvania focuses on "residents" of districts, and pursuant to state law prisoners are residents of their home addresses, not their cells.

Under *LWV-PA*, the population distortions caused by prison-based gerrymandering also create tension with Article I, § 5, the Free and Equal Elections Clause. By relying on incarcerated people to meet population requirements in districts with state correctional institutions, past congressional plans have inaccurately reflected where Pennsylvanians actually live. This inequality of voting power is precisely what the Free and Equal Elections Clause restricts. This Court has explained that Article I, § 5 "guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government[,]" and "mandates that all voters have an equal opportunity to translate their votes into representation." *LWV-PA*, 178 A.3d at 804. Thus, "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters will violate the guarantee of 'free and equal' elections afforded by Article I, Section 5." *Id.* at 809. This is all the more true when the inequality disproportionately weakens representation for Black and Latino communities.

### C.   Districting Plans Can Be Based On Adjusted Census Data

Although the Census Bureau reports imprisoned people's cell addresses,

nothing in federal or state law limits the Commonwealth from adjusting Census

data to correct for prisoners' home addresses before drawing congressional

districts. In the last redistricting cycle, two states made such adjustments to the

official 2010 Census data, and courts upheld the resulting maps in both states.

*Fletcher v. Lamone*, 831 F. Supp. 2d 887 (D. Md. 2011) (three-judge panel)

(congressional districts), *aff'd without opinion*, 567 U.S. 930 (2012); *Little v. N.Y.*

*State Legislative Task Force on Demographic Research & Reapportionment*, No.

2310-2011 (N.Y. Sup. Ct. Dec. 1, 2011) (state legislative districts), *available at*

http://www.prisonersofthecensus.org/little/Decision_and_Order.pdf. More

recently, the Supreme Court of Oklahoma found no federal constitutional barriers

to a proposed ballot question to end prison-based gerrymandering for

congressional and legislative districts that would mandate adjustments to Census

data like those made by the LRC. *In re Initiative Petition No. 426, State Question*

*No. 810*, 465 P.3d 1244, 1249-55 (Okla. 2020).

In the current redistricting cycle, at least seven states are making

adjustments like this to prisoners' addresses for congressional redistricting. *See*

Cal. Elec. Code § 21003; Colo. Rev. Stat. § 2-2-902; Md. Code Ann., Elec. Law,

§ 8-701; Nev. Rev. Stat. §§ 304.065, 360.288; N.J.S.A. §§ 52:4-1.1 to -1.6; Va.

Code Ann. § 24.2-304.04(9); Wash. Rev. Code § 44.05.140.

Moreover, numerous states, including the Commonwealth, adjust Census

data in other ways when redrawing districts, for example by excluding transient

populations such as nonresident military members. *Evenwel v. Abbott*, 578 U.S. 54,

60 & n.3 (2016); *cf. also Bethel Park v. Stans*, 449 F.2d 575, 582 n.4 (3d Cir.

1971) ("Although a state is entitled to the number of representatives in the House

of Representatives as determined by the federal census, it is not required to use

these census figures as a basis for apportioning its own legislature."). In

Pennsylvania, the LRC has routinely made technical adjustments to the official

Census reports before drawing legislative districts, such as correcting voting-

district code and name discrepancies, municipality name discrepancies, late

precinct changes, and problems with split blocks. *See, e.g.*, *Holt v. 2011 Legislative

Reapportionment Comm'n*, 38 A.3d 711, 719 & n.6 (Pa. 2012); LRC, *The

Legislative Guide to Redistricting in Pennsylvania* (last updated May 8, 2013),

https://tinyurl.com/twmpdcx4. Nothing restricts the Commonwealth from

additionally adjusting prisoners' addresses when redistricting. And especially since

Pennsylvania's new state legislative districts are being drawn on the basis of

prisoners' home addresses, considerations of consistency militate in favor of using

the same adjusted data set for drawing congressional districts.

# CONCLUSION

The Court should reject the recommendations of the Special Master and should instead select a superior congressional plan. Of the numerous constitutional, fair, and neutral plans before the Court, the Ali Plan is the best option, and the Court should select it, or in the alternative should draw its own plan according to the principles reflected in the Ali Plan.

Respectfully submitted,

*/s/ Benjamin D. Geffen*

Mary M. McKenzie, Bar No. 47434

Benjamin D. Geffen, Bar No. 310134

PUBLIC INTEREST LAW CENTER

1500 JFK Blvd., Suite 802

Philadelphia, PA 19102

mmckenzie@pubintlaw.org

267-546-1319

bgeffen@pubintlaw.org

267-546-1308

Martin J. Black, Bar No. 54319

Andrew M. Rocco, Bar No. 330751

DECHERT LLP

Cira Centre

2929 Arch Street

Philadelphia, PA 19104

martin.black@dechert.com

andrew.rocco@dechert.com

215-994-4000

*Counsel for Amici Khalif Ali et al.*

Suzanne R. Almeida, Bar No. 309558

COMMON CAUSE

800 N. 3rd Street, Suite 401

Harrisburg, PA 17102

salmeida@commoncause.org

717-232-9951

*Counsel for Amicus Khalif Ali*

Dated: February 14, 2022

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

I further certify that this brief complies with the length limitation set forth in Pa.R.A.P. 531(b)(3). According to the word count of the word-processing system used to prepare this brief, the brief contains 6,974 words, not including the supplementary matter as described in Pa.R.A.P. 2135(b).

