Received 2/14/2022 3:27:27 PM Supreme Court Middle District

Filed 2/14/2022 3:27:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Carol Ann Carter; Monica Parrilla; | : | CASES CONSOLIDATED |
| Rebecca Poyourow; William Tung; | : | |
| Roseanne Milazzo; Burt Siegel; | : | No. 7 MM 2022 |
| Susan Cassanelli; Lee Cassanelli; | : | |
| Lynn Wachman; Michael Guttman; | : | **AMICUS PARTICIPANTS'** |
| Maya Fonkeu; Brady Hill; Mary Ellen | : | **("CITIZEN-VOTERS")** |
| Balchunis; Tom DeWall, Stephanie | : | **EXCEPTIONS TO REPORT** |
| McNulty and Janet Temin, | : | **CONTAINING PROPOSED** |
| | : | **FINDINGS OF FACT AND** |
| Petitioners, | : | **CONCLUSIONS OF LAW** |
| | : | |
| v. | : | Counsel of Record for Amicus |
| | : | Participants ("Citizen-Voters"): |
| Leigh Chapman, in her official | : | |
| capacity as the Acting Secretary of | : | Dillon, McCandless, King, |
| the Commonwealth of Pennsylvania; | : | Coulter & Graham L.L.P. |
| Jessica Mathis, in her official | : | |
| capacity as Director for the | : | Thomas W. King III |
| Pennsylvania Bureau of Election | : | PA. ID No. 21580 |
| Services and Notaries, | : | tking@dmkcg.com |
| | : | |
| Respondents, | : | Thomas E. Breth |
| | : | PA. ID No. 66350 |
| ──────────────────── | : | tbreth@dmkcg.com |
| | : | |
| Phillip T. Gressman; Ron Y. Donagi; | : | Jordan P. Shuber |
| Kristopher R. Tapp; Pamela Gorkin; | : | PA. ID No. 317823 |
| David P. Marsh; James L. | : | jshuber@dmkcg.com |
| Rosenberger; Amy Myers; Eugene | : | |
| Boman; Gary Gordon; Liz | : | 128 West Cunningham Street, |
| McMahon; Timothy G. Freeman; | : | Butler, Pennsylvania 16001 |
| and Garth Isaak, | : | 724-283-2200 (phone) |
| | : | 724-283-2298 (fax) |
| Petitioners, | : | |
| | : | |
| v. | : | |
| | : | |
| Leigh Chapman, in her official | : | |
| capacity as the Acting Secretary of | : | |

the Commonwealth of Pennsylvania; :
Jessica Mathis, in her official           :
capacity as Director for the              :
Pennsylvania Bureau of Election           :
Services and Notaries,                    :
                                          :
                        Respondents,      :
_____       :
                                          :
Leslie Osche, Kim Geyer, Michael T. :
Slupe, Candee Barnes, Thomas              :
Reep, Brandy Reep, Kenneth                :
Lunsford, Tammy Lunsford, James           :
Thompson, Pamela Thompson,                :
Joseph Renwick, Stephanie                 :
Renwick, Louis Capozzi, David Ball, ;
Mary E. Owlett, Kristine Eng, Justin :
Behrens, James P. Foreman,                :
Matthew J. Stuckey, Anthony J.            :
Luther, Linda C. Daniels, Jeffrey         :
Piccola, James Vasilko, Jay               :
Hagerman, and Evan P. Smith,              :
                                          :
                  Amicus Participants,    :
                                          :
            v.                            :
                                          :
Leigh Chapman, in her official            :
capacity as the Acting Secretary of       :
the Commonwealth of Pennsylvania; :
Jessica Mathis, in her official           :
capacity as Director for the              :
Pennsylvania Bureau of Election           :
Services and Notaries,                    :

                        Respondents.

## AMICUS PARTICIPANTS' ("CITIZEN-VOTERS") EXCEPTIONS TO REPORT CONTAINING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Amicus Participants ("Citizen-Voters")[1], by and through their undersigned counsel, hereby file the within Exceptions to the Master's Report (authored by the Hon. Patricia McCollough) Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule ("Master's Report").

## Introduction

The Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule ("Master Report") was a well-reasoned and thorough review of the maps submitted in the present matter. Citizen Voters recognize the efforts set forth by the parties to the present matter as well as the Master

---

[1] Leslie Osche, Kim Geyer, Michael T. Slupe, Candee Barnes, Thomas Reep, Brandy Reep, Kenneth Lunsford, Tammy Lunsford, James Thompson, Pamela Thompson, Joseph Renwick, Stephanie Renwick, Louis Capozzi, David Ball, Mary E. Owlett, Kristine Eng, Justin Behrens, James P. Foreman, Matthew J. Stuckey, Anthony J. Luther, Linda C. Daniels, Jeffrey Piccola, James Vasilko, Jay Hagerman, and Evan P. Smith.

2

in accomplishing, "the 'unwelcome obligation'" of choosing an appropriate congressional redistricting plan on a heavily restricted timeline.

Notwithstanding the Master's thorough and well-reasoned report, several matters regarding the "Citizen-Voters'" map and submission necessitate the filing of the present exceptions. While the Master's recommended map, HB 2146, certainly satisfies the constitutional requirements for a proposed congressional map in the Commonwealth of Pennsylvania, the "Citizen-Voters" map, and in the alternative, the "Reschenthaler 1" map, perform better than HB 2146 in several of the metrics used by the Master in determining which map to recommend to this Court. In light of these alleged errors, Amicus Participants file the within Exceptions to the Master's Report, stating in support thereof as follows:

## Exception One

The Master erred in extending deference to the HB 2146 Map for the sole reason that HB 2146 had gone through the proper legislative channels prior to the present litigation as the "Citizen-Voters" map, and in the alternative, the "Reschenthaler 1" map, better satisfy the constitutional requirements of a proposed congressional district map in the Commonwealth of Pennsylvania and in particular with respect to "splits" or divisions of counties.

3

## Exception Two

The Master erred in declining to recommend the adoption of the "Citizen-Voters" map because "it has a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one-person deviation." *See* Master's Report, at pg. 204. As noted in the Master Report's Proposed Findings of Fact, Conclusions of Law, and Adoption of Map Recommendation, Finding 18 on p. 192, the Carter Plan and the House Democratic Plan are the only plans that result in a two-person deviation. S*ee* Master's Report, FF 18, at pg. 192. Moreover, a review of the "Citizen-Voters'" map shows that the population deviation for each district is set forth on the face of the map and such figures show that no district deviated by more than one person.  A true and correct copy of the data sheets utilized in drafting the Citizen Voters proposed 17-district congressional map, showing a maximum deviation of one person, is attached hereto as "Exhibit A."

## Exception Three

The Master erred in declining to recommend adoption of the Citizen-Voter's Plan because "it was not accompanied by an expert report or testimony consequently, the Court received no testimonial or written explanation concerning why the map drew the lines in the particular manner

4

that it did and to demonstrate why the divides in the maps were absolutely necessary to achieve population equality as opposed to some other secondary or impermissible goal." *See* Master's Report, at pg. 204. As noted by the Commonwealth Court's Order dated January 14, 2022, "Amicus Participants who wish to submit for the Court's consideration one (1) proposed 17-district congressional redistricting map/plan . . . and, i*f the Amicus Participant chooses to do so*, a supporting brief and/or a support expert report, by 5:00 p.m. on Monday, January 24, 2022." (emphasis added). Accordingly, an expert report was not mandated nor required for an Amicus Participant's map(s) to be considered by the Master.

## Exception Four

The Master erred in finding that, "[t]he Citizen Voters did not provide an expert report to support their map. Consequently, the Court received no expert testimonial or written explanation concerning why the map drew the lines in the particular manner that it did, and, perhaps, more importantly, to demonstrate why the divides in the maps were absolutely necessary to achieve population equality as opposed to some other secondary or impermissible goal. There was no discussion or evidence whatsoever presented by Citizen Voters that their district lines preserved communities of interests. Left with this evidentiary mode of speculation, the Court provides

5

little to no weight to the map submitted by the Citizen Voters." *See* Master's Report, FF 11 at pg. 156. On the contrary, the Amicus Participants' ("Citizen-Voters") Proposed Map of Congressional Districts, filed on January 24, 2022, clearly shows "Citizen-Voters'" efforts to maintain communities of interest. *See* Amicus Participants' ("Citizen-Voters") Proposed Map of Congressional Districts, at Pg. 1-2.

## Exception Five

In the alternative, the Master erred in declining to adopt Reschenthaler 1 Map as the Reschenthaler 1 Map had the lowest county split of all the maps presented (13 Counties), had the lowest "county pieces" (29), had the lowest municipal splits (16 Municipalities), tied for the lowest number of "municipal pieces" (33), and "[is] consistent with the Free and Equal Elections Clause of the Pennsylvania Constitution, and, also, the aspirations and ideals expressed by that constitutional provision as pronounced by the Court in LWV II due to [its] compactness, degree of partisan fairness, and specific development of congressional districts." *See* Master's Report, at FF 24 (pg. 193); FF 54 (pg. 206); FF 57 (pg. 207).

6

## Exception Six

The Master erred in finding that, "the Senate Democratic Caucus 2 Plan, the House Democratic Caucus Plan, the Draw the Lines Plan, the Reschenthaler 1 Plan, and the Citizen-Voters Plan have three incumbent pairings and as such will be given less weight in this regard," as the "protection of incumbents," is a factor to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts. *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 817 (Pa. 2018). The Reschenthaler 1 Map and the Citizen-Voters Map in actuality have only one incumbent pairing.

WHEREFORE, Amicus Participants ("Citizen-Voters") respectfully request that this Honorable Court sustain their exceptions to the Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule ("Master Report") and request that this Honorable Court adopt the Citizen-Voters' map or, in the alternative, the Reschenthaler 1 map, as the map closest in accomplishing the Citizen-Voters' "aim to maintain county line integrity in the plan."

7

Respectfully submitted,

**DILLON, McCANDLESS, KING,
COULTER & GRAHAM, L.L.P.**

By:   /s/ Thomas W. King, III
          Thomas W. King, III
          PA. I.D. No. 21580
          tking@dmkcg.com

8

| District | Total Population | Deviation |
|---|---|---|
| District 1 | 764865 | 0 |
| District 2 | 764865 | 0 |
| District 3 | 764864 | -1 |
| District 4 | 764865 | 0 |
| District 5 | 764865 | 0 |
| District 6 | 764865 | 0 |
| District 7 | 764864 | -1 |
| District 8 | 764865 | 0 |
| District 9 | 764864 | -1 |
| District 10 | 764865 | 0 |
| District 11 | 764865 | 0 |
| District 12 | 764865 | 0 |
| District 13 | 764865 | 0 |
| District 14 | 764864 | -1 |
| District 15 | 764865 | 0 |
| District 16 | 764865 | 0 |
| District 17 | 764864 | -1 |

EXHIBIT A

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the Public Access

Policy of the Unified Judicial System of Pennsylvania: Case Records of the

Appellate and Trial Courts that require filing confidential information and

documents differently than non-confidential information and documents.


 /s/ Thomas W. King, III
Thomas W. King, III

## <u>CERTIFICATE OF SERVICE</u>

I certify that this filing was served via PACFile upon all counsel of record this 14th day of February, 2022.

<u>/s/ Thomas W. King, III</u>
Thomas W. King, III

Received 2/14/2022 3:30:01 PM Supreme Court Middle District

Filed 2/14/2022 3:30:01 PM Supreme Court Middle District
7 MM 2022

## IN THE SUPREME COURT OF PENNSYLVANIA

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Balchunis; Tom DeWall, Stephanie McNulty, and Janet Temin,

                        Petitioners,

    v.

Leigh Chapman, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania; Jessica Mathis, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries,

                        Respondents,

Phillip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Freeman; and Garth Isaak,

                        Petitioners,

    v.

CASES CONSOLIDATED

No. 7 MM 2022

**AMICUS PARTICIPANTS' ("CITIZEN-VOTERS") BRIEF IN SUPPORT OF EXCEPTIONS TO REPORT CONTAINING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Counsel of Record for Amicus Participants ("Citizen-Voters"):

Dillon, McCandless, King, Coulter & Graham L.L.P.

Thomas W. King III
PA. ID No. 21580
tking@dmkcg.com

Thomas E. Breth
PA. ID No. 66350
tbreth@dmkcg.com

Jordan P. Shuber
PA. ID No. 317823
jshuber@dmkcg.com

128 West Cunningham Street,
Butler, Pennsylvania 16001
724-283-2200 (phone)
724-283-2298 (fax)

Leigh Chapman, in her official                              :
capacity as the Acting Secretary of                         :
the Commonwealth of                                         :
Pennsylvania; Jessica Mathis, in                            :
her official capacity as Director for                       :
the Pennsylvania Bureau of                                  :
Election Services and Notaries,                             :
                                                            :
                        Respondents,                        :
                                                            :
_____                             :
                                                            :
Leslie Osche, Kim Geyer, Michael                            :
T. Slupe, Candee Barnes, Thomas                             :
Reep, Brandy Reep, Kenneth                                  :
Lunsford, Tammy Lunsford, James                             :
Thompson, Pamela Thompson,                                  :
Joseph Renwick, Stephanie                                   :
Renwick, Louis Capozzi, David                               :
Ball, Mary E. Owlett, Kristine Eng,                         :
Justin Behrens, James P.                                    ;
Foreman, Matthew J. Stuckey,                                :
Anthony J. Luther, Linda C.                                 :
Daniels, Jeffrey Piccola, James                             :
Vasilko, Jay Hagerman, and Evan                             :
P. Smith,                                                   :
                                                            :
                        Amicus Participants,                :
                                                            :
                v.                                          :
                                                            :
Leigh Chapman, in her official                              :
capacity as the Acting Secretary of                         :
the Commonwealth of                                         :
Pennsylvania; Jessica Mathis, in                            :
her official capacity as Director for                       :
the Pennsylvania Bureau of                                  :
Election Services and Notaries,                             :
                                                            :
                        Respondents.                        :

A2374

## <u>TABLE OF CONTENTS</u>

I.   Summary of Argument. ................................................................................................ 1

II.  Argument. ..................................................................................................................... 4

    A.  The Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule improperly disqualified Amicus Participants Citizen-Voters' Proposed Congressional Map. ................................................................... 4

        1.  Citizen-Voters were not required to submit an expert report for the consideration of their map. ............................................................................... 4

        2.  The Master erred in finding that Citizen-Voters' map had a two-person difference in population from the largest to their smallest districts, as the Citizen-Voters' map had a maximum deviation of one-person. ...................... 7

        3.  The Master erred in refusing to adopt Citizen-Voters' map as such map satisfies all of the constitutional requirements of a proposed congressional district map in the Commonwealth of Pennsylvania. ................ 8

    B.  The Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule improperly disqualified the Reschenthaler 1 Proposed Congressional Map. ............................................................................................ 14

III. Conclusion. ................................................................................................................. 17

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*City of Bethlehem v. Marcincin*, 515 A.2d 1320 (Pa. 1986) ................................................ 11

*Holt v. 2011 Legislative Reapportionment Com'n*, 38 A.3d 711 (Pa. 2011) .................... 13

*League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) ............. 11, 12, 13

*Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) .......................................................................... 12

**Statutes**

42 U.S.C. § 1973 ...................................................................................................................... 12

**Constitutional Provisions**

Art. I, § 5, Pa. Const. ......................................................................................................... 11, 12

Art II, § 16, Pa. Const. ...................................................................................................... 11, 12

ii

## AMICUS PARTICIPANTS' ("CITIZEN-VOTERS") BRIEF IN SUPPORT OF EXCEPTIONS TO REPORT CONTAINING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Amicus Participants ("Citizen Voters")[1], by and through their undersigned counsel, hereby file the within Brief in Support of Amicus Participants' Exceptions to the Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule ("Master's Report"), stating in support thereof as follows:

### I.      Summary of Argument.

Amicus Participants ("Citizen Voters") except to the Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule as the Court erred in extending deference to the HB 2146 Map for the sole reason that such map had been submitted to, and approved by, Pennsylvania's General Assembly; erred in declining to consider the Citizen Voters plan for the reason that the

---

[1] Leslie Osche, Kim Geyer, Michael T. Slupe, Candee Barnes, Thomas Reep, Brandy Reep, Kenneth Lunsford, Tammy Lunsford, James Thompson, Pamela Thompson, Joseph Renwick, Stephanie Renwick, Louis Capozzi, David Ball, Mary E. Owlett, Kristine Eng, Justin Behrens, James P. Foreman, Matthew J. Stuckey, Anthony J. Luther, Linda C. Daniels, Jeffrey Piccola, James Vasilko, Jay Hagerman, and Evan P. Smith.

1

plan was unaccompanied by an expert report; erred in concluding that Citizen Voters plan, "has a two-person difference in population from the largest to their smallest districts;" and, in the alternative, erred in declining to adopt the Reschenthaler 1 plan as the Master's recommended map for adoption by the Pennsylvania Supreme Court.

The Court's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule concluded that

> [b]ased on all of the foregoing, the Court does not recommend adopting the Citizen Voters' Plan for the congressional districts in the Commonwealth of Pennsylvania because:
>
> 1) It was not accompanied by an expert report or testimony consequently, the Court received no testimonial or written explanation concerning why the map drew the lines in the particular manner that it did and to demonstrate why the divides in the maps were absolutely necessary to achieve population equality as opposed to some other secondary or impermissible goal;
>
> 2) It has a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one-person deviation.

*See* Master's Report, at pg. 204.

As an initial matter, the Court's Order permitting Amicus Participants to submit a proposed map for the Master's consideration did not require the submission of an expert report as a condition for the Master's consideration

2

of any submitted maps. Respectfully, the Master's refusal to consider maps submitted without an expert report is in error as Amicus Participant Citizen-Voters' map submission included a supporting brief which brief set forth the Citizen-Voters' reasons for drafting their map in the manner that they did.

Further, the Master erred in determining that Citizen-Voters' map had, "a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one-person deviation," as the Citizen-Voters' map did not have any districts exceeding a variation of "-1."

The Master additionally erred in declining to recommend the adoption of Citizen-Voters' map as Citizen-Voters' map satisfies all of the constitutional requirements for a proposed congressional district map in the Commonwealth of Pennsylvania and was one of the plans dividing the fewest counties, cities, incorporated towns, boroughs, townships, and wards, thereby displaying the Citizen-Voters' efforts to maintain communities of interest.

Lastly, in the alternative, the Master erred in declining to adopt the Reschenthaler 1 Map as such map satisfies all of the constitutional requirements for a proposed congressional district map; satisfies the ideals and goals expressed by the Free and Equal Elections Clause, as set forth

3

by the Pennsylvania Supreme Court; and consistently outperformed other maps in virtually every metric set forth by this Court. Importantly, to this Amicus Participant, it has the lowest number of county splits or divisions.

## II.    Argument.

**A.    The Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule improperly disqualified Amicus Participants Citizen-Voters' Proposed Congressional Map.**

The Master's Report expressly did not recommend the adoption of the Citizen Voters' map because: 1) Citizen Voters did not submit an expert report or testimony concerning, "why the map drew the lines in the particular manner that it did;" and 2) Citizen Voters map allegedly had a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one-person deviation.

### 1.    Citizen-Voters' were not required to submit an expert report for the consideration of their map.

On January 14, 2022, following oral argument on the ten applications to intervene filed in the present matter, the Court issued an Order denying the applications for leave to intervene filed by Voters of the Commonwealth of Pennsylvania, Citizen Voters, Draw the Lines-PA, and Khalif Ali, *et al*.

Pursuant to the Court's January 14, 2022, Order, Voters of the Commonwealth of Pennsylvania, Citizen Voters, Draw the Lines-PA, and Khalif Ali, *et al.* were permitted to participate in the present matter as "Amicus Participants." Amicus Participants were permitted to participate in the present matter as follows,

> Amicus Participants who wish to submit for the Court's consideration one (1) proposed 17-district congressional redistricting map/plan that is consistent with the results of the 2020 Census shall file the proposed map/plan and, if the Amicus Participant chooses to so, a supporting brief and/or a supporting expert report, by 5:00 p.m. on Monday, January 24, 2022.

As shown by Court's Order dated January 14, 2022, Amicus Participants were not required to submit an expert report for the consideration of their proposed congressional map.

Despite the fact that an expert report was not mandated for the consideration of a proposed 17-district congressional redistricting map/plan, the Master refused to consider or recommend the adoption of Citizen Voters' proposed map, stating that,

> [t]he Citizen Voters did not provide an expert report to support their map. Consequently, the Court received no expert testimonial or written explanation concerning why the map drew the lines in the particular manner that it did and, perhaps, more importantly, to demonstrate why the divides in the maps were absolutely necessary to achieve population equality as opposed to some other secondary or impermissible goal. There was no discussion or evidence whatsoever presented by Citizen Voters that their district lines preserved communities of interests. Left

5

with this evidentiary mode of speculation, the Court provides little
to no weight to the map submitted by the Citizen Voters.

*See* Master's Report, FF 11, at pg. 156.

While Citizen Voters acknowledge that an expert report was not
submitted with their proposed map, and Citizen Voters were not permitted to
offer testimony at the evidentiary hearings held in this matter due to their
status as an Amicus Participant, the Citizen Voters did submit a brief with
their proposed map. The Citizen Voters' brief sets forth the efforts to maintain
communities of interest as well as the reasons for the layout of their map as
follows:

> The proposed Congressional Redistricting Map submitted by the
> Citizen-Voters restores the following counties which were split by
> Pennsylvania's 2018 Congressional District Map: Washington,
> Cambria, Butler, and Centre. The proposed map endeavors to
> maintain communities of interest in one congressional district.
> For example, the Citizen Voters' proposed Map includes the City
> of Pittsburgh and the South Hills of Allegheny County in one
> district in District 17. In drafting the Citizen Voters' proposed
> map, efforts were taken to ensure that the proposed map split
> fewer municipalities than Pennsylvania's 2018 Congressional
> District Map, with fewer than sixteen (16) municipalities split by
> the Citizen Voters' map as compared to the nineteen (19)
> municipalities split by Pennsylvania's 2018 Congressional
> District Map. Further, the Citizen Voters' Map splits fewer than
> One Hundred and Nine (109) school districts as compared to the
> One Hundred and Twenty-Four (124) school districts split by
> Pennsylvania's 2018 Congressional District Map.

*See* Amicus Participants Citizen Voters' Brief, at Pg. 1-2.

Citizen Voters' proposed map, and the accompanying Brief in Support, set forth the Citizen-Voters' efforts to maintain communities of interest, as opposed to some other secondary or impermissible goal. Accordingly, the Master erred in providing, "little to no weight," to the map submitted by the Citizen Voters.

> **2.    The Master erred in finding that Citizen-Voters' map had a two-person difference in population from the largest to their smallest districts, as the Citizen-Voters' map had a maximum deviation of one-person.**

The Master refused to recommend the adoption of the Citizen Voters' map because, "it has a two-person difference in population from the largest to their smallest districts, while the majority of other plans were able to achieve a one-person deviation." *See* Master's Report, at Pg. 204. However, this finding is in error as the Citizen-Voters' map does not contain any districts which have a deviation greater than one person.

Seemingly, the fact that Citizen-Voters' map does not have a district with a deviation greater than one-person was recognized by the Master earlier in the report. The Master's Report's Finding of Fact 18 provides, "[h]owever, *unlike the other plans that have a maximum population deviation of one person*, the Carter Plan and the House Democratic Plan both result in districts that have a two-person deviation." *See* Master's Report, FF 18, at Pg. 192. (emphasis added).

7

An examination of the map submitted by Citizen Voters reveals that the population deviation is set forth on the face of the map and that such deviation does not exceed one in any of the proposed districts therein. Citizen Voters' proposed 17th District, 14th District, 9th District, and 7th District have a deviation of one person, while the remaining proposed districts do not deviate at all. A true and correct copy of the data sheets utilized in drafting the Citizen Voters proposed 17-district congressional map, showing a maximum deviation of one person, is attached hereto as "Exhibit A."

Accordingly, the Master erred in refusing to consider Citizen-Voters' proposed map because, "[i]t has a two-person difference in population from the largest to their smallest districts," as Citizen-Voters' proposed map did not create any districts with a deviation greater than one person.

> **3.    The Master erred in refusing to adopt Citizen-Voters' map as such map satisfies all of the constitutional requirements of a proposed congressional district map in the Commonwealth of Pennsylvania.**

The Master's Report concluded that it does not recommend the adoption of Citizen-Voters' map in the present matter, and instead recommended the adoption of the HB 2146 Map. *See* Master's Report, FF 97, at Pg. 216. While the Court's analysis of the HB 2146 Map was well reasoned and thoroughly conducted, the Court ultimately extended great deference to HB 2146 simply by virtue of the map having gone through the

8

legislative process. However, an analysis of the Citizen-Voters' map reveals that it better satisfies all of the constitutional requirements for a proposed congressional map in the Commonwealth of Pennsylvania and consistently outperformed other maps in several metrics utilized by the Master to determine which map to recommend to this Court for adoption.

Article I, Section 5 of the Pennsylvania Constitution provides that, "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."

The Pennsylvania Supreme Court has had occasion to review Pennsylvania's Free and Equal Elections Clause and has interpreted the same to prohibit, "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 809 (Pa. 2018); *citing City of Bethlehem v. Marcincin*, 515 A.2d 1320, 1323-24 (Pa. 1986). In so holding, the Court established "neutral benchmarks" to measure a congressional district map's compliance with Article I, Section 5 by drawing upon Article II, Section 16 of the Pennsylvania Constitution. Article II, Section 16 of the Pennsylvania Constitution provides,

> [t]he Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed

9

of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township, or ward shall be divided in forming either a senatorial or representative district.

Pa. Const. Art. II, §16.

Upon review of Article II, Section 16, this Court held that to satisfy the requirements of Article I, Section 5 of the Pennsylvania Constitution, a congressional district map must be, "composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." *League of Women Voters*, 178 A.3d at 816-17.

In addition to the factors established by Article II, Section 16, the Court noted that other factors such as, "the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment." *Id*. at 817. One such additional factor to be reviewed by a Court in adopting a proposed congressional redistricting plan is, "whether the plans operate to dilute the voting impact of any minority," under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. *See Mellow v. Mitchell*, 607 A.2d 204, 208 (Pa. 1992). While such factors are permissible to consider in determining the constitutionality of a proposed

10

A2386

congressional district map, these factors are, "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." As stated by this Court,

> [w]e recognize that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment. However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts.

*League of Women Voters*, 178 A.3d at 817; *citing Holt v. 2011 Legislative Reapportionment Com'n*, 38 A.3d 711, 1235 (Pa. 2011).

Citizen-Voters' proposed map satisfies the constitutional requirements that a proposed map be, "composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." *League of Women Voters*, 178 A.3d at 816-17.

Beginning with the requirement that a proposed map be composed of compact and contiguous territory, Citizen-Voter's map was given a Polsby score of 0.3494, a Schwartzberg score of 1.714, and a Reock score of

11

0.4406. As noted by the Master, "[a]ll plans presented to the Court met the contiguous requirement. All plans proposed districts of contiguous territory. *See* Master's Report, CL 1, at Pg. 137; *citing* Duchin Expert Rebuttal 2. As shown by the Citizen-Voters' proposed congressional district map below, such map satisfies the constitutional requirement that maps be composed of company and contiguous territory.

### Citizen-Voters' Proposed Map



In regard to the requirement that a proposed map be nearly equal in population as practicable, Citizen-Voters' proposed map out-performed the Carter Plan, House Democratic Plan, and the Ali Plan. *See* Master's Report,

12

at Pg. 137-38. The ideal district population for each of the Commonwealth's 17 reapportioned congressional districts is approximately 764,864 or 764,865 persons. *See* Master's Report, FF 2, at Pg. 138. Of the 17 plans submitted to the Master for consideration, all plans but the Carter Plan and the House Democratic Plan were able to reach a maximum deviation from the ideal district population of one individual. Additionally, the Master concluded that the Ali Plan, "cannot appropriately be compared to other maps," because of its reliance on Data Set #2, which provides for the reallocation of prisoners to their addresses prior to incarceration.

Citizen-Voters' plan also satisfies the constitutional requirement that a proposed redistricting map, "not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." The Citizen-Voters' Plan divided 14 counties, 16 municipalities, and 21 wards. These figures place the Citizen-Voters' map in the lowest number of municipal splits of the maps submitted to the Master and the second fewest in county splits. *See* Master's Report, FF 36-38, at Pg. 146.

Lastly, Citizen-Voters' plan satisfies the extra-constitutional considerations regarding the adequacy of a proposed congressional map such as, "the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior

13

reapportionment." As noted in the Brief filed by the Citizen-Voters, the Citizen-Voters' map restores the counties of Washington, Cambria, Butler, and Centre, which were split by Pennsylvania's 2018 Congressional District Map, thereby preserving the historical district lines of these counties. Further, Citizen-Voters' map maintains communities of interest by maintaining the City of Pittsburgh in one contiguous district together with the South Hills of Allegheny County. *See* Citizen-Voters' Brief, at Pg. 1.

Accordingly, as Citizen-Voters' map satisfy the constitutional requirements for a proposed redistricting map in the Commonwealth of Pennsylvania and has exceed other maps in several metrics reviewed by this Court, the Master has erred in refusing to recommend the adoption of Citizen-Voters' map.

**B.   The Master's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendations of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule improperly disqualified the Reschenthaler 1 Proposed Congressional Map.**

In the alternative to Section A, the Master's Report erred in failing to recommend the adoption of the Reschenthaler 1 proposed congressional map as such map best meets the criteria set forth by the Pennsylvania Supreme Court's prior case law and best satisfies the criteria reviewed by the Master below.

14

As noted by Dr. Duchin, and as further shown by the map below, the Reschenthaler 1 map is contiguous, closely balanced in terms of population, and "reasonably compact," thereby satisfying the first constitutional requirement for a proposed district map. *See* Master's Report, FF 168, at Pg. 85. Further, the Reschenthaler 1 map had the lowest county split of all maps submitted, showing an "aggressive pursuit of county integrity," and had the lowest number of municipal splits. *See* January 27, 2022, Transcript, at Pg. 459. Lastly, the Reschenthaler 1 map was able to produce 17-congressional districts with no population deviation greater than one person. *See* Master's Report, CL 2, at Pg. 138.

