Received 2/14/2022 6:11:56 PM Supreme Court Middle District

Filed 2/14/2022 6:11:00 PM Supreme Court Middle District
7 MM 2022

# IN THE SUPREME COURT OF PENNSYLVANIA

_____

## No. 7 MM 2022
_____

CAROL ANN CARTER, MONICA PARRILLA, REBECCA
POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT
SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN
WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL,
MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE
MCNULTY AND JANET TEMIN,
                                    Petitioners,

v.

LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE
ACTING SECRETARY OF THE COMMONWEALTH OF
PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY
AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION
SERVICES AND NOTARIES,
                                    Respondents.

_____

PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP;
PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER;
AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON;
TIMOTHY G. FEEMAN; AND GARTH ISAAK,
                                    Petitioners,

v.

LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE
ACTING SECRETARY OF THE COMMONWEALTH OF
PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY
AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION
SERVICES AND NOTARIES,
                                    Respondents.

A2556

_____

**BRIEF OF** *AMICUS CURIAE* **WILLIAMSPORT/LYCOMING
CHAMBER OF COMMERCE AND GREATER SUSQUEHANNA
VALLEY CHAMBER OF COMMERCE URGING THIS COURT TO
ADOPT WITH ONE MODIFICATION THE SPECIAL MASTER'S
REPORT CONTAINING PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW SUPPORTING RECOMMENDATION
OF CONGRESSIONAL REDISTRICTING PLAN AND
PROPOSED REVISION TO THE 2022 ELECTION
CALENDAR/SCHEDULE**

_____

Exceptions filed from the February 7, 2022, Report issued by Special
Master Judge Patricia A. McCullough of the Commonwealth Court of
Pennsylvania, at No. 464 M.D. 2021 and No. 465 M.D. 2021, Containing
Proposed Findings of Fact and Conclusions of Law Supporting
Recommendation of Congressional Redistricting Plan and Proposed
Revision to the 2022 Election Calendar/Schedule

Christopher D. Carusone, Esquire
Attorney I.D. No. 71160
ccarusone@cohenseglias.com

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.
525 William Penn Place
Suite 3005
Pittsburgh, PA 15219
(412) 227-5951 (Phone)
*Attorney for Amicus Curiae
Williamsport/Lycoming
Chamber of Commerce and
Greater Susquehanna Valley
Chamber of Commerce*

Date:  February 14, 2022

ii

## **TABLE OF CONTENTS**

I.    INTEREST OF AMICUS CURIAE...................................................1

II.    SCOPE AND STANDARD OF REVIEW .........................................3

III.   QUESTION PRESENTED...............................................................4

IV.   SUMMARY OF ARGUMENT .........................................................5

V.    ARGUMENT: THE COURT SHOULD ADOPT THE SPECIAL MASTER'S REPORT, BUT MODIFY IT TO ADOPT THE CONFIGURATION OF THE 7TH DISTRICT DEPICTED IN THE RESCHENTHALER MAPS. .............................................................6

VI.   CONCLUSION ...............................................................................19

**Exhibit 1:** Notes of Testimony – Pennsylvania House State Government Committee North Central Regional Public Hearing on Congressional Redistricting (October 12, 2021).

i

# TABLE OF AUTHORITIES

## Rules

Pa.R.A.P. 531 ........................................................................................ 1

## Cases

*Annenberg v. Com.*, 757 A.2d 338 (Pa. 2000) ................................... 3

*Department of Auditor General v. State Employees'
Retirement System, 836 A.2d 1053 (Pa.Cmwlth. 2003)* .................. 9

*Hall v. Moreno*, 270 P.3d 961, 971 (Colo. 2012) .............................. 8

*Holt v. 2011 Legislative Reapportionment Com'n*,
38 A.3d 7115 (Pa. 2012) ..................................................................... 7

*Prosser v. Elections Board*,
793 F.Supp. 859 (W.D. Wis. 1992) ..................................................... 8

## Secondary Authority

Gormley, *Racial Mind-Games and Reapportionment*,
4 PA.J.CONST.L. 735 (2002) .............................................................. 7

## I.    INTEREST OF AMICUS CURIAE[1]

The Williamsport/Lycoming Chamber of Commerce (WLCC) has been representing the business community in Lycoming County since 1885.  With over 900 members, the mission of the WLCC is to preserve, protect, and defend the free enterprise system through promoting a vibrant business climate and quality of life for the businesses and people of Lycoming County.  The Greater Susquehanna Valley Chamber of Commerce (GSVCC), founded in 1921, represents the business community in the Montour, Northumberland, Snyder, and Union counties region.  With nearly 700 members, the mission of the GSVCC is to advance the prosperity of its communities, commerce, culture, fellow citizens, and their businesses in the region.

The WLCC and the GSVCC, have a significant interest in the outcome of this case.  Their members, some 1,600 combined, employ thousands of Pennsylvania voters who live and work in Lycoming, Union, Snyder, Northumberland, and Montour counties. These members rely on the WLCC and GSVCC to be their voice in matters of public policy affecting the business community.  A new configuration of

---

[1]    This brief was written by the undersigned and paid for by the Williamsport/Lycoming Chamber of Commerce and the Greater Susquehanna Valley Chamber of Commerce.  Pa.R.A.P. 531(2).

1

congressional districts that fractures the communities of interest that comprise the region will undermine the effectiveness of the WLCC and GSVCC by requiring them to coordinate on regional issues with multiple members of Congress. As explained herein, this was the problem with the congressional redistricting that occurred following the 2000 census, which split communities of interest in the same region into two separate districts. Moreover, as noted by Judge Patricia McCullough in her Report to this Court: "[I]f an important issue is divided across multiple districts, it is likely to receive diffuse and unfocused attention from the multiple representatives it affects, as each is pulled in other directions by the many other issues confronting their districts. However, if a discrete and unique issue is placed in one district, that representative may familiarize herself with the complexities of the issue and the stakeholders it affects." Report at 153.

## II.   SCOPE AND STANDARD OF REVIEW

The Court has plenary jurisdiction over this case, but has appointed Commonwealth Court Judge Patricia McCullough as a Special Master to issue proposed findings of fact and conclusions of law. The Court's standard of review is *de novo*.  When addressing findings of fact made by Judge McCullough, while those findings do not bind this Court, the Court "will afford them due consideration, as the jurist who presided over the hearings was in the best position to determine the facts."  *Annenberg v. Com.*, 757 A.2d 338, 342-343 (Pa. 2000).

### III.  QUESTION PRESENTED

Whether this Court should adopt Special Master Judge Patricia McCullough's Report Containing Proposed Findings of Fact and Conclusions of Law Supporting Recommendation of Congressional Redistricting Plan, with the modification that the Court adopt the configuration of the 7th District in the Reschenthaler maps.

*[Suggested Answer: Yes]*

## IV.    SUMMARY OF ARGUMENT

The Greater Susquehanna Valley Chamber of Commerce (GSVCC) and the Williamsport/Lycoming Chamber of Commerce (WLCC) represent the business community in Lycoming, Union, Snyder, Northumberland, and Montour counties.  These counties, along with their regional partners in Tioga, Sullivan, and Columbia counties, form communities of interest that should be grouped within a single district.  While the GSVCC and WLCC urge this Court to adopt the Special Master's Report, they request that this Court use the configuration of the 7th Congressional District contained in the Reschenthaler maps in order to keep these important communities of interest together.

**V.   ARGUMENT: THE COURT SHOULD ADOPT THE SPECIAL MASTER'S REPORT, BUT MODIFY IT TO ADOPT THE CONFIGURATION OF THE 7TH DISTRICT DEPICTED IN THE RESCHENTHALER MAPS.**

The Greater Susquehanna Valley Chamber of Commerce (GSVCC) and the Williamsport/Lycoming Chamber of Commerce (WLCC) are largely in agreement with proposed findings of fact and conclusions of law prepared by Commonwealth Court Judge Patricia McCullough, particularly her rejection of the maps submitted by Carter Petitioners, Governor Tom Wolf, and the Senate Democratic Caucus.  The GSVCC and WLCC submit this brief as *amicus curia*, however, to emphasize the importance of the communities-of-interest doctrine, and to express their preference for the configuration of the 7th District depicted in the Reschenthaler maps, which group <u>all</u> of Snyder and Union counties into the same district, along with regional partners Lycoming, Tioga, Sullivan, Northumberland, Sullivan, Columbia, and Montour counties.

**A.   <u>Communities-Of-Interest Doctrine.</u>**

"[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of

6

interest, and creating geographic compactness." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016).  As this Court has noted, communities of interest "have shared interests for which they can more effectively advocate when they can act as a unified body and when they have representatives who are responsive to those interests." *Holt v. 2011 Legislative Reapportionment Com'n*, 38 A.3d 711, 745 (Pa. 2012) (Holt 1).  Dean Gormley, whom this Court has cited with approval, stated:

> At the same time, states have historically considered a broad range of such imprecise communities of interest (many of which are naturally intertwined) in exercising their sound discretion. They do so to satisfy constituents. They do so to sweep together a host of generally identifiable interest groups that wish to be given a unified voice. This is perfectly healthy and permissible. It is an important aspect of the state's prerogative, when it comes to structuring its own form of government.

*Id.* at 746 (quoting Gormley, Racial Mind-Games and Reapportionment, 4 U.PA.J.CONST.L. 735, 780-781 (2002)).  Dean Gormley has further noted: "[S]chool districts, religious communities, ethic communities, [and] geographic communities[,] which share common bonds due to locations of rivers, mountains, and highways, and a host of other 'communities of interest' are routinely considered by districting bodies in order to construct fair and effective maps." *Id.*

7

Judge McCollough strongly embraced the communities-of-interest doctrine throughout her report, bolding her language for emphasis. "**To be an effective representative, a legislator must represent a district that has a reasonable homogeneity of needs and interests; otherwise the policies he supports will not represent the preferences of most of his constituents**." <u>See</u> Report at 153 (emphasis in original) (quoting *Prosser v. Elections Board*, 793 F.Supp. 859, 863 (W.D. Wis. 1992)). "**[I]f an important issue is divided across multiple districts, it is likely to receive diffuse and unfocused attention from the multiple representatives it affects, as each is pulled in other directions by the many other issues confronting their districts.  However, if a discrete and unique issue is placed in one district, that representative may familiarize herself with the complexities of the issue and the stakeholders it affects.**" *Id.* (emphasis in original) (quoting *Hall v. Moreno*, 270 P.3d 961, 971 (Colo. 2012)).  Application of this concept, by the reliance of unrebutted expert testimony, is evident throughout Judge McCollough's proposed findings of fact (Report at 154-161, ¶¶1-28) and conclusions of law (Report at 194, 208, 210, 212; ¶¶ 25, 29, 60,

8

73, 84).    This is most notable in her rejection of proposals to split the City of Pittsburgh into two congressional districts.  See *supra*.

**B.    The Region Represented By The GSVCC And WLCC, Which Includes Lycoming, Snyder, Montour, Northumberland, & Union Counties, Are Communities Of Interest And Should Be Grouped Together.**

On October 12, 2021, the Pennsylvania House State Government Committee held a regional public hearing on congressional redistricting. See Exhibit 1.   Malcolm Derk, Chair of the GSVCC's Government Affairs Committee, testified during the hearing.  *Id.* at 18-28.   Jason Fink, President and Chief Executive Officer of the WLCC, also testified. *Id.* at 29-33.   Because this testimony is part of the legislative record that ultimately resulted in the map contained in HB 2146, which is the map that Judge McCullough is recommending for adoption, the GSVCC and WLCC ask this Court to take judicial notice of this testimony.  See *Department of Auditor General v. State Employees' Retirement System*, 836 A.2d 1053 (Pa.Cmwlth. 2003) (holding that Commonwealth Court may take judicial notice of legislative journals).

During his testimony, Mr. Derk testified about the many ways in which Snyder, Union, Northumberland, and Montour counties are tied together. In so doing. Mr, Derk stressed the natural travel patterns and

9

road systems that give these counties a "united feel."  *Id.* at 21-22.  Mr.

Derk noted in particular the Route 11/15 corridor, along which

residents of these counties work, recreate, and engage in commerce.  *Id.*



Mr. Derk also testified about the travel patterns of GSVCC members,

which increasingly include travel to Lycoming and Columbia counties.

*Id.* at 22.  Mr. Derk predicted that these connections will only grow with

the completion of the Central Susquehanna Valley Thruway providing

connections to Interstate 80. *Id.*  Aside from travel patterns, Mr. Derk

pointed to large employers in the area, such as Geisinger and UPMC health systems as well as Bucknell and Susquehanna University, which pull employees from the multi-county region of Lycoming, Columbia, Montour, Union, Snyder, and Northumberland counties. *Id.* at 22. Mr. Derk also pointed to the Central Susquehanna Regional 911 system that covers Snyder, Union, and northern Northumberland counties. *Id.* at 24. Finally, Mr. Derk pointed to other entities – such as Rabbit Transit, Community Action Agency, Agency on Aging, The Greater Susquehanna Valley United Way, Red Cross, Susquehanna Valley Visitors Bureau, and media providers such as *The Daily Item* and *WKOK 1070AM* – all of whom take a regional approach involving Snyder, Union, Northumberland, and/or Montour counties. *Id.* at 24-26. In conclusion, Mr. Derk stressed the importance of keeping counties whole whenever possible: "As our members or neighbors ask about how to contact their member of Congress, it is helpful if entire communities are kept together to avoid confusion at the ballot box or as citizens seek constitute services from their legislator." *Id.* at 26-27.

During his testimony on behalf of the WLCC, Mr. Fink outlined the industrial, educational, and highway systems of Lycoming County,

emphasizing the importance of keeping the county together. *Id.* at 31. He pointed to the period 2000-2010, during which Lycoming County was split into two congressional districts, making it difficult to work on county-wide issues. *Id.* at 31-32. Mr. Fink also urged the committee to include Lycoming County in the same district with its neighboring counties of Clinton, Tioga, Union, Northumberland, Snyder, and Sullivan counties. *Id.* at 32-33. In support thereof, Mr. Fink described the workforce development projects involving some or all of those counties, such as the SEDA-COG. *Id.* at 32.



Borrowing a term used by Mr. Derk, Mr. Fink referenced the "commute shed" travel patterns of residents between Lycoming, Clinton, Tioga, Union, Northumberland, Snyder, and Sullivan counties. *Id.* at 32. Mr.

12

Fink also noted that employers in Lycoming County – such as West Pharmaceuticals, Shop-Vac Corporation, L3 Harris,[2] Lycoming Engines, Spartonics, PMF Industries, and QorTek – draw from schools in Union (Bucknell University, SUN Area Technical Institute), Snyder (Susquehanna University), Clinton (Lock Haven University), and Tioga (Mansfield University) counties.  *Id.* at 30-31, 32-33.

**C.   The Maps That Best Capture The Communities Of Interest Principle For Amici's Region Are the Reschenthaler Maps For The New 7th District.**



---

[2] L3 Harris is now known as Stellant Technologies.

13



Reschenthaler 2 Congressional Map

As is evident above, the Reschenthaler maps, while not perfect, best depict the communities of interest described by Mr. Derk of the GSVCC and Mr. Fink of the WLCC.   Their testimony before the Pennsylvania House State Government Committee stressed the need, from a communities of interest perspective, to avoid splits in Lycoming, Union, Snyder, Northumberland, and Montour counties.    The Reschenthaler maps accomplish this.   They also group these counties together in a single district, and pair them with other counties like Sullivan, Columbia, and Tioga counties that complete the region.

14

**D.** **The Maps Submitted By The Carter Petitioners, Governor Wolf, And The Senate Democratic Caucus Greatly Separate Amici's Communities Of Interest**.

While amici respectfully submit that the Reschenthaler maps best depict their communities of interest over the map proposed by Judge McCollough, more important to amici is the rejection of those maps that do the greatest violence to the region's communities of interest.



Proposed PA Congressional Map: Carter et al. plaintiffs

Map: Jonathan Lai (@Elaijuh)

The map above submitted by the Carter Petitioners splits Lycoming County into two congressional districts – the newly-created

15

15th District (apportioning most of the county with its neighbors to the west), and the newly-created 9th District to the east.  This map also groups Union and Snyder counties into the 15th District, separating them from eastern Lycoming County and their other regional partners to the east (particularly Northumberland and Montour counties).

**The Governor's Map**



The Governor's Map splits the regions represented by the WLCC and GSVCC into three congressional districts.  The western half of Lycoming County, along with all of Tioga County, are grouped with counties to their west extending all the way to Clarion and Armstrong counties into the newly-created 14th District. The northern and eastern

16

parts of Northumberland County, along with Union and Snyder counties, are grouped with counties to their southwest extending as far as the Maryland border into the newly-created 12th District. All that remains of the communities of interest articulated above is the newly-created 9th District, which includes the eastern half of Lycoming County (to include Williamsport), along with Bradford, Sullivan, Columbia, Montour, and most of Northumberland County.



Map #1 submitted by the Senate Democratic Caucus Intervenors severs Lycoming County, Tioga County, and the tip of Union County from its regional partners in Snyder, Northumberland, Northampton, Montour, and Sullivan counties.

17



Map #2 submitted by the Senate Democratic Caucus Intervenors is very similar to Map #1, except that it groups part of Lycoming County and all of Union County with its regional partners in Snyder, Northumberland, Northampton, Montour, and Sullivan counties.

The WLCC and GSVCC recognize that the drawing of a new congressional map following the 2020 census is a complicated endeavor, involving numerous factors and all counties across Pennsylvania. The purpose of this brief is not to upset the delicate balance struck by Judge McCullough. Rather, the WLCC and GSVCC seek only to modify her findings to keep communities of interest in their region together.

18

## VI.  CONCLUSION

Wherefore, for the reasons set forth herein, the Williamsport/Lycoming Chamber of Commerce and Greater Susquehanna Valley Chamber of Commerce respectfully request that this Court adopt the Special Master's Report, but adopt the formulation of the 7th Congressional District depicted in the Reschenthaler maps.

Respectfully Submitted,

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.

*Christopher Carusone*

Date: February 14, 2022

_____
Christopher D. Carusone, Esquire
PA I.D. No. 71160
ccarusone@cohenseglias.com
*Attorney for Amicus Curiae*
*Williamsport/Lycoming*
*Chamber of Commerce and*
*Greater Susquehanna Valley*
*Chamber of Commerce*

**525 William Penn Place**
**Suite 3005**
**Pittsburgh, PA 15219**
**(412) 227-5951 (Phone)**

19

## **WORD COUNT CERTIFICATION**

I hereby certify that the above principal brief complies with the word count limits of Pa.R.A.P. 531(b)(3). Based on the word count feature of the word processing system used to prepare this brief, this document contains 3,043 words.

Respectfully Submitted,

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.

*Christopher Carusone*

Date: February 14, 2022

_____
Christopher D. Carusone, Esquire
PA I.D. No. 71160
ccarusone@cohenseglias.com
*Attorney for Amicus Curiae
Williamsport/Lycoming
Chamber of Commerce and
Greater Susquehanna Valley
Chamber of Commerce*

**525 William Penn Place
Suite 3005
Pittsburgh, PA 15219
(412) 227-5951 (Phone)**

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.

*Christopher Carusone*

Date: February 14, 2022

_____

Christopher D. Carusone, Esquire
PA I.D. No. 71160
ccarusone@cohenseglias.com
*Attorney for Amicus Curiae*
*Williamsport/Lycoming*
*Chamber of Commerce and*
*Greater Susquehanna Valley*
*Chamber of Commerce*

**525 William Penn Place**
**Suite 3005**
**Pittsburgh, PA 15219**
**(412) 227-5951 (Phone)**

1

COMMONWEALTH OF PENNSYLVANIA
HOUSE OF REPRESENTATIVES
STATE GOVERNMENT COMMITTEE


NORTH CENTRAL REGIONAL PUBLIC HEARING
ON CONGRESSIONAL REDISTRICTING


WELLSBORO FIRE ANNEX
EAST AVENUE
WELLSBORO, PENNSYLVANIA



TUESDAY, OCTOBER 12, 2021
4:02 P.M.



BEFORE:

HONORABLE SETH GROVE, MAJORITY CHAIRMAN
HONORABLE SCOTT CONKLIN, MINORITY CHAIRMAN
HONORABLE RUSS DIAMOND (VIRTUAL)
HONORABLE DAWN KEEFER
HONORABLE ANDREW LEWIS (VIRTUAL)
HONORABLE BRETT MILLER (VIRTUAL)
HONORABLE ERIC NELSON (VIRTUAL)
HONORABLE CLINT OWLETT
HONORABLE FRANK RYAN (VIRTUAL)
HONORABLE PAUL SCHEMEL (VIRTUAL)
HONORABLE LOUIS SCHMITT (VIRTUAL)
HONORABLE ISABELLA FITZGERALD (VIRTUAL)
HONORABLE BENJAMIN SANCHEZ (VIRTUAL)
HONORABLE JARED SOLOMON (VIRTUAL)




_____


BRENDA J. PARDUN, RPR
REPORTER - NOTARY PUBLIC

Exhibit 1

A2581

2

```
 1                          INDEX

 2    NAME                                    PAGE

 3    WELCOME

 4    INTRODUCTIONS

 5    JEFFREY P. REBER
      VICE-CHAIR
 6    UNION COUNTY BOARD OF COMMISSIONERS
      MIFFLINBURG, PENNSYLVANIA
 7
      ROGER BUNN
 8    VICE-CHAIR
      TIOGA COUNTY BOARD OF COMMISSIONERS
 9    WELLSBORO, PENNSYLVANIA

10    MALCOLM DERK
      GREATER SUSQUEHANNA VALLEY CHAMBER
11    OF COMMERCE
      FREEBURG, PENNSYLVANIA
12
      JASON FINK
13    WILLIAMSPORT/LYCOMING CHAMBER OF COMMERCE
      WILLIAMSPORT, PENNSYLVANIA
14
      MARY ANN HESTON
15    HECTOR TOWNSHIP, PENNSYLVANIA

16    JANET GYEKIS
      WELLSBORO, PENNSYLVANIA
17
      BRYN HAMMARSTROM, RN
18    MIDDLEBURY CENTER, PENNSYLVANIA

19    AMY SHIELDS
      EXECUTIVE DIRECTOR
20    ALLEGHENY HARDWOOD UTILIZATION GROUP
      KANE, PENNSYLVANIA
21
      JAMES VAN BLARCOM
22    SUGAR BRANCH FARMS
      COLUMBIA CROSS ROADS, PENNSYLVANIA
23
      ADJOURNMENT
24

25
```

18

1    divided amongst multiple districts would

2    create undue burden on our elected officials,

3    create confusion with our electorate, and make

4    clear communication with our state elected

5    officials more difficult.  We respectfully

6    request that our congressional boundaries, as

7    currently defined, remain unchanged.

8              Thank you for your time and efforts

9    in this most important issue.  Signed by the

10   Tioga County Commissioners.

11             Thank you.

12             MAJORITY CHAIRMAN GROVE:  Thank you

13   so much, Commissioner Bunn.  Appreciate your

14   willingness to come testify and participate

15   this evening.

16             Before we head to our next testifier,

17   if Representative Eric Nelson wants to chime

18   in and say hi, he's participating virtually.

19             REPRESENTATIVE NELSON:  Hello.  Thank

20   you, Mr. Chair.  Appreciate being a part of

21   the hearing.  Hello from Westmoreland County.

22             MAJORITY CHAIRMAN GROVE:  Thank you.

23             Next testifier, Malcolm Derk, Greater

24   Susquehanna Valley Chamber of Commerce, from

25   Freeburg, Pennsylvania.

A2583

1           Mr. Derk, thank you so much for
2   coming and testifying this evening.  And when
3   you're comfortable and ready, and as long as
4   that green light is on, the floor is yours.
5           MR. DERK:  Thank you very much.
6           On behalf of the Greater Susquehanna
7   Valley Chamber of Commerce, the greater
8   Susquehanna Valley, please accept our
9   gratitude for the opportunity to share remarks
10  with you today to the State Government
11  Committee.
12          Representative Seth Grove and
13  Representative Scott Conklin, I thank you, as
14  chairs of this committee, for allowing us this
15  opportunity.
16          And Representative Owlett, I
17  appreciate being in Wellsboro, your home
18  district.
19          So, thank you for this opportunity.
20          I hope to share some information that
21  would be helpful to you, as you go about this
22  very important work of congressional
23  redistricting.  My name is Malcolm Derk, and I
24  am the chair of the Government Affairs
25  Committee of the Greater Susquehanna Valley

20

1    Chamber.

2         The testimony I share today is the

3    result of several listening sessions that

4    we've held with our members, and we're a very

5    diverse chamber that has health care,

6    educational members, as well as a variety of

7    wood products industries represented.  The

8    views do not necessarily reflect the views of

9    my employer or the leadership of the chamber,

10   but are the general consensus of those

11   listening sessions that we held at the Greater

12   Susquehanna Valley Chamber.  We hope that you

13   find these comments to be useful as you move

14   ahead with your important work.

15        I appreciate the momentous task that

16   you now have, as we know that the census has

17   required that Pennsylvania will lose one

18   congressional representative, one seat, and it

19   requires you to look at all of the lines once

20   again, something that I don't envy.

21        As you move forward with this

22   important work, our chamber members really

23   would like you to look at three overarching

24   points:  the natural travel patterns of

25   constituents; communities of interest; and

21

1      recognizable boundaries, specifically

2      boundaries that are familiar to residents and

3      distinguishable by voters.

4             Travel patterns in the region take

5      advantage of highways and road systems that

6      tie our region together, and in our home

7      communities -- Snyder, Union, Northumberland,

8      and Montour counties -- we're blessed with

9      having a robust system of highways and bridges

10      that tie those communities together and create

11      a network that feels very much like a unified

12      community.  We live, work, recreate, and

13      engage in commerce based on the ease by which

14      we're able to travel.  And along the 11 and 15

15      corridor in Snyder County, a large number of

16      retail establishments, restaurants, lodging

17      options, and grocery stores are located in

18      Shamokin Dam, Selinsgrove, and in Monroe

19      Township, and these amenities draw neighbors

20      from their surrounding counties, and it really

21      covers a large radius of the population.

22             In areas where natural travel

23      patterns are considered by a lack of connected

24      infrastructure, it really makes it difficult

25      for those communities to share common

A2586

22

1    interests.  But we are thankful that our

2    chamber region really does have that unified

3    feel because of the reliable transportation

4    infrastructure that has been supported by

5    federal and state governments.

6            More and more, the travel patterns in

7    our region also encompass Lycoming and

8    Columbia County, as the central Susquehanna

9    Valley throughway is under construction and

10   continues to tie us closer to Interstate 80

11   and that important corridor.

12           Our large employers, such as major

13   health systems of Geisinger and UPMC, they

14   provide jobs that pull employees from a

15   multi-county region that includes Lycoming,

16   Columbia, Montour, Union, Snyder, and

17   Northumberland counties.  Educational

18   institutions like Bucknell and Susquehanna

19   also require a larger area to recruit capable

20   employees that are educated and skilled

21   workers.

22           The wood products industry also is

23   not alone, and that's in Snyder and Union

24   County.  We have a variety of wood products

25   industries, cabinetry makers and others that

1    require a large amount of skilled workforce

2    that pull from a multi-county area.

3            These employees are required to

4    continue to look beyond just one county

5    boundary.  So, again, this creates a sense of

6    a unified feel and a community of interest in

7    the broader surrounding area.

8            While not a watershed in the

9    traditional sense, we think of the

10   transportation corridor as creating

11   communities of interest in a similar way that

12   streams, creeks, and rivers create a

13   watershed.  So, we call it -- rather than a

14   watershed, we call it a job shed or an

15   employment shed, and it's the catchment basin

16   that our various large employers use to find

17   skilled workers.

18           We ask that the committee consider

19   these flows of people for work and for

20   commerce as you engage and establish new

21   congressional boundaries.  I am certain that

22   each of you see similar movements within your

23   community and in the cohesion created by work

24   forces and travel patterns.

25           In our rural region, it's not

1    uncommon for many of our neighbors to commute

2    to other counties, thirty to forty minutes to

3    an hour away, to find meaningful employment

4    that's family-sustaining.  Such a commute in

5    an urban area may be traveling just a few

6    miles, but in our rural community, such travel

7    times can get us thirty to fifty miles away

8    from home.  And that's another area that I'd

9    like you to consider as you look at this

10   important work.

11          Communities of interest are also

12   created by the ways we collaborate with

13   neighbors, and Jeff Reber, from Union County,

14   mentioned that there are various ways that

15   counties collaborate for services.  In Snyder,

16   Union, and Northumberland County, the region

17   established the central Susquehanna 911

18   system.  The three-county collaboration shows

19   how small rural counties can work together to

20   improve efficiency, cost, reliability, and

21   improve scale.  The 911 system also partners

22   with several other counties in using a shared

23   phone system that includes Lycoming County as

24   well.

25          Union and Snyder County and other --

1      other agencies also collaborate for

2      transportation with Rabbit Transit and

3      community action agencies that are shared

4      across county boundaries.  And in our area --

5      the Snyder, Union, Northumberland County

6      region, we often refer to all three counties

7      as the SUN counties because they partner on so

8      many different varieties of social service and

9      government-administered funds.

10             Other social and nonprofit

11     organizations also function in this

12     multi-county way.  The Greater Susquehanna

13     Valley United Way, the Red Cross, and the

14     Susquehanna Valley Visitors Bureau also all

15     share this regional approach.  Grouping these

16     collaborative communities together in one

17     congressional district makes a lot of sense

18     because they do share this common interest.