*/s/ Benjamin D. Geffen*
Benjamin D. Geffen

Dated: February 14, 2022

Received 2/14/2022 6:17:27 PM Supreme Court Middle District

Filed 2/14/2022 6:17:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Carol Ann Carter, Monica Parrilla, Rebecca Poyourow, William Tung, Roseanne Milazzo, Burt Siegel, Susan Cassanelli, Lee Cassanelli, Lynn Wachman, Michael Guttman, Maya Fonkeu, Brady Hill, Mary Ellen Balchunis, Tom DeWall, Stephanie McNulty and Janet Temin, Petitioners | : : : : : : : : : : : : : | **CASES CONSOLIDATED** |
| v. | : : | No. 7 MM 2022 |
| Leigh M. Chapman, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania; Jessica Mathis, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries, Respondents | : : : : : : : | |
| Philip T. Gressman, Ron Y. Donagi; Kristopher R. Tapp; Pamela Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Feeman; and Garth Isaak, Petitioners | : : : : : : : : | |
| v. | : : | |
| Leigh M. Chapman, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania; Jessica Mathis, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries, Respondents | : : : : : : : | |

A2324

## EXCEPTIONS OF DRAW THE LINES PA AMICUS PARTICIPANTS TO THE FEBRUARY 7, 2022 REPORT AND RECOMMENDATION

AND NOW, this 14th day of February, 2022, pursuant to the Court's Order of February 2, 2022, Amicus Participants Adam Dusen, Sara Stroman, Mike Walsh, Myra Forrest, Athan Biss, Michael Skros, Susan Wood, Jean Handley, Daniel Mallinson, Jesse Stowell, Sandra Strauss, Rick Bryant, Jeffrey Cooper, Kyle Hynes, Priscilla McNulty and Joseph Amodei, each of whom is affiliated in some manner with the Draw the Lines PA project (the "DTL Amicus Participants"), take the following exceptions to the February 7, 2022 Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule (the "Report"):

1.      The DTL Amicus Participants take exception to the Report's inappropriate deference to the House Bill 2146 ("H.B. 2146") Plan proposed by the Republican Legislative Intervenors, a map that was vetoed by Governor Wolf in accordance with the Pennsylvania Constitution and has not been adopted into law. See Pa. Const. art. IV, § 15.  According to the United States Supreme Court, a plan that has been vetoed is not entitled to deference or owed any more than "thoughtful consideration." *Sixty-Seventh Minnesota State Sen. v. Beens*, 406 U.S. 187, 197 (1972); *see also O'Sullivan v. Brier*, 540 F. Supp. 1200, 1202 (D. Kan. 1982) (citing *Beens*, 406 U.S. at 197, for the proposition that deference is not owed to "any plan

that has not survived the full legislative process to become law"). While the Report ostensibly "review[ed] [H.B. 2146] along with the other plans submitted to the Court to assess its compliance with the constitutional . . . [and] non-constitutional factors," Report at 43, the Report improperly accorded deference to H.B. 2146 as "functionally tantamount to the *voice and will of the People*, . . . a device of monumental import [that] should be honored and respected by all means necessary, *id*. at 214 (emphasis added). In the same vein, the Report erroneously concluded that "the Court must find that the decisions and policy choices expressed by the legislative branch are presumptively reasonable and legitimate, absent a showing of an unconstitutional defect or deficiency." *Id.* at 213. In contrast, the Report did not accord any deference to the plan proposed by Governor Wolf, who is himself a representative chosen by a majority of statewide electors (and not solely a particular subset of the state population). Thus, this Court should reject the Special Master's Report as improperly deferential to H.B. 2146.

2.      The DTL Amicus Participants take exception to the Report's inappropriate focus on the treatment of one single municipality, the City of Pittsburgh, to the exclusion of consideration of other municipalities throughout the Commonwealth. In particular, the Report erroneously states that the Citizens' Map proposed by the DTL Amicus Participants and various other maps proposed by other parties and Amicus Participants would split the City of Pittsburgh across

2

congressional districts for the first time "in the history of the Commonwealth." *Id.* at 194. This is incorrect. To the contrary, Pittsburgh was regularly split among multiple Congressional districts until the 1980s redistricting cycle. *Id.* at 148; *see also* https://www.redistricting.state.pa.us/ for redistricting summaries from 1943, 1951, 1962 and 1972, each including splits of Pittsburgh). There are several legitimate reasons why it would be appropriate to split the City of Pittsburgh among two Congressional districts, such as achieving compactness, which the Report acknowledges is better achieved with a split of Pittsburgh, Report at 155, and political competitiveness, *see infra* ¶ 3. While the Report generally references H.B. 2146's jurisdictional splits, it provides no specific analysis of such splits, in contrast to extended discussion of the proposed split of Pittsburgh in several proposed maps. *See, e.g.*, Report at 144, 148–52. Of the four reasons cited in the Report for rejecting the Citizens' Plan, three concerned the Plan's proposed split of Pittsburgh. *Id.* at 201. Similarly, four of the five reasons cited in the Report for rejecting Governor Wolf's proposed map, and three of the five reasons cited for rejecting Senate Democratic Caucus Plans 1 and 2, concerned the maps' proposed split of Pittsburgh. *Id.* at 200-02. The Report's inappropriate focus on the treatment of a single municipality, the City of Pittsburgh, to the exclusion of analysis of the treatment of other municipalities warrants its rejection by this Court.

3.     The DTL Amicus Participants take exception to the Report's recommendation that the Citizens' Map should not be adopted. *Id.* at 201. The Citizens' Map is superior to the other maps submitted to the Commonwealth Court in terms of the constitutional factors of "compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality" recognized by this Court. *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 816–17 (Pa. 2018). As noted in the Report, the Citizens' Map scores at or near the top of several compactness metrics, *see* Report at 141, tbl. 1 (depicting the high scores of the Citizens' Map—referred to therein as the "CitizensPlan"—in the Polsby-Popper, Reock and Pop-Polygon metrics), and, according to Governor Wolf's expert, Dr. Moon Duchin, ranks approximately third among all plans in terms of overall compactness, *id.* at 147.  Although omitted from the Report's comparison, the Citizens' Map ties with the Senate Democratic Caucus 2 Plan for the least total number of jurisdictional divisions of any map submitted to the Court (46). *See id.* at 147. Finally, all districts in the Citizens' Map are composed of either 764,864 or 764,865 people—a deviation of one person, which the Report noted is "as nearly equal in population as practicable." *Id.* at 137. The Citizens' Map is compliant with the Voting Rights Act and, as Dr. Duchin noted, "[is] far superior at leveling the partisan playing field," particularly in comparison to H.B. 2146, which "consistently convert[s] close elections to heavy Republican representational advantages." *Id.* at

4

82 (internal citation omitted). The Citizens' Map, the final product of five public mapping competitions, was created with unprecedented public engagement and input and reflects the values that over 7,200 Pennsylvanians, representing 40 of Pennsylvania's 67 counties, have declared as important to them. For these reasons, the Court should reject the Report's recommendation that the Citizens' Map should not be adopted as the plan of the Commonwealth.

4.      The DTL Amicus Participants take exception to each and every subsidiary question within the issues identified in these Exceptions.