## Reschenthaler 1 Proposed Map



15

The Reschenthaler 1 map represents a "first-tier" standard of excellence in the drafting of a proposed 17 district congressional plan and easily satisfies both the neutral criteria set forth by this Court in League of Women Voters, as well as the extra-constitutional considerations for a proposed congressional map. *See* Master's Report, FF 51, at Pg. 206. The Reschenthaler 1 map's satisfaction of these considerations together with its preservation of communities of interest make it the clear choice to be recommended for adoption by this Court. The Reschenthaler 1 map consistently outperformed almost every other map in each metric that the Master utilized in reviewing the maps.

Accordingly, should this Court decide not to adopt Citizen-Voters' proposed congressional map, Amicus Participants Citizen-Voters urge this Court to adopt the Reschenthaler 1 map as it satisfies all of the neutral criteria for the creation of a congressional district map in the Commonwealth of Pennsylvania, satisfies all of the extra-constitutional considerations such as the maintaining of communities of interest, and consistently outperformed the other maps submitted to the Master.

16

### III.      Conclusion.

The Master's Report in the present matter sets forth a very well-reasoned and thorough legal analysis of the multiple maps submitted to the Court on an expedited basis. The efforts of the Master to create such an extensive report in a timely manner are recognized and deeply appreciated by Amicus Participants Citizen-Voters.

However, notwithstanding the thorough legal analysis, several findings of fact in the Master's Report were incorrect and necessitate the filing of the present exceptions. The Citizen-Voters were not required to submit an expert report in order to have their map considered by the Master, and the Master erred in finding that Citizen-Voters' map deviated by more than one person per district.

In conclusion, Amicus Participants Citizen-Voters urge this Court to accept and consider Citizen Voters' proposed 17-district congressional map for adoption in the Commonwealth of Pennsylvania as Citizen-Voters' map was improperly disqualified by the Master and satisfies all of the constitutional requirements for a proposed congressional redistricting plan in the Commonwealth of Pennsylvania.

In the alternative, Amicus Participants Citizen-Voters urge this Court to accept and consider the Reschenthaler 1 map in the Commonwealth of

Pennsylvania as such map also satisfies all of the constitutional requirements for a proposed congressional redistricting plan and consistently outperformed other maps submitted to the Master for consideration.

Respectfully submitted,

**DILLON, McCANDLESS, KING, COULTER & GRAHAM, L.L.P.**

By:   /s/ Thomas W. King, III
       Thomas W. King, III
       PA. I.D. No. 21580
       tking@dmkcg.com

18

| District | Total Population | Deviation |
|---|---|---|
| District 1 | 764865 | 0 |
| District 2 | 764865 | 0 |
| District 3 | 764864 | -1 |
| District 4 | 764865 | 0 |
| District 5 | 764865 | 0 |
| District 6 | 764865 | 0 |
| District 7 | 764864 | -1 |
| District 8 | 764865 | 0 |
| District 9 | 764864 | -1 |
| District 10 | 764865 | 0 |
| District 11 | 764865 | 0 |
| District 12 | 764865 | 0 |
| District 13 | 764865 | 0 |
| District 14 | 764864 | -1 |
| District 15 | 764865 | 0 |
| District 16 | 764865 | 0 |
| District 17 | 764864 | -1 |

EXHIBIT A

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Public Access

Policy of the Unified Judicial System of Pennsylvania: Case Records of the

Appellate and Trial Courts that require filing confidential information and

documents differently than non-confidential information and documents.


 /s/ Thomas W. King, III
Thomas W. King, III

## <u>CERTIFICATE OF SERVICE</u>

I certify that this filing was served via PACFile upon all counsel of record this 14th day of February 2022.


<u>/s/ Thomas W. King, III</u>
Thomas W. King, III

Received 2/15/2022 3:29:29 PM Supreme Court Middle District

## IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Balchunis; Tom DeWall, Stephanie McNulty, and Janet Temin, | : : : : : : : : : : : : | CASES CONSOLIDATED<br><br>No. 7 MM 2022<br><br>**AMICUS PARTICIPANTS' ("CITIZEN-VOTERS") STATEMENT OF INTEREST FOR BRIEF IN SUPPORT OF EXCEPTIONS** |
| Petitioners, | : : : | Counsel of Record for Amicus Participants ("Citizen-Voters"): |
| v. | : : | |
| Leigh Chapman, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania; Jessica Mathis, in her official capacity as Director for the Pennsylvania Bureau of Election Services and Notaries, | : : : : : : : : | Dillon, McCandless, King, Coulter & Graham L.L.P.<br><br>Thomas W. King III<br>PA. ID No. 21580<br>tking@dmkcg.com<br><br>Thomas E. Breth<br>PA. ID No. 66350<br>tbreth@dmkcg.com |
| Respondents, | : : : | Jordan P. Shuber<br>PA. ID No. 317823<br>jshuber@dmkcg.com |
| Phillip T. Gressman; Ron Y. Donagi; Kristopher R. Tapp; Pamela Gorkin; David P. Marsh; James L. Rosenberger; Amy Myers; Eugene Boman; Gary Gordon; Liz McMahon; Timothy G. Freeman; and Garth Isaak, | : : : : : : : : : | 128 West Cunningham Street, Butler, Pennsylvania 16001<br>724-283-2200 (phone)<br>724-283-2298 (fax) |
| Petitioners, | : : | |
| v. | : : : | |

Leigh Chapman, in her official
capacity as the Acting Secretary of
the Commonwealth of
Pennsylvania; Jessica Mathis, in
her official capacity as Director for
the Pennsylvania Bureau of
Election Services and Notaries,

       Respondents,

_____

Leslie Osche, Kim Geyer, Michael
T. Slupe, Candee Barnes, Thomas
Reep, Brandy Reep, Kenneth
Lunsford, Tammy Lunsford, James
Thompson, Pamela Thompson,
Joseph Renwick, Stephanie
Renwick, Louis Capozzi, David
Ball, Mary E. Owlett, Kristine Eng,
Justin Behrens, James P.
Foreman, Matthew J. Stuckey,
Anthony J. Luther, Linda C.
Daniels, Jeffrey Piccola, James
Vasilko, Jay Hagerman, and Evan
P. Smith,

      Amicus Participants,

   v.

Leigh Chapman, in her official
capacity as the Acting Secretary of
the Commonwealth of
Pennsylvania; Jessica Mathis, in
her official capacity as Director for
the Pennsylvania Bureau of
Election Services and Notaries,

       Respondents.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
;
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## <u>AMICUS PARTICIPANTS' ("CITIZEN-VOTERS") STATEMENT OF INTEREST FOR BRIEF IN SUPPORT OF EXCEPTIONS</u>

Amicus Participants ("Citizen-Voters"), by and through their undersigned counsel, hereby file the within Statement of Interest for Amicus Participants' Brief in Support of Exceptions to Report Containing Proposed Findings of Fact and Conclusions of Law, stating as follows:

Pursuant to Rule 531 of the Pennsylvania Rules of Appellate Procedure, the Republican Federal Committee of Pennsylvania (PAC) contributed to the payment of counsel for the preparation of Amicus Participants' Brief in Support of Exceptions to Report Containing Proposed Findings of Fact and Conclusions of Law. No other person or entity paid in whole or in part for the preparation of this brief or authored any part of this brief.

Respectfully submitted,

**DILLON, McCANDLESS, KING, COULTER & GRAHAM, L.L.P.**

By:  /s/ Thomas W. King, III
      Thomas W. King, III
      PA. I.D. No. 21580
      tking@dmkcg.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the Public Access

Policy of the Unified Judicial System of Pennsylvania: Case Records of the

Appellate and Trial Courts that require filing confidential information and

documents differently than non-confidential information and documents.


 /s/ Thomas W. King, III
Thomas W. King, III

## <u>CERTIFICATE OF SERVICE</u>

I certify that this filing was served via PACFile upon all counsel of record this 15th day of February 2022.


 /s/ Thomas W. King, III
Thomas W. King, III

Received 2/14/2022 10:03:11 PM Supreme Court Middle District

Filed 2/14/2022 10:03:00 PM Supreme Court Middle District
7 MM 2022

## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

No. 7 MM 2022

Carol Ann Carter; Monica Parrilla; Rebecca Poyourow; William Tung; Roseanne Milazzo; Burt Siegel; Susan Cassanelli; Lee Cassanelli; Lynn Wachman; Michael Guttman; Maya Fonkeu; Brady Hill; Mary Ellen Bachunis; Tom DeWall; Stephanie McNulty; and Janet Temin,

Petitioners,

v.

Leigh M. Chapman, in Her Capacity as Acting Secretary of the Commonwealth of Pennsylvania; and Jessica Matthis, in Her Acting Capacity as Director of the Bureau of Election Services and Notaries,

Respondents.

### BRIEF OF *AMICI CURIAE* VOTERS OF THE COMMONWEALTH OF PENNSYLVANIA IN SUPPORT OF SPECIAL MASTER'S REPORT

Supporting Report Containing Proposed Findings of Fact and Conclusions of Law of the Honorable Patricia A. McCullough of the Commonwealth Court of Pennsylvania Supporting Her Recommendation of a Redistricting Plan

Kathleen A. Gallagher (PA #37950)
Russell D. Giancola (PA #200058)
GALLAGHER GIANCOLA LLC
3100 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412.717.1900 (Phone)
412.717.1901 (Fax)
*Counsel for Amici Curiae Voters of the Commonwealth of Pennsylvania, Haroon Bashir, Valerie Biancaniello, Tegwyn Hughes, and Jeffrey Wenk*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................1

DETERMINATION IN QUESTION ........................................................3

STATEMENT OF THE CASE..................................................................4

SUMMARY OF ARGUMENT ..................................................................8

ARGUMENT ............................................................................................9

    I.    The Court's Role in Congressional Redistricting ...............................10

    II.   Neutral Redistricting Criteria Must Predominate ..............................11

    III.  The Special Master Properly Recommended Excluding Certain
        Maps for Failing to Satisfy Constitutional Criteria...........................13

            A.    The Carter Plan, House Democratic Plan, and Ali Plan Fail
                  to Achieve Population Equality ................................................14

            B.    The Governor's Plan, the Senate Democratic Plans,
                  the Draw the Lines Plan, and the Ali Plan
                  Unconstitutionally Split Pittsburgh...........................................16

    IV.  The Special Master Properly Did Not Rely on "Partisan Fairness"
        Metrics to Compare the Merits of the Plans.......................................19

            A.    "Partisan Fairness" Is a Slippery Slope that Risks
                  Subordinating the Neutral Criteria.............................................19

            B.    The Gressman Plan and the Draw the Lines Plan Subordinate
                  Neutral Criteria in Favor of Partisan Fairness .........................22

    V.   The Special Master Correctly Held that the Evidentiary Record
        Did Not Support Voting Rights Act Considerations, rendering
        the Gressman Plan an Unconstitutional Racial Gerrymander.............23

i

VI.    The Special Master's Recommendation to Adopt the HB 2146 Plan
       Was Proper; Alternatively, the Court Should Adopt the Voters of PA
       Plan ..................................................................................................24

       A.    Compactness ..............................................................................25

       B.    Political Subdivision Splits .......................................................28

       C.    Incumbency Protection ..............................................................29

       D.    Partisanship .............................................................................32

       E.    The Special Master's Credibility Determinations Are Entitled
             to Special Weight ......................................................................34

VII.   The Voters of PA Take No Position Regarding the Primary
       Election Calendar ...............................................................................35

CONCLUSION ...................................................................................................36

Declaration of Sean Trende ............................................................... Ex. A

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................. 22

*Albert v. 2001 Legislative Reapportionment Comm'n*,
   790 A.2d 989 (Pa. 2002) ..................................................................... 1

*Annenberg v. Commonwealth*, 757 A.2d 338 (Pa. 2000) .................... 34

*Butcher v. Bloom*, 216 A.2d 457 (Pa. 1966) ....................................... 10

*Carter v. Chapman*, No. 7 M 2022, Order filed Feb. 2, 2022 ................ 8

*Chapman v. Meier*, 420 U.S. 1 (1964).................................................. 10

*City Council of Bethlehem v. Marcinin*, 515 A.2d 1320 (Pa. 1986)..................... 11

*Commonwealth ex rel. Specter v. Levin*, 293 A.2d 15 (Pa. 1972)................. 11, 13

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ........................................... 23

*Growe v. Emison*, 507 U.S. 25 (1993) .................................................. 10

*Holt v. 2011 Legislative Reapportionment Comm'n*,
   38 A.3d 711 (Pa. 2012) ............................................................. 13, 32

*Holt v. 2011 Legislative Reapportionment Comm'n*,
   67 A.3d 1211 (Pa. 2013).................................................... 12, 17, 20

*In re New Britain Borough Sch. Dist.*, 145 A. 597 (Pa. 1929) ............................ 13

*Johnson v. Wis. Elections Comm'n*, 399 Wis. 2d 623 (Wis. 2021)..................... 13

*Karcher v. Daggett*, 462 U.S. 725 (1983).............................................. 14

*Kirkpatrick v. Preisler*, 394 U.S. 526 (1969).......................................... 14

*League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) .......passim

*League of Women Voters v. Commonwealth*, 181 A.3d 1083 (Pa. 2018) ............ 16

*Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) ................................................. 10, 14

*Reynolds v. Sims*, 377 U.S. 533 (1964) ......................................................... 10, 14

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ........................................ 20, 21

*Shaw v. Reno*, 509 U.S. 630 (1993) ..................................................................... 23

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................................... 23

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ........................................................ 19, 20

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ......................................................... 23

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ....................................................... 10, 14

*White v. Weiser*, 412 U.S. 783 (1973) ................................................................. 10

## Statutes and Rules

42 Pa.C.S. § 726 ...................................................................................................... 5

Pa. R.A.P 3309 ......................................................................................................... 5

## Other Authorities

2 Records of the Federal Convention of 1787 (Max Farrand ed. 1911) ............... 32

Gormley, *Racial Mind-Games and Reapportionment*,
    4 U. Pa. J. Const. L. 735 (2002) ...................................................... 13

Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for
    Judicial Acquiescence to Incumbent-Protecting Gerrymanders*,
    116 HARV. L. REV. 649 (2002) ......................................................... 20

iv

## **Constitutional Provisions**

PA. CONST. art. I, § 5 ............................................................................. 11

PA. CONST. art. II, § 16 .............................................................. 12, 13, 16

U.S. CONST. art. I, § 2 ..................................................................... 11, 14

U.S. CONST. art. I, § 4 ............................................................................ 10

v

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Haroon Bashir, Valerie Biancaniello, Tegwyn Hughes, and Jeffrey Wenk ("Voters of PA") are individuals who reside in Pennsylvania, are registered to vote in Pennsylvania, and consistently vote in each election. The Voters of PA intend to advocate and vote for Republican candidates in the upcoming 2022 primary and general elections. As such, they represent the "mirror-image" interests of the Carter Petitioners, who have averred that they are Pennsylvania registered voters who intend to advocate and vote for Democratic candidates in the upcoming 2022 primary and general elections.

Insofar as "the right to vote is personal" and "the rights sought to be vindicated in a suit challenging an apportionment scheme are 'personal and individual,'" *Albert v. 2001 Legislative Reapportionment Comm'n*, 790 A.2d 989, 994–95 (Pa. 2002), no two voters have precisely the same interest in cases such as these consolidated matters, in which the Court has stated it will adopt the next congressional districting plan. To that end, the Voters of PA sought leave to intervene in this action. Although no proposed voter intervenor groups were granted intervention in this action, the Voters of PA were permitted to participate as amici. Accordingly, the Voters of PA submitted a brief and proposed congressional redistricting plan in order to have their voices and preferences heard. Following the hearing before the Special Master, the Honorable Patricia A. McCullough, the Voters of PA's proposed

1

congressional redistricting plan was one of three maps submitted that is "consistent with the Free and Equal Elections Clause of the Pennsylvania Constitution, and, also, the aspirations and ideals expressed by that constitutional provision as pronounced by the Court in [*League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018)]."

Pursuant to Rule 531 of the Pennsylvania Rules of Appellate Procedure, the Fair Lines America Foundation contributed to the payment for the preparation of this brief.  No other person or entity paid in whole or in part for the preparation of this brief or authored any part of this brief.

2

## <u>DETERMINATION IN QUESTION</u>

Before the Court is the "Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan and Proposed Revision to the 2022 Election Calendar/Schedule" (the "Report") filed by the Special Master, the Honorable Patricia A. McCullough, on February 7, 2022.

3

## <u>STATEMENT OF THE CASE</u>

Pennsylvania's current congressional map is based upon the 2010 Census data, when Pennsylvania had a population of 12,702,379. Dividing the population by the 18 congressional districts apportioned to Pennsylvania, the ideal population for each of Pennsylvania's congressional districts was 705,688. Based on the results of the 2020 Census, Pennsylvania has a population of 13,002,700. Beginning with this year's congressional election, Pennsylvania will have only 17 congressional districts. Thus, the ideal population for each of Pennsylvania congressional districts beginning in 2022 will be 764,865. Thus, at this moment, each congressional district in Pennsylvania will be malapportioned for the 2022 congressional election.

On December 17, 2021, the Carter Petitioners and the Gressman Petitioners—individuals registered to vote in Pennsylvania—each filed a Petition Review in the Commonwealth Court pursuant to its original jurisdiction. On December 20, 2021, the Commonwealth Court consolidated the two actions. Also on December 20, the Commonwealth Court set a deadline of December 31, 2021, for applications to intervene to be filed.

The Voters of PA timely filed an application for leave to intervene on December 31. A total of 10 groups of proposed intervenors sought leave to intervene. The parties to the action filed timely responses. The Commonwealth

4

Court held a hearing on all of the applications for leave to intervene on January 6, in which the Voters of PA participated.

On January 14, 2022, the Commonwealth Court entered an order denying the Voters of the Commonwealth's Application for Leave to Intervene. In that same order, the Commonwealth Court denied all other applications for leave to intervene filed by individual voters. Also in the order, the Commonwealth Court granted the applications to intervene filed by current officeholders.

On January 24, 2022, the Voters of PA, as amicus participants, submitted a brief and proposed congressional redistricting plan. On January 27 and 28, 2022, the Honorable Patricia A. McCullough presided over an evidentiary hearing regarding the various congressional redistricting plans that were submitted.

On January 29, 2022, the day after the evidentiary hearing concluded, the Carter Petitioners filed an Emergency Application for Extraordinary Relief Under 42 Pa.C.S. § 726 and Pa. R.A.P. 3309, requesting the Court to assume extraordinary jurisdiction over this action. On February 2, 2022, this Court granted the application, designating the Honorable Patricia A. McCullough to serve as Special Master.

Consistent with the Court's Order of February 2, 2022, the Honorable Patricia A. McCullough filed her Report on February 7, 2022. The Report set forth the Special Master's proposed findings of fact and conclusions of law. In the Report, the Honorable Patricia A. McCullough found that:

As a result of its credibility and weight determinations, the Court finds that the map submitted by the Voters of PA *Amici*, the Congressional Intervenors' maps (especially Reschenthaler 1), and the map of the Republican Legislative Intervenors (known as HB 2146) are consistent with the Free and Equal Elections Clause of the Pennsylvania Constitution, and, also, the aspirations and ideals expressed by that constitutional provision as pronounced by the Court in [*League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018)] due to their compactness, degree of partisan fairness, and specific development of congressional districts.

Report at 207 ¶ 57. The Special Master thus concluded:

> For the above-stated reasons, and as its penultimate suggestion, the Court respectfully, yet firmly, **recommends that our Supreme Court adopt and implement HB 2146 as a matter of state constitutional law as it meets all of the traditional criteria of the Free and Equal Elections Clause, and does so in respects even noted by the Governor's expert, as well as the other considerations noted by the courts, it compares favorably to all of the other maps submitted herein, including the 2018 redistricting map, it was drawn by a non-partisan good government citizen, subjected to the scrutiny of the people and duly amended, it creates a Democratic leaning map which underscores its partisan fairness, and, otherwise, is a reflection of the "<u>policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature.</u>"**

Report at 216 ¶ 97 (emphasis in original).

On February 9, 2022, the Court issued an Order temporarily suspending the General Primary Election calendar.

Pursuant to the Court's Order of February 2, 2022, the parties and amicus participants have until February 14, 2022, to file exceptions to the Report. By subsequent order, the Court also instructed any parties and amicus participants to

6

A2414

file briefs in support of the Report by February 14.  Argument on the exceptions is scheduled to take place on February 18, 2022.

A2415

## SUMMARY OF ARGUMENT

Nearly four years ago, to prevent violations of the Free and Equal Elections Clause of the Pennsylvania Constitution, the Supreme Court of Pennsylvania adopted a set of criteria to serve as a "floor" to ensure that extraneous considerations, including partisan interests, did not subordinate traditional, more neutral factors in the development of a congressional redistricting plan. *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 817 (Pa. 2018). With the General Assembly and Governor unable to reach an agreement on a new redistricting plan, the "unwelcomed obligation" to navigate the "rough terrain" of this "notoriously political endeavor" again falls to this Court. *Carter v. Chapman*, No. 7 MM 2022, Order filed Feb. 2, 2022 (Dougherty, J., concurring statement at 3–5).

The Honorable Patricia A. McCullough, serving as Special Master, ably presided over a complex evidentiary hearing in which more than a dozen congressional redistricting plans were vetted. Having carefully considered the credibility of the expert witnesses who testified, she recommended the adoption of HB 2146, the redistricting plan submitted by the Republican leadership of the General Assembly. This decision was made somewhat easier by the significant number of redistricting plans that failed to satisfy one or more "neutral criteria" that this Court adopted in *LWV*. This Court should adopt the Special Master's Report and Recommendation, and specifically should adopt HB 2146. Alternatively, this

8

Court should adopt the Voters of PA's Plan, one of just three redistricting plans that the Special Master found to be "consistent with the Free and Equal Elections Clause of the Pennsylvania Constitution, and, also, the aspirations and ideals" expressed by this Court in *LWV*.  Report at 207–08 ¶¶ 57–59.

9

## ARGUMENT

### I.   The Court's Role in Congressional Redistricting

Courts have long recognized that "the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 821 (Pa. 2018) ("*LWV*") (citing U.S. CONST. art. I, § 4; *Butcher v. Bloom*, 216 A.2d 457, 458 (Pa. 1966)); *accord Growe v. Emison*, 507 U.S. 25, 34 (1993) (stating that "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts."). "Congressional redistricting becomes a judicial responsibility only when, as here, the state legislature has not acted after having had an adequate opportunity to do so." *Mellow v. Mitchell*, 607 A.2d 204, 214 (Pa. 1992) (citing *White v. Weiser*, 412 U.S. 783, 794–95 (1973); *Reynolds v. Sims*, 377 U.S. 583, 586 (1964)).

Regardless of whether the legislative or judicial branch is tasked with reapportionment, the goal is the same: to make "as nearly as is practicable one man's vote in a congressional election … worth as much as another's." *Mellow*, 607 A.2d at 214 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964)). "This requirement is the 'preeminent if not the sole, criterion' for appraising the validity of redistricting plans." *Id.* (quoting *Chapman v. Meier*, 420 U.S. 1, 23 (1964)). This goal derives directly from the U.S. Constitution, which mandates that the U.S. House of

Representatives "shall be apportioned among the States … according to their respective Numbers."  U.S. CONST. art I, § 2.

The last time a congressional redistricting plan was before this Court, the Court noted that Article I, Section 5 of the Pennsylvania Constitution provided additional grounds for achieving this goal.  *See LWV*, 178 A.3d at 804.  This section provides:

> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

PA. CONST. art. I, § 5.  The Court noted that the Free and Equal Elections Clause "mandates that all voters have an equal opportunity to translate their votes into representation."  *LWV*, 178 A.3d at 804.  Thus, the Free and Equal Elections Clause prohibits any governmental action that "dilutes the vote of any segment of the constituency," *City Council of Bethlehem v. Marcincin*, 515 A.2d 1320, 1323–24 (Pa. 1986), including with respect to redistricting plans, *LWV*, 178 A.3d at 817.  Like Article I, Section 2 of the U.S. Constitution, Pennsylvania's Free and Equal Elections Clause prohibits "the creation of congressional districts which confer on any voter an unequal advantage by giving his or her vote greater weight in the selection of a congressional representative" than other voters.  *Id.* at 816.

## II.   Neutral Redistricting Criteria Must Predominate

To determine whether a congressional redistricting plan violates the Free and Equal Elections Clause, this Court adopted the same "neutral benchmarks" for

11

congressional redistricting that are set forth in Pennsylvania's Constitution to prevent the dilution of individual's votes in state legislative districts. Thus, to ensure that all voters have an equal opportunity to translate their votes for congressional representatives into representation, the essential inquiry is whether the congressional districts created under a redistricting plan are:

> Composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

*LWV*, 178 A.3d at 816; *see also* PA. CONST. art. II, § 16 (governing the creation of legislative districts). "These neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *LWV*, 178 A.3d at 817.

Other factors have historically played a role in the drawing of districts, including "preservation of existing … districts, protection of incumbents, avoiding situations where incumbent legislators would be forced to compete for the same new seat." *Holt v. 2011 Legislative Reapportionment Comm'n*, 67 A.3d 1211, 1235 (Pa. 2013) ("*Holt II*"). But these factors must remain "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *LWV*, 178 A.3d at 817. The subordination of the "neutral criteria" constitutes a violation of the Free and Equal Elections Clause, regardless of whether

12

such subordination was intentional. *Id.* (citing *In re New Britain Borough Sch. Dist.*, 145 A. 597 (Pa. 1929)).

Other means may be available to determine whether a redistricting plan violates the Free and Equal Elections Clause. *Id.* at 817. For example, communities "have shared interests for which they can more effectively advocate when they can act as a united body and when they have representatives who are responsive to those interests." *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 745 (Pa. 2012) ("*Holt I*"). "Historically, reapportionment bodies have considered 'communities of interest' as one legitimate factor in drawing fair and politically sensitive districts." *Id.* (quoting Gormley, *Racial Mind-Games and Reapportionment*, 4 U. PA. J. CONST. L. 735, 779–81 (2002)). Thus, a map may sacrifice compactness in order to encompass a "dispersed community of interest." *LWV*, 178 A.3d at 828 (Baer, J., concurring and dissenting).

### III. The Special Master Properly Recommended Excluding Certain Maps for Failing to Satisfy Constitutional Criteria

The Honorable Patricia A. McCullough properly recommended that the Court not adopt several of the submitted maps because they fail to satisfy one or more of the criteria this Court held "provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *LWV*, 178 A.3d at 817. Regardless of the merits of the extraneous considerations used in drawing those maps, these maps' failure to meet the requirements of Article II, § 16 of the

13

Pennsylvania Constitution—made applicable to congressional redistricting plans in *LWV*—renders them constitutionally infirm and disqualifies them from adoption by the Court.

**A.   The Carter Plan, House Democratic Plan, and Ali Plan Fail to Achieve Population Equality**

The Constitution of the United States provides in relevant part that the U.S. House of Representatives "shall be apportioned among the States … according to their respective Numbers." U.S. CONST. art. I, § 2. This requires that congressional districts be drawn to "achieve population equality 'as nearly as is practicable.'" *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964)). This standard "requires that the State make a good-faith effort to achieve precise mathematical equality. *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969) (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). "Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." *Id.* Departures from "mathematical perfection" are justified only to "avoid fragmentation of local government territories and the splitting of election precincts; effectuating adequate representation of a minority group; creating compact and contiguous districts; maintaining relationships of shared community interests; and not unduly departing from the useful familiarity of existing districts." *Mellow*, 607 A.2d at 206.

14

Three of the plans submitted to the Special Master fail this basic requirement. Both the Carter Plan and the House Democratic Plan feature a population deviation of 2; the other plans achieve "mathematical perfection" by having a population deviation of only 1.[1] But neither the Carter Petitioners nor the House Democratic Intervenors offer any compelling justification for failing to achieve mathematical perfection. Their plans are no more compact than competing plans. Their plans do not boast fewer splits than their competitors. They offered no persuasive evidence that the additional population deviation was used to effectuate adequate representation of a minority group. And while the Carter Petitioners suggest that their plan best preserves the cores and boundaries of the existing 18-district plan—by only a marginal amount—this is an "extraneous consideration" which must be "wholly subordinate" to the neutral criteria of population equality. *LWV*, 178 A.3d 737.

A third plan—submitted by the Ali *Amici*—fails to satisfy the population equality standard by a significantly larger margin. In developing their plan, the Ali *Amici* used Legislative Redistricting Commission "Data Set #2," which adjusts

---

[1] The Special Master's Report also finds that the Citizen Voters' Plan has a two-person difference in population between the largest and smallest districts. Report at 204. Although the Citizen Voters did not submit an expert report of their own, experts of other parties opined that their plan had a population deviation of only 1. To the extent the Citizen Voters' Plan has a population deviation greater than 1, their plan fails for the same reason.

15

A2423

Pennsylvania's population to use the home addresses of state prisoners, so as to avoid the practice of so-called "prison-based gerrymandering."  (Ali Br. at 9).  But this Court refused to utilize this data set just 4 years ago when it crafted the remedial congressional redistricting plan in 2018.  *See League of Women Voters v. Commonwealth*, 181 A.3d 1083, 1087 n.8 (Pa. 2018).  Thus, when measured against the data set consistently used in past congressional redistricting plans in Pennsylvania (including the one most recently adopted by the Court), the Ali *Amici*'s plan features a population deviation of more than 8,000, several orders of magnitude greater than every other plan submitted to the Court for consideration.

The Carter Plan, the House Democratic Plan, and the Ali *Amici* Plan each fail to offer the justification needed to fail to achieve mathematical perfection in population equality when the other submitted plans meet that standard.  Thus, these submitted plans are unconstitutional as a matter of federal and state law.  Accordingly, the Special Master properly recommended that these plans not be adopted.