19             Communities of interest are also

20     created by media coverage, and I think that's

21     one thing that you can appreciate in your

22     roles.  The chamber has several newspapers and

23     other media providers that offer quality

24     coverage and reporting to help inform the

25     citizenry.  The Daily Item, for example,

1    covers the counties of Snyder, Union, and

2    Northumberland, and Montour, and 1070 WKOK AM

3    provides coverage of local events and also a

4    talk radio program to help inform people

5    Monday through Friday of local news coverages.

6           The media assets help to inform the

7    public regarding their government decision

8    making.  We are also fortunate that these

9    media markets align with the current

10   congressional districts and our chamber

11   region.  Helping our members and fellow

12   citizens receive current and transparent

13   information is important to consider in

14   district lines.  These media groups create

15   affinity in the region, as we seek to have an

16   informed populace.  We should not

17   underestimate the importance of regional media

18   in creating communities of interest.  It is

19   important for the public to know what their

20   elected officials are doing and to know how to

21   access government.

22           I would like to dedicate the final

23   portion of my testimony to the importance of

24   maintaining, wherever possible, recognizable

25   municipal boundaries.  Keeping an entire

1    county within the same congressional district

2    helps to avoid confusion among voters and

3    provides an ease in recognizing districts.

4    Keeping counties whole should be a goal,

5    wherever possible.  But we also realize that

6    there are population shifts that make this

7    difficult in some instances.

8         We humbly request that when that does

9    happen that you do your best to find other

10   recognizable political subdivisions that help

11   to make sure we maintain communities of

12   interest and, for example, if there has to be

13   a split of a county, perhaps there's two

14   school districts in that county, that a whole

15   school district would remain intact.

16        Likewise, if you look at smaller

17   subdivisions such as a borough or a township,

18   we ask that those be kept whole as much as

19   possible.

20        As our members or neighbors ask for

21   how to contact their congressional

22   representatives, it's helpful for entire

23   communities to be kept together to avoid

24   confusion at the ballot box or as people seek

25   constituent services.

28

```
 1              Please keep municipalities and
 2       communities of interest whole as much as
 3       possible.
 4              Thank you, again, for your time today
 5       and for your interest in creating fair
 6       districts and for creating this transparent
 7       process where the public can engage with you
 8       and your colleagues across the state.
 9              Thank you again for your time.
10              MAJORITY CHAIRMAN GROVE:  Thank you
11       so much.
12              Just to let you know, Rabbit
13       Transit's executive director is my HOA
14       president.
15              MR. DERK:  Wonderful.  Then you
16       certainly know the work.
17              MAJORITY CHAIRMAN GROVE:  Right.
18       Right.  That's good stuff.  So, thank you so
19       much.
20              MR. DERK:  Thank you.
21              MAJORITY CHAIRMAN GROVE:  Appreciate
22       your time and your testimony.
23              We do have another member joining us
24       online, Representative Paul Schemel.
25              If you want to hop on, Paul, and say
```

29

```
1     hi, introduce yourself.

2              REPRESENTATIVE SCHEMEL:  Hi.  Thanks

3     so much.  Look forward to the testimony.

4              MAJORITY CHAIRMAN GROVE:  Thank you.

5              Next we have Jason Fink,

6     Williamsport/Lycoming Chamber of Commerce,

7     Williamsport, Pennsylvania.

8              Mr. Fink, thank you so much for

9     joining us and taking time out of your

10    schedule to do that.  We look forward to your

11    testimony.  And when you're comfortable and

12    ready, go ahead and begin.

13             MR. FINK:  Sounds good.  Thank you.

14             Good afternoon.  My name is Jason

15    Fink, and I'm the president and CEO of the

16    Williamsport/Lycoming Chamber of Commerce.

17             Thank you to the House State

18    Government Committee for this opportunity to

19    address the upcoming congressional

20    redistricting here in Pennsylvania.  I

21    appreciate the fact that you are doing these

22    across Pennsylvania and giving areas such as

23    ours the opportunity to voice their thoughts

24    on what should be considered for how the new

25    districts will be drawn and accommodating the
```

1   loss of one of our congressional seats.

2          To begin with my comments, I'd like

3   to give you a baseline of Lycoming County.  We

4   have a population of roughly 114,000 people

5   and are one of fourteen MSAs here in the

6   Commonwealth.  Most of our population can be

7   found in the greater Williamsport area.  The

8   city itself is a population of approximately

9   28,000 people, and the greater Williamsport

10  area is just under 90,000.

11         There are eight public school

12  districts in the county.  We have two

13  colleges:  Pennsylvania College of Technology,

14  with a student population of 4500, and

15  Lycoming College, with a student population of

16  1500.

17         We have a strong industrial base here

18  in the county.  Manufacturing is vibrant and

19  growing, as we see new industries such as

20  Digger Specialities and Chance Aluminum

21  establishing new operations here.  We're also

22  seeing growth with existing manufactures, such

23  as West Pharmaceuticals and Shop-Vac

24  Corporation.

25         Additionally, we have a strong

1    presence of industry that conduct federal work

2    with the Department of Defense, including L3

3    Harris, Lycoming Engineers, Spartronics, PMF

4    Industries, and QorTek.

5         The county has major highways running

6    through it, with I-180, US 15, and US 220.  It

7    has rail service with mainline service by NS

8    and short-line service with North Shore

9    Railroad.  We also have the Williamsport

10   Regional Airport.

11        It should also be noted that we are

12   also home to the US Middle District Courthouse

13   in Williamsport.

14        Given the size of our county, we are

15   first and foremost concerned about ensuring

16   that any redistricting be done which keeps

17   Lycoming County whole.  This has been mostly

18   the case when maps have been drawn, however it

19   hasn't always been that way.  From 2000 to

20   2010, Lycoming County was split with roughly

21   two-thirds of the county being in the 5th

22   Congressional District and the remaining

23   portion in the 15th Congressional District.

24        Our congressmen during that time were

25   John Peterson and Glenn Thompson.  Both were

1    great to work with, however it was difficult

2    at times for us, in trying to work with them

3    on a county-wide -- on county-wide issues

4    given the nature in which we were divided.

5            Having been through something like

6    this in our not-to-distant past, we would

7    strongly encourage those in finalizing the new

8    congressional districts to keep Lycoming

9    County whole.

10           We would next request that, as the

11   maps are drawn, that consideration been given

12   to provide us to be included with neighboring

13   counties, as is currently done.  Those

14   counties that I speak of include Clinton,

15   Tioga, Union, Northumberland, Snyder, and

16   Sullivan.  There are many items that we work

17   with these counties on, as all but two of

18   these are in the same local development

19   district, SEDA-COG.

20           Specifically to the chamber, we have

21   a number of workforce development

22   opportunities that we work with neighboring

23   counties here in the region.  Our commute shed

24   for industries in our counties include all

25   that were mentioned.  Area industries also

33

1     rely upon colleges in the region, including

2     Bucknell, Susquehanna, Lock Haven, and

3     Mansfield.  There also is greater involvement

4     with current technical schools, such as SUN

5     vo-tech and Central Mountain.

6               It is understood that there will be

7     changes that need to be made based upon the

8     loss of our congressional seat.  This is part

9     of a larger problem that we, as

10    Pennsylvanians, need to look at addressing now

11    so that we don't see this occurrence in 2030,

12    when the next census is complete.

13              For now, though, we ask that Lycoming

14    County be kept whole and that our existing

15    relationships with neighboring counties be

16    maintained as they currently are in developing

17    this new congressional map.

18              Thank you for taking this request in

19    consideration.

20              MAJORITY CHAIRMAN GROVE:  Thank you

21    very much for your testimony and your time

22    this evening.  Really appreciate it.

23              Next testifier is Mary Anne Heston,

24    Hector Township, Pennsylvania.

25              Mary Anne, come on up.  And when you

**[J-20-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : | No. 7 MM 2022<br><br>ARGUED:  February 18, 2022 |
| Petitioners | : : : | |
| v. | : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : : | |
| Respondents | : : | |
| ------------------------------------------------------------ | : | |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : : : | |
| Petitioners | : : : | |
| v. | : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF | : : : | |

PENNSYLVANIA; JESSICA MATHIS, IN      :
HER OFFICIAL CAPACITY AS DIRECTOR     :
FOR THE PENNSYLVANIA BUREAU OF        :
ELECTION SERVICES AND NOTARIES,       :
                                      :
            Respondents               :

## ORDER

**PER CURIAM**

     **AND NOW,** this 23rd day of February, 2022, this Court, following full deliberation and consideration, hereby orders as follows:

     First, the Pennsylvania primary and general elections for seats in the United States House of Representatives commencing in the year 2022 shall be conducted in accordance with the "Carter Plan" submitted in the record before the Special Master and as described by 2020 Census block equivalency (denominated the "Carter Plan – Block Assignments") and ESRI shape files (denominated "Carter Plan – Shape Files") uploaded to this Court's website at https://www.pacourts.us/2022-redistricting-opinions.[1]   The Carter Plan, in its constituent parts, is hereby made part of this Order, and is hereby **ADOPTED** as the division of this Commonwealth into seventeen congressional districts, unless and until the same shall be lawfully changed.  For reference, images of the Carter Plan, submitted to the Court, are attached at Appendix A, and are available at the above website.

     Second, Executive Respondents together with the General Assembly's Legislative Data Processing Center (LDPC),[2] shall prepare textual language that describes the Carter Plan and submit the same to the Secretary of the Commonwealth without delay. The Secretary of the Commonwealth shall thereafter file with this Court's Prothonotary a

---

[1]    As noted, we adopt the "Carter Plan" submitted in the record before the Special Master as opposed to the additional plan submitted by Petitioner Carter in Exhibit A to the brief in support of exceptions to the Special Master's Report.

[2]    The LDPC was established by the Act of Dec. 10, 1968, P.L. 1158, No. 365, and routinely provides technical services relating to congressional and legislative redistricting.

2

certification of compliance of the preparation of the textual description of the Carter Plan, along with a copy of the textual description.

Third, Respondent Secretary of the Commonwealth shall, without delay, following the preparation of the textual description of the Carter Plan, publish notice of the Congressional Districts in the Pennsylvania Bulletin.

Fourth, this Court's February 9, 2022 order, that temporarily suspended the General Primary Election calendar, is **VACATED**. To provide for an orderly election process, the schedule for the primary election to be held May 17, 2022, for the election of Representatives to the United States Congress and statewide elections is **MODIFIED** only in the following respects:

| | |
|---|---|
| First day to circulate and file nomination petitions | February 25, 2022 |
| Last day to circulate and file nomination petitions | March 15, 2022 |
| First day to circulate and file nomination papers | March 16, 2022 |
| Deadline to file objections to nomination petitions | March 22, 2022 |
| Last day that may be fixed by the Commonwealth Court for hearing on objections that have been filed to nomination petitions | March 25, 2022 |
| Last day for the Commonwealth Court to render decisions in cases involving objections to nomination petitions | March 29, 2022 |
| Last day for the County Boards of Elections to send remote military-overseas absentee ballots. *See* 25 Pa.C.S. §3508; 52 U.S.C. §20302(a)(8)(A) | April 2, 2022 |

In all other respects, the dates under the 2022 General Election Primary calendar for Congressional and statewide offices are not modified by this Order. Along these lines, it is **NOTED** that, with respect to Congressional and statewide offices, the appeal period set forth in Rule of Appellate Procedure 903(c)(1)(ii) (relating to appeals arising under the Election Code) remains in effect. This schedule shall be implemented by the Secretary of the Commonwealth and all election officers within the Commonwealth in accordance

3

with this Court's Order.  By separate Order, this Court has temporarily suspended the General Primary Election calendar relative to seats in the Pennsylvania General Assembly.  *See In re Petitions for Review Challenging the Final 2021 Legislative Reapportionment Plan*, 569 Judicial Administration docket (order dated February 23, 2022).

Fifth, should there be any congressional vacancies existing now or occurring after the entry of this Order, but prior to the commencement of the terms of the members to be elected in the General Election of 2022, the districts prescribed in the Remedial Plan adopted by this Court by Order dated February 19, 2018, shall control.

Sixth, the Secretary of the Commonwealth is directed to notify this Court by 4:00 p.m. on February 25, 2022, should it foresee any technical issues concerning the implementation of the Carter Plan.

So Ordered.

Jurisdiction retained.

Opinions to follow.

Justices Todd, Mundy, and Brobson dissent as to the selection of the Carter Plan as the congressional redistricting plan.

4

**[J-20-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : | No. 7 MM 2022 ARGUED:  February 18, 2022 |
| Petitioners | : : : | |
| v. | : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : | |
| Respondents | : : | |
| ----------------------------------------------------------- | : | |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : | |
| Petitioners | : : : | |
| v. | : : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF | : : : | |

A2603

PENNSYLVANIA; JESSICA MATHIS, IN         :
HER OFFICIAL CAPACITY AS DIRECTOR        :
FOR THE PENNSYLVANIA BUREAU OF           :
ELECTION SERVICES AND NOTARIES,          :
                                         :
        Respondents                      :

## ORDER

**PER CURIAM**

      **AND NOW,** this 23rd day of February, 2022, this Court, following full deliberation and consideration, hereby orders as follows:

      First, the Pennsylvania primary and general elections for seats in the United States House of Representatives commencing in the year 2022 shall be conducted in accordance with the "Carter Plan" submitted in the record before the Special Master and as described by 2020 Census block equivalency (denominated the "Carter Plan – Block Assignments") and ESRI shape files (denominated "Carter Plan – Shape Files") uploaded to this Court's website at https://www.pacourts.us/2022-redistricting-opinions.[1]   The Carter Plan, in its constituent parts, is hereby made part of this Order, and is hereby **ADOPTED** as the division of this Commonwealth into seventeen congressional districts, unless and until the same shall be lawfully changed.  For reference, images of the Carter Plan, submitted to the Court, are attached at Appendix A, and are available at the above website.

      Second, Executive Respondents together with the General Assembly's Legislative Data Processing Center (LDPC),[2] shall prepare textual language that describes the Carter Plan and submit the same to the Secretary of the Commonwealth without delay. The Secretary of the Commonwealth shall thereafter file with this Court's Prothonotary a

---

[1]    As noted, we adopt the "Carter Plan" submitted in the record before the Special Master as opposed to the additional plan submitted by Petitioner Carter in Exhibit A to the brief in support of exceptions to the Special Master's Report.

[2]    The LDPC was established by the Act of Dec. 10, 1968, P.L. 1158, No. 365, and routinely provides technical services relating to congressional and legislative redistricting.

certification of compliance of the preparation of the textual description of the Carter Plan, along with a copy of the textual description.

Third, Respondent Secretary of the Commonwealth shall, without delay, following the preparation of the textual description of the Carter Plan, publish notice of the Congressional Districts in the Pennsylvania Bulletin.

Fourth, this Court's February 9, 2022 order, that temporarily suspended the General Primary Election calendar, is **VACATED**. To provide for an orderly election process, the schedule for the primary election to be held May 17, 2022, for the election of Representatives to the United States Congress and statewide elections is **MODIFIED** only in the following respects:

| First day to circulate and file nomination petitions | February 25, 2022 |
|---|---|
| Last day to circulate and file nomination petitions | March 15, 2022 |
| First day to circulate and file nomination papers | March 16, 2022 |
| Deadline to file objections to nomination petitions | March 22, 2022 |
| Last day that may be fixed by the Commonwealth Court for hearing on objections that have been filed to nomination petitions | March 25, 2022 |
| Last day for the Commonwealth Court to render decisions in cases involving objections to nomination petitions | March 29, 2022 |
| Last day for the County Boards of Elections to send remote military-overseas absentee ballots. *See* 25 Pa.C.S. §3508; 52 U.S.C. §20302(a)(8)(A) | April 2, 2022 |

In all other respects, the dates under the 2022 General Election Primary calendar for Congressional and statewide offices are not modified by this Order. Along these lines, it is **NOTED** that, with respect to Congressional and statewide offices, the appeal period set forth in Rule of Appellate Procedure 903(c)(1)(ii) (relating to appeals arising under the Election Code) remains in effect. This schedule shall be implemented by the Secretary of the Commonwealth and all election officers within the Commonwealth in accordance

with this Court's Order. By separate Order, this Court has temporarily suspended the General Primary Election calendar relative to seats in the Pennsylvania General Assembly. *See In re Petitions for Review Challenging the Final 2021 Legislative Reapportionment Plan*, 569 Judicial Administration docket (order dated February 23, 2022).

Fifth, should there be any congressional vacancies existing now or occurring after the entry of this Order, but prior to the commencement of the terms of the members to be elected in the General Election of 2022, the districts prescribed in the Remedial Plan adopted by this Court by Order dated February 19, 2018, shall control.

Sixth, the Secretary of the Commonwealth is directed to notify this Court by 4:00 p.m. on February 25, 2022, should it foresee any technical issues concerning the implementation of the Carter Plan.

So Ordered.

Jurisdiction retained.

Opinions to follow.

Justices Todd, Mundy, and Brobson dissent as to the selection of the Carter Plan as the congressional redistricting plan.

Judgment Entered 02/23/2022

*Amy L. Drupbis*
DEPUTY PROTHONOTARY

4



Proposed Plan

Districts:

| | | | | |
|---|---|---|---|---|
| 1 | | | 14 | |
| 10 | | | 15 | |
| 11 | | | 16 | |
| 12 | | | 17 | |
| 13 | | | 2 | |
| | | | 3 | |
| | | | 4 | |
| | | | 5 | |
| | | | 6 | |
| | | | 7 | |
| | | | 8 | |
| | | | 9 | |
| | | | County boundaries | |

**[J-20-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : : | No. 7 MM 2022 ARGUED:  February 18, 2022 |
| Petitioners | : : : : | |
| v. | : : : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : : : | |
| Respondents | : : : | |
| ---------------------------------------------------------- PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : : : : | |
| Petitioners | : : : | |
| v. | : : : | |

A2608

```
                                          :
                                          :
LEIGH M. CHAPMAN, IN HER OFFICIAL         :
CAPACITY AS THE ACTING SECRETARY          :
OF THE COMMONWEALTH OF                    :
PENNSYLVANIA; JESSICA MATHIS, IN          :
HER OFFICIAL CAPACITY AS DIRECTOR         :
FOR THE PENNSYLVANIA BUREAU OF            :
ELECTION SERVICES AND NOTARIES,           :
                                          :
              Respondents                 :
```

## OPINION

OPINION FILED:  March 9, 2022

**CHIEF JUSTICE BAER**                    DECIDED:  February 23, 2022

### I. Introduction

Pennsylvania's current congressional districting plan is irrefutably unconstitutional based upon the reapportionment of the House of Representatives following the 2020 Decennial Census conducted pursuant to Article I, Section 2 of the United States Constitution.  Due to this Commonwealth's loss of population relative to the nation as a whole, Pennsylvania's allotted number of congressional representatives declined from eighteen to seventeen.  As a result, Pennsylvania now requires a new congressional districting plan drawn with only seventeen districts for the upcoming May 17, 2022, Primary Election.

Because the General Assembly and the Governor failed to agree upon a congressional redistricting plan, this Court was tasked with that "unwelcome obligation." *League of Women Voters of Pennsylvania v. Commonwealth*, 178 A.3d 737, 823 (Pa. 2018) ("*LWV II*").  This is not uncharted territory, as a similar scenario unfolded following the inability of the political branches to enact a plan in the wake of the 1990 Decennial Census.  In *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992), this Court assumed plenary jurisdiction of an action originating in the Commonwealth Court and designated a

Commonwealth Court judge as master to conduct hearings, make findings of fact, and render conclusions of law before the Court decided on an appropriate redistricting plan. *Mellow*, 607 A.2d at 206.  The same procedure was adhered to in this case.

Our Special Master expended tremendous effort by expeditiously conducting hearings, making extensive findings of fact, providing a comprehensive report to this Court analyzing the merits of the various congressional redistricting plans submitted before it, and ultimately recommending the adoption of the plan created by the Pennsylvania Legislature in House Bill 2146 ("H.B. 2146"), which Governor Tom Wolf vetoed on January 26, 2022.  We acknowledge and thank her for her effort.

After deliberating and affording due consideration to our Special Master's findings and recommendation and reviewing *de novo* the relative merit of the submitted congressional plans, the Court respectfully declined to adopt the Special Master's analysis and ultimate plan selection.  Rather, on February 23, 2022, we entered a *per curiam* order, directing that the Pennsylvania primary and general elections for seats in the United States House of Representatives commencing in 2022 shall be conducted in accordance with the plan submitted to the Special Master by the Carter Petitioners, who we name herein below ("Carter Plan").[1]  Our order indicated that an opinion would follow, and this opinion is filed in accordance therewith.

In full cognizance that the redistricting of congressional districts falls squarely within the purview of the General Assembly, U.S. CONST., art. I, § 4, cl. 1, we have fulfilled our obligation to select a redistricting plan only because the Legislature was unable to do so.[2]  In making our selection, we were guided by our decision in *LWV II*, where we applied

---

[1] Justices Todd, Mundy, and Brobson dissented as to the selection of the Carter Plan as the congressional redistricting plan.

[2] The Elections Clause of the United States Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed

the traditional core districting criteria requiring that congressional districts be compact, contiguous, as nearly equal in population as practicable, and which minimize divisions of political subdivisions, while taking into consideration the subordinate historical considerations, such as communities of interests, the preservation of prior district lines, and the protection of incumbents. *LWV II*, 178 A.3d at 816-17. Finally, we have ensured that the congressional districting plan that we adopted does not violate Pennsylvania's Free and Equal Elections Clause by "dilut[ing] the potency of an individual's ability to select the congressional representative of his or her choice," *id.* at 816, and complies with the Voting Rights Act, 52 U.S.C. § 10301.[3]

This Court acknowledges that there is no perfect redistricting plan. Each map involves trade-offs between the requisite traditional core redistricting criteria, as well as the subordinate historical redistricting considerations. The task of balancing these criteria and considerations is better suited to the Commonwealth's political branches, rather than the judiciary. Nevertheless, given our unwelcomed circumstance, we have endeavored to adopt a plan that, as phrased in *League of Women Voters of Pennsylvania v. Commonwealth*, 181 A.3d 1083, 1087 (Pa. 2018) ("*LWV III*"), is "superior or comparable" to all of the plans submitted on the designated criteria.

As evidenced by the views expressed by our esteemed colleagues and the Special Master, reasonable minds can disagree in good faith as to which submitted plan best

_____

in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST., art. I, § 4, cl. 1. Congress passed 2 U.S.C. § 2a, pursuant to the Elections Clause, which provides that, following the decennial census and reapportionment, the Clerk of the House of Representatives shall "send to the executive of each State a certificate of the number of Representatives to which such State is entitled" and the state shall be redistricted "in the manner provided by the law thereof."

[3] The Free and Equal Elections Clause provides that "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, § 5.

balances the requisite criteria and considerations.  Nevertheless, for the reasons set forth below, we adopt the plan submitted to the Special Master by the Carter Petitioners as the 2022 Congressional Redistricting Plan.

## II. Procedural History

This matter commenced on December 17, 2021, when two separate petitions for review were filed in the Commonwealth Court's original jurisdiction.  At Commonwealth Court docket number 464 M.D. 2021, Carol Ann Carter *et al.* (collectively referred to as "Carter Petitioners") presented a petition for review.[4]  The Carter Petitioners identified themselves as citizens of the United States who are registered to vote in Pennsylvania. They named as respondents to their petition Veronica Degraffenreid, in her capacity as then-Acting Secretary of the Commonwealth of Pennsylvania,[5] and Jessica Mathis, in her capacity as Director for the Pennsylvania Bureau of Election Services and Notaries (collectively referred to as "Respondents").  At Commonwealth Court docket number 465 M.D. 2021, Philip T. Gressman, *et al.* (collectively referred to as "Gressman Petitioners") filed a petition for review.[6] [7]  The Gressman Petitioners identified themselves as United States citizens who are registered to vote in Pennsylvania.  They further described themselves as "leading professors of mathematics and science[.]"  Gressman Petitioners'

---

[4] Additional Carter Petitioners included:  Monica Parrilla, Rebecca Poyourow, William Tung, Roseanne Milazzo, Burt Siegel, Susan Cassanelli, Lee Cassanelli, Lynn Wachman, Michael Guttman, Maya Fonkeu, Brady Hill, Mary Ellen Balchunis, Tom DeWall, Stephanie McNulty, and Janet Temin.

[5] Leigh Chapman later became the Acting Secretary of the Commonwealth of Pennsylvania and was substituted for Acting Secretary Degraffenreid.

[6] Additional Gressman Petitioners were Ron Y. Donagi, Kristopher R. Tapp, Pamela Gorkin, David P. Marsh, James L. Rosenberger, Amy Myers, Eugene Boman, Gary Gordon, Liz McMahon, Timothy G. Feeman, and Garth Isaak.

[7] We will refer to the Carter Petitioners and the Gressman Petitioners collectively as "Petitioners."

Petition for Review, 12/17/2021, at ¶10.  The Gressman Petitioners also designated Respondents as the opposing parties.

The petitions for review were substantially similar in their alleged facts, claims presented, and relief requested.  Factually, Petitioners asserted that this Court in *LWV III*, utilized data from the 2010 Census when we adopted the 2018 congressional district plan ("2018 Plan"), which appropriately divided the Commonwealth into eighteen districts. Petitioners, however, explained that the 2020 Census reflected a population shift that resulted in the Commonwealth losing one of its congressional districts, rendering the 2018 Plan unconstitutionally malapportioned.

Stated broadly, Petitioners claimed that the 2018 Plan violated their state and federal rights to cast undiluted votes.   In terms of relief, Petitioners asked the Commonwealth Court to: (1) deem the 2018 Plan unconstitutional; (2) enjoin Respondents and related parties from implementing, enforcing, or giving effect to that plan; and (3) adopt a constitutionally acceptable congressional district plan in time for the impending 2022 election cycle.

On December 20, 2021, the Commonwealth Court consolidated the petitions for review and, in a separate order, established a process, in compliance with this Court's prior decision in *Mellow*, *supra*, by, *inter alia*, setting deadlines for:  (1) the filing of applications to intervene; (2) submitting proposed seventeen-district congressional reapportionment plans consistent with constitutional principles and the 2020 Census; and (3) conducting hearings in the event that the court would be required to choose a new map due to political gridlock.

The following day, December 21, 2021, Petitioners filed in this Court Applications for Extraordinary Relief.  In those applications, Petitioners asked this Court, *inter alia*, to exercise its extraordinary jurisdiction pursuant to 42 Pa.C.S. § 726 and Pa.R.A.P. 3309

to address expeditiously the merits of the claims that they presented in their petitions for review.[8]  This Court eventually denied those applications without prejudice to reapply for similar relief, as future developments might dictate.

While these applications were pending in this Court, the Commonwealth Court held a hearing on the ten applications to intervene that had been filed in that court.  By order dated January 14, 2022, the court set new deadlines regarding the judicial process that would address the petitions for review, and it granted intervenor status to the following applicants:   (1) the Speaker and Majority Leader of the Pennsylvania House of Representatives; (2) the President Pro Tempore and Majority Leader of the Pennsylvania Senate; (3) Pennsylvania State Senators Maria Collett, Katie J. Muth, Sharif Street, and Anthony H. Williams; (4) Tom Wolf, Governor of the Commonwealth of Pennsylvania; (5) Senator Jay Costa and members of the Democratic Caucus of the Senate of Pennsylvania; (6) Representative Joanna E. McClinton, Leader of the Democratic Caucus of the Pennsylvania House of Representatives; and (7) Congressman Guy Reschenthaler, Swatara Township Commissioner Jeffrey Varner, Tom Marino, Ryan Costello, and Bud Shuster.

The Commonwealth Court directed that these intervenors would participate in the litigation as parties.  The court directed all parties to submit at least one but no more than

---

[8] Section 726 of the Pennsylvania Judicial Code provides as follows:

> Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

42 Pa.C.S. § 726.  Pennsylvania Rule of Appellate Procedure 3309 explains the process for applying for relief under 42 Pa.C.S. § 726.

two proposed congressional redistricting plans, along with a supporting brief and/or an expert report by January 24, 2022.  The court also required each party to file a responsive brief and/or expert report by January 26, 2022.  In addition, the court directed these parties to submit a joint stipulation of facts, and the court set January 27th and 28th of 2022 as the dates of the evidentiary hearings on this matter.  Concerning those hearings, the court explained that each of the parties would be permitted to present one witness and to cross-examine the other parties' witnesses.

In the same order, the Commonwealth Court granted *amicus* status to the following applicants:  (1) Voters of the Commonwealth of Pennsylvania; (2) Citizen-Voters; (3) Draw the Lines-PA; and (4) Khalif Ali *et al.*  The court limited the *amicus* participants' litigation contribution to the submission of one proposed congressional redistricting plan and a supporting brief and/or expert report.

Subsequently, the parties and *amici* submitted congressional redistricting maps, expert reports, and briefs in support thereof.  The Commonwealth Court held hearings on January 27th and 28th of 2022, at which numerous experts testified.

On January 29, 2022, the Carter Petitioners filed in this Court another Application for Extraordinary Relief, requesting that this Court immediately assume jurisdiction over the redistricting litigation.  By order dated February 2, 2022, this Court granted the Carter Petitioners' Application for Extraordinary Relief, obtaining original jurisdiction over the matter.