Dated:  February 14, 2022                    Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP


By: */s/ John P. Lavelle, Jr.*
    John P. Lavelle, Jr. (Pa. ID No. 54279)
    1701 Market Street
    Philadelphia, PA  19103-2921
    +1.215.963.4824
    john.lavelle@morganlewis.com

    *Counsel for the DTL Amicus*
    *Participants*

# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Carol Ann Carter, Monica Parrilla, | : | **CASES CONSOLIDATED** |
| Rebecca Poyourow, William Tung, | : | |
| Roseanne Milazzo, Burt Siegel, | : | |
| Susan Cassanelli, Lee Cassanelli, | : | |
| Lynn Wachman, Michael Guttman, | : | |
| Maya Fonkeu, Brady Hill, Mary Ellen | : | |
| Balchunis, Tom DeWall, | : | |
| Stephanie McNulty and Janet Temin, | : | No. 7 MM 2022 |
| Petitioners | : | |
| | : | **BRIEF OF DRAW THE LINES PA** |
| v. | : | **AMICUS PARTICIPANTS IN** |
| | : | **SUPPORT OF THEIR** |
| Leigh M. Chapman, in her official | : | **EXCEPTIONS TO THE** |
| capacity as the Acting Secretary of the | : | **FEBRUARY 7, 2022 REPORT AND** |
| Commonwealth of Pennsylvania; | : | **RECOMMENDATION** |
| Jessica Mathis, in her official capacity | : | |
| as Director for the Pennsylvania Bureau | : | |
| of Election Services and Notaries, | : | |
| Respondents | : | |
| | : | |
| Philip T. Gressman, Ron Y. Donagi; | : | |
| Kristopher R. Tapp; Pamela Gorkin; | : | John P. Lavelle, Jr. (Pa. ID No. 54279) |
| David P. Marsh; James L. Rosenberger; | : | MORGAN, LEWIS & BOCKIUS LLP |
| Amy Myers; Eugene Boman; | : | 1701 Market Street |
| Gary Gordon; Liz McMahon; | : | Philadelphia, PA 19103-2921 |
| Timothy G. Feeman; and Garth Isaak, | : | +1.215.963.4824 |
| Petitioners | : | john.lavelle@morganlewis.com |
| | : | |
| v. | : | *Counsel for the DTL Amicus* |
| | : | *Participants* |
| Leigh M. Gressman, in her official | : | |
| capacity as the Acting Secretary of the | : | |
| Commonwealth of Pennsylvania; | : | |
| Jessica Mathis, in her official capacity | : | |
| as Director for the Pennsylvania Bureau | : | |
| of Election Services and Notaries, | : | |
| Respondents | : | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITES .................................................................. iii

STATEMENT OF INTEREST OF DRAW THE LINES AMICUS
    CURIAE PARTICIPANTS ............................................................. v

SUMMARYOF ARGUMENT .......................................................... 1

ARGUMENT ................................................................................... 2

I.   THE PLAN PROPOSED IN HOUSE BILL 2146 IS ENTITLED TO
     NO DEFERENCE ..................................................................... 2

    A.   The Report Failed to Follow the Applicable Legal Precedent .............3

    B.   The Report Erred in According Deference to the Plan Proposed
       In H.B 2146 ................................................................................4

II.  THE REPORT INAPPROPRIATELY GAVE SPLITTING THE
    CITY OF PITTSBURGH NEAR-DISPOSITIVE WEIGHT, AND
    IGNORED OVERALL PERFORMANCE ON MINIMIZING
    SPLITS OF POLITICAL SUBDIVISIONS ...................................7

    A.   The DTL Amicus Participants Were Not Required to Prove the
       "Necessity" of Splitting the City of Pittsburgh Specifically ...............8

    B.   The Special Master's Report Inappropriately Overweighted
       Secondary Factors in Concluding that Splitting Pittsburgh Into
       Two Congressional Districts was a Dispositive Issue ......................10

        1.   The Citizens' Map Does Not Propose to Impermissibly
           Create Proportional Political Representation by Splitting
           Pittsburgh ..............................................................................10

        2.   Splitting Pittsburgh Among Two Congressional Districts
           Aligns with Historical Pennsylvania Redistricting Maps .......12

        3.   The Special Master's Unsupported Conclusion that
           Pittsburgh is a "Community of Interest" Cannot Be the
           Basis for Rejecting the Citizens' Map ...................................13

III.  THE CITIZENS' MAP IS SUPERIOR TO THE OTHER MAPS
    SUBMITTED ..........................................................................16

    A.   Neutral Constitutional Criteria Favor the Citizens' Map ..................16

    B.   Partisan Fairness Also Favor the Citizens' Map ..............................18

**TABLE OF CONTENTS**
(continued)

**Page**

IV.   CONCLUSION.................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ................................................................................4

*Hartung v. Bradbury*,
  33 P.3d 972 (Or. 2001) ..........................................................................3

*Holt v. 2011 Legislative Reapportionment Comm'n*,
  67 A. 3d 1211 (Pa. 2013) .................................................................11, 14

*Johnson v. Wisconsin Elections Comm'n*,
  967 N.W.2d 469 (Wis. 2021) .................................................................3

*League of Women Voters v. Commonwealth*,
  178 A.3d 737 (Pa. 2018) ...............................................................*passim*

*O'Sullivan v. Brier*,
  540 F. Supp. 1200 (D. Kan. 1982) ........................................................3

*Perry v. Perez*,
  132 S. Ct. 934 (2012) .............................................................................3

*Sixty-Seventh Minnesota State Sen. v. Beens*,
  406 U.S. 187 (1972) ...............................................................................3

*Smiley v. Holm*,
  285 U.S. 355 (1932) ...............................................................................4

*Upham v. Seamon*,
  456 U.S. 37 (1982) .................................................................................3

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) .............................................................................12

*Wilson v. Eu*,
  823 P.2d 545 (Cal. 1992) .......................................................................3

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

**OTHER AUTHORITIES**

House Bill 2146 ................................................................................... *passim*

Mich. Const. art. IV, § 6(13)(c) ...............................................................14

Pa. Const. art. I, § 5................................................................................16

Pa. Const. art. II, § 16 .............................................................................8

Pa. Const. art. IV, § 15 ............................................................................6

**<u>Statement of Interest of Draw the Lines Amicus Curiae Participants</u>**

The Draw the Lines ("DTL") Amicus Participants are members of Draw the Lines PA, a civic engagement project founded in 2016 and developed and hosted by the Committee of Seventy, Pennsylvania's oldest and largest 501(c)3 nonpartisan good government organization. Draw the Lines PA is a nonpartisan education and engagement initiative that has attempted to demonstrate that ordinary Pennsylvanians, when given the same digital tools and data used in the political redistricting process, can, through a fair and transparent process, produce voting districts that are objectively better by standard mapping metrics.