**B.    The Governor's Plan, the Senate Democratic Plans, the Draw the Lines Plan, and the Ali Plan Unconstitutionally Split Pittsburgh**

No fewer than 5 proposed plans fail because they ignore the basic constitutional requirement that no city shall be divided "unless absolutely necessary."  PA. CONST. art. II, § 16; *see also LWV*, 178 A.3d at 816–17.  Each of these plans splits Pennsylvania's second largest city, despite the fact that it easily

16

fits within a single congressional district.  Historically, this significant community of interest has remained a single congressional district in prior districting plans and the plan proponents who would split the city offer no compelling rationale for doing so.  Certainly, they fail to establish, as required under *LWV* and the Pennsylvania Constitution, that splitting the City of Pittsburgh is "*absolutely necessary*."

Testimony at the evidentiary hearing confirmed that the splitting of Pittsburgh was not for the purpose of population equality, but rather to either improve compactness scores (N.T. at 216–17, 436), or to create two Democratic-leaning districts rather than one, (N.T. at 526–27).  The latter, of course, is an extraneous, partisan, consideration that the Court has expressly required be "subordinated" to the neutral criteria of contiguity, compactness, equal population, and minimization of political subdivision splits.  *LWV*, 178 A.3d at 817; *Holt II*, 67 A.3d at 1239.

The numerous plans that do not split Pittsburgh put the lie to any claim that dividing the city into two districts is "absolutely necessary."  Numerous plans achieve similar—or, in the Voters of PA's case, *better*—compactness scores with comparable or fewer total political subdivision splits without splitting Pittsburgh.  The evidentiary record is devoid of any evidence—and in fact disproves—that the division of Pittsburgh was "absolutely necessary" to achieve equal population or any other neutral criteria.

17

In a similar vein, although the House Democratic Plan kept the City of Pittsburgh intact, that plan includes a district with a "Freddy-Krueger like claw" that reaches into Allegheny County to "grab" Pittsburgh to combine it with Republican-leaning areas in the North. The House Democrats offer no rationale for doing so. Its effect is the same as those plans that would split Pittsburgh, attempting to harvest a second Democratic-leaning district in and around this city without regard to communities of interest. This Court cannot endorse such a blatant attempt to have partisan interests subordinate the neutral criteria in direct contravention of this Court's recent dictate. Accordingly, the Special Master properly discounted the plans of the Governor,[2] Senate Democrats, House Democrats, Draw the Lines PA, and Ali *Amici* and properly recommended the Court not adopt these plans.

---

[2] The Governor's Plan also would split Bucks County for the first time in 150 years (despite Pennsylvania having more congressional districts for much of that period). Like Pittsburgh, it is not "absolutely necessary" to split Bucks County, whose residents generally share the same community of interests. Rather, the primary purpose of splitting Bucks County appears to be to turn a Republican-leaning district into a Democratic-leaning one. The Governor's proposed splitting of Bucks County serves as an additional basis for rejecting his plan, as the Special Master properly did.

18

IV.   **The Special Master Properly Did Not Rely on "Partisan Fairness" Metrics to Compare the Merits of the Plans**

A.   **"Partisan Fairness" Is a Slippery Slope that Risks Subordinating the Neutral Criteria**

Several plan proponents have argued that their plans are superior based, at least in part, on scores obtained using one metric of "partisan fairness" or another. Although the Court successfully used partisan fairness metrics to determine whether partisan considerations subordinated the neutral criteria, the Court should avoid the siren song of using these metrics to determine the relative adequacy of one redistricting plan versus another. The Honorable Patricia A. McCullough resisted this temptation, and the Court would be well advised to do likewise.

*First*, the partisanship and "maintenance of the political balance which existed after the prior reapportionment" are factors that must be "wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *Id.* at 817.

*Second*, Pennsylvania's political geography—wherein Democratic voters are clustered and Republican voters are a bit more spread out across different geographies of Pennsylvania"—creates a natural geographic advantage for Republicans. *Id.* at 774. Partisan fairness metrics would either ignore or run directly counter to the natural distribution of voters within the Commonwealth.

19

*Third*, the use of partisan fairness metrics in the selection of a redistricting plan would be akin to creating a right to proportional party representation, which would be directly at odds with Pennsylvania and federal precedent.  *See Vieth v. Jubelirer*, 541 U.S. 267, 288 (2004) (holding that "the Constitution provides no right to proportional representation" and that nothing in the United States Constitution commands "that farmers or urban dwellers, Christian fundamentalists or Jews, Repubicans or Democrats, must be accorded political strength proportionate to their numbers"); *Rucho v. Common Cause*, 139 S. Ct. 2484, 2499 (2019) ("The Founders certainly did not think proportional representation was required"); *Holt II*, 67 A.3d at 1236 (holding that the Court "need not credit" arguments that a plan resulted in one party's "dominance out of proportion to party registration and party voting patterns in the Commonwealth"); *see also* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 672–73 (2002) ("So long as the state's majority has its advocate in the executive, is it necessarily true that the state's majority should control the legislature as well?"); *Johnson v. Wis. Elections Comm'n*, 399 Wis. 2d 623, 649 (Wis. 2021) (quoting *Rucho* and *Vieth* and declining to consider the partisan makeup of districts in crafting judicial remedies in the event of a legislative impasse).  The use of a partisan fairness metric to select a redistricting plan would necessarily require the Court to enshrine a particular definition of

20

"fairness," despite the lack of an adequate evidentiary record or legal precedent to do so here.

*Fourth*, incorporation of one or more metrics of partisan fairness in the selection of a map would quickly prove unworkable.  Indeed, the inability to craft a manageable judicial standard led the U.S. Supreme Court to hold that partisan gerrymandering claims present political questions beyond the reach of the federal courts: "Even assuming the court knew which version of fairness to be looking for, there are no discernible and manageable standards for deciding whether there has been a violation."  *Rucho*, 139 S. Ct. at 2501.

Declining to use partisan fairness metrics to *select* a map does not mean such metrics have no place in redistricting jurisprudence.  This Court successfully utilized metrics such as the mean-median gap and the efficiency gap to determine the extent to which the 2011 congressional redistricting plan constituted a partisan gerrymander that subordinated traditional, neutral criteria.  *LWV*, 178 A.3d 774, 777.  In *LWV*, the court used these partisan fairness metrics to confirm the 2011 Plan's "outlier status" and to rule out other potential causes for the partisan breakdown of that plan.  *Id.*  at 773–77.  Judge McCullough did likewise in the evidentiary hearing, finding that the House Democratic Plan "has a more favorable efficiency gap outcome for Democrats than 100% of [Dr. Barber's] simulated maps."  Report at 176 ¶ FF23.

<center>21</center>

**B.** **The Gressman Plan and the Draw the Lines Plan Subordinate Neutral Criteria in Favor of Partisan Fairness**

Despite the Court's express command that extraneous considerations—especially partisanship—be subordinated to the neutral criteria of contiguity, compactness, population equality and minimization of political subdivision splits, the Gressman Petitioners and Draw the Lines *Amici* did the exact opposite. As aptly noted by the Special Master, the Gressman Petitioners deliberately created their plan using an algorithm that sought to optimize on partisan fairness. Report at 178 ¶ FF2. Likewise, the Draw the Lines *Amici* admitted to splitting Pittsburgh into two congressional districts to maximize political competitiveness. Report at 178 ¶ FF3. These plans undoubtedly could have featured better compactness scores and fewer political subdivision splits had they not subordinated these neutral criteria to the pursuit of "partisan fairness" as they measured it. Given the political geography of Pennsylvania that naturally lends itself to a Republican advantage, the Gressman Plan's skewing to a Democratic-advantaged map functions as a partisan gerrymander subordinating the neutral criteria enshrined in *LWV*. Accordingly, the Honorable Patricia A. McCullough properly recommended against the adoption of the Gressman and Draw the Lines Plans for their express prioritization of partisan fairness.

22

A2430

## V.  <u>The Special Master Correctly Held that the Evidentiary Record Did Not Support Voting Rights Act Considerations, rendering the Gressman Plan an Unconstitutional Racial Gerrymander</u>

The Honorable Patricia A. McCullough correctly concluded that there is no record evidence that the Black or Hispanic voters of Philadelphia require a majority-minority district, or some other district drawn to a racial target, to have an equal opportunity to elect representatives of their choice to Congress.  Report at 19.

"The Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification."  *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018).  The Fourteenth Amendment prohibits "the deliberate segregation of voters into separate districts on the basis of race."  *Shaw v. Reno*, 509 U.S. 630, 641 (1993).  "[C]ourts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law."  *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).  Three threshold elements, must first be proven: (1) the relevant minority group must be "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; (2) the relevant minority group must be "politically cohesive," and (3) the "district's white majority … 'vote[s] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'"  *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (quoting *Thornburg v. Gingles*, 478 U.S. 30 (1986)).

23

The Gressman Plan boasts the creation of three would create three minority opportunity districts.  But the Gressman Petitioners did not offer any expert opinion on the *Gingles* factors under the Voting Rights Act, and, in fact, their expert conceded that candidate win rates in Philadelphia suggested that minority-preferred candidates are not usually defeated by white bloc voting.  (N.T. at 283).  The Gressman Petitioners appear to simply take the view that "more is always better" when it comes to the creation of minority opportunity districts.  But U.S. Supreme Court authority confirms this is not the case.  Absent sufficient evidence to satisfy each of the *Gingles* factors for each proposed minority opportunity district, the Gressman Petitioners' Plan constitutes an unconstitutional racial gerrymander that cannot be adopted.  Accordingly, the Honorable Patricia A. McCullough correctly refused to recommend the Gressman Plan for adoption.

## VI. The Special Master's Recommendation to Adopt the HB 2146 Plan Was Proper; Alternatively, the Court Should Adopt the Voters of PA Plan

As set forth *supra*, the plans proposed by the Carter Petitioners, Gressman Petitioners, Governor, House Democrats Intervenors, Senate Democrats Intervenors, Draw the Lines *Amici*, and Ali *Amici* fail on multiple, constitutional grounds.[3]  By process of elimination, then, only three plan proponents remain: (1) the General

---

[3] Depending on the count, the Citizen-Voter *Amici* Plan may also fail on the ground of excessive population deviation.  In any event, the Citizen-Voter Plan was unsupported by any expert report, rendering analysis of that plan more challenging than for those plans which provided an evidentiary predicate.

Assembly's Republican Leadership (via the HB 2146), the Congressional Intervenors, and the Voters of PA. The Honorable Patricia A. McCullough did not err in recommending HB 2146; however, to the extent the Court declines to adopt that recommendation, the Court should adopt the plan proposed by the Voters of PA.

### A.    Compactness[4]

In addition to avoiding the constitutional defects suffered by the plans discussed *supra*, both HB 2146 and the Voters of PA Plans score well on compactness. As noted by the Governor's expert witness, Dr. Duchin, "the maps [submitted to the Court] are quite good across the board." (N.T. at 334).

The Voter of PA Plan, in fact, offers the most compact plan submitted. This is confirmed by the Dr. Duchin, who, as the Governor's witness, had no interest in supporting the Voter of PA Plan: "By far the two most compact plans, considering these metrics overall, are VotersOfPA and GovPlan. The next two, some ways behind the leaders, are Reschenthaler1 and CitizensPlan." (Duchin Resp. Report at 2). Voters of PA's own analysis bears this out: it boasts the highest mean Reock Score, the highest mean Polsby-Popper Score, and the highest mean Schwartzberg Score among all of the submitted plans. *See* Sean Trende Declaration, attached as

---

[4] The Voters of PA Plan, like all of the submitted plans, includes fully contiguous districts. Similarly, like most of the other plans, the Voters of PA Plan also features "mathematical perfection" with respect to its population deviation. *See* Sean Trende Declaration, attached as Appx. B, at 9.

Appx. B, at 10–14.  Thus, on a plan-wide basis, the Voters of PA's plan is the most compact. *Id.*

The Voters of PA Plan achieves the highest compactness scores without sacrificing any districts.  As reflected in the attached Declaration of Sean Trende, The Voters of PA Plan also features the highest Reock Score for its least compact district—by a substantial margin—while also featuring Polsby-Popper and Schwartzberg Scores for its least compact district that place it in the top half of all plans submitted.  *Id.*

| Map | Mean Reock |
| --- | --- |
| Voters of the Commonwealth | 0.442 |
| Draw the Lines | 0.436 |
| Reschenthaler 1 | 0.426 |
| Citizen Voters | 0.418 |
| Concerned Citizens | 0.416 |
| Reschenthaler 2 | 0.414 |
| Carter | 0.413 |
| Ali | 0.407 |
| Governor Wolf | 0.401 |
| Gressman | 0.395 |
| House Democrats | 0.392 |
| House Republicans | 0.383 |
| Senate Democrats 2 | 0.379 |
| Senate Democrats 1 | 0.373 |

| Map | Least Compact (Reock) |
| --- | --- |
| Voters of the Commonwealth | 0.343 |
| Reschenthaler 1 | 0.307 |
| Reschenthaler 2 | 0.307 |
| House Republicans | 0.270 |
| Gressman | 0.264 |
| Ali | 0.234 |
| Draw the Lines | 0.227 |
| House Democrats | 0.226 |
| Carter | 0.214 |
| Citizen Voters | 0.210 |
| Senate Democrats 1 | 0.209 |
| Governor Wolf | 0.203 |
| Concerned Citizens | 0.199 |
| Senate Democrats 2 | 0.197 |

26

| Map | Mean Polsby-Popper |
|---|---|
| Voters of the Commonwealth | 0.396 |
| Governor Wolf | 0.381 |
| Draw the Lines | 0.379 |
| Reschenthaler 1 | 0.363 |
| Ali | 0.352 |
| Concerned Citizens | 0.352 |
| Reschenthaler 2 | 0.352 |
| Citizen Voters | 0.349 |
| Gressman | 0.348 |
| Senate Democrats 2 | 0.335 |
| Carter | 0.321 |
| House Republicans | 0.321 |
| Senate Democrats 1 | 0.315 |
| House Democrats | 0.279 |

| Map | Least Compact (Polsby-Popper) |
|---|---|
| Reschenthaler 1 | 0.246 |
| Concerned Citizens | 0.244 |
| Senate Democrats 2 | 0.242 |
| Citizen Voters | 0.234 |
| Draw the Lines | 0.233 |
| Voters of the Commonwealth | 0.229 |
| Senate Democrats 1 | 0.220 |
| Governor Wolf | 0.219 |
| Reschenthaler 2 | 0.216 |
| Ali | 0.208 |
| House Republicans | 0.194 |
| Gressman | 0.187 |
| Carter | 0.172 |
| House Democrats | 0.148 |

27

| Map | Mean Schwartzberg | | Map | Least Compact (Schwartzberg) |
|---|---|---|---|---|
| Voters of the Commonwealth | 0.626 | | Reschenthaler 1 | 0.496 |
| Governor Wolf | 0.613 | | Concerned Citizens | 0.494 |
| Draw the Lines | 0.611 | | Senate Democrats 2 | 0.491 |
| Reschenthaler 1 | 0.599 | | Citizen Voters | 0.484 |
| Concerned Citizens | 0.591 | | Draw the Lines | 0.483 |
| Reschenthaler 2 | 0.591 | | Voters of the Commonwealth | 0.478 |
| Ali | 0.590 | | Senate Democrats 1 | 0.469 |
| Citizen Voters | 0.589 | | Governor Wolf | 0.468 |
| Gressman | 0.585 | | Reschenthaler 2 | 0.464 |
| Senate Democrats 2 | 0.577 | | Ali | 0.456 |
| Carter | 0.562 | | House Republicans | 0.440 |
| House Republicans | 0.561 | | Gressman | 0.432 |
| Senate Democrats 1 | 0.558 | | Carter | 0.415 |
| House Democrats | 0.521 | | House Democrats | 0.385 |

## B.    Political Subdivision Splits

Both HB 2146 and the Voters of PA Plans score well on the splits of political subdivisions, not only for minimizing the number of political subdivisions that are cut, but in the reasons and manner of splitting same. Both HB 2146 and the Voters of PA Plan contain 15 county splits. Report at 146 ¶ FF33 and 209 ¶ 67; Sean Trende Declaration at 15. Neither plan splits Bucks County. Report at 210–211; Sean Trende Declaration at 15. HB 2146 splits just 16 municipalities, while the Voters of PA Plan splits 17 municipalities. Report at 146 ¶ FF33 and 209 ¶ 67. Neither plan splits the City of Pittsburgh.

28

More critically, the Voters of PA Plan avoids any three-way splits of counties (except for Philadelphia, whose population requires a three-way split).  Sean Trende Declaration at 18.  Multiple splits of a single county plague every other map that was submitted and dilute the power of voters in those counties.  *Id.*  By avoiding multiple splits of a single county, the Voters of PA tie for the least number of county "pieces" or "segments."

| Table 6: Splits and Compactness Measures | | | | | | |
|---|---|---|---|---|---|---|
| All Maps | | | | | | |
| Plan | # Splits | 3-Way Mongomery Split? | Extends Montgomery Into Berks? | Splits Pittsburg? | Splits Bucks? | Splits Counties 3 Ways? |
| Ali | 16 | Yes | Yes | Yes | Yes | Yes |
| Carter | 13 | Yes | Yes | No | No | Yes |
| Citizen Voters | 13 | Yes | Yes | No | No | Yes |
| Concerned Citizens | 16 | No | No | Yes | No | Yes |
| Draw The Lines | 14 | Yes | No | Yes | No | Yes |
| Governor Wolf | 16 | Yes | Yes | Yes | Yes | Yes |
| Gressman | 14 | No | Yes | No | Yes | Yes |
| House Democrats | 16 | No | Yes | No | Yes | Yes |
| House Republicans | 15 | No | No | No | No | Yes |
| Reschenthaler 1 | 13 | Yes | No | No | No | Yes |
| Reschenthaler 2 | 13 | Yes | No | No | No | Yes |
| Senate Democrats 1 | 17 | No | No | Yes | Yes | Yes |
| Senate Democrats 2 | 16 | Yes | Yes | Yes | Yes | Yes |
| Voters of the Commonwealth | 15 | No | No | No | No | No |

### C.    <u>**Incumbency Pairings**</u>

It is a logical necessity that in dropping from 18 congressional seats to 17, at least 2 incumbents must be paired in the upcoming election.  As the Honorable Patricia McCullough observed, however, some of the plans stand out as pairing more incumbents from one party than another.  Report at 180 FF17.  For example, Senate Democrat Plan 2 and the Draw the Lines Plan both pair a Republican incumbent

with a Democratic incumbent in the same district, while another district within that plan pairs two other Republican incumbents. Uncontroverted testimony at the evidentiary hearing—and common sense—confirms that the pairing of three Republicans and only one Democrat particularly favors Democrats. Conversely, the Reschenthaler 1 Plan and the Citizen-Voters Plan both pair a Republican incumbent with a Democrat incumbent in a single district, while another district pairs two Democratic incumbents, plans which particularly favor Republicans.

In contrast, HB 2146 pairs a Republican and a Democrat in a single district, while also pairing Representatives Lamb and Doyle in a single district; but neither Representative Lamb nor Representative Doyle is seeking reelection.

The Voters of PA Plan scores even better on this measure, eliminating concern of partisanship with respect to incumbency protection. Under the Voters of PA Plan, there are two districts which each pair a Republican with a Democrat: Representative Fitzpatrick, a Republican, is paired with Representative Boyle, a Democrat, while Representative Cartwright, a Democrat, is paired with Representative Meuser, a Republican. In addition, one district is retained as an open district, although it is very close to the residence of Democratic Representative Boyle. The pairing of incumbents under the Voters of PA Plan is thus neutral from a partisan perspective,

30

or even potentially favoring Democrats slightly.[5]  *See* Sean Trende Declaration at 19–20, ¶¶ 50–51.  The location of the incumbents in the Voters of PA's Plan are set forth below and in the Declaration of Sean Trende, attached hereto.



Proposed Map, With Locations of Incumbents, Philadelphia Area Excluded

---

[5] As noted in their Application for Leave to Intervene, the Voters of PA are registered electors who intend to support and vote for Republican candidates.

31

Proposed Map, With Locations of Incumbents, Philadelphia Area



### D.   Partisanship

Pennsylvania courts have not prohibited the use of partisanship in the redistricting process.   Our Founders readily observed the political nature of redistricting, noting that whoever draws the district maps might "mould their regulations as to favor the candidates they wished to succeed."   2 Records of the Federal Convention of 1787, at 241 (Max Farrand ed. 1911).  The Supreme Court of Pennsylvania likewise acknowledged that "redistricting has an inevitably legislative, and therefore an inevitably political, element; but the constitutional commands and restrictions on the process exist precisely as a brake on the most overt of potential excesses and abuse."  *Holt I*, 38 A.3d at 745.  This Court has clarified that "partisan gerrymandering dilutes the votes of those who in prior elections voted for the party

32

not in power to give the party in power a lasting electoral advantage." *LWV*, 178 A.3d at 814. Yet, this Court did not adopt a particular measure to determine the extent to which partisan considerations governed the drawing of a map; instead, it adopted the neutral criteria of Article II, Section 16 to "provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *Id.* at 817.

As argued *supra*, the use of partisan fairness metrics to select a map—as opposed to determining whether a challenged plan is a partisan outlier that subordinated neutral criteria—opens the door to a host of problems. Nevertheless, to the extent the Court determines that partisan fairness metrics have a place in selecting a redistricting plan, the Voters of PA Plan scores well here as well. The Special Master expressly found that both HB 2146 and the Voters of PA "persuasively create a sufficient number of competitive, 'toss up' congressional districts which could go either way, depending upon the particular election and/or office at issue and the qualifications and political platforms of the individual candidates." Report at 208 ¶ 59. Further, the Voters of PA Plan performs well in the efficiency gap and mean-median measures utilized by the Court in *LWV*. *See* Sean Trende Declaration at 24–25.

33

**E.**   **The Special Master's Credibility Determinations Are Entitled to Special Weight**

Although the Court's standard of review in this matter is *de novo*, the Court has recognized that the Special Master's findings of fact are owed "due consideration, as the jurist who presided over the hearings was in the best position to determine the facts." *LWV*, 178 A.3d at 801 n.62 (quoting *Annenberg v. Commonwealth*, 757 A.2d 338, 343 (Pa. 2000)).

The Court's interest in affording the Special Master's proposed findings of fact "due consideration" is particularly high here, given the heightened need for transparency.  In *LWV*, Justice Baer objected to the lack of transparency of the Court's process of adopting a remedial congressional plan.  *See LWV*, 178 A.3d at 831 (Baer, J., concurring and dissenting).  Court adoption of a redistricting plan stands in stark contrast to the comparably open legislative process.  During the legislative process, voters may contact their representative and senator to provide input regarding maps under consideration.  The public may also provide comments or maps of their own via the Public Comment Ports., https://portal.pennsylvania-mapping.org/#gallery.  But the procedure utilized by the Court does not allow for public comment.  Rather, the only means by which interested citizens could have their voices heard was their participation in the evidentiary hearing before the Special Master.  Disregarding the Special Master's credibility determinations would

serve to cheapen the value of the evidentiary hearing and renew the public's concerns regarding the integrity of how Pennsylvania's congressional lines are drawn.

**VII.** **The Voters of PA Take No Position Regarding the Primary Election Calendar**

The Voters of PA take no position regarding the primary election schedule or any proposed revisions thereto.

35

## CONCLUSION

Unlike the vast majority of redistricting plans that were submitted, both HB 2146 and the Voters of PA Plans are fully compliant with the standards announced by the Supreme Court of Pennsylvania in *LWV*. Both satisfy the one-person, one-vote requirement, create seventeen contiguous districts, and produce the same number of majority-minority districts as the existing map. The Voters of PA's Plan has better mean compactness scores than the remedial map adopted by the Supreme Court and every other submitted plan. The Voters of PA's Plan minimizes county and municipal splits, and the Voters' Map does not "sacrifice" any county or municipality with more splits or transverses than are necessary. The Voters' Map also scores well within the normal range on conventional partisanship metrics. These metrics combine to provide a high level of assurance that the traditional, neutral criteria predominated in the drafting of the Voters' Map. When so many of the submitted plans were disqualified on constitutional grounds, HB 2146 and the Voters of PA Plan serve as exemplary choices. Even the Governor's expert witness, Dr. Duchin, commended the Voters of PA Plan as the most compact and in the highest "tier" of adherence to the traditional principles.

For the reasons set forth above, *amici curiae* Voters of PA respectfully request that this Honorable Court adopt the Special Master's Report and, by extension, HB 2146 as the congressional redistricting plan for the 2022, 2024, 2026, 2028, and 2030

congressional elections.  Alternatively, the Voters of PA submit that to the extent the Court chooses not to adopt HB 2146, the Voters of PA's proposed congressional redistricting plan should be adopted for the use in the 2022, 2024, 2026, 2028, and 2030 congressional elections.

Respectfully submitted,

**GALLAGHER GIANCOLA LLC**

Dated:  February 14, 2022

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher (PA #37950)
kag@glawfirm.com
Russell D. Giancola (PA #200058)
rdg@glawfirm.com

3100 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412.717.1900 (Phone)
412.717.1901 (Fax)

*Counsel for Amici Curiae Voters of the Commonwealth of Pennsylvania, Haroon Bashir, Valerie Biancaniello, Tegwyn Hughes, and Jeffrey Wenk*

37

# Exhibit A

## Declaration of Sean Trende

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Carol Ann Carter, *et al.*,<br>            Petitioners | : **CASES CONSOLIDATED**<br>: <br>: <br>: No. 464 M.D. 2021<br>: <br>: <br>: <br>: |
| v. | |
| Leigh Chapman, *et al.*,<br>            Respondents | |
| | |
| Philip T. Gressman, *et al.*,<br>            Petitioners | :<br>:<br>:<br>:<br>: No. 465 M.D. 2021<br>:<br>:<br>:<br>: |
| v. | |
| Leigh Chapman, *et al.*,<br>            Respondents | |

## DECLARATION OF SEAN P. TRENDE

1.     I am over the age of 18 and am competent to testify regarding the matters discussed below.

2.     I have been retained in this matter by *Amici Curiae* Voters of the Commonwealth Legislative Defendants, and am being compensated at $400.00 per hour for my work in this case.

3.     My *curriculum vitae* is attached to this report as Appendix 1.

4.     I have been asked to summarize and opine as to the properties of the various maps that have been submitted to this Court by the parties and amici. In particular, I was asked to emphasize and explore the plans' compactness and competitiveness.

1

A2447

## EXPERT CREDENTIALS

5.      I joined RealClearPolitics in January of 2009 after practicing law for eight years.  I assumed a full-time position with RealClearPolitics in March of 2010.  My title is Senior Elections Analyst. RealClearPolitics is a company of around 50 employees, with offices in Washington D.C. It produces one of the most heavily trafficked political websites in the world, which serves as a one-stop shop for political analysis from all sides of the political spectrum and is recognized as a pioneer in the field of poll aggregation.  It produces original content, including both data analysis and traditional reporting.  It is routinely cited by the most influential voices in politics, including David Brooks of *The New York Times*, Brit Hume of *Fox News*, Michael Barone of *The Almanac of American Politics*, Paul Gigot of *The Wall Street Journal*, and Peter Beinart of *The Atlantic*.

6.      My main responsibilities with RealClearPolitics consist of tracking, analyzing, and writing about elections.  I collaborate in rating the competitiveness of Presidential, Senate, House, and gubernatorial races.  As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior.  In particular, understanding the way that districts are drawn and how geography and demographics interact is crucial to predicting United States House of Representatives races, so much of my time is dedicated to that task.

7.      I am currently a Visiting Scholar at the American Enterprise Institute, where my publications focus on the demographic and coalitional aspects of American Politics.  There, I have written on the efficiency gap, a metric for measuring the fairness of redistricting plans.

8.      I am the author of *The Lost Majority: Why the Future of Government Is Up for Grabs and Who Will Take It.*  In this book, I explore realignment theory.  It argues that realignments are a poor concept that should be abandoned.  As part of this analysis, I conducted a

2

thorough analysis of demographic and political trends beginning in the 1920s and continuing through the modern times, noting the fluidity and fragility of the coalitions built by the major political parties and their candidates.

9.      I co-authored the 2014 *Almanac of American Politics*.  The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind the elections.  PBS's Judy Woodruff described the book as "the oxygen of the political world," while NBC's Chuck Todd noted that "[r]eal political junkies get two *Almanacs*: one for the home and one for the office."  My focus was researching the history of and writing descriptions for many of the newly-drawn districts, including tracing the history of how and why they were drawn the way that they were drawn.

10.      I have spoken on these subjects before audiences from across the political spectrum, including at the Heritage Foundation, the American Enterprise Institute, the CATO Institute, the Bipartisan Policy Center, and the Brookings Institution.  In 2012, I was invited to Brussels to speak about American elections to the European External Action Service, which is the European Union's diplomatic corps.  I was selected by the United States Embassy in Sweden to discuss the 2016 elections to a series of audiences there, and was selected by the United States Embassy in Spain to fulfil a similar mission in 2018.  I was invited to present by the United States Embassy in Italy, but was unable to do so because of my teaching schedule.

11.      In the winter of 2018, I taught American Politics and the Mass Media at Ohio Wesleyan University.  I taught Introduction to American Politics at The Ohio State University for three semesters from Fall of 2018 to Fall of 2019, and again in Fall of 2021.  In the Springs of 2020 and 2021, I taught Political Participation and Voting Behavior at The Ohio State University. This course spent several weeks covering all facets of redistricting: how maps are drawn, debates

over what constitutes a fair map, measures of redistricting quality, and similar topics.  I am teaching this course this semester as well.

12.     It is my policy to appear on any major news outlet that invites me, barring scheduling conflicts.  I have appeared on both Fox News and MSNBC to discuss electoral and demographic trends.  I have been cited in major news publications, including *The New York Times*, *The Washington Post*, *The Los Angeles Times*, *The Wall Street Journal*, and *USA Today*.

13.     I sit on the advisory panel for the "States of Change: Demographics and Democracy" project.  This project is sponsored by the Hewlett Foundation and involves three premier think tanks: the Brookings Institution, the Bipartisan Policy Center, and the Center for American Progress.  The group takes a detailed look at trends among eligible voters and the overall population, both nationally and in key states, to explain the impact of these changes on American politics, and to create population projections, which the Census Bureau abandoned in 1995.  In 2018, I authored one of the lead papers for the project: "In the Long Run, We're All Wrong," available at https://bipartisanpolicy.org/wp-content/uploads/2018/04/BPC-Democracy-States-of-Change-Demographics-April-2018.pdf.