In conformance with this Court's decision in *Mellow*, *supra*, we: (1) designated as a Special Master the Honorable Patricia A. McCullough, the Commonwealth Court judge who was presiding over the matter when we assumed plenary jurisdiction; (2) explained that the proceedings that already had occurred in the Commonwealth Court shall be considered part of the Special Master's record; (3) directed the Special Master to file in

this Court on or before February 7, 2022, a report containing proposed findings of fact and conclusions of law supporting her recommendation of a redistricting plan; and (4) set a schedule for the parties and *amicus* participants to file exceptions and briefs in this Court.

On February 7, 2022, the Special Master submitted her comprehensive report. While we do not provide a detailed summary of that report, we highlight that the report deemed the 2018 Plan constitutionally deficient because, *inter alia*, it created boundaries for eighteen congressional seats based upon the 2010 Census but the 2020 Census resulted in Pennsylvania being limited to seventeen congressional seats. The report further observed that the General Assembly and Governor were unable to agree upon a congressional redistricting plan to replace the 2018 Plan, thus, thrusting upon the Pennsylvania judiciary the task of selecting such a plan.

The Special Master ultimately received thirteen congressional redistricting plans to study. Although the Special Master used several metrics to choose the most desirable plan, she eliminated multiple plans from consideration due to the following alleged shortcomings: (1) the splitting of the City of Pittsburgh into separate districts; (2) the yielding of a partisan advantage contrary to Pennsylvania's political geography; and (3) the failure to achieve a maximum population deviation of one person.

Regarding the remaining plans, the Special Master ultimately chose H.B. 2146 to replace the 2018 Plan. As will be discussed in more detail *infra*, the Special Master appears to have given H.B. 2146 preferential treatment because "it is the General Assembly's prerogative, rather its constitutional mandate, to redraw the state's congressional districts under Article I, section 4 of the United States Constitution and its related provisions in the Pennsylvania Constitution and state statutes." Report at 208, ¶62; *id.* at 214, ¶94 ("The Court believes that, in the context of this case, where it must

recommend one map of many, as a matter of necessity, the interests of the Commonwealth as a sovereign state and political entity in its own right, would best be served by factoring in and considering that H.B. 2146 is functionally tantamount to the voice and will of the People[.]").

While the Special Master provided her recommendation of a congressional district plan, we are mindful that this Court obtained original jurisdiction over this litigation when we granted the Carter Petitioners' Application for Extraordinary Relief; accordingly, our scope of review of the matter is *de novo*. *LWV II*, 178 A.3d at 801 n.62. While Judge McCullough's findings of fact are not binding on this Court, they are afforded due consideration, as she presided over the evidentiary hearing. *Id.*

In accordance with this Court's order of February 2, 2022, the following parties and *amicus* participants have filed exceptions in this Court: (1) Carter Petitioners; (2) Gressman Petitioners; (3) Respondents; (4) Congressman Guy Reschenthaler, Swatara Township Commissioner Jeffrey Varner, Tom Marino, Ryan Costello, and Bud Shuster; (5) Senator Jay Costa and members of the Democratic Caucus of the Senate of Pennsylvania; (6) Tom Wolf, Governor of the Commonwealth of Pennsylvania; (7) Representative Joanna E. McClinton, Leader of the Democratic Caucus of the Pennsylvania House of Representatives; (8) Khalif Ali *et al.*; (9) Citizen-Voters; and (10) Draw the Lines-PA.

In relevant part, the exceptions challenge the way that the Special Master eliminated plans and the criteria that she utilized in choosing H.B. 2146. For example, several of the parties and *amici* are of the view that it was error for the Special Master to reject plans because they split the City of Pittsburgh, attempted to accomplish partisan fairness, or failed to achieve a maximum population deviation of one person. Some also

insist, *inter alia*, that the Special Master erroneously favored H.B. 2146 simply because it was produced by the Legislature.

The following parties have filed briefs in support of the Special Master's Report: (1) Voters of the Commonwealth of Pennsylvania;[9] (2) the Speaker and Majority Leader of the Pennsylvania House of Representatives; and (3) the President Pro Tempore and Majority Leader of the Pennsylvania Senate.  Lastly, the following parties filed *amicus* briefs in the Court:  (1) Philadelphia County Board of Elections; (2) Washington County Public Officials; (3) Concerned Citizens for Democracy; and (4) Williamsport/Lycoming Chamber of Commerce and Greater Susquehanna Valley Chamber of Commerce.

On February 18, 2022, this Court heard argument on the parties' exceptions to the Special Master's Report.  We would like to extend our gratitude to the parties and their counsel who participated in that hearing.  Their submissions and advocacy have greatly aided this Court in completing the task of selecting an appropriate redistricting plan.

### III. Case Law

In *Mellow*, *supra*, we explained that Pennsylvania lost two congressional districts following the 1990 census, and the General Assembly failed to enact a timely remedial reapportionment plan.  State senators subsequently filed an action in the Commonwealth Court seeking: (1) a declaration that the existing congressional apportionment law was unconstitutional; (2) an injunction to enjoin the implementation of the congressional election until a valid plan could be adopted; and (3) the adoption of a valid plan in the event the Legislature was unable to do so.  *Mellow*, 607 A.2d at 205.  Upon the senators' request, this Court assumed plenary jurisdiction over the matter and designated a Commonwealth Court judge as special master to conduct hearings, to make findings of fact, and to render conclusions of law.  *Id.* at 206.

---

[9] The Voters of the Commonwealth of Pennsylvania additionally advocated in favor of the map they submitted.

In *Mellow*, this Court adopted the master's factual findings, as well as his recommended decision regarding the selection of one of the six congressional redistricting plans submitted. *Id.* Initially, the Court examined the master's reasons for recommending the plan, *i.e.*, the plan had a low maximum population deviation, contained minimal splits of municipalities, achieved an enlarged number of congressional districts with a majority African American population, and came closest to implementing factors relating to communities of interest. *Id.* at 206. The Court proceeded to resolve numerous exceptions to the master's report filed by the parties, ultimately concluding that the master's conclusions of law were sound. Notably, the Court then addressed what it termed as "Additional Criteria," which included an examination of the political fairness of the plan, finding that the plan "results in a politically fair balance in the Pennsylvania delegation between Democrats and Republicans," considering that it divided the two-seat congressional loss equally between both parties. *Id.* at 210.

Following *Mellow*, which was decided in 1992, this Court, once again, was faced with having to adopt a congressional redistricting map under the circumstances presented in our seminal 2018 decision in *LWV II*. Unlike the instant case, where the General Assembly and the Governor failed to enact a redistricting map after a change in Pennsylvania's population resulted in the loss of a congressional district, voters in *LWV II* commenced an action in the Commonwealth Court challenging an existing congressional redistricting plan enacted in 2011 ("2011 Plan"). The petitioners alleged, *inter alia*, that the 2011 Plan violated the Free and Equal Elections Clause of Article I, Section 5 of the Pennsylvania Constitution by intentionally discriminating against the petitioners and other Democratic voters by using redistricting to maximize Republican congressional seats and entrench Republican power. *LWV II*, 178 A.3d at 766. They contended that the 2011 Plan had the actual discriminatory effect of disadvantaging Democratic voters and

burdening severely their representational rights.  Petitioners thereafter filed an application for extraordinary relief in this Court.

We granted the application, assumed plenary jurisdiction, and remanded the matter to the Commonwealth Court for the creation of an evidentiary record.  Upon review of the findings of fact and conclusions of law submitted by then-Judge, now-Justice, Brobson, this Court, on January 22, 2018, entered a *per curiam* order: (1) declaring that the 2011 Plan clearly, plainly, and palpably violated the Pennsylvania Constitution; (2) striking the 2011 Plan as unconstitutional; and (3) enjoining its use at the May 2018 primary election.  *League of Women Voters of Pennsylvania*, 175 A.3d 282, 289 (Pa. 2018) ("*LWV I*").  Our *per curiam* order further afforded the General Assembly the opportunity to submit a congressional districting plan that comported with our state charter, if approved by the Governor.  Absent such submission, the Court declared that it would proceed expeditiously to adopt a plan based on the evidentiary record developed in the Commonwealth Court.[10]  *Id.* at 290.  No such plan was ever adopted by the Legislature.

In our subsequent opinion in support of our *per curiam* order, the Court explained that the "Free and Equal Elections Clause was specifically intended to equalize the power of voters in our Commonwealth's election process, and it explicitly confers this guarantee[.]"  *LWV II*, 178 A.3d at 812.  In determining how to assess a claim alleging congressional vote dilution under the Free and Equal Elections Clause of the state charter, the Court turned to the neutral criteria that traditionally governed the formation of the Commonwealth's state legislative districts, as set forth in Article 2, Section 16 of the Pennsylvania Constitution.  *Id.* at 815-16.  These criteria require an examination of whether the congressional districts created under the redistricting plan:  (1) are composed

---

[10] This author filed a concurring and dissenting statement, and then-Chief Justice Saylor and Justice Mundy filed dissenting statements.

of compact territory; (2) are comprised of contiguous territory; (3) are as nearly equal in population as practicable; and (4) do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population (collectively, "traditional core criteria"). *Id.* at 816-17. We explained that these criteria emphasize greatly the creation of representational districts that "maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs," and "accord equal weight to the votes of residents in each of the various districts." *Id.* at 814.

Finding these traditional core criteria to be "deeply rooted in the organic law of our Commonwealth," and the "foundational requirements which state legislative districts must meet under the Pennsylvania Constitution," the Court adopted them as a measure to assess whether a congressional districting plan dilutes the potency of a voter's ability to select his or her preferred congressional representative in violation of the Free and Equal Elections Clause. *Id.* at 816. We explained that these traditional core criteria provide a "floor" of protection against the dilution of one's vote and that the subordination of these criteria to extraneous considerations, such as partisan gerrymandering, is unconstitutional. *Id.* at 817. Additionally, we observed that congressional districting maps must also comply with federal law, specifically, the Voting Rights Act, 52 U.S.C. § 10301. *Id.* at 817 n.72.

The Court in *LWV II* further recognized additional factors that have historically played a role in the creation of legislative districts, such as "the preservation of prior district lines, the protection of incumbents, and the maintenance of the political balance which existed after the prior reapportionment." *Id.* at 817. Additionally recognized as a subordinate historical factor was the preservation of communities of interest because "[w]hen an individual is grouped with other members of his or her community in a

congressional district for purposes of voting, the commonality of the interests shared with the other voters in the community increases the ability of the individual to elect a congressional representative for the district who reflects his or her personal preferences." *Id.* at 816.

We clarified that these historical factors are wholly subordinate to the traditional core criteria requiring compact and contiguous districts, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts. *Id.* at 817. We will refer to these factors as "subordinate historical considerations."

Relevant here, we recognized that "there exists the possibility that advances in map drawing technology and analytical software can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these [traditional core] criteria, nevertheless operate to unfairly dilute the power of a particular group's votes for a congressional representative." *Id.* (referencing trial testimony discussing the concept of an efficiency gap metric used to determine partisan fairness based upon the number of "wasted" votes for the minority political party under a particular redistricting plan). Because this Court was resolving *LWV II* based exclusively on the degree to which the traditional core criteria were subordinated to pursue partisan advantage, we did not discuss a means by which to differentiate among myriad redistricting plans that, on their face, satisfy the traditional core criteria. *Id.*

Applying this jurisprudence to the 2011 Plan, the Court in *LWV II* concluded that it clearly violated the traditional core criteria, thereby depriving the petitioners of their state constitutional right to free and equal elections. *Id.* at 818. The Court found that the 2011 Plan revealed "tortuously drawn districts that cause plainly unnecessary political-subdivision splits," and "oddly shaped, sprawling districts which wander seemingly

arbitrarily across Pennsylvania, leaving 28 counties, 68 political subdivisions, and numerous wards, divided among as many as five congressional districts, in their wakes." *Id.* at 819. We emphasized that the congressional districts "often rend municipalities from their surrounding metropolitan areas and quizzically divide small municipalities which could easily be incorporated into single districts without detriment to the traditional redistricting criteria." *Id.* Accordingly, we concluded that the 2011 Plan did not comply with traditional core redistricting criteria and, thus, violated the Free and Equal Elections Clause. *Id.* at 820.

As to the appropriate remedy in *LWV II*, the Court acknowledged that while the primary responsibility for apportioning congressional districts rests with the General Assembly, it becomes the judiciary's task to determine the appropriate redistricting plan when the Legislature is unable or chooses not to act. *Id.* at 821-22. Accordingly, based upon both state and federal case law, we found sufficient authority for this Court to formulate a valid redistricting plan.[11] *Id.* at 824.

The Court thereafter prepared a constitutionally sound plan, *i.e.*, the 2018 Plan, which was implemented for the May 2018 primary election. *LWV III, supra.* The 2018 Plan was based upon the record developed in the Commonwealth Court and relied significantly upon the submissions provided by the parties, intervenors, and *amici*. *LWV III*, 181 A.3d at 1087. In *LWV III*, this Court found that the 2018 Plan satisfied the traditional core criteria as it split only 13 counties, four of which are split into three districts and nine of which are split into two districts. *Id.* The Court opined that the 2018 Plan was "superior or comparable" to all plans submitted in compactness, by whichever calculation methodology was employed. *Id.* Finally, the Court observed that the 2018 Plan achieves the constitutional guarantee of one person, one vote. *Id.*

---

[11] This author filed a concurring and dissenting opinion, and then-Chief Justice Saylor and Justice Mundy filed dissenting opinions.

**IV. Special Master Recommendation and Exceptions to Special Master's Report**

Based upon the processes and guidelines set forth in *Mellow* and the *LWV* decisions, we turn to our review of the Special Master's Report and recommendation and the numerous exceptions and responses filed by the parties and *amici*.  For the reasons set forth below, we respectfully declined to adopt the Special Master's recommendation to select H.B. 2146.  Below, we focus upon the following three aspects of the Special Master's analysis: (1) the Special Master's conclusion that certain plans improperly yielded a partisan advantage to the Democratic Party contrary to Pennsylvania's political geography; (2) the Special Master's finding that certain plans failed to achieve a maximum population deviation of one person; and (3) the Special Master's preferential treatment of H.B. 2146.  As discussed below, we respectfully disagree with the reasons provided for narrowing the plans on these bases.  Thus, the exceptions filed by the parties and *amici* to the Special Master's Report are sustained in part, consistent with the following analysis.

**1. Partisan Advantage**

Several of the exceptions challenge the Special Master's discrediting of six of the thirteen maps for "yield[ing] a partisan advantage to the Democratic Party" based upon either their mean-median scores or their efficiency gap scores, which, as discussed i*nfra*, are generally accepted metrics for evaluating the partisan fairness of a redistricting plan.[12] Report at 197, ¶ 41-42. The Report viewed this asserted partisan advantage as contrary to the "natural and undisputed Republican tilt" in the Commonwealth resulting from the clustering of Democratic voters in the urban areas.  *Id.* at ¶ 40 The Special Master deemed the drawing of district lines to negate this tilt to be "a subspecies of unfair

---

[12] Specifically, the Report gave "less weight" to the Gressman Plan, the House Democratic Caucus, the Carter Plan, the Governor's Plan, the Senate Democratic Caucus 2 Plan, the House Democratic Caucus Plan, and the Draw the Lines Plan because these plans provide a "partisan advantage to the Democratic Party."  Report at 197, ¶ 41-42.

gerrymandering." *Id.* She explained, "[A]ny map that prioritizes proportional election outcomes, for example, by negating the natural geographic disadvantage, to achieve proportionality at the expense of traditional redistricting criteria, violates" the Free and Equal Elections Clause. *Id.* at 198, 44. Nevertheless, while discounting these six maps due to the absence of a sufficient "Republican tilt," the Special Master credited H.B. 2146 for the same attribute, observing that the Republican majority in the General Assembly "developed and proposed a plan, H.B. 2146, that favors Democrats, which ultimately underscores the partisan fairness of the plan." Report at 211, ¶ 79; 216. ¶ 97.

Respectfully, we reject this contradictory logic, which uses partisan advantage to discredit some but not all plans. Moreover, the record does not support the conclusion that all of the enumerated maps in fact "prioritized proportional election outcomes" at the expense of the traditional core criteria, given the various maps' exceptional performances on these criteria. Instead, it appears that the mapmakers were cognizant of this Court's expressed concern that maps could be engineered in the future to meet the requisite traditional core criteria while operating to dilute votes. *LWV II*, 178 A.3d at 817. Indeed, we conclude that consideration of partisan fairness, when selecting a plan among several that meet the traditional core criteria, is necessary to ensure that a congressional plan is reflective of and responsive to the partisan preferences of the Commonwealth's voters. Thus, for purposes of our review, we return these six plans to the same status as the other submitted plans.[13]

### 2. Population Deviation

The Special Master further discounted the two plans that failed to reach a maximum population deviation of one person, despite finding that all the proposed plans

---

[13] We additionally credit Dr. Jonathan Rodden's observation that "it is not the case that the human geography in Pennsylvania somehow requires that we draw unfair districts." Transcript of Jan. 27, 2022 ("Tr.") at 192-93.

satisfied the constitutional requirement that congressional districts be created "as nearly equal in population as practicable."[14]  Report, at 138, CL 1; *see* PA. CONST. art. II, § 16; U.S. CONST. art. I, § 2.  In other words, while the districts in most of the plans deviated by only one person, the two discounted plans deviated from the ideal district population of 764,865 by plus one person or minus one person.[15]

While we acknowledge that the Special Master is justified in flagging these plans due to their slightly greater population deviation, we respectfully disagree that a population deviation of an additional person serves as an indelible mark against these plans.  Rather, under the relevant case law discussed *infra*, a failure to achieve the lowest population deviation requires further investigation into the justification for the population deviation.  *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983).  The Special Master, however, did not engage in any such analysis.  Accordingly, we conclude that it was improper to discredit these two plans without considering the reasons for the minor population deviation.  Indeed, as set forth in detail *infra*, we ultimately conclude that the Carter Petitioners sufficiently justified the deviation present in their plan of plus or minus one person.

### 3.  Preferential Treatment of H.B. 2146

After rejecting the majority of the plans based, *inter alia*, upon their alleged "Democratic partisan advantage" or the two-person population deviation, the Special Master was left with four plans to consider, Voters of the Commonwealth of Pennsylvania, Reschenthaler 1, Reschenthaler 2, and H.B. 2146.  According to the Special Master, Republican Legislative Intervenors requested that some degree of deference be given to

---

[14] The two plans discounted under this rationale were the Carter Plan and the House Democratic Plan.

[15] The ideal district population is determined by dividing the Commonwealth's population as determined by the 2020 Census, which is 13,002,700, by the seventeen allotted districts, which results in a population of 764,864.7.  Report at 3, n.6.

H.B. 2146 because it had gone through the legislative process and was passed by the Legislature. The Special Master initially indicated that she would not afford H.B. 2146 any special deference and instead would assess the plan the same as the other parties and *amici* and their respective maps.

Nevertheless, the Special Master ultimately recommended the adoption of H.B. 2146, emphasizing that "the decisions and policy choices expressed by the legislative branch are presumptively reasonable and legitimate, absent a showing of an unconstitutional defect or deficiency." *Report*. at 213, ¶ 90 (citing *Upham v. Seamon,* 456 U.S. 37, 41-42 (1982)). The Special Master reasoned that "H.B. 2146 represents [t]he policies and preference of the state, and constitutes a profound depiction of what the voters in the Commonwealth of Pennsylvania desire, through the representative model of our republic and democratic form of government, when compared to the Governor or any other of the parties or their *amici*." *Id.* at 214, ¶ 93 (internal quotation marks and citations omitted).

To the extent that the Special Master's recommendation was premised upon bestowing H.B. 2146 preferential treatment simply because it had made it partway through the legislative process, we reject her endorsement of this plan on this basis alone. *Upham*, relied upon by the Special Master in affording H.B. 2146 special consideration, is readily distinguishable from the present matter. There, the United States Supreme Court was tasked with reviewing a district court's decision to reject a congressional reapportionment plan in favor of its own drafted plan. Importantly, the at-issue plan had already been duly enacted and was awaiting preclearance from the United States Attorney General when a suit was filed in the federal district court, challenging the constitutionality of the reapportionment plan and its validity under the Voting Rights Act. Thus, *Upham*, unlike this case, involved a fully-enacted plan that was not vetoed by the

Governor.[16]  Moreover, by relying upon *Upham*, the Special Master ignored a separate line of cases where courts have, in similar circumstances, declined to afford deference to vetoed plans.[17]

In our view, declining to afford preferential treatment to a plan passed by the Legislature but vetoed by the Governor is not only logical, *see Cartsen*, 543 F. Supp. at 79 (observing that if it were to accept the argument that a vetoed redistricting plan should receive priority during deliberations, "a partisan state legislature could simply pass any bill it wanted, wait for a gubernatorial veto, file suit on the issue and have the Court defer to their proposal"), but also comports with this Commonwealth's constitutional precepts.[18]

---

[16] A second case cited by the Special Master, *Perry v. Perez*, 565 U.S. 388 (2012), is likewise distinguishable, as that case also involved a challenge to new electoral plans that had already been duly enacted.  *See Perry*, 565 U.S. at 391-92 (reviewing the implementation of interim maps that were allegedly inconsistent with the State of Texas' enacted plans).

[17] *See, e.g.*, *Johnson v. Wisconsin Elections Commn.*, 967 N.W.2d 469, 490 n.8 (Wis. 2021) ("The legislature asks us to use the maps it passed during this redistricting cycle as a starting point, characterizing them as an expression of 'the policies and preferences of the State[.]'  The legislature's argument fails because the recent legislation did not survive the political process.") (internal citations omitted); *Carstens v. Lamm*, 543 F.Supp. 68, 79 (D. Colo. 1982) (affording no deference to vetoed redistricting plan and instead, regarding "the plans submitted by both the Legislature and the Governor as 'proffered current policy' rather than clear expressions of state policy") (footnote omitted); and *Hippert v. Ritchie*, 813 N.W.2d 374, 379, n. 6 (Minn. 2012) (acknowledging that in *Perry*, *supra*, the United States Supreme Court held that a federal district court, when creating an interim congressional redistricting plan, should defer to the duly enacted redistricting plan, but finding that in this case, the legislature's redistricting plan was not entitled to such deference because it "was never enacted into law").

[18] As this Court explained in *Scarnati v. Wolf*, 173 A.3d 1110, 1120 (Pa. 2017), by "conferring upon the Governor the authority to nullify legislation that has passed both legislative houses, [Pa. Const. art. IV,] Section 15 entrusts him with the obligation both to examine the provisions of the legislation within the ten days allotted by Section 15 and to either approve it or return it, disapproved, for legislative reconsideration."). Consequently, the Governor is "an integral part of the lawmaking power of the state."  *Id.* (internal quotation marks omitted).  *See also id.* (observing that "[n]o bill may become law without first being submitted to the Governor for approval or disapproval").

Finally, by disregarding the Governor's veto and affording H.B. 2146 preference because it purportedly represented "the will of the people," the Special Master improperly elevated the General Assembly's role in passing legislation over that of the Executive Branch, which is an inappropriate departure from basic constitutional principles of checks and balances, *see*, *e.g.*, *Carstens*, 543 F. Supp. at 79 (finding that the legislature's vetoed plan, while certainly entitled to careful consideration, could not "represent current state policy any more than the Governor's proposal" because "[b]oth the Governor and the General Assembly are integral and indispensable parts of the legislative process"), and offensive to the separation-of-powers doctrine.

## V. Standard for Choosing New Redistricting Plan

Having rejected the Special Master's process of winnowing the maps, we review these maps *de novo* under this Court's precedent in *Mellow* and *LWV II*. In selecting one of the various congressional districting plans submitted by the parties and *amici*, we find ourselves bound by the same commands that the Legislature must satisfy when performing such task. First and foremost, we begin, with the traditional core criteria of ensuring that the districts are compact, contiguous, are as nearly equal in population as practicable, and do not divide any county, city, incorporated town, borough, township, or ward, except where necessary. *LWV II,* at 178 A.3d at 816- 17. As noted, these traditional core criteria provide a "'floor' of protection for an individual against the dilution of his or her vote in the creation of [congressional] districts." *Id.* at 817.

Second, we may also examine the subordinate historical considerations, including, *inter alia,* communities of interests, the preservation of prior district lines, and the protection of incumbents. *Id.* As noted, we must keep in mind that these factors are wholly subordinate to the traditional core criteria. *Id.*

Third, we ensure that the congressional districting plan does not violate Pennsylvania's Free and Equal Elections Clause by "diluting the potency of an individual's ability to select the congressional representative of his or her choice." *LWV II*, 178 A.3d at 816.   While the traditional core criteria protect against the creation of obviously gerrymandered districts, such as those present in the 2011 Plan, they do not necessarily prevent all forms of vote dilution.   As noted *supra*, this Court observed in *LWV II* that "advances in map drawing technology and analytical software can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these [traditional core] criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a congressional representative."   *Id.* Partisan fairness metrics provide tools for objective evaluation of proposed congressional districting plans to determine their political fairness and avoid vote dilution based on political affiliation.

Fourth, and finally, in adopting a congressional redistricting plan, we guarantee that the dictates of the Voting Rights Act, 52 U.S.C. § 10301, have been respected.

As mentioned throughout, many of the plans submitted by the parties and the *amici curiae* satisfy these rigorous standards set forth in *LWV II*.   Moreover, as demonstrated in our respected colleagues' responsive opinions, reasonable minds may disagree as to which of these plans best balances the designated criteria and considerations. Nevertheless, having been thrust into the position of choosing a redistricting plan due to the political stalemate between the Legislature and the Governor, we applied the aforementioned designated criteria and considerations and selected the Carter Plan as the 2022 Congressional Redistricting Plan.   Our reasons for doing so follow.

### VI. Adoption of Carter Plan

We initially observe that the parties and their experts generally agree on the metrics to be used in judging a plan's performance on the traditional core criteria, the subordinate historical considerations, and the evaluations of partisan fairness. However, through no fault of the experts, the results of these metrics vary based on differences in their application of the metrics and divergences in the data sets. For example, the seemingly simple task of counting how many counties are split by a plan varies between experts based on their assessment of a naturally noncontiguous piece of Chester County.[19] Additionally, some of the standards used to evaluate partisan fairness vary based upon how many past elections are included in the relevant dataset. Given these variations, we rely upon the analyses performed by Dr. Daryl DeFord, which evaluate all of the submitted plans using the same methods and data sets.[20] See, *inter alia*, Exh. 1 of Post-Trial Submission of Gressman Petitioners. We appreciate Dr. DeFord's efforts in this regard as it allows the Court to engage in an apples-to-apples comparison of the plans on each metric.

### A. Description of the Carter Plan

The Carter Plan was created by Dr. Jonathan Rodden,[21] who submitted an expert report and testified as to his decision-making process at the hearing in this case. Dr. Rodden explained that he used the 2018 Plan "as a guide" with the goal of "preserving

---

[19] As described by one of the experts, a small portion of Chester County is rendered "technically non-contiguous" if the boundary between Chester County and Delaware County is used as a district boundary. In such case, that six-person portion of Chester County is "marooned in Delaware County due to a bend in the Brandywine Creek at the intersection with the [s]outhern state boundary." Expert Report of Jonathan Rodden ("Rodden Report") at 21. While some experts included this in the count of county splits, others did not.

[20] Dr. DeFord is an assistant professor of data analytics at Washington State University.

[21] Dr. Rodden is a professor of political science at Stanford University and director of the Stanford Spatial Social Science Lab.

the cores and boundaries of districts where feasible given equal population requirements and meeting or surpassing [the 2018 Plan's] adherence to traditional districting criteria[.]" Rodden Report at 1.

He opined that the 2018 Plan was a "reasonable starting point" because it "performed very well according to traditional redistricting criteria," observing that it "was a compact plan" that involved "relatively few county splits and other jurisdictional splits." Rodden Report at 6; Tr. at 88.  He additionally recognized that the 2018 Plan "was broadly recognized" as a fair plan by those who study redistricting, following its use in the 2018 and 2020 elections.  *Id.* at 89.  He observed that it "produce[d] relatively competitive elections" with "outcomes that are roughly in line with overall partisan preferences of Pennsylvania voters."[22]  Rodden Report at 6.

Dr. Rodden provided a detailed district-by-district assessment of the adjustments needed to achieve population equality, given the different rates of population growth. Rodden Report at 8-9, 12-20.  He additionally explained the rationale behind each decision to alter district boundaries, with due consideration paid to the give and take between traditional core criteria which require maximizing compactness and minimizing county splits.  *Id.*

In adjusting the 2018 Plan to the population changes of the 2020 Census, Dr. Rodden observed that Pennsylvania's urban areas, especially in Southeastern Pennsylvania, "have experienced population growth on par with the United States as a whole" in the years since the 2010 Census.  Rodden Report at 1.  As a result, only minimal adjustments in the 2018 Plan boundaries were needed for the urban districts in Southeastern and Southwestern Pennsylvania to achieve the population targets under

---

[22] In those elections, the average Democratic vote share was 52.7 percent, and the Pennsylvania congressional delegation was split evenly between Republicans and Democrats, with several competitive districts.  Rodden Report at 4.

the 2020 Census. However, the "precipitous decline in population" in the rural areas of Central Pennsylvania required more substantial changes in those districts to achieve the necessary equal population, resulting in the absorption of former-District 12 of the 2018 Plan into the surrounding districts, Districts 9, 15, and 13. *Id.* at 1, 20.