Draw the Lines PA created the Citizens' Map with the input of more than 7,200 Pennsylvania citizens. To do so, Draw the Lines PA hosted competitions open to anyone in Pennsylvania and compiled more than 1,500 maps drawn by individuals and teams throughout the state to create the Citizens' Map.

The DTL Amicus Participants have a direct interest in the outcome of this case, as they have submitted the Citizen's Map to the Court and believe it to be the best plan the Court will consider. The Citizen's Map has not only scored at or near the top in every metric compared to the other maps submitted, but also best reflects the priorities of everyday Pennsylvania citizens.

## SUMMARY OF ARGUMENT

Amicus Participants Adam Dusen, Sara Stroman, Mike Walsh, Myra Forrest, Athan Biss, Michael Skros, Susan Wood, Jean Handley, Daniel Mallinson, Jesse Stowell, Sandra Strauss, Rick Bryant, Jeffrey Cooper, Kyle Hynes, Priscilla McNulty and Joseph Amodei, each of whom is affiliated in some manner with the Draw the Lines PA project (the "DTL Amicus Participants"), respectfully submit this brief pursuant to the Court's Order of February 2, 2022 in support of their three exceptions to the Special Master's February 7, 2022 Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule (the "Report").   First, the Report erroneously accorded deference to the plan proposed in House Bill 2146 ("H.B. 2146").   Second, the Report inappropriately made splitting the City of Pittsburgh disqualifying and failed to conduct the proper constitutional analysis, which would have demonstrated that the Citizens' Map proposed by the DTL Amicus Participants (also referred to as the "Draw the Lines' Plan") was the most successful plan in minimizing splits of political subdivisions.   Third, the Report failed to recognize that in consideration of all of the constitutional factors of compactness, contiguity, minimization of the division of political subdivisions and maintenance of population equality, the Citizens' Map is superior to the other maps submitted.

## ARGUMENT

I.     **The Plan Proposed In House Bill 2146 is Entitled to No Deference.**

The Special Master erroneously afforded the plan proposed in H.B. 2146, a bill that was vetoed by the Governor and never signed into law, special and deferential treatment to which it was not entitled.  There is no precedent that suggests partisan proposals are somehow more authoritative than congressional redistricting plans that have been thoroughly and thoughtfully authored with comment and participation from non-partisan groups and individual citizens.  The Report acknowledges extensive precedent recognizing that redistricting maps that were merely proposed by a branch of government but not adopted into law are owed no deference.  Report at 42.  However, the Report nevertheless accords substantial deference to the plan proposed in H.B. 2146 as purportedly "functionally tantamount to the voice and will of the People", and in doing so disregards Supreme Court precedent on point, and the weight of authority to the contrary.   In deciding that the plan proposed in H.B. 2146 was entitled to deference, the Special Master circumvented, and failed to conduct, the proper constitutional analysis of determining which map is the best proposal for Pennsylvania voters.  If that had been done, the Citizens' Map would have been selected, for the reasons discussed, *infra*.

2

A.    **The Report Failed to Follow the Applicable Legal Precedent.**

First, in concluding that the plan proposed by the Republican Legislative

Intervenors -- H.B. 2146 – was entitled to deference the Report ignored extensive

relevant precedent.   According to the United States Supreme Court, a plan that has

been vetoed is not owed any more than "thoughtful consideration[.]" *Sixty-Seventh*

*Minnesota State Sen. v. Beens*, 406 U.S. 187, 197 (1972); *see also O'Sullivan v.*

*Brier*, 540 F. Supp. 1200, 1202 (D. Kan. 1982) (citing *Beens*, 406 U.S. at 197, for

the proposition that deference is not owed to "any plan that has not survived the

full legislative process to become law."); *Johnson v. Wisconsin Elections Comm'n*,

967 N.W.2d 469, 490 n.8 (Wis. 2021); *Hartung v. Bradbur*y, 33 P.3d 972, 979 (Or.

2001) (rejecting the argument that deference is owed to the Legislative Assembly's

plan of reapportionment vetoed by the Governor); *Wilson v. Eu*, 823 P.2d 545, 576

(Cal. 1992) (rejecting argument that "special deference be given to the various

plans passed by the Legislature but vetoed by the Governor.").

The Report's efforts to avoid this substantial authority are unavailing and

should be rejected.  The Report erroneously cited *Upham v. Seamon*, 456 U.S. 37

(1982) and *Perry v. Perez*, 132 S. Ct. 934, 941 (2012) for the propositions that

district courts are not free to disregard the political program of state legislatures

when fashioning reapportionment plans and legislative backed plans deserve

deference.  Report at 43.  But *Upham* and *Perry* did not involve partisan

3

redistricting bills that had been vetoed by the Governor, and in fact, involved a very different process whereby under Texas law the district court had to pre-clear the legislature's plan.  Furthermore, the U.S. Supreme Court has recognized that, under the Elections Clause, "legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power." *See Smiley v. Holm*, 285 U.S. 355, 372-73 (1932); *see also Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 806 (2015) (reaffirming *Smiley*).  In this Commonwealth, the Governor has the authority under the Commonwealth's constitution to veto election-related legislation.  The Governor exercised that authority to veto H.B. 2146.  Thus, the Report erred in ignoring the Supreme Court's guidance in *Beems* that vetoed reapportionment plans are entitled to no more than "thoughtful consideration."

B.    **The Report Erred in According Deference to the Plan Proposed In H.B. 2146.**

The Report is deferential to the plan proposed in H.B. 2146 not because it is a superior plan but simply because it was proposed by the General Assembly – or, more specifically, by the Republican Legislative Intervenors whose caucus currently controls the General Assembly.  The Report declared that it would analyze H.B. 2146 in the same manner as the other plans submitted. Report at 208, para. 61.  However, the Report failed to follow its own proclamation and relied on

4

logical fallacy in its decision to treat H.B. 2146 more favorably than any other proposed redistricting plan.