14.     I am currently a doctoral candidate in political science at The Ohio State university.  I received a Master's in Applied Statistics as part of my coursework.  My coursework for my Ph.D. and M.A.S. included, among other things, classes on G.I.S. systems, spatial statistics, issues in contemporary redistricting, machine learning, non-parametric hypothesis tests and probability theory.  I have completed my coursework and have passed comprehensive examinations in both methods and American Politics.  I expect to receive my Ph.D. in May of 2022, and have filed my application to graduate.  My dissertation focuses on applications of spatial statistics to political

4

questions, including an article on redistricting simulations and the effect of communities of interest on partisan bias.

15.     In 2021, I served as one of two special masters appointed by the Supreme Court of Virginia to redraw the districts that will elect the commonwealth's representatives to the House of Delegates, state Senate, and U.S. Congress in the following decades. The Supreme Court of Virginia accepted those maps and were praised by observers from across the political spectrum. "New Voting Maps, and a New Day, for Virginia," *The Washington Post* (Jan. 2, 2002), *available at* https://www.washingtonpost.com/opinions/2022/01/02/virginia-redistricting-voting-maps-gerrymander/; Henry Olsen, "Maryland Shows How to do Redistricting Wrong. Virginia Shows How to Do it Right," *The Washington Post* (Dec. 9, 2021), *available at* https://www.washingtonpost.com/opinions/2021/12/09/maryland-virginia-redistricting/; Richard Pildes, "Has VA Created a New Model for a Reasonably Non-Partisan Redistricting Process," *Election Law Blog* (Dec. 9, 2021), *available at* https://electionlawblog.org/?p=126216.

16.     I previously authored an expert report in *Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super Ct., Wake County), which involved North Carolina's 2012 General Assembly and Senate maps.  Although I was not called to testify, it is my understanding that my expert report was accepted without objection.  I also authored an expert report in *Covington v. North Carolina*, Case No. 1:15-CV-00399 (M.D.N.C.), which involved almost identical challenges in a different forum. Due to what I understand to be a procedural quirk, where my largely identical report from *Dickson* had been inadvertently accepted by the plaintiffs into the record when they incorporated parts of the *Dickson* record into the case, I was not called to testify.

17.     I authored two expert reports in *NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.), which involved challenges to multiple changes to North Carolina's voter laws, including the

elimination of a law allowing for the counting of ballots cast in the wrong precinct. I was admitted as an expert witness and testified at trial. My testimony discussed the "effect" prong of the Voting Rights Act claim. I did not examine the issues relating to intent.

18.      I authored reports in *NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio), and *Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio), which dealt with challenges to various Ohio voting laws. I was admitted and testified at trial in the latter case (the former case settled). The judge in the latter case ultimately refused to consider one opinion, where I used an internet map-drawing tool to show precinct locations in the state. Though no challenge to the accuracy of the data was raised, the judge believed I should have done more work to check that the data behind the application was accurate.

19.      I served as a consulting expert in *Lee v. Virginia Board of Elections*, No. 3:15-cv-357 (E.D. Va. 2016), a voter identification case. Although I would not normally disclose consulting expert work, I was asked by defense counsel to sit in the courtroom during the case and review testimony. I would therefore consider my work *de facto* disclosed.

20.      I filed an expert report in *Mecinas v. Hobbs*, No. CV-19-05547-PHX-DJH (D. Ariz. 2020). That case involved a challenge to Arizona's ballot order statute. Although the judge ultimately did not rule on a motion in limine in rendering her decision, I was allowed to testify at the hearing.

21.      I authored two expert reports in *Feldman v. Arizona*, No. CV-16-1065-PHX-DLR (D. Ariz.). Plaintiffs in that case challenged an Arizona law prohibiting the collection of voted ballots by third parties that were not family members or caregivers and the practice of most of the state's counties to require voters to vote in their assigned precinct. My reports and testimony were admitted. Part of my trial testimony was struck in that case for reasons unrelated to the merits of

6

the opinion; counsel for the state elicited it while I was on the witness stand and it was struck after Plaintiffs were not able to provide a rebuttal to the new evidence.

22.     I authored expert reports in *A. Philip Randolph Institute v. Smith*, No. 1:18-cv-00357-TSB (S.D. Ohio), *Whitford v. Nichol*, No. 15-cv-421-bbc (W.D. Wisc.), and *Common Cause v. Rucho*, NO. 1:16-CV-1026-WO-JEP (M.D.N.C.), which were efficiency gap-based redistricting cases filed in Ohio, Wisconsin and North Carolina.

23.     I also authored an expert report in the cases of *Ohio Organizing Collaborative, et al v. Ohio Redistricting Commission, et al* (No. 2021-1210); *League of Women Voters of Ohio, et al v. Ohio Redistricting Commission, et al* (No. 2021-1192); *Bria Bennett, et al v. Ohio Redistricting Commission, et al* (No. 2021-1198). These cases were consolidated and are presently pending in original action before the Supreme Court of Ohio.[1]

24.     In 2019, I was appointed as the court's expert by the Supreme Court of Belize. In that case I was asked to identify international standards of democracy as they relate to malapportionment claims, to determine whether Belize's electoral divisions (similar to our congressional districts) conformed with those standards, and to draw alternative maps that would remedy any existing malapportionment.

25.     I currently serve as the voting rights act expert to counsel for the Arizona Independent Redistricting Commission.

---

[1] I have only been excluded as an expert once, in *Fair Fight v. Raffensperger*, 1:18-CV-5391-SCJ (N.D. Ga.). The judge concluded that I lacked sufficient credentials to testify as an expert in election administration, and this case did not deal with redistricting.

**EVALUATION OF MAP**

26.     I have been asked to analyze the map submitted on behalf of *amici curiae* Voters

of the Commonwealth of Pennsylvania ("Proposed Map")  as well as those submitted by the

parties and other amici, and to summarize their relevant features for the Court.

27.     I have reviewed the Supreme Court of Pennsylvania's Order in *League of Women*

*Voters of Pennsylvania v. Commonwealth*, 178 A.3d 737 (Pa. 2018). That opinion specifically

mentions the following factors as important ones: (1) contiguity; (2) compactness; (3) equality of

population; and (4) splits of political subdivisions.  *Id.* at 816–17.  In addition, I have obtained

data relating to incumbent addresses and political affiliation to see whether the map unfairly

places incumbents from one party into the same district (called "double bunking"), and whether

the map unduly favors one party over another.

28.     To accomplish this analysis, I obtained a block assignment file for the Proposed

Map from counsel.  A block assignment file simply consists of a list of census blocks for the

Commonwealth of Pennsylvania, and the congressional districts to which each block is assigned.

I also acquired the shapefiles for those census blocks from the Redistricting Data Hub, a widely

utilized resource that collects political data relevant to the redistricting process and makes it

publicly available to researchers.  *See* https://redistrictingdatahub.org/.  These blocks also contain

population data. Here, I utilized the population counts that were not adjusted for prisoner

population.

29.     I also downloaded precinct shapefiles that included political data from the

Redistricting Data Hub, and matched them to the appropriate district.  In addition, I downloaded

a shapefile for the current congressional districts.

30.     I obtained a list of addresses for incumbents from counsel and geocoded those addresses to obtain latitude and longitude data.

31.     Using a widely utilized statistical and graphics programming language called R, I used the block assignment file to match the shapefile of the blocks to their respective districts. From this, I was able to create a shapefile of the districts in the Proposed Map.

## CONTIGUITY AND EQUALITY OF POPULATION

32.     All plans submitted to this Court are contiguous.  Most plans contain the minimum population deviation that is possible: 12 districts with a population of 764,865 and five districts with a population of 764,864, for a population deviation of five.  The exceptions are as follows:

- The map submitted by the Carter plaintiffs contains four districts with populations of 764,866 and nine districts with populations of 764,864, for a total population deviation of 13.

- The maps submitted by the House Democrats have two districts with populations of 764,866 and seven districts with populations of 764,864, for a total population deviation of 9.

- The map submitted by the Ali *amici* utilizes the Group Quarter Adjusted population (i.e. "prisoner adjusted" population). It is balanced under that count but has total population deviations of 29,479 residents using the unadjusted census counts.

9

**COMPACTNESS**

33.     To evaluate the compactness of the districts, I employed three commonly used metrics: Reock, Polsby-Popper and Schwartzberg. All three metrics are based on comparing the drawn district to a circle, which is the most compact shape.

34.     The Reock score looks at the ratio of the area of the district to the area of the smallest circle that would enclose the district (also known as a "minimum bounding circle"). Ernest Reock, "A Note: Measuring Compactness as a Requirement of Legislative Apportionment," 1 *Midwest Jrnl. Pol. Sci.* 70 (1961). This ratio will fall as the district becomes distorted lengthwise; it therefore punishes long, bacon-like districts. Note, however, that a district that weaves back-and-forth in a serpentine fashion could score reasonably well on the Reock scoring. This illustrates the importance of looking at multiple standards of compactness. A "perfect" Reock score is 1, while a zero reflects a theoretical perfectly non-compact district.

35.     The Polsby-Popper score looks at the ratio of the area of a district to the area of a circle that has the same perimeter as the district. Daniel D. Polsby & Robert D. Popper, "The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering," 9 *Yale L. & Pol. Rev.* 301 (1991). To understand the motivation behind Polsby-Popper, sketch out a circle. Then erase some of the edge of the circle, and have a narrow tendril snake into the district toward the center. The Reock score would not change much, since the size of the minimum bounding circle remains the same and the area of the district changes only slightly. The Polsby-Popper score, however, would fall significantly, since the perimeter of the district would be greatly increased.  A "perfect" Polsby-Popper score is 1, while a theoretical perfectly non-compact district would score a zero.

10

36.     Finally, I computed the Schwartzberg score. The Schwartzberg score takes the perimeter of the district and compares it to the perimeter (circumference) of a circle that has the same area as the district. *See* Joseph E. Schwartzberg, "Reapportionment, Gerrymanders, and the Notion of Compactness," 50 *Minn. L. Rev.* 443 (1965). By taking the inverse (dividing the number "1" by this score), the scores are, like the above scores, scaled from 0 to 1, with 1 representing a perfectly compact district.

37.     The following table provides the mean Reock, Polsby-Popper, and Schwartzberg scores for the maps.  I also provide the minimum of each score.  This tells us whether the map drawer is "cheating" by drawing one or two badly non-compact districts and then balancing out the average by drawing the remainder of the districts in a fairly compact manner.  For example, the Carter plaintiffs' map generally draws compact districts, but then draws a truly grotesque district extending from the Philadelphia border almost to Schuykill County.

| Table 1: Comparison of Compactness Measures | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Maps | | | | | | | | | | | | | | |
| | Amici | | | | | Parties | | | | | | | | |
| Measure | Ali | Cit. Voters | Conc. Cits. | DTL | PA Voters | Carter | Gov. Wolf | Gressman | House Ds | House Rs | Resch 1 | Resch 2 | Senate Ds 1 | Senate Ds 2 |
| **Reock** | | | | | | | | | | | | | | |
| Mean | 0.407 | 0.418 | 0.416 | 0.436 | 0.442 | 0.413 | 0.401 | 0.395 | 0.392 | 0.383 | 0.426 | 0.414 | 0.373 | 0.379 |
| Minimum | 0.234 | 0.210 | 0.199 | 0.227 | 0.343 | 0.214 | 0.203 | 0.264 | 0.226 | 0.270 | 0.307 | 0.307 | 0.209 | 0.197 |
| **Polsby-Popper** | | | | | | | | | | | | | | |
| Mean | 0.352 | 0.349 | 0.352 | 0.379 | 0.396 | 0.321 | 0.381 | 0.348 | 0.279 | 0.321 | 0.363 | 0.352 | 0.315 | 0.335 |
| Minimum | 0.208 | 0.234 | 0.244 | 0.233 | 0.229 | 0.172 | 0.219 | 0.187 | 0.148 | 0.194 | 0.246 | 0.216 | 0.220 | 0.242 |
| **Schwartzberg** | | | | | | | | | | | | | | |
| Mean | 0.590 | 0.589 | 0.591 | 0.611 | 0.626 | 0.562 | 0.613 | 0.585 | 0.521 | 0.561 | 0.599 | 0.591 | 0.558 | 0.577 |
| Minimum | 0.456 | 0.484 | 0.494 | 0.483 | 0.478 | 0.415 | 0.468 | 0.432 | 0.385 | 0.440 | 0.496 | 0.464 | 0.469 | 0.491 |

38.     This is an admittedly dense chart.  To help digest it better, the following table focuses only on the Reock Score. It sorts the maps by the mean Reock Score and the minimum Reock Score (recall that a higher score is more compact).

11

| Map | Mean Reock |
|---|---|
| Voters of the Commonwealth | 0.442 |
| Draw the Lines | 0.436 |
| Reschenthaler 1 | 0.426 |
| Citizen Voters | 0.418 |
| Concerned Citizens | 0.416 |
| Reschenthaler 2 | 0.414 |
| Carter | 0.413 |
| Ali | 0.407 |
| Governor Wolf | 0.401 |
| Gressman | 0.395 |
| House Democrats | 0.392 |
| House Republicans | 0.383 |
| Senate Democrats 2 | 0.379 |
| Senate Democrats 1 | 0.373 |

| Map | Least Compact (Reock) |
|---|---|
| Voters of the Commonwealth | 0.343 |
| Reschenthaler 1 | 0.307 |
| Reschenthaler 2 | 0.307 |
| House Republicans | 0.270 |
| Gressman | 0.264 |
| Ali | 0.234 |
| Draw the Lines | 0.227 |
| House Democrats | 0.226 |
| Carter | 0.214 |
| Citizen Voters | 0.210 |
| Senate Democrats 1 | 0.209 |
| Governor Wolf | 0.203 |
| Concerned Citizens | 0.199 |
| Senate Democrats 2 | 0.197 |

39.     As you can see, the Voters of the Commonwealth map has the best mean Reock score, and its least compact district scores better than any of the other least compact districts. In fact, its least compact district is almost as compact as the average district in the Senate Democrats' maps.

40.     Likewise, the Voters of the Commonwealth map has the best overall Polsby-Popper scores, and scores well with respect to the least compact district.

12

A2458

| Map | Mean Polsby-Popper |
|---|---|
| Voters of the Commonwealth | 0.396 |
| Governor Wolf | 0.381 |
| Draw the Lines | 0.379 |
| Reschenthaler 1 | 0.363 |
| Ali | 0.352 |
| Concerned Citizens | 0.352 |
| Reschenthaler 2 | 0.352 |
| Citizen Voters | 0.349 |
| Gressman | 0.348 |
| Senate Democrats 2 | 0.335 |
| Carter | 0.321 |
| House Republicans | 0.321 |
| Senate Democrats 1 | 0.315 |
| House Democrats | 0.279 |

| Map | Least Compact (Polsby-Popper) |
|---|---|
| Reschenthaler 1 | 0.246 |
| Concerned Citizens | 0.244 |
| Senate Democrats 2 | 0.242 |
| Citizen Voters | 0.234 |
| Draw the Lines | 0.233 |
| Voters of the Commonwealth | 0.229 |
| Senate Democrats 1 | 0.220 |
| Governor Wolf | 0.219 |
| Reschenthaler 2 | 0.216 |
| Ali | 0.208 |
| House Republicans | 0.194 |
| Gressman | 0.187 |
| Carter | 0.172 |
| House Democrats | 0.148 |

41.    Finally, we provide the same chart for the Schwartzberg scores:

13

| Map | Mean Schwartzberg | | Map | Least Compact (Schwartzberg) |
|---|---|---|---|---|
| Voters of the Commonwealth | 0.626 | | Reschenthaler 1 | 0.496 |
| Governor Wolf | 0.613 | | Concerned Citizens | 0.494 |
| Draw the Lines | 0.611 | | Senate Democrats 2 | 0.491 |
| Reschenthaler 1 | 0.599 | | Citizen Voters | 0.484 |
| Concerned Citizens | 0.591 | | Draw the Lines | 0.483 |
| Reschenthaler 2 | 0.591 | | Voters of the Commonwealth | 0.478 |
| Ali | 0.590 | | Senate Democrats 1 | 0.469 |
| Citizen Voters | 0.589 | | Governor Wolf | 0.468 |
| Gressman | 0.585 | | Reschenthaler 2 | 0.464 |
| Senate Democrats 2 | 0.577 | | Ali | 0.456 |
| Carter | 0.562 | | House Republicans | 0.440 |
| House Republicans | 0.561 | | Gressman | 0.432 |
| Senate Democrats 1 | 0.558 | | Carter | 0.415 |
| House Democrats | 0.521 | | House Democrats | 0.385 |

42.     Once again, the Voters of the Commonwealth map has the best overall compactness, and performs well on the "Least Compact" metric.

43.     In summary, the Voters of the Commonwealth map scores the best on four of the six measures, and is in the top half on the other two metrics.

14

## SPLITS OF POLITICAL SUBDIVISIONS

44.     The final consideration explicitly addressed by the Supreme Court of

Pennsylvania is the number of political subdivisions split. I begin by analyzing county splits in

the proposed map. As shown in Table 4, the map splits only 15 counties between the 17 districts.

| Table 4: County Splits, Proposed Map | |
|---|---|
| County | Districts |
| Allegheny County | 16,17 |
| Berks County | 6,9 |
| Chester County | 5,6 |
| Cumberland County | 11,12 |
| Dauphin County | 9,11 |
| Delaware County | 3,5 |
| Forest County | 13,15 |
| Lackawanna County | 8,9 |
| Lawrence County | 15,16 |
| Monroe County | 7,8 |
| Montgomery County | 4,6 |
| Philadelphia County | 1,2,3 |
| Tioga County | 9,13 |
| Washington County | 14,16 |
| York County | 10,11 |

45.     The map splits counties in a manner consistent with the way counties have

historically been split in the Commonwealth. Bucks County appears to have only been split once

in any congressional map since Pennsylvania adopted district-based elections in the Second

Congress, *see* Congressional District Law, Mar. 16, 1791 (C. XIII); Congressional District Law

15

Apr. 28, 1873 (N. 58) (splitting Bucks between the 7th and 10th Congressional Districts).  The Proposed Map keeps Bucks County intact today.

46.     Additionally, since 1822 Montgomery County has traditionally had a congressional district wholly assigned to it; when it did not, that district has almost always been paired with the City of Philadelphia or Bucks County. In the 1980s, the 13th Congressional District was almost entirely within Montgomery County, paired with a few western Philadelphia precincts. In the 1990s, the 13th Congressional District was entirely within Montgomery County. In the 2000s, the portions of the 13th Congressional District that were not in Montgomery County were paired with northeastern Philadelphia; the same was true of the map used in the early 2010s. The current 4th district is entirely within the boundaries of Montgomery County, except for a small protrusion into Berks County.  *See also* Congressional District Law, Apr. 8, 1822 (C. CLXXIV) (Montgomery County and the 5th Congressional District were coterminous); Congressional District Law, June 9, 1832 (Montgomery County and the 5th Congressional District were coterminous); Congressional District Law, Mar. 25, 1843 (N. 57) (placing all of Montgomery County in the 5th Congressional District, while pairing it with Delaware County); Congressional District Law, May 1, 1852 (placing all of Montgomery County in the 5th Congressional District, while pairing it with what is today northeastern Philadelphia County); Congressional District Law, Mar. 4, 1862 (N. 409) (placing all of Montgomery County in the 6th Congressional District, while pairing it with Lehigh County); Congressional District Law Apr. 28, 1873 (N. 58) (placing all of Montgomery County in the 7th Congressional District, while pairing it with portions of Bucks County); Congressional District Law, May 19, 1887 (N.81) (placing Montgomery County entirely in the 7th Congressional District, while pairing it with the entirety of Bucks County); Congressional District Law, July 11, 1901 (N. 331) (placing

16

Montgomery County entirely in the 8th Congressional District, while pairing it with the entirety of Bucks County) ; Congressional District Law, May 10, 1921 (N. 216) (placing Montgomery County entirely in the 9th Congressional District, while pairing it with the entirety of Bucks County); Congressional District law, June 27, 1931 (N.361) (Montgomery County and the 17th Congressional District were coterminous); Congressional District Law, Feb. 25, 1942 (Montgomery County and the 17th Congressional District were coterminous) (N. 1); Congressional District Law, May 8, 1943 (Montgomery County and the 16th Congressional District were coterminous) (N. 119); Congressional District Law Dec. 22, 1951 (N. 464) (Montgomery County and the 13th Congressional District were coterminous); Congressional District Law, Jan. 29, 1962 (Montgomery County and the 13th Congressional District were coterminous); Congressional District Law, Mar. 8, 1966 (placing the 13th Congressional District entirely within Montgomery County); Congressional District Law Jan. 25, 1972 (N. 3) (placing 13th Congressional District entirely within Montgomery County).

47.     There are three counties in Pennsylvania that must be split due to their population: Philadelphia, Montgomery and Allegheny.  Outside of these mandatory splits, the splits in the Proposed Map impact just 25.1% of the population.  In addition, the map avoids multiple traversals of a district. That is to say, when a district crosses a county boundary, it does so only once.

48.     The Proposed Map also splits relatively few municipal divisions, as illustrated in Table 5.  Notably, the only large city the Proposed Map splits in Philadelphia (which must be split due to its population). Large cities such as Pittsburgh, Allentown, Erie, and Reading are kept intact. Most of the municipal splits are confined to places with small populations.

17

A2463

| Table 5: MCD Splits, Proposed Map | | |
|---|---|---|
| MCD | Districts | Population |
| Carbondale city | 8,9 | 8,828 |
| Chartiers township | 14,16 | 8,632 |
| Darby township | 3,5 | 9,219 |
| Delmar township | 9,13 | 2,856 |
| Easttown township | 5,6 | 10,984 |
| Hampden township | 11,12 | 32,761 |
| Jenks township | 13,15 | 3,629 |
| Limerick township | 4,6 | 20,458 |
| Mount Lebanon township | 16,17 | 34,075 |
| Neshannock township | 15,16 | 9,843 |
| Philadelphia city | 1,2,3 | 1,603,797 |
| Pocono township | 7,8 | 10,844 |
| Spring Garden township | 10,11 | 13,683 |
| Springettsbury township | 10,11 | 27,058 |
| Upper Darby township | 3,5 | 85,681 |
| Upper Paxton township | 9,11 | 4,161 |
| York township | 10,11 | 29,719 |

49.     In summary: The Voters of the Commonwealth map does split more counties than some maps, but it does so by avoiding the three-way splits that plague every other map and dilute the power of voters in those counties.  Even setting that issue aside, the Voters of the Commonwealth map and the House Republicans map are the only ones that neither include a needless three-way split of Montgomery County, nor extends the Montgomery County district into Berks County, nor splits Pittsburgh, nor splits Bucks County.

18

| Plan | # Splits | 3-Way Montgomery Split? | Extends Montgomery Into Berks? | Splits Pittsburg? | Splits Bucks? | Splits Counties 3 Ways? |
|---|---|---|---|---|---|---|
| Table 6: Splits and Compactness Measures | | | | | | |
| All Maps | | | | | | |
| Ali | 16 | Yes | Yes | Yes | Yes | Yes |
| Carter | 13 | Yes | Yes | No | No | Yes |
| Citizen Voters | 13 | Yes | Yes | No | No | Yes |
| Concerned Citizens | 16 | No | No | Yes | No | Yes |
| Draw The Lines | 14 | Yes | No | Yes | No | Yes |
| Governor Wolf | 16 | Yes | Yes | Yes | Yes | Yes |
| Gressman | 14 | No | Yes | No | Yes | Yes |
| House Democrats | 16 | No | Yes | No | Yes | Yes |
| House Republicans | 15 | No | No | No | No | Yes |
| Reschenthaler 1 | 13 | Yes | No | No | No | Yes |
| Reschenthaler 2 | 13 | Yes | No | No | No | Yes |
| Senate Democrats 1 | 17 | No | No | Yes | Yes | Yes |
| Senate Democrats 2 | 16 | Yes | Yes | Yes | Yes | Yes |
| Voters of the Commonwealth | 15 | No | No | No | No | No |

## INCUMBENCY

50.     The Supreme Court of Pennsylvania has acknowledged that incumbency protection is a factor that has historically played a role in the drawing of districts, and may be pursued and considered, so long as their accommodation does not subordinate the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintaining equal population among congressional districts.  I have examined whether the Proposed Map unfairly places incumbents in districts together.

51.     Using the incumbency file referenced above, I have plotted the addresses of the existing incumbents who have declared that they will be seeking re-election in 2022. Under the Proposed Map, the 2nd and 17th Congressional Districts are open districts. Most incumbents are placed in a district by themselves.  The exceptions are Rep. Matt Cartwright and Rep. Dan Meuser, who are placed together in the 8th Congressional District, and Rep. Brendan Boyle and

19

A2465

Rep. Brian Fitzpatrick, who are placed together in the 1st district.  Notably, however, Rep. Boyle

lives close to the 2nd District, which is retained as an open district.



Proposed Map, With Locations of Incumbents, Philadelphia Area Excluded



Proposed Map, With Locations of Incumbents, Philadelphia Area

20

## PARTISANSHIP

52.     Finally, although it was not mentioned as a factor in *LWV*, I was asked by counsel to evaluate the existing and proposed plan under various proposed measures of partisanship. This is a difficult endeavor, because there are, at the very least, dozens of proposed metrics for partisan gerrymandering (just as there are for compactness).  Some of them are difficult to explain, some are difficult to interpret, and some are both.  For purposes of this report, I have drawn on two of the most common, straightforward metrics: the efficiency gap and mean-median.

53.     Before exploring those metrics, some foundation must be laid.  One must first decide how to assess the partisanship of a district when no elections have yet been held in it. One of the most common ways of doing so is to look at previously held elections.  But which ones? No fewer than eleven statewide partisan elections have been held in Pennsylvania over the past three election cycles. But the farther one goes back, the more difficult it becomes to assess whether the election is relevant to current outcomes.  Election totals from Chester County in 2012, when Mitt Romney narrowly carried the county, are likely to be significantly less probative of outcomes in the 2020s than the election totals from 2020, when Joe Biden carried the county by 20 points.

54.     Even then, Donald Trump may have unique appeal among voters for a Republican candidate in certain areas of the state, while turning otherwise-Republican voters off in other portions of the state.  This would counsel examining multiple elections. But it may also be the case that Trump represents the future of the Republican Party, and therefore particular heed should be paid to the results of elections in which he was a candidate.

21

55.     Because of this, I have examined three different sets of election results: The Biden/Trump race alone, all the statewide partisan elections from 2020, and all of the non-judicial partisan statewide elections from 2016 to 2020.  The results were downloaded from the Redistricting Data Hub, disaggregated to the census block level using R (weighting by VAP), and then aggregated back up to the relevant map shapefile.

56.     While aggregating races can be problematic in a state like Maryland or Massachusetts, where Republican overperformances in gubernatorial races can twice the "true" partisanship of a district, the races in Pennsylvania are reasonably consistent.  Narrow Republican wins are not uncommon, nor are substantial Democratic victories.

57.     Mean-median is the difference between a party's statewide vote share and its vote share in the middle district in the state. The goal is to keep a party's share of the seats in which it performs better than it performed statewide roughly the same as the party's share of the seats where it performed worse than it performed statewide.

58.     The efficiency gap proceeds from the following intuition: When a party seeks to gerrymander, it seeks to waste the other party's votes. It wastes the other party's votes by either clumping them into a few districts where the other party will win overwhelmingly (packing), or by spreading them out over many districts where they have little chance of winning (cracking). The efficiency gap is simply the percentage of the statewide vote total that consists of wasted Democratic votes (votes either cast in districts Democrats lose or those beyond 50% of the vote in districts they win) minus the percentage of the statewide vote total that consists of wasted Republican votes.

59.     The following table gives the mean-median and efficiency gap scores for the plans using different races as indicators.

| | Amici | | | | | Parties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| race | Ali | Cit.Voters | Conc.Cits | DTL | PA.Voters | Carter | Gov | Gressman | House.Ds | House.Rs | Rens.1 | Rens.2 | Sen.Ds.1 | Sen.Ds.2 |
| **Mean-Median** | | | | | | | | | | | | | | |
| Trump/Biden | 0.0 | 2.2 | 0.3 | 0.3 | 3.0 | 0.3 | -1.8 | 0.3 | -1.7 | 2.8 | 1.4 | 1.4 | 0.6 | -1.6 |
| All 2020 | 0.0 | 0.9 | 0.2 | 0.2 | 2.0 | 0.0 | -1.1 | 0.1 | -0.8 | 1.9 | 0.5 | 0.5 | 0.3 | -1.3 |
| 2016-2020 | 0.4 | 1.0 | 0.3 | 0.3 | 2.2 | 0.5 | 0.3 | 0.2 | 0.1 | 2.1 | 1.4 | 1.4 | 0.9 | -0.2 |
| **Efficiency Gap** | | | | | | | | | | | | | | |
| Trump/Biden | -2.9 | 3.6 | -3.1 | -3.0 | 3.6 | -3.0 | -2.9 | -3.0 | -8.7 | 3.5 | 3.6 | 3.6 | -3.0 | -2.9 |
| All 2020 | -9.0 | 3.0 | -3.7 | -3.6 | 3.0 | -9.1 | -3.5 | -9.0 | -9.3 | 3.0 | 3.0 | 3.0 | 3.1 | -3.5 |
| 2016-2020 | -6.3 | -0.9 | -6.5 | -6.4 | 5.6 | -6.4 | -1.0 | -6.3 | -12.1 | 5.5 | -0.9 | -0.9 | 0.3 | -6.3 |

Table 7: Comparison of Competitiveness Measures
All Maps

60.     One downside of the various partisan fairness metrics is that, while they attempt to quantify the amount of partisanship involved in the line drawing, they do not answer the question of "how much gerrymandering is too much."  As you can see, all of the maps exhibit some degree of partisan bias.  It is just difficult to say how much is "excessive" or when partisanship comes to predominate.