Dr. Rodden expressly stated that he "did not consider racial data [when] drawing districts or making adjustments for population changes in the map." Rodden Report at 23. Likewise, he explained that he "did not consider partisan performance" when drawing the map. *Id.* However, after completing the map, he "was asked to evaluate the districts' partisan performance," which he deemed to be "consistent with and responsive to Pennsylvania voters' partisan preferences." *Id.* at 1. As incorporated into the discussion below, Dr. Rodden also addressed the plan's performance on the requisite traditional core criteria as well as the subordinate historical considerations.

### B. Special Master's Rejection of the Carter Plan

The Special Master rejected the Carter Plan, reasoning that in using the 2018 Plan, the Carter Plan erroneously elevated the subordinate historical considerations of preservation of prior district lines above the traditional core criteria, in violation of this Court's decision in *LWV II*, which held that the historical considerations are "wholly subordinate" to the traditional core criteria. Report at 183, CL 2 (quoting *LWV II*, 178 A.3d at 817); 187, FF10. Specifically, she faulted the Carter Plan for "opting to draw less compact districts instead of disrupting" the district boundaries of the 2018 Plan. *Id.* at 186, FF9. Additionally, while acknowledging that the so-called "least-change" approach may be appropriate when applied to a legislatively enacted plan, the Special Master concluded that "choosing a plan based upon its similarity to a previously court-drawn redistricting plan is not constitutionally sound." *Id.* at CL 5. She theorized that use of the least-change approach for a court map could allow a court to adopt continuously "features

of its prior plan, effectively rendering impossible any future challenge to the plan." *Id.* at 188, FF 11.

Respectfully, this Court does not view the Carter Plan's utilization of the 2018 Plan as a starting point to be either a prerequisite or a disqualifying attribute. Instead, we deem it to be one of several reasonable starting points. Such method is particularly useful here, considering that the 2018 Plan was adopted only four years ago and in strict conformity with the traditional core criteria explicated in *LWV II*. *LWV III*, 181 A.3d at 1086-87. Thus, the 2018 Plan provided a reasonable starting point of contiguous and compact districts that minimized divisions of political subdivisions, even if it no longer provided districts of equal population.

Our decision to adopt the Carter Plan, however, is not based upon its starting point but rather its end point. Stated another way, we do not select the Carter Plan because it utilized the least change approach but because the least change approach worked in this case to produce a map that satisfies the requisite traditional core criteria while balancing the subordinate historical considerations and resulted in a plan that is reflective of and responsive to the partisan preferences of the Commonwealth's voters, as set forth below.

## C. Traditional Core Criteria

### 1. Contiguity

Starting with the simplest and least contentious of the traditional core criteria, the seventeen districts in the Carter Plan, like every map submitted, are all contiguous.

### 2. Compactness

Turning to compactness, we find that all of the submitted plans are on a higher plane of compactness than the unconstitutional 2011 Plan with its "oddly shaped, sprawling districts which wander seemingly arbitrarily across Pennsylvania." *LWV II*, 178 A.3d at 819. Moreover, utilizing the various accepted metrics, the submitted maps are all

within a relatively narrow range comparable to the 2018 Plan, which this Court deemed constitutionally sufficient.[23]

While well within the range of the submitted plans, we acknowledge that the Carter Plan is slightly less compact than some of the other maps. We discount, however, the Special Master's suggestion that any reduction in compactness resulted from adherence to the 2018 Plan lines. Instead, minor reductions resulted from a trade-off acknowledged by numerous experts between two of the traditional core criteria: compactness and minimization of political subdivision splits. It is easily comprehended that adherence to county and city lines will decrease compactness because many of the boundaries follow geographic features such as rivers, which meander across our Commonwealth. A mapmaker must, therefore, balance more compact districts with respect for the integrity of political subdivisions.

In our view, Dr. Rodden's Report sufficiently justifies the slightly less-compact aspect of the Carter Plan by explaining various decision points where he sacrificed compactness in favor of unifying counties or other political subdivisions. Rodden Report at 8-9, 12-20, 22-23, Tr. at 105-06. Additionally, we recognize that the Carter Plan is less compact in part due to the decision to keep Pittsburgh within a single district. Rather than utilizing a relatively smooth dividing line, the Carter Plan traces Pittsburgh's jagged city

---

[23] Several metrics are used to evaluate compactness, each testing a slightly different aspect of that concept. We need not delve into the details of the computations of these accepted metrics, which are not contested, but rather look broadly to the results across the metrics. Specifically, using the Mean Polsby-Popper metric in which larger scores indicate greater compactness, the submitted maps range from 0.27 to 0.38, with the Carter Plan scoring 0.31 and the 2018 Plan scoring 0.32. On the Mean Reock score, under which higher scores again indicate greater compactness, the submitted maps range from 0.38 to 0.44, with the Carter Plan at 0.41 and the 2018 Plan at 0.43. The Carter Plan again is within the midrange of the Mean Convex Hull metric where larger scores indicate more compact districts, with the maps ranging from 0.75 to 0.81, the Carter Plan at 0.78 and the 2018 Plan at 0.79. Finally, addressing the Cut Edges metric, for which a lower score demonstrates more compact districts, the Carter Plan at 5896 falls within the range of maps from 5,061 to 6821, where the 2018 Plan is at 5,789.

line. Given the thorough explanation for the choices made and the realities of existing but irregular county and municipality boundaries, we deem the Carter Plan to be sufficiently compact in comparison to the other submitted plans.

### 3. Equal Population

The Carter Plan included four districts with a population of 764,865, four districts with one additional person at 764,866, and nine districts with one less person at 764,864. Rodden Report at 21. As stated *supra*, the Special Master found that each proposed plan satisfied the constitutional requirement that congressional districts be as nearly equal in population as practicable. Report at 138, CL 1. Nevertheless, she gave less weight to the Carter Plan because districts in the plan had a maximum deviation of two persons, whereas some plans achieved a maximum deviation of only one person. As noted above, we respectfully rejected the Special Master's discounting based upon its maximum population deviation, without considering whether the slight difference between the one- and two-person population deviation was justified.[24]

Although a challenge under the equal population requirement is not presently before this Court, the case law is nonetheless instructive in reviewing whether the Carter Plan sufficiently met the traditional core criterion of equal population. While the criterion of equal population is exacting and enforced strictly, the United States Supreme Court has conceded that "precise mathematical equality … may be impossible to achieve in an imperfect world," and consequently, the United States Constitution's equal population standard requires only that districts be apportioned to achieve population equality "as nearly as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983).

---

[24] While the Special Master merely gave the Carter Plan less weight, some parties and *amici* argued that the Carter Plan failed to meet the equal population requirement because nine plans achieved a deviation of one person.

Under the relevant caselaw, a challenge to population equality requires the parties challenging the proposed plan to show that the population deviation "could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." *Id.* at 730. This burden may be satisfied by the presentation of a plan with a lower population deviation, particularly where the party being challenged presents an alternative plan that achieves a lower population deviation. *See Vieth v. Pennsylvania*, 195 F. Supp. 2d 672, 675–76 (M.D. Pa. 2002) (where defendants themselves presented a plan with a lower population deviation).

We will assume *arguendo* that this step is met as the Carter Petitioners appended to their exceptions filed in this Court a slightly revised plan containing only a one-person deviation. The reduced deviation was achieved at the expense of an additional split in a Vote Tabulation District.[25] Notably, however, the ability to achieve a lower maximum population deviation, by itself, does not establish the unconstitutionality of a plan with a larger deviation. *Karcher*, 462 U.S. at 740. Rather, the burden merely shifts to the proponent of the plan to prove "with some specificity" that the deviations in its proposed plan were necessary to achieve a legitimate state objective. *Id.* at 740-41.

The specificity required for demonstrating that the deviation was necessary is flexible and requires a case-by-case consideration of the following factors: the size of the deviation, the importance of the legitimate state interest necessitating the deviation, the consistency with which the plan reflects those interests, and whether alternatives might substantially vindicate those interests yet achieve a smaller deviation. *Id.* at 741.

---

[25] Dr. Rodden explained that a "vote tabulation district" is the term for the level at which ballots differ between local races. He attempted to minimize these splits because district divisions at this level create difficulties and potential errors for local election officials as they determine which ballot a voter should complete. Tr. at 95-96. He observed that these errors relating to vote tabulation districts can result in voters being provided incorrect ballots, which can have significant consequences in close elections. Tr. at 97.

Accordingly, "the greater the deviation, the more compelling the government's justification must be." *Vieth*, 195 F. Supp. 2d at 677.

While "there are no *de minimis* population variations," *Karcher*, 462 U.S. at 734, the size of the deviation between a one-person and two-person deviation is as small a population deviation as is possible and thus results in a low burden of justification. The *Karcher* court provided a non-exhaustive list of legislative policies that might justify a slight population variance, including respecting municipal boundaries and preserving prior districts. *Id.* at 740. Since *Karcher*, federal courts have also recognized a legitimate state interest in avoiding splitting of election precincts and not unduly departing from "the useful familiarity of existing districts." *Mellow*, 607 A.2d at 206 (Pa. 1992) (collecting cases).

In the brief filed in support of their exceptions in this Court, the Carter Petitioners explained that their attempts to reach zero deviation required not only the manipulation of several census blocks, but also the additional split of a Vote Tabulation District at the intersection of Districts 3 and 5 in South Philadelphia, which the original plan was able to keep intact. Carter Exceptions Brief at Exhibit A, 2–3. We addressed a similar justification in *Mellow*, where the proposed plan fell below others regarding population deviation precisely because the cost of maximum mathematical equality "require[d] manipulation of the smallest census unit, the census block." *Mellow*, 607 A.2d at 218. In *Mellow,* we found that the election administration problems arising from requiring voters in a single precinct to look to two different sets of congressional candidates "is not a minor one." *Id.* In doing so, we accepted the justification and ultimately adopted a proposed plan with a larger, but still slight, population deviation than other plans submitted.[26] *Id.*

---

[26] In *Mellow*, the Court adopted a plan with a 63-person maximum population deviation, despite the submission of a plan with only a one-person deviation. In the adopted plan, the smallest district included 565,754 persons, while the largest district had 565,817 persons. *Mellow*, 607 A.2d at 226 (Appendix A to Opinion of President Judge Craig).

In the present case, the Carter Petitioners have satisfied their burden by stating, with specificity, that the two-person deviation was required to prevent the additional split of a Vote Tabulation District. This is a recognized legitimate state interest, and there has been no evidence nor allegations of bad faith on the part of the Carter Petitioners. The Carter Plan represents a good-faith effort to draw districts of equal population, and the two-person deviation was the byproduct of legitimate efforts to limit the number of splits. Accordingly, the Carter Plan satisfies the equal population requirement and is comparable, given the very minimal deviation, to the other submitted plans.

### 4. Splits of Political Subdivisions

While the traditional core criterion of contiguity is very straight forward, it is less clear how to assess whether a plan has satisfied the requirement that it "not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." *LWV III*, 181 A.3d at 1085. In practical terms, there are only a few political subdivisions which are necessary to split to comply with the maximum population of a district.

Following the 2022 Census, the ideal population for Pennsylvania's congressional districts is 764,865. Thus, only Philadelphia, Allegheny, and Montgomery Counties exceed this population, and the only city with an excess population is Philadelphia. Beyond these required divisions, mapmakers must divide the Commonwealth by grouping together whole political subdivisions with parts of others to achieve the necessary equal population. Inevitably, there are tradeoffs inherent in this process. A plan that prioritizes minimizing the number of county splits may well incur more municipality and ward splits to achieve the critical equal population of the district as a whole. To complicate matters further, some boroughs span a county line, requiring a mapmaker to choose potentially between splitting the county or the borough. Additionally, reasonable minds can differ as

to whether it is preferable to split fewer total political subdivisions but to split some in multiple pieces. For example, Philadelphia's population requires it to be split in at least three pieces, but some proposed plans split it into four pieces.

Neither our constitution nor our caselaw provides guidance as to whether the unity of one type of political subdivision should be prioritized over that of another. Instead, we observe that these determinations are best left to the political branches, and thus, we do not rank the order of the importance of the splits. Instead, for the purpose of choosing a plan, we look wholistically across the plans for a minimization of the splits and for a justification for the splits to ensure that the decisions were based on valid redistricting criteria and not for vote dilution purposes.

Turning back to the submitted plans, we emphasize that all of the plans are a far cry from the unconstitutional 2011 Plan which splintered the Commonwealth, including the division of twenty-eight counties. *LWV II*, 178 A.3d at 819. In contrast, the Carter Plan splits half as many counties. Indeed, Dr. Rodden testified that he prioritized maintaining the counties as whole entities and, when counties are split, avoiding splitting them multiple times. While we do not opine as to which division is preferable, we merely observe that the Carter Plan is one of the best in terms of keeping counties whole and falls within all other ranges of the plans submitted.[27] Accordingly, we conclude that the Carter Plan is superior or comparable to all the other submitted plans on this criterion.

---

[27] As discussed *supra*, experts disagree as to how to count the separation of a non-contiguous portion of Chester County from the rest of the county when a plan uses the border between Chester and Delaware Counties as a district boundary. Dr. DeFord's comparison of the plans' splits indicates that this split was included in the Carter Plan's total of 14 divided counties, such that an argument could be made that the Carter Plan should actually be attributed with 13 splits, which would tie for the least split counties. In comparison, the other maps range from 13-17 counties, while the 2018 Plan divided 14.

In terms of city splits, the Carter Plan splits Philadelphia into three pieces as is required by its population but does not fragment it into 4 pieces as do some maps. While

**D. Subordinate Historical Considerations**

Having determined that the Carter Plan meets or exceeds the other submitted plans in terms of its adherence to the traditional core criteria, we next consider the subordinate historical considerations which this Court and other courts have recognized as relevant considerations in designing a congressional districting plan.

**1. Communities of Interest**

As discussed above, respect for communities of interest increases an individual's ability to elect a congressional representative who reflects his or her personal preferences based upon "the commonality of the interests shared with the other voters in the community." *Id.* at 816. We observe that the Special Master found that Dr. Rodden "did not explicitly examine or appear to have considered the specific considerations that need to be taken into account when establishing that splits maintain the surrounding communities of interest." Report at 156, FF12.

Respectfully, we do not read the record to support that finding, given that Dr. Rodden elucidated several choices that he faced relating to communities of interest. For example, in forming District 7, he drew the boundaries to "unify Carbon County with the rest of the Lehigh Valley" and to keep together the Allentown-Bethlehem-Easton area, which the United States Census Department recognizes as "a metropolitan statistical area." Rodden Report at 14, 17. Similarly, the Carter Plan centers District 10 around Harrisburg, keeping the greater Capital Region intact rather than dividing the area into

---

the Carter Plan retains Pittsburgh in a single district, it nevertheless splits Williamsport, which is in the range of the other maps which either split one or two cities. While the submitted maps split between 19 and 25 municipalities, the Carter Plan divides 23, and the 2018 Plan separates 29. In terms of wards, the Carter Plan divides 21, which is in the midrange of the submitted maps that divide from 14 to 41; the 2018 Plan split 29. In total, the Carter Plan divides 58 political subdivisions, whereas all the maps range from 49 to 79 total splits. The 2018 Plan had 72 total splits.

multiple district as do some of the plans.  The Plan addresses complaints raised regarding the 2018 Plan, which separated State College from its surrounding area, by placing the entirety of Centre County in District 15.  In addition, unlike several of the plans, the Carter Plan does not split the City of Pittsburgh, which many, including the Special Master, have argued results in the division of a community of interest.[28]

Given the choices made to protect communities of interest, we conclude that the Carter Plan sufficiently considered this historical redistricting consideration.

### 2. Preservation of Prior Districts

As has been repeatedly observed by this Court and the United States Supreme Court, the preservation of prior districts is a legitimate redistricting objective, but one that is subordinate to the traditional redistricting criteria.  *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983).  As discussed *supra*, the Carter Plan used the 2018 Plan as a starting point with the intent of preserving district cores and boundaries as much as possible, given the population changes.  The Carter Petitioners argue that the preservation of districts is beneficial in part because it "create[s] continuity for the overwhelming majority of Pennsylvania residents."  Carter Plan Brief at 6. The data presented at the hearing demonstrates that the Carter Plan "laps the field" by ensuring that 86.6 percent of the population falls in the same district as under the 2018 Plan, while the next highest plan included only 82.4 percent.  Tr. at 407-408 (Dr. Moon Duchin); Rodden Response Report at 22.

### 3. Incumbents

---

[28] While we do not view the splitting of Pittsburgh as a disqualifying feature as did the Special Master, we recognize that it is relevant to a plan's consideration of communities of interest.  Moreover, given the history of the recent congressional districting plans, we deem it preferable to retain it within a single district.

A plan's treatment of incumbents is a relevant consideration because it can reveal partisan bias where a map protects one party's incumbents but pairs the other party's incumbents against each other, absent other justification.

In this case, the Special Master observed that the Carter Plan pairs two incumbent Republican representatives, opining that it does so "without any explicit or apparent justification."  Report at 204.  Our review of the record does not support this conclusion.  To the contrary, Dr. Rodden stated that he intentionally considered incumbent addresses when drawing the Plan to avoid "inadvertently double-bunking sitting congressional representatives in the same district."  Rodden Report at 23.  Moreover, he explained that the two incumbents paired in District 15 of the Carter Plan resulted from the absorption of the former-District 12 into District 15 and surrounding districts, which was necessitated by the significant population loss in Central Pennsylvania since the 2010 Census.  We find this pairing to be justified by the loss of population in this area and not suggestive of partisan bias, and we further conclude that the Carter Plan pays due consideration to incumbents.

### E. Partisan Fairness

We reiterate this Court's concern that advances in mapmaking have the potential to create a plan that will "dilute the power of a particular group's vote" despite meeting the traditional core criteria.  *LWV II,* 178 A.3d at 817.  Accordingly, we deem it appropriate to evaluate proposed plans through the use of partisan fairness metrics to ensure that all voters have "an equal opportunity to translate their votes into representation."  *Id.* at 814.

In recent years, numerous metrics have been developed to allow for objective evaluation of proposed districting plans to determine their partisan fairness.  For example, some of the metrics attempt to ascertain a map's responsiveness to voters, evaluating whether a party with a majority of votes is likely to win a majority of seats, or whether it is

likely to produce "anti-majoritarian" results, without focus on exact proportionality of representation. Others attempt to measure whether and to what extent a map favors one party. In utilizing these tools, we do not prioritize one metric over another, but rather look wholistically to a plan's performance across the assessments.

Turning to the Carter Plan specifically, we initially observe that Dr. Rodden expressly stated that he "did not consider partisan performance" when drawing the map but instead considered the relevant metrics after it was completed. Rodden Report at 23. In so doing, he provided detailed assessments of several of the districts. In sum, he views the Carter Plan as producing "8 districts where Democrats are expected to win, one of which (District 8) is potentially competitive; 8 districts where Republicans are quite likely to win, two of which are at least potentially competitive (1 and 10); and one district (District 7) that is a toss-up with a very slight Democratic lean." *Id.* at 25.[29] Moreover, Dr. Rodden viewed the Carter Plan as "similar to that of the [2018 Plan], reflective of Pennsylvania's statewide partisan preferences, and consistent with changes in population as they relate to partisanship." *Id.* He additionally opined that based on the competitiveness of several of the districts, the Carter Plan would be responsive to changes in Pennsylvania voters' partisan preferences. *Id.*

Dr. Rodden's assessment is supported by the plan's performance on the various metrics. In contrast to some of the submitted plans, the Carter Plan consistently scores better than average on the measures and equals or surpasses the standards set by the

---

[29] Some of the other parties and *amici* have oversimplified Dr. Rodden's assessment as describing a split of ten Democratic seats and seven Republican seats; we reject that view based on Dr. Rodden's description of the plan, which is further supported by the Carter Plan's performance on the metric's discussed below.

2018 Plan.[30]   Thus, we conclude the Carter Plan is superior or comparable to the other maps in regard to partisan fairness.

### F. Voting Rights Act

While formal Voting Rights Act assessments were not performed in relation to the submitted plans, the Carter Plan, like all the submitted plans but one, retains the two majority-minority districts present in the 2018 Plan according to Dr. DeFord's assessment.[31]   Indeed, unlike some of the plans, the Carter Plan's majority-minority districts hew closely to the same Philadelphia area districts included in the 2018 Plan, which to our knowledge has never been challenged as violative of the VRA.  As explained by Dr. Rodden, the boundaries of the Philadelphia area district remained largely unchanged because the population of this area grew at a similar rate to the United States as a whole.  Rodden Report at 12.  Additionally, Dr. Rodden expressly indicated that he "did not consider racial data [when] drawing districts or making adjustments for population changes in the map."  Rodden Report at 23.  Moreover, no party or *amici* have raised any concerns regarding the Carter Plan's compliance with the VRA.

---

[30] We set forth a few of the partisan fairness metrics.  The Carter Plan was one of the best performers on the Majority Responsiveness Metric, where a responsive map is confirmed by a low number of anti-majoritarian elections, which are balanced between the political parties.  The Carter Map had only 3 anti-majoritarian elections, with one favoring Democrats and two favoring Republicans.  In contrast, H.B. 2146 had one of the highest anti-majoritarian results, with all five favoring Republicans.  The Carter Plan had the least biased score (-0.4%) on the average efficiency gap metric, on which negative numbers favor Republicans and positive numbers favor Democrats.  The submitted plans ranged from -7.8% to +3.3%, including H.B. 2146 which had one of the highest efficiency gaps favoring Republicans at 6.3%.  The 2018 Plan had an average efficiency gap of -2.6%.  In regard to the mean-median metric, upon which numbers closer to zero demonstrate a more balanced plan, the Carter Plan scored -1.6%, which demonstrated a slight Republican tilt, where other plans ranged from -2.9% to -0.3%, with H.B. 2146 having the most significant skew in favor or Republicans at -2.9%.  The 2018 Plan had an average mean-median score of -1.9%.

[31] All other plans submitted also included two majority-minority districts, other than the Gressman Plan which was drawn in part to add an additional majority-minority district.

## VII. Conclusion

We reiterate that this Court has been forced into an unusual but not unprecedented role of selecting a congressional redistricting plan for the impending May 17, 2022, Primary Election.  There is no perfect plan, nor can there be, as many of the criteria work at cross-purposes to each other and require mapmakers to balance opposing criteria.  Our task is to discern which plan, in our view, best abides by the traditional core criteria with attention paid to the subordinate historical considerations and awareness of partisan fairness.  As noted, several of the maps submitted would be reasonable choices to be made by a legislature.  After careful consideration and for the reasons set forth above, we adopt the Carter Plan for the Pennsylvania primary and general elections for seats in the United States House of Representatives commencing in 2022.  We grant, in part, the exceptions to the extent they are consistent with this opinion and dismiss as moot the exceptions in all other respects.

Justices Donohue, Dougherty, and Wecht join the opinion.

Justices Donohue, Dougherty, and Wecht file concurring opinions.

Justices Todd, Mundy, and Brobson file dissenting opinions.

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

CAROL ANN CARTER, MONICA               :   No. 7 MM 2022
PARRILLA, REBECCA POYOUROW,            :
WILLIAM TUNG, ROSEANNE MILAZZO,        :
BURT SIEGEL, SUSAN CASSANELLI, LEE     :   ARGUED:  February 18, 2022
CASSANELLI, LYNN WACHMAN,              :
MICHAEL GUTTMAN, MAYA FONKEU,          :
BRADY HILL, MARY ELLEN BALCHUNIS,      :
TOM DEWALL, STEPHANIE MCNULTY          :
AND JANET TEMIN,                       :
                                       :
        Petitioners                    :
                                       :
                                       :
          v.                           :
                                       :
                                       :
LEIGH M. CHAPMAN, IN HER OFFICIAL      :
CAPACITY AS THE ACTING SECRETARY       :
OF THE COMMONWEALTH OF                 :
PENNSYLVANIA; JESSICA MATHIS, IN       :
HER OFFICIAL CAPACITY AS DIRECTOR      :
FOR THE PENNSYLVANIA BUREAU OF         :
ELECTION SERVICES AND NOTARIES,        :
                                       :
        Respondents                    :
                                       :
-------------------------------------------------- :
PHILIP T. GRESSMAN; RON Y. DONAGI;     :
KRISTOPHER R. TAPP; PAMELA GORKIN;     :
DAVID P. MARSH; JAMES L.               :
ROSENBERGER; AMY MYERS; EUGENE         :
BOMAN; GARY GORDON; LIZ MCMAHON;       :
TIMOTHY G. FEEMAN; AND GARTH           :
ISAAK,                                 :
                                       :
        Petitioners                    :
                                       :
                                       :
          v.                           :
                                       :
                                       :

A2647

LEIGH M. CHAPMAN, IN HER OFFICIAL          :
CAPACITY AS THE ACTING SECRETARY           :
OF THE COMMONWEALTH OF                     :
PENNSYLVANIA; JESSICA MATHIS, IN           :
HER OFFICIAL CAPACITY AS DIRECTOR          :
FOR THE PENNSYLVANIA BUREAU OF             :
ELECTION SERVICES AND NOTARIES,            :
                                           :
              Respondents

## CONCURRING OPINION

                                   **OPINION FILED**:  **March 9, 2022**
**JUSTICE DONOHUE**                **DECIDED:  February 23, 2022**

I agree with the selection of the Carter Plan, and I join in the Majority's analysis, including its invocation of partisan fairness as a factor in its selection.  Because this case requires the Court to select one of thirteen maps, most of which satisfy the four "floor" criteria identified in *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) ("*LOWV*"), we must use a tiebreaker. In my view, in this circumstance, the logic of *LOWV* compels us to consider the degree of partisan fairness among the plans.

Contrary to Justice Brobson's suggestion, none of us wish "to serve as the mirror on the wall and choose the fairest map of them all."  Dissenting Op. at 8 (Brobson, J.). And while Justice Brobson seems to be less opposed to our selection of the Carter Map than "the analysis that the majority uses to break a partisan impasse," the fact remains that the political branches have unfortunately thrust the selection of a map on us.  Justice Brobson fears that we have "invited, not discouraged this Court's future involvement in the congressional redistricting process," *id.*, but does not set forth an alternative selection that would avoid his pessimistic prediction.  While which map should be chosen is subject to good faith disagreement, we must choose, and "I don't know" is the one answer we cannot give.

[J-20-2022] [MO: Baer, C.J.] - 2

In *LOWV*, we held that to meet constitutional muster under our Free and Equal Election Clause,[1] a map must satisfy four neutral "floor" criteria: "compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." *LOWV*, 178 A.3d at 817. The submitted maps admirably complied with that dictate.[2] The proponents of each map submitted the performance metrics corresponding to the neutral criteria.[3] Pertinently, virtually all submissions contained an analysis of how each of their plans performed in terms of predicted partisan fairness.[4] Undoubtedly, this was driven by the following passage from *LOWV*:

> As we have repeatedly emphasized throughout our discussion of [Article I, Section 5] the overarching objective of this provision of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens. We recognize, then, that there exists the possibility that advances in map drawing technology and analytical software can

---

[1] "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.

[2] I acknowledge that the Carter Plan does not score the best on the floor criteria. *See* Majority Opinion at 27-33. I also agree with the Majority that there are trade-offs involved when giving one criterion more importance than others. *See id.* at 28. Moreover, unlike Justices Mundy and Todd, I do not view picking the best plan on these four criteria to be an objective exercise. The fact that both Justices wish to pick the plan that best complies with the floor criteria but end up favoring different plans illustrates the point.

Additionally, the parties have largely acknowledged that the 2018 map implemented by this Court produced fair outcomes, and, further, that the maps now presented are comparable or superior to the 2018 map. Thus, I do not find that the differences on the floor criteria are so great that any map can be ruled out on that basis alone. Hence, we must turn to a tiebreaker.

[3] *See* Majority Opinion at 28 n.23 (describing metrics used to evaluate compactness).

[4] The Khalif Plan was the only one that did not analyze partisan performance.

potentially allow mapmakers, in the future, to engineer congressional districting maps, which, **although minimally comporting with these neutral "floor" criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a congressional representative**. *See* N.T. Trial, 12/13/17, at 839–42 (Dr. Warshaw discussing the concept of an efficiency gap based on the number of "wasted" votes for the minority political party under a particular redistricting plan). However, as the case at bar may be resolved solely on the basis of consideration of the degree to which neutral criteria were subordinated to the pursuit of partisan political advantage, as discussed below, we need not address at this juncture the possibility of such future claims.

*Id.* (emphasis added).

Although the task of the Court in this matter is distinctly different than the constitutional challenge to the enacted redistricting plan at issue in *LOWV*, the parties in this matter obviously recognized that it was not enough to satisfy the neutral factors, because even though compliant with the drawing requirements, it was important that the plan did not "unfairly dilute the power of a particular group's vote for a congressional representative." *Id.*

The purpose of our Free and Equal Election Clause is not to ensure that congressional district maps contain clean lines with few divisions and a minimum of irregular borders encompassing an equal number of people. It is not a cartography lesson. The overreaching objective of this constitutional provision is to prevent dilution of a citizen's vote. Consequently, just as the political branches have an obligation to consider partisan fairness when enacting a redistricting plan, so too must this Court when put in the position of having to select one from the many that were submitted to us. Partisan fairness is not merely a subordinate factor to be considered. When, as here, all of the plans are compliant with the floor criteria, consideration of the degree of partisan

fairness must, in my view, drive the ultimate selection of a plan in the circumstances in which this Court finds itself.[5]

The degree of partisan fairness is measurable. Measurement is imperfect because it cannot account for, among other variables, the quality of candidates. Also, where, as here, the submitted plans have no performance record, the partisan fairness metrics are predictive, not actual. But the tools are available and widely used. The record in this case is replete with expert analyses of the predicted partisan fairness of the plans. Admittedly, the data sets used to calculate the metric and, in some cases, the methodologies within the designated partisan fairness tests differed among the parties' experts.