First, the Report erroneously asserts that the legislative branch is entitled to greater deference than the executive branch and "the decisions and policy choices expressed by the legislative branch are presumptively reasonable and legitimate, absent a showing of an unconstitutional defect or deficiency." Report at 213, ¶ 90. There is no legal authority cited by the Report for the breathtaking and fallacious conclusion that "policy choices" incorporated in a bill passed by the General Assembly that is vetoed and not adopted into law "are presumptively reasonable and legitimate[.]" *Id.* The Report also states that "HB 2146 represents '[t]he policies and preference of the state,' … and constitutes a profound depiction of what the voters in the Commonwealth of Pennsylvania desire, through the representative model of our republic and democratic form of government, when compared to the Governor or any other of the parties or their *amici*." Report at 214, ¶ 93. The Report concludes that "the interests of the Commonwealth … would best be served by factoring in and considering that *HB 2146 is functionally tantamount to the voice and will of the People* … and should be honored and respected by all means necessary." Report at 214, ¶ 94 (emphasis added).

There is no basis, however, to assume that the policy choices of the legislative branch in drawing a redistricting plan are presumptively reasonable and

5

legitimate, while assuming the choice of the duly elected governor to reject the redistricting plan is not.  Additionally, the Report offers no explanation why the plan proposed by Governor Wolf, who is himself a representative chosen by a majority of statewide electors (and not solely a particular subset of the state population), was not entitled to similar weight. Notably, Pennsylvania's Constitution provides a path for the General Assembly to override a Governor's veto and enact a vetoed plan into law—a path the Republican Legislative Intervenors have not attempted to take with respect to H.B. 2146.  *See* Pa. Const. art. IV, § 15; *see also* Am. Post-Hearing Submission of Intervenor-Resp. Gov. Tom Wolf at 46 (explaining that, based upon the initial votes on H.B. 2146, the legislature would not be able to obtain the requisite supermajority required to override the Governor's veto).   H.B. 2146, a bill that "never obtained the official status of a duly enacted statute" (Report at 213, ¶ 91), should be afforded no deference in judicial review and should stand on the same footing as the other plans submitted.  Thus, this Court should reject the Report's recommendation that this Court adopt and implement HB-2146 because it was based on unwarranted deference.

II.     **The Report Inappropriately Gave Splitting the City of Pittsburgh Near-Dispositive Weight, And Ignored Overall Performance on Minimizing Splits of Political Subdivisions.**

As discussed further below, the Citizens' Map was the best of all the maps on the constitutional criteria of minimizing the division of political subdivisions, with only 46 subdivisions.  The Report, however, ignored this completely – not even mentioning this excellent performance in its summary.  Report at 147 (FF39), 193 (¶ 23).  Instead, the Report focused myopically on the City of Pittsburgh alone and, inexplicably, suggested that the parties had a burden (not found in the law) to prove why splitting the City of Pittsburgh was necessary.  The Report then concluded that splitting the City of Pittsburgh was disqualifying and rendered the Citizens' Map less desirable than H.B. 2146 or other maps that kept together the City of Pittsburgh but split many more jurisdictions.  Report at 201 (citing splitting the City of Pittsburgh as three of the four reasons for rejecting the Citizens' Plan); *see also* Report at 200-02 (citing splitting the City of Pittsburgh as three of the four reasons for rejecting the Governor's Plan and three of the five reasons for rejecting the Senate Democratic Caucus Plans 1 and 2). Nowhere does the Report offer an explanation as to why the City of Pittsburgh should be treated differently than other political subdivisions.  Moreover, in connection with this improper focus on the City of Pittsburgh, the Report misstates the history of congressional redistricting.

7

A.    **The DTL Amicus Participants Were Not Required to Prove the "Necessity" of Splitting the City of Pittsburgh Specifically.**

The Report reasoned that neither the DTL Amicus Participants nor any other party proposing a Pittsburgh split had produced "any credible evidence as to why it was 'necessary' to split [Pittsburgh][.]"  Report at 194, ¶ 27.  This requirement is not found anywhere in the law. Instead, it appears the Special Master arrived at this evidentiary requirement based on an erroneous reading of both the Pennsylvania Constitution and this Court's opinion in *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) ("*LWV II*").  First, the Report cited to the Pennsylvania Constitution Article II, Section 16, which states that: "[u]nless absolutely necessary *no county, city, incorporated town, borough, township or ward shall be divided*…"  Report at 148 (CL1) (emphasis added).  However, the Pennsylvania Constitution creates no special burden to prove the necessity of splitting the City of Pittsburgh in particular, just as it would create no special burden for splitting any other specific individual municipality. Rather, as indicated by this Court in *League of Women Voters II*, any proposed redistricting plan must endeavor to minimize jurisdictional splits overall, which the Citizens' Map has done.  *See LWV II*, 178 A.3d at 814-15.

Second, the Report concluded that splitting Pittsburgh was disqualifying because it was not necessary to "ensure equality of population." Report at 148

(CL1), citing *LWV II*, 178 A.3d at 816-717 (congressional districts shall not "divide any county, city, incorporated town, borough, township, or ward, *except where necessary to ensure equality of population*") (emphasis added). While it is true that some maps achieved population equality without splitting Pittsburgh, they did so by splitting more total political subdivisions.  For example, the H.B. 2146 plan and the Gressman Plan both create 49 total splits, the Reschenthaler Plans 1 and 2 split 54 and 53 respectively, and the Carter Plan creates 57 total splits. Report at 143-146 (FF7-34); 157 (FF15).  This Court's *League of Women Voters II* decision did not require that a proposed redistricting plan afford any special deference to the City of Pittsburgh in balancing the neutral criteria of achieving population equality while minimizing jurisdictional divisions. Further, nowhere does the Report address why the Republican Legislative Intervenors were not required to justify the necessity of splitting any of the 16 municipalities the H.B. 2146 plan would split. Here, it is undisputed that the Citizens' Map achieves the highest level of population equality (with a population deviation of only 1 person), and the lowest number of jurisdictional splits (46) of all plans proposed. *See infra* at p.19.  In contrast, the H.B. 2146 plan would leave the City of Pittsburgh intact but create 49 total splits. The Report's focus on the City of Pittsburgh to the exclusion of consideration of other jurisdictional splits was inappropriate and should be rejected.