61.     To put this in perspective, when I participated in the map drawing in Virginia, we concluded that our congressional maps, which had a mean-median gap of 2.1, did not "unduly favor" one party or the other. Plaintiffs in the case of *Common Cause v. Rucho* (the "efficiency gap" case that eventually made its way to the Supreme Court of the United States) suggested an efficiency gap of 7.5 as a threshold for a state with a relatively large number of Congressional Districts. 279 F. Supp. 3d 587, 662 (M.D.N.C. 2018), *vacated and remanded*, 138 S.Ct. 2679 (2018).

62.     One way to look at this is to ask ourselves "what is the maximum efficiency gap we see" under the various iterations of the map. To measure this, I take the absolute value of the efficiency gaps below, so that a Republican efficiency gap is treated the same as a Democratic efficiency gap. As the following chart makes clear, the Voters of the Commonwealth Map

23

A2469

performs well here, landing in the bottom half, and never exceeds the thresholds suggested in earlier cases:

| Table 8: Ranked Maximum Efficiency Gaps | |
|---|---|
| All Maps | |
| Plan | Max E.G. |
| House.Ds | 12.1 |
| Carter | 9.1 |
| Ali | 9.0 |
| Gressman | 9.0 |
| Conc.Cits | 6.5 |
| DTL | 6.4 |
| Sen.Ds.2 | 6.3 |
| PA.Voters | 5.6 |
| House.Rs | 5.5 |
| Cit.Voters | 3.6 |
| Rens.1 | 3.6 |
| Rens.2 | 3.6 |
| Gov | 3.5 |
| Sen.Ds.1 | 3.1 |

63.     Of course, the efficiency gap is not without its problems (as I have testified previously), and it is particularly inappropriate for non-competitive states (where some of its stranger properties become relevant). I am generally of the mind that the traditional redistricting criteria, perhaps combined with computer simulations, are the best way to evaluate a map.  I include these metrics simply because they have become popular, and because the Court may find them to be of interest.

64.     In other words, the Voters of the Commonwealth map performs well on the metrics that this Court laid out in *LCV*, and also performs well on metrics such as the efficiency gap and mean-median. Adopting the Voters of the Commonwealth plan would be consistent with

24

this Court's earlier instructions to lower courts as to what factors they should consider when evaluating plans.

## **CONCLUSION**

65.    The Voters of the Commonwealth map is the most compact map offered according to most metrics and respects the geography of Pennsylvania better than any of the proposed maps, save, perhaps, the House Republican maps. Its partisan bias is small by historic standards.  If the Court were not to accept the magistrate judge's recommendations to accept the House Republican maps, it would be the best plan for this Court to adopt.

I declare under penalty of perjury under the law of the Commonwealth of Pennsylvania that the foregoing is true and correct.

Signed on: February 14, 2022, at Delaware County, Ohio, United States of America

Sean Trende

4891-5716-4549 v.1

25

A2471

# Appendix 1

**SEAN P. TRENDE**
1146 Elderberry Loop
Delaware, OH 43015
strende@realclearpolitics.com

**EDUCATION**

Ph.D., The Ohio State University, Political Science, expected 2022.

M.A.S. (Master of Applied Statistics), The Ohio State University, 2019.

J.D., Duke University School of Law, *cum laude*, 2001; Duke Law Journal, Research Editor.

M.A., Duke University, *cum laude*, Political Science, 2001. Thesis titled *The Making of an Ideological Court: Application of Non-parametric Scaling Techniques to Explain Supreme Court Voting Patterns from 1900-1941*, June 2001.

B.A., Yale University, with distinction, History and Political Science, 1995.

**PROFESSIONAL EXPERIENCE**

Law Clerk, Hon. Deanell R. Tacha, U.S. Court of Appeals for the Tenth Circuit, 2001-02.

Associate, Kirkland & Ellis, LLP, Washington, DC, 2002-05.

Associate, Hunton & Williams, LLP, Richmond, Virginia, 2005-09.

Associate, David, Kamp & Frank, P.C., Newport News, Virginia, 2009-10.

Senior Elections Analyst, RealClearPolitics, 2009-present.

Columnist, Center for Politics Crystal Ball, 2014-17.

Gerald R. Ford Visiting Scholar, American Enterprise Institute, 2018-present.

**BOOKS**

Larry J. Sabato, ed., *The Blue Wave*, Ch. 14 (2019).

Larry J. Sabato, ed., *Trumped: The 2016 Election that Broke all the Rules* (2017).

Larry J. Sabato, ed., *The Surge:2014's Big GOP Win and What It Means for the Next Presidential Election*, Ch. 12 (2015).

Larry J. Sabato, ed., *Barack Obama and the New America*, Ch. 12 (2013).

Barone, Kraushaar, McCutcheon & Trende, *The Almanac of American Politics 2014* (2013).

*The Lost Majority: Why the Future of Government is up for Grabs – And Who Will Take It* (2012).

**PREVIOUS EXPERT TESTIMONY**

*Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super. Ct., Wake County) (racial gerrymandering).

*Covington v. North Carolina*, No. 1:15-CV-00399 (M.D.N.C.) (racial gerrymandering).

*NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.) (early voting).

*NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio) (early voting).

*Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio) (early voting).

*Lee v. Virginia Bd. of Elections*, No. 3:15-cv-357 (E.D. Va.) (early voting).

*Feldman v. Arizona*, No. CV-16-1065-PHX-DLR (D. Ariz.) (absentee voting).

*A. Philip Randolph Institute v. Smith*, No. 1:18-cv-00357-TSB (S.D. Ohio) (political gerrymandering).

*Whitford v. Nichol*, No. 15-cv-421-bbc (W.D. Wisc.) (political gerrymandering).

*Common Cause v. Rucho*, No. 1:16-CV-1026-WO-JEP (M.D.N.C.) (political gerrymandering).

*Mecinas v. Hobbs*, No. CV-19-05547-PHX-DJH (D. Ariz.) (ballot order effect).

*Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga.) (statistical analysis).

*Pascua Yaqui Tribe v. Rodriguez*, No. 4:20-CV-00432-TUC-JAS (D. Ariz.) (early voting).

**COURT APPOINTMENTS**

Appointed as Voting Rights Act expert by Arizona Independent Redistricting Commission (2020)

Appointed special Master by the Supreme Court of Virginia to redraw maps for the Virginia House of Delegates, the Senate of Virginia, and for Virginia's delegation to the United States Congress for the 2022 election cycle.

Appointed redistricting expert by the Supreme Court of Belize in *Smith v. Perrera*, No. 55 of 2019 (one-person-one-vote).

**INTERNATIONAL PRESENTATIONS AND EXPERIENCE**

Panel Discussion, European External Action Service, Brussels, Belgium, *Likely Outcomes of 2012 American Elections.*

Selected by U.S. Embassies in Sweden, Spain, and Italy to discuss 2016 and 2018 elections to think tanks and universities in area (declined Italy due to teaching responsibilities).

Selected by EEAS to discuss 2018 elections in private session with European Ambassadors.

**TEACHING**

American Democracy and Mass Media, Ohio Wesleyan University, Spring 2018.

Introduction to American Politics, The Ohio State University, Autumn 2018, 2019, 2020, Spring 2018.

Political Participation and Voting Behavior, Spring 2020, Spring 2021.

**REAL CLEAR POLITICS COLUMNS**

Full archives available at http://www.realclearpolitics.com/authors/sean_trende/

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief contains fewer than the 7,000 words permitted under Pa. R.A.P. 2135(a)(1), excluding the cover page, table of contents, and table of authorities.  This word county relies upon the word count of the word processing software used to prepare this brief.

GALLAGHER GIANCOLA LLC

Dated:  February 14, 2022          <u>*/s/ Kathleen A. Gallagher*</u>
                                   Kathleen A. Gallagher
                                   Russell D. Giancola

## CERTIFICATE OF COMPLIANCE
## <u>WITH PUBLIC ACCESS POLICY</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

GALLAGHER GIANCOLA LLC

Dated:  February 14, 2022                 */s/ Kathleen A. Gallagher*
                                           Kathleen A. Gallagher
                                           Russell D. Giancola

Received 2/14/2022 9:01:53 PM Supreme Court Middle District

Filed 02/14/2022 Supreme Court Middle District

# IN THE SUPREME COURT OF PENNSYLVANIA
_____

## No. 7 MM 2022
_____

CAROL ANN CARTER, et al, Petitioners,

v.

LEIGH M. CHAPMAN, et al., Respondents.

---

Review of the Recommended Findings of Fact and Conclusions of Law of the
Commonwealth Court of Pennsylvania, entered on February 7, 2022, at Nos. 464
MD 2021 & 465 MD 2021.
_____

**BRIEF OF AMICI CURIAE
CONCERNED CITIZENS FOR DEMOCRACY
IN SUPPORT OF PETITIONERS**

---

BRIAN A. GORDON (I.D. NO. 52342)
GORDON & ASHWORTH, P.C.
168 Idris Road
Merion Station, PA 19066
(610) 667-4500
Briangordon249@gmail.com

Counsel for Amicus Curiae
Concerned Citizens for Democracy

General Business
A2478

## <u>TABLE OF CONTENTS</u>

**INTEREST OF AMICUS CURIAE**      4

**INTRODUCTION**      4

**I.**      **IN CHOOSING AMONG MAPS, THE COURT SHOULD BE GUIDED BY THE CONSTITUTION'S OVERARCHING GOAL OF ACHIEVING *EQUAL* VOTING RIGHTS, WHICH REQUIRES CONSIDERATION OF THE PARTISAN FAIRNESS OF ANY PROPOSED MAP.**      6

**II.**      **INCUMBENT PROTECTION FAILS TO ADVANCE THE GOAL OF FREE AND EQUAL ELECTIONS.**      13

**III.**      **CCFD'S REDISTRICTING METHOD PROVIDES A STEP-BY-STEP GUIDE TO NEUTRAL REDISTRICTING THAT CAN ASSIST THIS COURT IN EVALUATING THE PROPOSED MAPS.**      16

     A.  The History and Development of the CCFD Method.      16

     B.  A Step-by-Step Guide to Neutral Redistricting.      19

     C.  The Court's 2018 Remedial Map Largely Comports with the CCFD Method      21

     D.  The Emergence of a Judicially Manageable Standard.      22

     E.  CCFD Endorses Other Amici Maps That Follow the Drafting Principles Reflected in the Court's 2018 Remedial Map and Offers an Illustrative 17-Seat Congressional Map Applying its Methodology.      23

**IV.**      **CONCLUSION**      26

General Business

## TABLE OF AUTHORITIES

**Cases**

*Agre v. Wolf*, 284 F. Supp. 3d 591 (E.D. Pa. 2018)                                                5

*Harper v. Hall,* NC Supreme Court Case No. 21 CVS 200085 (Feb. 4, 2022)          11

*League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Op. No. 2022-Ohio-65
(January 12, 2022)                                                                                           12

*League of Women Voters of Pa. v. Commonwealth of Pa.*, 645 Pa. 1, 178 A.3d 737
(Pa. 2018) ("*LWV*")                                                      4, 6, 7, 10, 13, 14, 15, 21, 28

*Rucho v. Common Cause,* No. 18-422, 139 S. Ct. 2484, 2487, 588 U.S. ___  (2019)          27

*Vieth v. Jubelirer,* 541 U.S. 267, 307-308 (2004)                                               27

*Wesberry v. Sanders*, 376 U.S. 1 (1964)                                                        16

**Constitutional and Statutory Authorities**

Pennsylvania Constitution, Article I, Section 5                              7, 8, 9, 10, 14, 15

Pennsylvania Constitution, Article II, Section 16                        4, 5, 6, 7, 8, 9, 17, 24

Voting Rights Act, 52 U.S. Code § 10101, et seq.                                      19, 24

General Business

## INTEREST OF AMICUS CURIAE

Concerned Citizens for Democracy (CCFD) is a think-tank composed of lawyers, computer scientists, and engineers dedicated to developing nonpartisan, judicially manageable standards for redistricting in Pennsylvania. Since February 2017, CCFD, a 501(c)(3) non-partisan, Pennsylvania non-profit association, has been studying partisan redistricting techniques and how to prevent them. When, as here, the political processes have broken down and the political actors are unable to agree upon fair redistricting maps, the Court will benefit from guidance provided by nonpartisan groups such as CCFD. Such groups not only have proposed individual maps to govern a particular election, but also have developed standards for drawing fair maps and for determining when the resultant electoral districts provide for free and equal elections.

## INTRODUCTION

This Court set forth standards for evaluating partisan gerrymandering in *League of Women Voters of Pa. v. Commonwealth of Pa.*, 645 Pa. 1, 178 A.3d 737 (Pa. 2018) ("*LWV*"). This Court noted four neutral criteria – compactness, contiguity, population equality, and minimization of political subdivision splits – set out in Article II, Section 16 of the Pennsylvania Constitution, which set a constitutional floor for the fair drafting of electoral districts. But the Court recognized that these four factors might not be sufficient to ensure the fair representation of Pennsylvania's citizens. In order to satisfy Article I, Section 5's separate requirement of "free and equal" elections, this Court should explicitly hold, contrary to the Special Master's reasoning, that "partisan fairness" is a crucial fifth criterion for evaluating the constitutional

Page | 4

General Business

validity of voting districts.

This Court today faces the unenviable task of choosing among several redistricting proposals, at least several of which arguably satisfy the relevant constitutional criteria that the Court heretofore has developed. In addition to choosing a map to decide this case, it would be helpful if the Court were to discuss in more detail the neutral line-drawing procedures that are most likely to result in legislative districts that satisfy constitutional requirements. To that end, in Part III of this brief, CCFD describes its simple, step-by-step redistricting procedure that results in nonpartisan, fair and equal electoral districts. The CCFD method can be used to draft any legislative map while concomitantly serving as a judicially manageable standard to evaluate maps that have been drawn and then are challenged as the product of impermissible gerrymandering.

CCFD is also submitting an expert report (Exhibit A). One of its authors, Anne Hanna, is a data scientist who testified as an expert witness in *Agre v. Wolf*, 284 F. Supp. 3d 591 (E.D. Pa. 2018), the federal anti-gerrymandering case that challenged the 2011 Pennsylvania congressional map before a federal three-judge panel. The report (a) presents a model 17-seat Congressional redistricting map drafted utilizing the CCFD method, (b) identifies the subordinate criteria that then were chosen to be incorporated into the draft CCFD map, and explains why that was done, and (c) details, in a transparent manner, how the draft map was modified to accommodate the subordinate criteria. The report also analyzes the Special Master's Report, specifically the Report's findings and conclusions and map selection recommendations.

General Business

I.    IN CHOOSING AMONG MAPS, THE COURT SHOULD BE GUIDED BY THE CONSTITUTION'S OVERARCHING GOAL OF ACHIEVING *EQUAL* VOTING RIGHTS, WHICH REQUIRES CONSIDERATION OF THE PARTISAN FAIRNESS OF ANY PROPOSED MAP.

In *League of Women Voters of Pennsylvania*, this Court held that the Commonwealth's citizens are entitled to free and equal participation in the electoral process and that electoral maps cannot be drawn to benefit one political party over another. This Court concluded that, contrary to the Pennsylvania Constitution's guarantees of free and equal elections, the Congressional redistricting plan the State Legislature adopted in 2011 was an impermissible gerrymander. This Court created a judicially manageable standard in *LWV*, and the expert the Court appointed used that standard to create a fair, non-gerrymandered Congressional map.

For redistricting purposes, the two relevant provisions of the Pennsylvania Constitution are Article II, Section 16 and Article I, Section 5. Article II, Section 16 provides:

§ 16. Legislative districts.

The Commonwealth shall be divided into 50 senatorial and 203 representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district. (Apr. 23, 1968, P.L. App. 3, Prop. No. 1)

The second provision, Article I, Section 5 – the Free and Equal Elections Clause ("FEEC") – is more general. It provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." This Court gave a full-throated support of the broadest possible interpretation of the FEEC. *See, e.g.,* 178 A.3d at 804, 814 ("the Clause should be given the broadest interpretation, one which

Page | 6

governs all aspects of the electoral process . . .")

This Court provided clear guidance for determining the minimum criteria that a legislative redistricting map must meet to satisfy constitutional requirements. This Court found that a legislative redistricting plan must:

(1) be composed of compact and contiguous territory;
(2) be as nearly equal in population as practicable; and
(3) not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

178 A.3d at 742 (citing Order, 1/22/18 at ¶ "Fourth"). These four criteria essentially required compactness, contiguity, equal population, and minimization of divisions of political subdivisions.[1]

After quoting from Article II, Section 16, this Court in *LWV* noted that, in addition to the four essential criteria, there were additional factors, such as the maintenance of prior district lines or incumbent protection, that historically had played a role in the drawing of districts. *LWV*, 178 A.3d at 817. This Court held that such other factors, if they are considered, must be "wholly subordinate" to the four mentioned criteria. *Id*. These criteria provide a "'floor' of protection for an individual against the dilution of his or her vote" in the creation of legislative districts, and subordination of these neutral criteria to other considerations, particularly partisan gerrymandering, creates a constitutional violation. *Id.* at 816-17.

To be sure, there are a multitude of maps that can satisfy the four criteria. But it is clear that partisan advantage cannot play *any* role in the construction of a permissible electoral map.

_____

[1] Although *LWV* dealt with Congressional districts that the Pennsylvania state legislature drew, the rationale and holdings of *LWV* apply to both state and federal redistricting.

Page | 7

As this Court noted:

> When . . . it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, *in whole or in part*, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I, Section 5 of the Pennsylvania Constitution. . . .  [T]his standard *does not* require a showing that the creators of congressional districts *intentionally* subordinated these traditional criteria to other considerations in the creation of the district in order for it to violate Article I, Section 5; rather, it is sufficient to establish a violation of this section to show that these traditional criteria were subordinated to other factors.

178 A.3d at 817 (emphasis added). This language, which highlights the requirement that the four criteria not be subordinated to other considerations, ensures that, as a practical matter, applying the four criteria must be the first step in constructing a map that adheres to constitutional requirements.

In *League of Women Voters*, this Court was keenly aware that satisfying the four criteria enumerated in Article II, Section 16 – compactness, contiguity, equal population, and minimization of divisions of political subdivisions – constituted a floor, not the ceiling, of what the Constitution requires.

> These neutral criteria provide a "floor" of protection for an individual against the dilution of his or her vote . . . . As we have repeatedly emphasized throughout our discussion, the overarching objective of this provision of our constitution is to prevent dilution of an individual's vote by *mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens*. We recognize, then, that there exists the possibility that advances in map drawing technology and analytical software can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these neutral "floor" criteria, nevertheless operate to *unfairly dilute the power of a particular group's vote* for a congressional representative.

178 A.3d at 817 (emphasis added).

When, as now, the Court has before it a number of proposed maps that satisfy the four

Page | 8

"floor criteria" explicit in Section 16, then the Court must determine what additional factor or factors will be necessary to satisfy Article I, Section 5's requirement of "free and equal" elections.

The crucial next factor for the Court to consider is partisan fairness. Partisan fairness can be defined as attempting to ensure that the anticipated seat shares of the parties (Democratic, Republican, or other parties) of a proposed electoral map will approximate the statewide vote share of each party, based on statewide elections, over a reasonable period of time. For example, if the vote shares of two parties over the last decade had been 53% and 47%, respectively, then the anticipated statewide seat share of a fairly drawn 17-seat map, should be 9-8, but no more pronounced. Stated alternatively, a party's anticipated seat share should not exceed the party's vote share in statewide elections over a reasonable period of time. For a more detailed analysis of partisan fairness, *see* Ex. A (CCFD Expert Report).

The Special Master mistakenly concluded that it *violates* the Free and Equal Elections Clause to attempt to minimize any partisan advantage that results from concentrations of political party supporters in, for example, urban versus rural areas. *See* Report at 197, para. 40. The opposite is true. The Pennsylvania Constitution's guarantee of equal voting rights for individuals does not recognize any so-called "natural advantage" for one set of voters or one political party over another. Nothing in *LWV* supports such a conclusion. Indeed, as this Court noted, "any legislative scheme which has the *effect* of impermissibly diluting the potency of *an individual's vote* for candidates for elective office relative to that of other voters will violate the guarantee of 'free and equal' elections afforded by Article I, Section 5." *LWV*, 178 A.3d at 809 (emphasis added); *see also id.* at 812 ("The [FEEC] was specifically intended to equalize the power of

Page | 9

voters in our Commonwealth's election process, and it explicitly confers this guarantee.").

Equalizing the voting power of individuals necessarily implies that each voter should have an equal opportunity to have his party obtain majority status in a legislature when a majority of the state's voters agree with his or her voting preference. Democracy is not well-served when (a) large numbers of like-minded voters are packed together in districts where their votes are likely to be wasted, and (b) control of the legislature systematically favors a small number of voters in a different geographic area. As this Court observed:

> By placing voters preferring one party's candidates in districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing), the non-favored party's votes are diluted. *It is axiomatic that a diluted vote is not an equal vote,* as all voters do not have an equal opportunity to translate their votes into representation. This is the antithesis of a healthy representative democracy. Indeed, for our form of government to operate as intended, each and every Pennsylvania voter must have the same free and equal opportunity to select his or her representatives.

178 A.3d at 814 (emphasis added). That is why, in *LWV*, this Court explicitly adopted a "broad interpretation" of Article I, Section 5 – to "guard[] against the risk of unfairly rendering votes nugatory, artificially entrenching representative power, and discouraging voters from participating in the electoral process because they have come to believe that the power of their individual vote has been diminished to the point that it 'does not count.'" 178 A.3d at 814.

The egregious violation of the four "floor" criteria in Pennsylvania's 2011 Congressional map, in pursuit of extreme, durable, and disproportionate partisan advantage, was the basis of this Court's decision to overturn that map as an unconstitutional partisan gerrymander. The 2011 map was egregious precisely because, by design, the anticipated share of Republican seats far exceeded the anticipated share of seats for Democratic candidates. Indeed, and as demonstrated

Page | 10

by the elections of 2012, 2014, and 2016, the predictable result of these elections was 13 seats

for Republican candidates and 5 seats for Democratic candidates, despite close to even state-

wide election results.

In Pennsylvania, at the present time, there is a tendency for Democratic voters to self-

pack in cities, suburbs, and factory towns, making them easy targets for packing and cracking. If

this Court were to ignore this phenomenon and allow parties to carefully draw maps with subtle

gerrymanders that further pack Democratic voters into cities and towns, this would permanently

dilute the equal power of these voters to influence both the state legislature and Congress.[2] As is

evident from the various expert reports submitted, maps drawn with complete indifference to

partisan outcomes have a tendency to pack voters who prefer Democratic candidates in cities and

inner ring suburbs, thereby putting a finger on the scales against their representation interests,

despite their approximately equal statewide prevalence.

In February 2022, the North Carolina Supreme Court, in *Harper v. Hall,* NC Supreme

Court Case No. 21 CVS 200085 (Feb. 4, 2022), interpreting its analogous state constitution,

---

2 In selecting the map proposed by the Republican Legislators, the Special Master repeatedly
stated that the map satisfied the principal goal underlying the holding in *LWV*: protecting
"communities of interest." *See, e.g.,* Report at 152, n.46. This is a misconstruction of *LWV*'s
holding. *LWV* did not hold that protecting communities of interest ("COI") is the principal—or
even a significant—criterion in drawing a map that protects an individual voter's right to an
undiluted vote. Rather, *LWV* held that the FEEC applies to ensure that electoral redistricting is
not marred by partisan unfairness. As such, under *LWV*, where mapping decisions intended to
prevent partisan unfairness impinge to some degree on the COI issue, the policy of preventing
partisan fairness must supersede concerns with alleged COI. This conclusion is bolstered by the
fact that (1) the four neutral criteria themselves go a long way to ensuring the protection of COI,
and (2) the concept of a "community of interest"—unlike the four neutral criteria—is amorphous
and subjective and, as such, currently does not and cannot provide a judicially manageable
standard.

Page | 11

agreed that partisan balance is a crucial determinant, not a subsidiary factor, in determining whether an individual's equal voting right is infringed. That Court held unconstitutional a legislatively approved redistricting plan that "systematically makes it harder for one group of voters to elect a governing majority than another group of voters of equal size," finding that the plan "unconstitutionally infringe[d] upon [the] fundamental right to vote." Order at 5, para. 4. The Court noted that "[t]he fundamental right to vote includes the right to enjoy 'substantially equal voting power and substantially equal legislative representation.'" *Id.*[3]

This Court should similarly hold that the FEEC prohibits redistricting maps that either are intended to or have the effect of incorporating a partisan advantage into them. This conclusion requires the drafter to make some level of adjustments to their maps (as in Step 6 of the CCFD method, *see infra*) to ensure that electoral districts do not confer unfair partisan advantage to any political party in violation of the FEEC.

When boundary adjustments are made to achieve partisan fairness, two principles must be respected. First, the mapmaker should explicitly note and explain the basis of any adjustment so that a reviewing court (or Commission) can see and understand the changes. Second, the adjustments should be limited to the minimum number and degree necessary to accomplish the goal of partisan fairness. For example, adjustments to increase a political party's expected seat share can meet, but not exceed, a party's likely statewide vote share. So if a party has a 10-year

---

[3] *Cf. League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Op. No. 2022-Ohio-65 (January 12, 2022) (Ohio Constitution, as amended by voters, requires that "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." Slip Op at 4 (quoting Ohio Constitution, Article XI, Section 6)).

Page | 12

statewide average vote share of 53%, the party can make minor adjustments in boundary lines to seek an anticipated seat share of 53%, but not one seat higher. Thus, if we are looking at a proposed 17-seat Congressional map, and a party with a vote share of 53%, that party's anticipated seat share should be nine seats, and the anticipated seat share of the party with 47% of the statewide vote should be eight seats. It is important for a reviewing court to carefully examine this step to ensure that a drafter has not engaged in stealth gerrymandering by over-adjusting in the name of "partisan fairness."[4]

## II.      INCUMBENT PROTECTION SHOULD BE DISFAVORED, SINCE IT FAILS TO ADVANCE THE CENTRAL GOALS OF FREE AND EQUAL ELECTIONS.

One redistricting consideration that has often played a role in maps that state legislatures in particular have drawn is "incumbent protection," *i.e.,* designing districts that minimize the chance that incumbent legislators will lose their seats. Incumbent protection can take various forms, *e.g.,* keeping the centers of prior district boundaries from changing to preserve the advantage of incumbency or making competitive seats either more conservative or more liberal by adding or subtracting territory to achieve the drafter's intended partisan advantage. The goal of incumbent protection is inconsistent with this Court's reasoning in *LWV*.  This Court emphasized at the very beginning of its opinion that "[i]t is a core principle of our republican

---

[4] Although voter preferences are not fixed from election to election, non-partisan political analysts are able to calculate likely seat share and vote share ranges using *objective numerical standards*. Likely seat share and vote share ranges can be determined by evaluating a particular map against a representative sample of statewide and district elections from the most recent election cycles preceding the redistricting. The results of many such analyses have been accepted as reliable in past redistricting cases in Pennsylvania and across the nation. As a result, this guidance can provide a neutral basis for redistricting authorities, courts, and their experts to ensure defensible, fair maps. For a more extensive analysis, *see* Ex. A.

Page | 13

form of government 'that the voters should choose their representatives, not the other way around.'" 178 A.3d at 740-41.  Incumbent protection, of course, is the quintessential example of representatives choosing their voters, rather than the other way around. Indeed, the desire to protect incumbents places the interests of elected representatives above the interests of the voters themselves.

A plan designed to protect incumbents also impermissibly favors one group of political candidates over another. As this Court noted in *LWV*, the first version of the Free and Equal Elections Clause declared that "all elections ought to be free; and that all free men having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, *or to be elected into office*." Pa. Const. of 1776, Art. I, § VII; 178 A.3d at 806-07 (emphasis added). Thus, the initial version of the FEEC included the right not only to cast a free and equal vote, but also a free and equal right to be elected into office. Although the language was changed in the final version of Article I, Section 5, that language was "revised to remove all prior ambiguous qualifying language," 178 A.3d at 808, *i.e.,* in order to expand, not restrict, its scope. As this Court further explained:

> The broad text of the first clause of this provision mandates clearly and unambiguously, and *in the broadest possible terms*, that all elections conducted in this Commonwealth must be "free and equal."  In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that *all aspects of the electoral process*, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government.

178 A.3d at 804 (emphasis added).

Incumbent protection, *even if done on a bipartisan basis*, serves to entrench the power of

Page | 14

the current Congressional representatives, making it more difficult for voters to change elected

representatives who have displeased them. As this Court noted:

> adoption of a broad interpretation [of Article I, Section 5] guards against the risk
> of unfairly rendering votes nugatory, *artificially entrenching representative*
> *power*, and discouraging voters from participating in the electoral process because
> they have come to believe that the power of their individual vote has been
> diminished to the point that it "does not count."

178 A.3d at 814.

This Court's only express discussion of incumbent protection in *LWV* implied that the

practice would not be permissible since the goal of incumbent protection must be subordinated to

the four criteria.  *See* 178 A.3d at 818 n.74 ("Dr. Chen also credibly rebutted the notion that the

2011 Plan's outlier status derived from a hypothetical attempt to protect congressional

incumbents – *which attempt still, in any event, subordinated the traditional redistricting factors*

*to others* . . .") (emphasis added). To the extent that incumbent protection is considered at all

when drawing district boundaries, it should be *wholly subordinate* to the other more neutral

redistricting criteria adopted by this Court. District boundaries that are moved to accommodate

incumbents should be examined by courts with careful scrutiny.

This Court also should be aware that partisan party mapmakers, rather than protecting

incumbents, sometimes attempt to gain unfair advantage through gerrymandered districts that

target, rather than protect, incumbents. Partisan mapmakers can purposefully create districts that

pit the opposing party's incumbents against each other, thereby dramatically increasing the odds

that at least one of the opposing party's incumbents will be defeated in a primary or general

election. Regardless of whether the goal is to protect or attack incumbents, drafting decisions that

are designed to help or hurt individual candidates deprive all candidates of an equal opportunity

Page | 15

to be elected, and therefore are inconsistent with Article 1, Section 5 of the Pennsylvania Constitution. .[5]

## III.   CCFD'S REDISTRICTING METHOD PROVIDES A STEP-BY-STEP GUIDE TO NEUTRAL REDISTRICTING THAT CAN ASSIST THIS COURT IN EVALUATING THE PROPOSED MAPS.