Nevertheless, I do not find that the lack of one perfect test for measuring partisan fairness precludes us from considering that factor. It simply means that we should look for the most comprehensive review available. Based on the record before us we have one comprehensive, comparative analysis of each of the submitted plans' predicted performance on partisan fairness. The Gressman plaintiff's expert, Dr. Daryl DeFord, performed an "apples to apples" analysis comparing all plans to each other. In other words, he reconciled the data set and methodologies used by the various experts. From my perspective, it forms a reliable basis to rank the predicted partisan fairness of the submissions. Unlike some other experts, who used limited data sets, Dr. DeFord's

---

[5]  I do not suggest that any of the plans submitted for consideration reflect a degree of partisan unfairness that is disqualifying in a constitutional sense, nor do I suggest the level of partisan fairness that a duly enacted congressional district plan must attain. I do, however, believe that when this Court is forced to choose among plans, the plans that perform the best on partisan fairness metrics must rank above the others.

analysis examined "vote totals for [eighteen] statewide general elections[.]"  Expert Report

of Dr. DeFord at 5.  He elaborated on this point:

> For each of my partisan-fairness metrics, I have used election
> results from [eighteen] statewide general elections that took
> place in the Commonwealth between 2012 to 2020.  This
> represents the general elections races for U.S. President,
> U.S. Senate, Governor, Attorney General, Auditor General,
> and State Treasurer.  This dataset includes examples of
> elections where each of the major political parties' candidates
> won the overall statewide vote.  Many of these races were
> decided by small margins, particularly those in which a
> Republican candidate won the overall election.  Thus, I also
> included the 2017 Supreme Court Justice election in my
> analysis, as that election had a larger margin of victory for the
> Republican candidate than the other elections had.  Looking
> at this breadth of election results helps us better understand
> and model the political geography of a state and related
> realistic vote outcomes.

*Id*. at 22.

Dr. DeFord explained that using general elections was useful because "the

percentages reported reflect the two-party vote share from the two most successful

candidates, which in these elections were always the Democratic and Republican

candidates."  *Id*. at 22-23.  Each of the partisan fairness metrics he used "requires one

first to determine, for each of the [eighteen] general elections, which candidate, the

Democratic or Republican, carried each of the districts in each redistricting plan at issue."

*Id*. at 23.  Then, that information was used "to plot a seats-votes curve, and they also

become inputs for the partisan-symmetry computations described below."  *Id*.  These

results were then used to generate a mean-median score[6] and an efficiency gap score.[7]

Dr. DeFord then compared all plans to each other on these two metrics, plus four other

measures generated by the PlanScore.org website.  The following table, which is copied

from the Gressman's Brief in Support of Exceptions at page 59 with slight alterations to

the headings, reflects the results of that comparison.  (In his report, Dr. DeFord indicates

that a negative score indicates a Republican lean.)

| Partisan Fairness Metric *(closer to zero is better)* | [Tier one (least bias)] | [Tier two] | [Tier three (most bias)] |
|---|---|---|---|
| **Dr. DeFord's Average Mean-Median** (using all 18 elections from 2012 to 2020) | Sen. Dems 2 (-0.3%) Gressman (-0.8%) House Dems (-0.9%) Governor (-1.0%) Draw the Lines (-1.2%) | Carter (-1.6%) Ali (-1.8%) Sen. Dems 1 (-1.9%) Citizen-Voters (-2.0%) | Reschenthaler 2 (-2.6%) Reschenthaler 1 (-2.7%) Voters of PA (-2.7%) HB2146 (-2.9%) |

---

[6] "The mean-median score is a metric related to partisan symmetry.  In simple terms, a plan that exhibits partisan symmetry is one that is likely to treat the parties similarly in terms of seat outcomes given equal votes received by all candidates statewide. That is, if Party A is expected to turn a 55%-to-45% statewide vote advantage into a 10-to-7 seats advantage, then a symmetric result would require Party B to turn a similar 55%-to-45% statewide vote advantage into a 10-to-7 seats advantage." Report of Dr. DeFord at 26 (footnote omitted).

[7] We explained the concept in *LOWV*.

> Dr. Warshaw suggested that the degree of partisan bias in a redistricting plan can be measured through the "efficiency gap," which is a formula that measures the number of "wasted" votes for one party against the number of "wasted" votes for another party.  *Id.* at 840–41.  For a losing party, all of the party's votes are deemed wasted votes. For a winning party, all votes over the 50% needed to win the election, plus one, are deemed wasted votes.  The practices of cracking and packing can be used to create wasted votes.

*LOWV*, 178 A.3d at 777.

| Dr. DeFord's Average Efficiency Gap (using the same 18 elections) | Carter (-0.4%) Governor (0.6%) Gressman (0.8%) Sen. Dems 2 (1.0%) | Draw the Lines (-1.6%) Sen. Dems 1 (-2.5%) Citizen-Voters (-2.6%) Ali (-2.7%) House Dems (3.3%) | Voters of PA (-4.8%) HB2146 (-6.3%) Reschenthaler 1 (-7.8%) Reschenthaler 2 (-7.8%) |
|---|---|---|---|
| PlanScore Efficiency Gap | House Dems (1.2% D) Gressman (1.4% R) Carter (1.8% R) Governor (1.9% R) | Ali (2.4% R) Sen. Dems 2 (2.4% R) Sen. Dems 1 (2.5% R) Draw the Lines (3.5% R) Citizen-Voters (4.6% R) | Reschenthaler 2 (6.3% R) Reschenthaler 1 (6.4% R) HB2146 (6.6% R) Voters of PA (6.8% R) |
| PlanScore Declination | Gressman (0.03 R) House Dems (0.04 D) Carter (0.05 R) Governor (0.05 R) | Ali (0.07 R) Sen. Dems 1 (0.07 R) Sen. Dems 2 (0.07 R) Draw the Lines (0.10 R) Citizen-Voters (0.13 R) | Reschenthaler 2 (0.18 R) HB2146 (0.19 R) Reschenthaler 1 (0.19 R) Voters of PA (0.20 R) |
| PlanScore Partisan Bias | Gressman (0.9% R) Governor (1.1% R) Carter (1.3% R) Sen. Dems 2 (1.5% R) | Sen. Dems 1 (1.8% R) Ali (1.9% R) House Dems (1.9% D) Draw the Lines (2.9% R) | Citizen-Voters (4.3% R) Reschenthaler 2 (5.9% R) Reschenthaler 1 (6.2% R) Voters of PA (6.5% R) HB2146 (6.3% R) |
| PlanScore Mean-Median Difference | Gressman (0.4% R) Carter (0.4% R) Governor (0.4% R) Sen. Dems 2 (0.5% R) | Sen. Dems 1 (0.6% R) House Dems (0.7% D) Ali (0.7% R) Draw the Lines (1.0% R) | Citizen-Voters (1.7% R) Voters of PA (2.2% R) HB2146 (2.3% R) Reschenthaler 1 (2.4% R) Reschenthaler 2 (2.4% R) |

This comparison establishes that four maps submitted for our consideration separate them from the field: the Carter Plan, the Gressman Plan, the Governor's Plan, and the second Senate Democratic Caucus plan. The Gressman Plan performs the best, with the remaining three all scoring slightly lower. Although the Carter Plan is not the best performer, the other plans contain concerning anomalies in their physical configuration. Namely, as further explained, those plans make changes that depart radically from the historical treatment of certain established communities of interest. Because the Carter Plan does not contain these anomalies and its partisan fairness score is nearly identical to those other three maps, I agree that it is the best option.

The three maps which score better on partisan fairness draw districts that depart from historically recognized communities of interest that, in my view, are too drastic for this Court to adopt.  The most salient of these are: the decisions to split the City of Pittsburgh (the Governor and Senate Democratic Caucus) and the decision to place Pittsburgh in a district with Washington County along with splitting Bucks County (Gressman Plan).  Communities of interest are in the eyes of the beholder.  A determination of what qualifies as a community of interest, and what those interests are, involves a mixture of local knowledge and political considerations uniquely determinable by the political branches within the confines of the floor constitutional criteria.  If an adopted districting plan resulted in a map that split the City of Pittsburgh and otherwise met the *LOWV* criteria, then the split could be a valid choice.  The same could be said for the Bucks County split that resulted in a Latino minority opportunity district and the combination of the City of Pittsburgh with Washington County based on the rationale that they are part of the same standard metropolitan statistical area.  From where I sit, I have no legitimate way to decide whether the tradeoffs for more substantial compliance with the floor criteria involved with these significant changes in the historical treatment of these areas are acceptable.[8]  Therefore, I cannot endorse the selection of these maps when

---

[8]  For example, a bipartisan group of current and former Washington County elected public officials submitted an amicus brief urging this Court to select any plan but the Gressman Plan due to the fact it would create a new congressional district containing all of Washington County and the City of Pittsburgh.  These individuals argued that Washington County and parts of Allegheny County, while "hav[ing] much in common," actually "have little in common[.]"  Amicus Brief at 5.  Moreover, they predicted that the City of Pittsburgh would dominate Washington County.  *Id.* at 6.

the Carter Map manages not to make those significant changes and still scores very highly on partisan fairness.

Because the outcome achieved in the Carter Plan[9] satisfies the *LOWV* floor criteria and is among the best in preventing dilution of an individual's vote, as demonstrated in its partisan fairness metrics, without disrupting long recognized communities of interest, I join in its selection as the 2022 Congressional District Plan.

---

[9]  As discussed in other opinions, the Carter Plan was designed using the "least change" approach.  I agree with the Majority that our focus should not be on the method used in creating the map – it should be on the outcome.  Majority Opinion at 27.

Regarding whether this Court can apply a clear standard in selecting a map, Justice Dougherty favorably cites the "least change" approach used by the Carter Plan mapmaker.  *See* Concurring Op. at 3 (Dougherty, J.).  Justice Wecht likewise cites that approach as a favorable criterion, albeit not as a sole tiebreaker.  *See* Concurring Op. at 19-20 (Wecht, J.).  Justices Mundy and Todd both desire to select the map which best follows the neutral floor criteria.  *See* Dissenting Op. at 5 (Todd, J.); Dissenting Op. at 9 (Mundy, J.).  However, this shared belief in the correct standard did not yield the same answer.  I note that courts in analogous circumstances have asked parties to brief the question of whether a clear standard should be adopted.  *See Johnson v. Wisconsin Elections Comm'n,* 967 N.W.2d 469, 476 (Wi. 2021) ("[W]e ordered the parties to address four issues. ... (3) The petitioners ask us to modify existing map using a 'least change' approach. Should we do so, and if not, what approach should we use?").  While the adoption of a fixed standard is desirable, without the benefit of advocacy I believe this Court is ill-equipped to clearly answer that question.  For instance, Justice Mundy uses the "Borda system," which was not used by any of the parties, and the weights Justice Mundy gives to the floor criteria were not subject to examination.  In the absence of advocacy on the viability of a fixed standard, I believe that it is incumbent upon us to rely on the record.

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

CAROL ANN CARTER, MONICA          :   No. 7 MM 2022
PARRILLA, REBECCA POYOUROW,        :
WILLIAM TUNG, ROSEANNE MILAZZO,    :
BURT SIEGEL, SUSAN CASSANELLI,     :
LEE CASSANELLI, LYNN WACHMAN,      :   ARGUED:  February 18, 2022
MICHAEL GUTTMAN, MAYA FONKEU,      :
BRADY HILL, MARY ELLEN BALCHUNIS,  :
TOM DEWALL, STEPHANIE MCNULTY      :
AND JANET TEMIN,                   :
                                   :
            Petitioners            :
                                   :
                                   :
        v.                         :
                                   :
                                   :
LEIGH M. CHAPMAN, IN HER OFFICIAL  :
CAPACITY AS THE ACTING SECRETARY   :
OF THE COMMONWEALTH OF             :
PENNSYLVANIA; JESSICA MATHIS, IN   :
HER OFFICIAL CAPACITY AS DIRECTOR  :
FOR THE PENNSYLVANIA BUREAU OF     :
ELECTION SERVICES AND NOTARIES,    :
                                   :
            Respondents            :
                                   :
-------------------------------------------------  :
PHILIP T. GRESSMAN; RON Y. DONAGI; :
KRISTOPHER R. TAPP; PAMELA GORKIN; :
DAVID P. MARSH; JAMES L.           :
ROSENBERGER; AMY MYERS; EUGENE     :
BOMAN; GARY GORDON; LIZ MCMAHON;   :
TIMOTHY G. FEEMAN; AND GARTH       :
ISAAK,                             :
                                   :
            Petitioners            :
                                   :
                                   :
        v.                         :
                                   :
                                   :

A2657

LEIGH M. CHAPMAN, IN HER OFFICIAL        :
CAPACITY AS THE ACTING SECRETARY         :
OF THE COMMONWEALTH OF                   :
PENNSYLVANIA; JESSICA MATHIS, IN         :
HER OFFICIAL CAPACITY AS DIRECTOR        :
FOR THE PENNSYLVANIA BUREAU OF           :
ELECTION SERVICES AND NOTARIES,          :
                                         :
                    Respondents          :

**<u>CONCURRING OPINION</u>**

**OPINION FILED:  March 9, 2022**

**JUSTICE DOUGHERTY**                    **DECIDED:  February 23, 2022**

I join the majority opinion, but distance myself from certain aspects of part VI.B. Most significantly, I agree completely with the Court's selection of the Carter Plan for the primary and general elections for seats in the United States House of Representatives commencing May 17, 2022.  In my view, the Carter Plan is the correct choice because it effects the least change from the 2018 Plan, while also satisfying the various criteria we have established as the constitutional standard.

As the learned majority explains, the Carter Plan — together with several other plans submitted by the parties — meets the traditional core criteria established in *League of Women Voters of Pennsylvania v. Commonwealth*, 178 A.3d 737 (Pa. 2018) ("*LWV II*"), as the "floor" for a constitutionally valid redistricting plan.  *See* Majority Opinion at 27-33; *LWV II*, 178 A.3d at 817.  And, the Carter Plan — among others — satisfies additional metrics identified by the majority as "subordinate historical considerations."  *See* Majority Opinion at 34-36.  But a test utilizing these factors alone, acknowledged by the majority as being satisfied by multiple maps presented in this case, does little to advance a predictable judicial standard for circumstances like these, *i.e.*, where the Court is forced into the map-selecting business by a decennial impasse, and where multiple possible plans satisfy the floor criteria.  *Cf. Carter v. Chapman*, 7 MM 2022, 2022 WL 304580, at

*5 (Pa. Feb. 2, 2022) (Dougherty, J., concurring) ("[T]he people of this Commonwealth, as well as the other branches of government upon which the primary responsibility for drawing federal congressional districts rests, have a right to know what to anticipate should the judiciary be dragged into the process" including, *inter alia*, the "criteria that should guide a court's analysis."); *see id.* (imploring the Court to "shine as much light as possible on what many believe is an improperly political and unfairly partisan process").

Although the majority lands on the right answer, it fails to satisfactorily explain how it reaches that result. The majority appears to employ "a totality-of-the-circumstances analysis, where all conceivable factors, none of which is dispositive, are weighed with an eye to ascertaining" which plan is most "'fair.'" *Vieth v. Jubelirer*, 541 U.S. 267, 291 (2004) (plurality); *see* Majority Opinion at 39 ("Our task is to discern which plan, in our view, best abides by the traditional core criteria with attention paid to the subordinate historical considerations and awareness of partisan fairness."). Respectfully, while I fully support that goal, I also believe a more concrete standard is needed "to meaningfully constrain the discretion of the courts, and to win public acceptance for the court['s] intrusion into a process that is the very foundation of democratic decisionmaking." *Vieth*, 541 U.S. at 291; *see also id.* at 307 (Kennedy, J., concurring) ("With uncertain limits, intervening courts — even when proceeding with best intentions — would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.").

In my view, the critical factor that sets the Carter Plan apart  — the "tie-breaker," so to speak — is that the Carter Plan yields the least change from the Court's 2018 congressional redistricting plan. *See* Majority Opinion at 35 (acknowledging Carter Plan "laps the field" in terms of maintaining district lines). The least changed map is also the best choice where, as here, no one has demonstrated which subordinate historical considerations should outweigh the others, all maps are generally in the same acceptable

range, and we lack enough information about partisan fairness metrics to focus on those as the deciding factor.[1]

The majority correctly observes the Carter Plan ensures 86.6 percent of the Commonwealth's population falls in the same district as under the 2018 Plan.  *See id.*  Maintaining continuity for the vast majority of Pennsylvania residents is particularly important where, as here, the Court was forced to participate belatedly in what should have been an exclusively political process.[2]  In this context, a light, transparent judicial touch is particularly advisable.  I am also sensitive to the fact that Pennsylvania's voters have already had their districts changed twice since 2011, with a third realignment now made necessary by the population changes measured in the 2020 census.

Moreover, as noted by the majority, expert testimony established the 2018 Plan was "broadly recognized as a fair plan by those who study redistricting, following its use

---

[1] I fully agree with the majority's recognition that partisan fairness should be considered in our analysis.  *See, e.g.*, Majority Opinion at 18 ("we conclude that consideration of partisan fairness, when selecting a plan among several that meet the traditional core criteria, is necessary to ensure that a congressional plan is reflective of and responsive to the partisan preferences of the Commonwealth's voters"); *id.* at 23 ("Partisan fairness metrics provide tools for objective evaluation of proposed congressional districting plans to determine their political fairness and avoid vote dilution based on political affiliation."); *id.* at 36, *quoting LWV II*, 178 A.3d at 814 ("we deem it appropriate to evaluate proposed plans through the use of partisan fairness metrics to ensure that all voters have 'an equal opportunity to translate their votes into representation.'").  However, I also recognize that the metrics for this criterion remain somewhat in flux when compared to the more standardized measures of the traditional core criteria.  *See, e.g.*, *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring) ("No substantive definition of fairness in [re]districting seems to command general assent.").  Still, "[t]hat no such [partisan fairness] standard has emerged in this case should not be taken to prove that none will emerge in the future." *Id.* at 311.

[2] Notably, as I observed when we agreed to exercise extraordinary jurisdiction over this matter, "all parties concede the judiciary's involvement is not only appropriate at this point, but imperative."  *Carter*, 7 MM 2022, 2022 WL 304580, at *2 n.1 (Dougherty, J., concurring) (citations omitted).  Any hypothetical claim this Court lacks the authority to select a map has been irretrievably waived.

in the 2018 and 2020 elections," and the 2018 Plan "produce[d] relatively competitive elections with outcomes that are roughly in line with overall partisan preferences of Pennsylvania voters." *Id.* at 25 (internal quotation marks omitted). To me, it is eminently reasonable that we select the plan that hews as closely as possible to a prior district map we already know is constitutional and that has been proven through multiple election cycles to produce fair outcomes.[3]

Finally, I must express my personal frustration with the widely held misperception — promulgated disingenuously in the media as well as far too many courtrooms — that this Court somehow relishes the opportunity to play politics here. We decide this case not because we want to but because we have to as a result of the intransigent inability of the two other co-equal branches of government to fulfill their constitutional obligations and reach a compromise agreement. It is an unfortunate reality that when our Commonwealth's legislative and executive branches succeed only in creating a void, we have no choice but to step once again into the breach.

---

[3] I am not persuaded by arguments that the least change approach is exclusively relegated to situations where the prior map was legislatively enacted. Indeed, courts have recognized the approach is just as valid — if not more so — when the prior plan was court-made. *See, e.g., Stenger v. Kellett*, 2012 WL 601017, at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts. . . . The 'least change' method is advantageous because it maintains the continuity in representation for each district and is by far the simplest way to reapportion[.]"); *Hippert v. Ritchie*, 813 N.W.2d 374, 380 (Minn. Special Redistricting Panel 2012) (explaining the panel utilizes a least-change strategy "where feasible" to avoid making political decisions that should be made by the legislature and governor); *Markham v. Fulton Cty. Bd. of Registrations & Elections*, 2002 WL 32587313, at *6 (N.D. Ga. May 29, 2002) (where prior districts were created by court order, court used that map as benchmark in drawing new map using a least-change methodology); *see also Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 496-97 (Wis. 2021) (Dallet, J., dissenting) (although "the least-change approach has no 'general acceptance among reasonable jurists' when the court's starting point is a legislatively drawn map . . .[,] when a court is redrawing maps based on a prior court-drawn plan, it may make sense to make fewer changes since the existing maps should already reflect neutral redistricting principles").

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : : | No. 7 MM 2022<br><br>ARGUED:  February 18, 2022 |
| Petitioners | : : : | |
| v. | : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : : | |
| Respondents | : : : | |
| -------------------------------------------------------- | : | |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : : | |
| Petitioners | : : : | |
| v. | : : : : : | |

LEIGH M. CHAPMAN, IN HER OFFICIAL       :
CAPACITY AS THE ACTING SECRETARY        :
OF THE COMMONWEALTH OF                  :
PENNSYLVANIA; JESSICA MATHIS, IN        :
HER OFFICIAL CAPACITY AS DIRECTOR       :
FOR THE PENNSYLVANIA BUREAU OF          :
ELECTION SERVICES AND NOTARIES,         :
                                        :
               Respondents              :

### CONCURRING OPINION

OPINION FILED:  March 9, 2022

**JUSTICE WECHT**                    DECIDED:  February 23, 2022

I join the Court's adoption of the Carter Plan as the Commonwealth's 2022 Congressional Redistricting Plan, as well as its opinion in support thereof.  I write separately to further explain why I found a number of exceptions to the Special Master's Report and Recommendation to be meritorious, and also to offer a more detailed discussion regarding the "least-change" approach, the "subordinate historical consideration" that tipped the scales in favor of the Carter Plan.

Although "the primary responsibility and authority for drawing" the Commonwealth's congressional districts "rests squarely" with the General Assembly,[1] the long-standing practice of the state and federal courts counsels judicial intervention when the political branches fail to timely enact a congressional districting plan and "when further delay" threatens to "disrupt the election process."[2]  As the recent flurry of activity involving

---

[1]    *League of Women Voters v. Commonwealth*, 178 A.3d 737, 821 (Pa. 2018) ("*LWV II*").

[2]    *Branch v. Smith*, 538 U.S. 254, 279 (2003) (plurality); *cf. LWV II*, 178 A.3d at 822 ("When . . . the legislature is unable or chooses not to act, it becomes the judiciary's role to determine the appropriate redistricting plan."); *Scott v. Germano*, 381 U.S. 407, 409 (1965) (*per curiam*) ("The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but (continued…)

requested modifications to the primary election calendar demonstrates, delaying our consideration of this case any longer likely would have impeded the orderly administration of this year's elections to the detriment of voters and candidates alike.  Alas, though our task may be an "unwelcome" one,[3] it is not unfamiliar to this Court.[4]

Preliminarily, I concur with the Court's evaluation of the pertinent systemic exceptions taken by a number of Parties and *Amicus* Participants to the Special Master's Report and Recommendation ("Report").  Chief among those exceptions, in my view, is the Special Master's treatment of House Bill 2146 as "functionally tantamount to the voice and will of the People,"[5] which fundamentally misapprehends the Governor's role as "an integral part of the lawmaking power of the state."[6]

With respect to the redistricting process, it is well-settled that the authority vested in each State's Legislature to prescribe "[t]he Times, Places and Manner of holding

---

appropriate action by the States in such cases has been specifically encouraged."); *Growe v. Emison*, 507 U.S. 25, 33-34 (1993) (observing that, "[i]n the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself," and instructing federal courts to "neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it" "[a]bsent evidence that these state branches will fail timely to perform that duty") (emphasis in original); *Butcher v. Bloom*, 216 A.2d 457, 459 (Pa. 1966) (noting that the Court selected redistricting plans for the Pennsylvania House and Senate after "[t]he deadline set forth in our earlier opinion passed without [the] enactment of the required legislation").

[3]     *LWV II*, 178 A.3d at 823 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)).

[4]     *See generally LWV II*, *supra* note 1; *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) (assuming plenary jurisdiction of redistricting impasse litigation arising from the political branches' failure to cure malapportioned congressional map in the wake of the Commonwealth's loss of two congressional seats following the 1990 decennial census).

[5]     Report at 214-15.

[6]     *Commonwealth ex rel. Attorney General v. Barnett*, 48 A. 976, 976 (Pa. 1901).

Elections for . . . Representatives"—which remains subject to Congress' plenary power to "make or alter such Regulations" "at any time by Law"[7]—"involves lawmaking in its essential features and most important aspect."[8]   As such, the United States Supreme Court has admonished that "the exercise of th[at] authority must be in accordance with the method which the state has prescribed for legislative enactments."[9]   In other words, the Legislature has no "power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted."[10]

Unlike those jurisdictions that have enshrined certain aspects of the congressional redistricting process in their respective state constitutions,[11] Pennsylvania's charter is silent on the subject.   As in most States, redistricting in Pennsylvania typically is carried out through the traditional legislative process.[12]   That is significant, because the

---

[7]      U.S. CONST. art. I, § 4 (hereinafter, "Elections Clause").

[8]      *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

[9]      *Id.* at 367; *see also Hawke v. Smith*, 253 U.S. 221, 230 (1920) (distinguishing the "power to ratify a proposed amendment to the" U.S. Constitution, which a State "derives" from the Fifth Article thereof, from "the power to legislate in the enactment of the laws of a state," which "is derived from the people of the state").

[10]      *Smiley*, 285 U.S. at 367-68.

[11]      *See, e.g.*, ARIZ. CONST. art. IV, pt. 2, § 1; CAL. CONST. art. XXI; COLO. CONST. art. V, §§ 44-48; HAW. CONST. art. IV, § 2; IDAHO CONST. art. III, § 2; MICH. CONST. art. IV, § 6; MONT. CONST. art. V, § 14; N.J. CONST. art. II, § II; N.Y. CONST. art. III, § 4; OHIO CONST. art. XIX; UTAH CONST. art. IX, § 1; VA. CONST. art. II, §§ 6, 6-A; WASH. CONST. art. II, § 43.

[12]      The High Court considered the validity of non-traditional exercises of legislative power in the redistricting sphere in *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), which concerned a challenge to a 1912 amendment to the Constitution of Ohio that expressly reserved to the people of that State the concurrent right to exercise the legislative power "by way of referendum"—*i.e.*, "to approve or disapprove by popular vote any law enacted by the [G]eneral [A]ssembly." *Id.* at 566.  In May 1915, the Ohio General Assembly passed, and the Governor of Ohio signed into law, an act redistricting the State into twenty-two congressional districts.  When voters subsequently disapproved of the act (continued…)

Governor's constitutionally designated role in the legislative process ought not to be treated as an afterthought.   More specifically, the Presentment Clause and the

---

in a statewide referendum, challengers unsuccessfully sought a writ of *mandamus* from the Supreme Court of Ohio directing election officials to disregard the vote on the grounds that it violated the Elections Clause and thus was void.  *See id.* at 567.

The U.S. Supreme Court affirmed the denial of relief for three interrelated reasons. First, the Court explained that "the referendum constituted a part of the state Constitution and laws," and therefore "was contained within the legislative power" of the State.  *Id.* at 568.  Next, it observed that in 1911, Congress had, by statute,

> expressly modified the phraseology of the previous acts relating to [redistricting] by inserting a clause [which directed that redistricting should be performed by a State 'in the manner provided by the laws thereof'] plainly intended to provide that where, by the state Constitution and laws, the referendum was treated as part of the legislative power, the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law.

*Id.*  Lastly, the Court reasoned that any contention that Congress exceeded its constitutional authority in sanctioning use of the referendum

> for the purpose of apportionment . . . must rest upon the assumption that to include the referendum in the scope of the legislative power is to introduce a virus which destroys that power, which in effect annihilates representative government, and causes a state where such condition exists to be not republican in form, in violation of the guaranty of the Constitution . . . [which] presents no justiciable controversy.

*Id.* at 569 (citing U.S. CONST. art. 4, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government . . . .")); *cf. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 795 n.3 (2015) ("The people's sovereign right to incorporate themselves into a State's lawmaking apparatus, by reserving for themselves the power to adopt laws and to veto measures passed by elected representatives, is one this Court has ranked a nonjusticiable political matter.").  In short, neither Ohioans' decision to overrule a duly enacted congressional redistricting plan by statewide vote, nor Congress' recognition of their authority to do so in 1911, were "repugnant" to the Constitution.  *Id.*  As far as I am aware, Pennsylvania has not utilized referenda for redistricting purposes.

gubernatorial veto[13] have been critical features of our Commonwealth's tripartite system of government for nearly two-and-a-half centuries.[14]

---

[13]    *Compare* PA. CONST. art. IV, § 15 ("Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated . . . ."), *with* PA. CONST. (1790) art. I, § 22 ("Every bill which shall have passed both Houses, shall be presented to the Governor; if he approve, he shall sign it; but if he shall not approve it, he shall return it, with his objections, to the House in which it shall have originated . . . .").  As this Court has explained,

> The veto power is a survival of the lawmaking authority vested in the king as a constituent if not a controlling third body of the parliament, in which he might and not infrequently did sit in person.  With the growth of free ideas and institutions, and the aggressive spirit of the popular branch of the parliament in the affairs of government, it lost its vitality as a real power in England. . . .  But in the colonies it not only existed, but was an active power, absolute in character, and so constantly exercised that . . . the Declaration of Independence set forth first among the grievances of the colonies, "He has refused his Assent to Laws, the most wholesome and necessary for the public good."
>
> *    *    *
>
> From the colonies the power passed, with various limitations, into nearly all the American constitutions, state and national.  Originally intended mainly as a means of self-protection by the executive against the encroachments of the legislative branch, it has steadily grown in favor with the increasing multitude and complexity of modern laws, as a check upon hasty and inconsiderate as well as unconstitutional legislation.