B.    **The Special Master's Report Inappropriately Overweighted Secondary Factors in Concluding that Splitting Pittsburgh Into Two Congressional Districts was a Dispositive Issue**

The Citizens' Map was superior to H.B. 2146 and other maps which propose to keep Pittsburgh in a single Congressional district because, *inter alia*, it had substantially fewer splits of political subdivisions – a key constitutional neutral criteria. Despite this, the Report concluded that three other secondary factors weighed against plans that proposed splitting Pittsburgh: eschewing proportionality, preserving historical practice, and preserving Pittsburgh as a "community of interest[.]"  Report at 201.  Though the Report recognized that these factors should be viewed as secondary to the constitutional neutral criteria, it not only afforded these issues substantial weight, but also relied on erroneous conclusions of law, incorrect factual statements, and uncredible expert opinion to justify rejecting any plan that proposed to split Pittsburgh into two Congressional districts.

1.    *The Citizens' Map Does Not Propose to Impermissibly Create Proportional Political Representation by Splitting Pittsburgh.*

The Pennsylvania Citizens' Map is the result of 7,200 Pennsylvanians sharing their opinions and priorities about the best way to create new congressional districts in their state. In addition to optimizing for constitutionally required criteria, the Citizens' Map's creators identified increasing political competitiveness within a congressional district as one of Pennsylvanians' top priorities.  Report at

10

201 (citing Villere Report at 4).  Splitting the City of Pittsburgh not only achieves lower jurisdictional splits and increased overall compactness without sacrificing population equality, it also increases political competitiveness by creating two competitive districts where one non-competitive Democratic district had existed. *Id.* To the extent increasing political competitiveness (and therefore *decreasing* the likelihood that one part or another has a guaranteed advantage) is a "political factor," this Court has explicitly stated that these "political factors can operate at will" so long as they do not contravene constitutional requirements.  *Holt v. 2011 Legis. Reapportionment Comm'n*, 67 A. 3d 1211, 1235-36 (Pa. 2013).  However, in an effort to frame splitting Pittsburgh as an impermissibly political recommendation, the Report mischaracterizes both Pennsylvania and federal law to reach the conclusion that increasing political competitiveness constitutes an unlawful "balancing the representation of the political parties[.]" Report at 176.

The Report confuses the Citizens' Plan's goal of creating more competition within a single congressional district with an effort to advantage the Democratic Party state-wide.  This is incorrect.  Some level of partisan consideration is permissible in redistricting.  *See Holt,* 67 A.3d at 1235-36.  Notably, the H.B. 2146 plan is far *more* partisan than the Citizens' Map: H.B. 2146 advantages Republicans by 6.3% according to Dr. DeFord (Report at 173) while the Citizens' Map advantages Republicans by only 3.5% as discussed *infra*). The Special Master

11

nevertheless concludes with no evidence that the Citizens' Map's motivations for splitting Pittsburgh are impermissibly partisan.  Report at 178.  The Report also cites *Vieth v. Jubelirer* for the principle that "the Constitution guarantees no right to proportional representation." 541 U.S. 267, 352 fn7 (2004) (citations omitted). However, the Report neglects to explain that in this decision the Supreme Court defines "proportional representation" as "a set of procedural mechanisms used to guarantee, with more or less precision, that a political party's *seats in the legislature* will be proportionate to its share of the vote." *Id.* (emphasis added). Plainly, this definition does not encompass increasing political competitiveness within a single congressional district.  In fact, increasing competitiveness actually *decreases* the likelihood of proportional representation by decreasing the number of congressional seats guaranteed to be won by one party or another.

2.     *Splitting Pittsburgh Among Two Congressional Districts Aligns with Historical Pennsylvania Redistricting Maps.*

The Report also erroneously stated that the Citizens' Map proposed by the DTL Amicus Participants and four other maps proposed by other parties and Amicus Participants would split the City of Pittsburgh across congressional districts "apparently for the first time in the history of the Commonwealth." Report at 194, 201. While it is true that "preservation of prior district lines" is a legitimate "subordinate" factor (Report at 161), the notion that Pittsburgh has "remained within a single congressional district in all previous districting plans" is

12

factually incorrect.  To the contrary, the City of Pittsburgh was routinely split into multiple congressional districts up until the 1980s.  Report at 148; *see also* https://www.redistricting.state.pa.us/maps/ (redistricting summaries from 1943, 1951, 1962 and 1972, each including splits of Pittsburgh). Thus, to the extent historical practice be given any consideration, in recent history the City of Pittsburgh has been split into multiple Congressional districts at least as often as not. The Report's reliance on the erroneous conclusion that splitting Pittsburgh is a "novel proposition" should be given no weight in this Court's decision.

> 3.   *The Special Master's Unsupported Conclusion that Pittsburgh is a "Community of Interest" Cannot Be the Basis for Rejecting the Citizens' Map.*

Finally, as further justification that Pittsburgh should not be split, the Report wrongfully elevated the goal of preserving communities of interest above constitutional criteria. To do this, the Report concluded without citation to any precedent that "although compactness, contiguity, and respect for municipal boundaries are undoubtedly the primary tool for evaluating the constitutionality of a redistricting plan, we understand these principles serve to advance the Free and Equal Elections Clause's overarching goal of protecting the interest of communities."  Report at 153.  Even if the preservation of communities of interest generally were a dispositive factor in evaluating redistrict plans, it is anything but clear that the City of Pittsburgh constitutes one singular community of interest.

The Special Master relies on the testimony of Dr. Keith Naughton, who gave analysis on how the different maps under considerations addressed communities of interest. Dr. Naughton "has 'no particular experience in redistricting,' and has never served as an expert in redistricting litigation before." Report at 93 (FF215). Further, "Dr. Naughton explained that 'much of [his] professional career has been dedicated to helping Republican candidates in Pennsylvania win their seats." *Id.* at 94 (FF218). Given this lack of expertise and potential for partisan bias, the Court should accord Dr. Naughton's opinion that the City of Pittsburgh constitutes a community of interest the same weight as the lay opinion of any other Pennsylvanian.

There is not a uniform legal definition in this Commonwealth of a "community of interest." The Report recognizes that the term encompasses "school districts, religious communities, ethnic communities, geographic communities which share a common bond due to locations of rivers, mountains and highways[.]" Report at 153, quoting *Holt,* 38 A.3d at 746. Michigan's Constitution provides an alternate definition, stating that "communities of interest may include, but shall not be limited to populations that share cultural or historical characteristics or economic interests." Mich. Const. art. IV, § 6(13)(c). Both definitions leave room for interpretation of what groups or neighborhoods have shared interests.