### A.   The History and Development of the CCFD Method

The CCFD method of redistricting was developed by examining the characteristics of the Pennsylvania Congressional maps from the 1930s to the 1970s. Such maps appeared to have been drawn in good faith to provide the requisite number of seats required by each census; blatant partisan gerrymandering by cracking and packing opposing party voters was absent. We observed that such districts invariably were uniformly compact and composed of unbroken counties, townships, and other political subdivisions. We further observed that after the United States Supreme Court's decision in *Wesberry v. Sanders*, 376 U.S. 1 (1964), the Congressional maps consisted of districts composed of whole counties assembled compactly and portions of larger population counties divided compactly.

The 1972 Pennsylvania Congressional map was the true inspiration for the CCFD method

---

[5] If the drafter is permitted to separate incumbent candidates in drafting their districts, this should be done so as not to give any party a seat share in excess of what is anticipated (looking at statewide vote shares over enough elections to ensure partisan fairness). When the division of incumbents into separate districts is done by exchanging territory with a similar partisan vote history, the statewide seat share will be unaffected. On the other hand, where conservative territory is exchanged for liberal voting territory to separate incumbents, or vice versa, separating incumbents can be used as an excuse for seeking partisan advantage. Again, a court must look carefully at any final adjustments to an electoral map to make sure that final proposed map approximates the will of the voters.

Page | 16

and is still relevant for ideal reapportionment today.



Specifically, the boundary choices along the Bucks County-Montgomery County border and the Allegheny County-Butler County border in that map are still a model for redistricting today. *See* District 8 on the Eastern border in grey and District 26 on the western border in light blue.

Page | 17



In each of the above instances, equal population was achieved by adding territory composed of whole townships and other political subdivisions in layers along a common border.

CCFD members then considered the following: "What if there were a set of rigorous design guidelines for drawing maps, consistent with Article II, Section 16 of the Pennsylvania Constitution, that made it extremely difficult to draw an unfair map, that is, a partisan gerrymandered map?" Thus, the CCFD method was developed. Rooted in Article II, Section 16 of the Pennsylvania Constitution, all districts must be composed of compactly assembled counties or other larger political subdivisions, and then whole pieces consisting of the next smaller political subdivision are added in layers along the district boundaries until equal population is achieved. In many ways, the layering of whole political subdivisions along a

Page | 18

common border is simply a means to create highly compact districts.

To make the method easier for map drawers to apply, CCFD devised a step-by-step guide to neutral redistricting, which was submitted to this Court in two amicus briefs in 2018 during the *LWV* litigation. We have worked to improve the articulation of the method over time.

B.    A Step-by-Step Guide to Neutral Redistricting (for Congressional Maps)

The CCFD method utilizes the following step-by-step approach to neutral redistricting:

**Step 1.**  The drafter of a new Congressional map should divide the state by the number of required districts based on the most recent decennial apportionment. In this case, 17 districts should be formed using whole counties or whole pieces of the largest political subdivisions in a visually compact manner.

> For a political subdivision with a population larger than a single Congressional district, the drafter first must draw as many districts as possible within that political subdivision, using as much of the subdivision's territory as possible in a compact manner. The drafter then should add any unused territory to no more than two adjacent districts in need of additional population.

> For a political subdivision with a population smaller than a single Congressional district, the drafter should begin by assembling larger political subdivisions (*e.g.,* counties) compactly to create the required number of districts. If necessary to divide a larger political subdivision, it should not be divided between more than two districts.

**Step 2.**  The drafter then should add or subtract whole territory of the next smaller political subdivisions along the borders of counties or other larger political subdivisions in a compact manner.

> In practice, this usually means that additional whole townships, towns, or boroughs are added along the whole length of a common boundary of a larger political subdivision (*e.g.,* counties) before moving to the next layer of smaller political subdivisions. The drafter shall continue to add whole political subdivisions of the next smaller size, in a layer-by-layer manner, until nearly equal population is achieved.

> This layered method creates compact districts in the first instance and deprives the drafter of discretion to, for example, produce long "tentacles"

Page | 19

or odd-shaped districts, reaching from one district into another for purposes of partisan gerrymandering.

**Step 3.**  The drafter then should divide one, and only one, smaller political subdivision along the common border between two proposed districts to achieve the target population of each district (plus or minus one resident), that is, population equality, based on the 2020 Census.

> The division of this single political subdivision should be accomplished in a compact manner using the layered approach set forth in Step 2. For example, one can add precincts one by one to the boundary of a township to reach population equality.

**Step 4.**  The drafter then should measure the compactness of the resulting districts using commonly accepted mathematical compactness measures such as Polsby-Popper, Schwartzberg, and Reock scores. Districts that perform poorly when measured in this manner, given constraints imposed by other mandatory criteria, should be adjusted to bring them into compactness ranges considered acceptable for these measures.

**Step 5.**  The drafter then should verify that the resulting map does not inadvertently divide racial or linguistic minority groups and make adjustments necessary to ensure that the map does not violate the Voting Rights Act, 52 U.S. Code § 10101, et seq. ("VRA"). Often, little or no further adjustment will be required as compact districts generally result in intact community representation, which leads to compliance with the VRA.

**Step 6.**  The drafter should then make adjustments, if any, needed to achieve the fifth primary criterion—assuring partisan fairness—and making the most minimal adjustments to achieve any subordinate goals/criteria that do not result in, or serve simply as proxies for, partisan gerrymandering.

The CCFD method results in a map that (a) does not consider partisan leanings of residents until after, if at all, a draft map is formed, (b) is transparent, because the decisions made to draw district lines result from the rigorous application of this method, and (c) provides for a judicially manageable redistricting standard, because courts can easily see when other maps choose boundaries that are non-compact and contain split political subdivisions or irregular boundaries in the absence of a layered approach to equalizing population.

Page | 20

General Business

C.      The Court's 2018 Remedial Map Largely Comports with the CCFD Method.

A detailed CCFD review of the 2018 remedial Congressional map below revealed that this Court's expert appears to have used the CCFD method of assembling counties compactly in the first instance and then layering whole townships and other political subdivisions at the district boundaries to equalize population. Assembling counties compactly can be seen clearly in districts 1-5, 7, 8, 10, 11, and 15-17. Layering smaller political subdivisions can be seen in districts 1 and 4 (Bucks-Montgomery County border), districts 7 and 8 (the Northampton-Monroe County border), and districts 15 and 16 (the Butler-Armstrong County border). The technique of minimizing county and other political subdivision splits can be seen throughout the 2018 remedial map.

The 2018 remedial map led CCFD to other insights about the merits of applying in a strict or rigorous manner the four criteria mandated by *LWV*. First, the remedial map resulted in a fair distribution of seats. The map was tested twice, in the 2018 and 2020 elections. In both, the 2018 map resulted in a 9-9 Republican-Democratic seat share for a state whose voters vote fairly evenly on a statewide basis. In addition, highly compact districts deprive the partisan drafter of discretion he/she otherwise would have to crack and pack opposing party voters.

Page | 21

D.      The Emergence of a Judicially Manageable Standard



By requiring that districts be composed of compactly assembled whole political subdivisions, this Court has created a neutral, judicially manageable standard. Each of the four criteria are subject to mathematical analysis and comparison. Compactness can be measured by common mathematical techniques, which can be used to compare one proposed map to another. Divided political subdivisions can be totaled up and compared from one map to another. Maps with elongated districts or many municipal splits are strong evidence of partisan drafting. Packing opponent's voters, cracking concentrations of an opponent's voters, and carefully distributing votes to give the drafter's party an electoral advantage often require drawing districts with irregular borders or split municipalities. Likewise, partisan fairness, the fifth criterion that we urge this Court to adopt, can be proven mathematically as noted above and in the attached expert report, by using commonly accepted metrics of partisan fairness. *See* Ex. A.

Where a drafter deviates from the principles enshrined in these criteria, this Court should find that a *prima facie* case of gerrymandering has occurred. Given a well-defined model for fair electoral mapmaking, the burden should shift to a map's proponent to offer a neutral explanation for any deviations, which the competing parties then could debate. There could be innocent explanations, for example, leftover territory between two well drafted districts, or ensuring diversity of representation in a legislature. However, where the final map's adjustments from the neutral criteria cannot be adequately explained by the drafter, then the process has gone awry. Either the parties should repair the map or this Court should step in to repair the map for them.

E.    CCFD Endorses Other Amici Maps That Follow the Principles Reflected in the Court's 2018 Remedial Map and Offers an Illustrative 17-Seat Congressional Map Applying Its Methodology.

CCFD endorses the following four maps that the following parties and amici have submitted as excellent examples of applying the principles embodied in the 2018 remedial map to a 2022 17-seat Congressional map: the Carter petitioners (Prof. Jonathan Rodden); the Gressman Petitioners; the Governor Wolf map (Prof. Moon Duchin); and the Draw the Lines Map (citizen mappers). These maps rigorously apply this Court's four criteria as well as the recommended additional requirement that maps incorporate partisan fairness. Each of these maps are highly compact and contiguous, minimize split political subdivisions, and (if relevant) do not exceed the anticipated seat share of the drafting party. For additional information regarding these recommendations See Ex. A CCFD Expert Report at __

In order to demonstrate how principles reflected in the 2018 map can be applied to a 17-seat Congressional map, CCFD offers the following map, which can be accessed on Dave's

Page | 23

Redistricting at the following link:

https://davesredistricting.org/join/19665c18-15a3-4b94-a254-f93d3feb984c

The full map data also can be downloaded from Dave's Redistricting for analysis in and

by other redistricting software. The following figure is an image of the CCFD proposed 17-seat



Congressional map showing the location of incumbent Members of Congress.

The technical data for this CCFD map is attached hereto as Exhibit A.

We also note that the CCFD map has the following characteristics: the districts are (1)

highly compact; (2) where additional territory is needed to equalize population, whole townships

or other political subdivisions are added in layers at county borders; and (3) the map achieves

Page | 24

partisan fairness with an anticipated seat share that matches the statewide distribution of voters. Highly compact districts can be seen in districts 1 to 4, 6 to 8, 10 to 12, and 14 and 15. The remaining districts, 5, 9, 13, and 16, which are slightly less compact, can be explained by neutral separation of incumbent members of Congress, or geographic constraints. The anticipated seat share of the 17-seat CCFD map, based on recent statewide elections, is nine Democrats and eight Republicans.

The aforementioned four fair maps and the CCFD map all have the following favorable attributes:

a) 17 equal population districts (plus or minus one person) based on the 2020 Census;

b) Districts are compact, which is healthy for representative democracy and resistant to partisan gerrymandering;

c) Districts composed of compactly assembled political subdivisions result in seats that reflect regional political views;

d) Compact districts in areas with conservative, moderate, and liberal voters tend to create a healthy number of competitive districts where candidates usually will have to cross party and ideological lines to get elected; and

e) The presence of some competitive seats is a desired outcome for the following reasons: (1) competitive seats often generate moderate candidates who compete for votes from members of all parties and independent voters; (2) competitive seats tend to depolarize legislatures; and (3) competitive seats tend to promote dialogue across party lines, compromise, and effective

functioning of legislatures to pass laws.

## IV.    CONCLUSION

One of the greatest threats to democracy is partisan gerrymandering. The best weapon to end partisan gerrymandering is compliance with all of the following: the four neutral criteria enumerated in Article II, Section 16, the requirement of partisan fairness embodied in Article I, Section 5, and the federal requirement of fair minority representation as defined by the Voting Rights Act.

In general, compact districts, composed of whole political subdivisions, restrain partisan gerrymandering. While it is possible to weaponize compactness as a tool to pack Democrats in cities and inner ring suburbs, in most instances compactness will result in a fair distribution of seats for all political parties, and it therefore is a useful tool for this Court to use to police partisan maps. As long as courts remain open to evidence of compactness being used to achieve an outsized seat share based upon the statewide vote share of a party, this criterion can be policed to prevent partisan gerrymandering.

The United States Supreme Court in *Vieth v. Jubelirer,* 541 U.S. 267, 307-308 (2004), and *Rucho v. Common Cause,* No. 18-422, 139 S. Ct. 2484, 2487, 588 U.S. ___ (2019), said it is impossible to create a judicially manageable standard to evaluate and judge partisan maps, but that is not the case. This Court already has created and applied such a standard in *LWV,* and the resulting remedial map. This standard needs to be honored, reiterated, and extended by this Court in this redistricting cycle. This Court should continue to follow the drafting criteria in *LWV,* and adopt "partisan fairness" (with its attendant accounting for statewide party vote shares) as an

General Business

explicit additional primary criterion, thereby preserving the most important tool for fighting

partisan gerrymandering that any court in the United States has ever articulated.

Respectfully submitted,

/s Brian A. Gordon

_____

Brian A. Gordon
Gordon & Ashworth, P.C.
168 Idris Road
Merion Station, PA 19066
(610) 667- 4500
Briangordon249@gmail.com
On behalf of
Concerned Citizens for Democracy

General Business

IN THE SUPREME COURT OF PENNSYLVANIA

Carol Ann Carter, et al.
        Petitioners

      v.                                             7 MD 2022

Leigh M. Chapman, et al.
        Respondents.


## CERTIFICATE OF SERVICE


On this date, February 14, 2022, I served a true and correct copy of the foregoing

pleading to all parties in this matter via e-filing with this Court's Unified PA Judicial website.

Respectfully submitted,


/s Brian A. Gordon

_____
Brian A. Gordon
Gordon & Ashworth, P.C.
168 Idris Road
Merion Station, PA 19066
(610) 667- 4500
Briangordon249@gmail.com
On behalf of
Concerned Citizens for Democracy

Received 2/14/2022 9:01:53 PM Supreme Court Middle District

# Exhibit A

# Report on Proposed Map of Concerned Citizens for Democracy
## Anne Hanna and Robert Hess
### *Carter v. Chapman*, 7 MM 2022 (Supreme Court of Pennsylvania)
### February 14, 2022

This report presents the proposed remedial 17-seat Congressional map of Concerned Citizens for Democracy (CCFD), analyzes its features, compares it with the present 18-seat Congressional map, and addresses some of the technical issues raised in the Special Master's report to the Court.

This map was designed using the CCFD hand-design mapping methodology, which easily produces districts satisfying the four traditional neutral redistricting criteria of compactness, contiguity, population equality, and minimization of political subdivision splits. In this methodology (set forth in the associated legal brief), one first constructs an initial draft by following four simple steps to produce a first-stage map satisfying the traditional neutral criteria, without yet considering other factors. After this first-stage map is complete, it may then be adjusted, altering some of the initial discretionary decisions while continuing to follow the guidance of the first four steps, to address vote dilution concerns under the federal Voting Rights Act or the Free and Equal Elections Clause (FEEC) of the Pennsylvania Constitution (Article I, Section 5), as well as to incorporate desired subordinate criteria. Given the politically charged nature of the present process, the design process for the CCFD proposed map included incumbent contest avoidance (but *not* intentional incumbent advantage) as a subordinate criterion, in order to produce a final result that may be more palatable to a broader range of stakeholders, while still prioritizing all legal mapping requirements.

## 1. Qualifications and Experience

**Anne Hanna** designed and analyzed the CCFD proposed map. She is a data scientist who testified as an expert witness in *Agre v. Wolf*, 284 F. Supp. 3d 591 (E.D. Pa. 2018), the federal anti-gerrymandering case that challenged the 2011 Pennsylvania congressional map before a federal three-judge panel. Her education includes a B.S. in Physics (California Institute of Technology, 2001) and an M.S. in Physics (University of Illinois at Urbana-Champaign, 2005), and she is presently a Ph.D. student in mechanical engineering at the Georgia Institute of Technology, developing data-driven numerical modeling methods for the study of the material properties of composites with complex microstructures. She is a two-time winner of Draw the Lines Congressional mapping competitions. In addition to her work with CCFD, she is a volunteer member of the Draw the Lines Citizen Map Corps and provides mapping and analytical support to Fair Districts PA. She has lived in Philadelphia since 2009.

1

**Robert Hess**, Ph.D., CFA® analyzed the Special Master's proposed findings of fact and conclusions of law, as well as her mapping recommendations.  He is a research analyst and economist with more than 40 years' experience, specializing in regional economic analysis, regional impact analysis, and real estate investing.  He received his Ph.D. in Economics from the University of Colorado in 1978.  He completed his undergraduate studies in physics at the Colorado School of Mines (1969).  He holds an M.S. degree in Aerospace Engineering Sciences from the University of Colorado (1971).  He became a Chartered Financial Analyst (CFA) charter holder in November 2000.

Dr. Hess retired in March 2010 from Prudential Real Estate Investors (now PGIM Real Estate) as a Principal, accumulating more than 16 years of experience providing expertise in the quantitative analysis of regional markets, market selection strategies and investment portfolio analysis.  An active industry participant, he served as Chair of the Research Committee of the National Association of Real Estate Investment Fiduciaries (NCREIF) from 2007 to 2009 and served on the NCREIF-PREA (Pension Real Estate Association) Reporting Standards Council from 2011 to 2016.  During his working career, he also served on staff research positions at several other financial institutions, consulting firms, and government offices.  He has provided data analysis and mapping support to CCFD since 2017.

## 2. Data Sources and Tools

All map design and most analysis in this report were performed in Dave's Redistricting App (DRA), a free, publicly-available online redistricting mapping and analysis tool available at http://www.davesredistricting.org.  The population dataset used was DRA's "Total Population 2020" Census data for Pennsylvania, which does *not* include the prisoner residence adjustments that were used by the Pennsylvania Legislative Reapportionment Commission (LRC).

The site offers a variety of election datasets from 2016 forward.  The specific election dataset used for each analysis will be noted in each case.

Some additional analyses were performed offline using QGIS, a free, open-source GIS suite available at http://www.qgis.org.  For these analyses, underlying population and geographical data were derived from the "2021 Data Set #1 (Without Prisoner Reallocation)" files provided by the LRC on its website at https://www.redistricting.state.pa.us/maps/.

Incumbent address data, for incumbent contest identification, was obtained from the Pennsylvania Department of State's publicly-accessible version of its voter registration database,

obtained via https://www.pavoterservices.pa.gov/Pages/PurchasePAFULLVoterExport.aspx on July 12, 2021.

### 3. The CCFD Proposed Map

The CCFD proposed map can be accessed on Dave's Redistricting at the following link:

  https://davesredistricting.org/join/19665c18-15a3-4b94-a254-f93d3feb984c

Full map data can also be downloaded from DRA for analysis in other redistricting software. Figure 1 below is an image of the map.

Fig. 1: CCFD Proposed 17-Seat Map



The map was designed by following the CCFD methodology. There were two major design stages —— producing an initial draft solely based on the four traditional neutral criteria, and then adjusting that draft to avoid vote dilution and address certain subordinate criteria.

3

## 4. Map Design Stage 1 (Methodology Steps 1-4)

In the first stage, an initial draft was produced by following steps 1-4 of the CCFD methodology, without close attention to details of partisan impact, incumbent locations, or racial composition of districts, albeit with unavoidable influence from the mapper's knowledge of community and regional identities in our state and previous district designs.

The overriding concerns in this initial draft were simply following the traditional neutral criteria, using methodology steps 1-4 as guides.  Rough district prototypes were created as compact assemblages of whole counties, splitting each county no more than necessary,[1] and splitting no more than one county at each boundary between two districts, to begin the population equalization process.  District populations were then fully equalized to 12 districts with 764,865 people and 5 districts with 764,864 people by subsequently splitting one municipality at each county split, one political ward in that municipality, and one precinct in that political ward, to equalize district populations while minimizing political subdivision splits.

The usual number of county, municipal, ward, and precinct splits by this method is the number of districts minus 1 at each level, i.e., 16 of each type of split on a 17-district map.  It is sometimes possible to find clever ways of achieving fewer splits, while additional mapping concerns or anomalies may occasionally require more splits.  Larger numbers of districts also tend to produce more variability in the number of splits required, as there may be more anomalous regions to contend with.  However, "the number of districts minus 1" is a good rule of thumb to estimate the lowest reasonably feasible number of splits in most maps.

The final results of the first mapping stage are shown in Figure 2 below and may be accessed in more detail at the following URL:

https://davesredistricting.org/join/ed075229-5210-4e51-b4fe-0d5ea9ce59fb

---

[1] Counties with population less than an ideal district (i.e., the total population of the Commonwealth divided by 17) were split no more than once (i.e., between two districts).  Counties with population larger than an ideal district were split amongst no more than the number of districts that could fit entirely within the county, plus 2.  (The "plus 2" comes first from the fact that the "remainder" population above the maximum number of whole districts *must* be assigned to at least one additional district, and then from the fact that there are sometimes theoretical or practical limits in certain unusual map topologies that make one additional split beyond the bare minimum necessary or preferable.)

4

Fig. 2: First design stage of CCFD Proposed 17-Seat Map (traditional neutral criteria only)



2021 Congressional Incumbents
● Republican
● Democrat
✕ Not Running

The current Congressional map was imposed by the Pennsylvania Supreme Court as part of its 2018 decision in *League of Women Voters v. Pennsylvania, 159 MM 2017* (*LWV*), to remedy the extreme partisan gerrymander of 2011, and was therefore presumptively legal when enacted. As a result, we will use it as a point of comparison for our proposed map, albeit with some caution because of the different number of Congressional seats (18 seats in the current map, *vs.* a coming reduction to 17).  Figure 3, below, shows an image of this map.

Fig. 3: Current 18-Seat Congressional map (as of *LWV v. PA*, 2018)



2021 Congressional Incumbents
● Republican
● Democrat
✕ Not Running

Many of the districts in the CCFD first-stage map bear some resemblance to their counterparts in the current Congressional map, and with good reason —— both maps are constrained by the same traditional neutral criteria, and influenced by the same Pennsylvania mapping traditions and underlying state geography, such as:

- Avoiding splitting Bucks County (which has never been split at the Congressional level)
- Keeping most of Montgomery County in one district (as it is slightly larger than one district in population and was badly and illegally split amongst 6 and 5 districts, respectively, in the gerrymandered 2002 and 2011 maps)
- Keeping the Lehigh Valley in one district
- Keeping Scranton/Wilkes-Barre in one district
- Keeping Reading, Lancaster, York, Harrisburg, and State College mostly together with their respective near suburbs
- Avoiding splitting the city of Pittsburgh
- Avoiding splitting Erie County

The above traditions of privileging certain specific counties, metropolitan areas, and cities for extra attention in split avoidance do not, of course, have the intrinsic status of legal requirements,

6

A2511

although they may, like any mapping decision, have meaningful impacts (positive or negative) on legal questions related to traditional neutral criteria and vote dilution, or on desired subordinate criteria.  Rather, following in the tracks of the 2018 *LWV* decision and most past Pennsylvania maps in avoiding splitting these regions, those traditions served as a simple, non-partisan, tiebreaker factor in regions where meaningful mapping discretion existed in this first stage of traditional-neutral-criteria-only mapping.

The changed mapping conditions since 2018 also result in some necessary large-scale structural differences between the present 18-seat Congressional map and this first-draft 17-seat Congressional map, including:

- A decrease in the total number of districts from 18 to 17, requiring each of the remaining districts to absorb a larger total population and thus to increase its land area
- Relative population declines in rural and western Pennsylvania, and relative population increases in urban and eastern Pennsylvania, resulting in districts in the former regions needing to grow more than in the latter

Nevertheless, the traditional neutral criteria statistics of this initial draft are comparable to or better than those of the 2018 *LWV*-imposed Congressional map that is currently in effect, as shown in Table 1 below.

Table 1: Traditional neutral criteria for CCFD first-stage map

|  | **2018 *LWV* 18-seat map** | **CCFD 17-seat map, first stage** |
|---|---|---|
| **Contiguous** | Yes | Yes |
| **Maximum-minimum district population difference** | 1 person (at enactment) | 1 person |
| **Polsby-Popper compactness** | 0.3270 | 0.3682 |
| **Reock compactness** | 0.4278 | 0.4328 |
| **County splits (Split counties)** | 18 (14) | 16 (15) |
| **Municipal splits (Split municipalities)** | 19 (18) | 16 (15) |
| **Precinct splits** | 32 (at enactment) | 16 |

Note that an 18-seat map likely requires one more split at each level (expected minimum of 17 splits) than would be needed for a 17-seat map (expected minimum of 16 splits).  The first-stage CCFD map achieves the minimum for its seat count of 16 splits of 15 counties (with Philadelphia

7

A2512

split twice), while the 2018 *LWV* map had slightly more than the expected minimum, at 18 splits of 14 counties (Berks, Butler, Montgomery, and Philadelphia all split twice).  In all cases except Philadelphia, the second split in each twice-split county of the *LWV* map was a small sliver removed to equalize populations with a neighboring district, and the bulk of each county was in a single district, rendering these excess splits relatively non-disruptive.  As Philadelphia has enough population for more than two districts, in both 17-seat and 18-seat maps, a minimum of two splits are always required there.

## 5. Map Design Stage 2 (Methodology Steps 5-6)

The traditional neutral criteria are not the only factors in play in Pennsylvania redistricting.  Concerns about vote dilution based on federal VRA considerations (racial, ethnic, or linguistic minority status) or on Pennsylvania FEEC considerations (other group memberships such as partisan preference) may also be present.  Other wholly subordinate considerations, such as avoidance of incumbent contests, may also be present.  These considerations necessitate a second design stage, described in steps 5-6 of the CCFD methodology.  In these last two steps, the initial map is modified to address considerations beyond the traditional neutral criteria while maintaining the traditional neutral criteria statistics as much as possible.  For the second mapping stage of our proposed 17-seat map, we considered the following three factors:

- Majority-minority districts (note that this should not be construed as a full VRA analysis, merely a simple first-order test)
- Partisan proportionality and symmetry (to respect the Pennsylvania FEEC)
- Incumbent contest avoidance, but not incumbent advantage (to improve political palatability of the map; this criterion was considered wholly subordinate to the others)

The relevant statistics for our first-stage 17-seat map, as compared to the 2018 *LWV* map, are in Table 2 below.

8

Table 2: Racial, partisan, and incumbent statistics for CCFD first-stage map

|  | **2018 *LWV* 18-seat map** | **CCFD 17-seat map, first stage** |
|---|---|---|
| **Majority-minority districts** | **District 2:**<br>59.74% minority<br>*26.97% Black*<br>*23.00% Hispanic*<br>*9.77% other minority*<br><br>**District 3:**<br>64.78% minority<br>*51.33% Black*<br>*5.04% Hispanic*<br>*8.41% other minority* | **District 2:**<br>58.49% minority<br>*26.09% Black*<br>*22.14% Hispanic*<br>*10.26% other minority*<br><br>**District 3:**<br>62.95% minority<br>*48.72% Black*<br>*5.47% Hispanic*<br>*8.76% other minority* |
| **Ideal proportional seat count** | **18 seats:** 9.44 D, 8.56 R | **17 seats:** 8.92 D, 8.08 R |
| **Likely seat count** | 9.31 D, 8.69 R | 8.35 D, 8.65 R |
| **Raw seat count** | 10 D, 8 R | 9 D, 8 R |
| **Seats bias (+ favors Rs)** | +5.07%  (+0.91 seats) | +8.05%  (+1.37 seats) |
| **Votes bias (+ favors Rs)** | +1.79% | +2.74% |
| **Mean-median gap (+ favors Rs)** | +0.07% | +0.88% |
| **Incumbent contests** | None<br>(at enacttment) | **District 5:**<br>Mary Gay Scanlon (D)<br>Chrissy Houlahan (D)<br><br>**District 9:**<br>Dan Meuser (R)<br>Fred Keller (R) |

Partisan statistics for Table 2 were computed using the DRA "Composite 2016-2020" election dataset, an average of several of the most recent statewide elections.  This dataset has a statewide two-party vote share of 52.46% for Democrats and 47.54% for Republicans.  Corresponding proportional seat counts for this statewide result are shown in the table.

"Likely" seat counts use DRA's seat win probability estimates to get expected results for an actual election, ignoring incumbent advantage and other variability.  "Raw" seat counts assume that the party which is ranked by the election data as having the highest vote share in that district wins the seat, even if narrowly, still ignoring the effects of individual candidate qualities.

9

Seats bias and votes bias use DRA's model of how precinct-level election outcomes change as the overall statewide vote shares of the two major parties shift, to see whether either party is at a disadvantage. Specifically:

- Seats bias: How much less than half the seats does a party win when it receives 50% of the statewide 2-party vote?
- Votes bias: How much more than 50% of the statewide 2-party vote would a party need to receive in order to win half of the available seats?

Positive numbers mean the Democratic Party is at a disadvantage and the Republican Party has an advantage, while negative numbers indicate the reverse.

The mean-median gap measures the difference between the overall statewide 2-party vote share and the 2-party vote share of the median district. A large difference means that the 2-party vote share distribution of the districts is skewed in favor of one party — more districts are more favorable to them than one would expect. A positive number in the table indicates a Republican advantage.

From this table we can see several points of potential improvement for the first-stage map relative to the vote dilution criteria and our subordinate criterion of incumbent contest avoidance:

**Minority-majority districts**

While the CCFD first-stage map has approximately the same two majority-minority districts as the 2018 map, Districts 2 and 3, and while the total minority populations of both districts are similar, District 3 is slightly less than majority-Black in the CCFD first-stage map, while it is narrowly majority-Black in the present map. While creating supermajority-minority districts sometimes runs the risk of unnecessarily packing both Black voters and Democratic voters, advocacy groups are often skeptical of changes which push a district from having a majority of a single racial or ethnic group to requiring a cross-ethnic coalition for victory.

Fortunately, the percentage change in racial composition of District 3 is small, and is easily remedied in the final version of the map, without too much change to neighboring district statistics. This is accomplished via relatively minor boundary shifts — a slightly whiter region of Northwest Philadelphia moves to join most of Montgomery County in District 4, allowing District 3 to include more of heavily-Black West Philadelphia. The cost is a single additional county/municipal split in Philadelphia, for a total of 4 Philadelphia splits, still meeting our county split limit for the city, and balanced by the removal of a split in Berks County that was previously providing extra population to District 4.