*Barnett*, 48 A. at 976-77 (quotation from Declaration of Independence modified).

[14]    While the classical view of the separation of powers might regard the veto power as an inherent feature of our system of checks and balances, this was not always the case.  By the time the United States Constitution was ratified in 1789, "it appears that only two states had provided for a veto upon the passage of legislative bills; Massachusetts, through the Governor, and New York, through a council of revision."   *Smiley*, 285 U.S. at 368.   In fact, not only did Pennsylvania's "radically democratic" founding era constitution, which governed from 1776 to 1790, fail to provide a mechanism for contemporaneous disapproval of laws passed by the unicameral legislature, it vested the "supreme executive power" in a council of twelve people.   *LWV II*, 178 A.3d at 802 (quoting Ken Gormley, *Overview of Pennsylvania Constitutional Law*, as appearing in Ken Gormley, ed., THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, 3 (2004)); PA. CONST. (1776) ch. II, § 4 ("The supreme executive power shall be vested in a president and council").

Reflecting on the redistricting process early in the twentieth century, in *Smiley*, the Supreme Court observed that "the uniform practice" among the States in such matters "has been to provide for congressional districts by the enactment of statutes with the participation of the Governor wherever the state Constitution provided for such participation as part of the process of making laws."[15]   To that end, the Court has observed:

> [W]hether the Governor of the State, through the veto power, shall have a part in the making of state laws, is a matter of state polity.   Article I, Section 4 of the Federal Constitution neither requires nor excludes such participation.   And provision for it, as a check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority. . . . That the state Legislature might be subject to such a limitation, either [at the time of the adoption of the Federal Constitution] or thereafter imposed as the several states might think wise, was no more incongruous with the grant of legislative authority to regulate congressional elections than the fact that the Congress in making its regulations under the same provision would be subject to the veto power of the President, as provided in Article I, Section 7. The latter consequence was not expressed, but there is no question that it was necessarily implied, as the Congress was to act by law; and there is no intimation, either in the debates in the Federal Convention or in contemporaneous exposition, of a purpose to exclude a similar restriction imposed by state Constitutions upon state Legislatures when exercising the lawmaking power.[16]

---

[15]     *Smiley*, 285 U.S. at 370.

[16]     *Id.* at 368-69 (cleaned up).   Regarding the particular role of the Elections Clause in our federal system, the High Court offered the following:

> The practical construction of Article I, Section 4 is impressive.   General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning.   This is especially true in the case of constitutional provisions governing the exercise of political rights, and hence subject to constant and careful scrutiny.   Certainly, the terms of the constitutional provision furnish no such clear and definite support for a contrary construction as to justify disregard of the established practice in the States.   That practice is eloquent of the conviction of the people of the States, and of their representatives in state Legislatures and executive

(continued…)

The Supreme Court reaffirmed the validity of these and other state constitutional constraints on the congressional redistricting process most recently in *Arizona State Legislature v. Arizona Independent Redistricting Commission*.  There, the Court relied upon the Elections Clause and 2 U.S.C. § 2a(c), the successor statute to the 1911 Act at issue in *Hildebrant*, in rejecting a challenge to a provision of the Arizona Constitution, adopted in 2000 via citizen initiative, that "remove[d] redistricting authority from the Arizona Legislature and vest[ed] that authority in an independent commission."[17]  Tracing the history of the federal statutes, the Court explained:

> From 1862 through 1901, the decennial congressional apportionment Acts provided that a State would be required to follow federally prescribed procedures for redistricting unless "the legislature" of the State drew district lines.  In drafting the 1911 Act, Congress focused on the fact that several States had supplemented the representative legislature mode of lawmaking with a direct lawmaking role for the people, through the process of initiative (positive legislation by the electorate) and referendum (approval or disapproval of legislation by the electorate).  To accommodate that development, the 1911 Act eliminated the statutory reference to redistricting by the state "legislature" and instead directed that, if a State's apportionment of Representatives increased, the State should use the Act's default procedures for redistricting "until such State shall be redistricted *in the manner provided by the laws thereof*."[18]

------

office, that in providing for congressional elections and for the districts in which they were to be held, these Legislatures were exercising the lawmaking power and thus subject, where the state Constitution so provided, to the veto of the Governor as a part of the legislative process.

*Id.* (citations omitted).

[17]   576 U.S. at 792.

[18]   *Id.* at 809 (cleaned up; emphasis in original).  "The 1911 Act also required States to comply with certain federally prescribed districting rules—namely that Representatives be elected 'by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants.'"  *Id.* at 809 n.19 (quoting Act of Aug. 8, 1911, ch. 5, § 3, 37 Stat. 14); *see also id.* ("The 1911 Act did not address (continued…)

Because the "lawmaking power in Arizona include[d] the initiative process," the establishment of an independent commission for purposes of congressional redistricting offended neither the Elections Clause nor Section 2a(c).[19]

Taken together, the foregoing authority undercuts the Special Master's suggestion that House Bill 2146 should be entitled to some special consideration, let alone "revere[nce],"[20] simply by virtue of its adoption by the General Assembly.  As I see it, there is no better embodiment of the People's will than the language of the Constitution itself, and that text is clear:  without the Governor's signature or a two-thirds vote of the House

---

redistricting in the event a State's apportionment of Representatives decreased, likely because no State faced a decrease following the 1910 census.").

Notably, requirements virtually identical to those enumerated in the 1911 Act had been added to Pennsylvania's Constitution by statewide referendum in 1874 to govern the redistricting process for state legislative districts, which at that time was handled by the General Assembly directly.  *See* PA. CONST. (1874) art. II, §§ 16, 17; *LWV II*, 178 A.3d at 815.  In 1968, Pennsylvania's voters overhauled the legislative redistricting process by amending the Constitution to commit the power to redraw those districts to the newly constituted Legislative Reapportionment Commission.  By its terms, our Constitution presently requires the Commission to draw legislative districts "composed of compact and contiguous territory as nearly equal in population as practicable," and instructs that "no county, city, incorporated town, borough, township or ward shall be divided in forming" such districts "[u]nless absolutely necessary."  *See* PA. CONST. art. II, § 16.  In *LVW II*, we effectively incorporated a slightly modified version of those requirements into the Free and Equal Elections Clause, *id.* art. I, § 5, as "neutral criteria" to measure the constitutionality of congressional redistricting plans.  *LWV II*, 178 A.3d at 816-17 (holding that "an essential part of such an inquiry is an examination of whether the congressional districts created under a redistricting plan are: 'composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population'").  "These neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts."  *Id.* at 817.

[19]    *Id.* at 793.

[20]    Report at 215.

and Senate to override his veto, it is axiomatic that House Bill 2146 is "just a bill."[21]  While the House Bill undoubtedly encompasses the current Legislature's policy *goals*, it does not have the force of law and therefore does not constitute state policy.[22]  Were this Court to treat it as anything more than a proposal on an equal footing with the other submitted plans, we would subvert the executive power in favor of the legislative power, elevating one coordinate branch of our government over another without a historical basis.  This we cannot do.

Apart from the deference question, I also find the piecemeal treatment of discrete features of any given map as disqualifying to be problematic.  For instance, while the Special Master considered the division of Pittsburgh to be suspect, her Report says nothing about House Bill 2146's treatment of Philadelphia.  Given its size, Philadelphia is the only county in Pennsylvania that can support two ideally populated congressional districts by itself, with the remainder of its surplus population added to a third district anchored in a neighboring county.  However, House Bill 2146 is the *only* submission among the thirteen before us that divides Philadelphia into *four* districts—again without any justification along the lines of what the Special Master demanded of maps that split Pittsburgh.  Likewise, the Special Master deemed maps that "divide[d] Bucks County for the first time since the 1860s" to be "[in]appropriate choice[s]."[23]  But similar concerns were absent with respect to Dauphin County, for instance, which historically had been

---

[21]     SCHOOLHOUSE ROCK!, I'M JUST A BILL (1975).

[22]     *See Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 197 (1972).

[23]     Report at 195.

kept whole before recent redistricting cycles.  Where the 2018 Remedial Map reunified the county, the House Bill would have distributed its populace among three districts.

Moreover, notwithstanding the Constitution's command that "no county, city, incorporated town, borough, township or ward shall be divided in forming" districts "[u]nless absolutely necessary," there are only three counties (one of which is coterminous with a city) in Pennsylvania that "absolutely" must be split to account for current population estimates.[24]  Beyond that, the Constitution does not create a hierarchy of political subdivisions to consistently guide the evaluation of a plan's performance on this measure.  Nor does it set forth intelligible standards by which courts can conclude that the integrity of some municipal boundaries are sacrosanct, while others are not. Consequently, we must choose among proposed maps without a constitutionally-prescribed basis by which to resolve citizens' pleas that certain municipalities or "communities of interest" should be kept together.  Ultimately, those questions are inherently political.

While historical practices might be a helpful starting point for a court to employ when it comes to scrutinizing political subdivisions, by no means do they create what one *Amicus* Participant cleverly chided as "cartographic *stare decisis*."[25]  In that vein, the Special Master erred in asserting that certain plans "propose to split the City of Pittsburgh into two districts, apparently for the first time in [Pennsylvania's] history."[26]  To the contrary, Pittsburgh historically had been split between multiple congressional districts for

---

[24]     Those counties are Allegheny, Montgomery, and Philadelphia.

[25]     Br. of *Amici* Participants Khalif Ali, *et al.*, 2/14/2022, at 20.

[26]     Report at 194.

the better part of the previous century and beyond, including four districts in 1931, five in 1943, four again in 1951, and three between 1962 and 1982, to summarize just a few maps that the Legislative Reapportionment Commission conveniently has made publicly available on its website.[27]  In fact, Pittsburgh has only comprised a single congressional district since 1982.  That said, while the Constitution does not require a justification for each and every split (or any, for that matter), absent compelling reasons not present in this record, whether and how to divide Pennsylvania's second-largest city for the first time in four decades are questions best left to the political branches, which possess the institutional competencies to survey the Commonwealth, conduct fact-finding, and weigh amorphous and constitutionally-undefined concepts like "communities of interest" in deciding where lines should be drawn.

To be clear, I do not believe that any of the maps before us should be disqualified based upon discrete line-drawing decisions.  The creation of a districting plan requires balancing a number of factors, some quantitative, others qualitative.  Necessarily, maximizing a plan's performance with respect to one factor (compactness, say) will complicate one's ability to minimize the results of another (*e.g.*, raw political subdivision splits).  In exercising our "equitable discretion" to choose one plan from an array of options, [28] this Court's first responsibility is to ensure that a given plan satisfies the constitutional requirements of equal population, contiguity, compactness, and preservation of political subdivisions.  As others have noted, using the 2018 Remedial

---

[27]     *See* https://www.redistricting.state.pa.us/Maps/.

[28]     *Connor*, 431 U.S. at 415.

Plan as a baseline, each of the submitted maps arguably satisfies these neutral criteria.[29]

This is a good problem to have, as it appears that the days of "Goofy kicking Donald

Duck" are over.[30]  Given that reality, our inquiry must turn to other considerations.

Some would have us look immediately to a variety of "partisan fairness" metrics, a

number of which have been scrutinized at length by the parties and their experts.

Respectfully, I see less value in that order of operations.  Though I reaffirm the proposition

> that there exists the possibility that advances in map drawing technology
> and analytical software can potentially allow mapmakers, in the future, to
> engineer congressional districting maps, which, although minimally
> comporting with these neutral 'floor' criteria, nevertheless operate to unfairly
> dilute the power of a particular group's vote for a congressional
> representative,[31]

I also bear in mind that we are in a fundamentally different posture than when we

recognized the justiciability of partisan gerrymandering claims in *LWV II*.  Because that

case began as a challenge to an existing map that had been drawn by the Legislature

and signed into law by the Governor, the litigants had the benefit of six years' worth of

election data by which to analyze that plan's actual performance.  While we found those

---

[29]     Majority Op. at 27-33; Concurring Op. (Dougherty, J.) at 2; *see* Report at 192 ("On their face, . . . all the maps in the proposed plans contain districts that are comprised within a contiguous territory and comply with the 'contiguity' requirement of the Pennsylvania Constitution."); *id.* ("Each and every proposed plan satisfies the command in the Free and Equal Elections Clause that congressional districts be created 'as nearly equal in in population as practicable.'").  Among the submissions, the Khalif Ali *Amici* Participants alone utilized the Legislative Reapportionment Commission's alternative, prisoner-adjusted data set.  While this choice is not disqualifying, it makes comparing *Amici*'s plan to the other submissions somewhat more difficult.  Absent a claim that such adjustments constitutionally are required, which *Amici* do not advance here, whether to use the prisoner-adjusted data set is a policy decision reserved to the discretion of policymakers.

[30]     *See LWV II*, 178 A.3d at 819 (relating the derisive moniker given to Congressional District 7 in the 2011 Plan).

[31]     *Id.* at 817.

computations to be instructive, we did not need to rely on them in striking down the 2011 Plan because its subordination of the neutral redistricting criteria was manifest, particularly with regard to the compactness criteria. Here, by contrast, we do not confront a challenge to an existing map. Consequently, the partisan fairness metrics used to evaluate the thirteen submitted maps are useful heuristics to approximate partisan outcomes under conditions that have never occurred—*i.e.*, elections held under proposed lines. For that reason, I caution against surrendering to the allure of those metrics at the front end of an analysis. The numbers are no doubt helpful to a comprehensive examination, but they must not be dispositive. They serve better as a gut-check at the culmination of the process, rather than as a gatekeeping function at the start.

Aside from partisan fairness, in *LWV II*, "[w]e recognize[d] that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment."[32] We designated these factors as "wholly subordinate to the neutral criteria" identified above, but available for consideration nonetheless.[33] I find inquiries about incumbent "protection" and maintaining "political balance" to be less appropriate or amenable to objective analysis in the context of a court-

---

[32]     *Id.*; *cf. Holt v. 2011 Legislative Reapportionment Comm'n*, 67 A.3d 1211, 1235 (Pa. 2013) ("*Holt I*") (explaining that, as a constitutional matter, "there is nothing at all to prevent a particular reapportionment commission from considering political factors, including the preservation of existing legislative districts, protection of incumbents, avoiding situations where incumbent legislators would be forced to compete for the same new seat, *etc.*, in drawing new maps to reflect population changes, . . . so long as they do not do violence to the constitutional constraints" expressed in the neutral criteria); *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (identifying "preserving the cores of prior districts" to be a "legitimate objective").

[33]     *Id.*

drawn or court-selected map.  Preserving prior district lines, however, readily can be assessed using straightforward quantitative metrics.  Accordingly, I agree with Justice Dougherty's sentiments that, compared to the other subordinate historical considerations, what courts have referred to in modern parlance as the "least-change" approach offers several virtues for a court engaged in the selection of a plan.[34]

For one thing, the least-change approach constrains the Court's exercise of its "equitable discretion," limiting the amount of judicial tinkering with existing district lines to the degree necessary to bring a malapportioned plan into compliance with constitutional requirements.  For another, prioritizing least-change promotes "continuity for the vast majority of Pennsylvania residents,"[35] curbing the tumult that might ensue with an indiscriminate overhaul of existing districts.  Furthermore, least-change offers a few objective measurements by which to compare competing submissions head-to-head. The "preeminent" metric for a least-change analysis is "core retention," which can be derived by comparing the existing district boundaries to the proposed district boundaries and then calculating the share of the population that would be retained in the overlapping portions.[36]  The larger the percentage, the better a plan performs on the core retention metric.  Alternatively, one can calculate a "displacement score" by identifying the share

---

[34]    *See* Concurring Op. (Dougherty, J.) at 3.

[35]    *Id.* at 4.

[36]    *Johnson v. Wis. Elections Comm'n*, ___ N.W.2d ___, 2022 WL 621082, *4, *7 (Wis. March 1, 2022) ("Core retention represents the percentage of people on average [who] remain in the same district they were in previously.  It is thus a spot-on indicator of least change statewide, aggregating the many district-by-district choices a mapmaker has to make.  Core retention . . . is central to a least change review.").

of the population in each proposed district that was not in the prior district, with smaller numbers indicating superior performance.[37]

On the core-retention metric, the submitted plans perform as follows:[38]

**Table 1: Retained Population Share in 14 Submitted PA Congressional Plans**

| Plan | Retained Population Share |
|------|---------------------------|
| Carter | 86.6 |
| CCFD | 76.1 |
| Citizen Voters | 82.4 |
| HB2146 | 78.5 |
| Draw the Lines PA | 78.8 |
| GMS | 72.8 |
| Governor Wolf | 81.2 |
| Ali | 81.5 |
| PA House Dem. Caucus | 73.3 |
| Reschenthaler 1 | 76.5 |
| Reschenthaler 2 | 76.5 |
| Senate Dem. Plan 1 | 72.5 |
| Senate Dem. Plan 2 | 72.5 |
| Voters of PA | 80.6 |

With a Retained Population Share of 86.6%, the Carter Plan significantly exceeds most submitted plans on this metric, with only the Citizen-Voters Plan coming within 5%. When asked at argument what significance should be given to these percentages, counsel for

---

[37]      In *Johnson*, the Wisconsin Supreme Court rejected the state legislature's argument that the Court "should weigh as a measure of least change the total number of counties and municipalities split under each proposal." *Id.* The Majority "fail[ed] to see why this [wa]s a relevant least-change metric," in light of the fact that "[i]f a municipality was split under the maps adopted in 2011, reuniting that municipality now—laudable though it may be—would produce more change, not less." *Id.* Although the Court suggested that "[p]articularized data about how many counties or municipalities remain unified or split may be a useful indicator of least change," it did not evaluate the proposed plans on that basis because none of the parties "saw fit to provide that data." *Id.* (emphasis in original). Similar data were not submitted in this case either.

[38]      *See* Carter Petitioners' Response Br. in Support of Proposed Congressional Redistricting Plan, 1/26/2022, Ex. 1 (Expert Report of Jonathan Rodden, 1/26/2022, at 2).

the Carter Petitioners explained that the difference between 86% and 76% on this measurement is roughly one million more people who would remain in their current districts. Broken down by district, eleven of the seventeen proposed districts in the Carter Plan have core retention scores exceeding 89%:[39]

**Table 3: Share of Population in Each Proposed District that Will be in the Same District as in the 2018 Plan**

| District | Share of population in previous version of district |
|---|---|
| 1 | 93.26% |
| 2 | 95.84% |
| 3 | 94.17% |
| 4 | 81.65% |
| 5 | 89.74% |
| 6 | 98.44% |
| 7 | 90.56% |
| 8 | 92.10% |
| 9 | 65.54% |
| 10 | 96.20% |
| 11 | 96.91% |
| 12(18) | 85.50% |
| 13 | 73.39% |
| 14 | 75.65% |
| 15 | 59.61% |
| 16 | 89.95% |
| 17 | 93.63% |

As the Governor's expert put it, the Carter Plan "just laps [the] field when it comes to least change."[40]

In criticizing the Carter Plan, the Special Master erroneously contended that this Court rejected the least-change approach in *Holt I*, and therefore the Carter Plan was

---

[39]   Carter Petitioners' Br. in Support of Proposed Congressional Redistricting Plan, 1/24/2022, Ex. 1 (Expert Report of Jonathan Rodden, 1/24/2022, at 3).

[40]   Notes of Testimony, 1/27/2022, at 409 (testimony of Moon Duchin, Ph.D.).

"developed in contravention of controlling precedent."[41]  But least-change was not at issue in that case.  Read in context, the cited passage concerned this Court's standard and scope of review of the Legislative Reapportionment Commission's 2011 Final Plan.  The Commission argued that the Court's "*de novo* review is to be constrained by the specifics of prior reapportionment plans 'approved' by the Court."[42]  That was so because the Commission mistakenly believed that this Court's prior redistricting decisions essentially pre-approved certain raw numbers of split political subdivisions and population deviation levels.[43]  In rejecting that approach, the Court clarified that those prior appeals only resolved challenges actually raised by the parties; they did not "insulate" the Commission's Final Plan "from attack . . . unless a materially indistinguishable challenge was raised and rejected in those decisions."[44]

Here, the Carter Petitioners do not suggest that the bulk of the 2018 Remedial Plan must be blindly re-adopted because it previously was approved by this Court.  Rather, they believe that it is a reasonable starting point for drawing a new plan that also complies with all other traditional criteria.  I agree.  Moreover, preferring the least-change approach would not inoculate future plans from challenges, as the Special Master evidently feared.[45]  The political branches are not bound by a least-change approach

---

[41]    Report at 187 (citing *Holt I*, 38 A.3d at 735).

[42]    *Holt I*, 38 A.3d at 735.

[43]    *Id.*

[44]    *Id.* at 736; *see also id.* at 735 (explaining that "prior 'approvals' of plans do not establish that those plans survived not only the challenges actually made, but all possible challenges").

[45]    *See* Report at 188 ("This Court is deeply troubled by the prospect of any court, let alone a court of this Commonwealth, applying the 'Least Change' doctrine, where the (continued…)

when drawing districts through the typical legislative process.  The United States and Pennsylvania Constitutions give the General Assembly ample latitude to draw new maps from scratch based upon its preferred policy considerations, limited only by constitutional constraints and federal statutes such as the Voting Rights Act.  Thus, the Legislature may replace wholesale the Carter Plan with a plan of its own devising in a future redistricting cycle, and any challenges to that plan would have to be evaluated independently on their merits.

To be sure, the least-change approach has its own shortcomings.  The utility of such an approach might be diminished significantly if our point of reference—*i.e.*, the thing to be changed the least—is a grossly gerrymandered map, as was the case with the 2011 Plan, whose deficiencies were pervasive.  In that instance, it would not have been prudent to require mapmakers to measure their proposals against manifestly unconstitutional lines.[46]

Although I would not declare that least-change should be *the* "tie-breaker" for all court-selected plans, my views on this subject align more closely with Justice Dougherty's.[47]  In exercising our constitutional and equitable powers, we must recognize

---

existing plan was drafted by that court itself, because that court could theoretically continuously adopt features of its prior plans, effectively rendering impossible any future challenge to the plan.").

[46]   That being said, utilizing a least-change approach where a prior map's constitutional shortcomings are confined to a few districts is not beyond the realm of possibility.  In that case, all other things being equal, least-change might still present the most restrained approach to judicial selection among several proposed maps.

[47]   *See* Concurring Op. (Dougherty, J.) at 3 ("In my view, the critical factor that sets the Carter Plan apart—the 'tie-breaker,' so to speak—is that the Carter Plan yields the least change from the Court's 2018 congressional redistricting plan.").

that redistricting is more art than science.  Every line reflects a value judgment to some community or individual.   Nonetheless, we should endeavor to resolve redistricting disputes by elevating as many "objective" criteria above "subjective" considerations as possible.  To that end, I consider a plan's least-change score to be a weighty plus-factor that parties to future impasse litigation would be wise to keep in mind when submitting plans for selection by a court.  Given that the other plans before us largely satisfy the threshold neutral criteria, the Carter Plan's superior performance on the least-change metric weighs heavily in its favor.  For that reason, I join the Court in adopting it as the Commonwealth's 2022 Congressional Redistricting Plan.

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : No. 7 MM 2022 <br> : <br> : <br> : ARGUED:  February 18, 2022 <br> : <br> : <br> : <br> : <br> : |
| Petitioners | : <br> : |
| v. | : <br> : <br> : |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Respondents | : <br> : <br> : |
| ------------------------------------------------------- | : |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Petitioners | : <br> : <br> : |
| v. | : <br> : <br> : |

LEIGH M. CHAPMAN, IN HER OFFICIAL     :
CAPACITY AS THE ACTING SECRETARY      :
OF THE COMMONWEALTH OF                :
PENNSYLVANIA; JESSICA MATHIS, IN      :
HER OFFICIAL CAPACITY AS DIRECTOR     :
FOR THE PENNSYLVANIA BUREAU OF        :
ELECTION SERVICES AND NOTARIES,       :
                                      :
              Respondents             :

## DISSENTING OPINION

                                       OPINION FILED:  March 9, 2022

**JUSTICE BROBSON**                           **DECIDED:  February 23, 2022**

## I.  One Person, One Vote

Article I, Section 2 of the United States Constitution,[1] as interpreted by the Supreme Court of the United States, commands that congressional districts be apportioned to achieve population equality—"one person, one vote."  *See Evenwel v. Abbott*, 578 U.S. 54 (2016); *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758 (2012) (per curiam); *Karcher v. Daggett*, 462 U.S. 725 (1983); *Wesberry v. Sanders*, 376 U.S. 1 (1964).  There is no *de minimis* exception to this constitutional imperative.  *Karcher*, 462 U.S. at 730-38; *see also Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 542 (M.D. Pa. 2002) ("[T]he [United States] Supreme Court has squarely rejected any *de minimis* exception to the requirement of absolute equality in population between districts.").  Rather, the equal representation standard of the United States Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."  *Wesberry*, 376 U.S. at 7-8.

The United States Supreme Court has established a two-prong test to evaluate the constitutionality of a congressional reapportionment plan under the one-person, one-vote

---

[1] "The House of Representatives shall be composed of Members *chosen . . . by the People of the several States . . . .*"  U.S. Const. art. I, § 2 (emphasis added).

standard.  The first question asks whether the population differences could practicably have been avoided through good-faith effort.  *Karcher*, 462 U.S. at 730.  If so, the second question asks whether the differences were nonetheless necessary to achieve a legitimate state objective.  *Tennant*, 567 U.S. at 760 (citing *Karcher*, 462 U.S. at 740-41).  Although we are not here being asked to evaluate the constitutionality of a reapportionment plan enacted through the legislative process outlined in our Pennsylvania Constitution, the one-person, one-vote standard and the *Karcher* test apply with equal force to a judicially created plan.

The Carter Plan, as it is called, fails the *Karcher* test.  It proposes 17 congressional districts—four with the ideal population of 764,865, four with a population of 764,866 (plus one), and nine with a population of 764,864 (minus one).  The Carter Plan, therefore, provides for a two-person population deviation between the largest and smallest congressional districts.  While I acknowledge that it is mathematically impossible to create 17 districts of precisely equal population, it is possible, with good faith, to craft a plan with less than a two-person deviation.  Indeed, of the 13 proposed reapportionment plans provided to this Court for its consideration, only two proposed a deviation of more than one person.  The Carter Plan is one of those two.  Moreover, the Carter Petitioners, in their Brief in Support of Exceptions to the Special Master's Report (Carter Brief), acknowledge that it was possible to create a plan with a one-person deviation.  (Carter Br. at 11 n.5.)  The Carter Plan, therefore, fails the first part of the *Karcher* test.

The majority, nonetheless, has chosen the Carter Plan over the 11 other plans with only a one-person deviation.  Applying the second prong of the *Karcher* test, then, it is the burden of the Carter Petitioners, and the majority by extension, to show that the two-person deviation in the Carter Plan is "necessary to achieve a legitimate state objective."  *Tennant*, 567 U.S. at 760.  Again, the presence of other plans before the Court

that satisfy all state and federal redistricting criteria with only a one-person deviation proves the contrary. The majority concludes, however, that the Carter Petitioners "have satisfied their burden by stating, with specificity, that the two-person deviation was required to prevent [an] additional split of a Vote Tabulation District [(VTD)]," which it contends is a recognized legitimate state interest. (Maj. Op. at 31.) In support, the majority relies on this Court's decision in *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992).

In *Mellow*, this Court adopted the master's recommendation to approve a proposed reapportionment plan with a total maximum population deviation of 0.0111% over a proposed redistricting plan with a total maximum population deviation of 0.0000017%, the latter of which represented a difference of just one person. *Mellow*, 607 A.2d at 208, 215, 218. In making his recommendation, however, the master acknowledged that the proposed reapportionment plan with the lowest population deviation "[fell] below other[] [proposed reapportionment plans] precisely because the cost of achieving maximum mathematical equality lies in having the congressional district boundaries split 22 election precincts as well as 27 local governments." *Id.* at 218. The proposed reapportionment plan that was ultimately adopted by this Court, on the other hand, split only three precincts. *Id.*

I have no qualms about accepting a small increase in the population deviation between districts to avoid splitting *19* additional election precincts. However, here, unlike the *Mellow* Court, the majority has made no attempt to evaluate whether the Carter Plan performs superiorly with respect to splits of VTDs when compared to the 11 other plans that achieved only a one-person deviation. Rather, the majority simply claims that avoiding the split of just one additional VTD (not 19 election precincts, as was the case in *Mellow*) constitutes a legitimate state interest that justifies the two-person population deviation of the Carter Plan; satisfies the one-person, one-vote standard; and elevates

the Carter Plan above all other plans that achieved population equality closer to zero. *Mellow* simply cannot bear the weight of the majority's reliance.