14

One person may feel strongly that Pittsburgh's municipal boundaries are sacrosanct and must be held together in a single Congressional District. But another person may believe that as soon as you cross the Monongahela River and go through the Fort Pitt Tunnel, you may technically still be in Pittsburgh but you have entered an entirely new community, with different needs and a different culture.

Ultimately, Draw the Lines leaned on the weight of its mappers, particularly those from Allegheny County, that were drawing their own districts.  From the 1,500 maps submitted to the Draw the Lines competition, a plurality of them used the three rivers confluence as a natural dividing line around Pittsburgh.  Thus, what makes the Citizens' Map so strong is that it was developed using input from 7,200 Pennsylvanians, each of whose opinions are just as credible as Dr. Naughton's on something as basic as Pennsylvania culture and what their neighborhood should be like.

In the end, the Report's conclusion that it was impermissible to split the City of Pittsburgh into two Congressional Districts arose from numerous legal and factual errors.  Here, the Citizens' Plan split less political subdivisions than any other plan, and under the neutral constitutional criteria, that is much more important than whether any one jurisdiction was split.

15

III.    **The Citizens' Map is Superior to the Other Maps Submitted.**

The Report erroneously failed to give sufficient weight to the constitutional neutral factors that this Court has explained govern congressional redistricting. Instead, it focused on partisan fairness, but turned this analysis on its head to require that Republican majorities be preserved. When the correct constitutional analysis is applied, it is clear that the Citizens' Map proposed by the DTL Amicus Participants is superior to the other maps submitted. In addition to excelling in all the constitutional criteria, the Citizens' Map was created with unprecedented public engagement and input and reflects the values that over 7,200 Pennsylvanians, representing 40 of Pennsylvania's 67 counties, have declared as important to them.

A.    **Neutral Constitutional Criteria Favor the Citizens' Map.**

In *League of Women Voters II*, this Court laid out the congressional redistricting standards that are necessary to comply with the Free and Equal Elections Clause in the Pennsylvania Constitution, Article I, Section 5. Specifically, this Court explained that the key factors were "the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *LWV II*, 178 A.3d at 817. The evidence demonstrates that the Citizens' Map for congressional

16

redistricting is far superior to the H.B. 2146 Plan that the Report recommended when evaluated under these criteria.

Dr. Moon Duchin, an expert retained by Governor Wolf, is a Professor of Mathematics and a Senior Fellow at Tufts University who has published numerous scholarly works on redistricting.  Report at 74-75 (FF112-13).  Dr. Duchin also runs an interdisciplinary research lab focused on geometric and computational and analytical aspects of redistricting.  Report at 75 (FF114).  Dr. Duchin placed the Draw the Lines Plan in the top tier (Tier One) on neutral criteria (along with Governor's Plan, Voters of the Commonwealth and Reschenthaler I).  Report at 79-80 (F138) (recognizing it as meeting "a high excellence standard for traditional criteria").  H.B. 2146, in contrast, was not in either Dr. Duchin's "high excellence standard" tier of plans or the lower "excellence standard" tier.  *Id.* at 79-80 (FF138-39).

Looking at the neutral criteria one by one yields the same result.  In each category, the Citizens' Map is either equal or superior to the H.B. 2146 plan.  First, the Citizens' Map satisfied the contiguity requirement, as did the other proposed maps.  Report at 137 (CL1-3).   Second, as to population equality, Citizens' Map met the standard that districts be created "as nearly equal in population as practicable," with a deviation of only 1 person, consistent with most other plans, and better than the Carter Plan and House Democratic Plan.  Report at 138 (CL1-

2).  However, with respect to the other two neutral factors, the Citizens' Map is clearly superior.   As to compactness, the Citizens' Map scores at or near the top of several compactness metrics (Polsby-Popper, Reock, Pop-Polygon metrics) and is superior to HB-2146 in four out of five of these metrics.  Report at 141(FF4 tbl 1).  According to Dr. Duchin, the Citizens' Map ranks approximately third or fourth among all maps submitted in terms of overall compactness, while the H.B. 2146 plan was not ranked as highly.  Report at 147 (FF1-3).  And as to minimization of the division of political subdivisions, the Citizens' Map was at the top -- tied with the Senate Democratic Caucus 2 Map for the least total number of jurisdictional divisions of any map submitted to the Court.  Report at 145 (FF23-24) (concluding that the Citizens' Map had 46 subdivisions); Report at 144 (FF19) (Senate Democratic Caucus 2 Map had 46 subdivisions); Report at 147 (FF39) and 193 (¶ 23) (stating that the plan which divided the fewest political subdivisions was the Senate Democratic Caucus 2 with 46 subdivisions, but failing to mention the Citizens' Map).  Thus, under the constitutional factors the Citizens' Map should be adopted as the plan of the Commonwealth.

### B.    Partisan Fairness Also Favor the Citizens' Map.

In addition to the neutral factors, "partisan gerrymandering" is impermissible under the Pennsylvania Constitution because it "dilutes the votes of those who in prior elections voted for the party not in power to give the party in

power a lasting electoral advantage[.]" *LVW II,* 178 A.3d at 813-14, 817 (where the neutral criteria are subordinated to "gerrymandering for unfair partisan political advantage" the congressional districting plan violates the Pennsylvania Constitution). When examining the Citizens' Map properly under the lens of partisan fairness, it is superior to H.B. 2146 and the other alternate plans.

As Dr. Duchin explained, the Governor's Plan and the Draw the Lines' Plan "are far superior at leveling the partisan playing field," whereas H.B. 2146 "consistently convert[ed] close elections to heavy Republican representational advantages." Report at 82 (FF151). The Report erred in discounting this testimony and instead reasoning that due to the geographic clustering of Democrats in Pennsylvania, it is a *fait accompli* that any map that attempts to minimize the inherent advantage awarded to the Republican Party is a partisan gerrymander. *Id.* at 197, ¶ 40 (concluding it was partisan gerrymandering when the lines drawn "negate a natural and undisputed Republican tilt that results from the objective, traditional, and historical practice whereby Democratic voters are clustered in dense and urban areas"). Yet, there is no law that says a political party is guaranteed a certain share of representation based simply on such geographic distribution. Rather, maps must minimize partisan bias for either party to the greatest extent possible under Pennsylvania's Free and Equal Elections Clause, consistent with the other Constitutional criteria. *See LWV II,* 178 A.3d at 817.