**Incumbent Contests**

Two pairs of incumbents are placed into potential contests in the CCFD first-stage map, which was designed without detailed reference to their locations. Two Democrats meet in Democratic-leaning District 5, while two Republicans meet in strongly-Republican District 9. This outcome at least penalizes both parties equally, and so does not impact the partisan fairness of the map, but nevertheless fails to avoid incumbent contests as well as the 2018 *LWV* map did.

The fact that Pennsylvania is losing one seat this year does not intrinsically force any incumbent contests, as one Democratic incumbent (Mike Doyle, District 18) is retiring, and another (Conor Lamb, District 17) has announced a run for the U.S. Senate. However, there is somewhat of a "traffic jam" of Representatives concentrated in eastern Pennsylvania, which produces the two incumbent contests in our initial incumbent-blind draft. These contests therefore require some specific attention, in order to satisfy the incumbent contest avoidance subordinate criterion.

*Resolving the Scanlon/Houlahan contest*

Houlahan lives in Chester County, right at the corner where Chester, Montgomery, and Delaware Counties meet. Scanlon lives approximately in the center of Delaware County. The first-stage map puts both in a 5th District that consists of all of Delaware County, a small piece of southwestern Philadelphia, and a number of border municipalities in eastern Chester County. As Houlahan lives in one of those border municipalities, to keep the two Representatives apart, it is necessary to have the 5th District either "go around" her to keep her out of the 5th district, or push the 5th into Montgomery County or further into Philadelphia.

Taking more of Philadelphia would in turn push Philadelphia's 2nd District partway into Bucks County (which we and others have prioritized not splitting), while adding part of Montgomery County threatens to pull Madeleine Dean into the 5th District, as she lives near the southern tip of Montgomery County. So, instead, the 5th District's Chester County portion was reshaped to include the southern portion of the county, along its borders with Delaware and Maryland, moving Houlahan into the 6th District. This unfortunately created a new incumbent contest with Republican Lloyd Smucker, who lives near Lancaster, and so the 6th District was migrated to include most of Berks County (to the north), instead, while the 11th gave up most of Berks and took the rest of Lancaster instead.

The final result was Scanlon remaining in the 5th District, Houlahan moving to the 6th District, and Smucker moving to the 11th District.

The impacts of resolving this contest were relatively localized and did not result in a net increase in political subdivision splits. The new 5th District is somewhat less compact than before, but, as we will see below, the overall impact on the map compactness statistics is small.

*Resolving the Meuser/Keller contest*

Separating Meuser and Keller has a somewhat broader impact. Snyder County, where Keller lives, is shifted from the 9th District to the 12th, the remainder of Blair County, where Republican John Joyce lives, is shifted to the 13th District, along with Bedford County, and Potter County moves to the 9th to help make up for the population loss of Snyder. There are several additional smaller adjustments around Harrisburg, northern Dauphin County, southern Centre County, and northern Clinton County, to help complete the population rebalancing without introducing excess splits and while keeping districts reasonably compact.

To make up for other population losses, the 15th District now also pushes westward to include Warren, Forest, Venango, and most of Butler County (halted only by the presence of Republican Mike Kelly in the center of Butler County). This, in turn, pushes the 16th District down into the northern half of Beaver County, and moves the 14th District down, out of Butler County and further into the northern portion of Washington County. The Allegheny portion of the 14th District must be reoriented to keep the 14th and 17th Districts compact, but the choice of precisely *how* to reorient it is a matter for the partisan fairness discussion.

The net result of these changes is:

- two additional county/municipal/precinct splits, resulting from:
  - splitting off the northern half of Dauphin County to maintain the population of the 9th District
  - splitting Beaver County to maintain the population of the 16th District
- a slight decrease in overall map compactness, with the most significant contribution arising from the east-west narrowing and north-south lengthening of the 16th District

As with the previous incumbent contest resolution, however, the overall statistics remain well within the reasonable traditional neutral criteria range. (The final results will be summarized in Table 3, below.)

**Partisan fairness**

At first glance, Table 2 appears to show that both the 2018 *LWV* map and the first-stage CCFD map produce closely balanced maps. The seat count statistics (both raw and likely) hover around 9D/9R to 10D/8R for the *LWV* map and 8D/9R to 9D/8R for the first-stage CCFD map, under the election dataset used. All of this might seem superficially reasonable for our "purple" state.

However, it is important to note that "eyeball" results from a single election dataset, even a multi-election, multi-year average dataset such as the DRA Composite 2016-2020 data underlying that table, are an inadequate measure of the partisan fairness of a map. First, while

12

A2517

Pennsylvania is generally considered to be a well-balanced "purple" state, the 2-party vote share of that dataset is actually 52.46% for Democrats and 47.54% for Republicans. This may seem like a small difference, but, converted proportionally into a district share, the difference in vote shares corresponds to 0.88 of a district on an 18-seat map and 0.84 of a district on a 17-seat map. In other words, one might expect that, if recent Pennsylvania elections averaged around a 52.46% Democratic seat share, Democrats would be expected to win, on average, nearly a full seat more than Republicans. One would therefore expect that analyses of a "fair" map performed using such an underlying election dataset would show a small but meaningful seat count advantage for Democrats.

In this light, even the seat count analysis already shows some warning signs in regard to the partisan fairness of the first-stage CCFD map. While the 2018 *LWV* map shows a slight "likely seat" advantage for Democrats of 9.31 D seats to 8.69 R seats, as one might expect from an election dataset with a slight Democratic advantage, the first-stage CCFD map actually shows a slight "likely seat" disadvantage under the same election data: 8.35 D seats to 8.65 R seats. Other statistics show even more if an imbalance — while both maps show a Republican advantage in seats bias (half the expected seat difference in a 50/50 election) and votes bias (the excess votes above 50% that a party has to win to receive half the seats), both bias scores show a more than 50% greater disadvantage for Democrats in the CCFD first-stage map than in the *LWV* map. The first-stage CCFD map also has a small mean-median gap favoring Republicans (i.e., more districts are more favorable to their candidates than one would expect), compared to the almost zero gap in the *LWV* map.

Despite the strong traditional-neutral-criteria statistics of the CCFD first-stage map, these significantly larger bias scores could potentially raise Free and Equal Elections Clause concerns about whether voters' ability to convert their votes into representation is being unfairly diluted based on their party preference. Thus, adjustments to the initial draft are potentially warranted to address this issue while still preserving the traditional neutral criteria statistics of the map as much as possible.

Fortunately, adjustments for partisan fairness do not, in this case, conflict with the previous adjustments made to preserve majority-minority districts and avoid incumbent contests. The majority-minority voting district adjustments primarily affected strongly Democratic-voting regions of the state and so had little impact on the overall partisan balance of the map. The incumbent contest avoidance adjustments actually improved the partisan balance of the map in several ways:

- Undoing suburban packing in Delaware and eastern Chester Counties
- Shifting more-rural northern Dauphin County into the 9th District, while incorporating more of eastern Cumberland County into the 10th District (reducing, although not eliminating, division of the more Democratic-leaning Harrisburg region)
- Moving more-rural Warren, Forest, Venango and eastern Butler Counties out of the 16th district and including more of somewhat more industrialized northern Beaver County in the district, thereby undoing some division of Pennsylvania's western "Rust Belt" region

The major partisan balance issue which remained after these adjustments was the potential for packing of the Pittsburgh region.  The "tradition" of not dividing the city of Pittsburgh during redistricting is relatively recent, unlike most other non-division traditions.  In the early part of the 20th Century, when Pennsylvania had more than 30 Congressional seats (for a maximum of 36 from 1913-1933), Congressional district populations were small enough that Pittsburgh was divided amongst multiple districts.  This continued until the 1982 redistricting, when Pennsylvania's apportionment fell from 25 to 23 seats, and Pittsburgh was undivided in Congressional redistricting for the first time.  Since then, seat counts in Pennsylvania have continued to fall, as other regions of the country grow faster than Pennsylvania, and Pittsburgh has remained undivided ever since.

Avoiding the division of municipalities is not only a traditional neutral redistricting criterion, it can also be important for avoiding cracking, that is, fragmenting the representation of small communities to the point where they are unable to have a meaningful voice in the selection of representatives of their choice.  This is the rationale behind the traditions of avoiding division of small metropolitan areas such as the Lehigh Valley, Scranton/Wilkes-Barre, Harrisburg, State College, Lancaster, Reading, York, and Erie — these regions are relatively populous compared to surrounding rural areas, but not so populous that the majority preferences of the residents of those regions can be translated into actual representation if the regions are divided amongst multiple districts.  However, the Pittsburgh metropolitan area, while not as large as the Philadelphia region, is still significantly larger than any other metropolitan area in the state.

While Pittsburgh itself, with a population of 302,971 as of the 2020 Census, is smaller than an ideal 17-seat Congressional district (764,864 or 764,865 people), its metropolitan area includes more than 2 million people (2,370,930) across 7 counties, equivalent to 3.14 Congressional districts.  The next-largest metropolitan area in the state is the Lehigh Valley, which, at 861,889 people, is only a little larger than 1 Congressional district (1.14 districts), small enough that it could easily be cracked by careless or malicious map design.  The Pittsburgh region, on the other hand, is large enough to potentially face the opposite challenge, that of being "packed" into as few districts as possible, to reduce the substantial ability of voters in the region to translate their votes into representation.  An insistence on abiding by the aforementioned relatively modern

14

A2519

"tradition" of refusing to split the city of Pittsburgh, the single largest concentration of voters in the region,  significantly exacerbates this risk of packing

Moreover, Pittsburgh has the largest concentration of Democratic voters in the southwestern part of the state, and the second-largest such concentration in the entire state.  A short-lived pseudo-tradition of privileging one specific municipality above all others for split avoidance may be a reasonable mapping criterion in a vacuum, but it becomes difficult to justify in the face of the overriding legal requirement to reduce the partisan bias of the map in order to abide by the Free and Equal Elections Clause of the state constitution.

Thus, the final major adjustment for partisan fairness in the CCFD 17-seat map was to split the city of Pittsburgh between the 14th and 17th Districts, along the natural dividing line at the Monongahela and Ohio Rivers, which cut the city approximately in half.  This relieves the previous packing of Democratic Pittsburgh voters solely into the 17th District, by somewhat reducing the overwhelming Democratic supermajority there (previously 68.69% Democratic 2-party vote share in the Composite 2016-2020 election data, now 62.88%).  Combined with previous changes for incumbent contest avoidance, the 14th District now moves from being a solidly-Republican district with a 38.97% Democratic 2-party vote share to being a competitive district with a 54.74% Democratic 2-party vote share, only slightly more Democratic than the dataset's statewide average Democratic vote share of 52.46%.

The end result of this second mapping stage is our final proposed map, which is shown again in Figure 4.

15

A2520

Fig. 4: CCFD Proposed 17-Seat Map (reprise)



## 6. Key Metrics of the CCFD Proposed Map

Together, the second-stage adjustments described above significantly improve the majority-minority, incumbent, and partisan fairness statistics of the CCFD proposed map, bringing it well in line with the example set by the Supreme Court's 2018 *LWV* map without significant harm to traditional neutral criteria statistics, as shown in Tables 3 and 4 below.

16

A2521

Table 3: Traditional neutral criteria for both map stages

|  | **2018 *LWV* 18-seat map** | **CCFD 17-seat map, first stage** | **CCFD 17-seat map, second (final) stage** |
|---|---|---|---|
| **Contiguous** | Yes | Yes | Yes |
| **Maximum-minimum district population difference** | 1 person (at enactment) | 1 person | 1 person |
| **Polsby-Popper compactness** | 0.3270 | 0.3682 | 0.3461 |
| **Reock compactness** | 0.4278 | 0.4328 | 0.4162 |
| **County splits (Split counties)** | 18 (14) | 16 (15) | 18 (16) |
| **Municipal splits (Split municipalities)** | 19 (18) | 16 (15) | 18 (16) |
| **Precinct splits** | 32 (at enactment) | 16 | 18 |

The number of county/municipal/precinct splits, while increased relative to the first-stage map, is still only 2 more than the expected minimum, identical to the excess in the 2018 map. The Reock and Polsby-Popper compactness scores have both slightly decreased, but the Polsby-Popper score remains higher than in the 2018 map, although Reock is now slightly lower. The contiguity and population equality are maintained, so that overall the second-stage map, our final proposed map, is comparable, on traditional neutral criteria grounds, to the 2018 map.

17

Table 4: Racial, partisan, and incumbent statistics for both map stages

| | **2018 *LWV* 18-seat map** | **CCFD 17-seat map, first stage** | **CCFD 17-seat map, second (final) stage** |
|---|---|---|---|
| **Majority-minority districts** | **District 2:** 59.74% minority *26.97% Black* *23.00% Hispanic* *9.77% other* <br><br> **District 3:** 64.78% minority *51.33% Black* *5.04% Hispanic* *8.41% other* | **District 2:** 58.49% minority *26.09% Black* *22.14% Hispanic* *10.26% other* <br><br> **District 3:** 62.95% minority *48.72% Black* *5.47% Hispanic* *8.76% other* | **District 2:** 58.49% minority *26.09% Black* *22.14% Hispanic* *10.26% other* <br><br> **District 3:** 65.40% minority *51.37% Black* *5.41% Hispanic* *8.62% other* |
| **Ideal proportional seat count** | **18 seats:** 9.44 D, 8.56 R | **17 seats:** 8.92 D, 8.08 R | **17 seats:** 8.92 D, 8.08 R |
| **Likely seat count** | 9.31 D, 8.69 R | 8.35 D, 8.65 R | 8.96 D, 8.04 R |
| **Raw seat count** | 10 D, 8 R | 9 D, 8 R | 10 D, 7 R |
| **Seats bias (+ favors Rs)** | +5.07% (+0.91 seats) | +8.05% (+1.37 seats) | +4.60% (+0.782 seats) |
| **Votes bias (+ favors Rs)** | +1.79% | +2.74% | +1.54% |
| **Mean-median gap (+ favors Rs)** | +0.07% | +0.88% | +0.88% |
| **Incumbent contests** | None (at enactment) | **District 5:** Mary Gay Scanlon (D) Chrissy Houlahan (D) <br><br> **District 9:** Dan Meuser (R) Fred Keller (R) | None (of those running) |

The 3rd District is now reinstated as a majority-Black district, with similar racial balance to the 2018 3rd District, and all incumbent contests are removed.  The likely seat count almost exactly matches the ideal proportional seat count for this election dataset, and the votes bias and seats bias are dramatically reduced to even below the levels found in the 2018 map.  The mean-median gap, relatively small to begin with, did not significantly change.

18

Overall, this map demonstrates that the CCFD methodology enables mappers to easily and simultaneously meet the standards of the 2018 *LWV* decision with respect to the traditional neutral criteria, protection against vote dilution based on race or political views, and incumbent contest avoidance. Neither traditional neutral criteria nor incumbent contest avoidance requires maps to enshrine discrimination against particular groups of voters. Any map which must be defended by claims that unfair and disproportionate vote dilution is simply "natural" should be considered highly suspect. The CCFD second-stage map sets a standard which any adopted map should be expected to meet or exceed.

With this in mind, we turn to an analysis of the Special Master's proposed map selection methodology.

## 7. Response to the Special Master's Proposed Findings of Fact and Conclusions of Law (Section V)

The remaining portion of this report addresses Sections V and VI of the Special Master's (SM) report. These sections presented, respectively, her proposed findings of fact and conclusions of law (Section V) and her map selection recommendations (Section VI).

First, we address Section V. In this section, the SM itemized many criteria for judging the suitability of the maps. For purposes of SM's discussion, the criteria fall into two groups: 1) the "Traditional Neutral Criteria" arising from requirements in the Pennsylvania Constitution and other court judgements; and (2) "Extra-Constitutional Considerations" drawn from the reports of the expert witnesses.

Table 5 (below) tabulates all of the criteria and applicable metrics the SM assembled in Section V.

**Traditional Neutral Criteria**
   **1) Contiguity**
The SM found that all of the maps satisfy this criterion.

> *Comment:* With the development of several online tools for creating districts (e.g. Dave's Redistricting App), the process ensuring contiguity has become relatively easy. This is particularly true at the Congressional level, as the number of discrete boundaries tends to be relatively small. As a result, achieving contiguity no longer requires focused effort.

   **2) Population Equality**
The SM addressed two aspects of the population equality criterion: 1) selection of the proper database of population figures: all but the Ali Plan use the approved Legislative

Reapportionment Commission (LRC) Dataset #1; 2) the variation of populations among the districts: the SM noted that the Carter plan and the House Democratic Caucus plan achieve a variation of 2 persons, while all others achieve a variation of 1 person.

> *Comment:* Selection of the proper dataset for computing populations seems, on the surface, to be a simple decision. However, the LRC certified two different datasets: 1) one relatively consistent with the Census Redistricting database; and 2) one adjusted for prisoner residence to home instead of the prison location. Complicating the issue somewhat is the fact that Dave's Redistricting App, one of the online redistricting software tools, continues to apply the Census Redistricting populations. This has little impact on the populations of districts except when differences between the Census and the LRC Datasets lie across a district boundary.

> The U.S. Supreme Court has ruled that there are no *de minimis* population variations that satisfy the requirements of one person, one vote. Nonetheless, in *Karcher v. Daggett*, the case that rejected a New Jersey redistricting plan with 0.7% population deviation, the problem was not the population deviation itself, but that New Jersey "did not meet their burden of proving that the population deviations in the plan were necessary to achieve a consistent, nondiscriminatory legislative policy." The 2 person variation in the Carter and House Democratic Caucus plans are allowable as the submissions articulate explicit justification for the plans they submit. According to the National Conference of State Legislatures, 14 other states have population deviations of greater than 1 person in their Congressional districts, with no precedent establishing that those deviations *automatically* violate the Constitutional requirement of one person, one vote.

> As a matter of fact, very small population uncertainties exist in all population statistics. From an enumeration point of view, knowing the exact populations of districts is impossible. Many factors can contribute to uncertainties in the tabulation of region membership at any point in time. Examples include reporting errors (or even deliberate mis-reporting) on the part of individual households, tabulation errors creating misidentification of actual address locations, deliberate adjustment of small-area data points by the Census to insure resident anonymity. Beyond tabulation errors, populations change over time, so that even if the population was known on April 1, 2020 to perfect precision, it would not apply beyond that moment due to births, deaths, internal relocations by citizens, and in- and out-migration by non-citizens.

> As a result, distinguishing between a population variation of 1 or 2 in a district total population of over 750,000 persons is a distinction without a difference.

20

**3) Compactness**

The SM noted Dr. Duchin's expert witness testimony to stipulate that all of the maps satisfy the constitutional compactness criterion.

> *Comment:* Maps can achieve maximal compactness by assembling counties compactly (or dividing more populous counties compactly) and then adding or subtracting whole townships and other political subdivisions, one at a time, along a county boundary, in layers until equal population is achieved. Then one and only one municipal subdivision need be divided along an electoral district's border. This uniform approach would allow a reviewing court to detect even subtle gerrymandering, such as where a boundary is both non-compact and non-uniform. This non-uniformity can then be analyzed by the Court and the parties to determine if a boundary line is  the result of innocent drafting, or the result of an impermissible attempt to engage in partisan gerrymandering, that is, gaining anticipated seat share beyond the party's state-wide vote share.

> We believe that compactness scores can highlight important strengths and weaknesses of individual district designs within a redistricting plan. Moreover, identifying outliers among the districts with particularly poor compactness scores can provide guidance for incorporating important improvements in the overall plan. We find it disappointing that the SM deferred careful analysis of this important criterion in the assessment of the plans.

**4) Subdivision Splitting**

The SM noted that Drs. Barber, deFord and Duchin provided expert analyses of plan splits (of political subdivisions) and the SM relied on them. The SM also noted, however, that not much "… evidence challenging … methodology" came from testimony and participant reviews. For analytical purposes, the SM consolidated the enumerations of splits for counties, municipalities and wards from the three expert sources to construct a single tabulation of the splits for each plan.

> *Comment:* Like population deviation, enumerating splitting of political subdivisions provides a specific quantitative, verifiable metric. Setting forth these splits arguably creates a simple and clear measurement of a plan's compliance with a constitutional requirement. The splitting criterion can conflict at times (but not always) with the compactness criterion and the population equality criterion, though careful drafting can balance these criteria.

> As discussed in Section 3 above,  theory suggests, and the CCFD methodology strongly supports, that there is a lower reasonable limit to the number of subdivision splits required at each subdivision scale (county, municipality, ward, precinct) when district populations must be exactly equal.

21

A2526

The CCFD methodology achieves this theoretically best possible result (lowest number of splits possible)  with its step-down sequence, which calls for incorporating whole subdivisions when possible in sequence along a district border until adding the next subdivision would exceed the population limit. At that point, the subdivision will be split by including, again in sequence, subdivisions of the next smaller scale (e.g. municipalities of a county when the entire county population is too large) until adding the next subdivision would exceed the allowable population, and so on.

**Special Issue – Splitting Pittsburgh**

The SM highlighted certain specific splits, deeming them "… an important consideration …".[2] Quoting Dr. Barber, the SM noted that splitting has the capacity, particularly as it applies to the city of Pittsburgh to "… serve partisan ends."[3] As a result, the SM concluded that the five plans that split Pittsburgh should be viewed less favorably than those that keep Pittsburgh within a single district.  In addition, the SM identified one plan that retains Pittsburgh in a single district but distorts the district design by surrounding it in a way that violates this requirement in an indirect way.

> *Comment:* In general terms, we agree that good districting designs avoid unnecessary splitting of subdivisions. However, all residents of every subdivision benefit from avoiding the dilution of their representation due to splitting.
>
> We believe that the SM should have addressed splitting issues associated with all subdivisions containing populations above some floor. For example, at least 10 counties have populations exceeding that of Pittsburgh, but the SM did not consider the implications of splitting any of these. Moreover, as discussed above, the greater Pittsburgh metropolitan area hosts a population far greater than that of a single district. Considerations extending beyond the Pittsburgh county boundary may very well apply and deserve attention.

**Special Issue – Splitting Bucks County**

The SM acknowledged that subdivision splitting shares importance with other "communities of interest" considerations. Highlighting Bucks County, the SM noted that both Dr. Naughton and Dr. Duchin expressed opinions about keeping communities of interest whole in district design plans. Noting strong sentiment that residents desire Bucks County to remain whole, the SM indicated that plans splitting Bucks County should carry lower weight.  In addition, the SM added the additional consideration to the district containing Bucks County that the additional population needed to achieve the target district population should come from Montgomery

---

[2] SM Report at 148.
[3] SM Report at 149, quoting Barber report at 28.

County and not from Philadelphia County, citing communities of interest considerations mentioned in Dr. Naughton's report.

> *Comment:* We agree that communities of interest considerations can take place in the context of determining final district designs. However, there are many, many such considerations that could take place throughout the state. We believe that focusing on Bucks County considerations without doing so in a more comprehensive manner weakens the importance of this single consideration. In any event, the Supreme Court emphasized in *LWV* that all criteria other than the four neutral criteria are "wholly subordinate" to the four criteria.

> Moreover, the argument that Bucks remain whole because this has been the case for many years[4] relies on a "least change" argument, a consideration that the SM dismissed in the context of the Carter submission.[5]

**Special Issue – Splitting Philadelphia County**

The Philadelphia County population is large enough to accommodate two whole districts plus part of a third. The map designs have the option to attach the surplus Philadelphia population to districts in the neighboring counties of Bucks, Delaware, and Montgomery. The SM noted the recommendation of Dr. Naughton that the surplus should be attached to a district in Delaware County as a result of communities of interest considerations.

> *Comment:* This consideration is comparable to the Bucks County situation, even though it addresses the allocation of a surplus population rather than the acquisition of population to address a shortfall. Thus, our comments concerning the Bucks County designs apply here equally. There are many specific circumstances in every design in which residents of a political subdivision are grouped or split. The SM's highlighting of some such subdivision splits, while ignoring others, appears arbitrary.

**Extra-Constitutional Considerations**

The SM continued collecting factual information from the experts relating to other design considerations, but noted that "Our inquiry into these subordinate considerations is strictly circumscribed."[6] This is consistent with the cautionary language of the Pennsylvania Supreme Court in *LWV* regarding subordinate criteria.[7]

---

[4] SM Report at 157, paraphrasing Dr. Naughton's testimony.
[5] SM Report at 183 ff.
[6] SM Report at 161.
[7] SM Report at 161 referencing LWV: 178 A.3d at 817.

23

### 1) Partisan Fairness

The SM found as a matter of fact that the distribution of partisan residents within the state tilts in favor of Republicans. From a standpoint of political geography, at least in Pennsylvania, Democrats are concentrated in large metropolitan areas, while Republicans are distributed throughout the state with a much lower propensity to congregate in densely populated areas. Accordingly, the SM noted that this will have a bearing on issues of partisan advantage.

The Special Master noted three approaches to measuring partisan fairness articulated in the expert witness testimony – Mean-Median scores, the Efficiency Gap, and Simulations.

### 2) Mean-Median Scores

The SM listed mean-median scores computed for the plans from seven expert witness statements, although not all experts provided such scores for every plan. In addition, the SM referred to testimony of an expert witness in *LWV* that a typical mean-median score ranges from -4% to 4%.[8] The SM also noted that such scores are computed from specific elections and that: a) the expert witnesses did not use identical historical elections in computing their metrics,  and b) that not all experts specified the elections used. After excluding the Duchin figures as not credible, the SM found that the mean-median scores for all of the plans fell within the acceptable range.

### 3) Efficiency Gap

The SM listed efficiency gap scores from five expert witness statements. As with mean-median scores, not all of the experts provided estimates for every plan. In addition, the SM referred to testimony of an expert witness in *LWV* that a typical efficiency gap score ranges from -20% to +20%.[9] Finally, the SM noted that the elections selected for efficiency gap calculations were the same ones used for the mean-median calculations. After excluding the Duchin figures as not credible, the SM found that the efficiency gaps for all of the plans fell within the acceptable range.

### 4) Simulations

The SM noted that simulations of many plans can help to place partisan fairness issues into perspective by providing a design variation context with which to measure the fairness of any given plan. SM referenced the simulations prepared by Dr. Barber in this context. Regarding the simulations, the SM noted that all of the maps submitted "… are at least 54% more favorable to Democrats than the simulated maps" and that the House Democrats map has "… [a] more favorable efficiency gap outcome for Democrats than 100% of his simulated maps."[10]

> *Comment:*  We were puzzled by the exclusion of these analyses by Dr. Duchin. Moreover, we could not find in Dr. Duchin's report the numerical figures listed as those set forth in the

---

[8] SM Report at 166 referencing *LWV*: 178 A.3d at 774.
[9] SM Report at 172 referencing *LWV*: 178 A.3d at 777.
[10] SM Report at 176.

SM's report. The testimony and report by this witness employed the use of graphical comparisons. In doing so, Dr. Duchin presented graphical representations of these metrics from twelve separate elections for three of the plans and included in the graphs representations of the results of 100,000 simulated elections.[11] The SM did not speak to either these simulations or the graphical representations in this context. In addition, Dr. Duchin employed the use of a seats-votes figure to elucidate the outcomes of many elections. We found the Duchin approach to provide more insight into the likely dynamic behavior of the plans than a single metric representing the aggregate results of several elections.

### 5) Partisan Fairness - Proportionality

Extracting statements regarding design objectives stated in and by the plan submissions, the SM stated unequivocally that "proportionality is not a requirement or goal of redistricting."[12] She found that the "Gressman Plan was purposefully created using an algorithm that sought to optimize on partisan fairness."[13] In addition, the SM found that "The Draw the Lines Plan admittedly split Pittsburgh into two congressional districts to maximize political competitiveness."[14] It should be noted that the CCFD amicus brief argues for the addition of partisan fairness as another mandatory criterion in addition to four Constitutional criteria.

### 6) Protection of Incumbents

The SM noted that plans that avoid "pairing" incumbents in the same new district (the term "stacking" is also used) can play a role in evaluating redistricting plans. Citing *LWV* and *Mellow* cases, the SM acknowledged that these considerations are "… among the factors that a court may consider in evaluating a redistricting plan …."[15] Additionally, the SM claimed that the reduction in the number of Congressional districts will by necessity, create at least one such pairing. Finally, the SM stated that deliberate selection of specific pairings could "… favor one party by pairing incumbents from the other party, effectively eliminating one of them."[16] Subsequently, the SM noted that some current incumbents – Lamb (D) of the 17th District and Doyle (D) of the 18th District – are not seeking reelection, which allows one to ignore a theoretical pairing in these districts as "… less indicative of any unfair distribution …."[17] The SM analysis of pairings focused on the number of incumbents of the same party included in any pairings, finding five plans for which 3 incumbents from a single party would experience pairing. The SM noted that as a result, the SM would place less weight on these plans.

> *Comment:* CCFD acknowledges that various parties have argued that the same consideration of incumbent pairs in plan design should be considered. However, we

---

[11] Moon Duchin expert witness report at 17 ff.
[12] This an following bullets from SM Report at 176-178.
[13] SM Report at 178 referencing Gressman Petitioners Brief at 14.
[14] SM Report at 178 referencing  Villere Report at 4.
[15] SM Report at 178.
[16] SM Report at 179. The SM also noted that both Dr. deFord and Dr. Duchin cited this potential.
[17] SM Report at 179.

suggest that this take place near the end of the design process. Further, we suggest that the home locations of incumbents also play a role in the analysis of this factor. Incumbents whose residences lie geographically close to each other may by simple location experience a high likelihood of pairing for that reason alone, as a district boundary would have to pass between these two residences to eliminate a pairing.

We suggest that the SM's conclusion that pairings reflect partisan design motivations carries with it the material risk of incorrectly assigning to the designer a motivation that may not in fact apply. The large number of factors playing a role in any district design can make such attributions difficult to prove.

### 7) VRA Considerations

The SM noted that Pennsylvania is subject to Section 2 of the VRA, and, citing Dr. Duchin's report, that the current district map includes two majority-minority districts. However, the SM also noted that no party presented evidence directed to this issue and that no party lodged a challenge to a plan based on this issue. As a consequence of this, the SM noted that "… the Court is thus unable to determine that any specific number of majority-minority districts is strictly necessary in any particular location in Pennsylvania…. The Court accordingly cannot conclude that any plan would be likely to violate section 2 of the VRA or any other requirements of federal law."[18]

Comment: We believe that VRA considerations not only are important but indeed are legally mandated, and should be a factor in selecting the best plan.