Moreover, while the majority appears willing to look past the 11 other proposed plans that achieve closer-to-zero population equality in order to save one VTD in the Carter Plan, it seems unphased by the fact that, while saving this one VTD, the Carter Plan is the only proposed plan that splits the City of Williamsport (Lycoming County). Indeed, Dr. Daryl DeFord, on whom the majority relies to support its selection of the Carter Plan (Maj. Op. at 24), criticizes the Carter Plan for this particular split:  "[O]ne plan (Carter) splits the city of Williamsport, whose population of 27,754 *is nowhere near to necessitating a split.*"[2]   Rebuttal Report of D. DeFord (for Gressman Math/Science Petitioners) at 6 (Jan. 26, 2022) (emphasis added).  By selecting the Carter Plan, the majority improperly saves a VTD that purportedly had to be split to ensure as close to equal population as practicable among the districts at the expense of an entirely unnecessary split of the City of Williamsport.  No legitimate state interest can be found in this tradeoff.

For the above reasons, I respectfully disagree with the majority's reading of *Mellow* and its conclusion that the Carter Plan satisfies the one-person, one-vote standard. Article I, Section 2 of the United States Constitution protects the sanctity of one person, one vote, not one VTD.  Accordingly, because I believe that the Carter Plan violates

---

[2] In *League of Women Voters v. Commonwealth*, 175 A.3d 282 (Pa. 2018) (*LWV I*) (mem.) (per curiam), this Court specifically noted that any congressional reapportionment plan submitted to the Pennsylvania Governor by the Pennsylvania General Assembly for consideration "shall consist of:  congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, *except where necessary to ensure equality of population.*"  *LWV I*, 175 A.3d at 290 (emphasis added).

Article I, Section 2 of the United States Constitution, I must dissent from the majority's selection of that plan.

## II.   Neutral Standards/Methods Over Partisan Metrics

Separately, it has been 60 years since the United States Supreme Court first waded into the "political thicket" to review and remedy malapportionment challenges. *See Baker v. Carr*, 369 U.S. 186 (1962).[3]   Since then, the United States Supreme Court has also waded into the thicket, rightly so, to address and remedy race-based or ethnic redistricting decisions that violate the Equal Protection Clause of the United States Constitution[4] and/or the Voting Rights Act of 1965.[5]   *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Cooper v. Harris*, 137 S. Ct. 1455 (2017).   Yet, the United States Supreme Court has refused to do so to address and remedy claims of excessive partisanship in the redistricting process, finding such claims nonjusticiable in the federal courts.   *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

Much ink has been spilt in this case about this Court's decision in *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) (*LWV II*).   In *LWV II*, this Court held that challenges to congressional redistricting plans for *excessive* partisanship—*i.e.*, partisan gerrymanders—are justiciable under the Free and Equal

---

[3] Two decades before *Baker*, Justice Frankfurter, writing for a plurality, affirmed the dismissal of a malapportionment challenge to congressional districts as involving a nonjusticiable political question.   *Colegrove v. Green*, 328 U.S. 549 (1946) (plurality opinion), *abrogated by Baker*, 369 U.S. 186.   "To sustain this action," Justice Frankfurter wrote, "would cut very deep into the very being of Congress.   Courts ought not to enter this political thicket."   *Colegrove*, 328 U.S. at 556.

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.

[5] 52 U.S.C. § 10101 *et seq.*

Elections Clause of the Pennsylvania Constitution.[6]   *LWV II*, 178 A.3d at 801-14.   In reaching this conclusion, the Court examined challenges to the Congressional Redistricting Act of 2011 (2011 Plan), Act of December 22, 2011, P.L. 598, 25 P.S. §§ 3596.101-.1501,[7] and determined that the 2011 Plan constituted an excessive partisan gerrymander in violation of the Free and Equal Elections Clause.   *Id.* at 818-21.

In *LWV II*, then, this Court waded into the political thicket to review and remedy excessive partisan gerrymanders under the Pennsylvania Constitution.   *Id.* at 821-24.   In so doing, the Court interpreted the Free and Equal Election Clause as protecting voters from congressional districts that create an "unfair," or unconstitutional, partisan advantage.   *Id.* at 817.   The Court concluded that a particular redistricting plan crosses the line from fair to unfair and, thus, is unconstitutional, when such plan subordinates neutral criteria—*i.e.*, "compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts"—"to extraneous considerations such as gerrymandering for *unfair* partisan political advantage."   *Id.* (emphasis added).   By extension, any redistricting plan that does not cross that line is both fair and constitutional.

In short, *LWV II* is a partisan gerrymandering case.   The current matter before this Court, however, is not a partisan gerrymandering case.   Indeed, no one in this litigation has challenged any of the proposed plans as an unconstitutional partisan gerrymander under *LWV II.*   *LWV II* recognizes that the Free and Equal Elections Clause protects Pennsylvanians from *excessive*, *unconstitutional, and thus unfair* partisanship in the drawing of legislative districts.   It does not, however, create any right in the people of

---

[6] "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. 1, § 5.

[7] The 2011 Plan was held unconstitutional by *LWV I.*

Pennsylvania to the fairest among fair and lawful maps.  The "fairest of the fair" inquiry is not a thicket; it is a quagmire.  It is an entirely subjective, partisan, and quintessentially political inquiry that belongs in the political branches of our government, not in the courts.

Respectfully, the majority,[8] in my view, grossly misreads the very narrow decision in *LWV II*, emboldening this Court to serve as the mirror on the wall and choose the fairest map of them all.  (Maj. Op. at 18 ("[W]e conclude that consideration of partisan fairness, when selecting a plan among several that meet the traditional core criteria, is necessary to ensure that a congressional plan is reflective of and responsive to the partisan preferences of the Commonwealth's voters."), 27 (noting Carter Plan "is reflective of and responsive to the partisan preferences of the Commonwealth's voters"), 36-37 (addressing partisan fairness and partisan metrics in its support of Carter Plan).)  The majority has essentially emerged from the political thicket and jumped into the partisan quagmire.  The long-term harm to the congressional redistricting process is not the majority's adoption of the Carter Plan, but the analysis that the majority uses to break a partisan impasse and choose among the 13 proposed reapportionment plans, all but a few of which satisfy the neutral redistricting criteria.

_____

[8] Although Justices Dougherty and Wecht join the majority opinion, they also file concurring opinions that, while accepting the use of partisan metrics when analyzing the proposed redistricting plans in this matter, do not embrace the use of those metrics with the fulsome enthusiasm expressed in the majority opinion.  Rather, Justice Dougherty recognizes "that the metrics for this criterion remain somewhat in flux when compared to the more standardized measures of the traditional core criteria."  (Concurring Op. at 4 n.1 (Dougherty, J., concurring).)  He further recognizes that no partisan fairness standard has emerged in this case.  As for Justice Wecht, he recognizes in his concurring opinion that "the partisan fairness metrics used to evaluate the [13] submitted maps are useful heuristics to approximate partisan outcomes under conditions that have never occurred," but he "caution[s] against surrendering to the allure of those metrics at the front end of an analysis."  (Concurring Op. at 14 (Wecht, J., concurring).)  He observes that while the numbers may be "helpful to a comprehensive examination, . . . they must not be dispositive."  (*Id.*)  Instead, he would relegate them to "a gut-check at the culmination of the process, rather than as a gatekeeping function at the start."  (*Id.*)

By considering numerical partisan metrics and ultimately adopting a reapportionment plan because it provides for "proportionality," avoids "anti-majoritarian" results, and attempts to offset a "structural tilt" in the political geography of Pennsylvania that favors Republican candidates,[9] the majority has invited, not discouraged, this Court's future involvement in the congressional redistricting process, whether in impasse litigation, such as this one; a partisan gerrymander challenge, such as the *LWV* litigation; or a "fairness" challenge to a legislatively enacted reapportionment plan signed into law by the governor. While the "least-change" approach—a neutral tool that in its purest form only makes minor revisions to existing legislative districts to account for population changes—purportedly used to create the Carter Plan may be imperfect,[10] it would have

---

[9] *See, e.g.*, Report of M. Duchin (for Governor Wolf) at 2, 6 (Jan. 24, 2022); Report of J. Rodden (for Carter Petitioners) at 25 (Jan. 24, 2022) (noting that Carter Plan is "reflective of Pennsylvania's statewide partisan preferences"); Report of J. Rodden (for Carter Petitioners) at 11 (Jan. 26, 2022) (criticizing plans that "would likely lead to counter-majoritarian outcomes").

[10] In a recent decision, the Wisconsin Supreme Court adopted the least-change approach as a neutral method to remedy the failure of Wisconsin's legislative and executive branches to enact a congressional redistricting plan. *See Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 488-92 (Wis. 2021). In so doing, the court recognized that "[t]he existing maps were adopted by the legislature, signed by the governor, and survived judicial review by the federal courts" and that "[t]reading further than necessary to remedy their current legal deficiencies . . . would intrude upon the constitutional prerogatives of the political branches and unsettle the constitutional allocation of power." *Id.* at 488. Thus, the court believed that the application of the least-change approach was a method by which it could remedy the malapportionment of Wisconsin's districts, following the 2020 Census, without "endors[ing] the policy choices of the political branches" of Wisconsin's government. *Id.* at 492. The circumstances presented in this matter, however, are different. Here, the Carter Plan applies the least-change approach to an 18-district congressional plan created by this Court (2018 Plan), not a plan enacted through the legislative process set forth in the Pennsylvania Constitution. Moreover, as a result of the 2020 Census, a congressional district must be eliminated. Thus, in order to apply the least-change approach to the 2018 Plan to arrive at the Carter Plan, the Carter Petitioners' expert, Dr. Jonathan Rodden, did more than simply redraw certain district boundaries to achieve population equality; he eliminated completely, and necessarily, one congressional district. As a result, for many Pennsylvanians, particularly

---

[J-20-2022] [MO: Baer, C.J.] - 9

been preferable, in my view, for the majority to have full-throatedly adopted it instead of using unquestionably partisan constructs to justify its selection of the Carter Plan.  In my judgment, where the judiciary is forced to adopt a legislative reapportionment plan, the court should hew closely to nonpartisan standards (*e.g.*, compactness, contiguity, minimizing splits, etc.) or nonpartisan methods (*e.g.*, the "least-change" approach), eschewing partisan considerations or partisan approaches.

---

those along the Route 15 and Interstate 80 corridors, the least-change approach yields a big change in terms of who will represent them in Washington, D.C.

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

CAROL ANN CARTER, MONICA                  :  No. 7 MM 2022
PARRILLA, REBECCA POYOUROW,               :
WILLIAM TUNG, ROSEANNE MILAZZO,           :
BURT SIEGEL, SUSAN CASSANELLI, LEE        :
CASSANELLI, LYNN WACHMAN,                 :  ARGUED:  February 18, 2022
MICHAEL GUTTMAN, MAYA FONKEU,             :
BRADY HILL, MARY ELLEN BALCHUNIS,         :
TOM DEWALL, STEPHANIE MCNULTY             :
AND JANET TEMIN,                          :
                                          :
            Petitioners                   :
                                          :
                                          :
         v.                               :
                                          :
                                          :
                                          :
LEIGH M. CHAPMAN, IN HER OFFICIAL         :
CAPACITY AS THE ACTING SECRETARY          :
OF THE COMMONWEALTH OF                    :
PENNSYLVANIA; JESSICA MATHIS, IN          :
HER OFFICIAL CAPACITY AS DIRECTOR         :
FOR THE PENNSYLVANIA BUREAU OF            :
ELECTION SERVICES AND NOTARIES,           :
                                          :
            Respondents                   :
                                          :
-----------------------------------------------  :
PHILIP T. GRESSMAN; RON Y. DONAGI;        :
KRISTOPHER R. TAPP; PAMELA GORKIN;        :
DAVID P. MARSH; JAMES L.                  :
ROSENBERGER; AMY MYERS; EUGENE            :
BOMAN; GARY GORDON; LIZ MCMAHON;          :
TIMOTHY G. FEEMAN; AND GARTH              :
ISAAK,                                    :
                                          :
            Petitioners                   :
                                          :
                                          :
         v.                               :
                                          :
                                          :

A2692

LEIGH M. CHAPMAN, IN HER OFFICIAL         :
CAPACITY AS THE ACTING SECRETARY          :
OF THE COMMONWEALTH OF                    :
PENNSYLVANIA; JESSICA MATHIS, IN          :
HER OFFICIAL CAPACITY AS DIRECTOR         :
FOR THE PENNSYLVANIA BUREAU OF            :
ELECTION SERVICES AND NOTARIES,           :
                                          :
              Respondents                 :

## DISSENTING OPINION

|                    | OPINION FILED:  March 9, 2022 |
|--------------------|-------------------------------|
| **JUSTICE MUNDY**  | **DECIDED:  February 23, 2022** |

When the political branches approve a redistricting plan, the map will ordinarily have gone through a public-comment stage, been sent to committee for amendment, garnered majority support from both Houses of the General Assembly, and been approved by the Governor.  It will subsume a myriad of political choices and tradeoffs which have been weighed, debated, and voted on by the public's elected representatives.  These considerations may include how closely the districts should match those of the previous plan, which non-retiring incumbents should be paired against each other in the upcoming election cycle, which counties and other political subdivisions should or should not be divided, which adjacent counties and townships should be grouped together, and which communities of interest should be kept intact within a single district.

Items such as these are generally viewed as valid districting factors so long as they do not subordinate the traditional, neutral criteria appearing in the state and federal charters.  *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 817 (Pa. 2018) ("LWV-II") (citing *Holt v. 2011 Legis. Reapportionment Comm'n*, 67 A.3d 1211, 1235 (Pa. 2012)).  As long as the plan that results from the political process does not "clearly, plainly, and palpably" violate the constitution, *League of Women Voters v. Commonwealth*, 175 A.3d 282, 289 (Pa. 2018) (*per curiam*) ("LWV-I"), it will survive a court challenge.

The present controversy is different.  This is an impasse case in which the political branches have failed to agree on a plan, and we have little choice but to wade into the "political thicket" of redistricting.  *Evenwell v. Abbott*, 578 U.S. 54, 58 (2016) (internal quotation marks and citation omitted).  Not only that, we are placed in an unfamiliar role: we must make a selection rather than issue an adjudication.  Stated differently, we are not merely required to judge the legality of a plan, we are put to the task of choosing the best among a number of competing plans that have been submitted for our consideration by a variety of parties and amici.  To the extent an adjudication is reached in this matter, it is minimal and undisputed:  the current map cannot be used because of population shifts in the last ten years and, most notably, because Pennsylvania now has only 17 representatives in Congress.

In undertaking our selection task, it is vital that this Court act in a politically neutral manner – and maintain the appearance of neutrality – to the greatest extent possible in order that the public may have confidence our decision is reached via compliance with neutral legal principles alone.  In this respect, the Supreme Court has characterized the need for objectively demonstrable standards in judging redistricting plans as being

> necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.

*Rucho v. Common Cause*, ___ U.S. ___, ___, 139 S. Ct. 2484, 2499-2500 (2019) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 291 (2004) (plurality)).  It is my position, then, that our mission should be carried out solely in reference to the politically neutral criteria appearing in the text of the state charter, namely:  contiguity, compactness, population equality, and respect for political boundaries.  *See* PA. CONST. art. II, §16 (requiring districts which are "composed of compact and contiguous territory as nearly equal in population as

practicable," and specifying further that, "[u]nless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming" such districts).[1]

Limiting our consideration to these express constitutional criteria has multiple benefits. In addition to maintaining the appearance of neutrality, it helps avoid any subtle, unconscious influence that political considerations might otherwise bring to bear upon our decision-making. Relatedly, the map we select will be known by all involved to be that which is most compliant with the Constitution's commands as judged by an objective, neutral standard open to public view.[2] Such an approach also appears likely to reduce any incentive the political branches might otherwise have to view an impasse as desirable in its own right – in the sense that they would rather "take their chances" with this Court than seek political compromise – and thereby, to reduce the incentive for those branches to act strategically. And while I do not discount the theoretical possibility that gerrymandering might occur within the confines of an effort to comply scrupulously with

---

[1] Article II, Section 16 only facially applies to state legislative districts. In the *LWV-II*, however, a majority of this Court held that it applies, as well, to Pennsylvania's congressional districts through Article I, Section 5, the Free and Equal Elections Clause. *See LWV-II*, 178 A.3d at 816.

[2] In this regard, I agree with many of the sentiments expressed by Justice Brobson to the effect that it is the Article II, Section 16 criteria, and not some concept of partisan fairness, that should control any redistricting exercise; whereas, the experts' fairness metrics may be used in proving that a challenged map embodies illegal gerrymandering. *See* Dissenting Op. at 8-9 (Brobson, J.). In my view, the neutral criteria appearing in the Constitution's text are insufficiently ambiguous to support the consideration of policy goals that are claimed to have motivated their adoption. As Judge McCullough suggested, moreover, the use of such policy goals as quality metrics in a map-selection endeavor can lead to reverse gerrymandering aimed at altering the partisan performance which arises naturally from the political geography of this state, which in turn stems from the decisions of many individual voters concerning where they wish to live. *See* Special Master Report at 197. Most importantly, the partisan-fairness metrics are not well suited to an objective scoring methodology because political judgments must be made about how to rank the maps in relation to such metrics.

the state charter's neutral directives, it seems evident that the closer a map adheres to those directives, the less likely it will be that district boundaries have been manipulated to give any political or partisan group an artificial advantage.  As this Court recently explained in *LWV-II*:

> Because the character of these [constitutional] factors is fundamentally impartial in nature, their utilization reduces the likelihood of the creation of congressional districts which confer on any voter an unequal advantage by giving his or her vote greater weight in the selection of a congressional representative as prohibited by Article I, Section 5.  Thus, use of these objective factors substantially reduces the risk that a voter in a particular congressional district will unfairly suffer the dilution of the power of his or her vote.

*LWV-II*, 178 A.3d at 816; *see also id.* (noting these standards also comport with the United States Constitution's requirements for congressional districts).

All of this leads to the question of how to determine which of the proffered maps best complies with the Constitution's neutral factors after eliminating any maps that fail to meet the constitutional floor.  *See generally LWV-II*, 178 A.3d at 817 ("These neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts.").[3]  To answer this question, two observations may be made.  First, the maps can be analogized to candidates in an election where each criterion by which they are judged is the equivalent of an individual voter taking part in a ranked-choice voting exercise:

---

[3] A map might fail to meet the floor by, for example, containing districts which are not contiguous, or by having an unjustified population variance between districts.  Such maps should be eliminated from consideration.

A given map must also comply with federal statutory law such as the Voting Rights Act or it, too, will not be considered.  Here, however, there has been no suggestion that any of the proposed maps violates federal statutory law.

When a court or agency purports to select one of many possible outcomes by ranking the outcomes under a set of criteria, the situation parallels the democratic process. In place of the preferences of individual citizens, rankings under criteria determine judicial or administrative choices.

Matthew L. Spitzer, *Multicriteria Choice Processes: An Application of Public Choice Theory to Bakke, the FCC, and the Courts*, 88 Yale L.J. 717, 717-18 (1979). This type of decisional process – having multiple voters rank the contenders in an effort to select the best one – has been applied in such diverse contexts as selecting the most valuable player in sports, *see* Saul Levmore, *More than Mere Majorities*, 2000 Utah L. Rev. 759, 763, choosing an Academy Award winning film, *see* National Conference of State Legislatures, *Ranked-Choice Voting*, Vol. 25, No. 24 (2017), *available at* https://www.ncsl.org/research/elections-and-campaigns/ranked-choice-voting.aspx (last viewed Feb. 23, 2022), nominating political candidates, *see Maine Senate v. Sec'y of State*, 183 A.3d 749, 751-52 (Me. 2018), and electing political leaders, *see id.*

The second observation is that ranked-choice voting can be accomplished through pairwise comparisons of the candidates, in this case, the candidate maps. As long as this Court has adequate data concerning how well the maps score for a given quality metric at the most granular level (for example, the Polsby-Popper compactness metric), any two maps can be compared to see which one is better, or if they are tied. These pairwise comparisons can then be used to rank and score the maps for each quality metric using the "Borda count" system.[4] Under this system, for each quality metric, each map receives one point for every other map it is superior to, plus one-half point for every other

---

[4] The Borda count method is named after Jean-Charles de Borda, an eighteenth-century French mathematician. *See* Edward B. Foley, *Tournament Elections with Round-Robin Primaries: A Sports Analogy for Electoral Reform*, 2021 Wis. L. Rev. 1187, 1200 n.39 (indicating Borda count is viewed as the best method to rank three or more candidates).

map it ties with.[5]  In this way, the pairwise comparisons yield a "raw" Borda count score for each map, for each quality metric at the most detailed level.

The method is simple and transparent.  It is also flexible enough to accommodate virtually any type of quality metric, including continuous metrics such as a map's score on a particular measure of compactness; integer-based metrics such as the number of county splits or county pieces reflected in a given map; binary metrics such as whether a map splits Pittsburgh (if this were indeed to be considered a valid quality metric); or criteria with a few discrete points, such as how many non-retiring incumbents are paired and whether they are from the same or opposite parties.[6]  These examples are given by way

---

[5] *See* Bernard Grofman, *Public Choice, Civil Republicanism, and American Politics: Perspectives of a "Reasonable Choice" Modeler*, 71 TEX. L. REV. 1541, 1565 n.110 (1993); Jean-Pierre Benoit & Lewis A. Kornhauser, *Assembly-Based Preferences, Candidate-Based Procedures, and the Voting Rights Act*, 68 S. CAL. L. REV. 1503, 1522 & n.44 (1995).

With human voters, Borda count can be subject to distortion based on insincere (strategic) voting, *see* Cheryl D. Block, *Truth and Probability – Ironies in the Evolution of Social Choice Theory*, 76 WASH. U.L.Q. 975, 987-88 (1998) (providing an example of insincere ranked-choice voting and its underlying motivation), and it has been shown to sometimes miss a majority winner, *see* Saul Levmore, *Voting Paradoxes and Interest Groups*, 28 J. LEGAL STUD. 259, 266 n.9 (1999).  These problems are absent here, as objective pairwise comparisons cannot be insincere, and our goal is not to pick the map that comes in first in most of the quality metrics, but to pick the best map overall.

[6] For example, the maps before the Court reflect the following non-retiring incumbent pairings:  one (R-D), one (R-R), two (R-D and R-D), two (R-R and R-D), two (D-D and R-D), and none.

These can be ranked in order from best to worst as follows.  Best: none; second-best: one (R-D); third-best:  two (R-D and R-D); fourth-best:  one (R-R); worst:  two (R-R and R-D) or two (D-D and R-D).

Returning to the handling of Pittsburgh:  the method can accommodate a three-point quality measure where keeping Pittsburgh whole is best, keeping it whole via a "claw"

of illustration, but, as explained, I will only be using the neutral constitutional criteria for the present discussion – albeit in the Appendix, I also fold in the maps' handling of Pittsburgh which, for reasons delineated below, is *sui generis*.

I use the term "raw scores" because the Borda count methodology must be modified slightly to be of use here.  A map's overall raw score is not ultimately what matters, but its overall weighted score, as explained *infra*.[7]  As for terminology, I will refer to high-level measures such as compactness and respect for political subdivision boundaries as the neutral constitutional *criteria*, and the different ways of measuring those criteria as *individual quality metrics*.  This distinction is needed because there are multiple ways to measure compliance with each criterion.  For example, there are several individual quality metrics associated with compactness, each capturing a different aspect of mathematical compactness, and some accounting for such features as jagged state borders or peninsulas which necessarily make districts less compact.  *See* N.T., Jan. 27, 2022, at 214 (reflecting expert testimony stressing the importance of considering multiple compactness metrics); *Holt*, 67 A.3d at 1242 (recognizing "an apparent variety" of compactness models).  Likewise, there are various different quality metrics relating to subdivision splits, such as county splits, ward splits, county pieces, and so on.

---

shape which grabs it, as in the House Democratic Caucus's proposed map, is second-best, and splitting it is worst.  The attached Appendix illustrates this scenario.

[7] The weighting of criteria has been used in a variety of multi-criteria decision making ("MCDM") tasks involving selection.  *See Thiel v. W. Mifflin Borough*, 2007 WL 1087773, at *3 (W.D. Pa. Apr. 9, 2007) (hiring and promotion); *Transactive Corp. v. N.Y. State Dep't of Soc. Servs.*, 665 N.Y.S.2d 701, 704 (N.Y. App. Div. 1997) (public procurement); *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107 (D.C. Cir. 1974) (parole selection); *Doe v. Alternative Med. Md., LLC*, 168 A.3d 21 (Md. 2017) (licensure selection); *Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812 (S. D. Tex. 2009) (assignment of client accounts to financial advisors); *Universal Grading Svc. v. eBay, Inc.*, 2009 WL 2029796 (E.D.N.Y. June 10, 2009) (assessment of rare-coin grading services).

Thus, for example, if compactness and respect for political boundaries are considered equally important and each is given a total weight of 10, there may be X ways to measure the former and Y ways to measure the latter. It follows that each compactness-related individual quality metric should have a weight of 10/X, and each boundary-related individual quality metric should have a weight of 10/Y. A map's score for a given individual quality metric, then, is its Borda count raw score multiplied by the weight of that quality metric.[8]

Consistent with my remarks at the beginning of this opinion, I would hold that this Court should rank and score all proposed maps according to each of the individual quality metrics and select the map with the highest total weighted score. The process entails five steps: (1) eliminate any map which fails to meet the constitutional "floor" or which violates federal law; then as to each of the remaining maps: (2) compute raw scores for each map for each individual quality metric using pairwise comparisons and Borda count; (3) compute weighted scores for each map for each individual quality metric by multiplying the raw scores by the weight for that individual quality metric; (4) compute the total weighted score for each map by summing all weighted scores for that map; and (5) select the map with the highest overall weighted score.

---

[8] This type of weighting might also be useful in situations where secondary factors such as preserving communities of interest are included in the analysis. This is because not all such metrics are equally important, nor are they as important as the constitutional criteria. *See* Majority Op. at 15 (noting such factors are "wholly subordinate to the traditional core criteria"). Assigning different weights can reflect those realities. Similarly, weighting can be useful if this Court ultimately reads the "unless absolutely necessary" language in Article II, Section 16 as signifying that the Constitution places a higher value on avoiding subdivision splits than on compactness. *See generally Holt*, 67 A.3d at 1242 (indicating that achieving population equality and avoiding subdivision splits may "necessitate[] a certain degree of unavoidable non-compactness in any reapportionment scheme." (internal quotation marks and citation omitted)). For example, a total weight of 10 could be assigned to compactness, 7 or 8 to avoiding subdivision splits, and 3, 4, or 5 to the subordinate historical considerations.

The maps presented to us, and the data contained in the expert reports concerning those maps, reveal that all meet the contiguity and population-equality criteria, which are essentially binary in nature.[9]  As noted, moreover, none are alleged to violate federal law.  *See supra* note 3.  This leaves only the compactness and adherence-to-political-boundaries criteria on which to form a judgment concerning which is the best of the maps under review.

Twelve maps have been submitted for this Court's consideration:  the Carter Petitioners' map ("CARTER") , the Gressman Petitioners' map ("GRESSMAN"), Governor Wolf's map ("GOV"), the map approved by the General Assembly ("HB-2146"), the first map by the Senate Democratic Caucus ("SEN-DEM-1"), the second map by the Senate Democratic Caucus ("SEN-DEM-2"), the House Democratic Caucus's map ("HOUSE-DEM"), the first map by the Reschenthaler group ("RESCH-1"), the second map by the Reschenthaler group ("RESCH-2"), the map submitted by the "Voters of the Commonwealth of Pennsylvania" group ("VOTERS-PA"), the map submitted by the "Draw

---

[9] Pursuant to the 2020 census, Pennsylvania's population was 13,002,700, resulting in 17 districts with an average population of 764,864.7 per district.  *See* Special Master Report at 3 n.6.  Because the population is not a multiple of 17, there must be a population deviation, that is, the population of the most-populous district minus the population of the least-populous district must be at least one person.

I am aware that some of the maps have a population deviation of two persons.  However, I do not consider the difference between a one-person and a two-person deviation to be legally significant, particularly as the census numbers are only approximate due to imperfections in data gathering combined with subsequent births, deaths, and relocations.  Put differently, discounting two-person-deviation maps as compared to one-person-deviation maps would, in my view, be an exercise in false precision.  Whether or not the Constitution allows for a *de minimis* population deviation, I would find a deviation of two persons to be *sub-de minimis.*  For purposes of this case, then, I consider all maps with a one- or two-person deviation as satisfying the constitutional equal-population criterion.

the Lines" citizens' group ("DRAW-LINES"), and the map submitted by the "Citizen Voters" group ("CITIZEN-VOTERS").[10]

These twelve maps have been given a compactness score for each of six different mathematical compactness measurements:  Polsby-Popper, Schwartzberg, Reock, Convex Hull, Population-Polygon, and Cut Edges.[11]  Each map, in fact, has 17 scores for these metrics because each has 17 districts for which a compactness measure can be calculated.  Helpfully, for each map the record contains average scores for each of these quality metrics – that is, an average score which comprises the mean value for the 17 districts contained on a particular map.  It is these averages that are used in the pairwise comparisons between maps.  Per the above discussion, each of the compactness metrics is assigned a weight of 1.67 (10 divided by 6, rounded to the nearest hundredth).

The averages for the twelve maps on four of the six compactness metrics were given by Dr. Daryl DeFord, *see* Majority Op. at 24, the expert who testified on behalf of the Gressman Petitioners.  The only two compactness metrics missing from Dr. DeFord's data are the Schwartzberg and Population-Polygon measures.  Fortunately, however, those are reflected in a table supplied by Dr. Moon Duchin, Governor Wolf's expert, which

---

[10] A thirteenth map was submitted by the Khalif Ali amici.  It has been excluded because, unlike all of the other maps, its boundaries were drawn based on data which attempted to assign prisoners to their last known home address without first establishing a legal basis for doing so.  When assessed according to the data used by all the other maps, its population deviation was too high to meet the constitutional requirement of equi-populous districts.  In any event, the record suggests it would not be the highest-scoring map in terms of compactness and subdivision splits even if accepted on its own terms.