That is what the Citizens' Map accomplishes.  In selecting the H.B. 2146 map, the Report improperly concluded that a map giving "heavy Republican representational advantages" was permissible, but a map that was superior in all constitutional criteria was not because it attempted to neutralize that advantage.

The Report also erred in concluding that "based on its credited efficiency gap score, [the Citizens' Map] provides a partisan advantage to the Democratic party in contravention to the natural state of political voting behavior and bias towards Republicans in Pennsylvania."  Report at 201.  In fact, the publicly available website PlanScore gives the Citizens' Map an efficiency gap of 3.5% in favor of Republicans when not factoring in the power of incumbency.  *See* https://planscore.campaignlegal.org/plan.html? 20220112T114256 .829958524Z; *see also* Report at 113-14 (FF335) (explaining the 3.5% efficiency gap in favor of Republicans).  This means Republicans would win an extra 3.5% of 17 seats, or an extra half-seat.  *Id.* (FF335) When factoring incumbency, there is a 0.2% gap in favor of Republicans.  Report at 114 (FF336).  Moreover, when analyzing the Citizen Map's mean-median difference, Dr. DeFord concluded that it was 1.6% in favor of Republicans.  Report at 170-71 (FF20).

To conclude that the Citizens' Map provides a partisan advantage to Democrats, the Report also relied heavily on an unreliable analysis from Dr. Michael Barber.  Dr Barber agreed that his analysis did not consider a number of

variables, including the voting results of all recent statewide elections, Voting

Rights Act requirements, equal population requirements (his simulations

improperly allowed for a variance of 30), the splitting of wards, or communities of

interest concerns.  Report at 92-93 (FF212). Moreover, Dr. Barber does not have

the proper credentials to serve as a reliable expert.  As Legislative

Reapportionment Commission Chairman Mark Nordenberg noted, Dr. Barber "has

not published a single academic article in the areas for which his expert testimony

was being presented." *See* Meeting of the Pennsylvania Legislative

Reapportionment Commission Approval of a Final Plan, at p. 18 (Feb. 4, 2022)

(available at www.redistricting.state.pa.us/resources/Press/2022-02-

04%20Chairmans%20 Statement.pdf.) Chairman Nordenberg largely dismissed Dr.

Barber's analysis on the legislative maps because other academics could not

accurately replicate his work.  *Id.*  The Court should do the same here.

Lastly, the Report erroneously concluded that Draw the Lines' incumbent

pairings showed greater partisan influence.[1]  Specifically, the Report noted that

since Pennsylvania lost one seat in the U.S. House of Representatives, one set of

incumbents must be paired in a single district, and that how these incumbents are

---

[1] The Report acknowledged that protection of incumbents is not "a constitutionally
required, or necessarily dispositive consideration," and "wholly subordinate" to the
constitutional criteria as stated in *LVW II*, 178 A.3d at 817, but still considered this
factor.  Report at 178 (CL1).

paired could be used to assess whether a proposed plan was partisan.  Report at 178-79 (FF1-2).  The Report concluded that it would be most non-partisan and desirable if the two Democratic incumbents who were not seeking re-election (Lamb and Doyle) were paired with each other or other Democratic incumbents. Report at 179 (FF4-5).  Because Draw the Lines did not do so, but paired three Republican incumbents with one Democrat, the Report wrongly concluded that its map was more partisan.  Report at 181 (FF24-25).  In fact, six Republican-held districts require adding people to meet the new population target (764,865), while all but two Democratic-held distrci will need to shed population to meet the target population.[2]  This will require more Republican-held districts to expand geographically.  Thus, it makes more sense to pair Republican incumbents together in light of the neutral constitutional criteria, as the Citizens' Map has done.

In conclusion, the Citizens' Map is superior to the H.B. 2146 Republican map selected by the Report both on the constitutional neutral criteria, and the additional metrics that are important to Pennsylvanians, like competitiveness, and limiting partisan bias (as discussed further below).[3] Moreover, it was created with

---

[2] *See* https://data.census.gov/cedsci/table?g=0400000US42%245000000&y=2020&d=DEC%20Redistricting%20Data%20%28PL%2094-171%29&tid=DECENNIALPL2020.P1 (2020 census data reflecting total population in each PA district).

[3] In addition, the Report acknowledges that the Citizens' Map has the same number of majority-minority districts as H.B. 2146 (and most of the other maps) and that it

22

unprecedented public engagement and input. It is a composite map that incorporates what over 7,200 Pennsylvanians, representing 40 of Pennsylvania's 67 counties, collectively mapped through public Draw the Lines competitions over the last four years, and reflects the values that mappers declared as important to them. The Citizens' Map, in effect, represents the everyday Pennsylvania, and the Special Master erred in not recommending it.

IV.   **CONCLUSION**

For the foregoing reasons, the Exceptions of the DTL Amicus Participants should be granted, and this Court should adopt the Citizens' Map as the final Congressional redistricting plan.

Dated:  February 14, 2022              Respectfully submitted,

                                       MORGAN, LEWIS & BOCKIUS LLP


                                       By: */s/ John P. Lavelle, Jr.*
                                       John P. Lavelle, Jr. (Pa. ID No. 54279)
                                       1701 Market Street
                                       Philadelphia, PA  19103-2921
                                       +1.215.963.4824
                                       john.lavelle@morganlewis.com

                                       *Counsel for the DTL Amicus Participants*

_____

was likely to be compliant with Section 2 of the Voting Rights Act.  Report at 182-183.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing of confidential information and documents differently than non-confidential information and documents.

<u>*/s/ John P. Lavelle, Jr.*</u>
John P. Lavelle, Jr. (Pa. ID No. 5427)

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service by PACFile eService as follows:**

All counsel of record

Dated: February 14, 2022

_/s/ John P. Lavelle, Jr._
John P. Lavelle, Jr. (Pa. ID No. 54279)
1701 Market Street
Philadelphia, PA  19103-2921
+1.215.963.4824
john.lavelle@morganlewis.com

*Counsel for the DTL Amicus Participants*