### 8) Least Change

The SM, referring to *LWV*, noted that "… preservation of prior district lines, or 'least change,' is another 'subordinate' factor the Court may consider in determining which plan to adopt."[19] Only Dr. Rodden (for the Carter petitioners) presented an analysis relevant to least change considerations and the SM recognized the analysis performed by Dr. Rodden's tabulation of the "Retained Population Share" for each plan. However, lacking a measure of acceptable retention, the SM declined to use this metric, stating "… this Court is left with attempting to decipher enigmatic data."[20]

As an alternative to comparative analysis of the plans, the SM examined past legal opinions regarding the use of least change approaches to redistricting and concludes that it is "… deeply troubled by the prospect of any court applying [this doctrine] … because that court could theoretically continuously adopt features of its prior plans, effectively rendering impossible any

---

[18] SM Report at 183.
[19] SM report at 183.
[20] SM report at 185.

future challenge to the plan."[21] The SM further "… conclude[d] that the Carter Petitioners have misconstrued and misapplied the "Least Change" doctrine, which does not apply in this circumstance …" and recommends that the high court not adopt the Carter Plan.[22]

> *Comment:* **Focusing on the least change from a prior map, as opposed to starting fresh in redistricting, can lead to a fair map or an unfair map depending on the qualities of the map being used as a model. If the prior map was the product of a partisan gerrymander, the new map will contain elements of a partisan gerrymander.**
>
> We suggest that the Court keep in mind and analyze changes in design from two perspectives: 1) from the perspective of the resident population, who benefit from continuity of representation and continuity of group sentiment; 2) from the perspective of incumbent representatives, who benefit from continuity of their constituents' communal concerns, and continuity of relevant administrative oversight functions.

---

[21] SM report at 188.
[22] SM Report at 188.

27

## Table 5: Special Master's Section V Analysis Metrics by Plan

| Criterion | Carter | Gressman | Governor | HB 2146 | Senate Dem I | Senate Dem II | House Dem | Reschenthaler I | Reschenthaler II | Draw the Lines | Ali | Citizen-Voters | Voters of PA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Traditional Neutral Criteria** | | | | | | | | | | | | | |
| Contiguity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Population Equality** | | | | | | | | | | | | | |
| Data Set | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #1 | LRC Set #2 | LRC Set #1 | LRC Set #1 |
| Metric | +1,-1 | +1 | +1 | +1 | +1 | +1 | +1,-1 | +1 | +1 | +1 | +1 | +1 | +1 |
| Compactness | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Splitting[1]** | | | | | | | | | | | | | |
| County | 13 | 15 | 16 | 15 | 17 | 16 | 16 | 13 | 13 | 14 | 16 | 14 | 15 |
| Municipality | 19 | 19 | 18 | 16 | 19 | 16 | 18 | 16 | 16 | 16 | 18 | 16 | 17 |
| Ward | 25 | 15 | 25 | 18 | 18 | 14 | 22 | 25 | 24 | 16 | 33 | 21 | 41 |
| **Focus** | | | | | | | | | | | | | |
| Pittsburgh | Whole | Whole | Split | Whole | Split | Split | Whole/Nbr | Whole | Whole | Split | Split | Whole | Whole |
| Bucks | | | Split | Whole | | | | | | | | | |
| Bucks add | | | from PHL | not from PHL | | | | | | | | | |
| PHL surplus | | | to Bucks | to Delaware | | | | | | | | | |
| **Extra-Constitutional Considerations** | | | | | | | | | | | | | |
| Partisan Fairness | | Design | | | | | | | | Split Pittsburgh | | | |
| Simulations | No specific references | | | | | | | | | | | | |
| **Mean-Median Scores[2]** | | | | | | | | | | | | | |
| Dr. Barber | | -0.6 | 1.4 | -0.04 | -1.5 | -0.5 | | -0.03 | 0.7 | -2.1 | -2.2 | -0.6 | -1.2 | -1.3 | -1.2 |
| Dr. Brunell[3] | | | | | | | | | -1.86** | | -1.89 | | | |
| Dr. Caughy | | | | 1 | -2.3 | -0.7 | | -0.5 | | | -2.4 | | | |
| Dr. deFord[4] | | -1.6 -0.8* | | -1 | -2.9 | -1.9 | | -0.3 | -0.9 | -2.7 | -2.6 | -1.2 | -1.8 | -2 | -2.7 |
| Dr. Duchin[5] | | -11.3 | 3.85 | -0.77 | -29.27 | -13.82 | | 1.06 | -0.71 | -25.24 | -25.34 | -10.42 | -12.09 | -18.47 | -27.34 |
| Dr. Rodden[6] | ?0.5 | ?0.5 | ?0.6 | | -2.4 ?0.7 | | ?0.7 | ?0.4 | | -0.1 | -0.1 ?0.6 | | ?0.4 | ?1.4 | -2.6 |
| S. Trende[6] | | | -1.1, ?0.3 | | | | | | | | | | | ?2.0, ?2.2 |
| **Efficiency Gap[7]** | | | | | | | | | | | | | |
| Dr. Barber | | 3.4 | 3.4 | 3.4 | -2.5 | -2.5 | | 3.4 | 9.3 | -2.5 | -2.5 | 3.4 | 3.4 | -2.5 |
| Dr. Caughy | | | | -3.5 | -6.6 | -2.3 | | -2.4 | | | -6.3 | | | |
| Dr. deFord | | -0.4 | 0.8 | 0.6 | -6.3 | -2.5 | | 1 | 3.3 | -7.8 | -7.8 | -1.6 | -2.7 | -2.6 | -4.8 |
| Dr. Duchin[8] | | -0.58 | 13.91 | 10.07 | -83.36 | -26.01 | | 12.21 | 18.14 | -110.24 | -110.42 | -16.78 | -31.66 | -40.74 | -56.58 |
| S. Trende[9] | | | -3.5, -0.10 | | | | | | | | | | | ?3.0, ?5.6 |
| Proportionality as Goal | | ✓ | | | | | | | | | ✓ | | | |
| **Incumbent Protection[10]** | | | | | | | | | | | | | |
| Pairings | 1 | 0 | 2[11] | 1 | 1 | 2 | 2 | 2 | 1 | 2 | -- | 2 | 2[11] |
| R-R Pairing | x | | x | | | x | x | | | x | | | |
| D-D Pairing | | | x | | | | | x | | | | x | |
| D-R Pairing | | | | x | x | x | x | x | x | x | | x | x - x |
| **VRA Considerations** | | | | | | | | | | | | | |
| Maj-Min Districts | | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| **Least Change** | | | | | | | | | | | | | |
| Retained Pop Share | 86.6 | 72.8 | 81.2 | 78.5 | 72.5 | 72.5 | 73.3 | 76.5 | 76.5 | 78.8 | 81.5 | 82.4 | 80.6 |

Note: Red shaded cells indicate values or characteristics that the Special Master deemed important for reduced weight of plan.
See additional notes and references on the following page.

Notes for Table 5:

1. SM Report at 143, ff.

2. SM Report at 168-171. Our entries here: figures in %, positive sign favors Democrats

3. Use of "**" on this row: Inconsistent in the report: 0.0186 and 1.6%

4. Use of "*" on this row: Incorrectly reported as -0.08%.

5. Strikethroughs: The SM finds these figures from Dr. Duchin to be not credible, and therefore removed them from consideration.

6. Use of "?" in this report: Dr. Rodden and S Trende did not specify score sign.

7. SM Report at 172-175.

8. Strikethroughs: The SM noted that Dr. Duchin's figures were extreme outliers and therefore not credible

9. Use of "?" on this row: S Trende did not specify score sign for the Voters of PA analysis.

10. Dr. deFord analyzed all of the plans for incumbent pairings in his report.

11. The SM report did not address the Governor's plan or the Voters of PA plan for pairings. These pairings are from the deFord report.

## 8. Response to the Special Master's Map Selection Recommendations (Section VI)

Section VI of the SM report sets forth the recommendations arising from the facts and metrics listed in Section V.

In the simplest terms, the SM in this section selected its recommended plan by way of an elimination process, identifying and removing plans one at a time and in groups, depending on the criterion, from the acceptable collection. This process appears in Table 6 below:

**Table 6: Summary of Eliminations by Plan**

| Reason for Exclusion | Carter | Gressman | Governor | HB 2146 | Senate Dem I | Senate Dem II | House Dem | Reschenthaler I | Reschenthaler II | Draw the Lines | Ali | Citizen-Voters | Voters of PA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plans not using LRC Dataset #1 (Page 192): | | | | | | | | | | | X | | |
| Plans that split Pittsburgh (Pages 194-195): | | | X | | X | X | | | | X | X | | |
| Plans that split Bucks county | | | X | | | | | | | | | | |
| Pairing two Republican Incumbents (Page 195) | X | | | | X | | | | | | | | |
| Use of "least change" approach (Pages 195-196) | X | | | | | | | | | | | | |
| Mean-median metric (Page 197) | | X | | | | | X | | | | | | |
| Efficiency gap metric (Page 197) | X | X | X | | | X | X | | | X | | | |
| VRA Considerations (Page 198) | | | | | | | | | | | | | |
| Population Variation - 2 difference  (Pages 192-199) | X | | | | | | X | | | | | X | |
| Lack of expert witness support | | | | | | | X | | | | | X | |
| Odd district shape near Pittsburgh (Page 203) | | | | | | | x | | | | | | |
| Inadequate COI consideration (Page 205) | | X | | | | | | | | | | | |

Note: Green shaded columns highlight plans with no identified reasons to eliminate.

The remaining maps the SM considered from the standpoint of the Free and Equal Elections Clause are:[23]

- Voters of PA plan
- Reschenthaler 1 plan
- HB 2146 plan

For these three plans, the SM listed the supporting benefits of these plans along with support statements by their experts. The SM noted that based on "… credibility and weight determinations,... " these maps "… are consistent with the Free and Equal Elections Clause … and, also, the aspirations and ideals expressed by that constitutional provision as pronounced by the Court in *LWV*…."[24] The SM then turned to a more comprehensive review of the HB 2146 plan's strengths[25]:

---

[23] SM report at 207. We note from Exhibit 2 above that the Reschenthaler 2 plan also survived the exclusion process, but the SM did not include it in the list of surviving plans. We found no explanation for this in the SM's report.
[24] SM report at 207.
[25] These points appear in the SM report, starting at 207.

- This plan arose from the legislative process laid out in the state Constitution
- The methodology laid out by the expert witness, Dr. Barber
- The plan performs well with regard to subdivision splits
- One incumbent pairing which does not impart a partisan advantage
- The plan does not split Bucks County
- The district including Bucks County draws from Montgomery County to complete
- The surplus Philadelphia population was added to a district in Delaware County
- The plan maintains two minority-majority districts
- The plan's compactness scores are near the 2018 Remedial Plan
- The plan has only a modest and unreducible partisan lean (8-D, 9-R)
- Several expert witnesses attested to the partisan fairness of the plan
- The plan has more competitive districts than the "other" plans
- The mean-median score is close to zero, indicating unbiased partisan fairness
- The efficiency gap is close to zero, indicating unbiased partisan fairness
- No parties have argued  that the plan does not meet "… all the neutral, traditional redistricting criteria…"

As a final statement, the SM argued strongly for the use of HB 2146 because it arose from the constitutional legislative process and because it satisfies all precedents set in prior court judgments.

> *Comment:* In our opinion, the elimination process the SM used fails to articulate the relative importance of the various criteria for elimination, which weakens the argument that only three plans survive this process. The criteria that the SM listed cannot be equally important. Yet the SM did not identify how or whether she prioritized them. A different process could very well employ different criteria and produce a different result. We acknowledge the difficulty of choosing a plan due to the very large number of factors which might come into play. For this reason, we would prefer that the Court employ a <u>district construction</u> process rather than a <u>plan selection</u> process going forward.
>
> Finally, we remind the Supreme Court that CCFD offers such a district construction process that, by its very nature, satisfies the constitutional requirements, avoids partisan interference, and offers process transparency that vastly improves the opportunity for judicial oversight.

Received 2/14/2022 5:30:04 PM Supreme Court Middle District

Filed 2/14/2022 5:30:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

## Docket No. 7 MM 2022

### CAROL ANN CARTER, et al.
#### Petitioners,

v.

### LEIGH M. CHAPMAN, in her official capacity as the Acting Secretary of the Commonwealth of Pennsylvania, et al.,
#### Respondents.

### BRIEF FOR *AMICUS CURIAE*
### PHILADELPHIA COUNTY BOARD OF ELECTIONS
### IN SUPPORT OF NEITHER PARTY

CITY OF PHILADELPHIA
LAW DEPARTMENT
Diana P. Cortes, City Solicitor

By: Benjamin H. Field  (ID No. 204569)
Chief Deputy City Solicitor
Michael Pfautz (ID No. 325323)
Deputy City Solicitor
Affirmative & Special Litigation
1515 Arch Street, 15th Floor
Philadelphia, PA 19102-1595
(215) 683-5233

*Attorneys for Amicus Curiae Philadelphia County Board of Elections*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF AMICUS CURIAE ................................................................ 1

ARGUMENT ................................................................................................. 2

CONCLUSION .............................................................................................. 6

# TABLE OF AUTHORITIES

**Statutes**

25 P.S. § 2642 ...................................................................................... 1, 4

25 P.S. § 2726 ......................................................................................... 1

25 P.S. § 3041 ......................................................................................... 1

25 P.S. § 3044 ......................................................................................... 1

25 P.S. § 3050 ......................................................................................... 4

25 P.S. § 3146.5 ................................................................................... 1, 2

25 P.S. § 3146.8 ................................................................................... 1, 4

25 P.S. § 3150.15 .................................................................................... 1

25 P.S. § 3154 ..................................................................................... 1, 4

25 P.S. § 3262 ......................................................................................... 4

25 Pa. C.S. § 1322 .................................................................................. 1

25 Pa. C.S. § 1328 .................................................................................. 1

25 Pa. C.S. § 1402 .................................................................................. 1

52 U.S.C. § 10503 ................................................................................... 1

**Regulations**

Voting Rights Act Amendments of 2006, Determinations Under Section
    203, 86 Fed. Reg. 69611 (Dec. 8, 2021) .................................................... 4

**Cases**

*Stein v. Boockvar*, No. 16-6287, 2020 WL 2063470 (E.D. Pa. 2020) ........... 3

**Other Authorities**

Phila Board of Elections, *Fiscal 20 Operating Budget* (last visited Feb. 14,
    2022), *available at* https://files7.philadelphiavotes.com/department-
    reports/FY20_Budget.pdf. .......................................................................... 1

Robert Torres, Dep't of State, Commonwealth of Pa., *Report Concerning the
    Examination Results of Elections Systems and Software EVS 6021 with
    DS200 Precinct Scanner, DS540 and DS850 Central Scanners,
    Expressvote HW 2.1 Market and Tabulator, ExpressVote XL Tabulator
    and Electionware EMS* (Nov. 30, 2018), available *at*
    https://www.dos.pa.gov/VotingElections/Documents/Voting%20Systems/
    ESS%20EVS%206021/EVS%206021%20Secretary%27s%20Report%20
    Signed%20-%20Including%20Attachments.pdf ........................................ 3

Wallace McKelvey, M*ail delays even worse across Pa., with 42% of Philly
    mail taking longer than 5 days*, PennLive (Oct. 29, 2020 11:29 p.m.),
    https://www.pennlive.com/news/2020/10/mail-delays-even-worse-across-
    pa-with-42-of-philly-mail-taking-longer-than-5-days.html. ...................... 2

## INTEREST OF AMICUS CURIAE

The Philadelphia County Board of Elections ("Philadelphia" or the "Board") or is responsible for the operation of elections in Philadelphia County and ensuring that they are free and accessible. It requires a staff of over 100 people to prepare for elections, including processing voter registration, 25 Pa. C.S. §§ 1322, 1328, providing and evaluating nominating petitions, 25 P.S. § 2642(j), arranging polling places, *id.* §§ 2642(b), 2726(c), obtaining and distributing election materials, notices, *id.* §§ 2642(c), (h), 3041, mailing absentee and mail-in ballots, *id.* §§ 3146.5, 3150.15, staffing district election boards and training district poll workers, *id.* § 2642(d), (f), (g), setting up electronic ballot marking devices (BMDs), *id.* § 2642(c), creating and testing the ballot in multiple languages,[1] 52 U.S.C. § 10503, preparing poll books, 25 Pa. C.S. § 1402(d), and shipping BMDs to polling places, 25 P.S. §§ 2642(b), 3044. The same staff are tasked with post-election responsibilities such as the canvass and tabulation of in-person votes, absentee and mail-in ballots, and provisional ballots, the examination of poll books, and the certification of election results. *See* 25 P.S. §§ 2642(k), 3146.8, 3154; 25 Pa. C.S. § 1402(f). Because of these responsibilities and the associated

---

[1] *See, e.g.*, Phila Board of Elections, *Fiscal 20 Operating Budget* at 1 (last visited Feb. 14, 2022), *available at* https://files7.philadelphiavotes.com/department-reports/FY20_Budget.pdf.

costs, the Board is necessarily interested in the matters at issue in this case which potentially impact these obligations and the timelines on which the Board conducts its pre- and post-election activities.

## ARGUMENT

*Amicus Curiae* the Philadelphia County Board of Elections takes no position on the merits of the Petition. However, the Board wishes to apprise the Court of the deadlines under which the Board operates as those timelines impact the Board's ability to conduct free and accessible elections, including the ability to take any action necessary to comply with this Court's decision in this matter.

As an initial matter, the Board must mail absentee and mail-in ballots to voters months in advance of the election. While most can be sent within fifty days of the election, the Board must mail ballots to international and military voters seventy days before the election. *See* 25 P.S. § 3146.5(a). Delays in mailing can exacerbate these timelines.[2]

With regard to in-person voting, the technology and administrative requirements in Philadelphia necessitate significant lead time for the Board to prepare the voting equipment. Philadelphia's elections take place on ExpressVote

---

[2] *See, e.g.*, Wallace McKelvey, M*ail delays even worse across Pa., with 42% of Philly mail taking longer than 5 days*, PennLive (Oct. 29, 2020 11:29 p.m.), https://www.pennlive.com/news/2020/10/mail-delays-even-worse-across-pa-with-42-of-philly-mail-taking-longer-than-5-days.html.

XL electronic ballot marking devices (BMDs). *See Stein v. Boockvar*, No. 16-6287, 2020 WL 2063470, at *2 (E.D. Pa. 2020). Although the BMDs are electronic, they rely on a database of information to display the ballot.[3] The Board must "lock" that database more than a month before an election in order to have the BMDs available for election day.[4] Once the database is locked, the Board cannot add or remove candidates' names from the ballot for the coming election. *Id.* After locking, the Board must conduct logic and accuracy testing on the BMDs in each required language[5] and then ship them over multiple weeks to their respective polling places for election day. Given the number of races involved in this primary and the recent inclusion of Chinese in addition to Spanish as a

---

[3] Robert Torres, Dep't of State, Commonwealth of Pa., *Report Concerning the Examination Results of Elections Systems and Software EVS 6021 with DS200 Precint Scanner, DS540 and DS850 Central Scanners, Expressvote HW 2.1 Market and Tabulator, ExpressVote XL Tabulator and Electionware EMS* at 24 (Nov. 30, 2018) [hereinafter *DOS Examination Report*], available *at* https://www.dos.pa.gov/VotingElections/Documents/Voting%20Systems/ESS%20EVS%206021/EVS%206021%20Secretary%27s%20Report%20Signed%20-%20Including%20Attachments.pdf

[4] *See* Decl. of Joseph Lynch at 4, *Stein*, 2020 WL 2063470 (E.D. Pa. Dec. 12, 2019) (ECF 123-2) (explaining need for 50 days before the 2020 General Election, a federal election); Non-Party Philadelphia County Board of Elections's Application To Expedite Consideration of Petition ¶ 8, *In Re: Nomination Petition of Rania Major as a Democratic Candidate for Municipal Judge in Philadelphia County*, No. 15 EAP 2021 (Pa. Mar. 31, 2021) (explaining need for 35 days before 2021 Primary Election, a municipal primary).

[5] *See*, Torres, *DOS Examination Report*, *supra* note 3, at 38.

required Section 203 language in Philadelphia,[6] the Board must lock the database at least 42 days in advance of the election. This timeline, therefore, requires that all candidates be finalized six weeks in advance of election day, including final determinations on challenges to nominating petitions. The Board would need additional time to prepare for a subsequent election if it were held less than three months later.

In addition, after each election, the same personnel who are involved in preparing for the election are tasked with post-election activities. It takes several weeks to finish canvassing ballots and processing provisional ballots, and even longer due to the social distancing of workers during the pandemic. *See, e.g.*, 25 P.S. §§ 3050(a.4), 3146.8(g), 3154. Additional time is required for a recount, if necessary. *See* 25 P.S. § 3154(e)-(g). Certification does not take place until 20 days after the election, during which time BMDs records must be preserved for recanvassing. *See* 25 P.S. §§ 2642(k), 3262(c). Afterwards, the ensuing months allow the Board staff to repair and perform preventative maintenance on the BMDs in preparation for the next election, as well as obtain parts, supplies for new ballots, and personal protective equipment (PPE). For instance, each separate election requires the Board to print and send a new ballot to each voter on the

---

[6] *See* Voting Rights Act Amendments of 2006, Determinations Under Section 203, 86 Fed. Reg. 69611, 69616 (Dec. 8, 2021).

Permanent Mail-in Voter List. These processes can take even longer if there are supply chain complications.

Thus, for the orderly administration of the 2022 Primary Election, the Board respectfully requests that if this Court adjusts the timeline for the Primary Election, it ensure that the adjusted timeline provides that the ballot will be final at least 42 days before the date of the 2022 primary election and that if there is an additional election day before the November 2022 General Election, that any such schedule provide at least 62 days between elections as well as accounting for the possibility that impoundment of election equipment could create further delays.

## CONCLUSION

For all of the reasons set forth above, the Board respectfully requests that this Court issue its decision such that the timeline for the 2022 Primary Election and final ballot is set at least 42 days before the date of the election, and that if there is an additional election before the November 2022 General Election that any schedule provides at least 62 days between elections.

Respectfully submitted,

CITY OF PHILA. LAW DEPARTMENT
Diana P. Cortes, City Solicitor

*/s/ Michael Pfautz*
Benjamin H. Field
Chief Deputy City Solicitor
Attorney I.D. 204569
Michael Pfautz
Deputy City Solicitor
Attorney I.D. No. 325323
Affirmative & Special Litigation
1515 Arch Street, 15th Floor
Philadelphia, PA 19102-1595
(215) 683-5233

February 14, 2022           *Attorneys for Amicus Curiae*
                            *Philadelphia County Board of Elections*

6

A2545

**CERTIFICATION OF COUNSEL**

I hereby certify that this brief contains 1120 words within the meaning of Pa. R. App. Proc. 2135. In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

I further certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

<div style="text-align: right">

*/s/ Michael Pfautz*
Michael Pfautz
Deputy City Solicitor
City of Philadelphia Law Department

</div>

Received 2/17/2022 12:09:37 PM Supreme Court Middle District

Filed 2/17/2022 12:09:37 PM Supreme Court Middle District
7 MM 2022



**CITY OF PHILADELPHIA**    LAW
**DEPARTMENT**

One Parkway
1515 Arch Street
17th Floor
Philadelphia, PA  19102

Michael Pfautz
Deputy City Solicitor
Affirmative & Special Litigation Unit
15th Floor
215-683-5233
215-683-5299 (fax)
michael.pfautz@phila.gov

February 17, 2022

**VIA PACFILE**

Amy Dreibelbis, Esq.
Deputy Prothonotary
Pennsylvania Judicial Center
601 Commonwealth Ave.
Suite 4500
P.O. Box 62575
Harrisburg, PA 17106,

**RE:**    ***Carter, et al. v. Chapman, et al.,* No. 7 MM 2022**

Dear Ms. Dreibelbis:

I represent *Amicus Curiae* the Philadelphia County Board of Elections (the "Board").  I write to disclose that no person or entity other than *Amicus Curiae* and its counsel paid, in whole or in part, for the preparation of the Board's *Amicus Curiae* Brief or authored, in whole or in part, the Board's brief filed February 14, 2022.

Sincerely,

/s/ Michael Pfautz
Michael Pfautz
Deputy City Solicitor

A2547

Filed 02/14/2022 Supreme Court Middle District

# IN THE PENNSYLVANIA SUPREME COURT

## 7 MM 2022

---

CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW,
WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL,
SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN,
MICHAEL GUTTMAN, MAYA FONKKAU, BRADLEY HILL, MARY ELLEN
BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY, and JANET TEMIN,

Petitioners,

v.

LEIGH M. CHAPMAN, in her official capacity as the acting SECRETARY OF
THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS in her
official capacity as DIRECTOR FOR THE PENNSYLVANIA BUREAU OF
ELECTION SERVICES AND NOTARIES,

Respondents.

---

## AMICUS BRIEF SUBMITTED BY WASHINGTON COUNTY PUBLIC OFFICIALS

---

James H. McCune, Esq.
PA I.D. #19852
jmccune@bowlesrice.com
Bowles Rice LLP
1800 Main Street, Suite 200
Canonsburg, PA 15317
724-514-8938

1

IN THE PENNSYLVANIA SUPREME COURT

| | |
|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKKAU, BRADLEY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY, and JANET TEMIN, | 7 MM 2022 |

Petitioners,

v.

LEIGH M. CHAPMAN, in her official capacity as the acting SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS in her official capacity as DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES,

Respondents

## AMICUS BRIEF SUBMITTED BY WASHINGTON COUNTY PUBLIC OFFICIALS

The following persons, namely Diana Irey Vaughn, Nick Sherman, Pete Daley, Steve Toprani, Austin J. Murphy and Bill DeWeese hereinafter "Washington

2

County Public Officials" by and through their counsel, James H. McCune and the law firm of Bowles Rice LLP hereby set forth the following Amicus Brief.

## STATEMENT OF INTEREST

This Amicus brief is being submitted by a number of current and former Washington County elected public officials, both Democrat and Republican, who are identified below.   These current and former officials believe that their interests are not represented by any of the parties to the current litigation, and that fairness, and a full opportunity to be heard, require that they be permitted to file this Amicus Brief.

The legal costs of this Amicus Brief are being paid by Friends of Diana.

## ARGUMENT

This Amicus Brief is submitted to the Pennsylvania Supreme Court by the following persons, all of whom are former or current elected public officials, both Democrat and Republican, and who live and vote in Washington County,

3

A2550

Pennsylvania. This group will hereinafter be referred to as the "Washington County Public Officials."

    The Washington County Public Officials are the following persons:

    a.    Diana Irey Vaugh, incumbent Chair of the Washington County Commissioners (R);

    b.    Nick Sherman, incumbent, Washington County Commissioner (R);

    c.    Peter J. Daley, former state representative (D);

    d.    Steve Toprani, former Washington County District Attorney (D);

    e.    Austin J. Murphy, former Congressman (D);

    f..    Bill DeWeese, former state representative (D)

    On February 2, 2022, the Supreme Court of Pennsylvania assumed jurisdiction over this matter pursuant to 42 Pa. C.S.A. §726.

    The purpose of this Amicus Brief, submitted by the Washington County Public Officials, is to urge the Pennsylvania Supreme Court **NOT** to adopt the proposed Gressman Math/Science Congressional Plan (hereinafter "GMS Map").

    The GMS Map would create a new congressional district 14, which would consist of all of Washington County, and portions of Allegheny County including all of the City of Pittsburgh.

4

The Court is asked to note that Special Master Judge Patricia A. McCullough, in her exhaustive 222 page report, did not recommend the adoption of the GMS Map.

The Washington County Public Officials strongly object to the GMS Map that would place all of Washington County in a new congressional district with the City of Pittsburgh, thereby creating an illogical and absurd result.

In their brief in support of the GMS Map, the writers at Page 6 have sought perfect mathematical proportionality. The GMS Map Plan in all of Pennsylvania would seek an ideal of twelve (12) congressional districts, the population of each of which would be exactly 764,865 and five (5) congressional districts with the population of exactly 764,864 each.

Although Washington County and parts of Allegheny County have much in common, Washington County and the City of Pittsburgh have little in common and the creation of this district would place small rural communities in Washington County, such as Independence Township, with a population of approximately 1500, in direct competition for scare public funds with the City of Pittsburgh. The Washington County Public Officials believe that a congressional district comprised of similar demographics would be much more fair.

Furthermore, the population density and the current demographic makeup of the residents of the City of Pittsburgh would mean that the City of

5

Pittsburgh would dominate congressional elections and choose congressional representatives to the detriment and exclusion of Washington County voters.

The Pennsylvania Constitution's Free and Equal Election Clause provides "the people of this Commonwealth an equally effective power to select the representative of his or her choice, and bars the dilution of the people's power to do so." *League of Women Voters 1,* 178 A. 3rd 737 (Pa. 2018) at 814 . Furthermore, when "a congressional redistricting plan dilutes the potency of an individual's ability to select a congressional representative of his or her choice" that plan "violates the free and equal elections clause." While gerrymandering is not to be permitted, a plan such as the GMS Map plan undermines the voter's ability to exercise their right to vote in free and equal elections if that term is to be interpreted in any credible way. *Id.* at 821. In other words, the GMS Map plan will unfairly dilute the voting power of Washington County residents in favor of residents of the City of Pittsburgh. The GMS Map creates partisan unfairness, which is not permitted under the Pennsylvania Constitution.

Note that the Washington County Public Officials do not advocate in favor of or against any other plan. They submit this Amicus Brief for the purpose of pointing out the unfairness and inappropriateness of the GMS Map. Accordingly, the Washington County Public Officials request that the Pennsylvania Supreme Court not adopt the GMS Map plan.

6

Respectfully submitted:
BOWLES RICE LLP

James H. McCune, Esq.
Pa ID #19852
1800 Main St, Ste 200
Canonsburg, PA 15317
724-514-8938
jmccune@bowlesrice.com

7

## CERTIFICATE OF COMPLIANCE UNDER PA. R.A.P. 127

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

By: _____

8

A2555