[11] As explained, each such metric captures a different aspect of geometrical compactness, and each has its strengths and weaknesses.  Further elucidation of this topic from a mathematical point of view is beyond the scope of this dissenting opinion.  I only note at this juncture that, for each metric except "Cut Edges," a number closer to 1.0 is better.  With the Cut Edges metric, a lower number is better.

was endorsed by the Special Master.  *See* Special Master Report at 141-43.[12]  All six of these compactness measures are shown below in the row containing the map name. From these averages, raw Borda count scores are obtained using pairwise comparisons; as previously noted, a map's raw score includes one point for each pairwise win, plus a half-point for each pairwise tie, and so a higher raw score indicates better performance on that metric.  The raw scores are then multiplied by the weight for that metric to arrive at the weighted score for each map for each metric:

| MAP | Polsby-Popper | Schwartzberg | Reock | Convex Hull | Population Polygon | Cut Edges |
|---|---|---|---|---|---|---|
| *Weight* | *1.67* | *1.67* | *1.67* | *1.67* | *1.67* | *1.67* |
| CARTER | .31 | 1.8103 | .41 | .78 | .7416 | 5896 |
| Borda raw score | 2.5 | 3 | 6.5 | 2.5 | 1 | 2 |
| Weighted score | 4.175 | 5.01 | 10.855 | 4.175 | 1.67 | 3.34 |
| GRESSMAN | .33 | 1.7351 | .40 | .80 | .7582 | 5546 |
| Borda raw score | 5 | 5 | 4.5 | 8.5 | 5 | 4 |
| Weighted score | 8.35 | 8.35 | 7.515 | 14.195 | 8.35 | 6.68 |
| GOV | .37 | 1.6534 | .40 | .81 | .7834 | 5154 |
| Borda raw score | 9.5 | 10 | 4.5 | 10.5 | 11 | 8 |
| Weighted score | 15.865 | 16.7 | 7.515 | 17.535 | 18.37 | 13.36 |
| HB-2146 | .31 | 1.8197 | .38 | .78 | .7524 | 5882 |
| Borda raw score | 2.5 | 1 | 1.5 | 2.5 | 3 | 3 |
| Weighted score | 4.175 | 1.67 | 2.505 | 4.175 | 5.01 | 5.01 |
| SEN-DEM-1 | .30 | 1.8144 | .37 | .77 | .7519 | 6016 |
| Borda raw score | 1 | 2 | 0 | 1 | 2 | 1 |
| Weighted score | 1.67 | 3.34 | 0 | 1.67 | 3.34 | 1.67 |
| SEN-DEM-2 | .32 | 1.7478 | .38 | .79 | .7601 | 5476 |
| Borda raw score | 4 | 4 | 1.5 | 5.5 | 6 | 5 |
| Weighted score | 6.68 | 6.68 | 2.505 | 9.185 | 10.02 | 8.35 |
| HOUSE-DEM | .27 | 1.9693 | .39 | .75 | .7205 | 6821 |
| Borda raw score | 0 | 0 | 3 | 0 | 0 | 0 |
| Weighted score | 0 | 0 | 5.01 | 0 | 0 | 0 |
| RESCH-1 | .35 | 1.6859 | .43 | .81 | .7737 | 5061 |

---

[12] In Dr. Duchin's report and table of map statistics, *see* Special Master Report at 141, the DRAW-LINES map is referred to as the "CitizensPlan."  *See* N.T., Jan. 27, 2022.  This should not be confused with the CITIZEN-VOTERS map.

| Borda raw score | 8 | 8 | 9 | 10.5 | 10 | 11 |
|---|---|---|---|---|---|---|
| Weighted score | 13.36 | 13.36 | 15.03 | 17.535 | 16.7 | 18.37 |
| RESCH-2 | .34 | 1.7127 | .41 | .80 | .7658 | 5208 |
| Borda raw score | 6.5 | 7 | 6.5 | 8.5 | 7 | 6 |
| Weighted score | 10.855 | 11.69 | 10.855 | 14.195 | 11.69 | 10.02 |
| VOTERS-PA | .38 | 1.6069 | .44 | .79 | .7681 | 5120 |
| Borda raw score | 11 | 11 | 10.5 | 5.5 | 8 | 10 |
| Weighted score | 18.37 | 18.37 | 17.535 | 9.185 | 13.36 | 16.7 |
| DRAW-LINES | .37 | 1.6625 | .44 | .79 | .7725 | 5202 |
| Borda raw score | 9.5 | 9 | 10.5 | 5.5 | 9 | 7 |
| Weighted score | 15.865 | 15.03 | 17.535 | 9.185 | 15.03 | 11.69 |
| CITIZEN-VOTERS | .34 | 1.7133 | .42 | .79 | .7575 | 5144 |
| Borda raw score | 6.5 | 6 | 8 | 5.5 | 4 | 9 |
| Weighted score | 10.855 | 10.02 | 13.36 | 9.185 | 6.68 | 15.03 |

In addition to the compactness metrics, there are five quality metrics relating to how well a map keeps political subdivisions intact:  counties split, county pieces, municipalities split, municipality pieces, and wards split.  Including a score for "ward pieces" would amount to double-counting, as Dr. DeFord's data reflect that no ward is split more than once.  The combined weight of these individual metrics will be set to approximately 10, in accordance with the decision mentioned above to give equal weight to compactness and respect for subdivision boundaries.  Still, it is something of a judgment call whether to consider these five quality metrics equally important and assign each a weight of 2.0.  In my view, doing so would diminish the importance of ward splits without constitutional warrant, as all types of subdivisions are listed in Article II, Section 16 on equal terms.  *See* PA. CONST. art. II, § 16 ("Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided[.]").

Separately, giving county splits and county pieces each a weight of 2.0 would involve double-counting as the number of county pieces will depend, to a large extent, on the number of split counties (and similarly for split municipalities and municipality pieces). To ameliorate these concerns, I am assigning a weight of 2.00 for county splits, 1.34 for

county pieces, 2.00 for municipality splits, 1.34 for municipality pieces, and 3.34 for ward splits.[13]  The total weight is 10.02, the same as the total weight for the compactness measures (6 x 1.67).[14]  The scores are set forth below in a manner similar to that for compactness:

| MAP | Counties split | County pieces | Municipali-ties split | Municipality pieces | Wards split |
|---|---|---|---|---|---|
| *Weight* | *2.00* | *1.34* | *2.00* | *1.34* | *3.34* |
| CARTER | 14 | 31 | 23 | 44 | 21 |
| Borda raw score | 8 | 7 | 2.5 | 1 | 5 |
| Weighted score | 16 | 9.38 | 5 | 1.34 | 16.7 |
| GRESSMAN | 15 | 32 | 19 | 36 | 15 |
| Borda raw score | 5 | 5 | 10.5 | 10.5 | 10 |
| Weighted score | 10 | 6.7 | 21 | 14.07 | 33.4 |
| GOV | 16 | 35 | 22 | 41 | 25 |
| Borda raw score | 2 | 1 | 4.5 | 4 | 1.5 |
| Weighted score | 4 | 1.34 | 9 | 5.36 | 5.01 |
| HB-2146 | 15 | 33 | 21 | 39 | 18 |

---

[13] The county and municipal pieces metrics include all pieces, not merely "extra" pieces. I note this because the data supplied by Dr. DeFord only includes the number for extra pieces.  For example, if a map splits, say, 20 municipalities into two pieces each, Dr. DeFord's data shows 20 split counties and 20 split pieces rather than 20 split counties and 40 split pieces.  The Borda counts will not change, however, as the ranking of maps according to the "pieces" metrics is the same regardless of whether all pieces, or only "extra" pieces, are counted.

As a separate matter, for consistency with the majority opinion, per Dr. DeFord's data the splits and pieces shown in the table include boroughs split by county lines.  *See* Majority Op. at 32.

[14] A reasonable argument could be made that these items should be weighted differently. One possibility would be to consider each type of municipality – cities, incorporated towns, boroughs, and townships – on equal terms.  But this could be distortive as there are different numbers of the different types of municipalities.  For example, Pennsylvania has only one incorporated town (Bloomsburg).  In the end, since counties are the basic sub-units of governance, and because splitting wards can be especially problematic, I am assigning a weight of 3.34 to counties, 3.34 to wards, and 3.34 to all other municipalities combined.

| | | | | | |
|---|---|---|---|---|---|
| Borda raw score | 5 | 4 | 6.5 | 5.5 | 7 |
| Weighted score | 10 | 5.36 | 13 | 7.37 | 23.28 |
| SEN-DEM-1 | 17 | 36 | 25 | 45 | 17 |
| Borda raw score | 0 | 0 | 0 | 0 | 8 |
| Weighted score | 0 | 0 | 0 | 0 | 26.72 |
| SEN-DEM-2 | 16 | 34 | 21 | 38 | 14 |
| Borda raw score | 2 | 2.5 | 6.5 | 7 | 11 |
| Weighted score | 4 | 3.35 | 13 | 9.38 | 36.74 |
| HOUSE-DEM | 16 | 34 | 24 | 43 | 21 |
| Borda raw score | 2 | 2.5 | 1 | 2 | 5 |
| Weighted score | 4 | 3.35 | 2 | 2.68 | 16.7 |
| RESCH-1 | 13 | 29 | 20 | 37 | 25 |
| Borda raw score | 10.5 | 10.5 | 8.5 | 8.5 | 1.5 |
| Weighted score | 21 | 11.39 | 17 | 11.39 | 5.01 |
| RESCH-2 | 13 | 29 | 20 | 37 | 24 |
| Borda raw score | 10.5 | 10.5 | 8.5 | 8.5 | 3 |
| Weighted score | 21 | 11.39 | 17 | 11.39 | 10.02 |
| VOTERS-PA | 15 | 31 | 23 | 42 | 41 |
| Borda raw score | 5 | 7 | 2.5 | 3 | 0 |
| Weighted score | 10 | 9.38 | 5 | 4.02 | 0 |
| DRAW-LINES | 14 | 30 | 22 | 39 | 16 |
| Borda raw score | 8 | 9 | 4.5 | 5.5 | 9 |
| Weighted score | 16 | 10.72 | 9 | 7.37 | 30.06 |
| CITIZEN-VOTERS | 14 | 31 | 19 | 36 | 21 |
| Borda raw score | 8 | 7 | 10.5 | 10.5 | 5 |
| Weighted score | 16 | 9.38 | 21 | 14.07 | 16.7 |

The final two steps are to compute the total weighted score for each map and select the one with the highest total. Doing so yields the following scores, from highest to lowest.[15] As can be seen, RESCH-1 is the top-scoring map, followed by DRAW-LINES:

---

[15] For the scoring in this opinion and the Appendix attached hereto, I have used a spreadsheet to facilitate the calculations. The weights, raw data, and raw Borda scores were entered manually. All other computations were performed by the spreadsheet program. All total weighted scores are rounded to two decimal places.

| MAP | Place | Total weighted score |
|---|---|---|
| RESCH-1 | 1 | 162.83 |
| DRAW-LINES | 2 | 158.83 |
| RESCH-2 | 3 | 142.79 |
| CITIZEN-VOTERS | 4 | 142.28 |
| GRESSMAN | 5 | 138.61 |
| VOTERS-PA | 6 | 121.92 |
| GOV | 7 | 114.06 |
| SEN-DEM-2 | 8 | 109.89 |
| HB-2146 | 9 | 81.66 |
| CARTER | 10 | 77.65 |
| SEN-DEM-1 | 11 | 38.41 |
| HOUSE-DEM | 12 | 33.74 |

I note that I used Dr. DeFord's data to align my scoring with the data used by the majority (supplemented where necessary).  To guard against possible distortion from the use of only one data set, I also scored the maps based on Dr. Duchin's table on page 141 of the Special Master's Report.  While there were slight variations in placement as among all twelve maps, the top two scoring maps remained the same:

| MAP | Place | Total weighted score |
|---|---|---|
| DRAW-LINES | 1 | 166.51 |
| RESCH-1 | 2 | 155.98 |
| RESCH-2 | 3 | 138.45 |
| CITIZEN-VOTERS | 4 | 134.60 |
| VOTERS-PA | 5 | 131.27 |
| GRESSMAN | 6 | 129.26 |
| SEN-DEM-2 | 7 | 116.57 |
| GOV | 8 | 113.89 |
| HB-2146 | 9 | 83.15 |
| CARTER | 10 | 68.80 |
| HOUSE-DEM | 11 | 42.42 |
| SEN-DEM-1 | 12 | 41.75 |

Thus, with Dr. Duchin's data the DRAW-LINES map was the top scorer, with RESCH-1 as the runner-up. As between those two maps, however, only RESCH-1 keeps Pittsburgh whole, whereas DRAW-LINES splits it in two.[16] If this factor were to be given weight as recommended by the Special Master, *see* Special Master Report at 150-51 (discussing evidence suggesting Pittsburgh should be kept within a single district); *see also id.* at 149 (finding that splitting Pittsburgh allows a map to achieve a higher compactness score), I would conclude that the RESCH-1 map should be chosen regardless of which data set is used.

In all events, the CARTER map does not come close to rising to the top of the pack. It seems notable, moreover, that, when compared with the other maps, the majority does not purport to find that the CARTER map scores particularly well on the neutral constitutional criteria on which the maps primarily compete, namely, compactness and respect for county and municipal boundaries. *See* Majority Op. at 28 n.23 (reflecting that the CARTER map is only a mid-level scorer in terms the compactness quality metrics listed); *id.* at 33 n.26 (same with regard to the split-municipalities quality metrics).

Whichever data set was used, the CARTER map placed tenth out of twelve – thus, in the bottom quartile. As the majority chooses that map for Pennsylvania, I respectfully dissent.

---

[16] With a population of approximately 302,000, Pittsburgh is the second-largest city in Pennsylvania, and it is the largest city that does not need to be split to maintain population equality among congressional districts. The third-largest city, Allentown, has a far-lower population – around 125,000 as of the 2020 census. *See* https://www.census.gov/quickfacts/allentowncitypennsylvania (last viewed Mar. 4, 2022). Therefore, and because of the distinctly local emphasis of Pittsburgh's political culture as described by the Special Master, there appears to be particular importance attached to the precept that Pittsburgh should not be split. The Appendix to this opinion reflects the weighted quality scores of the maps if the handling of Pittsburgh were to be subsumed as a quality metric. In that scoring, the RESCH-1 map scores highest.

APPENDIX

As suggested in the attached dissenting opinion, the Borda-count scoring system is versatile enough to subsume virtually any quality metric.  All that is needed is the ability to perform pairwise comparisons in reference to that metric.  The handling of Pittsburgh can be used to illustrate this concept.  Per the Special Master's report, it can be deemed best to keep Pittsburgh within a single district.  At the same time, keeping that city whole via a normal-looking district can be viewed as superior to keeping it whole by grabbing it with what the Special Master termed a "Freddy Krueger-like claw," which gives the appearance of gerrymandering.  Special Master Report at 152, 203.  Thus, one can construct three quality levels in the following descending order of desirability:  "whole," "claw," and "split."  In that event, the seven maps that keep Pittsburgh whole would receive a raw score of 8 because each is superior to five other maps and tied with six (5 + (0.5 x 6) = 8); the "claw" map would receive a raw score of 4 by being superior to the four maps that split Pittsburgh; and those last four maps (the ones that split Pittsburgh) would receive a raw score of 1.5 because each is tied with three other maps.  Giving the handling of Pittsburgh quality metric a weight of 4 (less than half as weighty as either of the neutral constitutional criteria which each received a weight of 10.02), the maps' handling of Pittsburgh can be folded into the scoring system with the following raw and weighted scores:

| MAP | Handling of Pittsburgh |
|---|---|
| *Weight* | *4.00* |
| CARTER | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| GRESSMAN | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| GOV | Split |
| Borda raw score | 1.5 |
| Weighted score | 6 |
| HB-2146 | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| SEN-DEM-1 | Split |
| Borda raw score | 1.5 |
| Weighted score | 6 |
| SEN-DEM-2 | Split |
| Borda raw score | 1.5 |
| Weighted score | 6 |
| HOUSE-DEM | Claw |
| Borda raw score | 4 |
| Weighted score | 16 |
| RESCH-1 | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| RESCH-2 | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| VOTERS-PA | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |
| DRAW-LINES | Split |
| Borda raw score | 1.5 |
| Weighted score | 6 |
| CITIZEN-VOTERS | Whole |
| Borda raw score | 8 |
| Weighted score | 32 |

When these weighted scores are added to the previous totals, the following ranking emerges:

| MAP | Place | Total weighted score |
|---|---|---|
| RESCH-1 | 1 | 194.83 |
| RESCH-2 | 2 | 174.79 |
| CITIZEN-VOTERS | 3 | 174.28 |
| GRESSMAN | 4 | 170.61 |
| DRAW-LINES | 5 | 164.83 |
| VOTERS-PA | 6 | 153.92 |
| GOV | 7 | 120.06 |
| SEN-DEM-2 | 8 | 115.89 |
| HB-2146 | 9 | 113.66 |
| CARTER | 10 | 109.65 |
| HOUSE-DEM | 11 | 49.74 |
| SEN-DEM-1 | 12 | 44.41 |

A similar ranking is generated when only the Dr. Duchin data are used:

| MAP | Place | Total weighted score |
|---|---|---|
| RESCH-1 | 1 | 187.98 |
| DRAW-LINES | 2 | 172.51 |
| RESCH-2 | 3 | 170.45 |
| CITIZEN-VOTERS | 4 | 166.60 |
| VOTERS-PA | 5 | 163.27 |
| GRESSMAN | 6 | 161.26 |
| SEN-DEM-2 | 7 | 122.57 |
| GOV | 8 | 119.89 |
| HB-2146 | 9 | 115.15 |
| CARTER | 10 | 100.80 |
| HOUSE-DEM | 11 | 58.42 |
| SEN-DEM-1 | 12 | 47.75 |

The above tables show that, when the handling of Pittsburgh is taken into account, the RESCH-1 map scores highest, followed by either the RESCH-2 map (using the Dr. DeFord data supplemented by the Dr. Duchin data) or the DRAW-LINES map (using only the Dr. Duchin data).  Moreover, the CARTER map is consistently in the bottom three even though it keeps Pittsburgh whole.

**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : | No. 7 MM 2022<br><br>ARGUED:  February 18, 2022 |
| Petitioners | : : : | |
| v. | : : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : : : | |
| Respondents | : : : | |
| ------------------------------------------------------ | : : | |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : : : | |
| Petitioners | : : : : | |
| v. | : : : : | |

LEIGH M. CHAPMAN, IN HER OFFICIAL      :
CAPACITY AS THE ACTING SECRETARY       :
OF THE COMMONWEALTH OF                 :
PENNSYLVANIA; JESSICA MATHIS, IN       :
HER OFFICIAL CAPACITY AS DIRECTOR      :
FOR THE PENNSYLVANIA BUREAU OF         :
ELECTION SERVICES AND NOTARIES,        :
                                       :
                 Respondents           :


## DISSENTING OPINION


|                          | OPINION FILED:  March 9, 2022 |
|--------------------------|-------------------------------|
| JUSTICE TODD             | DECIDED:  February 23, 2022   |

I dissent to the majority's selection of the Carter Plan as the congressional redistricting plan.

Initially, I observe that our Court was compelled to act in this matter because the General Assembly and the Governor failed to agree on a congressional redistricting plan in the aftermath of the 2020 Census, and a swift and final resolution of the legal and factual disputes surrounding the plan adopted by the Special Master was necessitated by the election timetable for the looming May 17, 2022 Primary Election.  As emphasized by the majority, this is not a task our Court sought, and, as a general matter, is one which our Court views as "unwelcome."  *See* Majority Opinion at 2 (quoting *League of Women Voters v. Commonwealth*, 178 A.3d 737, 823 (Pa. 2018) ("*LWV II*")).  Nevertheless, whenever the legislative and executive branches are at an impasse and unable to enact a redistricting plan into law, it falls to the judiciary as a coequal branch of our tripartite system of constitutional governance to determine an appropriate redistricting plan, and, when called upon, we will faithfully fulfill that solemn duty.  *LWV II*, 178 A.3d at 822.

In exercising that duty, I respectfully reject the majority's selection of the Carter Plan.  Rather, based on my analysis of the neutral constitutional criteria we set forth in

*LWV II*, I would select the plan developed by the "Gressman Math/Science" Petitioners – the "Gressman Plan" – as I consider it to most closely adhere to those neutral standards.[1]

I begin with some notable areas in which my views align with the majority. Like the majority, I disapprove of the rationale the Special Master used to justify adopting her chosen plan – H.B. 2146 – and I recognize that an examination of how well a congressional redistricting plan comports with the four neutral criteria our Court articulated in *LWV II*[2] is of paramount importance in any assessment of whether that plan provides each voter what is guaranteed them by the Free and Equal Clause of the Pennsylvania Constitution[3] – namely, that their vote is given full effect and not impermissibly diluted. *LWV II*, 178 A.3d at 816.

I likewise agree that the Special Master improperly accorded H.B. 2146 undue deference as "presumptively reasonable and legitimate" because, even though it was only a bill that never acquired the force of law (as it was vetoed by the Governor), in her view, it best represented the will of the voters among the competing plans. Report of the Special Master, 2/7/22, at 213-215. Respectfully, I find the Special Master's assertion unfounded, given that, under our Commonwealth's Constitution, and the duly enacted statutory framework governing the redistricting process promulgated thereto, the responsibility for approving a congressional redistricting plan is shared equally by the Governor and the General Assembly. *See LWV II*, 178 A.3d at 742 ("Pennsylvania's

---

[1] As the majority recognizes, and as I discuss below, any plan we pick must also satisfy the requirements of the federal Voting Rights Act, 52 U.S.C. § 10301. *LWV II*, 178 A.3d at 817 n.72.

[2] Congressional districts created under a redistricting plan must: (1) be compact; (2) be contiguous; (3) be as nearly equal in population as practicable; and (4) not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population. *LWV II*, 178 A.3d at 816-17.

[3] Pa. Const. art. I, § 5 (guaranteeing that all "[e]lections shall be free and equal.").

congressional districts are drawn by the state legislature as a regular statute, subject to veto by the Governor."). Because the Governor is elected by the voters of the entire Commonwealth, there is, therefore, no basis to regard his veto of the proposed plan in this matter as somehow less representative of the will of the people than the legislature's own enactment of that plan. H.B. 2146 therefore stands on equal footing with all other plans submitted to this Court – including the Governor's alternative proposed plan — namely, that it is a plan worthy of thoughtful consideration. It is not entitled to special weight merely because it was passed by the General Assembly, but never became law. *See Sixty-Seventh Minnesota State Senate v. Beems*, 406 U.S. 187, 197 (1972) (recognizing that, when a reapportionment plan is offered by the legislature but vetoed by the Governor, and the Governor offers his own plan which is not adopted by the legislature, both plans stand on an equal footing and are equally worthy of "thoughtful consideration.").

Further, the majority properly rejected the Special Master's automatic disqualification of plans which do not meet the mathematical minimum of a one-person deviation from the ideal district population. As the majority notes, a slightly greater deviation from the ideal population of plus or minus one person, resulting in a total deviation of two persons, is not, in and of itself, disqualifying. A marginally greater population deviation can be justified on the basis of "consistently applied legislative policies" that are nondiscriminatory, such as compactness, respect for municipal boundaries, preserving cores of prior districts, and avoiding contests between incumbent members of Congress. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

However, my agreement with the majority largely ends there. Most critically, in selecting the optimal redistricting plan from those before us, I disagree that, in this instance, we need to look beyond the constitutionally-specified neutral criteria, and

examine subordinate considerations. As the majority properly acknowledges, we recognized in *LWV II* that the four neutral criteria – contiguity, compactness, equal population, and splitting of political subdivisions – are the irreducible minimum requirements of Article I, Section 5 every redistricting plan must meet. *See LWV II*, 178 A.3d at 816. Indeed, as the majority aptly terms them, they are "core" requirements, and the other considerations our Court enumerated in *LWV II* such as preservation of communities of interest, preservation of prior districts, protection of incumbents, and partisan fairness are "*subordinate* historical considerations." Majority Opinion at 34 (emphasis added); *see also LWV II,* 178 A.3d at 817 ("We recognize that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment. However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." (citation omitted)). In my view, assessment of subordinate or secondary considerations such as partisan fairness, or whether a plan represents the least change from a prior congressional districting plan, is necessary *only* when a court must choose among various plans that are equal with respect to their compliance with the core criteria. Where, however, one plan is superior to all others, as measured by the closeness of its adherence to these criteria, I find it unnecessary for a court to consider the subordinate considerations. While I recognize that none of the submitted plans are perfect in this regard, I consider the Gressman Plan to best conform to the core criteria of all the plans submitted.

The Gressman Plan was crafted by a group of 12 professors of mathematics, statistics, computer science, geography, and data science who teach at Pennsylvania's institutions of higher learning, and who also live and vote in the Commonwealth.  *See* Petition for Review *filed in Gressman v. Chapman*, 465 M.D. 2021 (Pa. Cmwlth.).  As the Gressman Petitioners have described in their brief to our Court, they utilized a process known as computational redistricting, which, as a general matter, relies on raw population data and mathematical and statistical algorithms to generate maps based solely on neutral redistricting criteria.  *See* Gressman Brief in Support of Exceptions to Special Master's Report at 8 (citing, *inter alia*, Bruce E. Cain *et al.*, *A Reasonable Bias Approach to Gerrymandering: Using Automated Plan Generation to Evaluate Redistricting Proposals*, 59 Wm. & Mary L. Rev. 1521, 1536 (2018) (opining that constructing computational algorithms that create maps based on the neutral principles of "preservation of extant communities, compactness, contiguity, and adherence to one-person, one-vote guidelines" minimizes the influence of human bias in the map drawing process)).  In my view, the Gressman Plan, which was the product of this process, more closely adheres to *all* of the core criteria, collectively, than any of the plans currently before our Court, as measured by objective metrics.[4]

First, the Gressman Plan, like all the plans submitted to our Court, satisfies the requirement that its designated districts be contiguous.

---

[4] In making this assessment, as does the majority, I rely on the comprehensive comparison of Dr. Daryl DeFord of all of the plans which have been submitted to our Court.  *See* Majority Opinion at 24 (discussing DeFord analysis).

Second, the Gressman plan has the least minimum population deviation in congressional districts as is mathematically possible – one person – achieving ideal population equality of each district at 764,864 or 764,865 persons per district.

Third, with respect to compactness, which is a measure of the geographic or geometric regularity of the congressional districts created, the Gressman Plan is as good as or better than the other plans, and in particular the Carter Plan, according to four widely accepted statistical measures:  Polsby–Popper, Reock, Convex Hull, and Cut Edges. *See generally* Report of the Special Master, 2/7/22, at 25, 69, 77 (discussing measures); Stephen Ansolabehere *et al.*, *A Two Hundred-Year Statistical History of the Gerrymander*, 77 Ohio St. L.J. 741, 746 (2016) (discussing Polsby–Popper, Reock, and Convex Hull measures); Expert Report of Moon Duchin, 1/24/22, at 6 (Exhibit A to Exceptions of Governor Wolf) (discussing Cut Edges measure).  While I observe that some of the other submitted plans yield slightly more compact valuations on individual measures, there is, as the majority notes, tension between assuring compactness and minimizing political subdivisions splits.  *See* Majority Opinion at 28 ("It is easily comprehended that adherence to county and city lines will decrease compactness because many of the boundaries follow geographic features such as rivers, which meander across our Commonwealth.").

In that regard, and finally, the splitting of political subdivisions, as a general proposition, has a particularly pernicious effect in diluting the vote of the residents of those subdivisions, and is to be scrupulously avoided unless absolutely necessary to maintain

equality of population.[5]  *LWV II,* 178 A.3d at 815.  The Gressman Plan is superlative in that regard.  Dr. DeFord's analysis shows that, overall, the Gressman plan divides only 49 political subdivisions, which is 2 fewer than the next best plan in this category, the Senate Democratic Caucus Plan (which, unlike the Gressman Plan, splits the City of Pittsburgh).  As compared to H.B. 2146, the Gressman Plan divides 5 fewer political subdivisions, and it divides 9 fewer political subdivisions than the Carter Plan, which also divides one more city — Harrisburg — than does the Gressman Plan.

Consequently, the Gressman Plan, uniquely, has the twin salutary benefits of maintaining perfect population equality among congressional districts, while preserving the most number of intact political subdivisions within those districts.  This establishes, in my view, the plan's superiority over all the others which our Court has considered.[6]

For these reasons, I would have selected the Gressman Plan.  Accordingly, I respectfully dissent.

---

[5] In this regard, I agree with the majority that our Constitution does not set forth a hierarchical preference of the various types of enumerated political subdivisions which should be protected against splitting.  *See* Majority Opinion at 33.  As the majority notes, plans must be scrutinized to ensure that, as a whole, the number of political subdivision splits are minimized in accordance with consideration of all relevant objective criteria.  *Id.*
[6]  There is no suggestion by any of the parties that the Gressman Plan, which yields at least two majority-minority districts, is violative of the Voting Rights Act, *see supra* note 1, and I discern no such violation on the basis of this record.